# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of Southwest Corporate Federal Credit Union, and Members United Corporate Federal Credit Union, | ) ) ) ) ) | |
| | ) | Case Nos.  13 Civ. 6705 (DLC) |
| | ) | 13 Civ. 6719 (DLC) |
| Plaintiff, | ) | 13 Civ. 6721 (DLC) |
| | ) | 13 Civ. 6726 (DLC) |
| v. | ) | 13 Civ. 6727 (DLC) |
| | ) | 13 Civ. 6731 (DLC) |
| MORGAN STANLEY & CO., INC. and | ) | 13 Civ. 6736 (DLC) |
| MORGAN STANLEY CAPITAL I INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| And other NCUA cases. | ) | |
| | ) | |

**Expert Report of Charles D. Cowan, Ph.D. Regarding the
Selection of Statistically Reliable Random Samples of Mortgage Loans**

April 4, 2014

## I.  Introduction

1.      I was retained by Korein Tillery LLC and Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., counsel for the National Credit Union Administration Board ("NCUA"), to design a methodology for selecting statistically reliable random samples of loans from the Supporting Loan Groups ("SLGs") backing 82 unique Certificates purchased by NCUA from 75 securitizations of residential mortgage loans (the "Securitizations") at issue in these Actions.[1]

2.      Statistical sampling is a common and scientifically accepted methodology used for research and other purposes, including legal proceedings.  Courts routinely rely on statistical sampling to establish liability and damages.  Moreover, statistical sampling, as a scientific methodology, has been generally accepted in the scientific community for over one hundred years. There is a wide body of peer-reviewed literature in the field of statistics that discusses the utility of using statistical sampling to estimate results in a particular population based on results from a sample of that population.  There have been countless applications of statistical sampling in academia, government, and business.

3.      Statistical sampling has been used to value and assess portfolios of loans by the government and businesses alike.  For example, federal regulators often examine a sample of loans held by financial institutions to determine whether the financial institution is in compliance with its statutory and regulatory requirements.  Similarly, private businesses routinely use sampling to review and assess pools of mortgage loans, for example, to assess credit quality, compliance with regulatory requirements and other laws, and adherence to internal policies and procedures.

4.      In order to obtain a statistically reliable sample of loans for each of the Securitizations at issue in these cases, I have chosen a random sample of 100 loans from the populations of loans in the SLGs for the 82 unique Certificates (the "Populations").  I understand

---

[1]      The Offerings are identified in Appendix 2.

that NCUA will obtain the loan files for the loans that are randomly selected in order to re-underwrite them.

5.      This sample size of 100 loans is sufficiently large to draw conclusions about the Populations and specifically to make a scientifically reliable estimate of the number of Misrepresented Loans (*i.e.*, loans inconsistent with representations made in the offering documents) in each Population.  Regardless of the number of loans in each Population, a sample size of 100 loans will yield results at a 95 percent confidence level with a maximum margin of error of +/- 10 percent.  A 95 percent confidence level is standard in statistics and has been accepted by courts as scientifically valid in a number of similar actions.  A margin of error of +/- 10 percent is sufficiently precise for the purpose for which sampling is being used in this case.  In addition, prior to drawing the samples, I stratified the loans in each Population by Fair Isaac Corporation ("FICO") credit score, which will likely reduce the maximum margin of error below +/- 10 percent.  An increase in sample size to reduce the margin of error further would not significantly improve the determination of whether the statements in the offering documents were false, and any such increase in sample size would yield diminishing returns.  Likewise, use of additional stratification variables would not necessarily reduce the margin of error and could introduce other issues complicating the extrapolation of the sample to the Population.

6.      Because of the possibility that NCUA will not be able to obtain certain loan files, which typically are in the possession of defendants, defendants' affiliates, or third parties, I also selected an additional 100 loans for each SLG.  The goal is to re-underwrite the initial sample of 100 loans.  However, the additional 100 loans will be available as substitutes for loans from the initial sample that are missing.  The second set of 100 loans was ordered using a set of random numbers.  As a result, the loans selected as substitutes for any missing loan files are preordained but randomly selected.  A more detailed description of this process is given in the body of the Report.

- 2 -

7.     The initial and backup 100-loan samples are representative of the Populations and unbiased.  I have tested the representativeness of the proposed samples against the Populations on eleven key variables (or as many of those eleven as are available) from the loan tapes,[2] which allows me to confirm a high level of correspondence between the characteristics of the sampled loans and their respective Populations.  Once the re-underwriting of the loan files for each sample is complete, I will be able to extrapolate from the samples to the Populations using established methods.

8.     After extrapolation, the fact finder will be able to determine liability for any one Securitization with a known level of accuracy because of the computation of the confidence level and the margin of error.  It also will be possible for the fact finder to determine liability for the combined set of Securitizations in any particular case with a much higher level of confidence.

## II.  Professional Qualifications and Compensation

9.     I have over forty years of experience in statistical research and design.  I received my Bachelor of Arts degree in Economics from the University of Michigan, my Master of Arts degree in Economics from the University of Michigan, and my doctorate in Mathematical Statistics from the George Washington University.  I currently consult for numerous public and private sector entities on the design, implementation, and evaluation of research, and the synthesis of statistical and sampling techniques for measurement.  My professional experience and academic tenure are included in my curriculum vitae, a true and correct copy of which is attached as Exhibit 1.

### A.  Professional Experience

10.     I have designed some of the largest and most complex research programs incorporating sampling that were conducted by the federal government, including:  the Post Enumeration Program conducted by the Bureau of the Census to evaluate the 1980 Decennial

---

[2]     Loan tapes are collections of data identifying each loan included in a securitization by its loan number and providing various characteristics of the loan.  These tapes typically include the loan-to-value ratio, the borrower's FICO credit score, the property ZIP code, documentation type, and the borrower's occupancy status, among other characteristics.

Census, the Economic Cash Recovery valuations conducted by the Resolution Trust Corporation ("RTC") from 1990 to 1995, and many evaluation studies conducted for the Department of Justice, the Department of Defense, the Department of Housing and Urban Development ("HUD"), and the Department of Treasury.

11.     I have also provided expert advice to corporations and government agencies on the incorporation of complex research designs in demographic and economic measurement problems. My most significant matters include the following:

- Development of procedures used by the RTC and the Federal Deposit Insurance Corporation ("FDIC") for determining the value of all assets held by the RTC/FDIC taken from failed banks and savings and loan associations. This involved sampling and reviewing 10,000 loans per quarter to determine their value. Results from the extrapolation of the samples were used in quarterly reports to Congress on the loss to the American taxpayer that resulted from these failures. The RTC and FDIC also used these estimates of anticipated recoveries on assets for financial reporting. As a result of this work, the Government Accountability Office awarded these agencies their first clean opinions from its annual review of agency financial statements.

- Application of econometric and biometric procedures for measuring credit risk in large portfolios of loans for the FDIC, Regions Bank, Option One, and Providian. Frequently these model-based techniques are combined with the results of sample reviews to improve the reliability of evaluations of portfolios. These models are used for a variety of purposes within financial institutions, such as the pricing of loans, the long-term management of customers, decision-making on workouts for delinquent loans, and the establishment of economic and regulatory reserves.

- Model fitting and development of projection methods for the FDIC and PricewaterhouseCoopers to measure the likelihood of loss or errors in recording loans held by banks or put up for auction; measurement of the likelihood of fraud and/or noncompliance in systems, including bank holding companies, trading activities for brokers, and systems for compliance with health department and judicial requirements. These model-based techniques are combined with the results of sample reviews to improve the reliability of evaluations of portfolios.

- Establishment of audit and sampling methods to determine the completeness and accuracy of reporting and record systems. These procedures are used to both expand and streamline bank examinations for safety and soundness and also compliance measurement for the FDIC. These sampling techniques are applied in the audit of federal agencies concerned with regulatory review of operations and systems, and related systems for banks, regulatory agencies, and law firms.

- 4 -

- Evaluation of sample surveys conducted for the Department of Defense, the National Institutes of Health, the Department of Agriculture, the Department of Education, and the Department of the Treasury, each in response to Congressional inquiries on the validity of results in reports to Congress on activities in these agencies.

- Development of procedures used by the Bureau of the Census to apportion the population for revenue sharing purposes and to estimate the undercount in the Decennial Census of Population and Housing.  These procedures include application of sample-based, capture-recapture methods to measure the size of the undercount in the decennial census, use of network sampling as an alternative measure for population size, and measurement of the accuracy of data collected in the Census.

- Development of statistical methods to quantify the size of populations, including: nomadic populations for the Census of Somalia; the under-count and over-count in the Census of Egypt; the number of missing children in Chicago, Illinois; and, the number of homeless persons and families needing services in several large cities with transient populations.

12.     From January 2002 to the present, I have been the Managing Partner of Analytic Focus, LLC.  My firm provides expert witness and consulting services in litigation.  My firm also has several non-litigation projects with the federal government, and has assisted banks in evaluating the value and stability of their loan portfolios.  A list of cases in which I have given expert testimony during the previous 4 years is attached as Exhibit 2.  My most significant matters include the following:

- I served as a statistical sampling expert in *MBIA Insurance Corp. v. Countrywide Home Loans, Inc., et al.*, Index No. 602825/2008 (N.Y. Sup. Ct. Aug. 24, 2009), a case that recently settled in the Supreme Court of the State of New York and which involved allegations of material misrepresentations and omissions regarding loan characteristics that are similar to the allegations in these matters.  In *MBIA*, I constructed for Plaintiff MBIA statistically valid random samples of mortgage loans from over 368,000 loans underlying fifteen securitizations.  In 2010, the court accepted the sampling and extrapolation methodology that I formulated, and the samples have been used as the basis for re-underwriting review and to estimate damages.

- I served as a statistical sampling expert in *In re Washington Mutual Mortgage Backed Securities Litigation*, No. C09-37 MJP (W.D. Wash. July 23, 2012), which was also a residential mortgage backed security ("RMBS") action in federal court in the Western District of Washington.  In *Washington Mutual*, I constructed a statistically valid random sample of mortgage loans from 13,425 mortgage loans underlying six offerings.  In July 2012, the court accepted the sampling and extrapolation methodology that I proposed on behalf of Plaintiffs Policemen's Annuity and Benefit Fund of the City of Chicago and Boilermakers National

Annuity Trust.  The samples have been used as the basis for re-underwriting review, and my extrapolation was admitted as evidence of liability.  This case has been resolved.

- I currently serve as a statistical sampling expert in sixteen RMBS actions brought by the Federal Housing Finance Agency ("*FHFA*") pending in the United States District Court of the Southern District of New York[3] concerning allegations of material misrepresentations and omissions regarding loan characteristics similar to the allegations in these matters.  In *FHFA*, I developed a statistically valid random sampling methodology to draw statistically reliable samples from approximately 1,172,876 loans underlying 449 securitizations.  The court accepted my sampling methodology and the samples I proposed as the basis of the re-underwriting review and extrapolation analyses.

- I currently serve as a statistical sampling expert in 10 RMBS actions with similar claims brought by MassMutual pending in federal court in the District of Massachusetts.[4]  In these actions, I developed a statistically valid random sampling methodology to draw statistically reliable samples from approximately 278,689 loans underlying 121 Certificates.

- I currently serve as a statistical sampling expert in five RMBS actions coordinated in an MDL for discovery purposes.[5]  I have also developed statistically valid random sampling methodologies to draw statistically reliable samples in these cases.

- I currently serve as a statistical sampling expert in *Federal Home Loan Bank of Chicago v. Banc of America Securities LLC*, Case No. 10-2-36526-5 SEA (King Cnty. (Wash.) Super. Ct.) concerning allegations of material misrepresentations and omissions regarding loan characteristics similar to the allegations in these matters.  In these actions, I developed a statistically valid random sampling methodology to draw statistically reliable samples from approximately 33,860 loans underlying five offerings.

- From 2003 to 2005, for Regions Bank, I took a sample of small business loans and evaluated the safety ratings that Regions Bank had assigned to these loans.  Regions Bank relied on my work to pass an examination and review conducted by the Federal Reserve and the FDIC, in their capacity as regulators of the bank.

- For Option One, a mortgage originator, I evaluated in 2001 to 2002 their portfolio of loans and developed models to forecast prepay and default rates for residential mortgages.

---

[3]  The case numbers are:  11 Civ. 5201 (DLC), 11 Civ. 6188 (DLC), 11 Civ. 6189 (DLC), 11 Civ. 6190 (DLC), 11 Civ. 6192 (DLC), 11 Civ. 6193 (DLC), 11 Civ. 6195 (DLC), 11 Civ. 6196 (DLC), 11 Civ. 6198 (DLC), 11 Civ. 6200 (DLC), 11 Civ. 6201 (DLC), 11 Civ. 6202 (DLC), 11 Civ. 6203 (DLC), 11 Civ. 6739 (DLC), 11 Civ. 7010 (DLC), and 11 Civ. 7048 (DLC).

[4]  The case numbers are: 11-cv-30039-MAP, 11-cv-30044-MAP, 11-cv-30047-MAP, 11-cv-30048-MAP, 11-cv-30094-MAP, 11-cv-30126-MAP, 11-cv-30127-MAP, 11-cv-30141-MAP, 11-cv-30125-MAP, and 11-cv-30285-MAP.

[5]  These cases are *Allstate Insurance Company v. Countrywide Financial Corporation*, 11-cv-005236-MRP; *Massachusetts Mutual Life Insurance Company v. Countrywide Financial Corporation*, 11-cv-10414-MRP; *Minnesota Life Insurance Company v. Countrywide Financial Corporation*, 12-cv-06149-MRP; *National Integrity Life Insurance Company v. Countrywide Financial Corporation*, 11-cv-09889-MRP; and *Federal Deposit Insurance Corporation as Receiver for United Western Bank, F.S.B.*, 11-cv-10400-MRP. These cases have been consolidated as part of *In re Countrywide Financial Corp. Mortgage-Backed Securities Litigation*, 2:11-ML-2265-MRP-(MANx) (C.D. Cal.).

- For the FDIC, from 2002 to 2006, I selected samples of depositor records from a sample of banks that had been closed between 1990 and 2002, and conducted an analysis of the amount of time and effort required to close a very large bank and the problems associated with paying off depositors.  This work was used by the FDIC to streamline the processes it used to close banks and to pay depositors.

- For the Office of Personnel Management ("OPM"), from 2004 to the present, I redesigned the sampling system used by the OPM and KPMG for the audit of the Civil Service Retirement System and the Federal Employee Retirement System.  Each year, I am responsible for sampling records from four funding systems used by OPM to determine the safety and soundness of these funds.  My reports also are used to fulfill the requirements of the Improper Payments Act.

- In 2010 and 2011, I developed a methodology for the National Institutes of Health ("NIH") for the construction of sampling frames of physicians, health workers, and others involved in health-related fields.  My report, published by the NIH, serves as guidance to all 23 NIH agencies on methods for sample frame construction, sampling, and estimation for any research conducted by the NIH.

- From 2006 to the present, I have maintained a staff responsible for all quality control on litigation support work done by outside vendors hired by the Department of Justice in civil cases.  This staff designs and implements sampling plans that are used to conduct the quality control assessments.

- For the Small Business Administration, I conducted a 2005 study involving a sample of banks used to determine the manner in which banks evaluate the creditworthiness of small businesses.  The data from my research has been used by the Federal Reserve in its review of credit availability to small businesses and by the House Subcommittee on Banking.

- I have been retained as a statistics expert witness or consultant in connection with litigation involving antitrust claims, deceptive sales practices, environmental toxic tort, insurance and reinsurance, trademark and trade dress confusion, and class actions on behalf of defendants and plaintiffs.  I have relied on statistical sampling in cases as disparate as wrongful death cases and antitrust cases.

13.     From November 1999 to December 2001, I was a Director at the Analysis Research Planning Corporation ("ARPC"), an economic and management consulting firm that provides statistical, econometric, economic and financial analysis, strategic advice and expert testimony to a wide variety of clients facing uncertainty, potential litigation, and other disputes.  My work involved the development of new forecasting models for present and future claims in asbestos cases, and the analysis of alleged diminution of value in toxic tort cases.

14.     From January 1997 to November 1999, I was a Director at Pricewaterhouse Coopers, LLP responsible for managing the financial research group in the Survey Research Center ("SRC") and in the Data Mining Group.  Research efforts in the SRC were in support of business-to-business consumer research and for the federal government to research regulatory impact.  The Data Mining Group provided fraud detection services for financial services organizations, optimization research for businesses concerned with supply chain issues in production, and analysis of delivery systems for a number of major delivery companies.

15.     From 1991 to 1996, I was the Chief Statistician for the FDIC and the RTC.  During this time, I was responsible for all research on valuation of properties and assets taken in by the FDIC and RTC in the banking crisis of the 1980's and 1990's.  I supported research concerning fraud, optimization of contracts with servicing companies, and consumer perceptions of their interactions with banks and savings and loans.  I designed the sampling processes used for routine bank examinations, the sampling processes for banks under consideration for closure, and sampling processes for bank resolutions where the bank was closed and sold to an acquiring bank.  I prepared and jointly presented results on the FDIC's consumer research to Congress, specifically the House Banking Committee, in hearings regarding how consumers perceive what they are told regarding retail transactions in banks.

16.     During this time, I also served on a number of independent review committees for different federal agencies to evaluate the quality of research conducted or proposed by the National Institutes of Health, the Department of Health and Human Services, the Department of Justice, the Department of Treasury, and the Department of Agriculture.  These committees were formed specifically to determine whether research presented to the federal government could support conclusions drawn and to consider whether research proposed in grant applications would be adequate to study the topic in question.

17.     From 1989 to 1991, I was the Chief Statistician for the Opinion Research Corporation (the "ORC").  At the ORC, I designed samples and analytic methods by which financial institutions could incorporate external information in aid of their efforts to increase deposits and marketing of non-FDIC-insured products.  I also designed the sampling and estimation procedures used by the United States Postal Service to measure operational efficiency and consumer satisfaction for all post offices in the United States.

18.     From 1986 through 1989, I was the first Chief Statistician for the National Center for Education Statistics ("NCES"), an agency within the Department of Education.  As the Chief Statistician, I was responsible for the design of all surveys and research conducted by NCES, for reports to Congress on the state of education in the U.S. and around the world, and for staff development in research methods.  In particular, under my guidance, NCES was one of the first federal statistical agencies to publish standards for operations and research.  These standards are still mandatory for NCES staff and for all contractors working with the NCES.

19.     I also held a variety of positions at the U.S. Bureau of the Census, including Chief of the Survey Design Branch, where I was responsible for the technical aspects of all research conducted on the evaluation of surveys and the 1980 Decennial Census.  I also designed research studies on the validity of surveys conducted by the Census Bureau and experiments to measure response validity.  I helped a number of countries develop evaluation protocols for their economic and demographic research programs.

**B.  Experience in Academia**

20.     I teach graduate and undergraduate courses in sampling theory, survey methods, statistics, and computer methods for analysis.  I am currently an Adjunct Full Professor in the Department of Biostatistics in the School of Public Health at the University of Alabama in Birmingham.

21.      I also served as an Associate Professor of Statistics at George Washington University from 1993 to 1998, and served as a Visiting Research Professor at the Survey Research Laboratory of the University of Illinois from 1983 to 1989.

### C.  Publications

22.      I have co-authored two books:  one on evaluation of survey and census methods and one on econometric measures related to the welfare of the U.S. economy.  I also have written numerous articles on statistical methods, sampling, rare and elusive population research, and optimization techniques.  A listing of these publications is included at pages 4 to 7 of my curriculum vitae, attached as Exhibit 1.

23.      A number of these publications pertain to the use of statistical sampling and/or financial analysis in connection with lending institutions and loans.  *See* Adrian M. Cowan & Charles D. Cowan, *Default Correlation: An Empirical Investigation of a Subprime Lender*, J. Banking & Fin. (Mar. 2004); Charles D. Cowan & Adrian M. Cowan, *A Survey Based Assessment of Financial Institution Use of Credit Scoring for Small Business Lending* (U.S. Small Bus. Admin., Office of Advocacy Rep. No. 283, Nov. 2006); Adrian M. Cowan & Charles D. Cowan, *The Dynamics of Credit Quality and Implications for the Pricing of Small Business Loans*, 5 Int'l J. Banking & Fin. 31 (2008).

### D.  Professional Societies

24.      I am a member of the following professional societies:  (i) American Statistical Association ("ASA"); (ii) American Association for Public Opinion Research ("AAPOR"); and (iii) International Association of Assessing Officers.  My positions on various professional committees are listed on page 3 of my curriculum vitae, attached as Exhibit 1.

25.      I have held a number of positions with the ASA.  From 1980 to 1981, I served as the Chair of the Committee on Privacy and Confidentiality; from 1989 to 1990, I served as the Program Chair of the Section on Survey Research Methods; and, from 1995 to 2000, I served as the ASA's

representative to the Research Industry Coalition.  I also served as the President of the Research

Industry Coalition from 1999 to 2000.

26.      I have also held a number of positions with the AAPOR.  From 1982 to 1989, I

served as the Chair of the Conference Committee; from 1984 to 1985, I served as the Associate

Secretary-Treasurer; from 1985 to 1986, I served as the Secretary-Treasurer; and, in 1998, I served as

the President of the Washington/Baltimore Chapter of AAPOR.

### E.  Compensation

27.      I am being compensated for my work on this engagement at the rate of $595 per

hour for my time for non-testimony and $695 per hour for testimony.  The payment of my fees is

not contingent on the opinions I express in connection with this action.

### F.  Supporting Documentation

28.      The documents on which I relied in forming my opinions are listed in Exhibit 3.

### III. Summary of Opinions

29.      Use of a statistically reliable sample of loans allows the unbiased and precise

estimation of the rate of false statements and omissions concerning the loan populations in the

offering documents used in connection with each Securitization.  I understand that NCUA proposes

to use sampling to establish the falsity of the statements in the offering documents regarding

whether loans were originated consistent with representations made in the offering documents,

including representations about the loan-to-value ("LTV") or combined loan-to-value ("CLTV")

ratios, the applicable underwriting guidelines, and the adequacy of underwriting exceptions and their

justifications.

30.      I understand that this case involves 82 unique Certificates purchased by NCUA from

75 Securitizations, and that the 82 unique Certificates are collateralized by 79 unique SLGs that

include approximately 286,027 loans.[6]  Depending on the Securitization, the Certificates may be collateralized by a single SLG or multiple SLGs.  The same SLGs may collateralize different Certificates in a Securitization.

31.     I selected a random sample of 100 loans from the SLGs supporting 81 of the 82 unique Certificates (collateralized by 78 of the 79 unique SLGs) purchased by NCUA in the Securitizations, and I supplemented the initial 100 loans with a second random sample of another 100 loans from the SLGs.  The initial and backup samples for those 78 unique SLGs consist of 15,600 loans.[7]  A loan tape is presently unavailable for the 79th SLG.  *See infra* ¶ 56.

32.     The first 100 loan sample is designated as the sample of loans to be re-underwritten. In anticipation of missing loan files and a desire to maintain the sample size of 100 loans re-underwritten, the second "backup" sample is available should substitutions be necessary to replace loans in the first sample that are missing loan files.  If a loan file is missing from the first 100 loan sample, the next available loan in sequence in the second "backup" sample will be selected.

33.     The initial sample of 100 loans and the backup sample of 100 loans are both representative of the Population of loans.  The sample size of 100 re-underwritten loans will enable NCUA to estimate, per Certificate, at a 95 percent confidence level with a margin of error of at most +/- 10 percentage points, the percentage of loans as to which the offering documents contained false statements, *e.g.*, number/percentage of loans that had LTV ratios above values specified in the offering documents.  This sample size of 100 loans yields a 95 percent confidence level, which is standard in statistics and a maximum margin of error of 10 percentage points, which is sufficiently precise for the purpose.  Increasing the sample size to decrease the margin of error would also result in diminishing returns.  *See infra* ¶¶ 59-62.

---

[6]     To the extent Defendants provide new Loan Tapes, this number may change slightly.

[7]     The loans comprising each initial sample of 100 loans and the second supplemental sample of 100 loans are listed in Appendix 2.

34.     I have also stratified the sample by FICO credit score to make it possible to reduce the margin of error.  Stratification by FICO score cannot increase the margin of error.  Stratifying by additional variables would not necessarily reduce the margin of error and could introduce other issues complicating the extrapolation of the sample to the Population.  *See infra* ¶¶ 63-64.

35.     Once re-underwriting of the loan files is complete, I will be able to extrapolate from the samples to the Populations of loans using well-established methods.

## IV. Background on Statistical Sampling

### A.  Key Concepts in Statistical Sampling:  Confidence Level, Margin of Error, and Stratification

36.     Statistical sampling is often referred to as "probability sampling."  The population refers to the group about which we wish to draw inferences, and the sample is a defined subset of that population.  When a sample is randomly selected — that is, when each member of the population from which the sample is drawn has a known chance of being included in the sample — the sample provides an unbiased view of the population.

37.     The precision — or reliability — of a sample is measured using the confidence level and the margin of error.  *See* Shari Seidman Diamond, Reference Guide on Survey Research in Reference Manual on Scientific Evidence 359, 380 (Fed. Jud. Ctr., 3d ed. 2011) ("In all forms of probability sampling, each element in the relevant population has a known, nonzero probability of being included in the sample. . . .  Probability sampling offers two important advantages over other types of sampling.  First, the sample can provide an unbiased estimate that summarizes the responses of all persons in the population from which the sample was drawn; that is, the expected value of the sample estimate is the population value being estimated.  Second, the researcher can calculate a confidence interval that describes explicitly how reliable the sample estimate of the population is likely to be.").

38.     The confidence level refers to the percentage of time that the actual value for the population will be within a specified range around the sample value.  The margin of error describes that specified range around the estimated value from the sample.  For example, if the results of testing on the sample indicate that 50 percent of the mortgage loans were not originated in accordance with underwriting guidelines, then a confidence level of 95 percent with a +/- 10 percent margin of error means that the statistical probability is 95 percent that the true percentage of loans not originated in accordance with underwriting guidelines in the population will be between 40 and 60 percent.  This range is known as the confidence interval.

39.     When a sample is used to test a binary question (here, whether a loan was originated outside of the guidelines, or whether the LTV ratio of the loan was misrepresented), the estimate of the margin of error depends on the sample value.  The estimated margin of error (for a binary question) is greatest when the sample value is at 50 percent (here, for 50 percent of the loans in the sample, there were false statements or omissions in the offering documents concerning the LTV ratio or adherence to underwriting guidelines).  As the sample estimate deviates from 50 percent, in either direction, the margin of error for that estimate decreases.  This variation in margin of error, as sample estimate changes, is described below.  *See infra* ¶¶ 61-62.

40.     Although a sample drawn purely at random from within a population is statistically reliable, one can improve the representativeness and reliability of the sample by stratifying the population and selecting the random sample from within the strata created.  *See, e.g.*, Steven K. Thompson, Sampling 117-127 (2nd ed. 2002); Paul S. Levy & Stanley Lemeshow, Sampling of Populations: Methods and Applications 121-189 (3rd ed. 1999); William G. Cochran, Sampling Techniques 89-146 (3rd ed. 1977); W. Edwards Deming, Sample Design in Business Research 276-358, 487-493 (1960).  Stratification is a process where the population of loans is divided into

mutually exclusive and exhaustive subgroups of loans. Stratification can only be carried out using variables known for the entire population prior to sampling.

41.     Stratification commonly is used in sampling for two purposes. The first purpose is to increase the precision of the estimates from the sample. What is calculated from the sample is an estimate of the value in the population. The estimate has a margin of error due to sample-by-sample variability, which is directly related to the variability of the data being examined. When using a stratified sample, this variability is partitioned into two parts. The first part is the variability between the strata. The second part is the variability within each of the strata. Variability between strata is eliminated by forcing the sample into these separate subgroups a priori, leaving only the second part of the variability. Stratification does not guarantee a diminution in the margin of error; it makes the diminution possible.

42.     The second purpose of stratification is inapplicable here. Stratification can ensure that some subgroups in the population are included in sufficient numbers so that it is possible to make separate estimates for each of the subgroups. This purpose of stratification does not apply here because the relevant inquiry instead is whether there were misrepresentations and omissions in the offering documents regarding the SLGs as a whole, not a subset of loans within those SLGs.

**B. Statistical Sampling Is Scientifically Valid**

43.     A wide body of peer-reviewed literature in the field of statistics discusses the utility of statistical sampling for making reliable estimates of parameters in large populations of entities. *See*, *e.g.*, Thompson, *supra*; Reference Manual on Scientific Evidence (Fed. Judicial Ctr., 3d ed. 2011); Levy & Lemeshow, *supra*; Dan M. Guy, D. R. Carmichael, & O. Ray Whittington, Audit Sampling: An Introduction (4th ed. 1998); Leslie Kish, Statistical Design for Research (1987); Herbert Arkin, Handbook of Sampling for Auditing and Accounting (3d ed. 1984); Statistical Sampling Subcommittee of American Institute of Certified Public Accountants, Audit Sampling (1983);

Jaroslav Hájek, Sampling from a Finite Population (Václav Dupač & D.B. Owen eds., 1981);

Cochran, *supra*; Des Raj, Sampling Theory (1968); Deming, *supra*; Price Waterhouse, Audit Guidance

Series: Audit Sampling (1989).

44.    In addition, statistical sampling has been used successfully for hundreds of years as a

research tool.  Results from statistical sampling are replicable, meaning that statistical sampling

meets the basic requirement to be a scientific method.

45.    There have been numerous applications of statistical sampling in academia, business,

and government.  For example, the nation's largest statistical agency, the United States Census

Bureau, is authorized to base its surveys, including those on the extent of unemployment and the

cost of living index, on statistical samples.

46.    Statistical sampling has also been widely employed in the American legal system.  I

have testified in over 50 cases, and statistical sampling was accepted as scientifically valid in each of

those cases in which a sample was used.  Outside of my personal experience, courts routinely

approve the use of statistical sampling in cases in which claims as diverse as breach of contract,

fraud, antitrust, trademark infringement, or torts are at issue.  One commentator has characterized

the Census Bureau's reliance on sampling as a "great step forward" in "the law's gradual acceptance

of sampling," because Census Bureau reports "were admissible at common law and in some states

by special statutes."  Hans Zeisel & David Kaye, Prove It with Figures: Empirical Methods in Law

and Litigation 101 (1997).  Shari Seidman Diamond, who authored the "Reference Guide on Survey

Research," which is part of the Federal Judicial Center's Reference Manual on Scientific Evidence,

has identified Census Bureau data and the Standard Table of Mortality (used to present average life

expectancy) as examples of sample surveys that "are so well accepted that they even may not be

recognized as surveys."  Diamond, Reference Guide on Survey Research, in Reference Manual on

Scientific Evidence 359, 365 n.18.

47.     The development of statistical sampling is grounded in mathematics and is not focused on the type of entity being sampled, but instead applies universally across any entity that can be counted.  The accepted techniques of statistical sampling are the same regardless of the population being sampled, whether it consists of widgets, tires, people, or loan files.  This principle results in a truism regarding the precision of the sample:  The precision of the sample can always be quantified when the methodology is random sampling and the sample is random.  Indeed, the result of random sampling should be expressed only as a value accompanied by a confidence interval.  Thus, it is as accurate to sample produce for spoilage as to sample loans for noncompliance with guidelines, and the sampling range in each case will be quantifiable and reviewable in the same way.

**C.  Statistical Sampling Is Routinely Used in the Financial and Mortgage Industries**

48.     Statistical sampling has been used by the government and private businesses to value and assess pools of loans.

49.     Federal regulators, who are charged with examining loans and other activities at the financial institutions they regulate, look at a sample of loans, as it would be impracticable to examine the overwhelming volume of loans held by such an institution.  For example, the FDIC routinely relies on statistical samples to examine a bank's compliance with statutory and regulatory requirements.  As the FDIC describes in a manual published on its website, bank regulators use statistical sampling of a bank's loan portfolio to determine, among other things:  (i) the bank's adherence to its own lending policies; (ii) the adequacy of the quality of the bank's assets and collateral; and, (iii) whether the bank has charged the right interest rate and set aside the proper amount of reserves for the risk it faces.  *See* FDIC, Risk Mgmt. Manual of Examination Policies §§ 1.1 & 3.2 (2012), *available at* http://www.fdic.gov/regulations/safety/manual/index.html, a true and correct excerpt of which is attached as Exhibit 4.  Thus, the FDIC's objective in using sampling is to determine whether risks in a pool of assets have been properly presented and priced.

50.     Similarly, based on my other engagements in this industry, I understand that private businesses that purchase and securitize mortgage loans routinely use statistical sampling to price loan portfolios.  Loan originators, underwriters and investment banks, and servicers may use sampling for these and other purposes:

- Loan originators generally require the use of sampling for quality control purposes when purchasing loans from third parties, such as correspondent banks.  Loan originators often require the seller to conduct a quality control review of a sample of loans to ensure compliance with guidelines, as well as regulatory compliance.

- Underwriters and investment banks generally use sampling in connection with offering RMBS to investors.  More specifically, underwriters and investment banks, or third-party due diligence firms they hire, conduct credit and compliance reviews on random or adverse samples of loans selected from the pools of loans to be included in securitizations.

- Loan servicers generally use sampling to assess compliance with applicable servicing requirements.

- Credit reporting bureaus such as Experian, Transunion, and Equifax use sampling — specifically samples of loans taken from a small sample of banks — to create models to calculate credit scores.

- Financial institutions use sampling to conduct internal audit activities to ensure that transactions are correctly recorded as part of their quality control.

51.     As part of its quality control procedures and requirements for loan origination and servicing for FHA-insured loans, HUD has long endorsed the use of statistical sampling.  *See* U.S. Department of Housing & Urban Development, HUD Mortgagee Approval Handbook, 4060.1, ¶ 7-6(C), *available at*

http://www.hud.gov/offices/adm/hudclips/handbooks/hsgh/4060.1/40601c7HSGH.pdf

("Because it is not feasible to review all loans originated during a period, the Program must require that an appropriately sized sample is selected and evaluated during each review."); Mortgagee Letter 93-14 from U.S. Dep't of Hous. & Urban Dev. To All Approved Mortgagees, *Quality Control for Origination and Servicing Revisions to Mortgagee Letter 89-32* (May 26, 1993), *available at*

http://www.hud.gov/offices/adm/hudclips/letters/mortgagee/files/93-14ml.txt, a true and correct copy of which is attached as Exhibit 5.

## V.  Proposed Sampling Methodology

### A.  Purpose of Samples

52.     As described above, NCUA expects to use sampling to establish the falsity of the statements in the offering documents regarding whether loans were originated consistent with representations made in the offering documents, including representations about the LTV or CLTV ratios, the applicable underwriting guidelines, and the adequacy of underwriting exceptions and their justifications.  I further understand that NCUA will use the samples to enable it to estimate the percentage of loans in the Population that contain misrepresentations as to one or more of these attributes (the "Misrepresented Loans").

53.     I have been retained by NCUA's counsel in connection with this litigation to develop a methodology to select a statistically reliable random sample of the relevant SLGs in each Securitization and to extrapolate the results to each Population.

### B.  The Sample Size Is Sufficient, and Larger Samples Would Yield Diminishing Returns

54.     In some RMBS, not every loan collateralizing the RMBS backs every certificate or tranche within that RMBS.  The RMBS loan pool may be divided into various loan groups that back different certificates or tranches of that RMBS in various combinations.  An SLG for a certificate is the group of loans that directly collateralizes that certificate.

55.     I was instructed that the relevant populations are the SLGs for each Certificate.  I drew a sample of 100 loans for the relevant SLGs for each Securitization.  To draw the 100-loan samples, I used, in most cases, loan tapes provided by Defendants to determine the set of loans composing each SLG.

- 19 -

56.      In Case No. 13-6721, loan tapes are presently unavailable for one Securitization.[8]  I was able to use publicly available data from the SEC archived EDGAR documents to locate the Loan Tape for this Securitization.[9]  I employed the same methodology described in the body of this report to not only select the sample from the relevant SLG but also test the significance for this Securitization.  However, given that I have received imperfect information, I reserve the right to run a new sample for this Securitization if new information becomes available.  In Case No. 13-6726, neither a loan tape nor adequate publicly available information was available for the GMACM 2006-HE5 Securitization.  Should loan tapes become available in the future for that Securitization, I intend to draw loan samples pursuant to the same methodology described herein.

57.      A sample size of 100 loans yields an estimate with a 95 percent confidence level at a maximum margin of error of +/- 10 percent.[10]  I further stratified each sample based on FICO score, which may increase the precision of the samples by reducing the margin of error.  These samples — whether stratified by FICO score or not — are sufficiently large to draw scientifically valid conclusions about each Population.

     **1.      A 95 Percent Confidence Level, with a Maximum Margin of Error of +/- 10 percent, Strikes the Correct Balance Between Cost and Accuracy**

58.      A 95 percent confidence level with a maximum margin of error of +/- 10 percent is scientifically valid.  The confidence level of 95 percent is standard and well supported in statistics.  *See* Kevin D. Hoover & Mark V. Siegler, *Sound and Fury: McCloskey and Significance Testing in Economics*, 15 J. Econ. Methodology 1, 13-14, 24 (March 2008) ("The critical value is typically but not always chosen to secure a 5% probability of type I error under the null hypothesis (i.e. a 5% size of the

---

[8]   The one Securitization is LBMLT 2006-7.

[9]   Please refer to the SEC EDGAR website for more information: "https://www.sec.gov/edgar/searchedgar/companysearch.html".

[10]   The sample size necessary to achieve these results was 96.  I rounded up to 100 out of an abundance of caution. This "oversampling" creates a cushion for my calculations.

test)" and ". . . epidemiology or other areas of medical research . . . faithfully apply a standard of $p<0.05$ for reporting estimates"); Diamond, 2d ed., supra, at 244 ("Traditionally, scientists adopt the 95% level of confidence . . . .").

59.     The +/- 10 percent margin of error, with a 95 percent confidence level, strikes the correct balance between cost and accuracy for two primary reasons.  The first reason that increasing sample size would generate only marginal benefits — without commensurate benefits in increased precision — is that the gain in reliability due to a larger sample size increases only as the square root of the sample size.  This is demonstrated in Chart 1 below.  As the sample size increases from 1 to 100, there is a large increase in reliability (meaning smaller confidence intervals for 95 percent confidence).  As the sample size increases from 100 to 400, however, the increase in precision, and associated reduction in confidence interval, is only doubled.  To halve the margin of error again, from plus or minus five percent to plus or minus 2.5 percent, the sample size has to quadruple again, from 400 to 1,600.

**Chart 1:  Diminishing Returns for Increasing Sample Sizes**



60.      As shown in this chart, decreasing the margin of error below +/- 10 percent by increasing the sample size imposes large costs (the money and time needed to re-underwrite additional loan files) without commensurate benefits in increased precision.  Increasing the sample size also conflicts with the purpose of this sampling design, which is to provide a practical and scientifically valid methodology to calculate sufficiently precise estimates regarding (i) the number/percentage of loans that had LTV ratios above the values specified in the offering documents, and (ii) whether the loans were originated in compliance with the applicable underwriting guidelines.

61.      The second reason that increasing sample size would generate only marginal benefits is because the +/- 10 percent is merely the maximum margin of error for this confidence level, and it occurs only when the estimated percentage of Misrepresented Loans is 50 percent.  Fifty percent is the scenario where variability is at its greatest:  half contain Misrepresented Loans and half do not.

When the variability decreases — that is, when the percentage deviates from 50 percent in either direction — the margin of error — and thus confidence interval — becomes smaller.  As the intervals shrink, the marginal benefit of a larger sample size shrinks as well.

62.     As the estimated defect rate deviates from 50 percent in either direction, the difference in the margin of error for samples decreases.  This is shown in Chart 2 below, where the margins of error at a 95 percent confidence level for sample sizes of approximately 100 and 400 loans are shown for all possible percentages of Misrepresented Loans.  The maximum margins of error are +/- 9.8 percent for a 100 loan sample and +/- 4.9 percent for a 400 loan sample, and occur when the estimated percentage of Misrepresented Loans is 50 percent.  As Chart 2 demonstrates, quadrupling the sample size from 100 to 400 loans does not yield a commensurate reduction in the margin of error for a 95 percent confidence level across all possible percentages of Misrepresented Loans.  For example, when the estimated rate of Misrepresented Loans is 20 or 80 percent, the margins of error for a 95 percent confidence level are +/- 7.84 percent for a sample size of 100 loans and +/- 3.92 percent for a sample size of 400 loans.  When the estimated defect rate is 10 or 90 percent, the margins of error for a 95 percent confidence level are +/- 5.88 percent for a sample size of 100 loans and +/- 2.94 percent for a sample size of 400 loans.  As the defect rate approaches zero or 100 percent, the margin of error for the 95 percent level must also approach zero, regardless of sample size.

**Chart 2:    95% Margin of Error for Samples of Size Approximately 100 and Approximately 400 for All Defect Rates**



### 2.  Stratification by FICO Score May Increase the Precision of the Estimate

63.     The only variable I used to stratify the loan pools is the borrower's credit score, specifically the FICO score, which appeared for each loan on the loan tapes to be produced by the Defendants for the Securitizations.  A borrower's FICO score can range from 300 to 850.  A credit score is a number representing the creditworthiness of a person or the likelihood that person will pay his or her debts.  It has shown to be predictive of risk.  In my experience, lenders, including mortgage loan originators, use credit scores to determine who qualifies for a loan, at what interest rate, and to what credit limits.  In addition, in my experience, a borrower's credit score is highly unlikely to be misstated on a loan tape (unlike, for example, other loan tape data such as the LTV ratio), and is correlated with other factors that could be used as stratification variables.  Thus, the benefit of stratifying using variables in addition to FICO is diminished.

64.     Although there are other factors available for stratification from the loan tapes, it is reasonable to limit the number of variables used to stratify the population.  First, there are diminishing returns to reductions in the margin of error that result from adding more stratification variables.  As the number of stratification variables increases, the margin of error tends to decrease, but at a slower and slower rate, until there are only very marginal reductions.  Second, these decreases in the margin of error may not materialize if the stratifying variable is not correlated to outcomes of interest or if some of the subgroups created by the stratifying variables are empty.  Thus, there may be no benefit to stratifying by additional variables if the goal is simply to increase the number of strata without regard to the ultimate goal, which is reduction of the margin of error.

65.     Using FICO score as a stratifying variable, I divided the population of loans in each SLG into four equally sized groups with very low, somewhat low, somewhat high, and high credit scores defining the groups.  Because I have sampled each of the Securitizations separately, the set of strata boundaries that defined where one bucket ended and where the next began (three strata boundaries defined the four buckets in each Securitization) differed from Securitization to Securitization.  This will not be an issue for estimation from each sample, since the estimates are derived separately for each Securitization, adding up across all the strata.

66.     Four strata were created from the credit scores.  Each stratum had roughly the same number of loans.  A random number was generated for each loan in each stratum, in a manner that ensured that each loan had an equal chance of being selected.  After the random numbers were assigned, I sorted the loans from lowest to highest random number within each stratum.  The first 25 loans in each stratum were selected for the sample, and the next 25 loans in each stratum were then selected to be in the supplemental stratum, yielding 200 loans for each SLG in the Securitizations.

### 3.   The Sample Is Random and Unbiased

67.      The methodology described above for selecting a sample of loans from each

Securitization ensures that the sample is random and not subject to manipulation.  *See, e.g.,*

Thompson, *supra*, at 117-127; Levy & Lemeshow, *supra*, at 121-189; Cochran, *supra*, at 89-146;

Deming, *supra*, at 276-358, 487-93.

68.      Application of the methodology described herein to create the loan samples is a

mechanical process that is subject to no meaningful discretion on my part.  Given the SLG loan

tapes, the identity of the loans in the 100 initial loan samples and 100 supplemental loan samples was

determined not by any choice on my part, but only by the imposition of randomly assigned numbers

by standard statistical software.

69.      To ensure that the sample selected was representative of the population from which

it was selected, I tested the sample (both the initial 100 loan sample and the second backup 100 loan

sample) against the Population on eleven key variables (when available) from the loan tapes:  FICO

score, debt-to-income ratio, LTV ratio, CLTV ratio, note rate, current loan amount, original term,

documentation type, occupancy type, property type, and loan purpose.[11]  For continuous variables

(those where the values are numeric and increasing or decreasing in value, like FICO score and LTV

ratio), I compared the mean of the sample distribution to the mean of the Population distribution

using z-tests and t-tests, which are common statistical methods for determining that a sample value

could have come from the population.  For categorical variables (those where the values are

categories, such as documentation type), I compared the distribution of the categories in the sample

to the distribution of the categories in the Population using a Goodness of Fit Chi-square test.

Again, this is a common statistical method for determining that a sample distribution could have

come from the population.  For a 95 percent confidence level, I would expect 1 in 20 (5 percent) of

---

[11]    Not all eleven variables were available for each Securitization.  The variables that were used to test the sample
against the Population are indicated in Appendix 1.

the tests to fail by chance. The results of these tests on the samples drawn for each Certificate are listed in Appendix 1. The data and computer programs used to generate the results of these tests (and which allow for the replications of these results) are also being provided to Defendants with this Report. For all of the samples selected, fewer than five percent of the tests failed. These results indicate a very high level of correspondence between the samples and their populations.

70.     Samples will remain random and unbiased, even where unavailability of loan files requires that I replace loans in the original 100-loan sample with loans from the 100-loan supplement. This is because the 100-loan supplement will also be ordered using random numbers prior to NCUA obtaining the loan files. Thus, any loans selected as substitutes are preordained and randomly selected.[12]

## C. Extrapolation from Sample Re-Underwriting Results to Loan Populations Is Straightforward

71.     Once the samples of loans have been re-underwritten and determinations are made regarding each of the inquiries as set forth above in ¶ 52 with respect to compliance with the applicable underwriting guidelines and compliance with the applicable appraisal standards, LTV and CLTV ratios, the next step is to extrapolate the results of such re-underwriting to the Populations.

72.     Extrapolation refers to using the results from the sample to estimate the actual values of the population. Here, extrapolation will be the process of using the number of Misrepresented Loans in each sample to estimate the total number of Misrepresented Loans in each Population.

73.     There are several statistically valid methods of extrapolating the results of the re-underwriting conducted on the samples to the populations of loans. The actual method to be used depends on the availability of data and the relationships between the variables in the sample.

---

[12]   In the event that the 100 loan backup is insufficient to replace missing loan files from the 100 loan sample (because the supplement itself has missing loan files), I reserve the right to draw a further supplement sample in order to achieve a sample size of approximately 100 loans. I will do so according to the same methodology described herein.

74.     The method of extrapolation need not be determined before the sampling methodology can be accepted as statistically viable, because sample design and extrapolation are two separate statistical processes.  The method of extrapolation does not determine the sample design.  Similarly, there is not a single method of extrapolation that must be used based on my sample design.  There are a variety of extrapolation methods that I could apply.

75.     For expository purposes only, I have set forth below extrapolation methods that may potentially be used in this action.  The method that will ultimately be selected will be the one that minimizes the margin of error.  Because the selection of the method depends on which method reduces the margin of error the most, it is a relatively straightforward and uncontroversial process.  I intend to present the extrapolation method and results in a separate expert report to be submitted when NCUA's affirmative non-sampling expert reports are due.

76.     The first extrapolation method applies to a simple random sample, and assumes that relationships for numbers of loans in the sample are like relationships for numbers of loans in the population.  A simple example of this assumption is as follows:

$$\frac{\text{\# of misrepresented loans in sample}}{\text{Total number of loans in the sample}} = \frac{\text{\# of misrepresented loans in population}}{\text{Total number of loans in the population}}$$

77.     In this relationship, three of the four numbers are known:  (i) the number of loans in the sample that are misrepresented; (ii) the total number of loans in the sample; and (iii) the total number of loans in the population.  Solving the equation for the fourth number — the number of loans in the population that are misrepresented — is simple.  The mechanism of randomization allows us to assume that the ratio on the right for the population is like the ratio on the left for the sample.

78.     With simple random samples, one can calculate the proportion of loans in the sample that are misrepresented.  This proportion is an estimate of the proportion of Misrepresented

Loans in the population.  Multiplying this proportion by the total number of loans in the SLG provides an estimate of the number of Misrepresented Loans in the population.

79.     For a stratified random sample, the same assumption is made, but specifically within each stratum in the population, and an extrapolation is made from each stratum separately.  The sample estimate from a stratified random sample is the sum (or average, depending on the type of estimate) of estimates from the individual strata.  For a stratified sample, with a simple random sample selected within each stratum, the process described in the previous paragraph is repeated within each of the strata.  The estimated number of Misrepresented Loans within each stratum is summed over all strata to give an estimate of the number of Misrepresented Loans in the population.

80.     Accordingly, it will be possible using sampling for the fact finder to determine misrepresentations and resulting liability in connection with the sale of each Certificate with a known level of accuracy because of the existence of the confidence level and the margin of error.  It also will be possible for the fact finder to determine misrepresentations and resulting liability in connection with the sale of Certificates in all Securitizations with a much higher level of confidence. The Certificates are sampled independently, and one can sum the estimated total number of breaches across all Certificates in all Securitizations.

## VI. Conclusion

81.     For the reasons set forth above, a sample of 100 loans per Population will be sufficiently large to provide a scientifically reliable estimate of the number of Misrepresented Loans in those Populations.  To ensure that we have a sample of 100 loans that is re-underwritten, I selected an initial sample of 100 loans for re-underwriting, and a second backup sample of 100 loans that can be used to provide substitutes for loans with missing loan files, should any be missing in the initial set of 100.

April 4, 2014

_Charles D Cowan_

CHARLES D. COWAN, Ph.D.

**Appendix 1: Significance Test Results for Eleven Key Variables**

Notes:
- The entry "Not available" refers to situations where the materials provided by Defendants did not provide the corresponding variable used in the test of representativeness.

- The entry "Not necessary" refers to situations where there is only one category under the corresponding variable, thus, a test of representativeness is not necessary.

## NCUA v. Barclays S.D.N.Y. 13-cv-6727

Initial

| Variables Tested | BCAP 2007-AA1 | BCAP 2007-AA2 | BCAP 2007-AA3 (G 1) |
|---|---|---|---|
| FICO Score | 98% | 61% | 84% |
| Debt-to-Income | 65% | 78% | 84% |
| Loan-to-Value | 89% | 75% | 56% |
| Combined LTV | 89% | 30% | 56% |
| Note Rate | 95% | 1% | 57% |
| Current Balance | 40% | 55% | 93% |
| Documentation Type | 49% | 86% | 60% |
| Occupancy Type | 78% | 87% | 33% |
| Property Type | 51% | 64% | 26% |
| Loan Purpose | 6% | 10% | 22% |
| Original Terms | Not Necessary | Not Necessary | Not Necessary |

| Variables Tested | BCAP 2007-AA3 (G 2) | BCAPB 2007-AB1 | FHLT 2006-C |
|---|---|---|---|
| FICO Score | 74% | 89% | 68% |
| Debt-to-Income | 49% | 76% | 0% |
| Loan-to-Value | 28% | 42% | 72% |
| Combined LTV | 28% | 42% | 36% |
| Note Rate | 28% | 10% | 83% |
| Current Balance | 79% | 16% | 96% |
| Documentation Type | 14% | 0% | 48% |
| Occupancy Type | 96% | 86% | 44% |
| Property Type | 58% | 33% | 48% |
| Loan Purpose | 96% | 17% | 17% |
| Original Terms | Not Necessary | Not Necessary | Not Necessary |

| Variables Tested | SABR 2006-HE2 | WFHET 2006-3 | WFHET 2007-1 |
|---|---|---|---|
| FICO Score | 67% | 43% | 58% |
| Debt-to-Income | 30% | 10% | 83% |
| Loan-to-Value | 69% | 36% | 12% |
| Combined LTV | 9% | 76% | 48% |
| Note Rate | 17% | 52% | 19% |
| Current Balance | 70% | 23% | 76% |
| Documentation Type | 88% | 56% | 98% |
| Occupancy Type | 83% | 96% | 19% |
| Property Type | 75% | 18% | 81% |
| Loan Purpose | 54% | 82% | 35% |
| Original Terms | Not Necessary | Not Necessary | Not Necessary |

Supplemental

| Variables Tested | BCAP 2007-AA1 | BCAP 2007-AA2 | BCAP 2007-AA3 (G 1) |
|---|---|---|---|
| FICO Score | 41% | 28% | 82% |
| Debt-to-Income | 9% | 16% | 63% |
| Loan-to-Value | 10% | 56% | 77% |
| Combined LTV | 10% | 76% | 77% |
| Note Rate | 71% | 73% | 89% |
| Current Balance | 99% | 71% | 94% |
| Documentation Type | 2% | 65% | 34% |
| Occupancy Type | 45% | 32% | 12% |
| Property Type | 24% | 55% | 26% |
| Loan Purpose | 2% | 97% | 13% |
| Original Terms | Not Necessary | Not Necessary | Not Necessary |

| Variables Tested | BCAP 2007-AA3 (G 2) | BCAPB 2007-AB1 | FHLT 2006-C |
|---|---|---|---|
| FICO Score | 25% | 96% | 66% |
| Debt-to-Income | 38% | 23% | 88% |
| Loan-to-Value | 62% | 72% | 40% |
| Combined LTV | 62% | 72% | 65% |
| Note Rate | 69% | 18% | 21% |
| Current Balance | 39% | 89% | 40% |
| Documentation Type | 48% | 18% | 35% |
| Occupancy Type | 29% | 19% | 33% |
| Property Type | 75% | 11% | 23% |

| | | | |
|---|---|---|---|
| **Loan Purpose** | 8% | 94% | 60% |
| **Original Terms** | Not Necessary | Not Necessary | Not Necessary |

| Variables Tested | SABR 2006-HE2 | WFHET 2006-3 | WFHET 2007-1 |
|---|---|---|---|
| **FICO Score** | 92% | 94% | 65% |
| **Debt-to-Income** | 54% | 29% | 57% |
| **Loan-to-Value** | 36% | 87% | 96% |
| **Combined LTV** | 98% | 58% | 22% |
| **Note Rate** | 9% | 33% | 17% |
| **Current Balance** | 38% | 82% | 82% |
| **Documentation Type** | 54% | 59% | 88% |
| **Occupancy Type** | 22% | 52% | 32% |
| **Property Type** | 95% | 19% | 18% |
| **Loan Purpose** | 16% | 62% | 13% |
| **Original Terms** | Not Necessary | Not Necessary | Not Necessary |

*NCUA v. Credit Suisse S.D.N.Y. 13-cv-6736*

Initial

| Variables Tested | ARMT 2006-3 | ARMT 2007-1 | ARMT 2007-2 |
|---|---|---|---|
| FICO Score | 57% | 83% | 46% |
| Debt-to-Income | 94% | 94% | 44% |
| Loan-to-Value | 99% | 54% | 93% |
| Combined LTV | 74% | 76% | 90% |
| Note Rate | 96% | 89% | 37% |
| Current Balance | 34% | 5% | 8% |
| Documentation Type | 69% | 36% | 67% |
| Occupancy Type | 40% | 56% | 29% |
| Property Type | 15% | 8% | 50% |
| Loan Purpose | 50% | 24% | 80% |
| Original Terms | Not Necessary | Not Necessary | Not Necessary |

| Variables Tested | HEAT 2006-6 | HEMT 2006-2 | HEMT 2007-2 |
|---|---|---|---|
| FICO Score | 94% | 73% | 82% |
| Debt-to-Income | 91% | 28% | 73% |
| Loan-to-Value | 90% | 87% | 34% |
| Combined LTV | Not Available | 63% | 17% |
| Note Rate | 2% | 82% | 58% |
| Current Balance | 28% | 33% | 92% |
| Documentation Type | 6% | 95% | 97% |
| Occupancy Type | Not Necessary | 63% | 69% |
| Property Type | 22% | 98% | 90% |
| Loan Purpose | 53% | 2% | 43% |
| Original Terms | 1% | 57% | 75% |

| Variables Tested | LBMLT 2006-1 | LBMLT 2006-6 | RALI 2006-QA9 |
|---|---|---|---|
| FICO Score | 81% | 76% | 95% |
| Debt-to-Income | 99% | 49% | 28% |
| Loan-to-Value | 38% | 12% | 39% |
| Combined LTV | 74% | 61% | 14% |
| Note Rate | 62% | 67% | 22% |
| Current Balance | 59% | 74% | 89% |
| Documentation | 31% | 77% | 83% |

| Variables Tested | LBMLT 2006-1 | LBMLT 2006-6 | RALI 2006-QA9 |
|---|---|---|---|
| Type | | | |
| Occupancy Type | Not Necessary | 5% | 54% |
| Property Type | 57% | 89% | 53% |
| Loan Purpose | 67% | 44% | 15% |
| Original Terms | 95% | 47% | Not Necessary |

Supplemental

| Variables Tested | ARMT 2006-3 | ARMT 2007-1 | ARMT 2007-2 |
|---|---|---|---|
| FICO Score | 91% | 81% | 40% |
| Debt-to-Income | 52% | 58% | 57% |
| Loan-to-Value | 96% | 12% | 0% |
| Combined LTV | 48% | 8% | 0% |
| Note Rate | 63% | 22% | 97% |
| Current Balance | 82% | 55% | 61% |
| Documentation Type | 30% | 36% | 12% |
| Occupancy Type | 74% | 74% | 19% |
| Property Type | 96% | 11% | 47% |
| Loan Purpose | 30% | 1% | 77% |
| Original Terms | Not Necessary | Not Necessary | Not Necessary |

| Variables Tested | HEAT 2006-6 | HEMT 2006-2 | HEMT 2007-2 |
|---|---|---|---|
| FICO Score | 98% | 63% | 86% |
| Debt-to-Income | 89% | 45% | 31% |
| Loan-to-Value | 98% | 61% | 26% |
| Combined LTV | Not Available | 97% | 27% |
| Note Rate | 71% | 61% | 79% |
| Current Balance | 18% | 59% | 46% |
| Documentation Type | 54% | 100% | 33% |
| Occupancy Type | Not Necessary | 54% | 39% |
| Property Type | 72% | 2% | 97% |
| Loan Purpose | 1% | 11% | 24% |
| Original Terms | 16% | 19% | 72% |

| Variables Tested | LBMLT 2006-1 | LBMLT 2006-6 | RALI 2006-QA9 |
|---|---|---|---|
| FICO Score | 72% | 94% | 46% |
| Debt-to-Income | 80% | 10% | 37% |
| Loan-to-Value | 37% | 60% | 22% |
| Combined LTV | 8% | 61% | 49% |

| Variables Tested | LBMLT 2006-1 | LBMLT 2006-6 | RALI 2006-QA9 |
|---|---|---|---|
| Note Rate | 6% | 59% | 7% |
| Current Balance | 64% | 72% | 88% |
| Documentation Type | 53% | 47% | 76% |
| Occupancy Type | Not Necessary | 40% | 24% |
| Property Type | 95% | 59% | 97% |
| Loan Purpose | 29% | 82% | 80% |
| Original Terms | 64% | 74% | Not Necessary |

*NCUA v. Goldman Sachs S.D.N.Y. 13-cv-6721*

Initial

| Variables Tested | GSAA 2007-3 (G 1) | GSAA 2007-5 (G 2) | LBMLT 2006-7 (G2) |
|---|---|---|---|
| FICO Score | 79% | 86% | 94% |
| Debt-to-Income | 47% | 24% | 79% |
| Loan-to-Value | 2% | 68% | 32% |
| Combined LTV | 4% | 9% | 48% |
| Note Rate | 38% | 38% | 25% |
| Current Balance | 52% | 18% | 59% |
| Documentation Type | 76% | 66% | 35% |
| Occupancy Type | 73% | 93% | 84% |
| Property Type | 19% | 64% | 89% |
| Loan Purpose | 26% | 47% | 11% |
| Original Terms | Not Necessary | Not Necessary | 48% |

Supplemental

| Variables Tested | GSAA 2007-3 (G 1) | GSAA 2007-5 (G 2) | LBMLT 2006-7 (G 2) |
|---|---|---|---|
| FICO Score | 71% | 90% | 90% |
| Debt-to-Income | 78% | 46% | 90% |
| Loan-to-Value | 28% | 35% | 75% |
| Combined LTV | 28% | 55% | 92% |
| Note Rate | 61% | 7% | 84% |
| Current Balance | 44% | 74% | 81% |
| Documentation Type | 71% | 89% | 40% |
| Occupancy Type | 73% | 41% | 74% |
| Property Type | 18% | 32% | 44% |
| Loan Purpose | 53% | 75% | 71% |
| Original Terms | Not Necessary | Not Necessary | 39% |

*NCUA v. Morgan Stanley S.D.N.Y. 13-cv-6705*

Initial

| Variables Tested | MSAC 2006-HE2 (ALL) | MSAC 2006-HE2 (G 2) | MSAC 2006-HE4 |
|---|---|---|---|
| FICO Score | 99% | 78% | 49% |
| Debt-to-Income | 32% | 54% | 65% |
| Loan-to-Value | 93% | 42% | 0% |
| Combined LTV | Not Available | Not Available | Not Available |
| Note Rate | 30% | 30% | 8% |
| Current Balance | 15% | 25% | 94% |
| Documentation Type | 11% | 15% | 65% |
| Occupancy Type | Not Necessary | Not Necessary | 90% |
| Property Type | 42% | 22% | 90% |
| Loan Purpose | 61% | 40% | 75% |
| Original Terms | 93% | 61% | 6% |

| Variables Tested | MSAC 2006-HE6 | MSAC 2006-HE8 | MSAC 2006-NC4 |
|---|---|---|---|
| FICO Score | 85% | 75% | 80% |
| Debt-to-Income | 83% | 40% | 5% |
| Loan-to-Value | 24% | 87% | 44% |
| Combined LTV | Not Available | Not Available | Not Available |
| Note Rate | 97% | 86% | 25% |
| Current Balance | 22% | 22% | 83% |
| Documentation Type | 37% | 18% | 86% |
| Occupancy Type | Not Necessary | 19% | 32% |
| Property Type | 25% | 84% | 40% |
| Loan Purpose | 86% | 29% | 71% |
| Original Terms | 82% | Not Necessary | Not Necessary |

| Variables Tested | MSAC 2006-WMC2 | MSAC 2007-HE4 | MSAC 2007-HE5 |
|---|---|---|---|
| FICO Score | 93% | 83% | 77% |
| Debt-to-Income | 22% | 76% | 48% |
| Loan-to-Value | 49% | 45% | 75% |
| Combined LTV | Not Available | Not Available | Not Available |
| Note Rate | 38% | 37% | 65% |
| Current Balance | 67% | 25% | 86% |

| Variables Tested | MSAC 2006-WMC2 | MSAC 2007-HE4 | MSAC 2007-HE5 |
|---|---|---|---|
| Documentation Type | 26% | 91% | 95% |
| Occupancy Type | Not Necessary | Not Necessary | Not Necessary |
| Property Type | 79% | 79% | 100% |
| Loan Purpose | 88% | 41% | 79% |
| Original Terms | 73% | Not Necessary | Not Necessary |

| Variables Tested | MSHEL 2006-1 | MSHEL 2007-2 | MSIX 2006-1 |
|---|---|---|---|
| FICO Score | 82% | 84% | 62% |
| Debt-to-Income | 86% | 34% | 22% |
| Loan-to-Value | 100% | 78% | 62% |
| Combined LTV | Not Available | Not Available | Not Available |
| Note Rate | 49% | 23% | 81% |
| Current Balance | 55% | 83% | 6% |
| Documentation Type | 87% | 2% | 98% |
| Occupancy Type | 15% | 19% | 0% |
| Property Type | 90% | 53% | 65% |
| Loan Purpose | 49% | 43% | 42% |
| Original Terms | 86% | 17% | 93% |

| Variables Tested | MSM 2005-11AR | MSM 2006-10SL | MSM 2006-13ARX |
|---|---|---|---|
| FICO Score | 94% | 91% | 91% |
| Debt-to-Income | 74% | 3% | 2% |
| Loan-to-Value | 79% | 59% | 2% |
| Combined LTV | 82% | 46% | 34% |
| Note Rate | 29% | 24% | 54% |
| Current Balance | 98% | 93% | 37% |
| Documentation Type | 84% | 20% | 32% |
| Occupancy Type | 57% | 7% | 16% |
| Property Type | 24% | 5% | 54% |
| Loan Purpose | 95% | 71% | 87% |
| Original Terms | Not Necessary | 86% | Not Necessary |

| Variables Tested | MSM 2006-16AX | MSM 2006-3AR | MSM 2006-8AR |
|---|---|---|---|
| FICO Score | 86% | 90% | 58% |
| Debt-to-Income | 55% | 16% | 23% |
| Loan-to-Value | 60% | 96% | 66% |
| Combined LTV | 90% | 62% | 44% |

| Variables Tested | MSM 2006-16AX | MSM 2006-3AR | MSM 2006-8AR |
|---|---|---|---|
| Note Rate | 71% | 60% | 99% |
| Current Balance | 43% | 55% | 48% |
| Documentation Type | 58% | 61% | 70% |
| Occupancy Type | 79% | 62% | 42% |
| Property Type | 14% | 57% | 56% |
| Loan Purpose | 71% | 80% | 53% |
| Original Terms | Not Necessary | Not Necessary | Not Necessary |

| Variables Tested | MSM 2006-9AR | MSM 2007-11AR | MSM 2007-2AX |
|---|---|---|---|
| FICO Score | 76% | 93% | 95% |
| Debt-to-Income | 40% | 16% | 12% |
| Loan-to-Value | 22% | 40% | 10% |
| Combined LTV | 80% | 54% | 23% |
| Note Rate | 64% | 69% | 39% |
| Current Balance | 49% | 76% | 88% |
| Documentation Type | 75% | 30% | 17% |
| Occupancy Type | 28% | 98% | 11% |
| Property Type | 1% | 86% | 60% |
| Loan Purpose | 89% | 94% | 72% |
| Original Terms | Not Necessary | Not Necessary | Not Necessary |

| Variables Tested | MSM 2007-4SL | MSM 2007-5AX | NTIX 2007-HE2 |
|---|---|---|---|
| FICO Score | 58% | 57% | 55% |
| Debt-to-Income | 42% | 26% | 25% |
| Loan-to-Value | 72% | 82% | 89% |
| Combined LTV | Not Available | 49% | Not Available |
| Note Rate | 67% | 96% | 80% |
| Current Balance | 19% | 15% | 53% |
| Documentation Type | 61% | 80% | 35% |
| Occupancy Type | 95% | 38% | 38% |
| Property Type | 92% | 92% | 42% |
| Loan Purpose | 65% | 84% | 41% |
| Original Terms | 73% | Not Necessary | 62% |

| Variables Tested | RALI 2006-QA5 | SAST 2007-2 |
|---|---|---|

| | | |
|---|---|---|
| **FICO Score** | 89% | 37% |
| **Debt-to-Income** | 5% | 48% |
| **Loan-to-Value** | 49% | 33% |
| **Combined LTV** | 18% | 37% |
| **Note Rate** | 72% | 77% |
| **Current Balance** | 24% | 77% |
| **Documentation Type** | 18% | 61% |
| **Occupancy Type** | 52% | 63% |
| **Property Type** | 49% | 8% |
| **Loan Purpose** | 51% | 16% |
| **Original Terms** | Not Necessary | 47% |

Supplemental

| **Variables Tested** | **MSAC 2006-HE2 (ALL)** | **MSAC 2006-HE2 (G 2)** | **MSAC 2006-HE4** |
|---|---|---|---|
| **FICO Score** | 87% | 80% | 99% |
| **Debt-to-Income** | 48% | 66% | 90% |
| **Loan-to-Value** | 96% | 37% | 53% |
| **Combined LTV** | Not Available | Not Available | Not Available |
| **Note Rate** | 84% | 29% | 89% |
| **Current Balance** | 94% | 33% | 82% |
| **Documentation Type** | 65% | 98% | 81% |
| **Occupancy Type** | Not Necessary | Not Necessary | 58% |
| **Property Type** | 7% | 31% | 2% |
| **Loan Purpose** | 97% | 83% | 70% |
| **Original Terms** | 69% | 33% | 65% |

| **Variables Tested** | **MSAC 2006-HE6** | **MSAC 2006-HE8** | **MSAC 2006-NC4** |
|---|---|---|---|
| **FICO Score** | 93% | 57% | 64% |
| **Debt-to-Income** | 77% | 24% | 2% |
| **Loan-to-Value** | 100% | 69% | 34% |
| **Combined LTV** | Not Available | Not Available | Not Available |
| **Note Rate** | 96% | 69% | 16% |
| **Current Balance** | 37% | 95% | 100% |
| **Documentation Type** | 3% | 88% | 65% |
| **Occupancy Type** | Not Necessary | 55% | 8% |
| **Property Type** | 13% | 32% | 14% |
| **Loan Purpose** | 48% | 48% | 19% |

| Variables Tested | MSAC 2006-HE6 | MSAC 2006-HE8 | MSAC 2006-NC4 |
|---|---|---|---|
| Original Terms | 94% | Not Necessary | Not Necessary |

| Variables Tested | MSAC 2006-WMC2 | MSAC 2007-HE4 | MSAC 2007-HE5 |
|---|---|---|---|
| FICO Score | 89% | 59% | 73% |
| Debt-to-Income | 62% | 39% | 61% |
| Loan-to-Value | 87% | 73% | 27% |
| Combined LTV | Not Available | Not Available | Not Available |
| Note Rate | 61% | 99% | 2% |
| Current Balance | 67% | 84% | 90% |
| Documentation Type | 20% | 6% | 43% |
| Occupancy Type | Not Necessary | Not Necessary | Not Necessary |
| Property Type | 40% | 22% | 96% |
| Loan Purpose | 11% | 59% | 22% |
| Original Terms | 76% | Not Necessary | Not Necessary |

| Variables Tested | MSHEL 2006-1 | MSHEL 2007-2 | MSIX 2006-1 |
|---|---|---|---|
| FICO Score | 55% | 73% | 96% |
| Debt-to-Income | 34% | 20% | 20% |
| Loan-to-Value | 33% | 31% | 81% |
| Combined LTV | Not Available | Not Available | Not Available |
| Note Rate | 86% | 67% | 59% |
| Current Balance | 35% | 90% | 83% |
| Documentation Type | 52% | 96% | 1% |
| Occupancy Type | 58% | 97% | 80% |
| Property Type | 28% | 28% | 66% |
| Loan Purpose | 80% | 28% | 3% |
| Original Terms | 86% | 43% | 26% |

| Variables Tested | MSM 2005-11AR | MSM 2006-10SL | MSM 2006-13ARX |
|---|---|---|---|
| FICO Score | 75% | 81% | 83% |
| Debt-to-Income | 82% | 23% | 26% |
| Loan-to-Value | 30% | 59% | 48% |
| Combined LTV | 69% | 0% | 49% |
| Note Rate | 35% | 72% | 5% |
| Current Balance | 56% | 33% | 10% |
| Documentation Type | 79% | 9% | 30% |
| Occupancy Type | 56% | 30% | 17% |

| Variables Tested | MSM 2005-11AR | MSM 2006-10SL | MSM 2006-13ARX |
|---|---|---|---|
| Property Type | 59% | 42% | 29% |
| Loan Purpose | 72% | 91% | 66% |
| Original Terms | Not Necessary | 3% | Not Necessary |

| Variables Tested | MSM 2006-16AX | MSM 2006-3AR | MSM 2006-8AR |
|---|---|---|---|
| FICO Score | 52% | 88% | 76% |
| Debt-to-Income | 4% | 74% | 90% |
| Loan-to-Value | 78% | 58% | 3% |
| Combined LTV | 46% | 41% | 18% |
| Note Rate | 13% | 29% | 49% |
| Current Balance | 10% | 11% | 59% |
| Documentation Type | 40% | 77% | 53% |
| Occupancy Type | 19% | 11% | 27% |
| Property Type | 7% | 13% | 58% |
| Loan Purpose | 19% | 96% | 43% |
| Original Terms | Not Necessary | Not Necessary | Not Necessary |

| Variables Tested | MSM 2006-9AR | MSM 2007-11AR | MSM 2007-2AX |
|---|---|---|---|
| FICO Score | 88% | 89% | 77% |
| Debt-to-Income | 55% | 10% | 35% |
| Loan-to-Value | 98% | 35% | 0% |
| Combined LTV | 46% | 8% | 0% |
| Note Rate | 39% | 91% | 39% |
| Current Balance | 78% | 75% | 45% |
| Documentation Type | 33% | 18% | 87% |
| Occupancy Type | 91% | 3% | 50% |
| Property Type | 53% | 37% | 93% |
| Loan Purpose | 39% | 13% | 20% |
| Original Terms | Not Necessary | Not Necessary | Not Necessary |

| Variables Tested | MSM 2007-4SL | MSM 2007-5AX | NTIX 2007-HE2 |
|---|---|---|---|
| FICO Score | 93% | 7% | 76% |
| Debt-to-Income | 20% | 57% | 14% |
| Loan-to-Value | 53% | 47% | 57% |
| Combined LTV | Not Available | 48% | Not Available |
| Note Rate | 23% | 80% | 53% |
| Current Balance | 31% | 15% | 28% |

| Variables Tested | MSM 2007-4SL | MSM 2007-5AX | NTIX 2007-HE2 |
|---|---|---|---|
| Documentation Type | 42% | 90% | 80% |
| Occupancy Type | 74% | 1% | 6% |
| Property Type | 2% | 44% | 45% |
| Loan Purpose | 39% | 65% | 50% |
| Original Terms | 94% | Not Necessary | 11% |

| Variables Tested | RALI 2006-QA5 | SAST 2007-2 |
|---|---|---|
| FICO Score | 71% | 47% |
| Debt-to-Income | 29% | 28% |
| Loan-to-Value | 42% | 50% |
| Combined LTV | 41% | 81% |
| Note Rate | 47% | 71% |
| Current Balance | 93% | 53% |
| Documentation Type | 19% | 17% |
| Occupancy Type | 88% | 37% |
| Property Type | 79% | 7% |
| Loan Purpose | 99% | 25% |
| Original Terms | Not Necessary | 67% |

*NCUA v. RBS S.D.N.Y 13-cv-6726*

Initial

| Variables Tested | HVMLT 2006-10 | HVMLT 2007-1 (G 2) | HVMLT 2007-2 |
|---|---|---|---|
| FICO Score | 82% | 59% | 60% |
| Debt-to-Income | 41% | 31% | 52% |
| Loan-to-Value | 2% | 61% | 38% |
| Combined LTV | 2% | 12% | 25% |
| Note Rate | 85% | 17% | 14% |
| Current Balance | 96% | 61% | 54% |
| Documentation Type | 47% | 65% | 29% |
| Occupancy Type | 91% | 23% | 52% |
| Property Type | 30% | 66% | 42% |
| Loan Purpose | 29% | 90% | 38% |
| Original Terms | 33% | 79% | 98% |

| Variables Tested | HVMLT 2007-3 | INDX 2006-AR6 | LBMLT 2006-2 |
|---|---|---|---|
| FICO Score | 37% | 79% | 76% |
| Debt-to-Income | 19% | 10% | 20% |
| Loan-to-Value | 96% | 51% | 60% |
| Combined LTV | 36% | 72% | 84% |
| Note Rate | 80% | 28% | 86% |
| Current Balance | 61% | 21% | 98% |
| Documentation Type | 66% | 59% | 10% |
| Occupancy Type | 53% | Not Necessary | Not Necessary |
| Property Type | 61% | 4% | 91% |
| Loan Purpose | 22% | 21% | 82% |
| Original Terms | 43% | 39% | 100% |

| Variables Tested | LBMLT 2006-8 | MHL 2006-1 (G 1-A2) | MHL 2006-1 |
|---|---|---|---|
| FICO Score | 70% | 80% | 62% |
| Debt-to-Income | 9% | 77% | 51% |
| Loan-to-Value | 92% | 97% | 51% |
| Combined LTV | 97% | 94% | 57% |
| Note Rate | 93% | 49% | 48% |
| Current Balance | 44% | 24% | 80% |
| Documentation | 17% | 92% | 10% |

| Variables Tested | LBMLT 2006-8 | MHL 2006-1 (G 1-A2) | MHL 2006-1 |
|---|---|---|---|
| Type | | | |
| Occupancy Type | 66% | Not Necessary | 29% |
| Property Type | 12% | 6% | 35% |
| Loan Purpose | 88% | 64% | 5% |
| Original Terms | 95% | Not Necessary | Not Necessary |

| Variables Tested | NAA 2006-AR4 | NHELI 2007-1 | OOMLT 2007-2 |
|---|---|---|---|
| FICO Score | 80% | 79% | 76% |
| Debt-to-Income | 57% | 78% | 30% |
| Loan-to-Value | 94% | 73% | 96% |
| Combined LTV | 48% | 86% | 62% |
| Note Rate | 93% | 12% | 83% |
| Current Balance | 75% | 67% | 45% |
| Documentation Type | 5% | 16% | 48% |
| Occupancy Type | 20% | 94% | Not Necessary |
| Property Type | 25% | 66% | 53% |
| Loan Purpose | 92% | 99% | 69% |
| Original Terms | Not Necessary | Not Necessary | Not Necessary |

| Variables Tested | SVHE 2006-WF1 |
|---|---|
| FICO Score | 95% |
| Debt-to-Income | 98% |
| Loan-to-Value | 95% |
| Combined LTV | 99% |
| Note Rate | 85% |
| Current Balance | 86% |
| Documentation Type | 11% |
| Occupancy Type | 41% |
| Property Type | 73% |
| Loan Purpose | 48% |
| Original Terms | Not Necessary |

Supplemental

| Variables Tested | HVMLT 2006-10 | HVMLT 2007-1 (G 2) | HVMLT 2007-2 |
|---|---|---|---|
| FICO Score | 85% | 97% | 76% |
| Debt-to-Income | 64% | 25% | 48% |
| Loan-to-Value | 92% | 38% | 7% |
| Combined LTV | 76% | 58% | 95% |

| Variables Tested | HVMLT 2006-10 | HVMLT 2007-1 (G 2) | HVMLT 2007-2 |
|---|---|---|---|
| Note Rate | 43% | 93% | 78% |
| Current Balance | 21% | 73% | 57% |
| Documentation Type | 99% | 91% | 48% |
| Occupancy Type | 82% | 44% | 23% |
| Property Type | 18% | 33% | 39% |
| Loan Purpose | 6% | 65% | 59% |
| Original Terms | 92% | 61% | 72% |

| Variables Tested | HVMLT 2007-3 | INDX 2006-AR6 | LBMLT 2006-2 |
|---|---|---|---|
| FICO Score | 41% | 90% | 91% |
| Debt-to-Income | 98% | 53% | 10% |
| Loan-to-Value | 39% | 72% | 28% |
| Combined LTV | 57% | 40% | 51% |
| Note Rate | 84% | 84% | 95% |
| Current Balance | 60% | 23% | 77% |
| Documentation Type | 74% | 15% | 88% |
| Occupancy Type | 47% | Not Necessary | Not Necessary |
| Property Type | 13% | 53% | 46% |
| Loan Purpose | 97% | 88% | 82% |
| Original Terms | 76% | 76% | 22% |

| Variables Tested | LBMLT 2006-8 | MHL 2006-1 (G 1-A2) | MHL 2006-1 |
|---|---|---|---|
| FICO Score | 59% | 84% | 98% |
| Debt-to-Income | 52% | 49% | 57% |
| Loan-to-Value | 58% | 44% | 18% |
| Combined LTV | 25% | 60% | 14% |
| Note Rate | 11% | 27% | 22% |
| Current Balance | 87% | 85% | 86% |
| Documentation Type | 23% | 13% | 44% |
| Occupancy Type | 30% | Not Necessary | 1% |
| Property Type | 70% | 61% | 48% |
| Loan Purpose | 51% | 4% | 99% |
| Original Terms | 5% | Not Necessary | Not Necessary |

| Variables Tested | NAA 2006-AR4 | NHELI 2007-1 | OOMLT 2007-2 |
|---|---|---|---|
| FICO Score | 76% | 88% | 98% |
| Debt-to-Income | 9% | 98% | 19% |

| Variables Tested | NAA 2006-AR4 | NHELI 2007-1 | OOMLT 2007-2 |
|---|---|---|---|
| Loan-to-Value | 83% | 55% | 65% |
| Combined LTV | 47% | 90% | 61% |
| Note Rate | 23% | 72% | 86% |
| Current Balance | 30% | 62% | 77% |
| Documentation Type | 76% | 64% | 28% |
| Occupancy Type | 72% | 61% | Not Necessary |
| Property Type | 58% | 35% | 75% |
| Loan Purpose | 17% | 18% | 90% |
| Original Terms | Not Necessary | Not Necessary | Not Necessary |

| Variables Tested | SVHE 2006-WF1 |
|---|---|
| FICO Score | 88% |
| Debt-to-Income | 94% |
| Loan-to-Value | 76% |
| Combined LTV | 56% |
| Note Rate | 82% |
| Current Balance | 29% |
| Documentation Type | 49% |
| Occupancy Type | 66% |
| Property Type | 20% |
| Loan Purpose | 10% |
| Original Terms | Not Necessary |

- 48 -

*NCUA v. UBS S.D.N.Y 13-cv-6731*

Initial

| Variables Tested | ARSI 2006-W3 | CWALT 2006-OA3 | CWALT 2006-OA8 |
|---|---|---|---|
| FICO Score | 98% | 96% | 28% |
| Debt-to-Income | 74% | 34% | 54% |
| Loan-to-Value | 43% | 5% | 63% |
| Combined LTV | 15% | 4% | 99% |
| Note Rate | 57% | 53% | 73% |
| Current Balance | 72% | 67% | 55% |
| Documentation Type | 47% | 42% | 15% |
| Occupancy Type | 57% | 17% | 7% |
| Property Type | 70% | 74% | 77% |
| Loan Purpose | 23% | 82% | 19% |
| Original Terms | Not Necessary | 60% | 63% |

| Variables Tested | CWHL 2006-OA5 (G 1) | CWHL 2006-OA5 (G 2) | FHLT 2006-B |
|---|---|---|---|
| FICO Score | 85% | 85% | 32% |
| Debt-to-Income | 13% | 7% | 31% |
| Loan-to-Value | 44% | 96% | 57% |
| Combined LTV | 65% | 49% | 60% |
| Note Rate | 70% | 33% | 11% |
| Current Balance | 61% | 65% | 24% |
| Documentation Type | 62% | 49% | 25% |
| Occupancy Type | 42% | 86% | Not Necessary |
| Property Type | 79% | 28% | 90% |
| Loan Purpose | 87% | 89% | 18% |
| Original Terms | 60% | 30% | Not Necessary |

| Variables Tested | INABS 2007-A | INDS 2006-3 | INDS 2007-1 |
|---|---|---|---|
| FICO Score | 98% | 80% | 85% |
| Debt-to-Income | 47% | 52% | 90% |
| Loan-to-Value | 71% | 17% | 23% |
| Combined LTV | 60% | 60% | 77% |
| Note Rate | 44% | 31% | 97% |
| Current Balance | 11% | 91% | 70% |

| Variables Tested | INABS 2007-A | INDS 2006-3 | INDS 2007-1 |
|---|---|---|---|
| Documentation Type | 69% | 97% | 42% |
| Occupancy Type | 12% | Not Necessary | Not Necessary |
| Property Type | 78% | 68% | 10% |
| Loan Purpose | 66% | 85% | 45% |
| Original Terms | 17% | Not Necessary | Not Necessary |

| Variables Tested | INDS 2007-2 | MABS 2006-HE2 | MABS 2006-WMC1 |
|---|---|---|---|
| FICO Score | 64% | 73% | 55% |
| Debt-to-Income | 92% | 41% | 1% |
| Loan-to-Value | 42% | 22% | 21% |
| Combined LTV | 3% | 99% | 26% |
| Note Rate | 51% | 84% | 18% |
| Current Balance | 11% | 62% | 55% |
| Documentation Type | 30% | 80% | 21% |
| Occupancy Type | Not Necessary | 26% | 60% |
| Property Type | 87% | 78% | 17% |
| Loan Purpose | 21% | 40% | 13% |
| Original Terms | Not Necessary | Not Necessary | 15% |

| Variables Tested | MABS 2006-WMC4 | MARM 2007-2 | MARM 2007-HF2 |
|---|---|---|---|
| FICO Score | 57% | 91% | 49% |
| Debt-to-Income | 27% | 9% | 97% |
| Loan-to-Value | 61% | 24% | 23% |
| Combined LTV | 58% | 45% | 67% |
| Note Rate | 54% | 88% | 89% |
| Current Balance | 92% | 79% | 42% |
| Documentation Type | 79% | 64% | 49% |
| Occupancy Type | Not Necessary | 12% | 98% |
| Property Type | 97% | 90% | 53% |
| Loan Purpose | 56% | 18% | 80% |
| Original Terms | 50% | Not Necessary | Not Necessary |

| Variables Tested | MASL 2006-1 |
|---|---|
| FICO Score | 84% |
| Debt-to-Income | 88% |
| Loan-to-Value | 66% |
| Combined LTV | 43% |

| Variables Tested | MASL 2006-1 |
|---|---|
| Note Rate | 88% |
| Current Balance | 97% |
| Documentation Type | 83% |
| Occupancy Type | 73% |
| Property Type | 52% |
| Loan Purpose | 46% |
| Original Terms | 93% |

Supplemental

| Variables Tested | ARSI 2006-W3 | CWALT 2006-OA3 | CWALT 2006-OA8 |
|---|---|---|---|
| FICO Score | 93% | 80% | 70% |
| Debt-to-Income | 85% | 31% | 36% |
| Loan-to-Value | 25% | 11% | 97% |
| Combined LTV | 88% | 53% | 32% |
| Note Rate | 64% | 94% | 6% |
| Current Balance | 10% | 28% | 44% |
| Documentation Type | 92% | 75% | 78% |
| Occupancy Type | 57% | 69% | 24% |
| Property Type | 58% | 89% | 46% |
| Loan Purpose | 80% | 21% | 65% |
| Original Terms | Not Necessary | 4% | 86% |

| Variables Tested | CWHL 2006-OA5 (G 1) | CWHL 2006-OA5 (G 2) | FHLT 2006-B |
|---|---|---|---|
| FICO Score | 67% | 42% | 93% |
| Debt-to-Income | 54% | 10% | 91% |
| Loan-to-Value | 13% | 47% | 31% |
| Combined LTV | 28% | 92% | 62% |
| Note Rate | 64% | 30% | 49% |
| Current Balance | 5% | 16% | 77% |
| Documentation Type | 49% | 24% | 13% |
| Occupancy Type | 98% | 67% | Not Necessary |
| Property Type | 30% | 66% | 87% |
| Loan Purpose | 54% | 46% | 82% |
| Original Terms | 76% | 15% | Not Necessary |

| Variables Tested | INABS 2007-A | INDS 2006-3 | INDS 2007-1 |
|---|---|---|---|
| FICO Score | 99% | 94% | 87% |
| Debt-to-Income | 67% | 17% | 68% |
| Loan-to-Value | 21% | 62% | 37% |
| Combined LTV | 94% | 55% | 74% |
| Note Rate | 31% | 55% | 14% |
| Current Balance | 45% | 83% | 31% |
| Documentation Type | 55% | 16% | 43% |
| Occupancy Type | 99% | Not Necessary | Not Necessary |
| Property Type | 82% | 99% | 58% |
| Loan Purpose | 35% | 79% | 75% |
| Original Terms | 60% | Not Necessary | Not Necessary |

| Variables Tested | INDS 2007-2 | MABS 2006-HE2 | MABS 2006-WMC1 |
|---|---|---|---|
| FICO Score | 51% | 87% | 79% |
| Debt-to-Income | 48% | 66% | 24% |
| Loan-to-Value | 27% | 96% | 16% |
| Combined LTV | 84% | 87% | 35% |
| Note Rate | 28% | 65% | 46% |
| Current Balance | 16% | 42% | 60% |
| Documentation Type | 93% | 67% | 84% |
| Occupancy Type | Not Necessary | 6% | 69% |
| Property Type | 27% | 50% | 95% |
| Loan Purpose | 59% | 46% | 33% |
| Original Terms | Not Necessary | Not Necessary | 35% |

| Variables Tested | MABS 2006-WMC4 | MARM 2007-2 | MARM 2007-HF2 |
|---|---|---|---|
| FICO Score | 99% | 71% | 45% |
| Debt-to-Income | 18% | 45% | 78% |
| Loan-to-Value | 60% | 73% | 99% |
| Combined LTV | 56% | 29% | 93% |
| Note Rate | 43% | 45% | 65% |
| Current Balance | 71% | 83% | 20% |
| Documentation Type | 32% | 33% | 86% |
| Occupancy Type | Not Necessary | 86% | 68% |
| Property Type | 0% | 70% | 88% |
| Loan Purpose | 97% | 60% | 80% |
| Original Terms | 80% | Not Necessary | Not Necessary |

| Variables Tested | MASL 2006-1 |
|---|---|
| FICO Score | 100% |
| Debt-to-Income | 4% |
| Loan-to-Value | 51% |
| Combined LTV | 31% |
| Note Rate | 4% |
| Current Balance | 53% |
| Documentation Type | 59% |
| Occupancy Type | 48% |
| Property Type | 12% |
| Loan Purpose | 50% |
| Original Terms | 23% |

*NCUA v. Wachovia S.D.N.Y. 13-cv-6719*

Initial

| Variables Tested | WMLT 2006-ALT1 | WMLT 2006-AMN1 |
|---|---|---|
| FICO Score | 97% | 97% |
| Debt-to-Income | 30% | 66% |
| Loan-to-Value | 6% | 94% |
| Combined LTV | 14% | 57% |
| Note Rate | 61% | 34% |
| Current Balance | 51% | 15% |
| Documentation Type | 40% | 35% |
| Occupancy Type | 31% | 74% |
| Property Type | 7% | 52% |
| Loan Purpose | 2% | 35% |
| Original Terms | Not Necessary | Not Necessary |

Supplemental

| Variables Tested | WMLT 2006-ALT1 | WMLT 2006-AMN1 |
|---|---|---|
| FICO Score | 72% | 99% |
| Debt-to-Income | 72% | 72% |
| Loan-to-Value | 1% | 54% |
| Combined LTV | 2% | 91% |
| Note Rate | 32% | 49% |
| Current Balance | 14% | 67% |
| Documentation Type | 89% | 93% |
| Occupancy Type | 57% | 41% |
| Property Type | 11% | 82% |
| Loan Purpose | 71% | 17% |
| Original Terms | Not Necessary | Not Necessary |

**Appendix 2: List of Initial Samples and Supplemental Samples**

Notes:

- The "Initial 100 Loan Sample" identifies the set of loans to be re-underwritten. The "Supplemental 100 Loan Sample" provides a list of "backup" loans per stratum for the initial 100 loans in anticipation of missing loan files.

- The supplementation will occur in a sequential basis starting on row 26 of each FICO stratum.

## NCUA v. Barclays S.D.N.Y. 13-cv-6727

**BCAPB 2007-AB1**
**Initial Loan Sample**

|    | Fico Q1   | Fico Q2   | Fico Q3   | Fico Q4   |
|----|-----------|-----------|-----------|-----------|
| 1  | 157416843 | 157414871 | 157102633 | 157089392 |
| 2  | 156601445 | 157501321 | 157265166 | 157207697 |
| 3  | 157293713 | 71257232  | 156811432 | 157120262 |
| 4  | 71424238  | 156544942 | 156583031 | 156812364 |
| 5  | 156967002 | 157592882 | 157006883 | 157036229 |
| 6  | 157112863 | 157492083 | 157310558 | 157426438 |
| 7  | 157271701 | 147890214 | 157137274 | 156401127 |
| 8  | 156582561 | 156708109 | 157227836 | 157425455 |
| 9  | 157337411 | 156644932 | 157505223 | 156691438 |
| 10 | 156991184 | 157535022 | 156585333 | 157099284 |
| 11 | 157467796 | 154003347 | 155312895 | 157326117 |
| 12 | 156164428 | 157508003 | 157396219 | 157516006 |
| 13 | 156828709 | 156965964 | 157487455 | 157082777 |
| 14 | 157081589 | 157278425 | 156527244 | 157349887 |
| 15 | 156954455 | 156694804 | 157108325 | 157217787 |
| 16 | 156952582 | 157509043 | 155896632 | 157235136 |
| 17 | 155077191 | 157485889 | 71827505  | 157068909 |
| 18 | 156739856 | 157418351 | 157377326 | 151951167 |
| 19 | 157354143 | 157005794 | 156742124 | 156879686 |
| 20 | 70938592  | 156948135 | 157421249 | 157022369 |
| 21 | 156590689 | 157503079 | 157176579 | 156659088 |
| 22 | 157081894 | 157389396 | 155965981 | 156810814 |
| 23 | 156858672 | 157395682 | 71359756  | 157403098 |
| 24 | 156676603 | 156718371 | 156723959 | 157147232 |
| 25 | 157041708 | 157095829 | 157283763 | 156115701 |

## Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 156751406 | 155766728 | 156409401 | 156239592 |
| 27 | 157370974 | 151905874 | 156760274 | 157298522 |
| 28 | 156951782 | 70681887 | 155457435 | 156967713 |
| 29 | 156862641 | 156407504 | 69855542 | 156070914 |
| 30 | 156917957 | 156821555 | 155794969 | 157388489 |
| 31 | 157553728 | 157244237 | 157292194 | 156996894 |
| 32 | 154894653 | 157554957 | 69953792 | 157218785 |
| 33 | 157239211 | 157432139 | 156971095 | 152303848 |
| 34 | 157260738 | 157515248 | 156906034 | 157222712 |
| 35 | 155669971 | 157260365 | 154224059 | 155523954 |
| 36 | 156411134 | 157654708 | 156138026 | 157263286 |
| 37 | 156372062 | 157622929 | 157356684 | 70224308 |
| 38 | 70772272 | 157514753 | 68116516 | 157347022 |
| 39 | 156958332 | 157349986 | 156652547 | 157426073 |
| 40 | 157697681 | 71723688 | 157386855 | 69353654 |
| 41 | 156671638 | 156786436 | 71569651 | 156915357 |
| 42 | 156589434 | 70298567 | 151884608 | 157435728 |
| 43 | 157622358 | 70287545 | 157123308 | 156616625 |
| 44 | 156425118 | 156972804 | 69749679 | 157246539 |
| 45 | 156526444 | 156821456 | 71029649 | 157217514 |
| 46 | 157616426 | 157613407 | 157009101 | 157188871 |
| 47 | 157217324 | 157220385 | 157457052 | 71117519 |
| 48 | 156930943 | 157333519 | 157591272 | 157287558 |
| 49 | 157170002 | 157097916 | 157731654 | 157351651 |
| 50 | 157228388 | 156902397 | 157372574 | 157190232 |

## BCAP 2007-AA1
## Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1 | 125023238 | 6079903 | 124545193 | 125091902 |
| 2 | 124773984 | 125060123 | 125082722 | 125017593 |
| 3 | 124970657 | 125080650 | 6079866 | 124828296 |
| 4 | 125127753 | 124799175 | 125165944 | 124864513 |
| 5 | 124708696 | 6078891 | 125071389 | 124953029 |
| 6 | 125157791 | 124990188 | 6078973 | 125151879 |
| 7 | 124811827 | 124985036 | 124623957 | 125082973 |
| 8 | 124933963 | 124986251 | 125202509 | 125141637 |
| 9 | 124562379 | 125089012 | 124878294 | 125021337 |

| | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 10 | 125038603 | 124377276 | 124567818 | 125010407 |
| 11 | 6070493 | 124905270 | 124663547 | 125145947 |
| 12 | 125063341 | 125101731 | 124567749 | 124934260 |
| 13 | 124368497 | 125143877 | 124949418 | 124429719 |
| 14 | 124302044 | 6070928 | 124925715 | 6063215 |
| 15 | 125176756 | 124775315 | 125021273 | 125127233 |
| 16 | 125048321 | 124689265 | 124913211 | 125051998 |
| 17 | 125056873 | 125165935 | 125039734 | 6070485 |
| 18 | 125148393 | 124342658 | 124313427 | 124789073 |
| 19 | 125032430 | 124352724 | 125209838 | 124174373 |
| 20 | 124992756 | 125052381 | 124653348 | 125008586 |
| 21 | 124956075 | 6070483 | 125096103 | 124923556 |
| 22 | 124938128 | 124702668 | 124310904 | 124981834 |
| 23 | 124950352 | 124878459 | 124905346 | 124843107 |
| 24 | 125165938 | 124438283 | 125020918 | 124670987 |
| 25 | 124506045 | 125124058 | 6072110 | 125008065 |

### Supplemental Loan Sample

| | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 124638082 | 6078985 | 125088655 | 125039793 |
| 27 | 125062627 | 124826294 | 124686631 | 125076168 |
| 28 | 6072109 | 125154947 | 124687425 | 124969593 |
| 29 | 124965616 | 125073789 | 125120928 | 125135054 |
| 30 | 124816649 | 6072133 | 124758780 | 125025999 |
| 31 | 124995117 | 124984144 | 124939119 | 6079875 |
| 32 | 124672992 | 124933929 | 124843067 | 124784220 |
| 33 | 125160007 | 125043958 | 6064036 | 124957288 |
| 34 | 6079241 | 6079217 | 125102631 | 125061942 |
| 35 | 125079097 | 124843159 | 125095850 | 124957522 |
| 36 | 124447235 | 125036376 | 125077972 | 124644258 |
| 37 | 125070701 | 125067122 | 6057155 | 6070467 |
| 38 | 6070954 | 124648310 | 124637411 | 125098501 |
| 39 | 6070477 | 6072144 | 124881878 | 124991932 |
| 40 | 125056935 | 124703831 | 6078885 | 125067240 |
| 41 | 125118304 | 124927240 | 6078874 | 124903839 |
| 42 | 124933964 | 124617394 | 124933831 | 125089364 |
| 43 | 125141784 | 6070481 | 124689666 | 124655089 |
| 44 | 124522077 | 124877937 | 125073551 | 124937268 |
| 45 | 124947450 | 125069747 | 125021323 | 6070656 |

| 46 | 124755386 | 124827170 | 124995008 | 124917118 |
|----|-----------|-----------|-----------|-----------|
| 47 | 124710684 | 124756353 | 6079812   | 124906141 |
| 48 | 125041977 | 125039382 | 124958600 | 124548875 |
| 49 | 124871829 | 125024239 | 125021330 | 125115394 |
| 50 | 124511655 | 123933388 | 6079210   | 124947001 |

## BCAP 2007-AA2
### Initial Loan Sample

|    | Fico Q1   | Fico Q2   | Fico Q3   | Fico Q4   |
|----|-----------|-----------|-----------|-----------|
| 1  | 152851950 | 164248970 | 146881300 | 154761318 |
| 2  | 131228017 | 157011144 | 157353999 | 158690050 |
| 3  | 157663190 | 157912028 | 155681386 | 156985373 |
| 4  | 144891333 | 157054940 | 157049811 | 156666945 |
| 5  | 157437624 | 154734002 | 157754581 | 156775020 |
| 6  | 158678816 | 148148316 | 156258661 | 147641660 |
| 7  | 157177059 | 158515614 | 152930492 | 147347279 |
| 8  | 156044408 | 156178218 | 148056368 | 147385236 |
| 9  | 146404372 | 156968353 | 147155903 | 157674176 |
| 10 | 152620568 | 157102738 | 148080219 | 148028509 |
| 11 | 157302313 | 147342143 | 156884597 | 154942442 |
| 12 | 157122355 | 138763441 | 157762822 | 148125129 |
| 13 | 156582107 | 155180684 | 153758947 | 147394853 |
| 14 | 77156197  | 148235911 | 157257126 | 155823708 |
| 15 | 147340567 | 158118792 | 156048208 | 152060491 |
| 16 | 157813840 | 147731472 | 156935985 | 146603609 |
| 17 | 147706052 | 149160701 | 157813196 | 156753832 |
| 18 | 74128823  | 131812402 | 146656760 | 147301250 |
| 19 | 148243640 | 148121680 | 139660626 | 155546464 |
| 20 | 147339310 | 141674637 | 155323840 | 155882883 |
| 21 | 163866590 | 148244696 | 154828423 | 111828578 |
| 22 | 153682454 | 154742949 | 147579500 | 157923101 |
| 23 | 153945180 | 147345687 | 147392397 | 155818114 |
| 24 | 148732203 | 148165766 | 157443816 | 152434688 |
| 25 | 159146233 | 156650533 | 148770031 | 156450657 |

### Supplemental Loan Sample

|    | Fico Q1   | Fico Q2   | Fico Q3   | Fico Q4   |
|----|-----------|-----------|-----------|-----------|
| 26 | 157559410 | 157124144 | 147364338 | 155540268 |
| 27 | 158177587 | 155815778 | 148040654 | 149466803 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 28 | 148317177 | 147402262 | 147391949 | 156602494 |
| 29 | 155062149 | 155659588 | 157171182 | 165080934 |
| 30 | 143098388 | 155662133 | 157566147 | 157053308 |
| 31 | 163902517 | 157491020 | 144323985 | 20477193 |
| 32 | 20465002 | 140479656 | 154699152 | 139021020 |
| 33 | 156768859 | 156639963 | 147010548 | 140262125 |
| 34 | 140697823 | 148232806 | 156435294 | 155747563 |
| 35 | 155451370 | 155642277 | 147136988 | 158420080 |
| 36 | 156004151 | 155444240 | 148230118 | 156449185 |
| 37 | 146384473 | 156289257 | 163764225 | 146261426 |
| 38 | 146413781 | 155865687 | 147565787 | 156604942 |
| 39 | 157016510 | 157762813 | 147371178 | 146050298 |
| 40 | 147539023 | 157259399 | 154394473 | 156369740 |
| 41 | 156350955 | 156869947 | 132784826 | 147535111 |
| 42 | 131217048 | 156707820 | 142901089 | 147660511 |
| 43 | 148244552 | 164787443 | 156702469 | 156111537 |
| 44 | 148920018 | 154762148 | 147217991 | 149774210 |
| 45 | 147757275 | 155765999 | 157755197 | 146854313 |
| 46 | 148188713 | 156457658 | 147818330 | 156476127 |
| 47 | 155847200 | 155350450 | 156984045 | 146901047 |
| 48 | 163947848 | 6623940 | 155323504 | 148443340 |
| 49 | 148689309 | 146338899 | 157343096 | 148232942 |
| 50 | 148109383 | 153145559 | 156355777 | 156132634 |

### BCAP 2007-AA3 (Group 1)
### Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 157429564 | 157573163 | 156491797 | 157838095 |
| 2  | 157841768 | 71366017 | 156808362 | 157253584 |
| 3  | 157671447 | 71672661 | 69935625 | 157211301 |
| 4  | 157675927 | 157542382 | 71894646 | 156276917 |
| 5  | 72234123 | 69754679 | 157482068 | 157675562 |
| 6  | 71657308 | 71770473 | 157375981 | 71633655 |
| 7  | 157669482 | 70784392 | 157767104 | 72158231 |
| 8  | 157676131 | 71947063 | 71499008 | 70655626 |
| 9  | 157211657 | 66569476 | 71693931 | 156480121 |
| 10 | 71741318 | 72170137 | 71888242 | 157244351 |
| 11 | 157395864 | 156917106 | 157676081 | 157230368 |
| 12 | 157672452 | 154889216 | 71762785 | 71958854 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 13 | 157165028 | 72413594 | 71748412 | 157771817 |
| 14 | 155248545 | 158086629 | 157166398 | 72095821 |
| 15 | 70575949 | 71992705 | 72904683 | 71913263 |
| 16 | 71660005 | 157344904 | 156935801 | 71380034 |
| 17 | 71072342 | 157280397 | 155378201 | 157595638 |
| 18 | 71446637 | 156583759 | 157169459 | 71973754 |
| 19 | 72707367 | 72291891 | 157438995 | 157765611 |
| 20 | 157567777 | 157401696 | 157960741 | 71492615 |
| 21 | 71480446 | 157870197 | 72395858 | 157027236 |
| 22 | 71591325 | 156539843 | 71488985 | 156008062 |
| 23 | 156504151 | 157172958 | 72037575 | 157523267 |
| 24 | 72290125 | 157815416 | 72347149 | 68849546 |
| 25 | 157211087 | 157172933 | 157490178 | 72214695 |

## Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 71547459 | 72263676 | 71185102 | 157734062 |
| 27 | 69804763 | 156461006 | 72596976 | 72005101 |
| 28 | 72497829 | 71486039 | 157719618 | 71562235 |
| 29 | 157210105 | 156102568 | 157674003 | 71980312 |
| 30 | 69973303 | 157205394 | 68978188 | 156684441 |
| 31 | 157172271 | 72421597 | 157513821 | 71037469 |
| 32 | 70883269 | 72243629 | 157196882 | 157257445 |
| 33 | 157667775 | 71547756 | 70051073 | 72027469 |
| 34 | 71803241 | 156897134 | 157170879 | 152666681 |
| 35 | 156577793 | 157670134 | 157706524 | 156914137 |
| 36 | 71718845 | 156672289 | 72510019 | 157876442 |
| 37 | 158102418 | 68575497 | 71317515 | 157216052 |
| 38 | 157085648 | 72604648 | 72146731 | 70267745 |
| 39 | 65964835 | 69087161 | 157670928 | 69466837 |
| 40 | 157674995 | 157956491 | 72723513 | 156207318 |
| 41 | 157713769 | 157699117 | 157170572 | 156118168 |
| 42 | 157693292 | 72315286 | 72511496 | 70081773 |
| 43 | 72667074 | 71950158 | 156794455 | 72171101 |
| 44 | 71775316 | 157667809 | 71096374 | 70889134 |
| 45 | 158046581 | 157531948 | 71760805 | 156773707 |
| 46 | 72106016 | 157165739 | 72001688 | 72218332 |
| 47 | 72347974 | 156836272 | 157681693 | 156684599 |
| 48 | 68868389 | 71857502 | 157241498 | 156485484 |

| | | | |
|---|---|---|---|
| 49 | 157668518 | 61581781 | 49537913 | 157444407 |
| 50 | 157842485 | 65939191 | 157212192 | 71400774 |

## BCAP 2007-AA3 (Group 2)
### Initial Loan Sample

| | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 158514270 | 149054639 | 149375488 | 149819087 |
| 2 | 155748900 | 147006044 | 149343556 | 149445328 |
| 3 | 147214127 | 157690065 | 152753180 | 113568165 |
| 4 | 158698721 | 163458833 | 148312992 | 148048367 |
| 5 | 147915735 | 149366847 | 158610929 | 148896391 |
| 6 | 148419897 | 163522512 | 159270261 | 164726896 |
| 7 | 159114681 | 159323819 | 164438946 | 127795872 |
| 8 | 163476867 | 156774844 | 148315729 | 147217767 |
| 9 | 148748349 | 164497652 | 159298749 | 148949510 |
| 10 | 149204722 | 159265612 | 148626533 | 131693075 |
| 11 | 163549796 | 148866604 | 159328195 | 149478157 |
| 12 | 158828409 | 158680363 | 115740259 | 155215552 |
| 13 | 148555002 | 159243226 | 158124286 | 148993648 |
| 14 | 148862651 | 163475675 | 148154588 | 158781441 |
| 15 | 149234694 | 148971353 | 164371606 | 133358910 |
| 16 | 149294173 | 148583960 | 165048426 | 149101941 |
| 17 | 152460536 | 156277270 | 164236930 | 149589322 |
| 18 | 154978126 | 159555117 | 148787554 | 148892767 |
| 19 | 156111303 | 153024383 | 157136281 | 153712106 |
| 20 | 133368080 | 156704102 | 164353474 | 158680371 |
| 21 | 147897908 | 142544611 | 163966159 | 149611325 |
| 22 | 163457553 | 155393287 | 149452697 | 148784401 |
| 23 | 149901442 | 149708233 | 158814491 | 159158610 |
| 24 | 164703696 | 122889979 | 165371136 | 158281953 |
| 25 | 159127477 | 163390720 | 149781827 | 148949174 |

### Supplemental Loan Sample

| | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 165978330 | 148346293 | 157106243 | 149406099 |
| 27 | 159493965 | 149785611 | 164674068 | 164920144 |
| 28 | 157975116 | 157255063 | 158345242 | 148263842 |
| 29 | 149143891 | 164362973 | 165165864 | 159429485 |
| 30 | 157665967 | 148305943 | 148785953 | 157082493 |
| 31 | 158280276 | 154867970 | 150001775 | 164518638 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 32 | 147932033 | 149124568 | 158502888 | 8600105 |
| 33 | 148833255 | 148929051 | 164643991 | 149139722 |
| 34 | 165310329 | 158420960 | 151929030 | 164588544 |
| 35 | 107995651 | 148346693 | 159331164 | 156103493 |
| 36 | 158605102 | 159476355 | 158881933 | 149104702 |
| 37 | 148289053 | 149372655 | 149249360 | 159307099 |
| 38 | 150447996 | 158616722 | 149642729 | 156164529 |
| 39 | 157825853 | 149397850 | 118644637 | 149219508 |
| 40 | 149615846 | 149781627 | 152398795 | 159113682 |
| 41 | 158676528 | 149790852 | 149201914 | 164657868 |
| 42 | 159282707 | 164446827 | 166049603 | 158830761 |
| 43 | 157914444 | 164963469 | 158858504 | 149408516 |
| 44 | 164341626 | 133710953 | 7519965 | 148462126 |
| 45 | 165492519 | 149222116 | 149236022 | 158870970 |
| 46 | 164326391 | 148556714 | 148878341 | 163388236 |
| 47 | 148990887 | 149892624 | 158240221 | 149854460 |
| 48 | 149665324 | 163515182 | 158402124 | 148945445 |
| 49 | 164785650 | 149526779 | 157528102 | 164879624 |
| 50 | 148428242 | 120239235 | 164249220 | 164563884 |

## FHLT 2006-C
### Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 3000188368 | 5000217659 | 5000216821 | 3000201445 |
| 2  | 5000218115 | 5000224578 | 3000234375 | 3000192444 |
| 3  | 3000091340 | 7000208499 | 8000095315 | 3000218251 |
| 4  | 5000226181 | 7000210450 | 6000239439 | 3000238950 |
| 5  | 8000093580 | 3000180224 | 3000276593 | 3000226002 |
| 6  | 5000210806 | 3000201979 | 7000211936 | 6000240431 |
| 7  | 7000187756 | 5000226263 | 3000254893 | 7000210645 |
| 8  | 7000211369 | 6000237845 | 3000235764 | 6000240589 |
| 9  | 5000222592 | 6000238642 | 8000094201 | 6000242711 |
| 10 | 6000243513 | 3000205472 | 8000092876 | 3000199840 |
| 11 | 8000092641 | 7000210524 | 8000095135 | 8000093059 |
| 12 | 3000206601 | 3000242182 | 3000249920 | 3000242638 |
| 13 | 3000029775 | 6000240118 | 7000207213 | 6000238337 |
| 14 | 8000097540 | 3000232954 | 5000226673 | 3000231840 |
| 15 | 1000318912 | 5000222123 | 6000243141 | 6000239739 |
| 16 | 8000094285 | 6000243314 | 7000209216 | 6000241403 |

| | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 17 | 7000207185 | 3000232932 | 3000234649 | 5000226227 |
| 18 | 8000097334 | 5000220524 | 5000225920 | 8000095007 |
| 19 | 3000209648 | 7000209375 | 3000225717 | 5000224249 |
| 20 | 3000091772 | 8000096893 | 6000240341 | 5000225872 |
| 21 | 6000239975 | 7000209388 | 6000241843 | 1000324558 |
| 22 | 5000221317 | 3000229367 | 5000215190 | 6000233617 |
| 23 | 5000226447 | 7000208708 | 3000183158 | 6000240902 |
| 24 | 6000237131 | 8000095893 | 7000208202 | 3000214645 |
| 25 | 3000214792 | 6000238622 | 6000240837 | 7000209633 |

## Supplemental Loan Sample

| | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 3000162437 | 3000194834 | 7000206530 | 6000238741 |
| 27 | 6000220192 | 7000211665 | 5000220505 | 3000210004 |
| 28 | 3000228264 | 7000208321 | 6000235219 | 5000223846 |
| 29 | 5000217544 | 1000315571 | 3000256748 | 3000200956 |
| 30 | 3000194333 | 8000085559 | 3000181156 | 6000236414 |
| 31 | 6000238137 | 7000188068 | 3000216044 | 5000226007 |
| 32 | 3000230213 | 3000172360 | 7000210563 | 6000237577 |
| 33 | 6000224572 | 8000097187 | 3000238131 | 5000222971 |
| 34 | 6000236930 | 7000209710 | 3000271521 | 6000239998 |
| 35 | 6000237077 | 3000215258 | 8000096685 | 3000207544 |
| 36 | 5000219941 | 7000211661 | 7000206698 | 6000225517 |
| 37 | 7000209961 | 6000241824 | 5000221738 | 6000237445 |
| 38 | 6000223406 | 1000324218 | 7000208636 | 6000242271 |
| 39 | 8000096749 | 3000211174 | 6000240297 | 3000181895 |
| 40 | 6000240013 | 8000096791 | 3000186652 | 3000231065 |
| 41 | 1000323358 | 3000252016 | 3000174614 | 5000224125 |
| 42 | 6000242914 | 6000215601 | 5000221114 | 3000217557 |
| 43 | 8000095157 | 6000241838 | 6000237425 | 3000213198 |
| 44 | 5000216601 | 3000238836 | 5000225429 | 6000235169 |
| 45 | 5000213705 | 1000323258 | 5000217396 | 7000208532 |
| 46 | 8000095742 | 3000217682 | 3000167591 | 8000095292 |
| 47 | 8000076784 | 3000254520 | 5000221653 | 3000177822 |
| 48 | 6000241092 | 1000322908 | 6000241901 | 1000322588 |
| 49 | 6000239843 | 3000274329 | 8000094478 | 3000258922 |
| 50 | 3000197655 | 7000208800 | 8000097459 | 3000136504 |

### SABR 2006-HE2
### Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 4002216021 | 1000313108 | 1007859383 | 1007825856 |
| 2  | 2000876755 | 8000083904 | 3000041429 | 1007812682 |
| 3  | 4002262707 | 1007579462 | 5000208929 | 5000143540 |
| 4  | 7000192421 | 8000086369 | 7000193790 | 1007311303 |
| 5  | 6000215108 | 2000864435 | 1000252049 | 1007238857 |
| 6  | 1000255466 | 1007483975 | 1007915660 | 6000214331 |
| 7  | 1007618580 | 1007318477 | 1007909169 | 3000006881 |
| 8  | 1007328082 | 1007331103 | 8000083942 | 1007321052 |
| 9  | 1007650892 | 6000213707 | 8000080716 | 1007398559 |
| 10 | 8000084724 | 7000193397 | 8000084038 | 4002265830 |
| 11 | 1007876845 | 1007266264 | 1007502570 | 1007904743 |
| 12 | 1007306523 | 1007544428 | 6000217344 | 6000161831 |
| 13 | 1000314297 | 1007561319 | 1007918168 | 1000306078 |
| 14 | 7000194461 | 1007812156 | 1007399996 | 1007332987 |
| 15 | 1007498059 | 1008100770 | 1007144823 | 6000215731 |
| 16 | 1007915278 | 8000082614 | 3000023508 | 3000020890 |
| 17 | 3000035637 | 2000882381 | 6000211872 | 6000215500 |
| 18 | 7000192618 | 2000877414 | 4002084102 | 1000253145 |
| 19 | 1007264845 | 4002177243 | 5000207897 | 1007645373 |
| 20 | 1007563905 | 4002204661 | 1008031505 | 3000047835 |
| 21 | 6000213896 | 1007361080 | 1007768418 | 7000190481 |
| 22 | 2000881545 | 3000027476 | 1007736943 | 3000058793 |
| 23 | 1007582485 | 1006954673 | 4002265664 | 1007480488 |
| 24 | 6000217098 | 3000026395 | 7000194508 | 2000881822 |
| 25 | 7000187943 | 7000188828 | 7000194209 | 7000191074 |

### Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 1007556307 | 4002257307 | 5000203739 | 3000047653 |
| 27 | 6000219436 | 3000044627 | 1007513657 | 2000883284 |
| 28 | 6000216976 | 1007972321 | 1007467305 | 8000081931 |
| 29 | 1007573137 | 8000084247 | 7000192277 | 8000083401 |
| 30 | 1007785131 | 1007441789 | 1000315593 | 3000068977 |
| 31 | 6000214376 | 1007460507 | 5000205395 | 3000043318 |
| 32 | 1007567812 | 1006895871 | 1000315530 | 7000192687 |
| 33 | 1007982560 | 1007212045 | 1000314185 | 1008061358 |
| 34 | 6000211656 | 8000082384 | 5000206817 | 3000038630 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 1000311224 | 1007337465 | 1007463032 | 2000883381 |
| 36 | 1006971191 | 8000084331 | 1007192655 | 7000190387 |
| 37 | 6000217703 | 1007823581 | 7000191666 | 1008005936 |
| 38 | 1007326814 | 3000082316 | 7000190565 | 1007368109 |
| 39 | 1008013080 | 7000001348 | 8000084112 | 1000308698 |
| 40 | 1007540235 | 1007184619 | 3000053801 | 3000032678 |
| 41 | 3000053936 | 1007260457 | 1007968951 | 1007709740 |
| 42 | 5000205832 | 4002234906 | 1007800891 | 4002203166 |
| 43 | 5000202954 | 1007684927 | 6000212231 | 4002157047 |
| 44 | 1007569455 | 1006941875 | 5000205296 | 1007464852 |
| 45 | 6000213349 | 1007336331 | 1007476000 | 1007207122 |
| 46 | 1007980367 | 1007449077 | 1007870486 | 3000016246 |
| 47 | 8000081687 | 1007520015 | 3000077945 | 6000217904 |
| 48 | 1000312853 | 1007575322 | 6000218232 | 1008025807 |
| 49 | 1007869425 | 3000044422 | 5000201735 | 6000215231 |
| 50 | 7000193354 | 7000191904 | 1007355658 | 1007456139 |

**WFHET 2006-3**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 155724842 | 156393043 | 155895352 | 155937683 |
| 2  | 153907977 | 156306375 | 155841778 | 156057135 |
| 3  | 155741143 | 156078149 | 154451363 | 156092694 |
| 4  | 155648819 | 154679187 | 155120066 | 156311078 |
| 5  | 153347554 | 155804479 | 155264161 | 155961303 |
| 6  | 155973084 | 156130965 | 155389372 | 154852883 |
| 7  | 155815319 | 155609555 | 156090086 | 156130759 |
| 8  | 155685902 | 155888175 | 155974017 | 156074247 |
| 9  | 154610125 | 156248296 | 153522446 | 156109258 |
| 10 | 156427833 | 156152316 | 151822871 | 155780497 |
| 11 | 155494586 | 155736739 | 156375651 | 156309312 |
| 12 | 155285877 | 155462336 | 156027187 | 155956311 |
| 13 | 155671555 | 155887441 | 156422917 | 155680499 |
| 14 | 155321409 | 155906332 | 155789134 | 155825912 |
| 15 | 155748387 | 154922058 | 156473514 | 153683735 |
| 16 | 155270101 | 156011017 | 156090953 | 155737505 |
| 17 | 156142903 | 156088007 | 155066343 | 155859341 |
| 18 | 155639016 | 155827785 | 156066268 | 155676778 |
| 19 | 155418882 | 156082539 | 155807746 | 156460412 |

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 20 | 154055198 | 155456585 | 156429409 | 155682644 |
| 21 | 155867906 | 156304305 | 155306962 | 156035123 |
| 22 | 156309338 | 156330581 | 156373243 | 155230055 |
| 23 | 155750169 | 152572418 | 155451131 | 155629603 |
| 24 | 155606643 | 156097677 | 155679376 | 155889991 |
| 25 | 155676042 | 155706534 | 155794258 | 156142671 |

## Supplemental Loan Sample

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 155691751 | 155334279 | 155888795 | 153964572 |
| 27 | 156409823 | 156403636 | 156125957 | 155601024 |
| 28 | 155539703 | 155658552 | 155748676 | 155529852 |
| 29 | 155224942 | 155877723 | 154834881 | 155877194 |
| 30 | 155814692 | 156438418 | 155507502 | 155345465 |
| 31 | 155343148 | 154598783 | 156055568 | 155436546 |
| 32 | 155878325 | 156159717 | 153869599 | 155279615 |
| 33 | 156008054 | 155462195 | 156518193 | 156022964 |
| 34 | 156644148 | 156477085 | 156413197 | 156170417 |
| 35 | 155660756 | 154380075 | 156208563 | 155236169 |
| 36 | 155232796 | 156779332 | 156484446 | 154461628 |
| 37 | 153211529 | 153733282 | 155097876 | 155860919 |
| 38 | 154305262 | 155961063 | 155893209 | 156415457 |
| 39 | 155731417 | 156409187 | 155155229 | 155847353 |
| 40 | 154072557 | 155196736 | 156005738 | 155700297 |
| 41 | 155829252 | 153463484 | 156036816 | 154827687 |
| 42 | 156381543 | 156253171 | 156202962 | 155792161 |
| 43 | 156549859 | 156327595 | 154332191 | 156336919 |
| 44 | 156240269 | 156556938 | 155889876 | 155505803 |
| 45 | 155939101 | 155774839 | 153088836 | 155388622 |
| 46 | 155781974 | 156117301 | 156332272 | 153513734 |
| 47 | 155531098 | 156370835 | 156125122 | 155649973 |
| 48 | 154795348 | 155786569 | 156367948 | 156008393 |
| 49 | 153735071 | 155736267 | 156002362 | 155744741 |
| 50 | 155562556 | 155889983 | 155510704 | 156049462 |

## WFHET 2007-1
### Initial Loan Sample

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 157552043 | 157164864 | 157720038 | 157245952 |

|     | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|-----|---------|---------|---------|---------|
| 2   | 157799966 | 157775305 | 158074872 | 155240997 |
| 3   | 158265413 | 157943424 | 157692757 | 157840075 |
| 4   | 157499823 | 157193772 | 157175787 | 157515479 |
| 5   | 157810177 | 157632084 | 157935271 | 157538133 |
| 6   | 157915539 | 157178385 | 157767567 | 157959537 |
| 7   | 157031402 | 157844598 | 158050575 | 157435033 |
| 8   | 156588618 | 157941659 | 158026948 | 157636465 |
| 9   | 157691759 | 156966285 | 158052852 | 157845462 |
| 10  | 158028886 | 157981978 | 157687641 | 157430224 |
| 11  | 157521535 | 157819988 | 157601923 | 157768987 |
| 12  | 157483397 | 157621467 | 157975665 | 157054305 |
| 13  | 157595687 | 157824434 | 157754383 | 157832304 |
| 14  | 157210279 | 157653445 | 157686965 | 157808213 |
| 15  | 157624883 | 157040353 | 157968439 | 157921032 |
| 16  | 157855198 | 157331471 | 157691676 | 157919226 |
| 17  | 156064107 | 157882598 | 157835471 | 157653858 |
| 18  | 157081886 | 156499626 | 157955667 | 156894081 |
| 19  | 157853904 | 157847609 | 158191635 | 157612615 |
| 20  | 157760901 | 157975913 | 157538034 | 157840133 |
| 21  | 157680414 | 157804576 | 157047861 | 157941667 |
| 22  | 157466384 | 157719287 | 157996984 | 157120916 |
| 23  | 157619651 | 157835976 | 157635319 | 158197483 |
| 24  | 157606104 | 157609298 | 157774027 | 156275414 |
| 25  | 157729492 | 157534298 | 158126441 | 157780453 |

### Supplemental Loan Sample

|     | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|-----|---------|---------|---------|---------|
| 26  | 157236399 | 157964339 | 157102203 | 156910341 |
| 27  | 157703182 | 157783523 | 157773359 | 157421116 |
| 28  | 157359605 | 157813072 | 156972929 | 158080606 |
| 29  | 157624016 | 157711292 | 157415555 | 154958292 |
| 30  | 157784653 | 157793324 | 158168195 | 157245531 |
| 31  | 157998733 | 157381336 | 157596842 | 157798588 |
| 32  | 157783143 | 157660705 | 158074583 | 156675902 |
| 33  | 157931577 | 158132563 | 157633827 | 153881248 |
| 34  | 157495284 | 157365594 | 157077033 | 157552381 |
| 35  | 157665472 | 157792904 | 157732322 | 157807686 |
| 36  | 157920141 | 157885971 | 157611971 | 156482424 |
| 37  | 157491044 | 157399882 | 157791716 | 157357153 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 38 | 157589268 | 157624313 | 157364019 | 157881723 |
| 39 | 157954157 | 157900036 | 157211251 | 157947391 |
| 40 | 157406117 | 156347247 | 157833351 | 158044719 |
| 41 | 158045179 | 157008939 | 157956384 | 157859075 |
| 42 | 157380841 | 157818485 | 157848185 | 157888934 |
| 43 | 157075581 | 157772815 | 157464603 | 157837584 |
| 44 | 157867664 | 157834516 | 157019373 | 157358755 |
| 45 | 157253352 | 157716234 | 157333006 | 157673021 |
| 46 | 158113993 | 156801789 | 157654179 | 156770323 |
| 47 | 157214297 | 156998304 | 157870858 | 157810011 |
| 48 | 157589136 | 157634635 | 154036099 | 157249459 |
| 49 | 157101965 | 157886656 | 157759325 | 157758426 |
| 50 | 157850025 | 157449489 | 157913104 | 157552712 |

*NCUA v. Credit Suisse S.D.N.Y. 13-cv-6736*

**ARMT 2006-3**
**Initial Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 500745741 | 700329153 | 700329280 | 500745406 |
| 2 | 700344457 | 407992784 | 408381507 | 408381347 |
| 3 | 700286799 | 408191694 | 407992856 | 500740099 |
| 4 | 500706092 | 407992785 | 700322372 | 408381531 |
| 5 | 500746388 | 700306994 | 408381461 | 700322231 |
| 6 | 700329300 | 407992847 | 500773403 | 408381832 |
| 7 | 408191939 | 500727851 | 500775362 | 407940960 |
| 8 | 407800838 | 500742001 | 407171154 | 500715730 |
| 9 | 500734724 | 408191908 | 408191892 | 500726919 |
| 10 | 407170796 | 700282514 | 408381760 | 500762571 |
| 11 | 700329032 | 500743043 | 500729001 | 500755733 |
| 12 | 407992421 | 407590037 | 407170961 | 407992903 |
| 13 | 500720437 | 700339210 | 700274505 | 500774140 |
| 14 | 500750712 | 407590017 | 500753256 | 700322100 |
| 15 | 500731123 | 500742096 | 700336777 | 700258817 |
| 16 | 500742617 | 500725078 | 500721859 | 700325232 |
| 17 | 407992576 | 500747656 | 700330458 | 407992485 |
| 18 | 407992713 | 407992507 | 407992839 | 500703063 |
| 19 | 500726923 | 500717633 | 407992673 | 407590064 |
| 20 | 700319728 | 700307127 | 500706794 | 700315739 |
| 21 | 500754904 | 408381868 | 500745783 | 407992731 |
| 22 | 407992710 | 700331555 | 408191709 | 408191832 |
| 23 | 500739386 | 700334122 | 407992725 | 500754022 |
| 24 | 500720413 | 500693477 | 500750414 | 407992440 |
| 25 | 500732145 | 408191845 | 408381617 | 500753830 |

**Supplemental Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 500776154 | 700324678 | 500754873 | 408381588 |
| 27 | 407170995 | 500754635 | 700297689 | 500720442 |
| 28 | 700303658 | 500740815 | 500736798 | 500731164 |
| 29 | 407992742 | 407590083 | 500750656 | 500724906 |
| 30 | 408191875 | 407992880 | 407171116 | 408381528 |
| 31 | 500749524 | 408191799 | 407992791 | 500772982 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 32 | 500740071 | 500747856 | 407265794 | 407992707 |
| 33 | 500730040 | 500733231 | 407262813 | 407590129 |
| 34 | 700266651 | 500684580 | 500746321 | 500763506 |
| 35 | 407992830 | 700318262 | 408381506 | 408381794 |
| 36 | 700324679 | 500750377 | 500519473 | 500775529 |
| 37 | 407170871 | 500756242 | 500773211 | 500758894 |
| 38 | 500722360 | 500693820 | 500750362 | 407992887 |
| 39 | 408191804 | 500763831 | 500713415 | 500744327 |
| 40 | 500734388 | 500748250 | 500650571 | 408191817 |
| 41 | 407992456 | 407992461 | 408381423 | 500731030 |
| 42 | 407171107 | 408381696 | 408381591 | 408381613 |
| 43 | 407170866 | 500714740 | 500743036 | 408381841 |
| 44 | 500729446 | 408191851 | 500724058 | 500720990 |
| 45 | 408191784 | 500753431 | 700245698 | 700315730 |
| 46 | 500694559 | 500750061 | 700346784 | 700330986 |
| 47 | 500732872 | 500747210 | 408381358 | 407992439 |
| 48 | 408191989 | 408191744 | 700308199 | 407590091 |
| 49 | 500772232 | 700319237 | 407992401 | 700329600 |
| 50 | 500741195 | 500760518 | 407992851 | 408381502 |

**ARMT 2007-1**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 700486449 | 700271886 | 410117723 | 700476757 |
| 2  | 700498521 | 410621750 | 700499548 | 410621843 |
| 3  | 700354938 | 500828040 | 500751599 | 405939083 |
| 4  | 410057485 | 500755128 | 700460460 | 410116872 |
| 5  | 500855479 | 700486769 | 700499779 | 700424476 |
| 6  | 410621802 | 700335169 | 500832287 | 700352327 |
| 7  | 410621833 | 700413054 | 500878950 | 500761461 |
| 8  | 500885931 | 409833565 | 700498930 | 410117698 |
| 9  | 700447620 | 500797216 | 410117746 | 700501021 |
| 10 | 408879558 | 700432078 | 700459544 | 410057532 |
| 11 | 500886692 | 700479433 | 700415180 | 500903632 |
| 12 | 410621861 | 700359471 | 700479511 | 408510028 |
| 13 | 500811670 | 408879572 | 700483123 | 408510034 |
| 14 | 500878160 | 700478791 | 700474290 | 500827667 |
| 15 | 500901607 | 500858038 | 409263652 | 500861280 |
| 16 | 500874726 | 700463119 | 700483593 | 700489008 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 17 | 500817491 | 500804217 | 410621680 | 700352948 |
| 18 | 700391858 | 700429529 | 700475043 | 500858050 |
| 19 | 410621856 | 410621862 | 700480426 | 500897053 |
| 20 | 700349488 | 700492895 | 700442625 | 405939160 |
| 21 | 410117751 | 410239175 | 408846536 | 408879534 |
| 22 | 500858053 | 408879628 | 500861119 | 700458192 |
| 23 | 700406062 | 700484981 | 408879520 | 409263617 |
| 24 | 500879386 | 500806866 | 409650686 | 410388452 |
| 25 | 500836829 | 700451135 | 408509993 | 500851093 |

## Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 410117797 | 700344015 | 700498223 | 700486889 |
| 27 | 500834502 | 700446972 | 500888652 | 500855248 |
| 28 | 410621766 | 700463049 | 500922357 | 500849664 |
| 29 | 700450920 | 500892730 | 500882473 | 500855856 |
| 30 | 500837091 | 500851236 | 408510018 | 410638606 |
| 31 | 700475591 | 700491530 | 700481951 | 500883240 |
| 32 | 500882965 | 500837166 | 700498393 | 500872416 |
| 33 | 500919646 | 500859525 | 410169355 | 700498671 |
| 34 | 409263699 | 408509902 | 408879567 | 410645016 |
| 35 | 500872149 | 700494402 | 500811586 | 700466668 |
| 36 | 700473802 | 700440725 | 700483168 | 500883691 |
| 37 | 408196847 | 410621819 | 700416839 | 700442766 |
| 38 | 500853444 | 410621681 | 700410666 | 410638742 |
| 39 | 500878257 | 700473137 | 500781196 | 408509911 |
| 40 | 500825443 | 500817241 | 700483917 | 500851682 |
| 41 | 700456619 | 410169350 | 500892555 | 700410577 |
| 42 | 700466756 | 700472576 | 700403012 | 500863997 |
| 43 | 500874978 | 500886424 | 409263640 | 409263701 |
| 44 | 700446832 | 410117675 | 410116835 | 405234930 |
| 45 | 700439594 | 408510055 | 500910243 | 700466333 |
| 46 | 409360273 | 700500557 | 410282214 | 405939070 |
| 47 | 700466147 | 700454390 | 700495526 | 500850433 |
| 48 | 700377873 | 700402523 | 500830295 | 500877686 |
| 49 | 500800821 | 700493754 | 700422220 | 500918150 |
| 50 | 700451199 | 700447177 | 405939059 | 500770082 |

**ARMT 2007-2**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 700517331 | 500934364 | 411005572 | 411046288 |
| 2  | 500889293 | 700494724 | 500925173 | 411914415 |
| 3  | 500866699 | 411914434 | 700503038 | 500943593 |
| 4  | 500893008 | 411023075 | 411551973 | 700516859 |
| 5  | 700510747 | 700507685 | 700507366 | 500944405 |
| 6  | 411419040 | 500824799 | 700506613 | 500940656 |
| 7  | 500900953 | 500915629 | 411914427 | 411023047 |
| 8  | 700483404 | 500938105 | 500933763 | 700512276 |
| 9  | 411551976 | 500942731 | 500950201 | 700435823 |
| 10 | 411108576 | 500917988 | 411023041 | 500943103 |
| 11 | 500937483 | 411452731 | 411629531 | 411914399 |
| 12 | 500937162 | 500924585 | 410239103 | 411452685 |
| 13 | 411551882 | 411452716 | 700505413 | 700515449 |
| 14 | 500896965 | 500917584 | 411023079 | 410117830 |
| 15 | 500871395 | 500856675 | 500943336 | 411535719 |
| 16 | 411023086 | 500902231 | 500912901 | 500925207 |
| 17 | 500880034 | 500915873 | 411023107 | 410677664 |
| 18 | 411629512 | 411914360 | 700401932 | 411552012 |
| 19 | 500907777 | 700503948 | 411914352 | 700495077 |
| 20 | 500892357 | 411784384 | 500923391 | 500925085 |
| 21 | 500900307 | 411419062 | 500917573 | 411551953 |
| 22 | 500937534 | 500931562 | 500906745 | 500919237 |
| 23 | 500899542 | 411551946 | 700512518 | 500906112 |
| 24 | 700507909 | 500913516 | 411761404 | 500956596 |
| 25 | 500911346 | 500908592 | 500944996 | 500915825 |

**Supplemental Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 410543585 | 500902983 | 700463777 | 700499803 |
| 27 | 700505628 | 500933428 | 411285597 | 500958225 |
| 28 | 411551910 | 411618216 | 500927217 | 500928947 |
| 29 | 500911143 | 700487065 | 500859996 | 500842809 |
| 30 | 700508719 | 700518999 | 408846574 | 411023088 |
| 31 | 500906893 | 500931561 | 700516540 | 500922366 |
| 32 | 500815177 | 700520751 | 411023023 | 500926412 |
| 33 | 700498621 | 411535573 | 700519035 | 411551874 |
| 34 | 700493088 | 411005547 | 500951685 | 411023038 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 700479920 | 411452734 | 500944555 | 411784365 |
| 36 | 500907977 | 500904461 | 700499936 | 411108515 |
| 37 | 500900870 | 700518857 | 500923115 | 500916289 |
| 38 | 411419052 | 411108526 | 411914368 | 411452729 |
| 39 | 500926261 | 411914347 | 411285610 | 411551963 |
| 40 | 500915645 | 411285589 | 700497880 | 500893068 |
| 41 | 500953105 | 411551942 | 700518208 | 411023109 |
| 42 | 411784379 | 700485117 | 411419054 | 500931481 |
| 43 | 411536787 | 500898925 | 500922484 | 500901623 |
| 44 | 403539941 | 700514942 | 700517932 | 411551955 |
| 45 | 411551998 | 500950636 | 500909860 | 700488517 |
| 46 | 411452672 | 500947786 | 500919672 | 411551996 |
| 47 | 500921529 | 700500324 | 500918081 | 700504613 |
| 48 | 700514905 | 500902606 | 700502692 | 411551901 |
| 49 | 500891257 | 411452727 | 500925215 | 411452690 |
| 50 | 411629563 | 411551914 | 500899674 | 500933426 |

## HEAT 2006-6
### Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 407805535 | 407607048 | 407274043 | 407805581 |
| 2  | 407582840 | 407609226 | 407546780 | 500732445 |
| 3  | 407605756 | 407582537 | 500750003 | 407806085 |
| 4  | 407608434 | 407497118 | 407607104 | 407837973 |
| 5  | 407582642 | 407882648 | 407805884 | 407607892 |
| 6  | 407805892 | 407557400 | 407607210 | 500713937 |
| 7  | 407621259 | 407882797 | 407502884 | 407607051 |
| 8  | 407607071 | 407198810 | 407534569 | 407607092 |
| 9  | 407906995 | 407607927 | 405358373 | 407589380 |
| 10 | 407607335 | 408161251 | 407501745 | 408152457 |
| 11 | 407805863 | 407621153 | 408152840 | 407838072 |
| 12 | 407608165 | 407273996 | 407805585 | 407599354 |
| 13 | 407805823 | 407599219 | 407199255 | 407838113 |
| 14 | 407557891 | 407582605 | 407608745 | 407725271 |
| 15 | 407556944 | 407185746 | 407276035 | 407599308 |
| 16 | 407882653 | 500714042 | 407608358 | 407805651 |
| 17 | 407608651 | 407883134 | 407605746 | 407883140 |
| 18 | 407608627 | 407199383 | 500712200 | 407606933 |
| 19 | 407599286 | 407198193 | 407411606 | 407607500 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 20 | 407606071 | 407621140 | 407607743 | 407607941 |
| 21 | 407607834 | 407607666 | 408193223 | 407805897 |
| 22 | 407582305 | 407608111 | 407606043 | 407384383 |
| 23 | 407607344 | 407613335 | 407281350 | 407607246 |
| 24 | 407608684 | 407296235 | 407607010 | 407608729 |
| 25 | 407582327 | 407805474 | 407481649 | 408152314 |

## Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 407607271 | 407534625 | 407608637 | 407607732 |
| 27 | 407448706 | 407605871 | 407621370 | 407607011 |
| 28 | 407605771 | 407609066 | 407606788 | 407805853 |
| 29 | 407582553 | 408152608 | 407805933 | 407725407 |
| 30 | 407599269 | 407605530 | 407582609 | 407296109 |
| 31 | 407883039 | 407882939 | 407296243 | 407607990 |
| 32 | 407582280 | 407609057 | 408142321 | 407608969 |
| 33 | 407582422 | 408193260 | 407607627 | 407281187 |
| 34 | 407582287 | 407606049 | 407607159 | 408152491 |
| 35 | 407805795 | 500763935 | 407725340 | 407621312 |
| 36 | 407883358 | 407608003 | 407608647 | 407281393 |
| 37 | 407606076 | 407607140 | 407805768 | 407805807 |
| 38 | 407805774 | 407542088 | 407582694 | 407607696 |
| 39 | 406917399 | 407557677 | 407606825 | 407805501 |
| 40 | 407582307 | 407605822 | 407882695 | 407607045 |
| 41 | 407608171 | 407608792 | 407805766 | 407607671 |
| 42 | 407882689 | 407607280 | 407534652 | 407607283 |
| 43 | 407607526 | 407582608 | 407605869 | 407607097 |
| 44 | 407805843 | 407599365 | 407725261 | 407605834 |
| 45 | 407566452 | 407605916 | 407607750 | 407607187 |
| 46 | 407608368 | 407607460 | 408193052 | 407606929 |
| 47 | 407605987 | 407501809 | 407281145 | 407607422 |
| 48 | 407582596 | 407882805 | 406917030 | 407606969 |
| 49 | 407605948 | 407607276 | 407607545 | 407606874 |
| 50 | 407605814 | 407607906 | 407882833 | 407582383 |

### HEMT 2006-2
### Initial Loan Sample

|    | Fico Q1   | Fico Q2   | Fico Q3   | Fico Q4   |
|----|-----------|-----------|-----------|-----------|
| 1  | 405306624 | 500542037 | 405216423 | 405309977 |
| 2  | 405260645 | 407001825 | 405388579 | 406502516 |
| 3  | 500600355 | 405568860 | 405592198 | 405230609 |
| 4  | 403014081 | 405568859 | 405234781 | 405450897 |
| 5  | 403014027 | 500665988 | 500599872 | 500585157 |
| 6  | 500507324 | 403014030 | 500606828 | 406502333 |
| 7  | 500676848 | 403782793 | 406502646 | 500595427 |
| 8  | 405565478 | 405451341 | 406502037 | 500618348 |
| 9  | 405388783 | 406502014 | 500607273 | 405383423 |
| 10 | 500667282 | 500619566 | 405234889 | 500708471 |
| 11 | 405788627 | 405450824 | 406502253 | 406334597 |
| 12 | 500576822 | 405309954 | 500555214 | 500618383 |
| 13 | 500610890 | 405388609 | 405450893 | 405592221 |
| 14 | 500714299 | 406502427 | 405234878 | 406502455 |
| 15 | 405357077 | 500577234 | 500641592 | 405687427 |
| 16 | 405388943 | 405309979 | 500626319 | 405388610 |
| 17 | 500625652 | 405234891 | 406502198 | 406501950 |
| 18 | 405428765 | 406090993 | 500573187 | 405234774 |
| 19 | 406091067 | 405309966 | 405234786 | 405388541 |
| 20 | 405260138 | 405260412 | 405234906 | 406502460 |
| 21 | 405388761 | 500605347 | 500583534 | 405687408 |
| 22 | 405260089 | 405260518 | 405171699 | 500583766 |
| 23 | 500619132 | 405687426 | 405451229 | 406502597 |
| 24 | 405788897 | 405568858 | 405306596 | 405216390 |
| 25 | 500679957 | 500684934 | 406334583 | 406502562 |

### Supplemental Loan Sample

|    | Fico Q1   | Fico Q2   | Fico Q3   | Fico Q4   |
|----|-----------|-----------|-----------|-----------|
| 26 | 405788855 | 500572045 | 406502513 | 500648726 |
| 27 | 500647368 | 500693002 | 500553526 | 406502629 |
| 28 | 405260139 | 406502430 | 405216369 | 500523436 |
| 29 | 405346872 | 406502007 | 405260953 | 500587943 |
| 30 | 405788046 | 500496806 | 406502543 | 406502570 |
| 31 | 500693081 | 405415862 | 405388940 | 405592215 |
| 32 | 500710457 | 405306609 | 406951917 | 500630005 |
| 33 | 405260623 | 500590719 | 405592170 | 406502058 |
| 34 | 406091053 | 405592267 | 500548755 | 405346589 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 500548049 | 500531714 | 405388724 | 500694396 |
| 36 | 500653452 | 406502639 | 500524649 | 406502286 |
| 37 | 500577229 | 403782841 | 405260994 | 405346864 |
| 38 | 405451050 | 405346591 | 500681369 | 405388551 |
| 39 | 405234887 | 500549932 | 405450793 | 406502457 |
| 40 | 405306633 | 405234814 | 405451246 | 405450912 |
| 41 | 405788660 | 500683374 | 500633830 | 406502042 |
| 42 | 500676813 | 500614228 | 405234893 | 406502062 |
| 43 | 405450275 | 500648961 | 500537171 | 406502231 |
| 44 | 405260785 | 406501899 | 405234745 | 500652749 |
| 45 | 405388556 | 405388922 | 405216362 | 500563103 |
| 46 | 406334595 | 500684937 | 405383429 | 405388780 |
| 47 | 500651844 | 500649203 | 405388985 | 500673586 |
| 48 | 405451221 | 405234749 | 406502224 | 406951920 |
| 49 | 405260610 | 406091038 | 406502627 | 500615807 |
| 50 | 405259978 | 405565481 | 500566217 | 405383363 |

**HEMT 2007-2**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 410200415 | 500921247 | 700494419 | 409934203 |
| 2  | 410200142 | 410198062 | 411329874 | 700457909 |
| 3  | 410200082 | 500873440 | 408417744 | 700491580 |
| 4  | 500911572 | 700456659 | 500935501 | 408942907 |
| 5  | 409277269 | 410198680 | 700465842 | 408942996 |
| 6  | 500944221 | 500920909 | 411053696 | 700470896 |
| 7  | 410034536 | 500922373 | 500889751 | 500921290 |
| 8  | 410977495 | 500874062 | 409734237 | 410026740 |
| 9  | 500916160 | 700444680 | 410034318 | 410026754 |
| 10 | 408867847 | 500908657 | 410026455 | 409899580 |
| 11 | 411053631 | 410199693 | 408904176 | 700437502 |
| 12 | 500919621 | 410200073 | 411401734 | 411048624 |
| 13 | 410197371 | 409189229 | 410977049 | 409308229 |
| 14 | 411401453 | 409933993 | 410147317 | 409308276 |
| 15 | 410200442 | 410977101 | 700495310 | 700516599 |
| 16 | 409899600 | 700469485 | 409985341 | 409985468 |
| 17 | 409306730 | 409933822 | 410228722 | 410034580 |
| 18 | 410198946 | 700465095 | 500899863 | 700499518 |
| 19 | 411485796 | 410200141 | 410026171 | 410026160 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 20 | 411401815 | 410050072 | 500881547 | 410977173 |
| 21 | 410977365 | 410199669 | 410977441 | 700516172 |
| 22 | 410199368 | 410228641 | 410063203 | 409933892 |
| 23 | 410977535 | 700502128 | 410034389 | 500875458 |
| 24 | 410579254 | 500937402 | 410034300 | 700441002 |
| 25 | 409839965 | 410768595 | 410198297 | 411485815 |

### Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 409945522 | 410228813 | 500879617 | 700458202 |
| 27 | 410229111 | 410062816 | 410197036 | 500921214 |
| 28 | 410199483 | 500877617 | 500889213 | 700507863 |
| 29 | 410063163 | 500918219 | 408943002 | 700483188 |
| 30 | 409945543 | 410448872 | 500884694 | 500891538 |
| 31 | 409485169 | 409934046 | 700455350 | 410050512 |
| 32 | 409479543 | 410977090 | 410050088 | 700500733 |
| 33 | 410199650 | 410579309 | 500921284 | 411053760 |
| 34 | 408785825 | 700418600 | 410200474 | 411053686 |
| 35 | 500941111 | 500907810 | 500900730 | 410984531 |
| 36 | 410167078 | 409484875 | 410199979 | 500902099 |
| 37 | 409484760 | 410197123 | 409985372 | 700461725 |
| 38 | 700479246 | 410057243 | 500921474 | 410051201 |
| 39 | 410579114 | 410200212 | 410062715 | 410197086 |
| 40 | 410199604 | 410394961 | 500911458 | 500921202 |
| 41 | 410034687 | 409479620 | 410063081 | 409338991 |
| 42 | 409945369 | 409484690 | 410228744 | 700500816 |
| 43 | 410199056 | 410197563 | 500884563 | 409934268 |
| 44 | 409865101 | 409277429 | 409297093 | 700485021 |
| 45 | 410196689 | 700430147 | 700511762 | 500919240 |
| 46 | 410198484 | 410050402 | 500889990 | 700512515 |
| 47 | 410167041 | 408942975 | 500933585 | 500918946 |
| 48 | 409484971 | 500879269 | 500948251 | 409865091 |
| 49 | 409395138 | 410228497 | 409277221 | 411329867 |
| 50 | 407788491 | 410228343 | 410791681 | 410026154 |

### LBMLT 2006-1
### Initial Loan Sample

|   | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---------|---------|---------|---------|
| 1 | 6637693 | 6616025 | 6631776 | 6603136 |

|     | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
| --- | --- | --- | --- | --- |
| 2   | 6639733 | 6639606 | 6636225 | 6642511 |
| 3   | 6621118 | 6614865 | 6592327 | 6637409 |
| 4   | 6622983 | 6622232 | 6615127 | 6610541 |
| 5   | 6609007 | 6635752 | 6626432 | 6628215 |
| 6   | 6621517 | 6629954 | 6617045 | 6624537 |
| 7   | 6615429 | 6644128 | 6626265 | 6605060 |
| 8   | 6618089 | 6632063 | 6625644 | 6635860 |
| 9   | 6632130 | 6631325 | 6636064 | 6617439 |
| 10  | 6612399 | 6601167 | 6621724 | 6646432 |
| 11  | 6639985 | 6631589 | 6635002 | 6643183 |
| 12  | 6636966 | 6626427 | 6620482 | 6619800 |
| 13  | 6624841 | 6635821 | 6629558 | 6638214 |
| 14  | 6622992 | 6634388 | 6625755 | 6633092 |
| 15  | 6614217 | 6637683 | 6627548 | 6639063 |
| 16  | 6629866 | 6642944 | 6617377 | 6642741 |
| 17  | 6649094 | 6642547 | 6637883 | 6626203 |
| 18  | 6633502 | 6628810 | 6605525 | 6628239 |
| 19  | 6627845 | 6631601 | 6619774 | 6628219 |
| 20  | 6636066 | 6647628 | 6615384 | 6624017 |
| 21  | 6641049 | 6617909 | 6628837 | 6637748 |
| 22  | 6643819 | 6629204 | 6618917 | 6626489 |
| 23  | 6616990 | 6626522 | 6638274 | 6617625 |
| 24  | 6631973 | 6625425 | 6618625 | 6611154 |
| 25  | 6616307 | 6605550 | 6638540 | 6604383 |

### Supplemental Loan Sample

|     | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
| --- | --- | --- | --- | --- |
| 26  | 6645833 | 6619401 | 6631043 | 6623831 |
| 27  | 6618385 | 6602715 | 6632883 | 6635667 |
| 28  | 6631651 | 6620816 | 6640485 | 6633417 |
| 29  | 6637178 | 6619265 | 6631452 | 6636783 |
| 30  | 6640387 | 6622308 | 6633371 | 6631998 |
| 31  | 6628407 | 6638716 | 6604040 | 6615165 |
| 32  | 6619970 | 6624208 | 6651490 | 6596461 |
| 33  | 6623359 | 6622827 | 6620308 | 6632842 |
| 34  | 6625828 | 6616707 | 6587013 | 6610714 |
| 35  | 6629021 | 6635465 | 6634891 | 6632949 |
| 36  | 6628420 | 6642201 | 6638079 | 6626895 |
| 37  | 6623403 | 6640723 | 6629203 | 6626396 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 38 | 6623644 | 6611372 | 6639937 | 6635573 |
| 39 | 6607491 | 6631556 | 6625862 | 6637524 |
| 40 | 6614744 | 6630685 | 6651838 | 6643821 |
| 41 | 6611693 | 6648832 | 6636427 | 6646621 |
| 42 | 6624113 | 6620947 | 6627313 | 6629193 |
| 43 | 6634416 | 6632791 | 6630480 | 6643067 |
| 44 | 6638940 | 6613095 | 6628741 | 6631725 |
| 45 | 6628782 | 6629153 | 6601774 | 6606068 |
| 46 | 6631809 | 6616215 | 6623971 | 6621626 |
| 47 | 6634633 | 6613970 | 6631555 | 6653337 |
| 48 | 6616532 | 6583218 | 6599581 | 6632390 |
| 49 | 6602881 | 6615760 | 6619626 | 6620476 |
| 50 | 6630260 | 6609732 | 6638826 | 6632137 |

**LBMLT 2006-6**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 6742815 | 6737197 | 6724154 | 6745827 |
| 2  | 6735951 | 6719494 | 6741000 | 6733746 |
| 3  | 6738637 | 6725214 | 6736400 | 6744241 |
| 4  | 6713826 | 6737393 | 6692657 | 6743705 |
| 5  | 6729049 | 6728025 | 6736564 | 6740870 |
| 6  | 6750075 | 6730021 | 6729362 | 6743626 |
| 7  | 6734450 | 6741113 | 6718825 | 6745763 |
| 8  | 6726345 | 6729386 | 6725563 | 6737910 |
| 9  | 6722406 | 6742237 | 6726206 | 6741322 |
| 10 | 6731889 | 6730587 | 6728007 | 6733825 |
| 11 | 6733181 | 6732835 | 6728219 | 6737511 |
| 12 | 6743926 | 6724194 | 6739321 | 6738125 |
| 13 | 6734638 | 6733382 | 6730154 | 6732285 |
| 14 | 6743807 | 6736324 | 6735407 | 6721209 |
| 15 | 6735913 | 6735119 | 6732283 | 6731741 |
| 16 | 6729726 | 6725544 | 6730826 | 6724793 |
| 17 | 6742607 | 6722393 | 6736177 | 6739485 |
| 18 | 6735065 | 6733852 | 6733936 | 6743261 |
| 19 | 6728869 | 6726556 | 6733633 | 6714825 |
| 20 | 6696628 | 6736500 | 6738340 | 6718871 |
| 21 | 6745746 | 6735681 | 6723729 | 6742324 |
| 22 | 6725285 | 6738184 | 6734600 | 6733738 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 23 | 6721347 | 6733372 | 6738329 | 6732147 |
| 24 | 6729571 | 6737045 | 6733519 | 6715754 |
| 25 | 6737221 | 6745467 | 6733991 | 6725776 |

### Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 6732810 | 6721732 | 6727526 | 6707740 |
| 27 | 6727153 | 6729327 | 6716726 | 6734049 |
| 28 | 6727515 | 6731501 | 729317834 | 6747482 |
| 29 | 6726237 | 6718952 | 6738484 | 6744104 |
| 30 | 6740666 | 6728263 | 6737465 | 6721901 |
| 31 | 6742245 | 6728180 | 6718074 | 6731206 |
| 32 | 6738444 | 6733773 | 6742380 | 6731689 |
| 33 | 6733398 | 6732764 | 6728390 | 6727868 |
| 34 | 6737449 | 6728315 | 6720954 | 6744221 |
| 35 | 6740318 | 6727789 | 6735894 | 6722750 |
| 36 | 6712932 | 6740657 | 6730889 | 6736296 |
| 37 | 6742809 | 6741096 | 6741929 | 6739626 |
| 38 | 6738617 | 6743463 | 6731459 | 6740221 |
| 39 | 6731147 | 6737199 | 6721405 | 6738467 |
| 40 | 6729948 | 6738951 | 6733052 | 6730303 |
| 41 | 6727127 | 6739154 | 6696469 | 6727426 |
| 42 | 6732169 | 6725803 | 6741765 | 729318147 |
| 43 | 6731420 | 6725705 | 6728509 | 6735938 |
| 44 | 6732080 | 6737152 | 6736633 | 6729346 |
| 45 | 6723079 | 6719484 | 6729617 | 6727593 |
| 46 | 6736830 | 6742289 | 6742000 | 6721737 |
| 47 | 6733752 | 6731447 | 6732231 | 6740721 |
| 48 | 6732450 | 6734630 | 6701960 | 6728543 |
| 49 | 6730423 | 6735984 | 6734877 | 6742906 |
| 50 | 6735482 | 729314708 | 6736501 | 6720398 |

### RALI 2006-QA9
### Initial Loan Sample

|   | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---------|---------|---------|---------|
| 1 | 10917663 | 10988929 | 10912773 | 11012061 |
| 2 | 10945795 | 10912743 | 10655124 | 10862423 |
| 3 | 10594270 | 10945199 | 10676928 | 10912649 |
| 4 | 10952127 | 10426323 | 10945583 | 10912551 |

|   | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---------|---------|---------|---------|
| 5 | 10945773 | 10943655 | 10912691 | 10945609 |
| 6 | 10627818 | 10907389 | 10945299 | 10981687 |
| 7 | 10946023 | 10912643 | 10945515 | 10968525 |
| 8 | 10945297 | 10945503 | 10960777 | 10945309 |
| 9 | 10907391 | 10945915 | 10929153 | 10979495 |
| 10 | 10947061 | 10958023 | 10933803 | 10912523 |
| 11 | 10945541 | 10627828 | 10912625 | 10947311 |
| 12 | 10655326 | 10945627 | 10988979 | 10627898 |
| 13 | 10627924 | 10655206 | 10655064 | 10912429 |
| 14 | 10945439 | 10945605 | 10655114 | 10627906 |
| 15 | 10945883 | 10892821 | 10945907 | 10945939 |
| 16 | 10945869 | 10945043 | 10993491 | 10655068 |
| 17 | 10627848 | 10938951 | 10998715 | 10938985 |
| 18 | 10883307 | 10655116 | 10954279 | 10980617 |
| 19 | 10988399 | 10627932 | 10862515 | 10676890 |
| 20 | 10945347 | 10655222 | 10917669 | 10954857 |
| 21 | 10873847 | 10763105 | 10920327 | 10988887 |
| 22 | 10918159 | 10655320 | 10945937 | 10943491 |
| 23 | 10943941 | 10954683 | 10627870 | 10912513 |
| 24 | 10912803 | 9996560 | 10945539 | 10945049 |
| 25 | 10627786 | 10655102 | 11001447 | 10912487 |

## Supplemental Loan Sample

|   | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---------|---------|---------|---------|
| 26 | 10985073 | 11012245 | 11001237 | 10912405 |
| 27 | 10970331 | 11011835 | 10945155 | 10944509 |
| 28 | 10912699 | 10945191 | 10982993 | 10960809 |
| 29 | 10627846 | 10763341 | 10953997 | 10945893 |
| 30 | 11016175 | 10627766 | 10945455 | 10878775 |
| 31 | 10946013 | 10627836 | 11006979 | 10974789 |
| 32 | 10945147 | 10912761 | 10945207 | 10985057 |
| 33 | 10957367 | 10655088 | 10945821 | 10945665 |
| 34 | 10909341 | 10763435 | 10945229 | 10912519 |
| 35 | 10929469 | 10945729 | 11001105 | 10919883 |
| 36 | 10945595 | 10945167 | 10945807 | 10983177 |
| 37 | 10945435 | 11001483 | 10991331 | 10945743 |
| 38 | 10945173 | 10627792 | 10991535 | 10655324 |
| 39 | 10954453 | 10627926 | 10945909 | 10681100 |
| 40 | 10945247 | 10919845 | 10655134 | 10945507 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 41 | 10915699 | 10988815 | 11001017 | 10945269 |
| 42 | 10950017 | 10989031 | 11011939 | 10828853 |
| 43 | 10984005 | 10945399 | 10917665 | 10912595 |
| 44 | 10856307 | 10998319 | 10985265 | 10945745 |
| 45 | 10982505 | 10627844 | 10929317 | 10945987 |
| 46 | 10837629 | 10945351 | 10945567 | 10945075 |
| 47 | 10627894 | 10907291 | 10988965 | 10945437 |
| 48 | 10945537 | 10990091 | 10968777 | 10945797 |
| 49 | 10945551 | 10945783 | 10912789 | 10956579 |
| 50 | 10852937 | 10945833 | 11001337 | 10655196 |

*NCUA v. Goldman Sachs S.D.N.Y. 13-cv-6721*

**GSAA 2007-3**
**Initial Loan Sample**

|   | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---------|---------|---------|---------|
| 1 | 5778037 | 6601652 | 6665508 | 6410224 |
| 2 | 6410036 | 6191363 | 6410218 | 6651307 |
| 3 | 6678329 | 6410078 | 6190653 | 6678224 |
| 4 | 4903074 | 6601711 | 6601948 | 6409953 |
| 5 | 6653513 | 6405348 | 6409915 | 6410131 |
| 6 | 6597435 | 6409834 | 6651932 | 6589077 |
| 7 | 5626560 | 6528692 | 6191256 | 6678249 |
| 8 | 6192220 | 6601959 | 6414715 | 4810497 |
| 9 | 4813803 | 6409950 | 6414697 | 6414648 |
| 10 | 6190766 | 6528791 | 6192819 | 6407108 |
| 11 | 6528826 | 6410261 | 6528364 | 6601489 |
| 12 | 6653269 | 6601809 | 6528971 | 6601722 |
| 13 | 6597438 | 6414634 | 6409998 | 6601735 |
| 14 | 6651292 | 6651925 | 6191449 | 6665488 |
| 15 | 6528367 | 6191512 | 6651471 | 6409891 |
| 16 | 5071704 | 6602035 | 6410159 | 6651954 |
| 17 | 6601931 | 6500461 | 6651422 | 5928557 |
| 18 | 6601376 | 6528466 | 6191418 | 6407118 |
| 19 | 6601653 | 6528903 | 6523160 | 6500237 |
| 20 | 6601608 | 6410067 | 6406974 | 6651391 |
| 21 | 6528743 | 6653078 | 6665551 | 6190793 |
| 22 | 6601913 | 6410244 | 6602023 | 6410087 |
| 23 | 6414696 | 6414630 | 6601229 | 6191439 |
| 24 | 6653439 | 6601382 | 6528667 | 6410252 |
| 25 | 6651466 | 6410084 | 6407052 | 6665523 |

**Supplemental Loan Sample**

|   | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---------|---------|---------|---------|
| 26 | 6597413 | 6409918 | 6653421 | 6528706 |
| 27 | 5777798 | 6528509 | 6601324 | 6601611 |
| 28 | 6405267 | 6678270 | 6410008 | 6407095 |
| 29 | 6528703 | 6678303 | 6190764 | 6192226 |
| 30 | 6601281 | 6653298 | 6653409 | 6528533 |
| 31 | 6601552 | 6193003 | 6500156 | 6191452 |
| 32 | 6529042 | 6601258 | 6409849 | 6407074 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 33 | 6601404 | 6191443 | 6409877 | 6528904 |
| 34 | 6528570 | 6653171 | 5810752 | 6528853 |
| 35 | 6192837 | 6651358 | 6406961 | 6601865 |
| 36 | 6190611 | 4902900 | 6191226 | 6409889 |
| 37 | 6528526 | 6410089 | 6523216 | 6601957 |
| 38 | 6601353 | 6409968 | 6409980 | 6601826 |
| 39 | 6653503 | 6500551 | 6414707 | 6528717 |
| 40 | 6601816 | 6528579 | 6407117 | 6601825 |
| 41 | 6601413 | 6405271 | 6601469 | 6528809 |
| 42 | 6651935 | 6193181 | 6528751 | 6410072 |
| 43 | 6528525 | 5505682 | 6500463 | 6410156 |
| 44 | 6409912 | 6409916 | 6651930 | 6407119 |
| 45 | 6601389 | 6193064 | 6409963 | 6601951 |
| 46 | 6653550 | 6653360 | 6665522 | 6193178 |
| 47 | 5778135 | 5727986 | 6601572 | 6407914 |
| 48 | 6601649 | 6409925 | 6653661 | 6405349 |
| 49 | 6601907 | 6500462 | 6525269 | 6191262 |
| 50 | 6678155 | 6530243 | 6601925 | 6601292 |

## GSAA 2007-5
### Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 5770638 | 6842228 | 6680800 | 6845756 |
| 2  | 6842105 | 6846451 | 6839866 | 6681496 |
| 3  | 6830378 | 6842381 | 6191338 | 6193193 |
| 4  | 6678776 | 6839150 | 6700289 | 6682483 |
| 5  | 5792019 | 6839842 | 6841973 | 6665134 |
| 6  | 6680250 | 6615096 | 6843768 | 6681519 |
| 7  | 6678740 | 6839903 | 6842004 | 6680281 |
| 8  | 6587614 | 6839287 | 6842143 | 6843785 |
| 9  | 6106511 | 6682400 | 6839119 | 6680306 |
| 10 | 6839989 | 6793951 | 6839565 | 6663202 |
| 11 | 6845672 | 6677971 | 6839915 | 6842031 |
| 12 | 6665131 | 6665159 | 6842292 | 6678732 |
| 13 | 6839782 | 6843594 | 6843471 | 6192227 |
| 14 | 6845791 | 6846212 | 6839288 | 6839947 |
| 15 | 6839551 | 6839170 | 5975847 | 6665158 |
| 16 | 6843454 | 6839256 | 6665139 | 6839589 |
| 17 | 6407075 | 6845641 | 6845657 | 6665097 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 18 | 6839937 | 6677974 | 6838919 | 6839973 |
| 19 | 6663487 | 6841934 | 6839950 | 6840006 |
| 20 | 6106375 | 6842052 | 6681508 | 6846435 |
| 21 | 6839255 | 6843428 | 6843746 | 6839764 |
| 22 | 6842140 | 6839632 | 6681532 | 6839603 |
| 23 | 6106395 | 6105209 | 6845794 | 6663241 |
| 24 | 6682517 | 6839198 | 6682307 | 6680244 |
| 25 | 6615017 | 6680351 | 6680797 | 6839597 |

## Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 6192817 | 6663420 | 6700275 | 6681526 |
| 27 | 6500576 | 6192793 | 6842288 | 6109182 |
| 28 | 6839906 | 6105867 | 6842071 | 6846249 |
| 29 | 6842040 | 6734775 | 6682284 | 6842177 |
| 30 | 6192967 | 6842033 | 6844583 | 6839131 |
| 31 | 5784280 | 6704734 | 6842077 | 6839128 |
| 32 | 6615117 | 6614875 | 6843677 | 6707107 |
| 33 | 6926428 | 6844631 | 6665095 | 6191355 |
| 34 | 6843701 | 6681551 | 6665170 | 6845727 |
| 35 | 6704626 | 6843481 | 6707021 | 6846440 |
| 36 | 6953819 | 6193062 | 6839852 | 6500559 |
| 37 | 6830371 | 6678762 | 6681501 | 6843446 |
| 38 | 6845782 | 6846403 | 6665186 | 6681542 |
| 39 | 6839374 | 6839217 | 6845752 | 6407050 |
| 40 | 6663229 | 6677985 | 6681699 | 6839568 |
| 41 | 6682419 | 6678791 | 6193079 | 6682339 |
| 42 | 6615049 | 6842261 | 6681692 | 6663483 |
| 43 | 6678749 | 6926451 | 6680765 | 6839144 |
| 44 | 6830367 | 6680382 | 6500533 | 6665155 |
| 45 | 6614953 | 6682328 | 6843742 | 6793954 |
| 46 | 6682329 | 6615140 | 6845725 | 6704952 |
| 47 | 6615343 | 6843516 | 6839648 | 6706980 |
| 48 | 6191394 | 6682262 | 6680379 | 6839447 |
| 49 | 6680396 | 6842141 | 6841951 | 6682314 |
| 50 | 6700292 | 6616945 | 6839339 | 6839785 |

## LBMLT 2006-7
### Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 6750709 | 6762786 | 6746310 | 6758673 |
| 2  | 6756061 | 6746475 | 6746274 | 6747392 |
| 3  | 6758871 | 6735032 | 6747446 | 6737469 |
| 4  | 6754068 | 6745605 | 6747809 | 6753533 |
| 5  | 6747120 | 6745879 | 6748505 | 6749948 |
| 6  | 6733800 | 6752450 | 6732163 | 6748196 |
| 7  | 6742796 | 6752234 | 6750823 | 6755623 |
| 8  | 6743623 | 6735089 | 6742175 | 6755710 |
| 9  | 6757073 | 6746533 | 6750955 | 6751122 |
| 10 | 6752960 | 6742060 | 6754204 | 6750270 |
| 11 | 6749563 | 6751503 | 6744794 | 6755440 |
| 12 | 6740952 | 6744073 | 6721239 | 6746753 |
| 13 | 6756640 | 6683536 | 6748191 | 6754129 |
| 14 | 6758808 | 6757488 | 6742519 | 6751306 |
| 15 | 6740732 | 6745130 | 6749830 | 6757325 |
| 16 | 6733960 | 6750318 | 6746694 | 6735954 |
| 17 | 6743553 | 6747173 | 6759167 | 6741798 |
| 18 | 6757090 | 6750745 | 6729168 | 6761094 |
| 19 | 6747122 | 6762221 | 6739190 | 6732242 |
| 20 | 6752735 | 6747653 | 6753697 | 6745376 |
| 21 | 6742855 | 6743168 | 6758142 | 6742275 |
| 22 | 6751893 | 6752476 | 6745491 | 6730596 |
| 23 | 6760114 | 6756709 | 6761639 | 6743491 |
| 24 | 6729352 | 6736674 | 6757777 | 6745664 |
| 25 | 6746354 | 6748371 | 6742102 | 6742420 |

### Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 6756617 | 6753322 | 6761025 | 6756101 |
| 27 | 6761949 | 6743033 | 6753404 | 6751653 |
| 28 | 6742652 | 6754203 | 6748785 | 6760195 |
| 29 | 6748983 | 6734239 | 6758665 | 6759415 |
| 30 | 6759385 | 6753858 | 6756588 | 6760501 |
| 31 | 6749239 | 6742604 | 6733947 | 6735100 |
| 32 | 6743896 | 6748714 | 6742443 | 6746889 |
| 33 | 6741217 | 6743827 | 6738463 | 6752864 |
| 34 | 6749290 | 6747818 | 6742582 | 6752544 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 6747022 | 6756044 | 6744801 | 6745463 |
| 36 | 6746508 | 6695130 | 6746973 | 6746890 |
| 37 | 6746809 | 6752599 | 6684319 | 6748616 |
| 38 | 6756409 | 6741352 | 6752124 | 6752438 |
| 39 | 6751958 | 6746828 | 6739502 | 6747108 |
| 40 | 6747672 | 6750368 | 6745469 | 6751305 |
| 41 | 6749421 | 6756237 | 6760571 | 6741176 |
| 42 | 6753280 | 6757761 | 6758063 | 6757652 |
| 43 | 6754344 | 6751056 | 6743105 | 6741936 |
| 44 | 6733339 | 6743973 | 6753143 | 6757157 |
| 45 | 6750506 | 6753557 | 6751120 | 6756702 |
| 46 | 6732945 | 6740994 | 6741978 | 6717198 |
| 47 | 6747323 | 6757142 | 6743000 | 6749325 |
| 48 | 6742752 | 6746513 | 6741910 | 6715213 |
| 49 | 6739027 | 6745594 | 6735997 | 6753016 |
| 50 | 6753429 | 6745057 | 6748380 | 6749519 |

*NCUA v. Morgan Stanley S.D.N.Y. 13-cv-6705*

## MSAC 2006-HE4
### Initial Loan Sample

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 2010060210530 | 2050060224840 | 11454979 | 11434944 |
| 2 | 1006401725 | 2030060150700 | 2350060138330 | 11447695 |
| 3 | 1006306605 | 2080060289570 | 2100060242050 | 1006402010 |
| 4 | 1006372542 | 2030060260620 | 1006494894 | 2030060156030 |
| 5 | 1006265098 | 11463495 | 2200060355750 | 2070060278670 |
| 6 | 2250060337240 | 2210060387360 | 1006278173 | 2090060301350 |
| 7 | 1006669116 | 2220060292620 | 11465675 | 1006339937 |
| 8 | 11453749 | 2010060195010 | 2260060240720 | 11478136 |
| 9 | 2020060188090 | 11454278 | 2210060280780 | 2320060264450 |
| 10 | 11200673 | 11433082 | 11456655 | 11463291 |
| 11 | 2010060213170 | 11456962 | 11460030 | 2050060223830 |
| 12 | 2030060258820 | 1006346625 | 2250060127190 | 2280060385920 |
| 13 | 11468320 | 2010060325020 | 11446985 | 1006516656 |
| 14 | 11435614 | 11434670 | 2030060259110 | 2010060195820 |
| 15 | 1006347125 | 1006334273 | 2010060325660 | 11464140 |
| 16 | 2260060350760 | 11463348 | 11474259 | 11454470 |
| 17 | 2080060301720 | 11451280 | 2320060156620 | 11452135 |
| 18 | 2080060286530 | 2050060216860 | 2060060191550 | 11467098 |
| 19 | 2250060232420 | 1006190604 | 11461437 | 11438009 |
| 20 | 1006431462 | 2030060262360 | 11473357 | 2010060319500 |
| 21 | 1006263688 | 2010060187950 | 11461700 | 2020060292250 |
| 22 | 1006418511 | 11461769 | 2090060296940 | 2070060275320 |
| 23 | 2250060334720 | 2280060388400 | 11427867 | 11467556 |
| 24 | 2070060169070 | 2010060206160 | 2060060194960 | 11197513 |
| 25 | 11454737 | 1006912228 | 11462314 | 2080060292550 |

### Supplemental Loan Sample

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 11422965 | 2210060278380 | 2090060302020 | 1006336397 |
| 27 | 1006417558 | 2010060209590 | 2280060386320 | 11447072 |
| 28 | 11449875 | 2010060213180 | 2030060152120 | 11459913 |
| 29 | 1006236557 | 11436592 | 2260060347160 | 2260051228660 |
| 30 | 1006334754 | 1006333960 | 11450191 | 11477046 |
| 31 | 2050060224220 | 1006539668 | 2070060273970 | 11432003 |
| 32 | 11451404 | 2330060285150 | 11438839 | 11464717 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 33 | 2080060182560 | 2280060390680 | 11393498 | 2030060257200 |
| 34 | 2010060194400 | 1006332033 | 1006333693 | 2050060110750 |
| 35 | 11462211 | 2260060137770 | 1006457844 | 2020060182340 |
| 36 | 2330060287900 | 2330060288890 | 2020060293140 | 1006556407 |
| 37 | 11479841 | 1006315944 | 2010060321240 | 2090060297180 |
| 38 | 2070060385150 | 2260060347610 | 2010060324020 | 11381022 |
| 39 | 2290060369970 | 1006359308 | 1006143121 | 11460147 |
| 40 | 1006276166 | 2020060187510 | 11438731 | 11465666 |
| 41 | 11423871 | 11446448 | 1006270475 | 1006348160 |
| 42 | 2320060160250 | 2010060202590 | 11461905 | 11448165 |
| 43 | 2320060263590 | 11471699 | 11467232 | 2250060231400 |
| 44 | 2330060287650 | 11446516 | 2020060399330 | 1006367843 |
| 45 | 1006476066 | 2050060326850 | 2330060183600 | 1006318371 |
| 46 | 1006418888 | 2360060198240 | 11440020 | 11451059 |
| 47 | 2010060212350 | 2320060263810 | 1006690690 | 2060060297230 |
| 48 | 1006084239 | 11466123 | 2050060216550 | 11467188 |
| 49 | 2090060196140 | 11438391 | 2030060261390 | 1006891508 |
| 50 | 2020060293900 | 2010060296810 | 11453763 | 11443298 |

## MSAC 2006-HE6
### Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1 | 2220060394880 | 2070060502235 | 11578866 | 1007494776 |
| 2 | 2060060516350 | 2080060515160 | 1008124978 | 1008338694 |
| 3 | 2010060455960 | 11521862 | 11582955 | 11548501 |
| 4 | 11588406 | 1008075441 | 1008060162 | 11603149 |
| 5 | 1008203419 | 2250060547220 | 1007982864 | 11589451 |
| 6 | 11489004 | 1008662100 | 2010060456130 | 11576954 |
| 7 | 11487592 | 11567896 | 1007953921 | 11572716 |
| 8 | 1008422815 | 11585158 | 2230060507790 | 11575245 |
| 9 | 1007562489 | 2230060396090 | 2090060408090 | 11407703 |
| 10 | 1008350170 | 11587715 | 2280060506080 | 11559143 |
| 11 | 11581642 | 11571858 | 2260060460910 | 11583754 |
| 12 | 1007550027 | 2070060502832 | 11595617 | 1008454923 |
| 13 | 2010060456930 | 1008466457 | 11581948 | 11601009 |
| 14 | 1008220098 | 11588712 | 11581752 | 1007565636 |
| 15 | 11486307 | 2080060409850 | 1007976522 | 1007587131 |
| 16 | 2070060510170 | 2010060452640 | 11577157 | 11571996 |
| 17 | 1007863458 | 1008029260 | 1008046508 | 11563918 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 18 | 2290060478210 | 1008482741 | 11563622 | 11595665 |
| 19 | 1007613255 | 1007992176 | 2200060356890 | 11522641 |
| 20 | 1008612575 | 1007249541 | 1007994316 | 11566986 |
| 21 | 2070060505280 | 2050060549490 | 11559638 | 11570981 |
| 22 | 2090060409060 | 11594861 | 11547168 | 11555323 |
| 23 | 1008070071 | 2260060564260 | 11544644 | 2260060460150 |
| 24 | 11471145 | 2260060458020 | 11480966 | 11579369 |
| 25 | 1007656556 | 2080060515250 | 2060060516060 | 11565126 |

### Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 1007054439 | 1008004367 | 2200060568400 | 11490662 |
| 27 | 1008609892 | 2010060453040 | 2050060334170 | 1007949535 |
| 28 | 2010060558320 | 2030060476800 | 11580500 | 11570921 |
| 29 | 2210060598260 | 11582887 | 1007718428 | 11575067 |
| 30 | 2020060408170 | 11545455 | 2260060457770 | 11521884 |
| 31 | 1007160412 | 1008010074 | 11540130 | 1008083575 |
| 32 | 2010060192290 | 2290060477960 | 2350060136960 | 11579743 |
| 33 | 11575095 | 1008328106 | 2260060564000 | 11609877 |
| 34 | 1008107880 | 1007417191 | 1007532994 | 1007830500 |
| 35 | 2030060363960 | 1007896798 | 2100060239950 | 11561689 |
| 36 | 1007945762 | 2320060476720 | 11570374 | 1007498291 |
| 37 | 1007611293 | 2320060578780 | 1007597656 | 11552314 |
| 38 | 2010060502091 | 11576245 | 2070060504740 | 1007914475 |
| 39 | 2300060499700 | 1007519651 | 2290060588470 | 1007925999 |
| 40 | 2250060443140 | 1008683061 | 1008023514 | 1008104721 |
| 41 | 2330060401160 | 11534832 | 2250060549980 | 2060060307040 |
| 42 | 2010060449650 | 2100060555370 | 1007854547 | 2260060563500 |
| 43 | 11589278 | 2350060555030 | 11572927 | 11472934 |
| 44 | 2330060402760 | 2070060401980 | 11608994 | 11601771 |
| 45 | 2210060599780 | 1008021491 | 1007782946 | 11577227 |
| 46 | 2280060504830 | 11575584 | 2230060401650 | 11577201 |
| 47 | 11603268 | 11572123 | 2230060288810 | 1007744710 |
| 48 | 1007472040 | 2010060454660 | 2230060509720 | 1008037616 |
| 49 | 2020060512840 | 2220060509930 | 1008017157 | 11596549 |
| 50 | 2080060403970 | 11563294 | 2280060501720 | 2060060401693 |

**MSAC 2006-HE8**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 1008774132 | 1008945724 | 2290060587430 | 1008389282 |
| 2  | 2010060712755 | 2010060609152 | 2020060732170 | 2360060616670 |
| 3  | 1008554940 | 1009011892 | 1008119412 | 1008832640 |
| 4  | 2330060612840 | 2060060607375 | 2330060614510 | 1008907409 |
| 5  | 1008534838 | 1008538335 | 2230060623410 | 1008360515 |
| 6  | 2050060675210 | 1008603834 | 2030060694380 | 1009275517 |
| 7  | 1007115588 | 2280060508570 | 2210060714300 | 1009332457 |
| 8  | 2020060625480 | 1008677103 | 1008525571 | 1008309136 |
| 9  | 1008640740 | 2070060711244 | 1008255951 | 1008897777 |
| 10 | 1008707606 | 2290060795880 | 2010060713161 | 1009347290 |
| 11 | 2050060669680 | 2220060619080 | 1008286446 | 1008153918 |
| 12 | 1008114480 | 1008644746 | 1008855116 | 1009256217 |
| 13 | 1008635685 | 2070060726530 | 2080060621530 | 1007359752 |
| 14 | 1008293143 | 2050060663240 | 2280060618590 | 2290060606916 |
| 15 | 1008336534 | 1008633687 | 11579228 | 1008268572 |
| 16 | 1008578746 | 1007859196 | 1008683301 | 1008648403 |
| 17 | 2030060700860 | 1009141172 | 1009249529 | 1007678836 |
| 18 | 11548970 | 2020060730350 | 2350060667000 | 2220060514470 |
| 19 | 2030060690360 | 1008208334 | 11550470 | 1008596245 |
| 20 | 2060060620300 | 2320060686950 | 2290060692100 | 1008992067 |
| 21 | 2020060516280 | 2350060768410 | 2230060711141 | 1009015665 |
| 22 | 2010060687950 | 2050060663900 | 11561379 | 1008503354 |
| 23 | 1008271808 | 11573411 | 1008343937 | 2280060723110 |
| 24 | 2200060569470 | 2290060692430 | 1008375135 | 1008506547 |
| 25 | 1009003204 | 1008557661 | 1009009235 | 2030060581890 |

**Supplemental Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 1008250545 | 1009401989 | 1009015479 | 2010060608048 |
| 27 | 1008635480 | 2330060716740 | 1008577293 | 11580653 |
| 28 | 1008087349 | 1008540992 | 1009156735 | 1008952127 |
| 29 | 1008678344 | 11543195 | 11575446 | 2230060726590 |
| 30 | 2250060446460 | 2280060722050 | 2010060607859 | 1009049264 |
| 31 | 1008683551 | 11582021 | 1008584230 | 1008582152 |
| 32 | 1008877771 | 2200060682340 | 2070060618610 | 1008465047 |
| 33 | 1009296843 | 1008585373 | 2320060683130 | 1008536630 |
| 34 | 1007751925 | 2230060511740 | 2020060520800 | 1009071327 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 11537254 | 2090060618670 | 11600529 | 2010060689740 |
| 36 | 2050060668760 | 2080060622460 | 1008675793 | 1009348547 |
| 37 | 1008841499 | 1008401393 | 2010060693430 | 2220060618480 |
| 38 | 1008633151 | 11560962 | 1008472182 | 1008714867 |
| 39 | 1009127580 | 1008750452 | 2200060785180 | 1008728139 |
| 40 | 2080060730630 | 1008797180 | 1008096017 | 1008331352 |
| 41 | 1009132164 | 2280060723630 | 1008722545 | 1008629004 |
| 42 | 2030060700660 | 2260060680310 | 2260060681980 | 11587926 |
| 43 | 2280060615730 | 1008610719 | 1008557055 | 1008628112 |
| 44 | 2080060608937 | 1009002072 | 1006556602 | 1008421424 |
| 45 | 1008052224 | 1008537238 | 11581032 | 11581768 |
| 46 | 1006594731 | 2060060625050 | 11556142 | 2350060664980 |
| 47 | 2210060611690 | 2050060672610 | 1008642882 | 2070060729080 |
| 48 | 2230060621420 | 2070060514060 | 1008838813 | 11538364 |
| 49 | 1009151124 | 2290060481080 | 2260060678340 | 1008367983 |
| 50 | 2010060686730 | 1008091575 | 1009130683 | 1008742186 |

### MSAC 2006-NC4
### Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 1006879130 | 1006142765 | 1006795373 | 1006877775 |
| 2  | 1007130455 | 1005990047 | 1005267025 | 1006652945 |
| 3  | 1006736106 | 1006928060 | 1006441148 | 1006770238 |
| 4  | 1004610040 | 1006844686 | 1006610768 | 1006091356 |
| 5  | 1006276086 | 1006645712 | 1006786864 | 1006816662 |
| 6  | 1006737034 | 1002734152 | 1006914636 | 1006807315 |
| 7  | 1006887719 | 1006930592 | 1006094031 | 1006405641 |
| 8  | 1006596230 | 1005526558 | 1006228717 | 1007218931 |
| 9  | 1006925535 | 1007249202 | 1006392673 | 1006384539 |
| 10 | 1006228655 | 1006074561 | 1006162582 | 1006939539 |
| 11 | 1006712346 | 1006864967 | 1007236644 | 1005358677 |
| 12 | 1004632062 | 1005519584 | 1007207417 | 1006495731 |
| 13 | 1006602740 | 1006129307 | 1006748923 | 1007194699 |
| 14 | 2250033 | 1006445439 | 1007218101 | 1007279143 |
| 15 | 1005731719 | 1006566334 | 1006016759 | 1006134569 |
| 16 | 1006181525 | 1006805745 | 1003654094 | 1006233033 |
| 17 | 1006407596 | 1005728395 | 1006558405 | 1006408201 |
| 18 | 1006881369 | 1007031972 | 1006135194 | 1005726994 |
| 19 | 1006688603 | 1007319207 | 1006124703 | 1006960639 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 20 | 1006055270 | 1006467682 | 1006256990 | 1006793375 |
| 21 | 1006968258 | 1006718992 | 1007034979 | 1006231366 |
| 22 | 1006333915 | 1006848398 | 1007254516 | 1006207623 |
| 23 | 1006410010 | 1006493555 | 1007001905 | 1004812714 |
| 24 | 1006655032 | 1006722638 | 1006516843 | 1006160771 |
| 25 | 1006871940 | 1006372070 | 1006672479 | 1006269218 |

**Supplemental Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 1006054930 | 1006696499 | 1006477671 | 1006642617 |
| 27 | 1005604768 | 1006301664 | 1006402074 | 1006234372 |
| 28 | 1007049650 | 1007334654 | 1006709181 | 1006650876 |
| 29 | 1006232640 | 1006717662 | 1006233220 | 1006723370 |
| 30 | 1005884689 | 1005940379 | 1006655924 | 1005624112 |
| 31 | 1005881085 | 1006527421 | 1006428582 | 1006425273 |
| 32 | 1006446526 | 1006683822 | 1005992143 | 1006439419 |
| 33 | 1006878079 | 1006399612 | 1006200489 | 1006784768 |
| 34 | 1006142569 | 1006680727 | 1005915325 | 1005992768 |
| 35 | 1006095860 | 1006898333 | 1005801894 | 1004288915 |
| 36 | 1006134621 | 1006598746 | 1006340550 | 1005370733 |
| 37 | 1006903309 | 1006394519 | 1006883465 | 1004739769 |
| 38 | 1007122721 | 1006912031 | 1006402047 | 1006166944 |
| 39 | 1005921988 | 1004897035 | 1006888424 | 1006788416 |
| 40 | 1007041024 | 1006798156 | 1006856976 | 1005997825 |
| 41 | 1006242112 | 1006779284 | 1005642968 | 1006097733 |
| 42 | 1006241667 | 1007186840 | 1006547007 | 1006560429 |
| 43 | 1005544075 | 1006917429 | 1007053145 | 1006347223 |
| 44 | 1006210619 | 1006674422 | 1006948020 | 1006823958 |
| 45 | 1005723960 | 1005078159 | 1006824323 | 1006784866 |
| 46 | 1006944701 | 1006627064 | 1005521214 | 1006616557 |
| 47 | 1006994452 | 1006937247 | 1006418414 | 1006759117 |
| 48 | 1007109871 | 1006198795 | 1006604953 | 1006164731 |
| 49 | 1006662453 | 1006392584 | 1005760358 | 1006645909 |
| 50 | 1006367530 | 1005151015 | 1006196868 | 1006760098 |

**MSAC 2006-WMC2**
**Initial Loan Sample**

|    | Fico Q1  | Fico Q2  | Fico Q3  | Fico Q4  |
|----|----------|----------|----------|----------|
| 1  | 11471743 | 11467274 | 11465163 | 11476122 |
| 2  | 11475373 | 11522871 | 11530082 | 11524465 |
| 3  | 11462038 | 11454527 | 11458979 | 11486180 |
| 4  | 11472130 | 11510596 | 11511978 | 11490536 |
| 5  | 11485627 | 11511697 | 11491328 | 11481442 |
| 6  | 11512474 | 11489961 | 11516013 | 11530085 |
| 7  | 11498134 | 11518715 | 11496087 | 11458071 |
| 8  | 11445192 | 11488961 | 11530687 | 11510968 |
| 9  | 11479247 | 11477607 | 11507686 | 11505452 |
| 10 | 11503283 | 11498681 | 11469127 | 11505698 |
| 11 | 11494108 | 11499448 | 11522869 | 11528397 |
| 12 | 11484674 | 11484131 | 11471794 | 11502492 |
| 13 | 11461086 | 11516267 | 11496086 | 11499402 |
| 14 | 11411309 | 11475405 | 11485763 | 11483267 |
| 15 | 11523180 | 11486723 | 11515796 | 11537374 |
| 16 | 11460163 | 11523077 | 11479323 | 11520145 |
| 17 | 11499023 | 11491900 | 11470874 | 11519600 |
| 18 | 11509319 | 11500619 | 11506411 | 11394314 |
| 19 | 11501576 | 11504208 | 11484117 | 11530242 |
| 20 | 11518529 | 11500999 | 11515566 | 11388335 |
| 21 | 11461761 | 11513260 | 11467677 | 11470914 |
| 22 | 11507451 | 11481714 | 11490783 | 11463459 |
| 23 | 11498865 | 11462906 | 11492531 | 11515863 |
| 24 | 11476547 | 11510887 | 11487429 | 11522323 |
| 25 | 11446931 | 11464002 | 11504891 | 11473723 |

**Supplemental Loan Sample**

|    | Fico Q1  | Fico Q2  | Fico Q3  | Fico Q4  |
|----|----------|----------|----------|----------|
| 26 | 11475874 | 11486361 | 11459433 | 11477166 |
| 27 | 11477302 | 11476919 | 11471237 | 11481666 |
| 28 | 11473371 | 11520943 | 11497534 | 11516934 |
| 29 | 11472867 | 11467759 | 11513066 | 11478066 |
| 30 | 11514910 | 11537735 | 11461131 | 11461955 |
| 31 | 11516788 | 11518800 | 11481465 | 11528116 |
| 32 | 11517005 | 11479853 | 11478111 | 11480882 |
| 33 | 11509706 | 11509185 | 11538630 | 11493655 |
| 34 | 11489554 | 11489625 | 11472253 | 11515744 |

|    | Fico Q1   | Fico Q2   | Fico Q3   | Fico Q4   |
|----|-----------|-----------|-----------|-----------|
| 35 | 11504397  | 11459599  | 11502315  | 11484589  |
| 36 | 11472816  | 11492666  | 11484025  | 11524879  |
| 37 | 11507978  | 11471821  | 11469432  | 11516605  |
| 38 | 11472306  | 11488825  | 11461534  | 11487633  |
| 39 | 11479479  | 11481436  | 11536134  | 11518620  |
| 40 | 11521140  | 11476944  | 11530315  | 11496236  |
| 41 | 11513411  | 11501546  | 11478467  | 11469924  |
| 42 | 11509659  | 11487202  | 11490304  | 11503808  |
| 43 | 11497419  | 11495693  | 11484134  | 11488578  |
| 44 | 11516986  | 11473795  | 11518482  | 11485519  |
| 45 | 11460393  | 11481905  | 11482052  | 11495684  |
| 46 | 11491829  | 11481844  | 11482643  | 11516002  |
| 47 | 11516065  | 11519114  | 11465094  | 11528800  |
| 48 | 11501088  | 11479661  | 11522461  | 11483266  |
| 49 | 11519111  | 11485222  | 11505375  | 11477533  |
| 50 | 11526180  | 11508888  | 11481222  | 11500622  |

**MSAC 2007-HE4**
**Initial Loan Sample**

|    | Fico Q1        | Fico Q2        | Fico Q3        | Fico Q4        |
|----|----------------|----------------|----------------|----------------|
| 1  | 2320061038884  | 2200061002700  | 11673355       | 2350061086510  |
| 2  | 11742882       | 2230061034394  | 11734905       | 2010061036071  |
| 3  | 2030061015600  | 2060061037670  | 2010061038168  | 11703489       |
| 4  | 11743524       | 2030061019320  | 11708068       | 2010061037722  |
| 5  | 11682999       | 2050061141997  | 2010061036895  | 11728123       |
| 6  | 2020061144068  | 2010061142252  | 2250061069790  | 2200060995410  |
| 7  | 2020061040412  | 2280061042210  | 11698901       | 2060061035065  |
| 8  | 1050060905670  | 11733845       | 2070061039504  | 2350061036481  |
| 9  | 2030061121380  | 2060061035840  | 2350061082890  | 1050061014760  |
| 10 | 11706062       | 2070061141735  | 2050061033071  | 2010061036649  |
| 11 | 2090061137320  | 2350060980690  | 11663548       | 2060061140060  |
| 12 | 2020061047130  | 2090061034390  | 1050061020860  | 2220061031920  |
| 13 | 11691640       | 2010061124870  | 11677288       | 11656218       |
| 14 | 2050061039990  | 11730812       | 2070061039537  | 11698329       |
| 15 | 2250061035234  | 11717482       | 2220061034450  | 2070061040408  |
| 16 | 11707692       | 11689146       | 2260061121850  | 11719767       |
| 17 | 2020061036453  | 2070061033639  | 2260060909360  | 11710885       |
| 18 | 11691563       | 11720930       | 2010061033601  | 11729406       |
| 19 | 2010061038744  | 2220061032240  | 11725547       | 2320061097160  |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 20 | 2090061035220 | 2070061151900 | 2070061047110 | 11732998 |
| 21 | 11693115 | 11736321 | 11738641 | 11712284 |
| 22 | 2230061041880 | 2020061044580 | 2220061135110 | 11734292 |
| 23 | 11739396 | 2070061031709 | 11732673 | 11688034 |
| 24 | 2280061038982 | 11639920 | 11716283 | 2320061035963 |
| 25 | 2010060927486 | 11749694 | 2010061023500 | 2050061046470 |

## Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 2030061019410 | 11692145 | 2050061040670 | 2220060825530 |
| 27 | 2020061036211 | 2020061046850 | 11743268 | 11704487 |
| 28 | 11741487 | 11653950 | 2050061040690 | 11724688 |
| 29 | 11714820 | 11714831 | 2230061044480 | 2090061034200 |
| 30 | 2280061042170 | 1050060907030 | 2030061123190 | 11723425 |
| 31 | 2010061145702 | 2360061029020 | 2050061034942 | 11721615 |
| 32 | 2230061041890 | 2070061037702 | 2280061039674 | 11712613 |
| 33 | 2010061034403 | 11737253 | 2290061031356 | 2350061085020 |
| 34 | 11742114 | 2020061036414 | 2030061019890 | 11724841 |
| 35 | 2290061113690 | 2010061035611 | 11672644 | 2220061034370 |
| 36 | 2020061150480 | 11703980 | 2060061038470 | 2050060936810 |
| 37 | 11709384 | 2280061045020 | 11707025 | 2280061039811 |
| 38 | 2350061086160 | 2050061149970 | 11706422 | 11718509 |
| 39 | 11714534 | 2220061142173 | 2010061038383 | 2010060927813 |
| 40 | 11703175 | 11709850 | 11705811 | 11713874 |
| 41 | 2260061014040 | 2070061036056 | 11708659 | 11723833 |
| 42 | 2260060902410 | 2010060928762 | 1050060997410 | 11725799 |
| 43 | 11738196 | 2060061037234 | 11680451 | 2280061043990 |
| 44 | 2010061035546 | 2070061046960 | 11716466 | 2010061034632 |
| 45 | 2060061038681 | 2060061035700 | 2230061031686 | 2050061043890 |
| 46 | 11705441 | 2010061037571 | 2280061038926 | 11709244 |
| 47 | 2250061040384 | 2050061148200 | 2250061037503 | 2200061099360 |
| 48 | 2050060990550 | 11742887 | 2050061045710 | 11727143 |
| 49 | 2220061137400 | 11716282 | 11725849 | 11634429 |
| 50 | 11690434 | 2260061037032 | 2070061040066 | 2250061037716 |

### MSAC 2007-HE5
### Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 2320070101320 | 11763148 | 11770049 | 11789876 |
| 2  | 2290061117380 | 2290070124940 | 2320061141191 | 2290061117000 |
| 3  | 2260061231630 | 2320061256929 | 2010061144729 | 2250070161652 |
| 4  | 2350061292350 | 2010070158385 | 11777695 | 11774189 |
| 5  | 2070061256000 | 2360061232960 | 11799639 | 11762042 |
| 6  | 11754488 | 11770900 | 11799156 | 2350061148547 |
| 7  | 11774308 | 2350061291910 | 11722361 | 2050061155710 |
| 8  | 2010061252591 | 2070060711364 | 2020061257630 | 2010061253776 |
| 9  | 2010061148824 | 2050061253029 | 2320061257804 | 11748460 |
| 10 | 2260070138020 | 2010061142085 | 11788936 | 11749307 |
| 11 | 2020061250973 | 11778967 | 2220061241160 | 11755513 |
| 12 | 2070061154890 | 11729147 | 2030070160506 | 11771679 |
| 13 | 2260061229970 | 11776598 | 2230070156380 | 2030061250809 |
| 14 | 2070061032206 | 2320061255211 | 11772310 | 2350061189500 |
| 15 | 2070061250579 | 11777461 | 11798253 | 11807683 |
| 16 | 2090070162083 | 11807689 | 11748252 | 11744066 |
| 17 | 11739660 | 2230061254230 | 2230061148185 | 2200061256619 |
| 18 | 11774791 | 11747388 | 2070061256444 | 11781166 |
| 19 | 2010061251979 | 2220061241790 | 2260061234330 | 11741579 |
| 20 | 11742591 | 2070070158020 | 11562167 | 11745305 |
| 21 | 2250061149625 | 11793724 | 2290061252776 | 11791274 |
| 22 | 11787226 | 2220061239050 | 2070061154740 | 2060061250229 |
| 23 | 2020070158700 | 11771485 | 11757670 | 2290061118850 |
| 24 | 11727304 | 11792272 | 2320061299460 | 11783206 |
| 25 | 2010061037155 | 11748390 | 11688116 | 11783530 |

### Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 11690880 | 11738128 | 11756767 | 2030061228300 |
| 27 | 2070061258014 | 11770196 | 11795376 | 11764496 |
| 28 | 2030061225480 | 2030061123340 | 2320070161665 | 11738030 |
| 29 | 2230061251180 | 2290061220070 | 2070070158521 | 11770702 |
| 30 | 2010060700100 | 2070070159392 | 2320070101430 | 11751182 |
| 31 | 2070061253077 | 2280070164025 | 11730815 | 11768502 |
| 32 | 2360061232850 | 2020061148660 | 2020061153820 | 11761389 |
| 33 | 2260061231450 | 11734170 | 2290061251614 | 11773254 |
| 34 | 2320061199330 | 2230070158524 | 2010070135400 | 2010061229900 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 11763915 | 2350061293160 | 11786948 | 11791026 |
| 36 | 2260061126480 | 11679367 | 11784014 | 11758452 |
| 37 | 11742575 | 11737706 | 11768598 | 2220061241810 |
| 38 | 2010061257404 | 11768884 | 11794769 | 11722136 |
| 39 | 11806889 | 2230061255663 | 11731466 | 2010061256876 |
| 40 | 2010070158565 | 2030061020470 | 11783776 | 11688761 |
| 41 | 11744047 | 11730958 | 2060061148314 | 2030061226000 |
| 42 | 11727524 | 11763734 | 2070070158326 | 2230061258197 |
| 43 | 11723829 | 2230061149571 | 11762570 | 11793656 |
| 44 | 2010070159747 | 11760813 | 2020061151200 | 2070070159470 |
| 45 | 2020061153510 | 11797910 | 11765405 | 11755040 |
| 46 | 2360061131630 | 11792301 | 2050061262120 | 11733014 |
| 47 | 11764721 | 11769951 | 11801131 | 2280070159200 |
| 48 | 2010061144343 | 11753385 | 2260061143343 | 11754695 |
| 49 | 2060061243550 | 2010070159035 | 11731467 | 2280070158430 |
| 50 | 2020061039502 | 2010061127050 | 2230061255050 | 11764649 |

### MSAC 2006-HE2 (All Collateral)
### Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 2070051023240 | 11400872 | 11410895 | 11408013 |
| 2  | 11406664 | 11419760 | 11300964 | 11400236 |
| 3  | 2050051195010 | 11377129 | 2030051140710 | 2080051267780 |
| 4  | 11392789 | 11392547 | 2350051021720 | 11408349 |
| 5  | 11417655 | 2230051055570 | 11417366 | 11423803 |
| 6  | 2280051043820 | 11414507 | 11381344 | 11410558 |
| 7  | 2010051020980 | 2250051003010 | 2230051166860 | 11414184 |
| 8  | 2050051078870 | 11393048 | 11396156 | 11306784 |
| 9  | 11386740 | 2350051017880 | 11374236 | 11392595 |
| 10 | 11407210 | 11421096 | 11427470 | 11435285 |
| 11 | 11410571 | 11403773 | 11421540 | 11427229 |
| 12 | 11409624 | 11417532 | 11401061 | 11369684 |
| 13 | 11381339 | 2280051037960 | 11391714 | 2290050922950 |
| 14 | 11372515 | 11375183 | 2250051111980 | 11406762 |
| 15 | 2010051264250 | 11418599 | 11363670 | 11392292 |
| 16 | 11394329 | 2010051258740 | 2230051168320 | 11417278 |
| 17 | 11385875 | 2330051063550 | 11373591 | 11417963 |
| 18 | 2320051039970 | 2330051167140 | 2280051145580 | 11425382 |
| 19 | 2050051193650 | 2010050999570 | 11391596 | 2260050885400 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 20 | 11383730 | 11429140 | 11395184 | 11382470 |
| 21 | 2010051264600 | 11413584 | 2080051053100 | 11403154 |
| 22 | 11313030 | 11351926 | 2050051193910 | 11413969 |
| 23 | 11412437 | 2080051158840 | 11423335 | 11375664 |
| 24 | 2260051121680 | 11432627 | 11391451 | 11403723 |
| 25 | 11394176 | 11354911 | 11363776 | 11431502 |

## Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 11399871 | 11394935 | 11414077 | 11405750 |
| 27 | 2070051022590 | 11361586 | 2070051023870 | 11397020 |
| 28 | 11354464 | 11384993 | 2070051142850 | 11401593 |
| 29 | 11416326 | 2080050699820 | 2220051175330 | 11409580 |
| 30 | 11362749 | 11417411 | 11394897 | 11399220 |
| 31 | 11401122 | 2070051017640 | 11362644 | 2230051169970 |
| 32 | 2060051184310 | 11423467 | 11407713 | 11428472 |
| 33 | 11367208 | 11411342 | 11410627 | 2010051265910 |
| 34 | 11428312 | 2020050949100 | 2010051010090 | 11401338 |
| 35 | 11428168 | 11374364 | 11420285 | 11394631 |
| 36 | 11385027 | 11431742 | 11414873 | 11423068 |
| 37 | 2080051160720 | 11405662 | 2030051023940 | 11413212 |
| 38 | 2010051156760 | 11404782 | 2090050968030 | 11363952 |
| 39 | 11381383 | 2080051050480 | 2330051061500 | 11333791 |
| 40 | 2280051039690 | 11390577 | 2230050946820 | 11406975 |
| 41 | 11373872 | 2250050890240 | 11415828 | 11426767 |
| 42 | 11315069 | 11393619 | 2100051124030 | 11405231 |
| 43 | 11413238 | 11381384 | 11411018 | 11419737 |
| 44 | 2280051034770 | 11387840 | 11397658 | 11396497 |
| 45 | 2350051019190 | 11368177 | 2080051163420 | 11407617 |
| 46 | 2330051060470 | 2360051188380 | 2010051153320 | 11405336 |
| 47 | 11316449 | 11348998 | 2070051027360 | 11416153 |
| 48 | 11373406 | 2210051161850 | 11412909 | 11304410 |
| 49 | 2010051009430 | 2010051151050 | 2080051268750 | 11407372 |
| 50 | 2260051113920 | 11407768 | 2070051016470 | 11404620 |

## MSAC 2006-HE2 (Group 2)
### Initial Loan Sample

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 11407050 | 11347645 | 2030050912580 | 11404390 |
| 2 | 2020050839150 | 2010051257710 | 11404060 | 11410526 |
| 3 | 2020050839470 | 11374066 | 11398589 | 11396187 |
| 4 | 11409157 | 2010051023830 | 11409164 | 11403175 |
| 5 | 2010051134520 | 2080050941930 | 2100051127190 | 11388728 |
| 6 | 11323265 | 11396313 | 11407977 | 11402628 |
| 7 | 11405706 | 11399330 | 2320051040290 | 11410315 |
| 8 | 2010051259180 | 2030051026120 | 11408087 | 11413543 |
| 9 | 2070051027770 | 2320051147260 | 2260051011760 | 2250051112770 |
| 10 | 11288312 | 2100050911240 | 11426555 | 11366108 |
| 11 | 2020051060620 | 11407126 | 11419259 | 11420133 |
| 12 | 2080051167060 | 11366777 | 2080051047460 | 11338987 |
| 13 | 2070051141100 | 2080051158730 | 11405896 | 11415409 |
| 14 | 11378557 | 2020051168620 | 11399565 | 11390386 |
| 15 | 11422848 | 2070051018600 | 11408080 | 11327903 |
| 16 | 2070051024830 | 11351460 | 11405558 | 11415595 |
| 17 | 11417154 | 2020051171180 | 11419504 | 11409581 |
| 18 | 2100051121660 | 11417035 | 2010051134960 | 11426787 |
| 19 | 2070051014670 | 2080051046420 | 11430103 | 11399842 |
| 20 | 2250050998680 | 11400872 | 2030051025970 | 11420151 |
| 21 | 2010051151620 | 2100051018960 | 11401368 | 11410299 |
| 22 | 2090050860820 | 2080051161230 | 11417820 | 2080050938900 |
| 23 | 2070051248500 | 11364645 | 11362581 | 11413725 |
| 24 | 11344742 | 2230051058370 | 2080051159650 | 2010051265910 |
| 25 | 11392192 | 11419798 | 11414889 | 11419862 |

### Supplemental Loan Sample

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 2280051154770 | 2220051065710 | 11399145 | 11423204 |
| 27 | 11417182 | 11403114 | 2330051061850 | 11397551 |
| 28 | 2320051039050 | 2080051045950 | 11422370 | 11350788 |
| 29 | 11410281 | 2090051077980 | 11404706 | 11393458 |
| 30 | 2020050948150 | 2080051048990 | 2050051297630 | 11390908 |
| 31 | 2260051008600 | 11367034 | 11413717 | 11409353 |
| 32 | 11364848 | 2050051189950 | 2070051021220 | 2350051125520 |
| 33 | 2330051169030 | 2020051061160 | 2250050561850 | 11379121 |
| 34 | 11411666 | 11398134 | 11396834 | 11392047 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 11391081 | 11391469 | 2070050908730 | 2080050826720 |
| 36 | 2080051166410 | 11392823 | 11413437 | 11412575 |
| 37 | 2020050946240 | 11386057 | 2260051114890 | 11407911 |
| 38 | 11370059 | 11417268 | 2250051004680 | 11423967 |
| 39 | 2010051156690 | 11427079 | 11403717 | 11400521 |
| 40 | 2010050987850 | 11397328 | 2220051171300 | 11364601 |
| 41 | 11392712 | 2280051146170 | 2230051166860 | 11399888 |
| 42 | 2050051082990 | 2050051082090 | 2350051020960 | 11409875 |
| 43 | 11391294 | 11362227 | 11404196 | 11412510 |
| 44 | 2320051042080 | 2070051028510 | 2070051029870 | 11428657 |
| 45 | 2060051179290 | 11331438 | 11407230 | 2090051186570 |
| 46 | 2350051018650 | 11423617 | 11325494 | 11404468 |
| 47 | 2330051169080 | 11292382 | 11394416 | 11405755 |
| 48 | 11425296 | 2010051018050 | 2010051027840 | 11387151 |
| 49 | 11332574 | 11410566 | 11400509 | 11427861 |
| 50 | 2060050967290 | 11415002 | 2070051253050 | 11405472 |

**MSHEL 2006-1**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 2080050815850 | 2320050823460 | 2010050979000 | 2000003935 |
| 2  | 108398378 | 109733718 | 2280050809090 | 508120304 |
| 3  | 2350050804210 | 2350050805000 | 108400977 | 1000236208 |
| 4  | 3029505855 | 2080050823070 | 2070050900640 | 4600001618 |
| 5  | 2250050672300 | 111724706 | 2030050916440 | 2010050981020 |
| 6  | 110077639 | 2210050834150 | 2290050813470 | 2360050876330 |
| 7  | 108568387 | 2080050828020 | 109821587 | 3076503620 |
| 8  | 3076505778 | 5255501416 | 94244838 | 5600000283 |
| 9  | 2000004195 | D05050455 | 3058506835 | 5240506502 |
| 10 | 103133203 | 2030050911230 | 1000232448 | 1000232450 |
| 11 | 110472260 | 1000233418 | 1000238049 | 3029505224 |
| 12 | 2030050578800 | 1000238807 | 507281290 | 2070050877580 |
| 13 | 5215500192 | 2070050882690 | 5287502693 | 2000005011 |
| 14 | 3027505671 | 1000233026 | 3076505678 | 2290050710850 |
| 15 | 5272500964 | 5213500417 | 110343729 | G05061799 |
| 16 | 2260050986590 | 2070050770450 | 2260050872460 | 108375686 |
| 17 | 4500003053 | 2080050825530 | 2500000556 | 3027505150 |
| 18 | 2050050835820 | 2050050850630 | 3076506056 | 92549952 |
| 19 | 508095365 | 2070050998010 | 3500002933 | 109239854 |

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 20 | 2010050865660 | 507281077 | 1000235355 | 1000234965 |
| 21 | 506297202 | 103218646 | 2230050832130 | 2080050827260 |
| 22 | 2060050856300 | 2100050894560 | B05050786 | 5240506078 |
| 23 | 5240506041 | 2030050808490 | 2260050771010 | 2020050841310 |
| 24 | 3076505752 | 1000235661 | 3029505814 | 4300001382 |
| 25 | 93328698 | 1000237109 | 2280050807550 | 110656664 |

### Supplemental Loan Sample

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 2080050824480 | 2320050928650 | 3076506219 | 109560551 |
| 27 | 4500001589 | 2200050812410 | 2290050924230 | 4500002828 |
| 28 | 507063610 | 4000001479 | 2200050811940 | 110993213 |
| 29 | 508025803 | 507225033 | 3027505477 | 2030050803910 |
| 30 | 5299500693 | 3027506089 | 3029505227 | 5240506428 |
| 31 | 5200500917 | 3076505673 | 2100050903750 | 2290050817820 |
| 32 | E05060440 | 3076506394 | 111164145 | 1000237514 |
| 33 | 2010050872970 | 1000236340 | 2070050903580 | 108669761 |
| 34 | 3076506166 | 2030050806700 | 2280050915650 | 508094630 |
| 35 | 3029505748 | 110446018 | 99887622 | 5240505457 |
| 36 | 103138403 | 2070050996740 | 2010050981260 | 1000238444 |
| 37 | 107457491 | 1000236080 | 7100000458 | 5243508496 |
| 38 | 3027504016 | 2000004177 | E05030471 | 1000235903 |
| 39 | 2010050983790 | 2220050844910 | 2080050930860 | 3042500231 |
| 40 | 2100050904540 | 5289502938 | 2010050736830 | 2600001849 |
| 41 | 508025884 | 2280050808350 | 2010050982000 | 2260050881660 |
| 42 | 4700000583 | 110546056 | 94308310 | 3029506129 |
| 43 | 5600001135 | 109480833 | 1000237751 | 110442567 |
| 44 | 2070050999970 | 2070050998060 | 2020050841470 | 508051713 |
| 45 | 2500002168 | 1000222028 | 2260050986420 | 5240506750 |
| 46 | 5207501052 | 2030050910630 | 103163879 | 93325393 |
| 47 | 2070050904920 | 3076505520 | 111630836 | 508095447 |
| 48 | 109560487 | 5243505067 | 93750574 | 4800000075 |
| 49 | 2290050925640 | 3058507099 | 5205500985 | 3042500229 |
| 50 | 2070050885610 | 2210050834990 | 4000001030 | 508118106 |

**MSHEL 2007-2**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 2000036526 | 3061601307 | 3029610556 | 608286924 |
| 2  | 4300019490 | 4000014227 | 5200028037 | 4500024200 |
| 3  | 3029611859 | 3029610298 | 3027607925 | 7100005380 |
| 4  | 4420607098 | 3027608248 | 4700007931 | 7100006152 |
| 5  | 5800020040 | 611082486 | 5128600533 | 611209695 |
| 6  | 5240607580 | 4000014735 | 3076608397 | 610217680 |
| 7  | 4600011678 | 3000016081 | 611152922 | 610238748 |
| 8  | 610308317 | 5228603823 | 2600015558 | 2600018601 |
| 9  | 4300020885 | 7100005616 | 3027608643 | 3027608306 |
| 10 | 3000051387 | 610309165 | 7100006201 | 3029611080 |
| 11 | 2500052859 | 611139544 | 2000039065 | 3076608172 |
| 12 | 4500024388 | 2000036930 | 2300004693 | 3058612923 |
| 13 | 2000037947 | 3042601699 | 610310998 | 3027608357 |
| 14 | 3029611013 | 3500023724 | 3000052598 | 3027607207 |
| 15 | 2500053222 | 3029611249 | 5267602132 | 3500025394 |
| 16 | 611117606 | 3000051173 | 611164915 | 7300000129 |
| 17 | 2000036964 | 3000052609 | 609076340 | 3000052347 |
| 18 | 4500023801 | 4420605642 | 4300020092 | 2500053497 |
| 19 | 5297602059 | 5269600272 | 3029612056 | 3029612638 |
| 20 | 610042109 | 3027608401 | 4500024015 | 3000053041 |
| 21 | 5298604040 | 3500025158 | 3029609975 | 2000037362 |
| 22 | 610310927 | 7100006346 | 611071360 | 5292602877 |
| 23 | 609077805 | 610168611 | 3058611121 | 5243612222 |
| 24 | 611105973 | 611138650 | 3027608134 | 4500024542 |
| 25 | 611094405 | 611094677 | 611152447 | 3500024311 |

**Supplemental Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 3500018343 | 2500054205 | 2000039916 | 4000014856 |
| 27 | 2000036285 | 3058612872 | 610195452 | 5217602645 |
| 28 | 3500026145 | 3500024422 | 4500025279 | 4000014558 |
| 29 | 611140384 | 4600014804 | 3027607402 | 5200029809 |
| 30 | 2000038864 | 3029610544 | 2000035135 | 2000037533 |
| 31 | 3029610389 | 2000037101 | 4600014149 | 608219815 |
| 32 | 610240012 | 7200001086 | 4600014072 | 610264897 |
| 33 | 3500023628 | 3029610338 | 3076608227 | 3063600408 |
| 34 | 3058610816 | 611154013 | 2000038018 | 611138490 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 4300020152 | 3500021398 | 3029610634 | 3500023771 |
| 36 | 610038072 | 5243613915 | 4420606678 | 5243612340 |
| 37 | 610309307 | 611035728 | 3029611239 | 610100042 |
| 38 | 5217602485 | 610311172 | 611068726 | 3029612644 |
| 39 | 610253886 | 4000013533 | 5299605370 | 2600015931 |
| 40 | 2500053655 | 4420606045 | 3058609678 | 610179379 |
| 41 | 610168330 | 8887975774 | 3029611116 | 610238747 |
| 42 | 4500025167 | 3027608114 | 2500054868 | 2500054008 |
| 43 | 5201603793 | 5267602164 | 5267602296 | 3027608190 |
| 44 | 4300019088 | 7200001194 | 2300004709 | 5205601892 |
| 45 | 610182162 | 4000014648 | 5277604328 | 611176337 |
| 46 | 611012576 | 5200027343 | 4300020723 | 3500026675 |
| 47 | 611094005 | 4500024290 | 3500022537 | 3500025667 |
| 48 | 606163345 | 5200023640 | 611070396 | 4600014093 |
| 49 | 2300004842 | 4420607111 | 3029610631 | 5200028850 |
| 50 | 609156338 | 3027607191 | 608163989 | 611082052 |

**MSIX 2006-1**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1 | 601058096 | 5267600310 | 325393 | 2000019095 |
| 2 | 103224022 | 483129 | 1000251677 | 4700003371 |
| 3 | 3058601070 | 1000253286 | 1000253912 | 512051542 |
| 4 | 5266600003 | 1006528992 | 511283999 | 601203604 |
| 5 | 327006 | 4420600975 | 601268490 | 1000256382 |
| 6 | 37478 | 1000254369 | 55576102 | 3000009958 |
| 7 | 3000009708 | 3058600230 | 3000008618 | 2500006472 |
| 8 | 601180533 | 512018676 | 106034235 | 5243600585 |
| 9 | 3058600976 | 1000255695 | 601300470 | 512139871 |
| 10 | 199095 | 35558 | 1000257050 | 1000256473 |
| 11 | 2000018361 | 2500006575 | 1000252565 | 5267600177 |
| 12 | 1000255405 | 100030287 | 3029508312 | 3000009527 |
| 13 | 14314 | 1000255072 | 4412500649 | 1006450191 |
| 14 | 2300001790 | 4500012362 | 1000250344 | 2000018644 |
| 15 | 3027600521 | 3027601970 | 3027600457 | 33256 |
| 16 | 5281501316 | 31958 | 4800002564 | 511306219 |
| 17 | 5288600554 | 1000252178 | 1006763905 | 511217963 |
| 18 | 3058600370 | 302505 | 322450 | 603027799 |
| 19 | 3058603099 | 5000009749 | 100030175 | 3027602219 |

|    | Fico Q1    | Fico Q2    | Fico Q3    | Fico Q4    |
|----|------------|------------|------------|------------|
| 20 | 1000257994 | 3029603039 | 322395     | 1000253590 |
| 21 | 1000255710 | 1000254302 | 4500011214 | 3500010896 |
| 22 | 2000018081 | 3058600337 | 2600006620 | 601057449  |
| 23 | 3076600363 | 1000255098 | 1000253007 | 296423     |
| 24 | 1000252775 | 487114     | 4412600190 | 601179978  |
| 25 | 3027600546 | 1006512151 | 1000257001 | 241346     |

<u>Supplemental Loan Sample</u>

|    | Fico Q1    | Fico Q2    | Fico Q3    | Fico Q4    |
|----|------------|------------|------------|------------|
| 26 | 3029603097 | 5000024966 | 1000258572 | 5243600233 |
| 27 | 601146925  | 511187033  | 1000249983 | 5240600719 |
| 28 | 239794     | 512062921  | 4700003259 | 5207600349 |
| 29 | 4000007255 | 3027601828 | 3076508602 | 5243600913 |
| 30 | 4000007080 | 2000019193 | 512270357  | 1000252351 |
| 31 | 244234     | 3500011041 | 602285637  | 511283906  |
| 32 | 5291503323 | 4420600006 | 1000256223 | 3076601619 |
| 33 | 100030128  | 3027600381 | 3029602718 | 3027601796 |
| 34 | 339228     | 3029508069 | 3029603489 | 601057097  |
| 35 | 7100002752 | 100030059  | 4600007028 | 4700003162 |
| 36 | 321275     | 1006396027 | 5213501590 | 326060     |
| 37 | 5246600393 | 511047403  | 2300001873 | 1000254156 |
| 38 | 5201600088 | 2600005849 | 4600007032 | 106032239  |
| 39 | 325561     | 3058601587 | 307476     | 1000256781 |
| 40 | 3027507640 | 3029507728 | 3027600443 | 5213600496 |
| 41 | 317163     | 4700002806 | 5213501632 | 315374     |
| 42 | 601246033  | 1000251892 | 3027507653 | 5243602679 |
| 43 | 5202600137 | 601101967  | 3029508221 | 3076600848 |
| 44 | 5289600134 | 5240600259 | 3029600998 | 4600007114 |
| 45 | 106032163  | 3500010598 | 3058601044 | 2000019488 |
| 46 | 601090968  | 1006287742 | 4600006512 | 601246006  |
| 47 | 100029755  | 37936      | 2500005944 | 3027600305 |
| 48 | 5296600734 | 7500002551 | 323919     | 5272600108 |
| 49 | 4420600997 | 5200600297 | 326847     | 5272501474 |
| 50 | 5240600268 | 325599     | 3058600785 | 3076600615 |

## MSM 2005-11AR
## Initial Loan Sample

|   | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---------|---------|---------|---------|
| 1 | 3342000898 | 3000774027 | 3274032721 | 1153749 |
| 2 | 1216118 | 3000810265 | 3000816284 | 3000827521 |
| 3 | 1217402 | 3000823475 | 3000823122 | 1201898 |
| 4 | 1209338 | 3000826568 | 3311000972 | 569681413 |
| 5 | 3000813902 | 3000828933 | 1200454 | 40359304 |
| 6 | 3000818465 | 40404673 | 1223291 | 1219638 |
| 7 | 40410367 | 3253003782 | 1204637 | 3000818659 |
| 8 | 64603 | 1223278 | 3000821935 | 1207342 |
| 9 | 1124414 | 1201908 | 1221770 | 569710197 |
| 10 | 3274032988 | 3000810511 | 3000834490 | 5759806 |
| 11 | 3000824447 | 3000811789 | 3000828132 | 1198729 |
| 12 | 1212238 | 1212237 | 3000827063 | 1216569 |
| 13 | 3000817292 | 1212448 | 1221785 | 3000832936 |
| 14 | 1233345 | 3000834290 | 3000818735 | 1222749 |
| 15 | 1213955 | 3000820909 | 3000833761 | 3929060 |
| 16 | 3318005842 | 3000822512 | 1221784 | 3000780853 |
| 17 | 3929478 | 1218678 | 3274028908 | 3000816937 |
| 18 | 1216527 | 3000834033 | 3318004819 | 1212906 |
| 19 | 1207057 | 1114426 | 3000807544 | 1204912 |
| 20 | 1185333 | 3274031826 | 3000829579 | 3000829137 |
| 21 | 1117054 | 3000805613 | 3000813248 | 3000812311 |
| 22 | 3000826015 | 40419350 | 3318005477 | 1223270 |
| 23 | 1215591 | 40410368 | 40385193 | 1204611 |
| 24 | 3000824417 | 3000817784 | 1215845 | 3318005024 |
| 25 | 1208698 | 1213839 | 1211911 | 569574773 |

## Supplemental Loan Sample

|   | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---------|---------|---------|---------|
| 26 | 40416547 | 3318005668 | 1213899 | 3253002988 |
| 27 | 3925830 | 3931847 | 569740363 | 1221786 |
| 28 | 1226953 | 3000819308 | 1215998 | 3000820503 |
| 29 | 3000823974 | 1222627 | 40378327 | 3000825899 |
| 30 | 1171759 | 40393202 | 3931541 | 3000827561 |
| 31 | 3000812880 | 5763918 | 3000774799 | 1218590 |
| 32 | 9402390507665 | 3253004683 | 9402390518819 | 3000824951 |
| 33 | 1208382 | 3000824094 | 3000831207 | 3000834613 |
| 34 | 3000781866 | 3000804882 | 3000774287 | 1223279 |

|    | Fico Q1    | Fico Q2    | Fico Q3    | Fico Q4      |
|----|------------|------------|------------|--------------|
| 35 | 1225799    | 3318005707 | 3274031495 | 40404652     |
| 36 | 3914049    | 3000812894 | 1207198    | 9402390515591|
| 37 | 3000832201 | 3000831857 | 3000812574 | 569799082    |
| 38 | 3000827538 | 3925841    | 221651797  | 1208343      |
| 39 | 3000806981 | 40409450   | 1213877    | 1213836      |
| 40 | 1218885    | 3000823625 | 3000812962 | 1202215      |
| 41 | 3000831972 | 1200457    | 3000821389 | 1200956      |
| 42 | 3925038    | 3000804948 | 569469473  | 569675456    |
| 43 | 3000814255 | 3000817600 | 3000822437 | 3318500582   |
| 44 | 1221790    | 3000813771 | 3000832981 | 3000826062   |
| 45 | 1225626    | 3000786311 | 3000826799 | 3000812950   |
| 46 | 1207903    | 1223295    | 70165      | 40402433     |
| 47 | 1213690    | 3000823095 | 1206723    | 1208414      |
| 48 | 3000823448 | 1218605    | 3318005243 | 1219626      |
| 49 | 3000816280 | 3000784161 | 3000811581 | 1202403      |
| 50 | 3253004043 | 1211923    | 3000812477 | 1221791      |

**MSM 2006-3AR**
**Initial Loan Sample**

|    | Fico Q1    | Fico Q2    | Fico Q3    | Fico Q4    |
|----|------------|------------|------------|------------|
| 1  | 2390524160 | 1231137    | 1245746    | 1236584    |
| 2  | 1245758    | 1247567    | 1249833    | 1250983    |
| 3  | 1260379    | 1249053    | 1247589    | 1228540    |
| 4  | 1247578    | 1249057    | 1236848    | 1229357    |
| 5  | 1247607    | 1241976    | 2390523894 | 2390523640 |
| 6  | 4764549    | 1244808    | 549905596  | 2390524855 |
| 7  | 2390526232 | 1232688    | 1250976    | 1179123    |
| 8  | 2390523205 | 2390527470 | 1250740    | 2390526698 |
| 9  | 1249063    | 1236926    | 1250988    | 1247569    |
| 10 | 2390526987 | 1248085    | 1249071    | 1232519    |
| 11 | 1216022    | 3342000430 | 1220367    | 1241979    |
| 12 | 1230386    | 1248167    | 2390526078 | 1253909    |
| 13 | 2390523910 | 1233287    | 1232190    | 1229438    |
| 14 | 1228472    | 1245747    | 1255106    | 1247582    |
| 15 | 1258042    | 569475392  | 1236583    | 2390527641 |
| 16 | 1252155    | 1237461    | 1253382    | 1193905    |
| 17 | 1247576    | 1249984    | 1247584    | 1254871    |
| 18 | 1259112    | 1249213    | 1245752    | 569828155  |
| 19 | 2390521713 | 1241989    | 1230022    | 2390524853 |

- 107 -

|    | Fico Q1    | Fico Q2    | Fico Q3    | Fico Q4 |
|----|------------|------------|------------|---------|
| 20 | 2390523665 | 3311001475 | 1227833    | 1245745 |
| 21 | 1250195    | 1247596    | 2390522933 | 1235995 |
| 22 | 569606845  | 1247562    | 1247595    | 1238541 |
| 23 | 1236922    | 2390527246 | 1245739    | 1249221 |
| 24 | 1226557    | 1262971    | 1245756    | 1219896 |
| 25 | 1241978    | 1229305    | 1248074    | 1233283 |

## Supplemental Loan Sample

|    | Fico Q1 | Fico Q2    | Fico Q3    | Fico Q4    |
|----|---------|------------|------------|------------|
| 26 | 1248072 | 2390521645 | 1247573    | 1231150    |
| 27 | 1225902 | 1243920    | 1213984    | 1247700    |
| 28 | 1245753 | 1249293    | 1249831    | 1245759    |
| 29 | 1250985 | 1222596    | 1248163    | 1255111    |
| 30 | 1254755 | 1222541    | 1247561    | 569625718  |
| 31 | 1249879 | 1255013    | 1236906    | 2390527503 |
| 32 | 1248086 | 5180182    | 2390526165 | 1247602    |
| 33 | 1252152 | 1259507    | 1234296    | 1249049    |
| 34 | 1260369 | 1254873    | 1248083    | 1228114    |
| 35 | 1241974 | 1259447    | 1247590    | 2390524425 |
| 36 | 1243959 | 569784956  | 1252154    | 1248070    |
| 37 | 1247563 | 1249296    | 1247568    | 1261478    |
| 38 | 1222503 | 1241400    | 1243882    | 1250987    |
| 39 | 1261477 | 1224699    | 569712025  | 1245761    |
| 40 | 1261557 | 1236604    | 1245751    | 1245737    |
| 41 | 1245524 | 1250982    | 1249704    | 1249987    |
| 42 | 1222366 | 1224612    | 1213088    | 1243923    |
| 43 | 1248084 | 1204653    | 1245813    | 2390521495 |
| 44 | 1249285 | 1248165    | 1198730    | 1247591    |
| 45 | 1239028 | 1259446    | 1261475    | 1248082    |
| 46 | 1253844 | 1247594    | 1255104    | 1250109    |
| 47 | 1255296 | 3311001597 | 1242385    | 1205354    |
| 48 | 1247586 | 1228470    | 2390526632 | 1245740    |
| 49 | 1235980 | 1237620    | 67730      | 1239035    |
| 50 | 1249295 | 5100014    | 1229381    | 1233431    |

### MSM 2006-8AR
### Initial Loan Sample

|   | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---------|---------|---------|---------|
| 1 | 1293711 | 3940314 | 3000823077 | 3000895287 |
| 2 | 3929330 | 1309175 | 1294203 | 3947304 |
| 3 | 1264622 | 1203889 | 3253001720 | 3000888689 |
| 4 | 1292664 | 3000893788 | 5969880 | 1096704 |
| 5 | 1298143 | 1281750 | 2192 | 3942915 |
| 6 | 1310355 | 3000901476 | 3928334 | 3000880194 |
| 7 | 1294287 | 1222776 | 1309278 | 1237612 |
| 8 | 1291951 | 1273139 | 3000885316 | 5987295 |
| 9 | 3000897109 | 3000890541 | 3843981 | 1287041 |
| 10 | 1291756 | 1304003 | 3000905466 | 3000895726 |
| 11 | 3000885423 | 1298055 | 1296837 | 3000809524 |
| 12 | 3000877357 | 3000892137 | 1207419 | 3000820848 |
| 13 | 3000884114 | 3000892407 | 40414201 | 1298497 |
| 14 | 3000833328 | 1290253 | 1303972 | 5968688 |
| 15 | 1291443 | 3000894528 | 1107418 | 5986483 |
| 16 | 1282269 | 1143279 | 5989253 | 5969106 |
| 17 | 3000899559 | 3311000609 | 3000898073 | 3000891205 |
| 18 | 3000895274 | 40418847 | 1281199 | 1298097 |
| 19 | 3000897173 | 3000846209 | 5984040 | 1298682 |
| 20 | 1288622 | 1285424 | 1312525 | 3949799 |
| 21 | 1288243 | 1296111 | 1156892 | 3948966 |
| 22 | 1297419 | 3000887568 | 7827165 | 3951717 |
| 23 | 3936832 | 3000892686 | 3000881569 | 5980986 |
| 24 | 1284128 | 3000880042 | 65551 | 1132004 |
| 25 | 1267565 | 7831961 | 1289923 | 5770182 |

### Supplemental Loan Sample

|   | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---------|---------|---------|---------|
| 26 | 1294906 | 3000902686 | 1283593 | 5976815 |
| 27 | 3951872 | 3944631 | 3000890555 | 1216342 |
| 28 | 1291514 | 1283295 | 1209379 | 5984460 |
| 29 | 3253002461 | 1260384 | 3000901801 | 40487032 |
| 30 | 1272665 | 1272396 | 3000883547 | 3952438 |
| 31 | 3000857119 | 5973068 | 3000895320 | 1285489 |
| 32 | 3000899566 | 40411464 | 1093492 | 3000883732 |
| 33 | 1293213 | 1209371 | 1294753 | 1296785 |
| 34 | 1288224 | 40433841 | 1153780 | 1213081 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 1228343 | 3000824655 | 3000889024 | 5975424 |
| 36 | 1198159 | 1221771 | 5980307 | 3000901684 |
| 37 | 3000882609 | 1145201 | 3000893199 | 3000888697 |
| 38 | 3000898043 | 3000897957 | 3947663 | 5973123 |
| 39 | 1284120 | 1294459 | 5977760 | 1303981 |
| 40 | 3946334 | 1233418 | 3000898750 | 1197992 |
| 41 | 1308329 | 7571533 | 3000896075 | 1180550 |
| 42 | 1157068 | 1235621 | 3000891593 | 3000895833 |
| 43 | 1299136 | 1284129 | 1291965 | 5984606 |
| 44 | 3000895424 | 3000887987 | 3000885954 | 5991423 |
| 45 | 1308317 | 3000865655 | 1294751 | 7829336 |
| 46 | 1298052 | 1285411 | 1284131 | 3000886824 |
| 47 | 1183149 | 1288237 | 3000894264 | 40411746 |
| 48 | 1300793 | 3000892502 | 1308347 | 1282692 |
| 49 | 1284845 | 1291413 | 1250110 | 1295019 |
| 50 | 3947359 | 7831661 | 1232522 | 3000896424 |

### MSM 2006-9AR
### Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 1321431 | 1248100 | 1321641 | 5300001469 |
| 2  | 1335851 | 5300000711 | 5300001325 | 1321964 |
| 3  | 3955000545 | 1315015 | 1322757 | 6-005513 |
| 4  | 3951795 | 3000812014 | 3955001928 | 1321925 |
| 5  | 1336816 | 1301157 | 1306288 | 1334677 |
| 6  | 1320495 | 1331161 | 1320548 | 1320503 |
| 7  | 5300002307 | 3311003559 | 1327961 | 1321216 |
| 8  | 1308484 | 1323517 | 1317503 | 1760302952 |
| 9  | 1313012 | 1320489 | 1315733 | 1321531 |
| 10 | 1320406 | 1346684 | 1347878 | 3274041800 |
| 11 | 1303617 | 1321938 | 1335869 | 1345571 |
| 12 | 1335852 | 1345191 | 1321182 | 1317335 |
| 13 | 1345363 | 1321801 | 3604222 | 1321402 |
| 14 | 1303841 | 1321210 | 1343607 | 1321937 |
| 15 | 1320461 | 1345428 | 1297417 | 1320457 |
| 16 | 1241987 | 1322048 | 1321302 | 3253011453 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 17 | 1303880 | 1321817 | 1335334 | 1346664 |
| 18 | 1345417 | 5300001074 | 1322806 | 1336789 |
| 19 | 1326773 | 1335862 | 7830859 | 1326747 |
| 20 | 1345436 | 1331419 | 1334646 | 1321707 |
| 21 | 1860300446 | 1335842 | 1335881 | 5300000742 |
| 22 | 1269711 | 3908474 | 1321650 | 3253011608 |
| 23 | 1331250 | 1315359 | 1321855 | 1345379 |
| 24 | 1320488 | 1317378 | 1345360 | 1321980 |
| 25 | 1303847 | 3319000345 | 1321129 | 1300457 |

**Supplemental Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 3253011653 | 1320570 | 3000855481 | 1312316 |
| 27 | 1329316 | 1321686 | 1320432 | 1321998 |
| 28 | 3253013232 | 1321979 | 1321860 | 1320485 |
| 29 | 1326769 | 7840192 | 1321794 | 1208603 |
| 30 | 1303859 | 3930054 | 1322133 | 1321092 |
| 31 | 3319000399 | 5300000376 | 3955002125 | 3253011213 |
| 32 | 1320573 | 1315361 | 1275629 | 1345376 |
| 33 | 1331171 | 3318008178 | 1321299 | 1321229 |
| 34 | 1345570 | 1335920 | 1331172 | 1321232 |
| 35 | 1345483 | 1327970 | 1303855 | 3318008085 |
| 36 | 1329329 | 1296073 | 1321198 | 1321445 |
| 37 | 1313820 | 3253012461 | 3342004425 | 1275895 |
| 38 | 1335907 | 1326760 | 1320393 | 3342003674 |
| 39 | 1316496 | 3253012529 | 1321575 | 3274041892 |
| 40 | 1317272 | 1321475 | 1346656 | 1320450 |
| 41 | 3000865261 | 1312275 | 1320479 | 3253011782 |
| 42 | 1313813 | 1321476 | 3943716 | 1322088 |
| 43 | 3952564 | 1334733 | 1319673 | 3253013240 |
| 44 | 3957916 | 1323649 | 3955002042 | 1321262 |
| 45 | 1335871 | 1322069 | 1320541 | 1267783 |
| 46 | 3253012301 | 1326767 | 1335342 | 3274042674 |
| 47 | 1327940 | 1320571 | 1319434 | 3253012326 |
| 48 | 1208631 | 1345019 | 1319412 | 1321646 |
| 49 | 1321769 | 1335861 | 3253012222 | 1331215 |
| 50 | 5300000344 | 3953894 | 1320433 | 1322824 |

**MSM 2006-10SL**
**Initial Loan Sample**

|    | Fico Q1       | Fico Q2       | Fico Q3       | Fico Q4       |
|----|---------------|---------------|---------------|---------------|
| 1  | 1303815       | 3274040856    | 40564228      | 6024434       |
| 2  | 6007603       | 1313936       | 40565942      | 40566558      |
| 3  | 3318007416    | 6125355       | 1298142       | 3342003056    |
| 4  | 1314427       | 3000918671    | 3318007998    | 1317282       |
| 5  | 1293141       | 5909718       | 40579330      | 40542885      |
| 6  | 2280050923220 | 3274036383    | 3000920341    | 3000904598    |
| 7  | 2020050954200 | 40554207      | 40574384      | 1313986       |
| 8  | 3000936631    | 40576707      | 1290983       | 40541675      |
| 9  | 6189690       | 1298129       | 1287314       | 40581959      |
| 10 | 1328188       | 5863782       | 3342003491    | 1293129       |
| 11 | 2330060400650 | 2100060449020 | 3000902098    | 3000907463    |
| 12 | 6159529       | 3000900174    | 3955000156    | 40503478      |
| 13 | 2010051018090 | 40564260      | 40580464      | 1335967       |
| 14 | 2050060441060 | 3318007267    | 2010060331090 | 2200060252360 |
| 15 | 2200060358150 | 2010060337920 | 3318500989    | 40542117      |
| 16 | 5948443       | 40542359      | 6060057       | 5913389       |
| 17 | 6083216       | 3000939997    | 3342003149    | 3274040561    |
| 18 | 2090050974020 | 2320060371800 | 1274988       | 40475582      |
| 19 | 1274811       | 1337397       | 40545374      | 3945000251    |
| 20 | 1297430       | 3000924307    | 1329173       | 1298140       |
| 21 | 1316462       | 2330060288580 | 1302045       | 3349000126    |
| 22 | 2220060397900 | 1278971       | 40550412      | 3274041192    |
| 23 | 3000929047    | 40518747      | 3000928631    | 40549411      |
| 24 | 6242317       | 2300060394850 | 3000898365    | 3274040192    |
| 25 | 3000922738    | 2350060450260 | 40577377      | 40562035      |

**Supplemental Loan Sample**

|    | Fico Q1       | Fico Q2       | Fico Q3       | Fico Q4       |
|----|---------------|---------------|---------------|---------------|
| 26 | 1287310       | 3274037108    | 3000907481    | 40537939      |
| 27 | 6059083       | 2230060397020 | 1302213       | 3274039811    |
| 28 | 1298369       | 3253009889    | 1760302613    | 3253011672    |
| 29 | 5970249       | 1296263       | 1328363       | 2220060400730 |
| 30 | 2280051032880 | 40508656      | 3000932299    | 3274040818    |
| 31 | 40526455      | 1308518       | 40564806      | 3945000160    |
| 32 | 40539807      | 2210060490560 | 3253009217    | 40549459      |
| 33 | 1224684       | 2250060340860 | 3274040462    | 1336462       |
| 34 | 2030060367940 | 3274037192    | 40555240      | 3274041863    |

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 35 | 2230050948200 | 3000896215 | 3000914414 | 40466090 |
| 36 | 3274037028 | 2010060446920 | 2030060258830 | 40543715 |
| 37 | 2070060389550 | 5920129 | 1328191 | 3955001814 |
| 38 | 1299526 | 3000902535 | 40550889 | 1317783 |
| 39 | 1318896 | 1314017 | 3000929660 | 1316434 |
| 40 | 2230060401300 | 3000913704 | 3955000978 | 1298702 |
| 41 | 3000925097 | 3342003587 | 1310775 | 1250111 |
| 42 | 3274040243 | 1291335 | 40549365 | 1342442 |
| 43 | 1317007 | 1291346 | 3915000209 | 40562106 |
| 44 | 3253009815 | 2030060367350 | 3000934671 | 3253011732 |
| 45 | 6009906 | 1302408 | 1316457 | 1317977 |
| 46 | 2250060441150 | 2230060393360 | 40569664 | 1306352 |
| 47 | 3975000404 | 3274037142 | 3253009990 | 3349000137 |
| 48 | 6205413 | 3253010223 | 40541810 | 3342003722 |
| 49 | 1317796 | 3342002855 | 1329437 | 1300061 |
| 50 | 2030060470210 | 5300000417 | 40571481 | 3000933999 |

**MSM 2006-13ARX**
**Initial Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 1346848 | 1360986 | 1392090 | 1351983 |
| 2 | 1364672 | 1380391 | 1380383 | 1372193 |
| 3 | 1329160 | 1384454 | 1319237 | 1361022 |
| 4 | 1361551 | 1354145 | 1390947 | 1394884 |
| 5 | 1359021 | 1352998 | 1349727 | 3000964014 |
| 6 | 1328621 | 1361090 | 1378737 | 1359741 |
| 7 | 1350685 | 1365471 | 3962937 | 1296260 |
| 8 | 1303992 | 1331433 | 1324475 | 1380498 |
| 9 | 1323537 | 1350683 | 1346489 | 1350727 |
| 10 | 1362561 | 1380449 | 7843418 | 7844380 |
| 11 | 1380401 | 1377451 | 3983099 | 1350654 |
| 12 | 1350718 | 1148274 | 1378741 | 1383118 |
| 13 | 1372358 | 1365428 | 1322815 | 1395406 |
| 14 | 1380093 | 1380596 | 1365539 | 1354159 |
| 15 | 1372327 | 1346479 | 1383803 | 1352465 |
| 16 | 1321952 | 1359747 | 7843849 | 1318796 |
| 17 | 1354130 | 1347945 | 1322614 | 1350658 |
| 18 | 1380533 | 1385819 | 1359746 | 1365526 |
| 19 | 1344029 | 1348004 | 1315005 | 1352478 |

|    | Fico Q1    | Fico Q2   | Fico Q3   | Fico Q4   |
|----|------------|-----------|-----------|-----------|
| 20 | 6324117    | 1352083   | 1361298   | 1359178   |
| 21 | 1328545    | 1357940   | 1315749   | 1354202   |
| 22 | 3000944731 | 1380511   | 1354155   | 1354213   |
| 23 | 1361285    | 1348025   | 1352667   | 1350659   |
| 24 | 1232684    | 1314970   | 7844331   | 1323641   |
| 25 | 1393296    | 1375131   | 1346501   | 1351032   |

## Supplemental Loan Sample

|    | Fico Q1    | Fico Q2    | Fico Q3   | Fico Q4   |
|----|------------|------------|-----------|-----------|
| 26 | 1361216    | 1380404    | 1385639   | 7842009   |
| 27 | 1359958    | 1348032    | 1392108   | 1377045   |
| 28 | 1368291    | 1355248    | 1323655   | 3969204   |
| 29 | 1359837    | 1316719    | 1346538   | 3947617   |
| 30 | 1386446    | 1381237    | 1380417   | 1365504   |
| 31 | 1352663    | 3000934850 | 1380587   | 1317561   |
| 32 | 1352687    | 1380392    | 1361384   | 1393452   |
| 33 | 1368288    | 1319679    | 1315719   | 1320426   |
| 34 | 3952570    | 1357054    | 1360975   | 1360928   |
| 35 | 1361571    | 1383122    | 1318033   | 1385817   |
| 36 | 1352719    | 1298700    | 1346541   | 1359878   |
| 37 | 1355724    | 7845026    | 1392087   | 1367182   |
| 38 | 1344074    | 1380444    | 1355568   | 1384209   |
| 39 | 1361532    | 1352479    | 7843280   | 1365545   |
| 40 | 1350736    | 1361135    | 1357070   | 1380454   |
| 41 | 1352031    | 1361253    | 7842805   | 1355732   |
| 42 | 1352682    | 1383723    | 1323887   | 1368306   |
| 43 | 1388171    | 1351035    | 1329436   | 1365541   |
| 44 | 3000951351 | 1380452    | 1343998   | 1361061   |
| 45 | 1329163    | 1364002    | 6339494   | 1343985   |
| 46 | 1337395    | 1350648    | 1385421   | 1380419   |
| 47 | 1360858    | 1350676    | 7843860   | 1320480   |
| 48 | 1377031    | 1352666    | 1346525   | 1344035   |
| 49 | 1314950    | 6322332    | 1360860   | 1331152   |
| 50 | 1355445    | 1350730    | 1359959   | 1350698   |

**MSM 2006-16AX**
**Initial Loan Sample**

|    | Fico Q1    | Fico Q2    | Fico Q3    | Fico Q4    |
|----|------------|------------|------------|------------|
| 1  | 1364856    | 1370997    | 2091035    | 2094496    |
| 2  | 1357076    | 40635035   | 2093740    | 2092524    |
| 3  | 2092903    | 2094750    | 1366648    | 2096071    |
| 4  | 2093220    | 2091999    | 40590336   | 40637237   |
| 5  | 2090383    | 40579679   | 40593729   | 1361657    |
| 6  | 2091759    | 2094771    | 40621203   | 1320666    |
| 7  | 2091903    | 2092027    | 2084845    | 2093698    |
| 8  | 2094840    | 2090369    | 3000954925 | 2085413    |
| 9  | 2067182    | 40613992   | 2085723    | 2095104    |
| 10 | 2092205    | 2096758    | 2091427    | 2093024    |
| 11 | 2095976    | 2093763    | 3000983164 | 1363065    |
| 12 | 2091763    | 3000983649 | 2073377    | 40640509   |
| 13 | 3253012171 | 2085385    | 2090949    | 2094241    |
| 14 | 2081053    | 3000966355 | 2085408    | 2094335    |
| 15 | 2093383    | 2091626    | 1373058    | 1370021    |
| 16 | 2083428    | 2085456    | 2091998    | 2090970    |
| 17 | 2091869    | 2094341    | 2091653    | 1342606    |
| 18 | 2094757    | 2091966    | 40643136   | 2086284    |
| 19 | 3000988732 | 2085092    | 3000984937 | 3000991712 |
| 20 | 2083446    | 2091627    | 40631530   | 1375679    |
| 21 | 2084900    | 3000863241 | 2085156    | 1345262    |
| 22 | 3000985961 | 2090853    | 2094522    | 40632730   |
| 23 | 2093406    | 3000955433 | 2091990    | 2083737    |
| 24 | 1369951    | 2094356    | 2085074    | 1360095    |
| 25 | 2080666    | 2085403    | 2092213    | 2094030    |

**Supplemental Loan Sample**

|    | Fico Q1    | Fico Q2    | Fico Q3    | Fico Q4    |
|----|------------|------------|------------|------------|
| 26 | 2092087    | 1349460    | 2090930    | 40635301   |
| 27 | 1367870    | 2090944    | 2090408    | 2091633    |
| 28 | 2081363    | 3000980433 | 2092040    | 40644118   |
| 29 | 1367815    | 2085889    | 2085463    | 2091489    |
| 30 | 3000982332 | 2085431    | 2090594    | 2094061    |
| 31 | 2082787    | 3000982697 | 2090039    | 40638429   |
| 32 | 3000976950 | 2095667    | 2090209    | 2086480    |
| 33 | 1367774    | 40634886   | 2091530    | 2085387    |
| 34 | 2094494    | 1356729    | 2085891    | 2091988    |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 2083427 | 2090830 | 1364827 | 2094957 |
| 36 | 1360059 | 2092054 | 2094127 | 2094051 |
| 37 | 2093207 | 2094942 | 1355170 | 40621432 |
| 38 | 3000975027 | 1355364 | 1374047 | 2094965 |
| 39 | 2092245 | 2096057 | 2080859 | 1371989 |
| 40 | 2096231 | 2094178 | 2096778 | 2086067 |
| 41 | 2094278 | 1364632 | 2095195 | 1350314 |
| 42 | 2091878 | 2092204 | 1371577 | 1362126 |
| 43 | 2081439 | 1346618 | 40632092 | 2085130 |
| 44 | 2092212 | 3000950307 | 2091861 | 1372153 |
| 45 | 1361294 | 2092045 | 2085097 | 2091649 |
| 46 | 3000984167 | 2069924 | 40633184 | 40628328 |
| 47 | 2097374 | 1368308 | 1354367 | 2090952 |
| 48 | 1298554 | 1351693 | 2091119 | 40634138 |
| 49 | 1338928 | 2085437 | 2091090 | 1360537 |
| 50 | 1369177 | 2091369 | 2094987 | 40578501 |

**MSM 2007-2AX**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 5700968 | 3000999519 | 1447855 | 3000996642 |
| 2  | 123394187 | 1413678 | 1410347 | 1432773 |
| 3  | 1315027 | 1451949 | 1447461 | 1384465 |
| 4  | 3000993936 | 90561853 | 3000998117 | 1447314 |
| 5  | 1432837 | 424-10562942 | 124078830 | 123708051 |
| 6  | 124027749 | 203102835 | 6-011659 | 3000975349 |
| 7  | 124061754 | 3000994666 | 1344723 | 1447824 |
| 8  | 7841418 | 3968985 | 1445862 | 1436067 |
| 9  | 123578141 | 1390930 | 7846251 | 1419356 |
| 10 | 3001015851 | 124215013 | 1430097 | 3000886810 |
| 11 | 1426660 | 6-009701 | 1409640 | 1409631 |
| 12 | 1432374 | 1373255 | 6-012630 | 1447966 |
| 13 | 3000999021 | 7846822 | 1396816 | 1447357 |
| 14 | 1409682 | 1422679 | 1356923 | 1432878 |
| 15 | 90724691 | 7849190 | 1455974 | 1380412 |
| 16 | 1423516 | 90748583 | 1366068 | 90675562 |
| 17 | 3001007990 | 1447893 | 124203950 | 1447903 |
| 18 | 1413610 | 1408834 | 1447282 | 1403962 |
| 19 | 1448062 | 1424571 | 3001012937 | 6336667 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 20 | 1451916 | 6340577 | 3987410 | 124197914 |
| 21 | 1433529 | 3001024460 | 1432811 | 1432821 |
| 22 | 1420155 | 6339975 | 124081083 | 7846626 |
| 23 | 1447969 | 3954029 | 6336147 | 90339987 |
| 24 | 1382727 | 1409704 | 1445866 | 2711 |
| 25 | 3001007089 | 1432851 | 1447328 | 1448063 |

## Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 1364704 | 1441346 | 7846568 | 1430136 |
| 27 | 1450658 | 1426034 | 1407116 | 123974329 |
| 28 | 90641002 | 1419627 | 1441466 | 7572663 |
| 29 | 1396822 | 1445819 | 3000986846 | 1443564 |
| 30 | 1432862 | 7849346 | 7840149 | 1448197 |
| 31 | 1448127 | 1430569 | 3328 | 1302670 |
| 32 | 1447441 | 1441648 | 1423782 | 3001009129 |
| 33 | 3000996600 | 1419299 | 6349515 | 1432658 |
| 34 | 1362551 | 6330434 | 1393735 | 124182173 |
| 35 | 1434141 | 90751884 | 1408743 | 1447761 |
| 36 | 1409657 | 6-010376 | 1421729 | 1447638 |
| 37 | 1414262 | 6341379 | 123671835 | 6-011485 |
| 38 | 1436095 | 6336923 | 1402537 | 1447904 |
| 39 | 3001011423 | 1443542 | 1382764 | 1432879 |
| 40 | 1360885 | 124118092 | 123830348 | 1447580 |
| 41 | 203116637 | 1419372 | 1447760 | 7852635 |
| 42 | 1453210 | 1208524 | 3001004773 | 1432848 |
| 43 | 90718552 | 1393396 | 1429983 | 124169907 |
| 44 | 7850871 | 40609078 | 424-10570671 | 122897854 |
| 45 | 90524307 | 1431257 | 1433775 | 7853627 |
| 46 | 1375126 | 124137170 | 1430001 | 1443573 |
| 47 | 1446088 | 1464748 | 1372352 | 1445816 |
| 48 | 1447725 | 1406084 | 1432813 | 1441439 |
| 49 | 1426903 | 1402477 | 1403982 | 3001008338 |
| 50 | 3000996138 | 3000981423 | 1447936 | 1401886 |

## MSM 2007-4SL
## Initial Loan Sample

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 292095610 | 292104595 | 290046226 | 292101312 |
| 2 | 290062402 | 290053984 | 292107774 | 292075976 |
| 3 | 292103592 | 290054125 | 292097894 | 290054757 |
| 4 | 292090163 | 290046460 | 290058352 | 290054286 |
| 5 | 290054798 | 290054219 | 290058592 | 292107491 |
| 6 | 292095193 | 290058257 | 292097430 | 292103195 |
| 7 | 290062583 | 292099774 | 290099039 | 290049574 |
| 8 | 292096297 | 292102565 | 290061722 | 292103400 |
| 9 | 290058448 | 292099692 | 292103810 | 290054063 |
| 10 | 292092554 | 292102583 | 292108558 | 290049556 |
| 11 | 290054539 | 290058997 | 292100428 | 292094814 |
| 12 | 290058918 | 290046161 | 290058551 | 292082392 |
| 13 | 290058237 | 290058868 | 290054796 | 290054522 |
| 14 | 292082734 | 292086512 | 292099251 | 290054624 |
| 15 | 290056471 | 290062552 | 292073276 | 290061184 |
| 16 | 290058740 | 292097272 | 290061278 | 290046474 |
| 17 | 290058244 | 292103883 | 292065359 | 290054293 |
| 18 | 290050923 | 290058805 | 292102561 | 292104684 |
| 19 | 292095636 | 292107509 | 292107481 | 290054686 |
| 20 | 292107739 | 290054675 | 290054038 | 292080004 |
| 21 | 292107715 | 290035366 | 292099108 | 292098627 |
| 22 | 292107569 | 292092102 | 292103520 | 290056488 |
| 23 | 292100766 | 292100776 | 292105861 | 292083571 |
| 24 | 290058930 | 290054003 | 290053550 | 292083326 |
| 25 | 290062527 | 290059020 | 290054599 | 290054785 |

## Supplemental Loan Sample

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 292108254 | 290056476 | 292099097 | 290058500 |
| 27 | 290058839 | 290058508 | 292094804 | 290061358 |
| 28 | 292108233 | 292100373 | 292098451 | 290061138 |
| 29 | 292107744 | 290056512 | 290061394 | 290061197 |
| 30 | 290054681 | 292097981 | 290056559 | 290056596 |
| 31 | 292107683 | 292095351 | 290046582 | 292096922 |
| 32 | 292099046 | 290054325 | 292103276 | 292082079 |
| 33 | 292107802 | 292097153 | 292096449 | 292079016 |
| 34 | 290058831 | 290057262 | 292107654 | 292096662 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 292094568 | 290049635 | 292096903 | 292093144 |
| 36 | 292100806 | 290058717 | 290054051 | 290056366 |
| 37 | 292091025 | 292103506 | 292104638 | 292104899 |
| 38 | 292095302 | 292100533 | 290058440 | 290058809 |
| 39 | 292106041 | 292100816 | 292090485 | 292105791 |
| 40 | 290046326 | 290060397 | 290046560 | 292107631 |
| 41 | 290058828 | 292079934 | 292103573 | 292107669 |
| 42 | 290058633 | 290056613 | 290054233 | 292084598 |
| 43 | 290058514 | 292096107 | 292107338 | 292083320 |
| 44 | 292102669 | 290056726 | 292104184 | 290046316 |
| 45 | 290048947 | 290054280 | 290060395 | 292104036 |
| 46 | 290058590 | 292095308 | 290048025 | 292108709 |
| 47 | 290054278 | 290046571 | 290054628 | 290046102 |
| 48 | 290058970 | 292105445 | 290046688 | 290046609 |
| 49 | 292103697 | 290058950 | 290061185 | 292095891 |
| 50 | 290058625 | 292095360 | 292097487 | 290054331 |

**MSM 2007-5AX**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 2105533 | 4000012355 | 2096446 | 2109692 |
| 2  | 3968161 | 2106567 | 4700006579 | 2113423 |
| 3  | 2106399 | 2105080 | 2099968 | 2109760 |
| 4  | 2104405 | 2102691 | 2098030 | 3001024493 |
| 5  | 1477055 | 2105174 | 3500020366 | 6341839 |
| 6  | 2100228 | 2076131 | 2104927 | 2101351 |
| 7  | 2112248 | 2111463 | 2107109 | 1476131 |
| 8  | 2103380 | 7100005218 | 3000859717 | 4600012844 |
| 9  | 2099747 | 2035515 | 6341094 | 2109755 |
| 10 | 2080955 | 6-012757 | 2094734 | 2106159 |
| 11 | 2106219 | 2098593 | 3001034610 | 6330279 |
| 12 | 2100279 | 2102224 | 3500022141 | 2107459 |
| 13 | 2110628 | 2102281 | 2104298 | 2105292 |
| 14 | 2100048 | 2103990 | 4700006121 | 2103057 |
| 15 | 2098919 | 2107206 | 1466659 | 2106164 |
| 16 | 2109883 | 3500021877 | 2106091 | 6349581 |
| 17 | 2081018 | 3500019376 | 2105109 | 2600015235 |
| 18 | 2105085 | 2102476 | 2101636 | 2110728 |
| 19 | 6360842 | 2093789 | 4500023254 | 3001019143 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 20 | 2107196 | 2102958 | 2000032904 | 2110120 |
| 21 | 2103919 | 2106144 | 2104134 | 2076737 |
| 22 | 2107151 | 2100115 | 2104305 | 7853919 |
| 23 | 2106111 | 3000018163 | 7100004811 | 4500021957 |
| 24 | 2105030 | 2104412 | 2104727 | 2111559 |
| 25 | 2093051 | 4500020642 | 2098905 | 2111288 |

### Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 3001013654 | 7100004953 | 4500021014 | 2111747 |
| 27 | 2101445 | 2106783 | 2097069 | 2112004 |
| 28 | 2101360 | 2098032 | 3000018230 | 2106128 |
| 29 | 2099164 | 2106842 | 2109023 | 4600012865 |
| 30 | 2109361 | 3001039382 | 4600013376 | 4700006135 |
| 31 | 2102693 | 2106809 | 2103784 | 4000012969 |
| 32 | 33333333348602 | 6352406 | 2102656 | 2106134 |
| 33 | 2102649 | 4500020956 | 2100571 | 2600014316 |
| 34 | 2108989 | 3500020879 | 6345029 | 2106766 |
| 35 | 2110360 | 2000033532 | 3000854509 | 2100073 |
| 36 | 2105404 | 2096437 | 1479343 | 2000033627 |
| 37 | 2112769 | 2098382 | 2105133 | 7500004890 |
| 38 | 2103973 | 2103826 | 1462027 | 3500021153 |
| 39 | 2100188 | 3500020964 | 2300004757 | 6371105 |
| 40 | 2102439 | 3001019069 | 3001000695 | 2110677 |
| 41 | 2106530 | 2073475 | 2105034 | 2106127 |
| 42 | 2109876 | 2106789 | 2106153 | 2104686 |
| 43 | 2113414 | 2077500 | 2100915 | 40613451 |
| 44 | 2108487 | 2103929 | 2102150 | 1456014 |
| 45 | 2111074 | 2107332 | 2108192 | 4500021926 |
| 46 | 2091021 | 4700006355 | 2103354 | 2106779 |
| 47 | 2107438 | 7844945 | 2095817 | 7500005151 |
| 48 | 3000050127 | 2095938 | 4000012935 | 2110330 |
| 49 | 2109446 | 2109647 | 2111784 | 3989630 |
| 50 | 2109804 | 2600014480 | 2105262 | 2105106 |

**MSM 2007-11AR**
**Initial Loan Sample**

|    | Fico Q1    | Fico Q2     | Fico Q3     | Fico Q4      |
|----|------------|-------------|-------------|--------------|
| 1  | 1646536    | 1457305     | 1641514     | 1643387      |
| 2  | 1596313    | 1550689     | 1641483     | 1620932      |
| 3  | 1492619    | 1640212     | 1640218     | 1641235      |
| 4  | 1551555    | 1556267     | 1641669     | 1640155      |
| 5  | 1626131    | 1641381     | 1606049     | 1568248      |
| 6  | 1578200    | 1456635     | 1717692     | 1551496      |
| 7  | 1556260    | 1563999     | 1692626     | 1650926      |
| 8  | 1640177    | 1640203     | 1559789     | 1551564      |
| 9  | 1528154    | 1549720     | 424-10645355| 1521666      |
| 10 | 1539552    | 1520946     | 1648694     | 329-10610337 |
| 11 | 1539608    | 1570557     | 1553626     | 1641479      |
| 12 | 1641549    | 1551409     | 1614455     | 1650871      |
| 13 | 1443523    | 1553097     | 1535406     | 1655305      |
| 14 | 1569697    | 6375346     | 1641243     | 329-10621081 |
| 15 | 1546305    | 1614440     | 1641571     | 329-10612697 |
| 16 | 1543217    | 1559329     | 1618223     | 1717693      |
| 17 | 1011442192 | 1522067     | 1640194     | 1551600      |
| 18 | 1551438    | 1641364     | 1657632     | 1641244      |
| 19 | 1616416    | 1640176     | 6358518     | 1687798      |
| 20 | 1641412    | 1546754     | 1640154     | 1655316      |
| 21 | 1011752249 | 1543371     | 1495074     | 1641783      |
| 22 | 3001066566 | 1504339     | 1641431     | 1641661      |
| 23 | 3993226    | 1585006     | 1691302     | 3001058808   |
| 24 | 1479865    | 1549082     | 1526338     | 1551270      |
| 25 | 1614468    | 1011481960  | 1641237     | 1691127      |

**Supplemental Loan Sample**

|    | Fico Q1    | Fico Q2      | Fico Q3     | Fico Q4      |
|----|------------|--------------|-------------|--------------|
| 26 | 1530248    | 1504763      | 1641468     | 3001041131   |
| 27 | 1641279    | 1650930      | 1475791     | 1641591      |
| 28 | 1551351    | 1609198      | 1520894     | 1641626      |
| 29 | 1474116    | 3001064539   | 1641585     | 1551332      |
| 30 | 1628828    | 1641418      | 1447287     | 1641434      |
| 31 | 1563020    | 1641219      | 1551542     | 1457287      |
| 32 | 1539948    | 1641306      | 1576046     | 1551458      |
| 33 | 1641249    | 7859157      | 1691301     | 1520884      |
| 34 | 1539830    | 38-10554834  | 1641589     | 1520958      |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 1607414 | 1641685 | 1606122 | 1641466 |
| 36 | 1540265 | 1641336 | 3997122 | 1640199 |
| 37 | 1569900 | 1522084 | 1620841 | 1426657 |
| 38 | 1641453 | 1704192 | 1640220 | 1690051 |
| 39 | 1600614 | 1641511 | 1571509 | 1641442 |
| 40 | 236-10641726 | 1639722 | 1568236 | 1671194 |
| 41 | 1550132 | 1453767 | 1672391 | 1648713 |
| 42 | 1551306 | 1475676 | 1641673 | 130-10639911 |
| 43 | 1464805 | 1466500 | 1717700 | 1475858 |
| 44 | 1479893 | 1574149 | 1551287 | 1641411 |
| 45 | 1504444 | 1629881 | 1641566 | 6363414 |
| 46 | 1528201 | 1655338 | 1641755 | 397-10630419 |
| 47 | 1475833 | 1641331 | 1571628 | 1551627 |
| 48 | 1504665 | 1011686008 | 40561129 | 1600567 |
| 49 | 1530252 | 3387775 | 1668182 | 1568247 |
| 50 | 3001064386 | 1707399 | 1558173 | 1688536 |

**NTIX 2007-HE2**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 16501 | 5289605504 | 5243612967 | 60343167 |
| 2  | 3058611882 | 60244100 | 3029612741 | 5240608776 |
| 3  | 3029610037 | 3027608521 | 9501285150 | 333379 |
| 4  | 5274601384 | 342016 | 339500 | 54256 |
| 5  | 333869 | 340295 | 3027608554 | 342510 |
| 6  | 339098 | 3029610892 | 3027602898 | 342660 |
| 7  | 606152883 | 331663 | 5243612979 | 3027607242 |
| 8  | 60232931 | 1230046182 | 4420607237 | 5128600591 |
| 9  | 605116963 | 2000002051 | 3058612347 | 5208603165 |
| 10 | 60182029 | 5223600745 | 340055 | 335543 |
| 11 | 5243611620 | 333703 | 3058611724 | 5243613574 |
| 12 | 340511 | 4420607093 | 3027602933 | 9501288634 |
| 13 | 5218603497 | 343695 | 336865 | 5291605588 |
| 14 | 337276 | 60189842 | 339023 | 3076607077 |
| 15 | 60249422 | 5268602083 | 3076607996 | 331831 |
| 16 | 3058608832 | 335823 | 5255601070 | 5240608649 |
| 17 | 3027604494 | 5289605481 | 5243613577 | 5243613614 |
| 18 | 3027608695 | 343194 | 334719 | 335430 |
| 19 | 49665 | 329748 | 330126 | 338588 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 20 | 3029609915 | 9501285192 | 339585 | 3076608563 |
| 21 | 3063600550 | 343437 | 3029612497 | 335429 |
| 22 | 5259601045 | 3027605485 | 3076608057 | 52751 |
| 23 | 339811 | 3029603370 | 60120086 | 60263225 |
| 24 | 337105 | 339159 | 3027607849 | 3058611641 |
| 25 | 330204 | 20600554 | 337487 | 49954 |

## Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 605304489 | 5290700220 | 3029700357 | 328358 |
| 27 | 333410 | 4420606322 | 605184916 | 325801 |
| 28 | 341061 | 1007011461 | 5286700198 | 53801 |
| 29 | 335037 | 332306 | 53651 | 337899 |
| 30 | 5243611832 | 3076700359 | 60230802 | 340880 |
| 31 | 60097490 | 3029700099 | 337289 | 339266 |
| 32 | 5287605104 | 330963 | 341147 | 341114 |
| 33 | 341681 | 60270618 | 49876 | 331760 |
| 34 | 344993 | 330078 | 333933 | 340578 |
| 35 | 5291601798 | 5236600054 | 48353 | 3029612261 |
| 36 | 334280 | 3029608505 | 51161 | 9501287941 |
| 37 | 3027700698 | 5272602505 | 5243612030 | 16766 |
| 38 | 342595 | 16479 | 3029612796 | 333005 |
| 39 | 5208602587 | 335279 | 3027602677 | 3076608364 |
| 40 | 16219 | 336860 | 5284600819 | 16209 |
| 41 | 336844 | 331661 | 5288602010 | 333457 |
| 42 | 53133 | 16709 | 3058612375 | 3058610712 |
| 43 | 60314200 | 5291604964 | 342571 | 331511 |
| 44 | 5290603748 | 336770 | 3029611723 | 5243613469 |
| 45 | 5296602226 | 3029612684 | 333863 | 343191 |
| 46 | 331931 | 60165842 | 4420607245 | 330725 |
| 47 | 346042 | 52779 | 328949 | 341785 |
| 48 | 51595 | 3029611837 | 335276 | 341176 |
| 49 | 5223602200 | 334542 | 341631 | 340394 |
| 50 | 4420606841 | 332110 | 341143 | 15755 |

## RALI 2006-QA5
### Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 10658217 | 10672719 | 10473690 | 10610541 |
| 2  | 10501987 | 10674055 | 10605655 | 10622357 |
| 3  | 10611233 | 10466752 | 10673519 | 10623757 |
| 4  | 10704015 | 10626549 | 10473604 | 10394035 |
| 5  | 10692513 | 10466792 | 10622199 | 10704029 |
| 6  | 10473578 | 10649433 | 10639325 | 10473746 |
| 7  | 10706725 | 10633403 | 10673533 | 10473654 |
| 8  | 10643191 | 10620799 | 10607649 | 10466766 |
| 9  | 10607529 | 10626229 | 10598345 | 10625703 |
| 10 | 10689767 | 10664481 | 10672911 | 10611191 |
| 11 | 10636043 | 10704009 | 10530725 | 10602245 |
| 12 | 10530821 | 10620439 | 10643259 | 10649847 |
| 13 | 10619839 | 10639865 | 10595281 | 10622189 |
| 14 | 10704023 | 10658065 | 10602135 | 10473844 |
| 15 | 10652123 | 10001203 | 10673361 | 10626285 |
| 16 | 10651841 | 10473650 | 10395624 | 10699003 |
| 17 | 10395652 | 10473614 | 10635193 | 10605397 |
| 18 | 10704107 | 10616825 | 10673687 | 10584243 |
| 19 | 10667961 | 10631277 | 10473842 | 10474182 |
| 20 | 10610069 | 10654501 | 10639941 | 10643085 |
| 21 | 10020191 | 10673795 | 10473812 | 10474178 |
| 22 | 10597819 | 10473752 | 10637629 | 10473834 |
| 23 | 10635253 | 10530819 | 10474916 | 10664039 |
| 24 | 10667057 | 10673365 | 10466794 | 10591543 |
| 25 | 10395630 | 10625873 | 10667651 | 10606211 |

### Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 10534661 | 10645615 | 10626027 | 10610841 |
| 27 | 10639735 | 10645147 | 10672971 | 10642789 |
| 28 | 10647281 | 10692589 | 10697671 | 10637333 |
| 29 | 10673829 | 10577979 | 10633355 | 10612377 |
| 30 | 10473682 | 10704045 | 10704001 | 10566057 |
| 31 | 10672717 | 10674045 | 10660255 | 10479290 |
| 32 | 10458166 | 10660745 | 10608395 | 10492835 |
| 33 | 10622029 | 10610821 | 10636351 | 10594931 |
| 34 | 10643243 | 10674463 | 10660575 | 10626445 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 10602585 | 10605001 | 10595377 | 10602279 |
| 36 | 10474200 | 10704235 | 10613435 | 10637259 |
| 37 | 10636087 | 10589585 | 10473776 | 10652357 |
| 38 | 10704199 | 10637581 | 10595325 | 10644703 |
| 39 | 10592727 | 10474098 | 10654715 | 10596583 |
| 40 | 10488440 | 10620357 | 10580957 | 10647329 |
| 41 | 10626315 | 10566039 | 10673495 | 10602261 |
| 42 | 10625225 | 10672851 | 10466808 | 10704213 |
| 43 | 10615117 | 10654733 | 10610953 | 10704151 |
| 44 | 10395656 | 10620545 | 10625363 | 10673111 |
| 45 | 10645015 | 10610003 | 10591717 | 10474074 |
| 46 | 10591757 | 10645187 | 10579813 | 10647041 |
| 47 | 10631031 | 10651847 | 10607639 | 10477824 |
| 48 | 10637463 | 10604979 | 10570023 | 10473672 |
| 49 | 10502216 | 10704171 | 10649769 | 10474134 |
| 50 | 10285346 | 10625727 | 10595015 | 10624815 |

### SAST 2007-2
### Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 2000244729 | 12058910 | 12032714 | 12041233 |
| 2  | 12064500 | 2000240456 | 12069252 | 12051810 |
| 3  | 12039889 | 12072278 | 12035576 | 12076501 |
| 4  | 12065888 | 12066831 | 2000240553 | 2000240737 |
| 5  | 12064773 | 12062410 | 12062454 | 12070134 |
| 6  | 12060812 | 12060625 | 12066443 | 2000240484 |
| 7  | 12062006 | 12068855 | 12034625 | 12063675 |
| 8  | 12049007 | 12032407 | 2000238775 | 12064110 |
| 9  | 12062992 | 12071811 | 12066214 | 12077070 |
| 10 | 12059492 | 12065486 | 2000240511 | 2000238849 |
| 11 | 12069100 | 12068718 | 12066540 | 12059773 |
| 12 | 12054153 | 12064332 | 12031395 | 12045744 |
| 13 | 12062573 | 12067511 | 12065872 | 12057521 |
| 14 | 12057866 | 2000240447 | 2000240758 | 12050691 |
| 15 | 12065270 | 12065771 | 12074595 | 12065319 |
| 16 | 12067894 | 12033108 | 12079797 | 2000240453 |
| 17 | 12062956 | 12065917 | 12063543 | 2000240393 |
| 18 | 12066888 | 11930626 | 12059416 | 12042426 |
| 19 | 12060877 | 12038119 | 12074321 | 12072744 |

|     | Fico Q1     | Fico Q2     | Fico Q3     | Fico Q4     |
| --- | ----------- | ----------- | ----------- | ----------- |
| 20  | 12070068    | 12059891    | 12060721    | 11983765    |
| 21  | 12057565    | 12063567    | 2000238768  | 12068671    |
| 22  | 2000240506  | 12074714    | 2000244709  | 2000240492  |
| 23  | 2000238795  | 12077285    | 12051166    | 12073886    |
| 24  | 12064230    | 12060399    | 12076751    | 2000240664  |
| 25  | 12060675    | 12042752    | 2000244720  | 12056600    |

**Supplemental Loan Sample**

|     | Fico Q1     | Fico Q2     | Fico Q3     | Fico Q4     |
| --- | ----------- | ----------- | ----------- | ----------- |
| 26  | 12059083    | 12061841    | 12031604    | 12067658    |
| 27  | 12078015    | 12048879    | 12076423    | 2000240919  |
| 28  | 12033088    | 12048123    | 12072994    | 12063109    |
| 29  | 12055715    | 12060148    | 12075663    | 12062234    |
| 30  | 12062789    | 12065142    | 2000240839  | 12062860    |
| 31  | 12067320    | 12064766    | 12069425    | 12066889    |
| 32  | 12064331    | 12064926    | 12068785    | 12059929    |
| 33  | 12034414    | 12050187    | 12063485    | 2000240724  |
| 34  | 12043792    | 12065542    | 2000244691  | 12070653    |
| 35  | 12058676    | 12060650    | 12058719    | 12063596    |
| 36  | 2000240399  | 12062207    | 12045730    | 12060003    |
| 37  | 12065962    | 12032763    | 12069960    | 12071885    |
| 38  | 12075905    | 12072565    | 12063544    | 12063823    |
| 39  | 2000240660  | 12069528    | 12075973    | 12062155    |
| 40  | 12063398    | 12066980    | 12062078    | 12060633    |
| 41  | 12062741    | 12066656    | 12054866    | 2000240920  |
| 42  | 12075273    | 12044418    | 12063809    | 12066336    |
| 43  | 12066014    | 12060939    | 12075928    | 2000240930  |
| 44  | 12060084    | 12071564    | 12062360    | 12075065    |
| 45  | 12034191    | 12066562    | 12076425    | 12064410    |
| 46  | 2000244717  | 12069365    | 12061338    | 12068020    |
| 47  | 12063702    | 2000238753  | 12032984    | 2000244673  |
| 48  | 12071441    | 12067314    | 12071099    | 12070598    |
| 49  | 12062811    | 12056091    | 12058919    | 12076879    |
| 50  | 12063558    | 12071195    | 12070808    | 2000244733  |

*NCUA v. RBS S.D.N.Y 13-cv-6726*

**HVMLT 2006-10**
**Initial Loan Sample**

|      | Fico Q1     | Fico Q2     | Fico Q3     | Fico Q4     |
|------|-------------|-------------|-------------|-------------|
| 1    | 0051133666  | 0051133247  | 0049947770  | 0000507848  |
| 2    | 0000525980  | 0000031566  | 0006013884  | 1000102314  |
| 3    | 1000101446  | 0049947631  | 0049953117  | 0049954750  |
| 4    | 0000508978  | 0004992111  | 0051135421  | 0000525196  |
| 5    | 0004802518  | 0049942380  | 0005020227  | 4000338080  |
| 6    | 0009631078  | 0000514240  | 0000533240  | 0000522011  |
| 7    | 0006013993  | 0049924861  | 0000534149  | 0049953227  |
| 8    | 0004986790  | 1000112834  | 0000532507  | 0000083116  |
| 9    | 0004919254  | 1000110312  | 0004952875  | 0000421883  |
| 10   | 0009631677  | 0000050410  | 0000084460  | 0001026620  |
| 11   | 0051135505  | 0010444585  | 0004975033  | 0004939310  |
| 12   | 0000082156  | 0004982435  | 0000519215  | 0006014363  |
| 13   | 1000113246  | 6320600523  | 0049948711  | 0000033298  |
| 14   | 1000104477  | 0000080344  | 0049944058  | 0000021598  |
| 15   | 0000034184  | 0000083553  | 0000033853  | 0000539379  |
| 16   | 0000031807  | 0000515213  | 0000498626  | 1000106434  |
| 17   | 6310600119  | 0000031610  | 0000517730  | 0000518860  |
| 18   | 0000521013  | 0005003983  | 0051135476  | 0000538132  |
| 19   | 0000032200  | 0004800348  | 1000105416  | 0049951216  |
| 20   | 0004772653  | 0000540310  | 1000104101  | 0049937214  |
| 21   | 0004920351  | 0000083474  | 0000033730  | 0004778064  |
| 22   | 0009630028  | 0000050434  | 0000518233  | 0049941323  |
| 23   | 0000501106  | 0049945109  | 0000507897  | 0049945303  |
| 24   | 0004987210  | 0004807137  | 1000104957  | 0005000344  |
| 25   | 0009631512  | 1000105769  | 0000033391  | 0006014118  |

**Supplemental Loan Sample**

|      | Fico Q1     | Fico Q2     | Fico Q3     | Fico Q4     |
|------|-------------|-------------|-------------|-------------|
| 26   | 0000034275  | 0000503755  | 0006014454  | 0000524876  |
| 27   | 0000032587  | 0049952778  | 0000082664  | 0009631439  |
| 28   | 0009631075  | 0004998241  | 0004787313  | 0000530873  |
| 29   | 0049943321  | 0005012380  | 0000029787  | 0009631603  |
| 30   | 0000031097  | 0000032348  | 0000082985  | 0000531301  |
| 31   | 0000511519  | 0004804522  | 0049940748  | 0049953874  |
| 32   | 0000528596  | 0004973251  | 0009630023  | 4000326385  |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 33 | 0000034518 | 0049951009 | 0000534719 | 0004986022 |
| 34 | 0051135749 | 0049945808 | 0000084103 | 0000083233 |
| 35 | 0051135041 | 6410600055 | 0049952095 | 0049949516 |
| 36 | 0051134974 | 0006013575 | 0009631090 | 0000082742 |
| 37 | 0001025041 | 0000545731 | 0004796215 | 0009630579 |
| 38 | 0010478488 | 0051134804 | 0004907101 | 0004913273 |
| 39 | 0009631310 | 0000343442 | 0006014653 | 0000033166 |
| 40 | 0051135462 | 0004995114 | 0000505875 | 0049950327 |
| 41 | 0000510750 | 0006013280 | 0000524116 | 0000534206 |
| 42 | 0000489500 | 0000539957 | 0000033508 | 4000328504 |
| 43 | 0005000526 | 0005021399 | 0004992269 | 0000515395 |
| 44 | 0000031215 | 0000032375 | 0004956553 | 1000106740 |
| 45 | 0049954446 | 0000084399 | 0000531897 | 0000033397 |
| 46 | 1000112012 | 0004913596 | 0004820155 | 0004720348 |
| 47 | 0051135347 | 0000032514 | 0009630520 | 0005002076 |
| 48 | 0000032521 | 0004827515 | 0000031561 | 0000530303 |
| 49 | 0009630240 | 0009630690 | 0000516195 | 0049943619 |
| 50 | 0009630421 | 0051135477 | 0004976361 | 0006013766 |

## HVMLT 2007-1 (Group 2)
### Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 0156534135 | 0122870755 | 0130008072 | 0147502619 |
| 2  | 0154899455 | 0141153827 | 0155650493 | 0146095264 |
| 3  | 0154451343 | 0156768035 | 0155963227 | 0155567687 |
| 4  | 0147153958 | 0153390452 | 0154767587 | 0127083753 |
| 5  | 0155328377 | 0147840701 | 0131484585 | 0117070146 |
| 6  | 0147278775 | 0156041823 | 0098064623 | 0155866759 |
| 7  | 0155455571 | 0154656406 | 0126486643 | 0155068989 |
| 8  | 0155867383 | 0136736757 | 0146572734 | 0129760513 |
| 9  | 0144097860 | 0116676177 | 0154812493 | 0125244626 |
| 10 | 0153213648 | 0153702690 | 0155772672 | 0118047023 |
| 11 | 0147086654 | 0156137939 | 0126614568 | 0150803657 |
| 12 | 0156135523 | 0116675497 | 0147149238 | 0152513794 |
| 13 | 0117542002 | 0155360742 | 0146380441 | 0153847467 |
| 14 | 0156033571 | 0153240063 | 0155343123 | 0117163054 |
| 15 | 0151028440 | 0126446220 | 0153747132 | 0136713172 |
| 16 | 0154130850 | 0155208989 | 0126967255 | 0153616688 |
| 17 | 0135235240 | 0156851830 | 0152250091 | 0127324528 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 18 | 0153610639 | 0147807985 | 0146621996 | 0151977606 |
| 19 | 0155074806 | 0146107154 | 0153153963 | 0147424169 |
| 20 | 0152554761 | 0152440580 | 0146956742 | 0156379701 |
| 21 | 0155871824 | 0126614112 | 0155173075 | 0139582631 |
| 22 | 0152236457 | 0155755038 | 0146179663 | 0155470925 |
| 23 | 0147549409 | 0138507648 | 0147041448 | 0154831712 |
| 24 | 0156460786 | 0156519453 | 0156376565 | 0131829268 |
| 25 | 0154051249 | 0147835965 | 0155957683 | 0155661653 |

### Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 0131067165 | 0154586374 | 0155462796 | 0152159483 |
| 27 | 0155081063 | 0098061951 | 0154856683 | 0117225902 |
| 28 | 0156049528 | 0152452114 | 0132119226 | 0073365863 |
| 29 | 0154371760 | 0117278084 | 0139303581 | 0152947856 |
| 30 | 0155451130 | 0154375145 | 0147801280 | 0155555717 |
| 31 | 0155329473 | 0131214431 | 0140006958 | 0141796202 |
| 32 | 0154587758 | 0125025539 | 0155330889 | 0143860953 |
| 33 | 0152236905 | 0144623541 | 0150524526 | 0151474633 |
| 34 | 0154053498 | 0155131704 | 0131229361 | 0153384435 |
| 35 | 0142736640 | 0126904034 | 0152826145 | 0126828135 |
| 36 | 0155869592 | 0154045345 | 0127781784 | 0147251835 |
| 37 | 0146842647 | 0146682171 | 0155861383 | 0124232477 |
| 38 | 0153290266 | 0127167061 | 0155243232 | 0152634306 |
| 39 | 0156214265 | 0152036350 | 0156044464 | 0155069805 |
| 40 | 0156138571 | 0131951620 | 0125284326 | 0146966551 |
| 41 | 0154900911 | 0146966479 | 0154039824 | 0156435702 |
| 42 | 0154580333 | 0141998660 | 0127413549 | 0153420403 |
| 43 | 0117466592 | 0153467002 | 0154521278 | 0154449614 |
| 44 | 0154581165 | 0147874385 | 0116963461 | 0155966052 |
| 45 | 0153699434 | 0131697540 | 0153696682 | 0151913501 |
| 46 | 0156030940 | 0129273420 | 0150544237 | 0127505594 |
| 47 | 0152871158 | 0132981156 | 0146264138 | 0154577525 |
| 48 | 0147410967 | 0128213799 | 0141294627 | 0152795579 |
| 49 | 0142658422 | 0147132076 | 0152190300 | 0153091193 |
| 50 | 0152799451 | 0147249171 | 0147396310 | 0120234609 |

**HVMLT 2007-2**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 1000119611 | 0010931431 | 0001499070 | 0001526418 |
| 2  | 0000328894 | 0011371735 | 0000593798 | 0011001988 |
| 3  | 0051143253 | 0011002060 | 0000600114 | 0018610426 |
| 4  | 0011353171 | 0000610436 | 0010004941 | 1000116705 |
| 5  | 0011307391 | 0000602391 | 0001479050 | 0001532178 |
| 6  | 0001217359 | 0000329661 | 0011079061 | 0049976453 |
| 7  | 0011159335 | 0007610067 | 0000330330 | 0000629014 |
| 8  | 0011170093 | 0000609180 | 0000333552 | 0000329238 |
| 9  | 0011347397 | 0000327866 | 0000578955 | 0000617894 |
| 10 | 0011064421 | 0011169999 | 0001546066 | 0000591875 |
| 11 | 0011312543 | 0000622142 | 0000589549 | 0049972143 |
| 12 | 0000603282 | 0000590174 | 1000119435 | 1000125611 |
| 13 | 1000126245 | 0011370041 | 0000599605 | 0000589515 |
| 14 | 0000330159 | 0001497658 | 0001502977 | 0000590653 |
| 15 | 0000596148 | 0000610535 | 0000329327 | 0000037861 |
| 16 | 0049975904 | 0000085460 | 0000331186 | 0000624478 |
| 17 | 0011100929 | 0000632661 | 1000121797 | 0011351929 |
| 18 | 0000616052 | 0000612663 | 0011320319 | 0000573733 |
| 19 | 0011336897 | 0000585810 | 0000332302 | 0000598532 |
| 20 | 0000086250 | 0008611084 | 0000624049 | 0000330693 |
| 21 | 0011238887 | 0000605071 | 0000037310 | 0016025663 |
| 22 | 0011211707 | 0008611143 | 1000126005 | 0011342347 |
| 23 | 0010900512 | 0011309513 | 0051142661 | 0000085993 |
| 24 | 0010904838 | 1000126017 | 0000333044 | 0000331520 |
| 25 | 0000085792 | 0000334007 | 0000159686 | 1000117486 |

**Supplemental Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 0011315267 | 0000622225 | 0000626168 | 0000086171 |
| 27 | 1000117322 | 0000330451 | 0000626085 | 0019611239 |
| 28 | 0000329534 | 0001537692 | 0000331182 | 0000573287 |
| 29 | 0049975797 | 0011148879 | 0000162110 | 0000584227 |
| 30 | 0000330314 | 0000612952 | 611034736A | 0015610415 |
| 31 | 1000126993 | 0000622449 | 0000591560 | 0010818445 |
| 32 | 0011337257 | 0011285779 | 612209279A | 0009611135 |
| 33 | 0000606533 | 0000331913 | 0017610173 | 0000160872 |
| 34 | 1000120218 | 610317847A | 0018611036 | 0000328992 |

| | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 35 | 0000332466 | 0000329297 | 0011319773 | 0000162085 |
| 36 | 0000593913 | 0000330222 | 0001480068 | 0011278985 |
| 37 | 0000598672 | 0000627851 | 0000592352 | 0000595603 |
| 38 | 0000330150 | 0001466294 | 0000613513 | 0001517291 |
| 39 | 0000568295 | 0001535662 | 0000578625 | 0008611056 |
| 40 | 0001316003 | 0000576900 | 0000623991 | 0000592287 |
| 41 | 0001457258 | 0001447205 | 0000086453 | 0049974662 |
| 42 | 0049973074 | 0000574624 | 0000330220 | 0007611153 |
| 43 | 0011101773 | 0011321629 | 0011315829 | 0001524725 |
| 44 | 1000126794 | 0000587931 | 0000329951 | 0000636262 |
| 45 | 0001312615 | 0000333549 | 0011003634 | 0000329503 |
| 46 | 0011382005 | 0001546722 | 0000604009 | 0000329501 |
| 47 | 0000085547 | 1000124910 | 0000333791 | 0000596767 |
| 48 | 0011362879 | 0000332114 | 0001496418 | 0049973948 |
| 49 | 0011300647 | 0000036949 | 0000328389 | 0011134311 |
| 50 | 0010896186 | 0000616391 | 0000589572 | 1000119375 |

## HVMLT 2007-3
### Initial Loan Sample

| | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 0144901428 | 0144866589 | 37630 | 0106957111 |
| 2 | 4683462 | 49955322 | 37083 | 5156534 |
| 3 | 4762142 | 5156260 | 5131305 | 49966492 |
| 4 | 337182 | 37270 | 1000126425 | 5096953 |
| 5 | 4739207 | 37529 | 0106602436 | 49958002 |
| 6 | 4702015 | 1000124927 | 5101076 | 0144901865 |
| 7 | 5147525 | 5100870 | 0145475026 | 6015550 |
| 8 | 4953675 | 576280 | 5020607 | 582205 |
| 9 | 5108139 | 5110978 | 1000120498 | 38447 |
| 10 | 51144476 | 40164 | 51145135 | 1000120125 |
| 11 | 5146469 | 583294 | 6103236 | 6112974 |
| 12 | 0145870044 | 6015762 | 0106758436 | 1000122554 |
| 13 | 5154885 | 37601 | 5091640 | 1000122423 |
| 14 | 51144909 | 38059 | 5151295 | 5154919 |
| 15 | 574871 | 37554 | 1000121513 | 540930 |
| 16 | 4716577 | 0145356622 | 40256 | 0145605796 |
| 17 | 0144898251 | 6016074 | 5155890 | 0107131955 |
| 18 | 5159504 | 587006 | 1000120945 | 5016126 |
| 19 | 5142500 | 580696 | 51144480 | 0145610879 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 20 | 576504 | 5107453 | 0145690822 | 1000115753 |
| 21 | 1000115487 | 5008255 | 0145864609 | 39660 |
| 22 | 5081583 | 589754 | 0145465787 | 1000123166 |
| 23 | 5113345 | 5150230 | 0144903366 | 107220238 |
| 24 | 5104500 | 0145862959 | 49947136 | 6015770 |
| 25 | 85022 | 49954336 | 586198 | 37136 |

### Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 0145153243 | 5023734 | 49959137 | 1000122422 |
| 27 | 5120738 | 5100086 | 38587 | 0038760948 |
| 28 | 1000128758 | 0107378150 | 84926 | 0144886306 |
| 29 | 4703187 | 5094065 | 37736 | 0106932759 |
| 30 | 586537 | 587865 | 591982 | 0144904331 |
| 31 | 39382 | 37142 | 5103502 | 5138268 |
| 32 | 1000113059 | 5131727 | 1000119341 | 593236 |
| 33 | 4985180 | 573402 | 51145692 | 5102348 |
| 34 | 9634064 | 1000127391 | 1000118715 | 6015676 |
| 35 | 585612 | 38516 | 5121637 | 1197368 |
| 36 | 4695318 | 1000119139 | 588608 | 1000121833 |
| 37 | 0000012242 | 1000119406 | 51142813 | 49961840 |
| 38 | 4657615 | 5105002 | 6111491 | 556712 |
| 39 | 564781 | 0106774912 | 9633822 | 5003264 |
| 40 | 5139191 | 598003 | 5101258 | 0106429319 |
| 41 | 5108808 | 38328 | 571737 | 1000123868 |
| 42 | 37150 | 525402 | 0107224396 | 0107204117 |
| 43 | 1000122425 | 36820 | 576827 | 107172231 |
| 44 | 4962544 | 37401 | 0145041653 | 39477 |
| 45 | 4683371 | 0145862488 | 5152772 | 0145867636 |
| 46 | 4996575 | 5162565 | 37649 | 51145945 |
| 47 | 4707519 | 585216 | 0144902178 | 0036198216 |
| 48 | 1000124768 | 1000128593 | 576538 | 5161757 |
| 49 | 51145548 | 5092580 | 49966298 | 0107188591 |
| 50 | 4764940 | 5144597 | 49948274 | 0037934429 |

### INDX 2006-AR6
### Initial Loan Sample

|    | Fico Q1   | Fico Q2   | Fico Q3   | Fico Q4   |
|----|-----------|-----------|-----------|-----------|
| 1  | 123054252 | 123085365 | 122578856 | 122418301 |
| 2  | 123083035 | 122417977 | 122418044 | 123006527 |
| 3  | 123164864 | 123059271 | 122418480 | 123108934 |
| 4  | 122413617 | 123040804 | 122418234 | 123035691 |
| 5  | 123043669 | 122418024 | 122401336 | 123067840 |
| 6  | 122944512 | 122908220 | 122420926 | 123118617 |
| 7  | 123076944 | 123103117 | 122414128 | 122917092 |
| 8  | 122418507 | 123251130 | 122981157 | 122419324 |
| 9  | 122603060 | 122949241 | 123152255 | 123027316 |
| 10 | 122788826 | 123038846 | 122418259 | 122418037 |
| 11 | 123017631 | 122418689 | 123046985 | 122776639 |
| 12 | 123033952 | 122414044 | 122980925 | 122998779 |
| 13 | 122417955 | 123059581 | 122414664 | 123010683 |
| 14 | 122418472 | 121744692 | 122418525 | 122425861 |
| 15 | 122418109 | 123009959 | 123173031 | 122956078 |
| 16 | 122550441 | 122419342 | 122984959 | 122952933 |
| 17 | 123078477 | 122668328 | 122418518 | 122669731 |
| 18 | 123070571 | 123254574 | 123016660 | 123168749 |
| 19 | 122418620 | 123019312 | 122949460 | 123253388 |
| 20 | 122413837 | 122927728 | 123032568 | 122876547 |
| 21 | 122940866 | 123015400 | 123218290 | 122949732 |
| 22 | 122422135 | 123007133 | 123152257 | 123025703 |
| 23 | 122419284 | 122414050 | 122417488 | 123189533 |
| 24 | 122965381 | 122416047 | 123061207 | 122417529 |
| 25 | 122419346 | 122418443 | 122418437 | 122952070 |

### Supplemental Loan Sample

|    | Fico Q1   | Fico Q2   | Fico Q3   | Fico Q4   |
|----|-----------|-----------|-----------|-----------|
| 26 | 123131360 | 122984165 | 123082359 | 123129008 |
| 27 | 123018298 | 122413975 | 122399497 | 123070581 |
| 28 | 121744892 | 123181451 | 122793686 | 123068015 |
| 29 | 122414427 | 123175309 | 123058224 | 122824139 |
| 30 | 122666323 | 122419406 | 122949400 | 122418731 |
| 31 | 122923396 | 123058691 | 122855489 | 123008657 |
| 32 | 122526944 | 122415967 | 123014668 | 122940250 |
| 33 | 123014151 | 123001568 | 123021226 | 122418780 |
| 34 | 122415791 | 122933001 | 122777343 | 122915878 |

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 35 | 122419370 | 122413722 | 123070592 | 122793727 |
| 36 | 122911253 | 122425863 | 122931182 | 122984923 |
| 37 | 122993986 | 123113927 | 122992732 | 122847337 |
| 38 | 122416153 | 123089113 | 122967439 | 122792547 |
| 39 | 122415944 | 123019321 | 122962887 | 123176532 |
| 40 | 123020865 | 122418547 | 123140655 | 122418111 |
| 41 | 122416050 | 122899971 | 123184227 | 123034584 |
| 42 | 123140625 | 122425887 | 122418655 | 122983604 |
| 43 | 122753497 | 123136516 | 122973316 | 122422142 |
| 44 | 122452698 | 122414252 | 122418645 | 123070583 |
| 45 | 122418036 | 122967329 | 122871419 | 122988668 |
| 46 | 122755687 | 123045787 | 122467599 | 121738789 |
| 47 | 122414230 | 123059642 | 122861422 | 123206452 |
| 48 | 122851823 | 122417749 | 122418074 | 122864952 |
| 49 | 122887929 | 122968191 | 122415965 | 122418519 |
| 50 | 122405105 | 122824131 | 122670703 | 122984910 |

**LBMLT 2006-2**
**Initial Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 6658988 | 6650467 | 6667994 | 6649136 |
| 2 | 6652328 | 6651016 | 6633055 | 6660807 |
| 3 | 6664065 | 6655265 | 6651340 | 6647418 |
| 4 | 6538084 | 6663447 | 6606626 | 6643484 |
| 5 | 6647295 | 6647109 | 6626734 | 6633435 |
| 6 | 6592018 | 6623131 | 6645476 | 6570343 |
| 7 | 6660557 | 6641807 | 6653384 | 6667035 |
| 8 | 6662838 | 6618943 | 6658852 | 6660756 |
| 9 | 6623541 | 6638459 | 6634276 | 6650623 |
| 10 | 6652206 | 6648621 | 6595175 | 6670262 |
| 11 | 6658206 | 6653453 | 6660616 | 6657700 |
| 12 | 6653014 | 6645901 | 6670933 | 6554085 |
| 13 | 6579751 | 6658529 | 6644247 | 6666329 |
| 14 | 6647927 | 6654176 | 6647549 | 6616802 |
| 15 | 6642505 | 6641897 | 6649235 | 6654107 |
| 16 | 6647301 | 6641712 | 6621325 | 6636656 |
| 17 | 6662768 | 6649263 | 6647571 | 6586803 |
| 18 | 6641381 | 6649644 | 6651866 | 6657148 |
| 19 | 6406853 | 6644124 | 6600685 | 6593527 |

|     | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|-----|---------|---------|---------|---------|
| 20  | 6657512 | 6654871 | 6664882 | 6669236 |
| 21  | 6652067 | 6650526 | 6640037 | 6652711 |
| 22  | 6650017 | 6645939 | 6619081 | 6665319 |
| 23  | 6657303 | 6651677 | 6654150 | 6645332 |
| 24  | 6632851 | 6657253 | 6647032 | 6644488 |
| 25  | 6639954 | 6653131 | 6643693 | 6669482 |

## Supplemental Loan Sample

|     | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|-----|---------|---------|---------|---------|
| 26  | 6603060 | 6450376 | 6637818 | 6666617 |
| 27  | 6559203 | 6641679 | 6643793 | 6665001 |
| 28  | 6640184 | 6647699 | 6650225 | 6647921 |
| 29  | 6653462 | 6647086 | 6653385 | 6665194 |
| 30  | 6646410 | 6664927 | 6643761 | 6667328 |
| 31  | 6616927 | 6619362 | 6651756 | 6668902 |
| 32  | 6669673 | 6653179 | 6670244 | 6643697 |
| 33  | 6669951 | 6605891 | 6652072 | 6532234 |
| 34  | 6668160 | 6642649 | 6640560 | 6643621 |
| 35  | 6655082 | 6628001 | 6598245 | 6657149 |
| 36  | 6656941 | 6661684 | 6610288 | 6633336 |
| 37  | 6589796 | 6644583 | 6645194 | 6607509 |
| 38  | 6644306 | 6656381 | 6630167 | 6655606 |
| 39  | 6609646 | 6653887 | 6649310 | 6659930 |
| 40  | 6656839 | 6593900 | 6621769 | 6657294 |
| 41  | 6635783 | 6655035 | 6640325 | 6642114 |
| 42  | 6637802 | 6644348 | 6644600 | 6645409 |
| 43  | 6606342 | 6653576 | 6608721 | 6652536 |
| 44  | 6649696 | 6669318 | 6366564 | 6650253 |
| 45  | 6613508 | 6665914 | 6669484 | 6656648 |
| 46  | 6646732 | 6646305 | 6658877 | 6659167 |
| 47  | 6621132 | 6539365 | 6658695 | 6652412 |
| 48  | 6671118 | 6648881 | 6646184 | 6655468 |
| 49  | 6657537 | 6660371 | 6613676 | 6650794 |
| 50  | 6638249 | 6648667 | 6557055 | 6648778 |

**LBMLT 2006-8**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 6769462 | 6759588 | 6769111 | 6767252 |
| 2  | 6769473 | 6770669 | 6765060 | 6767537 |
| 3  | 729350603 | 729329391 | 729400622 | 729371906 |
| 4  | 6768395 | 6765443 | 729318592 | 6743857 |
| 5  | 729333120 | 6755437 | 729341479 | 729359000 |
| 6  | 729359026 | 6767400 | 729377739 | 6766283 |
| 7  | 6763427 | 6761205 | 6767300 | 6765099 |
| 8  | 729373597 | 729357772 | 6761852 | 729352278 |
| 9  | 729352062 | 6768991 | 6761157 | 6761487 |
| 10 | 729322651 | 6767541 | 6761521 | 6762995 |
| 11 | 6767695 | 729376509 | 6760593 | 729326520 |
| 12 | 6758406 | 729351247 | 6765330 | 6764505 |
| 13 | 729327007 | 729408518 | 729355875 | 6763130 |
| 14 | 6767034 | 729333682 | 729346551 | 6767488 |
| 15 | 6763691 | 729334607 | 729345363 | 729435230 |
| 16 | 6762921 | 6764165 | 6769113 | 729374884 |
| 17 | 729385716 | 729337410 | 729400242 | 6753518 |
| 18 | 729393983 | 729324764 | 6759163 | 6759801 |
| 19 | 6762009 | 6770479 | 729356758 | 6764746 |
| 20 | 729391383 | 729311506 | 729408682 | 6767984 |
| 21 | 6645431 | 729391870 | 6765649 | 729330001 |
| 22 | 6759354 | 6764987 | 729396820 | 6762874 |
| 23 | 729407429 | 729374546 | 6766591 | 6753880 |
| 24 | 6756571 | 6763553 | 6759904 | 6760588 |
| 25 | 729381251 | 729355917 | 6767623 | 729353318 |

**Supplemental Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 6762230 | 6763890 | 729372813 | 729342295 |
| 27 | 6768015 | 6762171 | 729355305 | 729318816 |
| 28 | 6749411 | 6764678 | 6767854 | 729427260 |
| 29 | 6763674 | 729390930 | 729336669 | 729343434 |
| 30 | 729332429 | 729349357 | 6766860 | 6760080 |
| 31 | 729415653 | 729365601 | 729328468 | 729374538 |
| 32 | 6762143 | 6767201 | 6763914 | 729328104 |
| 33 | 729445270 | 729387712 | 729341602 | 6755216 |
| 34 | 6765684 | 729429951 | 6760942 | 729329631 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 729325092 | 6761760 | 729345868 | 729377325 |
| 36 | 6754723 | 6761015 | 729348805 | 729394809 |
| 37 | 729389635 | 6757850 | 729380980 | 729358754 |
| 38 | 6756539 | 729374082 | 729337907 | 6766970 |
| 39 | 729361089 | 729330027 | 6760215 | 6759975 |
| 40 | 6768277 | 6766365 | 729412205 | 6765383 |
| 41 | 729381863 | 6765271 | 6768951 | 729344051 |
| 42 | 729323550 | 6768892 | 729350884 | 6766332 |
| 43 | 729414003 | 6766165 | 6763463 | 729359869 |
| 44 | 729366211 | 729380451 | 729341644 | 729335737 |
| 45 | 6763526 | 6760135 | 729325407 | 729343210 |
| 46 | 6763768 | 729341271 | 6753315 | 729411132 |
| 47 | 6766076 | 6762753 | 729361279 | 729417139 |
| 48 | 729342568 | 729341131 | 729377259 | 729391367 |
| 49 | 6757889 | 6762139 | 6754820 | 6758559 |
| 50 | 6765057 | 6766265 | 729370098 | 6757856 |

### MHL 2006-1 (Group 1-A2)
### Initial Loan Sample

| Count | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|-------|---------|---------|---------|---------|
| 1 | 40419598 | 40489074 | 40491166 | 40489119 |
| 2 | 40493068 | 40495024 | 40396721 | 40492466 |
| 3 | 40485802 | 40499492 | 40508984 | 40505398 |
| 4 | 40497359 | 40511902 | 40442863 | 40507610 |
| 5 | 40367304 | 40507251 | 40508940 | 40490067 |
| 6 | 40493096 | 40497164 | 40490012 | 40475901 |
| 7 | 40492189 | 40490575 | 40502264 | 40512740 |
| 8 | 40498512 | 40478289 | 40501003 | 40506434 |
| 9 | 40483833 | 40499352 | 40498696 | 40511064 |
| 10 | 40504893 | 40498813 | 40504179 | 40494782 |
| 11 | 40488526 | 40434724 | 40499627 | 40491808 |
| 12 | 40509983 | 40431524 | 40493791 | 40510178 |
| 13 | 40476265 | 40457535 | 40457324 | 40403719 |
| 14 | 40490650 | 40494429 | 40432645 | 40482792 |
| 15 | 40494453 | 40503951 | 40493092 | 40474681 |
| 16 | 40491126 | 40405425 | 40486818 | 40505444 |
| 17 | 40486137 | 40496806 | 40480664 | 40494305 |
| 18 | 40433485 | 40518742 | 40511528 | 40510553 |
| 19 | 40490810 | 40505402 | 40483080 | 40424318 |

| Count | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 20 | 40496036 | 40484715 | 40485913 | 40480473 |
| 21 | 40497395 | 40450645 | 40507901 | 40420156 |
| 22 | 40484628 | 40477668 | 40491910 | 40483609 |
| 23 | 40493683 | 40506565 | 40515238 | 40456700 |
| 24 | 40447400 | 40502803 | 40492927 | 40496295 |
| 25 | 40490593 | 40492708 | 40513146 | 40500255 |

## Supplemental Loan Sample

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 40492413 | 40503009 | 40482062 | 40477194 |
| 27 | 40496558 | 40501981 | 40450749 | 40504712 |
| 28 | 40510573 | 40497228 | 40502125 | 40507773 |
| 29 | 40496825 | 40484398 | 40482921 | 40488259 |
| 30 | 40508948 | 40494711 | 40488331 | 40508912 |
| 31 | 40493539 | 40427073 | 40505841 | 40514462 |
| 32 | 40485886 | 40487912 | 40447813 | 40482207 |
| 33 | 40489473 | 40436234 | 40495958 | 40497794 |
| 34 | 40495570 | 40516911 | 40510913 | 40473714 |
| 35 | 40412939 | 40492022 | 40509905 | 40507442 |
| 36 | 40485305 | 40498093 | 40493268 | 40487862 |
| 37 | 40484387 | 40487255 | 40431561 | 40426175 |
| 38 | 40508962 | 40499695 | 40466833 | 40435512 |
| 39 | 40473493 | 40426825 | 40430400 | 40493843 |
| 40 | 40420701 | 40436193 | 40501868 | 40501228 |
| 41 | 40463980 | 40509038 | 40485389 | 40504207 |
| 42 | 40483224 | 40462871 | 40493680 | 40506436 |
| 43 | 40491343 | 40516718 | 40502998 | 40500685 |
| 44 | 40482619 | 40395392 | 40495675 | 40495737 |
| 45 | 40525642 | 40487203 | 40430808 | 40522320 |
| 46 | 40506120 | 40432858 | 40450991 | 40500919 |
| 47 | 40523179 | 40514915 | 40502383 | 40511393 |
| 48 | 40482747 | 40429013 | 40499405 | 40433537 |
| 49 | 40474975 | 40509407 | 40491849 | 40482056 |
| 50 | 40487281 | 40452452 | 40494721 | 40479736 |

**MHL 2006-1**
**Initial Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 0040506488 | 0040432602 | 0040512765 | 0040478738 |
| 2 | 0040416657 | 0040500242 | 0040468163 | 0040500583 |
| 3 | 0040490896 | 0040502636 | 0040497517 | 0040498221 |
| 4 | 0040317365 | 0040499735 | 0040511423 | 0040505135 |
| 5 | 0040398879 | 0040500525 | 0040513172 | 0040516236 |
| 6 | 0040433128 | 0040441489 | 0040500519 | 0040496688 |
| 7 | 0040410793 | 0040427860 | 0040474856 | 0040508316 |
| 8 | 0040470163 | 0040367265 | 0040496481 | 0040474618 |
| 9 | 0040427872 | 0040502900 | 0040436810 | 0040428931 |
| 10 | 0040489657 | 0040440137 | 0040494523 | 0040472052 |
| 11 | 0040509284 | 0040511083 | 0040424854 | 0040494723 |
| 12 | 0040433307 | 0040458128 | 0040489794 | 0040458045 |
| 13 | 0040433702 | 0040494827 | 0040503369 | 0040471339 |
| 14 | 0040472362 | 0040427211 | 0040404567 | 0040497773 |
| 15 | 0040418337 | 0040466480 | 0040500531 | 0040517357 |
| 16 | 0040366978 | 0040349880 | 0040500261 | 0040471360 |
| 17 | 0040508951 | 0040357426 | 0040511532 | 0040394517 |
| 18 | 0040505366 | 0040512549 | 0040436519 | 0040442018 |
| 19 | 0040478812 | 0040432245 | 0040473363 | 0040503825 |
| 20 | 0040399643 | 0040433523 | 0040344975 | 0040453153 |
| 21 | 0040497472 | 0040515273 | 0040502839 | 0040415872 |
| 22 | 0040472291 | 0040510149 | 0040497152 | 0040466348 |
| 23 | 0040460544 | 0040493391 | 0040503559 | 0040513847 |
| 24 | 0040495080 | 0040450701 | 0040469828 | 0040457510 |
| 25 | 0040350369 | 0040457066 | 0040511518 | 0040490031 |

**Supplemental Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 0040498295 | 0040472523 | 0040511717 | 0040458161 |
| 27 | 0040435692 | 0040500561 | 0040474285 | 0040498493 |
| 28 | 0040471291 | 0040501122 | 0040498228 | 0040516844 |
| 29 | 0040362475 | 0040499859 | 0040489557 | 0040496395 |
| 30 | 0040429445 | 0040501391 | 0040463139 | 0040511271 |
| 31 | 0040501176 | 0040509196 | 0040476147 | 0040473831 |
| 32 | 0040401028 | 0040427488 | 0040492281 | 0040518211 |
| 33 | 0040409352 | 0040480873 | 0040418761 | 0040503944 |
| 34 | 0040422842 | 0040474884 | 0040459487 | 0040510666 |

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 35 | 0040490838 | 0040496157 | 0040402024 | 0040512447 |
| 36 | 0040430035 | 0040419122 | 0040505470 | 0040490394 |
| 37 | 0040467402 | 0040425046 | 0040477224 | 0040488764 |
| 38 | 0040499411 | 0040513543 | 0040497477 | 0040421929 |
| 39 | 0040494753 | 0040359253 | 0040507889 | 0040506052 |
| 40 | 0040487651 | 0040405452 | 0040363630 | 0040473792 |
| 41 | 0040473157 | 0040497368 | 0040502913 | 0040497755 |
| 42 | 0040468757 | 0040491821 | 0040502300 | 0040504506 |
| 43 | 0040480104 | 0040488594 | 0040498395 | 0040513462 |
| 44 | 0040502262 | 0040471548 | 0040488009 | 0040507346 |
| 45 | 0040502555 | 0040375419 | 0040484091 | 0040519276 |
| 46 | 0040505845 | 0040503274 | 0040500198 | 0040440494 |
| 47 | 0040474938 | 0040367153 | 0040469954 | 0040474815 |
| 48 | 0040474524 | 0040500258 | 0040471888 | 0040503333 |
| 49 | 0040424355 | 0040504229 | 0040445925 | 0040461579 |
| 50 | 0040394917 | 0040511072 | 0040480178 | 0040498237 |

**NAA 2006-AR4**
**Initial Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 0171593385 | 0171624921 | 0171639988 | 0171809748 |
| 2 | 0171655093 | 0171601866 | 0171601659 | 0171644484 |
| 3 | 0171458408 | 0171601799 | 0171601674 | 0171601548 |
| 4 | 0171601502 | 0171716553 | 0171611123 | 0171641580 |
| 5 | 0171540491 | 0171749460 | 0171601832 | 0171601424 |
| 6 | 0171601665 | 0171592735 | 0171643068 | 0171697940 |
| 7 | 0171718379 | 0171744878 | 0171835205 | 0171745515 |
| 8 | 0171718089 | 0171601383 | 0171601765 | 0171611076 |
| 9 | 0171624902 | 0171748557 | 0171551783 | 0171748546 |
| 10 | 0171544893 | 0171603150 | 0171601387 | 0171601885 |
| 11 | 0171749468 | 0171601571 | 0171601819 | 0171640183 |
| 12 | 0171710426 | 0171601483 | 0171601355 | 0171488372 |
| 13 | 0171601975 | 0171601405 | 0171601427 | 0171611075 |
| 14 | 0171624903 | 0171500277 | 0171601913 | 0171601974 |
| 15 | 0171601725 | 0171689073 | 0171655083 | 0171748568 |
| 16 | 0170829267 | 0171640173 | 0171601628 | 0171488390 |
| 17 | 0171749450 | 0171711654 | 0171624995 | 0171640194 |
| 18 | 0171601907 | 0171640156 | 0171616415 | 0171459911 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 19 | 0171767123 | 0171383951 | 0171601530 | 0171711646 |
| 20 | 0171615267 | 0171641565 | 0171506594 | 0171611085 |
| 21 | 0171745521 | 0171601805 | 0171641587 | 0171625019 |
| 22 | 0171643102 | 0171587226 | 0171624896 | 0171540305 |
| 23 | 0171528198 | 0171601581 | 0171601598 | 0171615211 |
| 24 | 0171705345 | 0171601719 | 0171498429 | 0171601724 |
| 25 | 0171624890 | 0171710428 | 0171551820 | 0171601834 |

### Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 0171601490 | 0171573022 | 0171718370 | 0171540417 |
| 27 | 0171584913 | 0171744871 | 0171498420 | 0171601453 |
| 28 | 0171745141 | 0171581054 | 0171711665 | 0171710421 |
| 29 | 0171616408 | 0171611126 | 0171800642 | 0171710409 |
| 30 | 0171458410 | 0171601789 | 0171601539 | 0171611081 |
| 31 | 0171601616 | 0171601800 | 0171641594 | 0171689074 |
| 32 | 0171601735 | 0171601677 | 0171649454 | 0171125160 |
| 33 | 0171212030 | 0171601362 | 0171644497 | 0171450852 |
| 34 | 0171601370 | 0171800643 | 0171644543 | 0171641556 |
| 35 | 0171714277 | 0171748572 | 0171056271 | 0171655113 |
| 36 | 0171647062 | 0170793588 | 0171063461 | 0171634873 |
| 37 | 0171640175 | 0171479625 | 0171601756 | 0171624852 |
| 38 | 0171549806 | 0171601829 | 0171601893 | 0171616419 |
| 39 | 0171601592 | 0171450867 | 0171655112 | 0171644478 |
| 40 | 0171616417 | 0171834757 | 0171640120 | 0171640151 |
| 41 | 0171644534 | 0171749106 | 0171655120 | 0171643094 |
| 42 | 0171651545 | 0171601537 | 0171611118 | 0171644820 |
| 43 | 0171601863 | 0171760215 | 0171611087 | 0171714233 |
| 44 | 0171624944 | 0171450873 | 0171645359 | 0171655118 |
| 45 | 0171744861 | 0171500275 | 0171601492 | 0171601591 |
| 46 | 0171640148 | 0171355317 | 0171601943 | 0171450863 |
| 47 | 0171624979 | 0171749463 | 0171711662 | 0171644521 |
| 48 | 0171711663 | 0171601465 | 0171800659 | 0171551784 |
| 49 | 0171624907 | 0170340194 | 0171601532 | 0171777602 |
| 50 | 0171601535 | 0171601917 | 0171800641 | 0171624894 |

## NHELI 2007-1
## Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 0171923309 | 0171910487 | 0171910595 | 0171920511 |
| 2  | 0171839780 | 0171968648 | 0171903932 | 0171710465 |
| 3  | 0171824572 | 0171910353 | 0171910512 | 0171968615 |
| 4  | 0171807375 | 0171932104 | 0171807060 | 0171903927 |
| 5  | 0171910475 | 0171807127 | 0171940906 | 0171940628 |
| 6  | 0171839658 | 0171815173 | 0171811964 | 0171940609 |
| 7  | 0171980438 | 0171932141 | 0171932092 | 0171811206 |
| 8  | 0171811356 | 0171710411 | 0171910334 | 0171574433 |
| 9  | 0171823850 | 0171811950 | 0171834682 | 0171887036 |
| 10 | 0171823832 | 0171807061 | 0171932113 | 0171811257 |
| 11 | 0171932083 | 0171887053 | 0171812005 | 0171809849 |
| 12 | 0171923795 | 0171869356 | 0171811338 | 0171923369 |
| 13 | 0171910437 | 0171940634 | 0171852717 | 0171809766 |
| 14 | 0171898385 | 0171968621 | 0171932082 | 0171795419 |
| 15 | 0171971852 | 0171811280 | 0171923304 | 0171868962 |
| 16 | 0171812049 | 0171910566 | 0171980452 | 0171823839 |
| 17 | 0171910582 | 0171940636 | 0171898393 | 0171809823 |
| 18 | 0171710495 | 0171940625 | 0171823878 | 0171819054 |
| 19 | 0171809773 | 0171809855 | 0171910489 | 0171812468 |
| 20 | 0171868978 | 0171856994 | 0171812017 | 0171812042 |
| 21 | 0171824450 | 0171910627 | 0171809878 | 0171811992 |
| 22 | 0171718494 | 0171812004 | 0171910570 | 0171968628 |
| 23 | 0171811966 | 0171898373 | 0171903912 | 0171940639 |
| 24 | 0171700980 | 0171887061 | 0171986801 | 0171811461 |
| 25 | 0171968606 | 0171811442 | 0171521984 | 0171811444 |

## Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 0171649908 | 0171940608 | 0171710441 | 0171868945 |
| 27 | 0171815197 | 0171956537 | 0171718433 | 0171887028 |
| 28 | 0171871103 | 0171910596 | 0171918001 | 0171878941 |
| 29 | 0171980472 | 0171811154 | 0171823842 | 0171807111 |
| 30 | 0171823861 | 0171940667 | 0171932056 | 0171877780 |
| 31 | 0171811458 | 0171811119 | 0171823854 | 0171910317 |
| 32 | 0171824466 | 0171875318 | 0171811397 | 0171856339 |
| 33 | 0171823841 | 0171823866 | 0171809875 | 0171795421 |
| 34 | 0171624920 | 0171811335 | 0171710430 | 0171898388 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 0171932041 | 0171811948 | 0171800171 | 0171811161 |
| 36 | 0171811375 | 0171710484 | 0171807068 | 0171811989 |
| 37 | 0171998830 | 0171811163 | 0171812012 | 0171811184 |
| 38 | 0171811469 | 0171824583 | 0171923357 | 0171549955 |
| 39 | 0171809796 | 0171811417 | 0171923343 | 0171903934 |
| 40 | 0171811126 | 0171910467 | 0171812021 | 0171831177 |
| 41 | 0171926264 | 0171858028 | 0171838910 | 0171710474 |
| 42 | 0171823835 | 0171988016 | 0171811423 | 0171868964 |
| 43 | 0171923366 | 0171839387 | 0171968624 | 0171714275 |
| 44 | 0171815194 | 0171991994 | 0171815203 | 0171812053 |
| 45 | 0171980433 | 0171991981 | 0171871468 | 0171910483 |
| 46 | 0171780257 | 0171872808 | 0171809164 | 0171811285 |
| 47 | 0171811368 | 0171932074 | 0171968584 | 0171968614 |
| 48 | 0171812006 | 0171823846 | 0171940645 | 0171811207 |
| 49 | 0171923353 | 0171968647 | 0171903928 | 0171922063 |
| 50 | 0171940883 | 0171718423 | 0171912038 | 0171910310 |

**OOMLT 2007-2**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 101065247 | 341038787 | 651020459 | 61075625 |
| 2  | 341037630 | 831070830 | 231087757 | 371042533 |
| 3  | 331051365 | 841021033 | 171037808 | 571014594 |
| 4  | 231086635 | 661020041 | 521046110 | 581015123 |
| 5  | 211049390 | 831070749 | 551023974 | 661020020 |
| 6  | 101065370 | 161050815 | 211051160 | 231089176 |
| 7  | 161051550 | 331050543 | 171037625 | 621020214 |
| 8  | 341038411 | 961072950 | 671016586 | 671016101 |
| 9  | 121050366 | 351038252 | 151037664 | 661020373 |
| 10 | 31045655 | 551017691 | 31046260 | 621020591 |
| 11 | 521048453 | 351038291 | 101066517 | 671016042 |
| 12 | 651023283 | 101061548 | 831070824 | 831070750 |
| 13 | 211051303 | 661019958 | 341038888 | 571010352 |
| 14 | 621019412 | 551020454 | 371043219 | 571011387 |
| 15 | 631015931 | 371038296 | 671015685 | 111002681 |
| 16 | 581015020 | 511050461 | 101066964 | 31046255 |
| 17 | 151038985 | 61071066 | 371038602 | 191035661 |
| 18 | 331050249 | 831070771 | 841023049 | 321039731 |
| 19 | 621020176 | 231085345 | 551021220 | 141052857 |

|    | Fico Q1   | Fico Q2   | Fico Q3   | Fico Q4   |
|----|-----------|-----------|-----------|-----------|
| 20 | 151039007 | 581014069 | 211051282 | 371040656 |
| 21 | 651023205 | 661019465 | 521048084 | 31046068  |
| 22 | 191035797 | 231085591 | 831071050 | 571009215 |
| 23 | 421001838 | 521042565 | 371041792 | 631015879 |
| 24 | 371040808 | 521044133 | 831070269 | 321037144 |
| 25 | 371037594 | 551018281 | 551025316 | 621020568 |

## Supplemental Loan Sample

|    | Fico Q1   | Fico Q2   | Fico Q3   | Fico Q4   |
|----|-----------|-----------|-----------|-----------|
| 26 | 621019702 | 191034401 | 581014594 | 511052756 |
| 27 | 421001256 | 371038650 | 211049003 | 661020407 |
| 28 | 421000809 | 521043541 | 341039045 | 141057020 |
| 29 | 161051648 | 351038500 | 101062792 | 521048791 |
| 30 | 551020111 | 651022109 | 191033811 | 341038915 |
| 31 | 51074245  | 831070747 | 171038036 | 671016175 |
| 32 | 581014316 | 551018153 | 371042868 | 621020906 |
| 33 | 581013413 | 831070809 | 611026380 | 231088891 |
| 34 | 371040645 | 331050972 | 831070671 | 321039416 |
| 35 | 831072201 | 101067361 | 831070814 | 101063831 |
| 36 | 871006632 | 521042945 | 61071786  | 511052546 |
| 37 | 211051537 | 841019877 | 231087464 | 141057917 |
| 38 | 621021233 | 141056094 | 101064116 | 371042282 |
| 39 | 151040068 | 551017704 | 351040843 | 331052046 |
| 40 | 581013230 | 321037367 | 291007439 | 841024086 |
| 41 | 961073446 | 831072526 | 141057634 | 831070801 |
| 42 | 661020390 | 101067250 | 191034834 | 61074669  |
| 43 | 421001303 | 421001672 | 661020549 | 211051757 |
| 44 | 421000604 | 551019098 | 121048618 | 521048244 |
| 45 | 171037295 | 61075932  | 231085306 | 151039281 |
| 46 | 411000786 | 341035999 | 511052966 | 141057775 |
| 47 | 521048298 | 841020294 | 581014564 | 61075999  |
| 48 | 331051231 | 551018788 | 551022195 | 581014953 |
| 49 | 671016256 | 321039233 | 411001134 | 671016181 |
| 50 | 521046833 | 371041509 | 521045520 | 661020359 |

## SVHE 2006-WF1
## Initial Loan Sample

|    | Fico Q1   | Fico Q2   | Fico Q3   | Fico Q4   |
|----|-----------|-----------|-----------|-----------|
| 1  | 150774974 | 151480829 | 152178646 | 152275178 |
| 2  | 151583218 | 153234778 | 152754974 | 154067722 |
| 3  | 153530209 | 67466359  | 152642435 | 153871918 |
| 4  | 153059654 | 153345681 | 152490728 | 153967021 |
| 5  | 152154175 | 154428254 | 153162029 | 153165931 |
| 6  | 153005855 | 153179924 | 153811807 | 153760822 |
| 7  | 151596731 | 154155741 | 152560066 | 153060736 |
| 8  | 153817085 | 152956066 | 153304589 | 151807658 |
| 9  | 153130281 | 152147773 | 152298808 | 152866893 |
| 10 | 154587117 | 153388772 | 154394514 | 153434071 |
| 11 | 152540449 | 153722574 | 153117338 | 152785374 |
| 12 | 153602156 | 67568519  | 152971115 | 151372992 |
| 13 | 154249429 | 153496864 | 152940912 | 153944772 |
| 14 | 152385621 | 152901773 | 153955067 | 153112982 |
| 15 | 153070933 | 154313142 | 153318811 | 153355573 |
| 16 | 151441771 | 153223268 | 154132476 | 153221262 |
| 17 | 153296751 | 152808739 | 153906607 | 153194402 |
| 18 | 153163506 | 151215308 | 151936762 | 154002935 |
| 19 | 154050413 | 152899118 | 150903268 | 152897161 |
| 20 | 153422621 | 153432679 | 152901286 | 153151584 |
| 21 | 153542592 | 154148415 | 152554812 | 151638541 |
| 22 | 152657722 | 153416607 | 153599535 | 152831384 |
| 23 | 153789755 | 154393508 | 153429477 | 152941712 |
| 24 | 152789277 | 153111703 | 153595483 | 153670542 |
| 25 | 152901252 | 151147618 | 154107528 | 152984829 |

## Supplemental Loan Sample

|    | Fico Q1   | Fico Q2   | Fico Q3   | Fico Q4   |
|----|-----------|-----------|-----------|-----------|
| 26 | 153249271 | 153172028 | 153113436 | 153378484 |
| 27 | 152574612 | 153353164 | 152953378 | 151377678 |
| 28 | 153781109 | 154457311 | 150061554 | 152851234 |
| 29 | 152100681 | 152804589 | 154037782 | 153456736 |
| 30 | 153886478 | 153332986 | 153951439 | 152595369 |
| 31 | 153316229 | 154034151 | 153468657 | 153378823 |
| 32 | 153977699 | 153167945 | 152752093 | 153457247 |
| 33 | 153657036 | 145875324 | 153276498 | 153916986 |
| 34 | 152083796 | 154238968 | 152908562 | 154034664 |

|     | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|-----|---------|---------|---------|---------|
| 35  | 153132659 | 153691761 | 153126032 | 152783098 |
| 36  | 153311279 | 153498282 | 152776019 | 153694765 |
| 37  | 153785795 | 153807185 | 154214068 | 153080569 |
| 38  | 153433537 | 150543312 | 154094163 | 153255443 |
| 39  | 153905054 | 153664206 | 153945159 | 150751311 |
| 40  | 154714612 | 152594206 | 154570469 | 153443189 |
| 41  | 153971957 | 152373643 | 150879641 | 152742631 |
| 42  | 153705488 | 153204573 | 154000889 | 153887559 |
| 43  | 152523957 | 154408611 | 153492434 | 152722393 |
| 44  | 153216676 | 153048681 | 152494894 | 152327284 |
| 45  | 153369483 | 152656906 | 152836789 | 153295068 |
| 46  | 151734498 | 154511588 | 150889079 | 152689527 |
| 47  | 153495502 | 152530267 | 153389184 | 153626783 |
| 48  | 152535829 | 150591089 | 152998001 | 153019526 |
| 49  | 154019426 | 152302485 | 152215687 | 153656574 |
| 50  | 154338784 | 153645452 | 151536992 | 152912952 |

*NCUA v. UBS S.D.N.Y 13-cv-6731*

**CWALT 2006-OA3**
**Initial Loan Sample**

|     | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|-----|---------|---------|---------|---------|
| 1   | 116991097 | 117077915 | 117368095 | 116966389 |
| 2   | 68216778  | 117213292 | 115801587 | 120509185 |
| 3   | 118035566 | 124488542 | 105027210 | 122181877 |
| 4   | 117569957 | 116962829 | 123559582 | 117578902 |
| 5   | 117696618 | 106234032 | 118069218 | 125781892 |
| 6   | 127319496 | 124501982 | 127399588 | 105947596 |
| 7   | 117240839 | 115782528 | 117365943 | 124842397 |
| 8   | 121947005 | 106757314 | 125916329 | 97906012  |
| 9   | 127145686 | 116256092 | 122443847 | 126971239 |
| 10  | 127600767 | 127586629 | 125441519 | 124183884 |
| 11  | 125873334 | 113566348 | 127499833 | 120998726 |
| 12  | 117460016 | 132414095 | 125487388 | 117233511 |
| 13  | 127260366 | 117061649 | 122570621 | 116848935 |
| 14  | 117147396 | 122599550 | 111932048 | 116703325 |
| 15  | 124775270 | 124900768 | 115255117 | 124714912 |
| 16  | 127408349 | 126721614 | 123903578 | 125853100 |
| 17  | 125186701 | 127585501 | 127673282 | 125401322 |
| 18  | 117462888 | 117026405 | 124685277 | 63480808  |
| 19  | 117199507 | 115408398 | 117417910 | 105459216 |
| 20  | 132208354 | 121990332 | 121030466 | 119970013 |
| 21  | 132962650 | 118056232 | 120702118 | 126757076 |
| 22  | 107296419 | 125971958 | 117866551 | 124154381 |
| 23  | 117298231 | 117813648 | 114010995 | 124896037 |
| 24  | 120377602 | 122599270 | 120336604 | 117205771 |
| 25  | 125550551 | 117618395 | 115644823 | 97856654  |

**Supplemental Loan Sample**

|     | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|-----|---------|---------|---------|---------|
| 26  | 126699306 | 113276566 | 117567381 | 117187841 |
| 27  | 105085369 | 117420278 | 98071360  | 106897132 |
| 28  | 124713391 | 77154836  | 117085044 | 122089916 |
| 29  | 125285814 | 117361447 | 123550387 | 117591872 |
| 30  | 125210541 | 106608528 | 123028335 | 105829773 |
| 31  | 125744902 | 124469349 | 126467533 | 116778150 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 32 | 125254891 | 116823212 | 116523742 | 117738415 |
| 33 | 117479786 | 125886434 | 115649248 | 107209632 |
| 34 | 97892546 | 98006091 | 120643784 | 115009201 |
| 35 | 97725531 | 114885619 | 116252996 | 114620791 |
| 36 | 126896665 | 107328159 | 124705467 | 105592616 |
| 37 | 97867791 | 124879999 | 124681781 | 115643183 |
| 38 | 124694062 | 97880337 | 132398324 | 105885748 |
| 39 | 125108375 | 123143312 | 132224204 | 123917306 |
| 40 | 113503731 | 120644498 | 122485204 | 120248132 |
| 41 | 126811837 | 124624725 | 117482106 | 121625399 |
| 42 | 127842048 | 125755483 | 127833015 | 117333515 |
| 43 | 116606976 | 126037851 | 115226136 | 107109595 |
| 44 | 115915857 | 120015139 | 117519743 | 116164640 |
| 45 | 97871328 | 125663771 | 132211538 | 117381753 |
| 46 | 117033126 | 106835212 | 127073104 | 127604543 |
| 47 | 126964350 | 132125555 | 108701528 | 107268087 |
| 48 | 123928964 | 123646798 | 132322635 | 121511464 |
| 49 | 9854656 | 123650901 | 127147078 | 123761526 |
| 50 | 117665206 | 125015745 | 124908393 | 124413835 |

## CWALT 2006-OA8
### Initial Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1 | 135545261 | 104529856 | 135518844 | 135429392 |
| 2 | 118280837 | 127278401 | 135796397 | 136496188 |
| 3 | 135807785 | 133096367 | 44784281 | 118367431 |
| 4 | 134669537 | 134257774 | 136205307 | 135376288 |
| 5 | 107797391 | 132592562 | 136214260 | 125301900 |
| 6 | 118938193 | 103930102 | 118894500 | 135368154 |
| 7 | 133089038 | 135188974 | 136112850 | 132356667 |
| 8 | 134202520 | 57206241 | 134524547 | 118619322 |
| 9 | 134901895 | 134605117 | 133569732 | 132216195 |
| 10 | 135421436 | 136216836 | 119364573 | 119147938 |
| 11 | 134389207 | 134853132 | 119559221 | 136782677 |
| 12 | 134803359 | 134577103 | 127900722 | 132501951 |
| 13 | 126678856 | 134792355 | 119328320 | 118914455 |
| 14 | 135176128 | 132379811 | 134996570 | 132716631 |
| 15 | 118816714 | 118213556 | 118112840 | 133009839 |
| 16 | 133730846 | 134344416 | 118702308 | 133851633 |

|      | Fico Q1    | Fico Q2    | Fico Q3    | Fico Q4    |
| ---- | ---------- | ---------- | ---------- | ---------- |
| 17   | 135288753  | 119545667  | 113721971  | 135570756  |
| 18   | 124252619  | 117283861  | 135121572  | 133642579  |
| 19   | 135431957  | 134296836  | 135322187  | 119058231  |
| 20   | 135295850  | 132691464  | 119356076  | 118375920  |
| 21   | 134899479  | 133118930  | 119266209  | 125017802  |
| 22   | 134137585  | 133561379  | 134013288  | 135290249  |
| 23   | 134428446  | 117913701  | 134671800  | 119293852  |
| 24   | 134883637  | 135406577  | 118760875  | 133217652  |
| 25   | 133678322  | 118787999  | 136459999  | 134848801  |

### Supplemental Loan Sample

|      | Fico Q1    | Fico Q2    | Fico Q3    | Fico Q4    |
| ---- | ---------- | ---------- | ---------- | ---------- |
| 26   | 135000419  | 118855543  | 136304111  | 133265850  |
| 27   | 134597700  | 119270129  | 127353721  | 134999579  |
| 28   | 135542684  | 98008380   | 134284910  | 136221325  |
| 29   | 117874792  | 119081417  | 134773129  | 134861799  |
| 30   | 118789039  | 134156662  | 136474050  | 119056254  |
| 31   | 134994458  | 133683955  | 133892297  | 136637707  |
| 32   | 134519794  | 118854047  | 118997713  | 123579822  |
| 33   | 127781687  | 134973096  | 133819463  | 127796480  |
| 34   | 134690287  | 133274775  | 118957780  | 135004888  |
| 35   | 119008946  | 134850755  | 119215386  | 134378054  |
| 36   | 134236227  | 135539124  | 136215156  | 44777912   |
| 37   | 134602325  | 133648360  | 134382958  | 119392272  |
| 38   | 127483830  | 133757756  | 134462351  | 133403340  |
| 39   | 118618417  | 133969344  | 119294228  | 119355748  |
| 40   | 134879261  | 118910782  | 134185174  | 119306622  |
| 41   | 118911590  | 118760771  | 118794263  | 136450829  |
| 42   | 134675286  | 135171628  | 135335153  | 133560518  |
| 43   | 134596780  | 119189255  | 135886249  | 135420340  |
| 44   | 118901125  | 133155338  | 118998745  | 133814214  |
| 45   | 132973614  | 117490979  | 118365383  | 135083928  |
| 46   | 134725450  | 136209371  | 127727844  | 126297991  |
| 47   | 134340399  | 134515914  | 134856928  | 119416883  |
| 48   | 117609914  | 118742105  | 132543452  | 133526545  |
| 49   | 133876831  | 118900245  | 133993886  | 135127404  |
| 50   | 133077928  | 118701900  | 132898457  | 135811769  |

**ARSI 2006-W3**
**Initial Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 93270031 | 94068996 | 92259951 | 94487675 |
| 2 | 93790152 | 94010550 | 93161198 | 93676559 |
| 3 | 84271410 | 93183952 | 92591999 | 94185238 |
| 4 | 93040392 | 94036670 | 92984111 | 92324995 |
| 5 | 93136877 | 92042993 | 91923797 | 92997071 |
| 6 | 93493351 | 90998030 | 86541638 | 89154033 |
| 7 | 93070472 | 91984112 | 92766914 | 89146633 |
| 8 | 93398311 | 89344634 | 92059476 | 92931997 |
| 9 | 93962355 | 90652231 | 92024835 | 92872274 |
| 10 | 93512598 | 92950278 | 93377877 | 93044998 |
| 11 | 94639754 | 94031119 | 93621597 | 91301317 |
| 12 | 94470390 | 93174118 | 84701176 | 93557270 |
| 13 | 93508752 | 93891711 | 93698991 | 92822279 |
| 14 | 93135275 | 94549391 | 88932637 | 92436872 |
| 15 | 84191816 | 93979714 | 93404838 | 93786994 |
| 16 | 93528073 | 93591352 | 92434356 | 90076639 |
| 17 | 92351279 | 93739274 | 92885193 | 94151271 |
| 18 | 93910396 | 93351195 | 87997037 | 93494912 |
| 19 | 84469493 | 93187433 | 92597194 | 93408755 |
| 20 | 94164910 | 84715531 | 92880350 | 94886314 |
| 21 | 93252591 | 94773595 | 93215754 | 92289677 |
| 22 | 93493112 | 93917193 | 92558238 | 94381837 |
| 23 | 91751115 | 94008513 | 92468396 | 91497511 |
| 24 | 92615350 | 92766278 | 93710358 | 93540672 |
| 25 | 93491512 | 92589514 | 93169878 | 93187078 |

**Supplemental Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 93128718 | 94912516 | 94137874 | 93528875 |
| 27 | 91730911 | 93706992 | 93922110 | 88697594 |
| 28 | 92516434 | 92742196 | 92548031 | 94784196 |
| 29 | 93721710 | 92923952 | 93347078 | 92914191 |
| 30 | 93384196 | 93551836 | 94081551 | 93664910 |
| 31 | 92362359 | 93122117 | 92968478 | 94696358 |
| 32 | 92965193 | 92144476 | 93180677 | 93460632 |
| 33 | 91178558 | 92582758 | 90837550 | 94201837 |

|    | Fico Q1  | Fico Q2  | Fico Q3  | Fico Q4  |
|----|----------|----------|----------|----------|
| 34 | 93135994 | 92824432 | 93395796 | 93741312 |
| 35 | 92916956 | 85186039 | 93094233 | 94286671 |
| 36 | 93070431 | 92265594 | 92879634 | 92735950 |
| 37 | 93903953 | 92657352 | 92746510 | 94334190 |
| 38 | 90753914 | 93160679 | 84718774 | 93862910 |
| 39 | 93524593 | 93289510 | 93349470 | 87327995 |
| 40 | 90928714 | 92116599 | 94616273 | 93511673 |
| 41 | 94388717 | 92409358 | 92514678 | 93716231 |
| 42 | 91373472 | 84680651 | 92359553 | 93970390 |
| 43 | 91684639 | 92173079 | 94322278 | 92144518 |
| 44 | 92531599 | 93213635 | 94688512 | 93150795 |
| 45 | 92551076 | 84427093 | 93364677 | 86643871 |
| 46 | 93255834 | 94212552 | 88082474 | 93225514 |
| 47 | 93399475 | 93875037 | 88224555 | 85131696 |
| 48 | 92882554 | 93401792 | 90479874 | 92694397 |
| 49 | 93247278 | 92245430 | 83535898 | 84723931 |
| 50 | 93359271 | 84445410 | 84487172 | 94182995 |

## CWHL 2006-OA5 (Group 1)
### Initial Loan Sample

|    | Fico Q1   | Fico Q2   | Fico Q3   | Fico Q4   |
|----|-----------|-----------|-----------|-----------|
| 1  | 97863903  | 124063626 | 121029234 | 115826430 |
| 2  | 116779166 | 116624315 | 109732758 | 122254225 |
| 3  | 97867023  | 117058249 | 124919645 | 106866496 |
| 4  | 9846872   | 125513505 | 122390687 | 104543865 |
| 5  | 125136551 | 115884013 | 121130439 | 125765376 |
| 6  | 111528743 | 117289886 | 97887690  | 117093485 |
| 7  | 122039920 | 117187729 | 116476400 | 116081958 |
| 8  | 123308352 | 97899763  | 126133894 | 116805129 |
| 9  | 122722949 | 125192104 | 124107948 | 44677348  |
| 10 | 123852337 | 125016513 | 122877604 | 125288150 |
| 11 | 98058327  | 117105623 | 116594535 | 117099206 |
| 12 | 124519898 | 124228008 | 125923002 | 124999063 |
| 13 | 121653056 | 122554479 | 116032576 | 125570254 |
| 14 | 114887125 | 124841797 | 123987226 | 124853219 |
| 15 | 125656432 | 98003227  | 125906771 | 117168319 |
| 16 | 106920071 | 125023594 | 120631363 | 94488325  |
| 17 | 117332507 | 44726962  | 124720072 | 125737072 |
| 18 | 123828775 | 116128452 | 123837648 | 124898488 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 19 | 126642778 | 125899376 | 116419041 | 116611817 |
| 20 | 121070506 | 121166633 | 115888310 | 117240423 |
| 21 | 116990088 | 81498444 | 124831340 | 116894196 |
| 22 | 117113448 | 122093458 | 125458218 | 125396206 |
| 23 | 125467209 | 125528433 | 117185113 | 116958044 |
| 24 | 124597064 | 116824884 | 107296283 | 115853345 |
| 25 | 117587568 | 123680343 | 123677967 | 116831413 |

### Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 124707719 | 116183571 | 122038984 | 106405389 |
| 27 | 124898416 | 121494062 | 116399046 | 125242322 |
| 28 | 124694646 | 105855840 | 116000916 | 115755469 |
| 29 | 115986050 | 123924811 | 107268263 | 116023719 |
| 30 | 116199981 | 94162932 | 124765833 | 125255227 |
| 31 | 116678857 | 123960622 | 116774301 | 116578477 |
| 32 | 123989867 | 122936540 | 125543260 | 117388242 |
| 33 | 125454973 | 116607689 | 117080620 | 116345752 |
| 34 | 123998460 | 125569966 | 121555030 | 116235010 |
| 35 | 123339889 | 117243592 | 121010026 | 116195764 |
| 36 | 124000948 | 111094749 | 116393886 | 125988626 |
| 37 | 116900413 | 117015004 | 116593383 | 124900464 |
| 38 | 125987174 | 117536305 | 123456088 | 126399734 |
| 39 | 116966317 | 97900699 | 126618529 | 124852414 |
| 40 | 116864321 | 126615080 | 124246194 | 117421166 |
| 41 | 97864831 | 123693441 | 124688822 | 105774494 |
| 42 | 124717136 | 116730104 | 124717320 | 121540490 |
| 43 | 115932867 | 117057977 | 116876810 | 97874320 |
| 44 | 125290040 | 117059097 | 116370539 | 116960925 |
| 45 | 123513437 | 116826476 | 117272571 | 116055819 |
| 46 | 116669112 | 114560110 | 117228942 | 123975984 |
| 47 | 123070366 | 97855886 | 116490682 | 123407661 |
| 48 | 116204957 | 116457662 | 117518383 | 124513578 |
| 49 | 124832292 | 123919867 | 124866199 | 116237090 |
| 50 | 115927315 | 116788031 | 123925811 | 116973990 |

**CWHL 2006-OA5 (Group 2)**
**Initial Loan Sample**

|       | Fico Q1    | Fico Q2    | Fico Q3    | Fico Q4    |
|-------|------------|------------|------------|------------|
| 1     | 125255787  | 121736551  | 124541341  | 111881048  |
| 2     | 125410747  | 97888906   | 117526088  | 125547583  |
| 3     | 123629433  | 115625469  | 117159918  | 9848150    |
| 4     | 116859264  | 116638996  | 117379809  | 117061793  |
| 5     | 124107964  | 110977866  | 120987081  | 125021106  |
| 6     | 117389130  | 125647854  | 79959331   | 115806379  |
| 7     | 116282360  | 124848214  | 121038395  | 124507398  |
| 8     | 116660151  | 125408427  | 125098905  | 116892044  |
| 9     | 116080150  | 116565859  | 116622618  | 116358553  |
| 10    | 123381826  | 126521186  | 97992962   | 116899245  |
| 11    | 124439748  | 116832773  | 122269113  | 115753717  |
| 12    | 125339952  | 106866376  | 117030814  | 125189117  |
| 13    | 126719934  | 125200603  | 123414040  | 125185869  |
| 14    | 124708327  | 116721311  | 116783543  | 124688702  |
| 15    | 125479323  | 116711734  | 116402455  | 125621876  |
| 16    | 97872008   | 116744258  | 97916901   | 123423663  |
| 17    | 124596800  | 116182443  | 116826372  | 125476979  |
| 18    | 106577291  | 116861792  | 124670350  | 116870361  |
| 19    | 115888214  | 125098505  | 124600408  | 123929476  |
| 20    | 123250634  | 116268110  | 123080039  | 116612617  |
| 21    | 116704005  | 117007395  | 97887282   | 124671092  |
| 22    | 125409187  | 124232309  | 117123377  | 126218698  |
| 23    | 116957212  | 112266374  | 113276236  | 125252691  |
| 24    | 124530724  | 117256561  | 124150989  | 125062451  |
| 25    | 116739609  | 124662041  | 117050328  | 105221354  |

**Supplemental Loan Sample**

|       | Fico Q1    | Fico Q2    | Fico Q3    | Fico Q4    |
|-------|------------|------------|------------|------------|
| 26    | 115627149  | 123925819  | 116389181  | 117483658  |
| 27    | 122433690  | 98003427   | 125252635  | 124348498  |
| 28    | 116088359  | 120184383  | 122404501  | 126339635  |
| 29    | 115954278  | 110414835  | 124443284  | 117443589  |
| 30    | 117115096  | 117113464  | 116454045  | 116986312  |
| 31    | 116887316  | 116541888  | 116932249  | 125185285  |
| 32    | 97906004   | 124846054  | 116221975  | 104655287  |
| 33    | 124603400  | 123060188  | 117384481  | 117115120  |
| 34    | 121256771  | 116642413  | 116236810  | 116929049  |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 116676497 | 117014315 | 97914813 | 125899392 |
| 36 | 124159990 | 125101033 | 116977087 | 117049264 |
| 37 | 126427747 | 116159176 | 116672777 | 117099902 |
| 38 | 124656120 | 116858848 | 124509154 | 116345960 |
| 39 | 124900832 | 116761284 | 125791662 | 116959397 |
| 40 | 124356307 | 116250476 | 115888110 | 97993538 |
| 41 | 124842629 | 124518242 | 125185925 | 125505816 |
| 42 | 99286384 | 126716662 | 116689979 | 97859550 |
| 43 | 116622178 | 125092384 | 125340784 | 97856566 |
| 44 | 124613986 | 124865999 | 125701151 | 117118585 |
| 45 | 115729634 | 116965981 | 125253107 | 117370360 |
| 46 | 125088624 | 116435067 | 123426799 | 115684684 |
| 47 | 124845901 | 125182156 | 117163606 | 117440645 |
| 48 | 125715443 | 107000910 | 116877842 | 125182564 |
| 49 | 97909988 | 116602552 | 116611865 | 116219255 |
| 50 | 117063186 | 116132884 | 116305779 | 116269710 |

**FHLT 2006-B**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1 | 8000084158 | 8000090878 | 3000159465 | 8000083455 |
| 2 | 8000076857 | 6000236229 | 8000087221 | 7000205427 |
| 3 | 8000091953 | 6000235548 | 7000198517 | 1000323578 |
| 4 | 6000224166 | 5000219649 | 5000205223 | 6000236696 |
| 5 | 5000216917 | 5000215477 | 7000206066 | 5000219683 |
| 6 | 8000090143 | 3000114893 | 6000233035 | 3000123428 |
| 7 | 5000192093 | 6000229402 | 3000138631 | 7000200828 |
| 8 | 6000214016 | 5000212421 | 6000230761 | 7000201802 |
| 9 | 7000195055 | 3000141226 | 3000139460 | 1000307942 |
| 10 | 8000086756 | 6000232115 | 3000167216 | 3000158818 |
| 11 | 8000094015 | 3000083146 | 7000188380 | 5000220585 |
| 12 | 1000323795 | 6000231335 | 3000163018 | 6000230666 |
| 13 | 7000205012 | 6000230025 | 1000321322 | 3000132817 |
| 14 | 5000199113 | 7000197118 | 7000202915 | 7000204989 |
| 15 | 8000087374 | 8000090324 | 1000321937 | 1000320148 |
| 16 | 6000224784 | 7000199263 | 5000213554 | 8000091827 |
| 17 | 3000112038 | 6000231845 | 7000197769 | 5000219821 |
| 18 | 3000118842 | 5000222194 | 5000223076 | 3000007826 |
| 19 | 7000189560 | 1000323617 | 3000163768 | 8000092853 |

|    | Fico Q1    | Fico Q2    | Fico Q3    | Fico Q4    |
|----|------------|------------|------------|------------|
| 20 | 1000316637 | 6000209960 | 3000145071 | 7000200716 |
| 21 | 3000115509 | 5000222426 | 7000203649 | 3000120403 |
| 22 | 6000235042 | 3000109545 | 5000223842 | 6000221119 |
| 23 | 3000118751 | 7000204912 | 5000201219 | 8000083632 |
| 24 | 6000234662 | 6000224024 | 3000139518 | 7000200903 |
| 25 | 6000236620 | 8000087716 | 3000112813 | 5000224555 |

## Supplemental Loan Sample

|    | Fico Q1    | Fico Q2    | Fico Q3    | Fico Q4    |
|----|------------|------------|------------|------------|
| 26 | 6000234040 | 5000218841 | 5000204437 | 5000218476 |
| 27 | 6000229870 | 3000113404 | 6000236693 | 1000322041 |
| 28 | 8000091522 | 5000212243 | 7000205190 | 7000205501 |
| 29 | 3000123031 | 6000233975 | 8000092303 | 5000221268 |
| 30 | 6000225085 | 6000221635 | 3000166783 | 6000234669 |
| 31 | 7000200635 | 7000001529 | 3000164097 | 6000219483 |
| 32 | 7000198560 | 3000109384 | 8000090990 | 6000235831 |
| 33 | 5000212345 | 1000323652 | 3000165418 | 7000205270 |
| 34 | 3000065008 | 8000092173 | 5000222637 | 7000205408 |
| 35 | 1000314755 | 6000220141 | 7000201412 | 5000216451 |
| 36 | 3000031198 | 3000104675 | 7000206861 | 7000203981 |
| 37 | 1000322387 | 5000219838 | 3000120163 | 3000100250 |
| 38 | 7000192775 | 5000212916 | 7000197800 | 7000001488 |
| 39 | 7000198309 | 3000108065 | 7000203638 | 5000222479 |
| 40 | 7000203367 | 6000233115 | 3000172166 | 3000122325 |
| 41 | 6000231770 | 6000225646 | 5000218956 | 5000216344 |
| 42 | 6000210586 | 3000020845 | 7000193525 | 3000089574 |
| 43 | 6000218368 | 3000124806 | 7000206542 | 5000216909 |
| 44 | 8000092962 | 7000203432 | 6000236742 | 3000104141 |
| 45 | 5000194466 | 6000234751 | 7000206653 | 1000318652 |
| 46 | 6000233986 | 3000114871 | 6000225706 | 1000321924 |
| 47 | 6000220663 | 5000213032 | 5000221454 | 1000316295 |
| 48 | 3000140782 | 6000233297 | 8000087198 | 7000202610 |
| 49 | 8000088365 | 6000233139 | 5000222463 | 3000106564 |
| 50 | 3000139632 | 5000219046 | 3000112506 | 1000320780 |

**INABS 2007-A**
**Initial Loan Sample**

|     | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
| --- | --- | --- | --- | --- |
| 1 | 125583143 | 125507202 | 125123147 | 125081833 |
| 2 | 3156476 | 125437287 | 125538583 | 125038961 |
| 3 | 125176926 | 1030498 | 6073369 | 6040128 |
| 4 | 125188292 | 125564324 | 6097190 | 124953435 |
| 5 | 125256507 | 124823954 | 125468327 | 6073260 |
| 6 | 125198242 | 125087148 | 6073827 | 125561667 |
| 7 | 124928355 | 125065491 | 124867054 | 6055269 |
| 8 | 125311511 | 124811610 | 125386853 | 6074247 |
| 9 | 125115705 | 124826351 | 6073215 | 125379403 |
| 10 | 124903559 | 125324841 | 125191587 | 6074188 |
| 11 | 3934057 | 125132861 | 125574299 | 124875855 |
| 12 | 125177869 | 125351247 | 125085726 | 6073248 |
| 13 | 125197806 | 125013372 | 1642082 | 125458792 |
| 14 | 125243385 | 125166894 | 125412051 | 125021336 |
| 15 | 125500428 | 120314043 | 124924741 | 125463987 |
| 16 | 125563574 | 124712930 | 124940675 | 125518474 |
| 17 | 124869521 | 124942533 | 124881713 | 124800447 |
| 18 | 125123820 | 125328208 | 125250686 | 125660733 |
| 19 | 125210605 | 125316405 | 125336594 | 6071344 |
| 20 | 124493465 | 125108222 | 125190794 | 125288316 |
| 21 | 125019230 | 6075808 | 125033745 | 6073954 |
| 22 | 125155011 | 125351704 | 125129163 | 125205802 |
| 23 | 125419433 | 124870681 | 125149086 | 125304166 |
| 24 | 125274252 | 125159533 | 125375585 | 125362637 |
| 25 | 125295601 | 125226764 | 125285550 | 6058936 |

**Supplemental Loan Sample**

|     | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
| --- | --- | --- | --- | --- |
| 26 | 124858115 | 125463819 | 125138231 | 125078068 |
| 27 | 125201282 | 125125168 | 125128987 | 125436834 |
| 28 | 125087278 | 125458313 | 125083200 | 125143444 |
| 29 | 124879847 | 125271162 | 125654961 | 6073976 |
| 30 | 125559405 | 124877371 | 125349126 | 125330201 |
| 31 | 125405185 | 125659195 | 124955001 | 124841378 |
| 32 | 125385100 | 125085390 | 125119349 | 6073246 |
| 33 | 125156866 | 125008912 | 125293878 | 125021343 |
| 34 | 125017351 | 124066827 | 124903432 | 6058531 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 125000240 | 125505590 | 125368086 | 125604497 |
| 36 | 125355728 | 125571616 | 125527029 | 6074056 |
| 37 | 125416505 | 124805494 | 6097154 | 125172026 |
| 38 | 124623624 | 125405430 | 125186491 | 125413921 |
| 39 | 124813048 | 124903787 | 125187417 | 125474951 |
| 40 | 120310755 | 125206887 | 124999643 | 125131741 |
| 41 | 124909549 | 125221792 | 125203578 | 125555708 |
| 42 | 124717734 | 125095055 | 6075810 | 125018875 |
| 43 | 124467061 | 125079138 | 6097272 | 125126678 |
| 44 | 124603511 | 125133586 | 6073258 | 125071908 |
| 45 | 125191313 | 124650705 | 125460039 | 124965163 |
| 46 | 124941842 | 124919762 | 125556652 | 125520167 |
| 47 | 125466680 | 125549562 | 125029009 | 125054378 |
| 48 | 125159837 | 125542261 | 125091500 | 124696073 |
| 49 | 124232932 | 125350612 | 125519031 | 125256811 |
| 50 | 125078913 | 120276364 | 124821220 | 125005860 |

**INDS 2006-3**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 124595811 | 124383444 | 124575399 | 124523503 |
| 2  | 124370745 | 124348954 | 124369042 | 124616506 |
| 3  | 124574139 | 124160507 | 124420145 | 124115575 |
| 4  | 124224053 | 124136075 | 124146485 | 124449425 |
| 5  | 124538788 | 124455371 | 124205314 | 124235026 |
| 6  | 124618040 | 124493069 | 124702490 | 124628600 |
| 7  | 124683931 | 124302998 | 124132928 | 124420410 |
| 8  | 124532568 | 124525265 | 124198083 | 124582405 |
| 9  | 124583314 | 124523291 | 124588915 | 124378820 |
| 10 | 124593253 | 124812680 | 124624594 | 124667080 |
| 11 | 124152463 | 124461514 | 124744573 | 124693769 |
| 12 | 124453908 | 124381061 | 124531295 | 124387373 |
| 13 | 124146644 | 124216994 | 124323527 | 124122814 |
| 14 | 124301508 | 124378812 | 124180974 | 123994585 |
| 15 | 124651584 | 124413486 | 124380951 | 124699124 |
| 16 | 124651178 | 124268442 | 124645976 | 124298165 |
| 17 | 124683946 | 124446117 | 124358345 | 124736363 |
| 18 | 124252665 | 124702516 | 124213944 | 124120849 |
| 19 | 124400693 | 124733642 | 124399671 | 124445956 |

|     | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|-----|---------|---------|---------|---------|
| 20 | 124607075 | 124192090 | 124277920 | 124241639 |
| 21 | 124484392 | 124188552 | 6049558 | 124388458 |
| 22 | 124783681 | 6056204 | 124728712 | 124263434 |
| 23 | 124094986 | 124626855 | 124472158 | 124251256 |
| 24 | 124357836 | 124164274 | 124256847 | 124378813 |
| 25 | 124622324 | 124578254 | 124212791 | 124280850 |

## Supplemental Loan Sample

|     | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|-----|---------|---------|---------|---------|
| 26 | 124518743 | 6039324 | 124404140 | 124322577 |
| 27 | 124541494 | 124383452 | 124305492 | 124470955 |
| 28 | 124330565 | 124370023 | 124572916 | 124288126 |
| 29 | 124663881 | 124358880 | 6039331 | 124723240 |
| 30 | 124443700 | 124039402 | 124281315 | 124182804 |
| 31 | 124677495 | 124346851 | 124258525 | 124785531 |
| 32 | 124497799 | 124376683 | 124616309 | 124203044 |
| 33 | 124169791 | 124520574 | 124232024 | 124730413 |
| 34 | 124520536 | 124397982 | 124109532 | 124489299 |
| 35 | 124459215 | 124256533 | 124580666 | 124335084 |
| 36 | 124694996 | 6056318 | 124635030 | 124330649 |
| 37 | 124728981 | 124383460 | 124316933 | 124307688 |
| 38 | 6056282 | 123887510 | 124702502 | 124352025 |
| 39 | 124299498 | 124435692 | 124725414 | 124540051 |
| 40 | 124251426 | 124660955 | 124437105 | 124305115 |
| 41 | 124592522 | 124344439 | 124466413 | 124417734 |
| 42 | 124475213 | 6056369 | 124173671 | 6039321 |
| 43 | 124530621 | 124175744 | 6049589 | 124270371 |
| 44 | 124404805 | 124133818 | 124325282 | 124597561 |
| 45 | 124270822 | 124688580 | 124215414 | 6056346 |
| 46 | 124703760 | 124362993 | 124524039 | 124285929 |
| 47 | 124728726 | 124554250 | 124249240 | 124254995 |
| 48 | 123839781 | 124440199 | 124488225 | 124649822 |
| 49 | 124537478 | 124402455 | 124452272 | 124193212 |
| 50 | 124429467 | 124716578 | 124600633 | 124117330 |

**INDS 2007-1**
**Initial Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 125182699 | 124792811 | 125191125 | 124713021 |
| 2 | 124782099 | 124723892 | 125096117 | 124919703 |
| 3 | 125082254 | 124854725 | 124840934 | 124816189 |
| 4 | 125014768 | 124712995 | 6070036 | 125177318 |
| 5 | 6070047 | 124870839 | 125069975 | 124764198 |
| 6 | 124971027 | 125353334 | 124836451 | 124962966 |
| 7 | 6080603 | 125085916 | 125184913 | 125008587 |
| 8 | 125217064 | 124867192 | 124888960 | 125060209 |
| 9 | 6075801 | 6069777 | 125280842 | 125072161 |
| 10 | 124728762 | 125045868 | 124153744 | 124827767 |
| 11 | 124475432 | 125141081 | 124937746 | 124955837 |
| 12 | 6069958 | 125055109 | 125062603 | 124844668 |
| 13 | 124745587 | 124751147 | 124592284 | 124713056 |
| 14 | 124780279 | 124694155 | 124828950 | 125092028 |
| 15 | 6069980 | 124847629 | 6073851 | 125288038 |
| 16 | 124938734 | 125171486 | 125158176 | 124887616 |
| 17 | 125124903 | 124753659 | 125017683 | 125035359 |
| 18 | 125170732 | 6069792 | 124717509 | 6061452 |
| 19 | 124467711 | 124927884 | 124766177 | 124646123 |
| 20 | 125207841 | 124882643 | 125260004 | 125082867 |
| 21 | 125093387 | 124635840 | 125046400 | 6061160 |
| 22 | 125034175 | 124377677 | 125160859 | 124534170 |
| 23 | 124959055 | 125019344 | 6061404 | 124959260 |
| 24 | 125063881 | 124401891 | 124728269 | 125239402 |
| 25 | 124823207 | 6061182 | 6061245 | 124552738 |

**Supplemental Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 125137236 | 124159911 | 125087803 | 124702481 |
| 27 | 125008263 | 6087497 | 124137589 | 124776735 |
| 28 | 124770494 | 6069965 | 124987163 | 124840033 |
| 29 | 125076388 | 6061446 | 125171543 | 124885457 |
| 30 | 124485260 | 124909729 | 125039070 | 125137975 |
| 31 | 124955772 | 124795796 | 124968803 | 6061197 |
| 32 | 124845553 | 125086464 | 125151254 | 6061415 |
| 33 | 125188845 | 124971814 | 124970237 | 124642033 |
| 34 | 124713038 | 124863059 | 6069883 | 124844170 |

|     | Fico Q1   | Fico Q2   | Fico Q3   | Fico Q4   |
| --- | --------- | --------- | --------- | --------- |
| 35  | 6069908   | 124786091 | 124573029 | 124712991 |
| 36  | 124796616 | 124660466 | 124956600 | 124480366 |
| 37  | 124903731 | 125065944 | 124713113 | 124831008 |
| 38  | 124852972 | 125026668 | 125237209 | 124895309 |
| 39  | 6087647   | 125293140 | 125048876 | 124564824 |
| 40  | 124947901 | 125078907 | 124874313 | 125172222 |
| 41  | 124832821 | 124847055 | 6061453   | 125066059 |
| 42  | 6069797   | 125197603 | 6061229   | 124713030 |
| 43  | 124755094 | 125155297 | 6063862   | 124778294 |
| 44  | 125007837 | 124713015 | 124984109 | 124994240 |
| 45  | 124681926 | 124995318 | 125003052 | 125096245 |
| 46  | 124760967 | 125277580 | 123982562 | 125213380 |
| 47  | 125096312 | 124838274 | 6061273   | 125132219 |
| 48  | 124738149 | 125102739 | 124949512 | 124986359 |
| 49  | 125087773 | 6069963   | 124920002 | 6074324   |
| 50  | 124878879 | 124803486 | 124916702 | 124837983 |

**INDS 2007-2**
**Initial Loan Sample**

|     | Fico Q1   | Fico Q2   | Fico Q3   | Fico Q4   |
| --- | --------- | --------- | --------- | --------- |
| 1   | 125340456 | 125178295 | 6096119   | 125017704 |
| 2   | 125425365 | 125311657 | 125259844 | 125167697 |
| 3   | 6096164   | 125367634 | 125290573 | 125644755 |
| 4   | 125478274 | 125388693 | 125407008 | 124851730 |
| 5   | 125318371 | 6073930   | 125418393 | 125337599 |
| 6   | 6090866   | 6090777   | 125457267 | 6073896   |
| 7   | 125526328 | 6096062   | 125082572 | 125211067 |
| 8   | 125262301 | 125420566 | 125297473 | 6074271   |
| 9   | 125720444 | 125496014 | 125355402 | 6074120   |
| 10  | 125109049 | 125332859 | 6096220   | 125342798 |
| 11  | 125525962 | 125133307 | 6089879   | 125392073 |
| 12  | 6090957   | 6090852   | 125352822 | 125150086 |
| 13  | 125170480 | 125378735 | 125136237 | 125330125 |
| 14  | 125268244 | 125304841 | 6087528   | 125230266 |
| 15  | 125435953 | 125330711 | 125325074 | 125624172 |
| 16  | 125263477 | 124936199 | 125456307 | 125243545 |
| 17  | 125095224 | 6098221   | 125309419 | 125245047 |
| 18  | 125144594 | 125099775 | 125290990 | 125234039 |
| 19  | 125516437 | 125457520 | 125256146 | 125240756 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 20 | 125140602 | 125568485 | 125349203 | 125257766 |
| 21 | 125469619 | 125265826 | 125347192 | 6074037 |
| 22 | 124899867 | 6094998 | 125532920 | 6061451 |
| 23 | 125103385 | 125393363 | 125477382 | 125213864 |
| 24 | 125302974 | 125523892 | 125449003 | 125278713 |
| 25 | 125621715 | 125609878 | 6074214 | 125530172 |

## Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 125468655 | 125275491 | 125231639 | 6074166 |
| 27 | 6061468 | 125462808 | 6074090 | 125705474 |
| 28 | 6061548 | 125307238 | 125504491 | 125558860 |
| 29 | 125525978 | 125329162 | 6074287 | 125407026 |
| 30 | 125357839 | 125355899 | 125215080 | 124903207 |
| 31 | 124806275 | 125269225 | 125417585 | 6074081 |
| 32 | 125412127 | 125318296 | 125408260 | 125621225 |
| 33 | 125150698 | 125444332 | 124958593 | 125178469 |
| 34 | 124996388 | 125499762 | 125331226 | 125447086 |
| 35 | 125097737 | 125234971 | 125293779 | 124815725 |
| 36 | 125526339 | 6061579 | 125596773 | 125005919 |
| 37 | 125526322 | 125593160 | 6074171 | 125596871 |
| 38 | 125390041 | 125007930 | 125380625 | 125169435 |
| 39 | 125391947 | 125640847 | 6090680 | 125521616 |
| 40 | 125410677 | 125480923 | 6096198 | 6096038 |
| 41 | 125316899 | 125494458 | 6099749 | 6091478 |
| 42 | 125289362 | 6096020 | 125223192 | 125239508 |
| 43 | 125277389 | 125247166 | 125074332 | 125237875 |
| 44 | 125597456 | 125402308 | 6074075 | 6096194 |
| 45 | 125351135 | 125481336 | 125453165 | 125115293 |
| 46 | 6096103 | 125137907 | 125224038 | 6089869 |
| 47 | 125526326 | 125499819 | 125691877 | 6049449 |
| 48 | 6069811 | 125430439 | 6074085 | 125570073 |
| 49 | 125349702 | 125288095 | 125201546 | 125501041 |
| 50 | 125171988 | 124583082 | 125299934 | 125547203 |

**MABS 2006-HE2**
**Initial Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 333635785 | 333618647 | 333618902 | 333619761 |
| 2 | 333619254 | 333634247 | 333635972 | 333634810 |
| 3 | 333634143 | 333618887 | 333634303 | 333619873 |
| 4 | 333634712 | 333619652 | 333624256 | 333634845 |
| 5 | 333653801 | 333634407 | 333635597 | 333634066 |
| 6 | 333653790 | 333633953 | 333619869 | 333619909 |
| 7 | 333653846 | 333633454 | 333618546 | 333634194 |
| 8 | 333618722 | 333635074 | 333624239 | 333634471 |
| 9 | 333634107 | 333635505 | 333635705 | 333619378 |
| 10 | 333634389 | 333635456 | 333619396 | 333619890 |
| 11 | 333633412 | 333634386 | 333634915 | 777016379 |
| 12 | 333618690 | 333619149 | 333634637 | 333633688 |
| 13 | 333653857 | 333619340 | 333618719 | 333619199 |
| 14 | 333634218 | 333618634 | 333624245 | 333619235 |
| 15 | 333634429 | 333619125 | 333618682 | 333619664 |
| 16 | 333633452 | 333618662 | 333635193 | 333599827 |
| 17 | 333635458 | 333624126 | 333635715 | 333635357 |
| 18 | 333618958 | 333635444 | 333635268 | 333635336 |
| 19 | 333619054 | 333635879 | 333653870 | 333584345 |
| 20 | 333618974 | 333619693 | 333618992 | 333633472 |
| 21 | 333633891 | 333635577 | 333634460 | 333633324 |
| 22 | 333635834 | 333633966 | 333624138 | 333619651 |
| 23 | 333634469 | 333619698 | 333653742 | 333635874 |
| 24 | 333635566 | 333624150 | 333619747 | 333635344 |
| 25 | 333618909 | 333653822 | 333635603 | 333635008 |

**Supplemental Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 333635671 | 333624087 | 333624301 | 333635674 |
| 27 | 333634487 | 333619475 | 333635457 | 333635395 |
| 28 | 333599883 | 333653798 | 333619808 | 333635185 |
| 29 | 333653799 | 333619497 | 333618555 | 333635174 |
| 30 | 333619187 | 333635658 | 333653824 | 333635222 |
| 31 | 333635751 | 333634864 | 333653684 | 333619057 |
| 32 | 333619308 | 333619298 | 333635108 | 333619606 |
| 33 | 333634522 | 333635324 | 333635976 | 333618635 |
| 34 | 333634263 | 333618912 | 333653852 | 333635338 |

|     | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|-----|---------|---------|---------|---------|
| 35 | 333633834 | 333619441 | 333619632 | 333624307 |
| 36 | 333619202 | 333618833 | 333635119 | 333635421 |
| 37 | 333634633 | 333634667 | 333624265 | 333619663 |
| 38 | 333653743 | 333619738 | 333635254 | 333624187 |
| 39 | 333634286 | 333619450 | 333618772 | 333635294 |
| 40 | 333633481 | 333618989 | 333634545 | 333653762 |
| 41 | 333619860 | 333635974 | 333619090 | 333635455 |
| 42 | 333634294 | 333624089 | 333618712 | 333635903 |
| 43 | 333619757 | 333618717 | 333633474 | 333599825 |
| 44 | 333633855 | 333599813 | 333599856 | 333633469 |
| 45 | 333618868 | 333618857 | 333631887 | 333634242 |
| 46 | 333619502 | 333634963 | 333653707 | 333624173 |
| 47 | 333618872 | 333633880 | 333653729 | 333635059 |
| 48 | 333634923 | 333619266 | 333634863 | 333635637 |
| 49 | 333634179 | 333599798 | 333633610 | 333619052 |
| 50 | 333634117 | 333635828 | 333599853 | 333635481 |

**MABS 2006-WMC1**
**Initial Loan Sample**

|     | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|-----|---------|---------|---------|---------|
| 1 | 11352838 | 11379903 | 11356785 | 11360280 |
| 2 | 11384162 | 11362029 | 11372507 | 11383697 |
| 3 | 11375343 | 11397370 | 11347409 | 11385245 |
| 4 | 11348209 | 11380684 | 11338769 | 11392055 |
| 5 | 11388375 | 11379655 | 11381064 | 11389120 |
| 6 | 11376125 | 11365886 | 11388330 | 11141857 |
| 7 | 11393500 | 11364106 | 11396167 | 11381017 |
| 8 | 11335933 | 11377820 | 11383927 | 11375876 |
| 9 | 11379942 | 11351923 | 11389122 | 11383596 |
| 10 | 11351700 | 11370085 | 11371199 | 11386236 |
| 11 | 11356142 | 11386667 | 11371807 | 11365649 |
| 12 | 11374205 | 11324641 | 11385649 | 11398844 |
| 13 | 11371824 | 11378391 | 11381698 | 11382965 |
| 14 | 11384158 | 11384389 | 11368186 | 11389900 |
| 15 | 11378367 | 11356126 | 11387697 | 11378197 |
| 16 | 11388282 | 11379947 | 11398405 | 11385299 |
| 17 | 11343901 | 11358063 | 11390504 | 11356561 |
| 18 | 11348639 | 11373533 | 11395066 | 11374120 |
| 19 | 11388559 | 11358900 | 11384738 | 11364231 |

|     | Fico Q1  | Fico Q2  | Fico Q3  | Fico Q4  |
| --- | -------- | -------- | -------- | -------- |
| 20  | 11287456 | 11367035 | 11388008 | 11374119 |
| 21  | 11381445 | 11384449 | 11393657 | 11382629 |
| 22  | 11386045 | 11394908 | 11395899 | 11374688 |
| 23  | 11380415 | 11386327 | 11381191 | 11387381 |
| 24  | 11358860 | 11347872 | 11365126 | 11391936 |
| 25  | 11359633 | 11337126 | 11376517 | 11381746 |

### Supplemental Loan Sample

|     | Fico Q1  | Fico Q2  | Fico Q3  | Fico Q4  |
| --- | -------- | -------- | -------- | -------- |
| 26  | 11401404 | 11376356 | 11377967 | 11317021 |
| 27  | 11375252 | 11393097 | 11338205 | 11377850 |
| 28  | 11367248 | 11368678 | 11372049 | 11368235 |
| 29  | 11372780 | 11359358 | 11382353 | 11403162 |
| 30  | 11361461 | 11371568 | 11383510 | 11401556 |
| 31  | 11388221 | 11364869 | 11362680 | 11363259 |
| 32  | 11400951 | 11383392 | 11388905 | 11377441 |
| 33  | 11275768 | 11365935 | 11345487 | 11378331 |
| 34  | 11384671 | 11367198 | 11384772 | 11385423 |
| 35  | 11380457 | 11379820 | 11370636 | 11385477 |
| 36  | 11391767 | 11380463 | 11376412 | 11354622 |
| 37  | 11383084 | 11346744 | 11389547 | 11390434 |
| 38  | 11367061 | 11389387 | 11382932 | 11369325 |
| 39  | 11349816 | 11375226 | 11383049 | 11388048 |
| 40  | 11389521 | 11373902 | 11387694 | 11391234 |
| 41  | 11375420 | 11388991 | 11366763 | 11365736 |
| 42  | 11403408 | 11368683 | 11360579 | 11382922 |
| 43  | 11382408 | 11375931 | 11383509 | 11368347 |
| 44  | 11394139 | 11371065 | 11380501 | 11369700 |
| 45  | 11401403 | 11389729 | 11396121 | 11381734 |
| 46  | 11359385 | 11351436 | 11349941 | 11352471 |
| 47  | 11377962 | 11380648 | 11397376 | 11365691 |
| 48  | 11377487 | 11396310 | 11396477 | 11399712 |
| 49  | 11386700 | 11375935 | 11365703 | 11385857 |
| 50  | 11360487 | 11355570 | 11371028 | 11402286 |

**MABS 2006-WMC4**
**Initial Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 11597438 | 11551066 | 11633425 | 11578436 |
| 2 | 11605887 | 11553709 | 11597030 | 11567841 |
| 3 | 11586815 | 11612446 | 11584734 | 11600883 |
| 4 | 11632874 | 11579171 | 11622908 | 11616044 |
| 5 | 11612641 | 11553574 | 11587530 | 11560817 |
| 6 | 11506895 | 11569695 | 11619509 | 11618919 |
| 7 | 11620033 | 11601208 | 11593985 | 11624056 |
| 8 | 11600673 | 11588864 | 11607634 | 11551929 |
| 9 | 11591997 | 11594169 | 11570687 | 11551292 |
| 10 | 11604296 | 11574367 | 11604998 | 11537116 |
| 11 | 11605642 | 11602966 | 11597328 | 11602539 |
| 12 | 11621190 | 11581022 | 11550982 | 11592274 |
| 13 | 11610178 | 11621702 | 11627577 | 11594177 |
| 14 | 11622271 | 11553003 | 11556508 | 11586265 |
| 15 | 11613031 | 11612821 | 11581879 | 11563585 |
| 16 | 11624098 | 11579214 | 11540335 | 11587167 |
| 17 | 11634926 | 11616288 | 11592551 | 11551122 |
| 18 | 11621054 | 11610199 | 11616828 | 11553130 |
| 19 | 11620367 | 11581907 | 11592643 | 11601944 |
| 20 | 11569525 | 11555977 | 11595734 | 11608591 |
| 21 | 11545065 | 11622840 | 11609230 | 11576710 |
| 22 | 11588413 | 11581606 | 11629714 | 11590835 |
| 23 | 11564476 | 11593332 | 11622588 | 11608631 |
| 24 | 11608713 | 11569630 | 11595214 | 11617930 |
| 25 | 11596984 | 11614881 | 11585780 | 11621596 |

**Supplemental Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 11597152 | 11613802 | 11582585 | 11552986 |
| 27 | 11580530 | 11593898 | 11585865 | 11596316 |
| 28 | 11588136 | 11593838 | 11637468 | 11614099 |
| 29 | 11597915 | 11569379 | 11623021 | 11625425 |
| 30 | 11606232 | 11616771 | 11620201 | 11547761 |
| 31 | 11593115 | 11555190 | 11537067 | 11593478 |
| 32 | 11582501 | 11575395 | 11594866 | 11628799 |
| 33 | 11596337 | 11594279 | 11625048 | 11566321 |
| 34 | 11541780 | 11614975 | 11588359 | 11591616 |

|     | Fico Q1  | Fico Q2  | Fico Q3  | Fico Q4  |
| --- | -------- | -------- | -------- | -------- |
| 35  | 11627073 | 11555779 | 11559454 | 11582507 |
| 36  | 11586462 | 11606149 | 11570917 | 11595067 |
| 37  | 11571447 | 11587548 | 11621366 | 11560331 |
| 38  | 11565013 | 11608190 | 11590155 | 11594047 |
| 39  | 11552790 | 11567575 | 11631371 | 11597226 |
| 40  | 11551403 | 11573107 | 11566931 | 11617759 |
| 41  | 11616173 | 11622309 | 11597564 | 11594043 |
| 42  | 11594221 | 11557610 | 11574149 | 11600656 |
| 43  | 11637204 | 11619567 | 11592007 | 11574350 |
| 44  | 11561973 | 11613865 | 11600299 | 11628267 |
| 45  | 11621956 | 11605711 | 11548035 | 11624968 |
| 46  | 11597735 | 11594618 | 11597032 | 11569460 |
| 47  | 11583290 | 11554889 | 11583913 | 11601941 |
| 48  | 11596741 | 11569022 | 11606273 | 11568852 |
| 49  | 11606370 | 11575651 | 11569329 | 11630510 |
| 50  | 11606508 | 11571285 | 11578592 | 11577228 |

**MARM 2007-2**
**Initial Loan Sample**

|     | Fico Q1   | Fico Q2   | Fico Q3   | Fico Q4   |
| --- | --------- | --------- | --------- | --------- |
| 1   | 334941678 | 334942078 | 334941836 | 334941783 |
| 2   | 334941318 | 334941512 | 334941620 | 334942039 |
| 3   | 334941217 | 334941412 | 334941983 | 334942036 |
| 4   | 334941402 | 334941947 | 334941873 | 334942151 |
| 5   | 334941388 | 334942364 | 334941959 | 334941455 |
| 6   | 334941832 | 334941427 | 334942112 | 334942360 |
| 7   | 334942156 | 334941554 | 334941732 | 334941872 |
| 8   | 334941560 | 334941403 | 334941317 | 334941260 |
| 9   | 334941250 | 334942167 | 334941769 | 334942472 |
| 10  | 334941781 | 334941385 | 334942334 | 334942150 |
| 11  | 334941152 | 334941937 | 334941424 | 334177049 |
| 12  | 334942212 | 334941653 | 334941159 | 334941364 |
| 13  | 334941123 | 334941679 | 334942408 | 334942002 |
| 14  | 334941811 | 334941433 | 334941496 | 334942314 |
| 15  | 334942452 | 334942171 | 334941486 | 334941933 |
| 16  | 334941557 | 334941741 | 334941624 | 334942044 |
| 17  | 334941892 | 334941100 | 334941255 | 334942307 |
| 18  | 334941112 | 334942114 | 334941805 | 334941118 |
| 19  | 334942029 | 334942253 | 334941105 | 334941686 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 20 | 334941806 | 334941419 | 334941787 | 334942347 |
| 21 | 334941158 | 334941866 | 334941214 | 334941142 |
| 22 | 334941795 | 334941501 | 334942257 | 334942310 |
| 23 | 334941562 | 334941416 | 334941888 | 334941085 |
| 24 | 334941365 | 334941276 | 334941489 | 334942180 |
| 25 | 334941600 | 334942187 | 334941144 | 334941171 |

### Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 334942049 | 334941941 | 334941824 | 334941594 |
| 27 | 334941305 | 334942323 | 334942365 | 334941699 |
| 28 | 334941502 | 334942258 | 334942284 | 334941794 |
| 29 | 334941965 | 334942108 | 334941623 | 334941566 |
| 30 | 334941610 | 334941297 | 334942272 | 334942046 |
| 31 | 334941239 | 334941208 | 334941196 | 334942473 |
| 32 | 334941826 | 334942249 | 334941162 | 334941446 |
| 33 | 334941926 | 334942308 | 334941418 | 334941429 |
| 34 | 334941635 | 334941698 | 334942107 | 334941901 |
| 35 | 334941934 | 334941744 | 334941545 | 334941356 |
| 36 | 334941131 | 334941460 | 334941652 | 334941586 |
| 37 | 334942331 | 334941520 | 334177064 | 334941857 |
| 38 | 334941780 | 334942396 | 334942185 | 334941482 |
| 39 | 334941473 | 334941728 | 334177065 | 334941531 |
| 40 | 334941185 | 334941786 | 334941530 | 334941589 |
| 41 | 334941907 | 334941442 | 334942449 | 334941931 |
| 42 | 334941184 | 334941475 | 334942439 | 334942243 |
| 43 | 334942172 | 334941509 | 334942071 | 334941939 |
| 44 | 334941908 | 334942248 | 334941508 | 334941844 |
| 45 | 334941938 | 334942084 | 334941207 | 334941500 |
| 46 | 334941378 | 334942038 | 334941673 | 334941576 |
| 47 | 334941438 | 334941804 | 334942305 | 334942454 |
| 48 | 334942158 | 334941291 | 334941244 | 334941725 |
| 49 | 334941738 | 334942073 | 334941533 | 334942416 |
| 50 | 334941756 | 334942262 | 334941957 | 334942099 |

### MARM 2007-HF2
### Initial Loan Sample

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 777033550 | 777033987 | 777035364 | 777034486 |
| 2 | 777033643 | 777036571 | 777035498 | 777038333 |
| 3 | 777036506 | 777035065 | 777035530 | 777033097 |
| 4 | 777033012 | 777018975 | 777035615 | 777037235 |
| 5 | 777035556 | 777038898 | 777036292 | 777038397 |
| 6 | 777038954 | 777036880 | 777035833 | 777037251 |
| 7 | 777029262 | 777029970 | 777035800 | 777034586 |
| 8 | 777031605 | 777037021 | 777028061 | 777029567 |
| 9 | 777032672 | 777034450 | 777035832 | 777035296 |
| 10 | 777030460 | 777031802 | 777035448 | 777035683 |
| 11 | 777032944 | 777033657 | 777033623 | 777036307 |
| 12 | 777036947 | 777034853 | 777029313 | 777036345 |
| 13 | 777037476 | 777034042 | 777034151 | 334740617 |
| 14 | 777038421 | 334740625 | 777035385 | 777034374 |
| 15 | 777039212 | 777036013 | 777032837 | 777034573 |
| 16 | 777031171 | 777033465 | 777038820 | 777033299 |
| 17 | 777018227 | 777035640 | 777035673 | 777033401 |
| 18 | 777032974 | 777038110 | 777036850 | 777029353 |
| 19 | 777038629 | 777037081 | 777037228 | 777032935 |
| 20 | 777031389 | 777033832 | 777037827 | 777038440 |
| 21 | 777033276 | 777033332 | 777034913 | 777035948 |
| 22 | 777033180 | 777036043 | 777036872 | 777036956 |
| 23 | 777036812 | 777035779 | 777036918 | 777034345 |
| 24 | 777030881 | 777031997 | 777038097 | 777035821 |
| 25 | 777034538 | 777034110 | 777035649 | 777029962 |

### Supplemental Loan Sample

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 777035274 | 777032178 | 777034614 | 777036297 |
| 27 | 777034433 | 777036282 | 777034809 | 777037518 |
| 28 | 777037477 | 777030996 | 777038431 | 777036940 |
| 29 | 777035811 | 777036637 | 777034290 | 777036227 |
| 30 | 777035290 | 777032447 | 777035213 | 777038602 |
| 31 | 777036766 | 777034398 | 777032619 | 777036322 |
| 32 | 777031901 | 777038003 | 777024243 | 777036601 |
| 33 | 777035188 | 334756522 | 777035536 | 777033095 |
| 34 | 777034647 | 777033827 | 777037349 | 777032387 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 35 | 777037309 | 777033963 | 777034585 | 777034896 |
| 36 | 777036958 | 777037512 | 777030290 | 777035788 |
| 37 | 777035921 | 777034504 | 777034421 | 777036277 |
| 38 | 777035551 | 777027702 | 777030816 | 777036441 |
| 39 | 777035310 | 777030685 | 777033802 | 777038477 |
| 40 | 777035852 | 777035577 | 777037649 | 777033255 |
| 41 | 777036207 | 777035984 | 777036012 | 777037975 |
| 42 | 777036624 | 777031227 | 777037261 | 777033406 |
| 43 | 777033033 | 334756570 | 777034619 | 777034471 |
| 44 | 777020847 | 777036328 | 777035117 | 777036920 |
| 45 | 777033572 | 777032034 | 777034251 | 777037488 |
| 46 | 777035555 | 777034666 | 777036415 | 777037345 |
| 47 | 777035659 | 777035667 | 777033696 | 777036778 |
| 48 | 777034503 | 777032928 | 777034018 | 334756496 |
| 49 | 777035255 | 777035929 | 777036072 | 777035229 |
| 50 | 777038160 | 777033616 | 777034651 | 777039226 |

**MASL 2006-1**
**Initial Loan Sample**

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 1  | 333528981 | 333526332 | 777012932 | 333522880 |
| 2  | 333529184 | 333528846 | 333523122 | 333483417 |
| 3  | 333523220 | 333537805 | 333529163 | 333526725 |
| 4  | 333527220 | 333528779 | 333528727 | 333483062 |
| 5  | 333527457 | 333528412 | 333537183 | 333526743 |
| 6  | 333528749 | 333537815 | 333525974 | 333523351 |
| 7  | 333529199 | 333523739 | 333526558 | 333528136 |
| 8  | 333527042 | 333537354 | 333527702 | 333522995 |
| 9  | 333526819 | 777009404 | 777009373 | 333528397 |
| 10 | 333529028 | 333527481 | 333527581 | 333523126 |
| 11 | 333527572 | 333522809 | 333522788 | 333537184 |
| 12 | 333529029 | 333528111 | 333537629 | 333522869 |
| 13 | 333527244 | 333529213 | 333537807 | 333537567 |
| 14 | 333527023 | 333537365 | 333528378 | 333528408 |
| 15 | 333538015 | 777009406 | 333526945 | 333483347 |
| 16 | 333527924 | 333523688 | 333529023 | 333523296 |
| 17 | 333527969 | 333526547 | 333483154 | 333522961 |
| 18 | 333528344 | 333537339 | 333537189 | 777009216 |
| 19 | 333528116 | 333527869 | 333526069 | 333522938 |

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 20 | 333527615 | 333537827 | 333527373 | 333483244 |
| 21 | 333527695 | 333537117 | 333526620 | 333482943 |
| 22 | 333526645 | 333526820 | 333537703 | 777010565 |
| 23 | 333529038 | 333525969 | 333523138 | 777009872 |
| 24 | 333537276 | 333526939 | 333528471 | 333528160 |
| 25 | 333528859 | 777012033 | 333526590 | 333522693 |

### Supplemental Loan Sample

|    | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|----|---------|---------|---------|---------|
| 26 | 333529097 | 333527768 | 777011773 | 333537463 |
| 27 | 333527851 | 333528597 | 333527532 | 333523083 |
| 28 | 333527927 | 333537914 | 333537935 | 333483386 |
| 29 | 333527523 | 333526709 | 333537195 | 333523618 |
| 30 | 333537013 | 333537243 | 333527422 | 333526436 |
| 31 | 333527079 | 333537912 | 333523286 | 333483415 |
| 32 | 333528873 | 333529083 | 333526574 | 333523301 |
| 33 | 333529156 | 777011955 | 333525938 | 333523009 |
| 34 | 333526288 | 333527724 | 333473615 | 333528532 |
| 35 | 333527206 | 333482538 | 333527870 | 777009270 |
| 36 | 333527980 | 333528706 | 333526872 | 333528146 |
| 37 | 333527031 | 333537834 | 333528452 | 333537831 |
| 38 | 333528389 | 333528416 | 333538050 | 333526896 |
| 39 | 333527772 | 333529226 | 777012180 | 777009350 |
| 40 | 333483410 | 333526007 | 777009370 | 333523481 |
| 41 | 333528521 | 333526010 | 333528566 | 333527900 |
| 42 | 333526493 | 333528495 | 333537453 | 333482717 |
| 43 | 333526789 | 333537287 | 333526632 | 777009916 |
| 44 | 333526829 | 333537129 | 333526678 | 777011898 |
| 45 | 333527450 | 333529045 | 333526849 | 333523586 |
| 46 | 333528355 | 333526666 | 777011609 | 333537894 |
| 47 | 333526681 | 777011231 | 333522973 | 333523221 |
| 48 | 333537197 | 333527964 | 333523740 | 333527188 |
| 49 | 333526573 | 333528361 | 333482908 | 333528696 |
| 50 | 333527341 | 333527871 | 333526930 | 333523484 |

*NCUA v. Wachovia S.D.N.Y. 13-cv-6719*

**WMLT 2006-ALT1**
**Initial Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 1 | 80020846 | 80022012 | 80022831 | 80022113 |
| 2 | 80022809 | 80021679 | 80021504 | 80020962 |
| 3 | 80020888 | 80022073 | 80022763 | 80021094 |
| 4 | 80020931 | 80016299 | 80021127 | 80021108 |
| 5 | 80022521 | 80021725 | 80019187 | 80022104 |
| 6 | 80022197 | 80022471 | 80021310 | 80021875 |
| 7 | 80022499 | 80021418 | 80020880 | 80018185 |
| 8 | 80021156 | 80021205 | 80022569 | 80022030 |
| 9 | 80020872 | 80021423 | 80021081 | 80020892 |
| 10 | 80021706 | 80021522 | 80022000 | 80021271 |
| 11 | 80020944 | 80022835 | 80022193 | 80020851 |
| 12 | 80020836 | 80018202 | 80021055 | 80021691 |
| 13 | 80022788 | 80022791 | 80021918 | 80022845 |
| 14 | 80021416 | 80021341 | 80021101 | 80021726 |
| 15 | 80022457 | 80022692 | 80021208 | 80020999 |
| 16 | 80016063 | 80022749 | 80021069 | 80021486 |
| 17 | 80022571 | 80021436 | 80021417 | 80020973 |
| 18 | 80022656 | 80022846 | 80021808 | 80022171 |
| 19 | 80022579 | 80022694 | 80022879 | 80022530 |
| 20 | 80021993 | 80022799 | 80021674 | 80022506 |
| 21 | 80020821 | 80022855 | 80018452 | 80021311 |
| 22 | 80022684 | 80021580 | 80021383 | 80022729 |
| 23 | 80022528 | 80021554 | 80021019 | 80021461 |
| 24 | 80021345 | 80021203 | 80021419 | 80021170 |
| 25 | 80020792 | 80022563 | 80022618 | 80021882 |

**Supplemental Loan Sample**

|  | Fico Q1 | Fico Q2 | Fico Q3 | Fico Q4 |
|---|---|---|---|---|
| 26 | 80022587 | 80022593 | 80021330 | 80021701 |
| 27 | 80021191 | 80021306 | 80020788 | 80021233 |
| 28 | 80021667 | 80021975 | 80021878 | 80021289 |
| 29 | 80021860 | 80020865 | 80021016 | 80022514 |
| 30 | 80022844 | 80021951 | 80018086 | 80021609 |
| 31 | 80022676 | 80020807 | 80021385 | 80022163 |

|    | Fico Q1  | Fico Q2  | Fico Q3  | Fico Q4  |
|----|----------|----------|----------|----------|
| 32 | 80022789 | 80022169 | 80020830 | 80020848 |
| 33 | 80020771 | 80021879 | 80021587 | 80021537 |
| 34 | 80022689 | 80021892 | 80022164 | 80021089 |
| 35 | 80021542 | 80022660 | 80021982 | 80022121 |
| 36 | 80022566 | 80018096 | 80021076 | 80020945 |
| 37 | 80021803 | 80020808 | 80021440 | 80022712 |
| 38 | 80021840 | 80020964 | 80022125 | 80022109 |
| 39 | 80018524 | 80021731 | 80022830 | 80021767 |
| 40 | 80021241 | 80021164 | 80021534 | 80020979 |
| 41 | 80021136 | 80021192 | 80022479 | 80021457 |
| 42 | 80021052 | 80022188 | 80021702 | 80021623 |
| 43 | 80020914 | 80021518 | 80022186 | 80020896 |
| 44 | 80022508 | 80021480 | 80022737 | 80022634 |
| 45 | 80021812 | 80022714 | 80021884 | 80022537 |
| 46 | 80020902 | 80021979 | 80022105 | 80021473 |
| 47 | 80022659 | 80021576 | 80022598 | 80020869 |
| 48 | 80021802 | 80021364 | 80021117 | 80021347 |
| 49 | 80021014 | 80019113 | 80021850 | 80021426 |
| 50 | 80022005 | 80022036 | 80022152 | 80021713 |

### WMLT 2006-AMN1
### Initial Loan Sample

|    | Fico Q1    | Fico Q2    | Fico Q3    | Fico Q4    |
|----|------------|------------|------------|------------|
| 1  | 206-470231 | 206-109695 | 206-117761 | 206-125712 |
| 2  | 206-060556 | 206-221789 | 206-055641 | 206-150822 |
| 3  | 206-092083 | 206-021739 | 206-087730 | 206-475691 |
| 4  | 206-093365 | 206-097328 | 206-095899 | 206-096330 |
| 5  | 206-088086 | 206-218974 | 206-218150 | 206-190280 |
| 6  | 206-451857 | 206-123531 | 206-427085 | 206-090218 |
| 7  | 206-088493 | 206-165749 | 206-225601 | 206-062630 |
| 8  | 206-175931 | 206-145748 | 206-192215 | 206-247591 |
| 9  | 206-002335 | 206-107684 | 206-146281 | 206-173903 |
| 10 | 206-142536 | 206-089929 | 206-079575 | 206-209240 |
| 11 | 206-019556 | 206-084374 | 206-140690 | 206-434430 |
| 12 | 206-031254 | 206-299851 | 206-248555 | 225-303213 |
| 13 | 206-068875 | 206-357214 | 206-189613 | 206-073119 |
| 14 | 206-114907 | 206-443030 | 206-415109 | 206-165731 |
| 15 | 206-172087 | 206-265166 | 206-213883 | 206-410352 |
| 16 | 206-425198 | 206-143494 | 206-383100 | 206-112998 |

|    | Fico Q1    | Fico Q2    | Fico Q3    | Fico Q4    |
|----|------------|------------|------------|------------|
| 17 | 225-342421 | 206-373694 | 206-164572 | 225-365235 |
| 18 | 206-092245 | 206-088868 | 206-109113 | 206-222611 |
| 19 | 206-354690 | 206-204205 | 206-038241 | 225-327864 |
| 20 | 206-158521 | 206-118821 | 206-180071 | 206-120443 |
| 21 | 206-096739 | 206-039166 | 206-202482 | 206-439598 |
| 22 | 206-112041 | 206-392427 | 206-358351 | 206-127847 |
| 23 | 206-035381 | 206-139209 | 206-081260 | 206-141513 |
| 24 | 206-112408 | 206-288409 | 206-060831 | 206-174748 |
| 25 | 206-415184 | 206-234660 | 206-018002 | 206-115563 |

## Supplemental Loan Sample

|    | Fico Q1    | Fico Q2    | Fico Q3    | Fico Q4    |
|----|------------|------------|------------|------------|
| 26 | 206-156375 | 206-426542 | 206-217781 | 206-190468 |
| 27 | 206-025483 | 206-241585 | 206-102691 | 206-251564 |
| 28 | 206-342349 | 206-146698 | 206-098456 | 206-194986 |
| 29 | 206-127499 | 206-091974 | 206-125534 | 206-119551 |
| 30 | 206-142404 | 206-230052 | 206-222581 | 206-163622 |
| 31 | 206-190671 | 206-264038 | 206-106050 | 206-430469 |
| 32 | 206-169175 | 225-362783 | 206-116977 | 206-414188 |
| 33 | 206-073437 | 206-067861 | 206-118007 | 225-363453 |
| 34 | 206-394781 | 206-200226 | 206-128215 | 206-044020 |
| 35 | 206-465084 | 206-413092 | 206-057288 | 206-129785 |
| 36 | 206-054416 | 206-446012 | 206-353341 | 206-214383 |
| 37 | 206-468512 | 206-371748 | 206-072767 | 206-017006 |
| 38 | 206-200099 | 206-217323 | 206-123086 | 206-110740 |
| 39 | 206-361131 | 206-084927 | 206-087357 | 206-090692 |
| 40 | 206-353286 | 206-062541 | 206-132930 | 206-150032 |
| 41 | 206-102232 | 206-206585 | 206-253346 | 206-462557 |
| 42 | 206-097786 | 225-335301 | 225-333163 | 206-096054 |
| 43 | 206-166788 | 206-031751 | 206-166028 | 206-100213 |
| 44 | 206-018053 | 206-167032 | 206-153074 | 206-067283 |
| 45 | 206-074450 | 206-345241 | 225-276437 | 225-370735 |
| 46 | 206-104278 | 206-436548 | 206-243456 | 206-072708 |
| 47 | 225-354624 | 206-059469 | 206-110375 | 206-092865 |
| 48 | 206-435011 | 206-425970 | 206-179499 | 206-061960 |
| 49 | 206-207913 | 206-115687 | 206-116781 | 206-119861 |
| 50 | 206-231059 | 206-029233 | 206-479018 | 206-066121 |

# EXHIBIT 1

## Exhibit 1: Resume of Charles D. Cowan

Charles D. Cowan is Managing Partner of ANALYTIC FOCUS LLC. Dr. Cowan has 40 years of experience in statistical research and design. He consults for numerous public and private sector entities on the design, implementation, and evaluation of research and the synthesis of statistical and sampling techniques for measurement.

Dr. Cowan has designed some of the largest and most complex research programs conducted by the Federal Government, including the Post Enumeration Program conducted by the Bureau of the Census to evaluate the 1980 Decennial Census, the Economic Cash Recovery valuations conducted by the Resolution Trust Corporation in 1990-95, and many evaluation studies conducted for the Justice Department, the Department of Defense, the Department of Housing and Urban Development, and the Treasury Department. He has provided expert advice to corporations and government agencies on the incorporation of complex research designs in demographic and economic measurement problems, including:

- Development of procedures used by the Resolution Trust Corporation and the FDIC for determination of the value of all assets held by the RTC\FDIC taken from failed banks and S&Ls. Results from this research were used in quarterly reports to Congress on the loss to the American taxpayer that resulted from these failures. These estimates of anticipated recoveries on assets were also used by the RTC and FDIC for financial reporting, leading these agencies to their first clean opinions from the GAO in their annual review of agency financial statements.

- Establishment of audit and sampling methods to determine the completeness and reliability of reporting and record systems. These procedures were used to both expand and streamline bank examinations for safety and soundness and also compliance measurement for the FDIC. These sampling techniques are applied in the audit of Federal agencies concerned with regulatory review of operations and systems, and related systems for banks, regulatory agencies, and law firms;

- Application of econometric and biometric procedures for measurement of credit risk in large portfolios of loans. These models are frequently used for a variety of purposes within financial institutions, such as the pricing of loans, the management of customers long term, decision making on workouts for delinquent loans, and for establishment of economic and regulatory reserves.

- Evaluation of research conducted for the Department of Defense, for the National Institutes of Health, and for the Department of Agriculture, each in response to Congressional inquiries on the validity of published results.

- Model fitting and development of projection methods to measure the likelihood of loss or errors in recording in loans held by banks or put up for auction; measurement of the likelihood of fraud and/or noncompliance in systems, including bank holding companies,

1

trading activities for brokers, and systems for compliance with health department and judicial requirements;

- Incorporation of population demographic models with financial assessment models to predict risk for insurance companies and corporations in terms of number and value of potential claims in mass tort litigation.

- Development of procedures used by the Bureau of the Census for apportionment of population for revenue sharing purposes and the estimation of the undercount in the Decennial Census of Population and Housing.  These procedures include application of capture-recapture methods to measure the size of the undercount in the decennial census, use of network sampling  as an alternative measure for population size, and measurement of the reliability of data collected in the Census.

- Development of statistical methods to quantify the size of populations, including nomadic populations for the Census of Somalia, the undercount and overcount in the Census of Egypt, the number of missing children in Chicago, IL, and the number of homeless persons and families needing services in several large cities with transient populations.

Dr. Cowan teaches graduate and undergraduate courses in survey methods, statistics, and computer methods for analysis.  He is the co-author of two books, one on evaluation of survey and census methods and one on econometric measures related to the welfare of the U.S. economy.  He has written numerous articles on statistical methods, sampling, rare and elusive population research, and optimization techniques.

Prior to cofounding ANALYTIC FOCUS LLC, Dr. Cowan was a Director with ARPC and with Price Waterhouse, where he specialized in financial research, survey research, and audit sampling. From 1991 to 1996, Dr. Cowan was the Chief Statistician for the Resolution Trust Corporation and the Federal Deposit Insurance Corporation, where he designed research necessary to measure the loss from the Savings & Loan Crisis of the late 1980's and capitalization requirements for the RTC funds from the U.S. Treasury.  Dr. Cowan also served as the Chief Statistician for the U.S. Department of Education, where he designed large-scale surveys of educational institutions to measure resource needs and availability, and for Opinion Research Corporation, where he designed predictive models of demand for automobile manufacturers, banks, and large horizontally diverse firms like GE and AT&T.  Dr. Cowan worked for the U.S. Bureau of the Census, where he was the Chief of the Survey Design Branch and developed many of the techniques in use today for the evaluation of coverage in surveys and censuses.

**Education**
Ph.D., Mathematical Statistics, The George Washington University, 1984
M.A., Economics, The University of Michigan, 1973
B.A., English and B.A., Economics, The University of Michigan, 1972

**Professional Experience**
Co-Founder, ANALYTIC FOCUS LLC, January 2002 to present.
Director, ARPC, November, 1999 to December, 2001.
Director, PricewaterhouseCoopers LLP, January 1997 to November, 1999.
Chief Statistician, Federal Deposit Insurance Corporation / RTC, 1991 to 1996.
Chief Statistician, Opinion Research Corporation, 1989 to 1991.
Chief Statistician, National Center for Education Statistics, US Dept. of Education, 1986 to 1989.
Bureau of the Census: Assistant Division Chief, International Statistical Programs Center, 1984 to 1986; Staff Liaison for Statistical Litigation Support, 1983 to 1984; Chief, Survey Design Branch, Statistical Methods Division, 1978 to 1983; Acting Chief, Survey Analysis and Evaluation Branch, Demographic Surveys Division, 1976 to 1978; Office of the Chief, Statistical Research Division, 1975 to 1976
Survey Research Center, Oregon State University: Manager, 1974 to 1975
Institute for Social Research, U. of New York: Assistant Study Director, 1972 to 1974.

**Professional Associations**
Adjunct Full Professor, Statistics, University of Alabama – Birmingham, 2002-present.
Associate Professor, Statistics, George Washington University, 1993 - 1998.
Visiting Research Professor, Survey Research Laboratory, U. of Illinois, 1983 - 1989.
Consultant, Dept. of Community Psychiatry, Johns Hopkins U., July 1985 - Dec 1987.

**Professional Societies – Memberships**
American Statistical Association  (ASA)
American Association for Public Opinion Research (AAPOR)
International Association of Assessment Officers

**Professional Societies - Positions**
President, Research Industry Coalition, 1999-2000
Council Member, Research Industry Coalition, Representative from ASA, 1995-2000
President, Washington/Baltimore Chapter of AAPOR, 1998
Program Chair, American Association for Public Opinion Research, 1991-2
Program Chair, Section on Survey Research Methods, ASA, 1989-90
Secretary-Treasurer, AAPOR, 1985-1986
Associate Secretary-Treasurer, AAPOR, 1984-1985
Editorial Board, Public Opinion Quarterly, 1980-1984
Editorial Board, Marketing Research, 1989-2000
Chair, Conference Committee, AAPOR, 1982-1989
Chair, Committee on Privacy and Confidentiality, ASA, 1980-1981

**Publications**

Strumpel, Burkhard; Cowan, Charles; Juster, F. Thomas; and Schmiedeskamp, Jay; editors, Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor:  The Institute for Social Research, 1975.

Duncan, Greg, and Cowan, Charles D., "Labor Market Discrimination and Nonpecuniary Work Rewards" in Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor:  The Institute for Social Research, 1975.

Curtin, Richard T. and Cowan, Charles D. "Public Attitudes Toward Fiscal Progress" in Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor:  The Institute for Social Research, 1975.

Cowan, Charles D., and Spoeri, Randall K., "Statistical Distance Measures and Test Site Selection:  Some Considerations", Proceedings of the Computer Science and Statistics:  Eleventh Annual Symposium on the Interface, 1978.

Bushery, John R., Cowan, Charles D., and Murphy, Linda R., "Experiments in Telephone-Personal Visit Surveys", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1978.

Spoeri, Randall K., and Cowan, Charles D., "On the Use of Distance Measures in Test Site Selection:  A Practical Application Using Census Data", Proceedings of the American Statistical Association, Section on Business and Economic Statistics, 1978.

Hogan, Howard, and Cowan, Charles D., "Imputations, Response Errors, and Matching in Dual System Estimation", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980.

Schwartz, Sidney H., Cowan, Charles D., and Sausman, Kenneth R., "Optimization in the Design of a Large-Scale State Sample", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980.

Cowan, Charles D., "Modifications to Capture-Recapture Estimation in the Presence of Errors in the Data" presented at the meetings of the American Statistical Association, Biometrics Section, 1982 (no proceedings).

Cowan, Charles D. "Interviews and Interviewing", The Social Science Encyclopedia, Routledge and Kegan Paul, Publishers, The Netherlands, 1984.

Wei, L. J. and Cowan, Charles D. "Selection Bias", Encyclopedia of Statistical Science, John Wiley and Sons, New York, N.Y., 1984.

Cowan, Charles D. and Malec, Donald J. "Capture-Recapture Models When Both Sources Have Clustered Observations", Journal of the American Statistical Association, June 1986, Vol. 81,

# 394, pp. 347-353, and Proceedings of the American Statistical Association, Section on Survey Research Methods, 1984.

Cowan, Charles D. The Effects of Misclassification on Estimates from Capture-Recapture Studies.  Unpublished doctoral dissertation, The George Washington University, September 1984.

Cowan, Charles D. "Misclassification of Categorical Data", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1985.

Cowan, Charles D., Biemer, Paul P., Magnani, Robert J., and Turner, Anthony G., Evaluating Censuses of Population and Housing, Statistical Training Document, ISP-TR-5, U.S. Department of Commerce, Bureau of the Census, 1985.

Cowan, Charles D., Turner, Anthony G., and Stanecki, Karen "Design of the Somali Post Enumeration Survey (1986-1987)", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986.

Cowan, Charles D. and Malec, Donald J. "Sample Allocation for a Multistage, Multilevel, Multivariate Survey", Proceedings of the Fourth Annual Research Conference (ARC IV), U.S. Bureau of the Census, 1988.

Frey, Carolin M., McMillen, Marilyn M., Cowan, Charles D., Horm, John W., and Kessler, Larry G..  "Representativeness of the Surveillance, Epidemiology, and End Results Program Data:  Recent Trends in Mortality Rates", Journal of the National Cancer Institute, Vol. 84, No. 11, June 3, 1992.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless, A Review" in Homelessness, Health, and Human Needs.  Institute of Medicine, National Academy Press, National Academy of Sciences, Washington, D.C., 1988.

Cowan, Charles D., "Standards for Statistical Surveys in the Federal Government:  Practices in the Center for Education Statistics", Proceedings of the American Statistical Association, Section on Survey Methods Research, 1988.

Sudman, Seymour, Sirken, Monroe G., and Cowan, Charles D., "Sampling Rare and Elusive Populations", Science, Vol. 240, pp. 991-996, May 20, 1988.

Cowan, Charles D., "Mall Intercepts and Clinical Trials:  The Philosophy of Inference from Different Types of Research Designs" in Marketing Research: A Magazine of Management & Applications, Vol. 1, No. 1, March 1989.

Cowan, Charles D., "Mall Intercepts:  Principles of Design for Research" in <u>Proceedings of the Seventh Annual Advertising Research Foundation Research Quality Workshop</u>, September, 1989.

Cowan, Charles D., "Estimating Census and Survey Undercounts Through Multiple Service Contacts" in <u>Housing Policy Debate:  Counting the Homeless: The Methodologies, Policies, and Social Significance Behind the Numbers</u>, Volume 2, Issue 3, pp. 869-882, 1991.

Cowan, Charles D., "Ratio vs. Regression Estimators in a Large Scale Survey of S&L's" in <u>Proceedings of the Section on Survey Research Methods, American Statistical Association, 1992.</u>

Cowan, Charles D., "A Longitudinal Survey and Reality Check for the Value of Financial Assets" in <u>Proceedings of Statistics Canada Symposium 92: Design and Analysis of Longitudinal Surveys</u>, November 1992.

Cowan, Charles D., and Wittes, Janet, "Intercept Studies, Clinical Trials, and Cluster Experiments: To Whom Can We Extrapolate?" in <u>Controlled Clinical Trials</u>, Vol.15, pp.24-29, 1994.

Cowan, Charles D., and Klena, Matthew K. "Use of the EM Algorithm for Allocation of Proceeds from Auctions and Bulk Sales" in <u>Proceedings of the Section on Business and Economic Statistics, American Statistical Association</u>, 1995.

Cowan, Charles D., "Coverage, Sample Design, and Weighting in Three Federal Surveys" in <u>Journal of Drug Issues</u>, October, 2001.

Cowan, Charles D.,  "Use of Mass Appraisals in Toxic Tort Litigation Involving Loss of Value" in <u>Proceedings of the International Association of Assessment Officers</u>, October, 2002.

Cowan, Adrian M. and Cowan, Charles D., "Default Correlation:  An Empirical Investigation of a Subprime Lender", <u>The Journal of Banking and Finance</u>, March 2004.

Cowan, Charles D. and Cowan, Adrian M.,  "A Survey Based Assessment of Financial Institution Use of Credit Scoring for Small Business Lending", <u>SBA Report 283</u>, Nov. 2006

Keith, Scott W. , Wang, Chenxi, Fontaine, Kevin R. , Cowan, Charles D.  and Allison, David B. , "Body Mass Index and Headache Among Women: Results From 11 Epidemiologic Datasets", <u>Obesity</u>, Volume 16, Issue 2 (February 2008) 16: 377-383; doi:10.1038/oby.2007.32

Cowan, Adrian M. and Cowan, Charles D., "The Dynamics of Credit Quality and Implications for the Pricing of Small Business Loans", <u>The International Journal of Banking and Finance</u>, 2007/08  (March) Vol. 5. Number 2:2008: 31-60

Brock, David W., Thomas, Olivia, Cowan, Charles D., Hunter, Gary R., Gaesser, Glenn A., and Allison, David B., Association between Physical Inactivity and Prevalence of Obesity in the United States, <u>Journal of Physical Activity and Health</u>, January, 2009

# EXHIBIT 2

Past Testimony, Charles D. Cowan

**Financial:**

MBIA v. Countrywide Home Loan et al. Hearing on motion *in limine* in NY State Court, Worked for plaintiff, September 2010.  Deposed July 2012.

In re: Countrywide Financial Corp. Mortgage Marketing and Sales Practices Litigation, Class Action. Worked for plaintiffs.  Deposed in May 2011.

Charles P. Haggarty and Gina M. Haggarty, et al v. Wells Fargo Bank, N.A.. Worked for plaintiffs.  Deposed in August 2012.

Dexia v. J. P. Morgan.  Worked for plaintiffs.  Deposed in February 2013.

Lucarelli Pizza and Deli et al v. Teco Energy, Peoples Gas System, and Posen Construction. Business Interruption case. Worked for the defendant. Deposition in January 2013; class certification hearing in January 2013.

AIG v. Bank of New York - Mellon. Worked for plaintiffs.  Deposed in May 2013, testimony at hearing in September 2013.

Mass Mutual v. numerous Underwriters of RMBS - 15 combined actions. Worked for plaintiffs. Deposed in May 2013, testimony at hearings, October 2013.

United States of America v. Bank of America, Countrywide, et al. Worked for the plaintiff. Deposed in June 2013, testimony in September 2013.

CUNA Mutual v. RBS Securities.  Worked for plaintiffs.  Deposed in January 2014.

Western Southern Life Insurance Company v. DLJ Mortgage Capital et al. Worked for plaintiffs. Deposed in March 2014.


**Construction Defects:**

in re WIRSBO Fitting Litigation. Worked for the plaintiffs.  Hearing, February 2012.

Bongalos v. D.R. Horton, Rancho Cordova, California.   Worked for Defense.   Deposition, January 2013.

Turnberry Towers East Unit-Owners Association v. Turnberry Towers L.P. et al., Worked for defense.  Deposition, July 2013.

Horizon v. Shapell. Worked for defense.  Deposition, September 2013.

Newport Lofts Homeowners Association v. Newport Lofts et al, Worked for defense. Deposition, September 2013.

Laurelwood v. Shapell. Worked for defense.  Deposition, December 2013.

**Fair Labor Standards Act (FLSA):**
Richter v. Dolgencorp et al.  Worked for defendant.  Deposition, Jan 2012.

**Disparate Impact \ Discrimination:**
Webb Bridge LLC v. City of Alpharetta et al. Worked for defendant.   Deposition, November 2013.

**Toxic Tort:**
Bawtinhimer v. D.R. Horton, Inc. Worked for the defense. Deposed, February 2013.

**Other cases:**
Avery vs. Southern Company. Worked for the plaintiff.  Deposition in April 2011.

Ultra Enterprises v. Ultra Records. Trademark infringement. Worked for plaintiff.
Deposition, July 2012.

Special Education Students in New Orleans v. State Superintendant of Education. Worked for the plaintiffs.  Deposition in July 2013.

Packgen v. Berry Plastics Corporation and Covalence Specialty Coatings, LLC. Worked for the defendants.  Testified at hearing in February 2014.

# EXHIBIT 3

**Documents Relied Upon**

1.  NCUA-BCI-NY00000003

2.  NCUA-BCI-NY00000004

3.  NCUA-BCI-NY00000005

4.  NCUA-BCI-NY00000006

5.  NCUA-BCI-NY00000007

6.  NCUA-BCI-NY000000001

7.  NCUA-BCI-NY00000008

8.  NCUA-BCI-NY000000002

9.  NCUA-BCI-NY00000009

10. CSNCUANY000000973

11. CSNCUANY000000213

12. CSNCUANY000000186

13. CSNCUANY000000185

14. CSNCUANY000001150

15. CSNCUANY000001164

16. CSNCUANY000001174

17. CSNCUANY000000208

18. CSNCUANY000001153

19. CSNCUANY000000205

20. CSNCUANY000000189

21. CSNCUANY000000117

22. CSNCUANY000000229

23. CSNCUANY000000537

24.          GS NCUA SW 000000002

25.          GS NCUA SW 000000021

26.          http://www.sec.gov/Archives/edgar/data/1119605/000127727706000530/fwploantape_lb20067.htm

27.          MS_NCUA_NY_000000008

28.          MS_NCUA_NY_000000008

29.          MS_NCUA_NY_000000001

30.          MS_NCUA_NY_000000002

31.          MS_NCUA_NY_000000003

32.          MS_NCUA_NY_000000004

33.          MS_NCUA_NY_000000005

34.          MS NCUA NY 000000006

35.          MS_NCUA_NY_000000007

36.          MS_NCUA_NY_000000009

37.          MS_NCUA_NY_000000010

38.          MS_NCUA_NY_000000011

39.          MS_NCUA_NY_000000012

40.          MS_NCUA_NY_000000016

41.          MS_NCUA_NY_000000017

42.          MS_NCUA_NY_000000042

43.          MS_NCUA_NY_000000013

44.          MS_NCUA_NY_000000014

45.          MS_NCUA_NY_000000015

46.          MS_NCUA_NY_000000022

47.	MS_NCUA_NY_000000043

48.	MS_NCUA_NY_000000020

49.	MS_NCUA_NY_000000044

50.	MS_NCUA_NY_000000023

51.	MS_NCUA_NY_000000024

52.	MS_NCUA_NY_000000025

53.	HVMLT 2006-10 (Schedule) RBS-NCUALA-00000026_CONFIDENTIAL

54.	HVMLT 2007-1 (Schedule) RBS-NCUALA-00000022_CONFIDENTIAL

55.	HVMLT 2007-2 (Schedule) RBS-NCUALA-00000023_CONFIDENTIAL

56.	RBS-NCUANY0000009

57.	RBS-NCUANY0000011

58.	RBS-NCUANY0000004

59.	RBS-NCUANY0000005

60.	RBS-NCUANY0000003

61.	RBS-NCUANY0000467

62.	MortgageIT 2006-1 (Schedule) RBS-NCUALA-00000017_CONFIDENTIAL

63.	NAA 2006-AR4 (Schedule) RBS-NCUALA-00000018_CONFIDENTIAL

64.	NHELI 2007-1 (Schedule) RBS-NCUALA-00000036_CONFIDENTIAL

65.	RBS-NCUANY0000008

66.	RBS-NCUANY0000007

67.	UBS_SDNY0000000319

68.	UBS_SDNY0000000322

69.	UBS/SDNY0000000005

70.	UBS/SDNY0000000006

71.        UBS/SDNY0000000007

72.        UBS_SDNY0000000320

73.        UBS/SDNY0000000007

74.        UBS_SDNY0000000320

75.        UBS/SDNY0000000008

76.        UBS_SDNY0000000318

77.        UBS_SDNY0000000321

78.        UBS_SDNY0000000314

79.        UBS_SDNY0000000315

80.        UBS_SDNY0000000317

81.        UBS/SDNY0000000012

82.        UBS_SDNY0000000316

83.        UBS/SDNY0000000001

84.        UBS/SDNY0000000013

85.        UBS/SDNY0000000014

86.        UBS/SDNY0000000015

87.        UBS/SDNY0000000016

88.        WCM-NCUA-SDNY000000083--WMLT_2006-ALT1_Prosupp_Tape—
           CONFIDENTIAL

89.        WMC-NCUA-SDNY000000084--WMLT 2006-AMN1—CONFIDENTIAL

90.        Complaint (D.E. 1), dated September 23, 2013, *National Credit Union Administration v. Barclays Capital, Inc.*, No. 13-6727 (S.D.N.Y.)

91.        Complaint (D.E. 1), dated September 23, 2013, *National Credit Union Administration v. Credit Suisse Securities (USA) LLC, et al.*, No. 13-6736 (S.D.N.Y.)

92.        Complaint (D.E. 1), dated September 23, 2013, *National Credit Union Administration v. Goldman, Sachs & Co.*, No. 13-6721 (S.D.N.Y.)

93.  Complaint (D.E. 1), dated September 23, 2013, *National Credit Union Administration v. Morgan Stanley & Co., Inc., et al.*, No. 13-6705 (S.D.N.Y.)

94.  Complaint (D.E. 1), dated September 23, 2013, *National Credit Union Administration v. RBS Securities., Inc., et al.*, No. 13-6726 (S.D.N.Y.)

95.  Complaint (D.E. 1), dated September 23, 2013, *National Credit Union Administration v. UBS Securities., LLC*, No. 13-6731 (S.D.N.Y.)

96.  Complaint (D.E. 1), dated September 23, 2013, *National Credit Union Administration v. Wachovia Capital Markets, LLC*, No. 13-6719 (S.D.N.Y.)

97.  Prospectus Supplement Dated February 26, 2007 (To Prospectus Dated February 22, 2007), Mortgage Pass-Through Certificates, Series 2007-AA1, BCAP LLC Trust 2007-AA1

98.  Prospectus Supplement Dated March 28, 2007 (To Prospectus Dated March 14, 2007), Mortgage Pass-Through Certificates, Series 2007-AA2, BCAP LLC Trust 2007-AA2

99.  Prospectus Supplement Dated May 30, 2007 (To Prospectus Dated February 22, 2007), Mortgage Pass-Through Certificates, Series 2007-AA3, BCAP LLC Trust 2007-AA3

100. Prospectus Supplement Dated July 18, 2007 (To Prospectus Dated March 14, 2007), Mortgage Pass-Through Certificates, Series 2007-AB1, BCAPB LLC Trust 2007-AB1

101. Prospectus Supplement Dated August 30, 2006 (To Prospectus Dated July 11, 2006), Mortgage-Backed Certificates, Series 2006-C, Fremont Home Loan Trust 2006-C

102. Prospectus Supplement Dated September 26, 2006 (To Prospectus Dated August 15, 2006), Mortgage Pass-Through Certificates, Series 2006-HE2, Securitized Asset Backed Receivables LLC Trust 2006-HE2

103. Prospectus Supplement Dated December 18, 2006 (To Prospectus Dated December 18, 2006), Home Equity Asset-Backed Certificates, Series 2006-3, Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust

104. Prospectus Supplement Dated March 28, 2007 (To Prospectus Dated March 23, 2007), Home Equity Asset-Backed Certificates, Series 2007-1, Wells Fargo Home Equity Asset-Backed Securities 2007-1 Trust

105. Prospectus Supplement Dated July 28, 2006 (To Prospectus Dated June 28, 2006), Adjustable Rate Mortgage-Backed Pass-Through Certificates Series, 2006-3, Adjustable Rate Mortgage Trust 2006-3

106.    Prospectus Supplement Dated February 28, 2007 (To Prospectus Dated February 28, 2007), Adjustable Rate Mortgage-Backed Pass-Through Certificates, Series 2007-1, Adjustable Rate Mortgage Trust 2007-1

107.    Prospectus Supplement Dated May 30, 2007 (To Prospectus Dated April 20, 2007), Adjustable Rate Mortgage-Backed Pass-Through Certificates, Series 2007-2, Adjustable Rate Mortgage Trust 2007-2

108.    Prospectus Supplement Dated July 28, 2006 (To Prospectus Dated June 28, 2006), Home Equity Pass-Through Certificates, Series 2006-6, Home Equity Asset Trust 2006-6

109.    Prospectus Supplement Dated April 26, 2006 (To Prospectus Dated April 5, 2006), Asset-Backed Notes, Series 2006-6, Home Equity Mortgage Trust 2006-2

110.    Prospectus Supplement Dated April 27, 2007 (To Prospectus Dated April 20, 2007), Home Equity Mortgage Pass-Through Certificates, Series 2007-2, Home Equity Mortgage Trust 2007-2

111.    Prospectus Supplement Dated January 30, 2006 (To Prospectus Dated February 10, 2004), Asset-Backed Certificates, Series 2006-1, Long Beach Mortgage Loan Trust 2006-1

112.    Prospectus Supplement Dated July 21, 2006 (To Prospectus Dated July 21, 2006), Asset-Backed Certificates, Series 2006-6, Long Beach Mortgage Loan Trust 2006-6

113.    Prospectus Supplement Dated October 26, 2006 (To Prospectus Dated October 26, 2006), Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA9, RALI Series 2006-QA9 Trust

114.    Prospectus Supplement Dated February 22, 2007 (To Prospectus Dated February 13, 2007), Asset-Backed Certificates, Series 2007-3, GSAA Home Equity Trust 2007-3

115.    Prospectus Supplement Dated April 27, 2007 (To Prospectus Dated February 13, 2007), Asset-Backed Certificates, Series 2007-5, GSAA Home Equity Trust 2007-5

116.    Prospectus Supplement Dated August 24, 2006 (To Prospectus Dated July 21, 2006), Asset-Backed Certificates, Series 2006-7, Long Beach Mortgage Loan Trust 2006-7

117.    Prospectus Supplement Dated April 24, 2006 (To Prospectus Dated March 27, 2006), Mortgage Pass-Through Certificates, Series 2006-HE2, Morgan Stanley Capital I Inc. Trust 2006-HE2

118.  Prospectus Supplement Dated June 20, 2006 (To Prospectus Dated March 14, 2006), Mortgage Pass-Through Certificates, Series 2006-HE4, Morgan Stanley ABS Capital I Inc. Trust 2006-HE4

119.  Prospectus Supplement Dated September 21, 2006 (To Prospectus Dated September 21, 2006), Mortgage Pass-Through Certificates, Series 2006-HE6, Morgan Stanley ABS Capital I Inc. Trust 2006-HE6

120.  Prospectus Supplement Dated November 21, 2006 (To Prospectus Dated September 21, 2006), Mortgage Pass-Through Certificates, Series 2006-HE8, Morgan Stanley ABS Capital I Inc. Trust 2006-HE8

121.  Prospectus Supplement Dated May 19, 2006 (To Prospectus Dated March 14, 2006), Mortgage Pass-Through Certificates, Series 2006-NC4, Morgan Stanley ABS Capital I Inc. Trust 2006-NC4

122.  Prospectus Supplement Dated May 25, 2006 (To Prospectus Dated March 14, 2006), Mortgage Pass-Through Certificates, Series 2006-WMC2, Morgan Stanley ABS Capital I Inc. Trust 2006-WMC2

123.  Prospectus Supplement Dated March 28, 2007 (To Prospectus Dated February 22, 2007), Mortgage Pass-Through Certificates, Series 2007-HE4, Morgan Stanley ABS Capital I Inc. Trust 2007-HE4

124.  Prospectus Supplement Dated April 24, 2007 (To Prospectus Dated February 22, 2007), Mortgage Pass-Through Certificates, Series 2007-HE5, Morgan Stanley ABS Capital I Inc. Trust 2007-HE5

125.  Prospectus Supplement Dated January 24, 2006 (To Prospectus Dated May 10, 2005), Mortgage Pass-Through Certificates, Series 2006-1, Morgan Stanley Home Equity Loan Trust 2006-1

126.  Prospectus Supplement Dated April 2, 2007 (To Prospectus Dated February 22, 2007), Mortgage Pass-Through Certificates, Series 2007-2, Morgan Stanley Home Equity Loan Trust 2007-2

127.  Prospectus Supplement Dated June 27, 2006 (To Prospectus Dated March 14, 2006), Mortgage Pass-Through Certificates, Series 2006-1, Morgan Stanley IXIS Real Estate Capital Trust 2006-1

128.  Prospectus Supplement Dated December 22, 2005 (To Prospectus Dated July 27, 2005), Mortgage Pass-Through Certificates, Series 2005-11AR, Morgan Stanley Mortgage Loan Trust 2005-11AR

129.  Prospectus Supplement Dated February 24, 2006 (To Prospectus Dated July 27, 2005), Mortgage Pass-Through Certificates, Series 2006-3AR, Morgan Stanley Mortgage Loan Trust 2006-3AR

7

130.   Prospectus Supplement Dated May 25, 2006 (To Prospectus Dated March 14, 2006), Mortgage Pass-Through Certificates, Series 2006-8AR, Morgan Stanley Mortgage Loan Trust 2006-8AR

131.   Prospectus Supplement Dated July 26, 2006 (To Prospectus Dated March 14, 2006), Mortgage Pass-Through Certificates, Series 2006-9AR, Morgan Stanley Mortgage Loan Trust 2006-9AR

132.   Prospectus Supplement Dated July 20, 2006 (To Prospectus Dated March 14, 2006), Mortgage Pass-Through Certificates, Series 2006-10SL, Morgan Stanley Mortgage Loan Trust 2006-10SL

133.   Prospectus Supplement Dated September 26, 2006 (To Prospectus Dated March 14, 2006), Mortgage Pass-Through Certificates, Series 2006-13ARX, Morgan Stanley Mortgage Loan Trust 2006-13ARX

134.   Prospectus Supplement Dated October 26, 2006 (To Prospectus Dated March 14, 2006), Mortgage Pass-Through Certificates, Series 2006-16AX, Morgan Stanley Mortgage Loan Trust 2006-16AX

135.   Prospectus Supplement Dated January 24, 2007 (To Prospectus Dated December 1, 2006), Mortgage Pass-Through Certificates, Series 2007-2AX, Morgan Stanley Mortgage Loan Trust 2007-2AX

136.   Prospectus Supplement Dated February 27, 2007 (To Prospectus Dated December 1, 2006), Mortgage Pass-Through Certificates, Series 2007-4SL, Morgan Stanley Mortgage Loan Trust 2007-4SL

137.   Prospectus Supplement Dated February 26, 2007 (To Prospectus Dated December 1, 2006), Mortgage Pass-Through Certificates, Series 2007-5AX, Morgan Stanley Mortgage Loan Trust 2007-5AX

138.   Prospectus Supplement Dated June 26, 2007 (To Prospectus Dated December 1, 2006), Mortgage Pass-Through Certificates, Series 2007-11AR, Morgan Stanley Mortgage Loan Trust 2007-11AR

139.   Prospectus Supplement Dated April 25, 2007 (To Prospectus Dated February 22, 2007), Mortgage Pass-Through Certificates, Series 2007-HE2, Natixis Real Estate Capital Trust 2007-HE2

140.   Prospectus Supplement Dated June 29, 2006 (To Prospectus Dated March 3, 2006), Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QA5, RALI Series 2006-QA5 Trust

141.   Prospectus Supplement Dated April 25, 2007 (To Prospectus Dated April 26, 2006), Mortgage Loan Asset Backed Certificates, Series 2007-2, Saxon Asset Securities Trust 2007-2

142.      Prospectus Supplement Dated November 28, 2006 (To Prospectus Dated November 2, 2006), GMACM Home Equity Loan-Backed Term Notes, Series 2006-HE5, GMACM Home Equity Loan Trust 2006-HE5

143.      Prospectus Supplement Dated November 10, 2006 (To Prospectus Dated August 10, 2006), Mortgage Loan Pass-Through Certificates, Series 2006-10, HarborView Mortgage Loan Trust

144.      Prospectus Supplement Dated March 7, 2007 (To Prospectus Dated January 30, 2007), Mortgage Loan Pass-Through Certificates, Series 2007-1, HarborView Mortgage Loan Trust

145.      Prospectus Supplement Dated March 29, 2007 (To Prospectus Dated March 26, 2007), Mortgage Loan Pass-Through Certificates, Series 2007-2, HarborView Mortgage Loan Trust

146.      Prospectus Supplement Dated April 26, 2007 (To Prospectus Dated March 26, 2007), Mortgage Loan Pass-Through Certificates, Series 2007-3, HarborView Mortgage Loan Trust

147.      Prospectus Supplement Dated April 27, 2006 (To Prospectus Dated April 25, 2006), Mortgage Pass-Through Certificates, Series 2006-AR6, IndyMac Indx Mortgage Loan Trust 2006-AR6

148.      Prospectus Supplement Dated February 28, 2006 (To Prospectus Dated February 10, 2004), Asset-Backed Certificates, Series 2006-2, Long Beach Mortgage Loan Trust 2006-2

149.      Prospectus Supplement Dated September 15, 2006 (To Prospectus Dated July 21, 2006), Asset-Backed Certificates, Series 2006-8, Long Beach Mortgage Loan Trust 2006-8

150.      Prospectus Supplement Dated February 17, 2006 (To Prospectus Dated September 26, 2005), Mortgage Loan Pass-Through Certificates, Series 2006-1, MortgageIT Mortgage Loan Trust

151.      Prospectus Supplement Dated November 29, 2006 (To Prospectus Dated November 17, 2006), Alternative Loan Trust, Series 2006-AR4, Mortgage Pass-Through Certificates, Series 2006-AR4

152.      Prospectus Supplement Dated January 29, 2007 (To Prospectus Dated April 18, 2006), Asset-Backed Certificates, Series 2007-1, Home Equity Loan Trust, Series 2007-1

153.      Prospectus Supplement Dated March 2, 2007 (To Prospectus Dated February 28, 2007), Asset-Backed Certificates, Series 2007-2, Option One Mortgage Loan Trust 2007-2

154. Prospectus Supplement Dated October 26, 2006 (To Prospectus Dated August 10, 2006), Asset-Backed Certificates, Series 2006-WF1, Soundview Home Loan Trust 2006-WF1

155. Prospectus Supplement Dated March 15, 2006 (To Prospectus Dated April 15, 2005), Asset-Backed Pass-Through Certificates, Series 2006-W3, Argent Securities Trust 2006-W3

156. Prospectus Supplement Dated March 27, 2006 (To Prospectus Dated March 31, 2006), Mortgage Pass-Through Certificates, Series 2006-OA3, Alternative Loan Trust 2006-OA3

157. Prospectus Supplement Dated May 30, 2006 (To Prospectus Dated March 27, 2006), Mortgage Pass-Through Certificates, Series 2006-OA8, CountryWide Home Loan Trust 2006-OA3

158. Prospectus Supplement Dated February 28, 2006 (To Prospectus Dated January 25, 2006), Mortgage Pass-Through Certificates, Series 2006-OA5, CHL Wide Mortgage Pass-Through Trust 2006-OA5

159. Prospectus Supplement Dated August 3, 2006 (To Prospectus Dated July 11, 2006), Mortgage-Backed Certificates, Series 2006-B, Fremont Home Loan Trust 2006-B

160. Prospectus Supplement Dated March 12, 2007 (To Prospectus Dated December 11, 2006), Home Equity Mortgage Loan Assest-Backed Trust, Series INABS 2007-A

161. Prospectus Supplement Dated December 6, 2006 (To Prospectus Dated November 17, 2006), Home Equity Mortgage Loan Assest-Backed Trust, Series INDS 2006-3

162. Prospectus Supplement Dated February 13, 2007 (To Prospectus Dated December 11, 2006), Home Equity Mortgage Loan Assest-Backed Trust, Series INDS 2007-1

163. Prospectus Supplement Dated March 21, 2007 (To Prospectus Dated December 11, 2006), Home Equity Mortgage Loan Assest-Backed Trust, Series INDS 2007-2

164. Prospectus Supplement Dated June 8, 2006 (To Prospectus Dated April 18, 2006), Mortgage Pass Through Certificates, Series 2006-HE2, MASTR Asset Backed Securities Trust 2006-HE2

165. Prospectus Supplement Dated March 24, 2006 (To Prospectus Dated June 2, 2005), Mortgage Pass Through Certificates, Series 2006-WMC1, MASTR Asset Backed Securities Trust 2006-WMC1

166. Prospectus Supplement Dated November 3, 2006 (To Prospectus Dated October 17, 2006), Mortgage Pass Through Certificates, Series 2006-WMC4, MASTR Asset Backed Securities Trust 2006-WMC4

167.    Prospectus Supplement Dated February 23, 2006 (To Prospectus Dated June 2, 2005), Mortgage Pass-Through Certificates, Series 2006-1, MASTR Second Lien Trust 2006-1

168.    Prospectus Supplement Dated November 29, 2006 (To Prospectus Dated November 17, 2006), Mortgage Pass-Through Certificates, Series 2006-AR4, Alternative Loan Trust, Series 2006-AR4

169.    Prospectus Supplement Dated December 19, 2006 (To Prospectus Dated May 23, 2006), Asset-Backed Certificates, Series-ALT1, Wachovia Mortgage Loan Trust 2006-ALT1

170.    Prospectus Supplement Dated June 26, 2006 (To Prospectus Dated May 23, 2006), Asset-Backed Certificates, Series 2006-AMN1, Wachovia Mortgage Loan Trust 2006-AMN1

# EXHIBIT 4

# RMS Manual of Examination Policies

## Table of Contents

**Section Title**                                                    **Section Number**
**Index**                                                                  0.1

**Part I – Basic Examination Concepts and Guidelines**
    Basic Examination Concepts and Guidelines                         1.1

**Part II – CAMELS**
    Capital Adequacy
        Capital                                                      2.1
    Asset Quality
        Asset Quality                                                3.1
        Loans                                                        3.2
        Securities and Derivatives                                   3.3
        Cash and Due from Banks                                      3.4
        Premises and Equipment                                       3.5
        Other Real Estate                                            3.6
        Other Assets and Liabilities                                 3.7
        Off-Balance Sheet Activities                                 3.8
    Management
        Management                                                   4.1
        Internal Routine and Controls                                4.2
        Related Organizations                                        4.3
        Fidelity and Other Indemnity Protection                      4.4
        Violations of Laws and Regulations                           4.5
        Miscellaneous Banking Activities                             4.6
    Earnings
        Earnings                                                     5.1
    Liquidity
        Liquidity and Funds Management                               6.1
    Sensitivity to Market Risk
        Sensitivity to Market Risk                                   7.1

**Part III – Other Examination Issues**
    Bank Secrecy Act, Anti-Money Laundering and
        Office of Foreign Assets Control                             8.1
    Bank Fraud and Insider Abuse                                     9.1
    Suspicious Activity and Criminal Violations                      10.1
    International Banking                                             11.1
    Applications                                                     12.1

**Part IV – Administrative and Enforcement Actions**
    Memorandums of Understanding                                     13.1
    Civil Money Penalties                                            14.1
    Formal Administrative Actions                                    15.1

**Part V - Examination Reports**
    Report of Examination Instructions                               16.1
    Bank of Anytown—Report of Examination                            17.1
    Report of Investigation Instructions                             18.1
    Bank of Anytown—Report of Investigation                          19.1

# BASIC EXAMINATION CONCEPTS AND GUIDELINES

Section 1.1

RATIONALE OF BANK EXAMINATIONS .................2
CONDUCT OF EXAMINATIONS ..........................2
  Prohibition Against Political Communication .............2
RATING SYSTEM ..............................................2
  Introduction ....................................................2
  UFIRS Overview ..............................................2
  Disclosure of Ratings ........................................3
  Discussions with Management................................3
  Examination Letters ...........................................4
EXAMINATION FREQUENCY...............................4
  Alternate Examinations ......................................5
  Specialty Examination Intervals ...........................5
  Insured Branches of Foreign Banks.......................5
EXAMINATION TYPES.......................................6
  Risk Focused Supervision....................................6
  Full Scope Examinations .....................................6
  Limited Scope Examinations and Visitations ...............6
  Other Situations ...............................................6
  Institutions Subject to Corrective Actions ..................6
  Newly Chartered Insured Institutions .......................7
    Examination and Visitation Cycles.......................7
    Monitoring Activities.......................................7
    Changes in Business Plans.................................7
  Converting to Insured Nonmember Status...................8
  Change of Ownership Control ...............................8
COORDINATING EXAM SCHEDULES.....................8
  State Authorities ...............................................8
  Holding Company Inspections and Subsidiary
  Institution Examinations......................................8
  Interstate Banking and Chain Banks........................8
SCHEDULING GUIDELINES ................................9
  Anticipatory Supervision .....................................9
  Scheduling Considerations ...................................9
    Offsite Analysis and Monitoring...........................9
    Other Financial Indicators .................................9
    Applications or Other Bank-Provided Data ............10
    Known Characteristics.....................................10
    Other Bank Regulators.....................................10
    Media..........................................................10
    Rumors/Observations/Other...............................10
RELYING ON STATE EXAMINATIONS....................10
PRE-EXAMINATION ACTIVITIES..........................12
  Reviewing External Audit Workpapers .....................12
  Shared Loss Agreements .....................................12
    Examination Considerations ..............................13
    Other Examination Considerations .......................13
MEETINGS WITH MANAGEMENT .........................13
  Pre-Examination Planning: ...................................14
  First Day ........................................................14
  Follow-up on Prior Examination Issues ...................14
  Strategic Planning and Budget...............................14
  Loan Discussion................................................14
  Material Preliminary Findings ...............................14
  Management Meeting..........................................14
  Meetings with Directors ......................................14

  Banks Assigned a Composite 4 or 5 Rating ...........14
  Banks Assigned a Composite 3 Rating...................15
  Banks Assigned a Composite Rating of 1 or 2.......15
  Other Considerations .........................................15
OTHER SOURCES OF EXAMINATION
INFORMATION AND POLICY GUIDANCE...............15
  Trust Department ..............................................16
  Information Technology (IT) .................................16
  Bank Secrecy Act (BSA) .....................................16
  Consumer Protection..........................................17
  Summary.........................................................17
DISCLOSING REPORTS OF EXAM ..........................17
EXAMINATION WORKPAPERS ..............................17
  Introduction.....................................................17
  Safeguarding Examination Information .....................17
  Examination Documentation Modules.......................18
  Substance of Workpapers ....................................18
  Filing of Workpapers .........................................18
  Retention of Workpapers .....................................19
ADDENDUM TO SECTION 1.1 ...............................20
UFIRS RATINGS DEFINITIONS ..............................20
  Composite Ratings ............................................20
    Composite 1 ..................................................20
    Composite 2 ..................................................20
    Composite 3 ..................................................20
    Composite 4 ..................................................20
    Composite 5 ..................................................20
  Component Ratings ...........................................20
    Capital Adequacy ...........................................21
    Asset Quality .................................................21
    Management ..................................................22
    Earnings ......................................................23
    Liquidity ......................................................24
    Sensitivity to Market Risk .................................24

# BASIC EXAMINATION CONCEPTS AND GUIDELINES

Section 1.1

## RATIONALE OF BANK EXAMINATIONS

The Federal Deposit Insurance Corporation conducts bank examinations to ensure public confidence in the banking system and to assess compliance with laws and regulations. Bank examinations help protect the Deposit Insurance Fund and facilitate the supervisory process.

Maintaining public confidence in the integrity of the banking system is essential because customer deposits are a primary funding source, without which banks would be unable to meet fundamental objectives, such as providing financial services. The financial stability of an institution or the existence of weak risk management practices are disclosed through examination of a bank's capital, assets, management, earnings, liquidity, and sensitivity to market risk.

Evaluating a bank's adherence to laws and regulations is best accomplished through periodic onsite examinations. Compliance with statutory and regulatory requirements is given high priority by bank supervisors and Congress.

Bank examinations play a vital role in protecting the integrity of the Deposit Insurance Fund. Examinations help identify problem situations and help prevent identified problems from deteriorating to the point where depositor payoffs or financial assistance by the FDIC become unavoidable.

Finally, examinations play a key role in the supervisory process by helping the FDIC to identify the nature, severity, and cause of a bank's problems; to recognize emerging risks in the financial services industry; and to develop effective corrective measures.

## CONDUCT OF EXAMINATIONS

Comprehensive bank examinations enhance the FDIC's ability to maintain public confidence in financial institutions and the banking system. Given the fundamental reasons for conducting examinations, regulatory personnel must have access to all records and employees of a bank during an examination.

Sections 10(b) and (c) of the Federal Deposit Insurance Act empower examiners to make a thorough examination of a bank's affairs. Examiners should contact their regional office for guidance if faced with serious impediments to an examination, including uncooperative executive officers, or restricted access to bank employees or records. The regional office will determine an appropriate solution to enable examiners to obtain the information needed to complete the examination. In such cases, examiners should document all significant examination obstacles and the regional office's resolution of the situation.

## Prohibition Against Political Communication

FDIC employees should avoid any form of political communication with insured depository institutions that could be perceived as suggesting the examination process is influenced by political considerations, or that the bank should take a particular position on legislative issues. Examinations must be kept free from political considerations, or the appearance of being influenced by political considerations, in order to maintain the integrity and effectiveness of the examination process. FDIC employees should promptly inform their regional office of any situation they feel compromised this policy.

## RATING SYSTEM

### Introduction

The Uniform Financial Institutions Rating System (UFIRS) was adopted by the Federal Financial Institutions Examination Council (FFIEC) on November 13, 1979, and updated in December 1996. Over the years, the UFIRS proved to be an effective supervisory tool for evaluating financial institutions on a uniform basis and for identifying institutions requiring special attention. Changes in the banking industry and regulatory policies prompted a revision of the 1979 rating system. The 1996 revisions to UFIRS include the addition of a sixth component addressing sensitivity to market risk, the explicit reference to the quality of risk management processes in the management component, and the identification of risk elements within the composite and component rating descriptions.

The UFIRS takes into consideration certain financial, managerial, and compliance factors that are common to all institutions. Under this system, the supervisory agencies endeavor to ensure all financial institutions are evaluated in a comprehensive and uniform manner, and that supervisory attention is appropriately focused on institutions exhibiting financial and operational weaknesses or adverse trends.

The UFIRS also serves as a useful vehicle for identifying institutions with deficiencies in particular component areas. Further, the rating system assists Congress in assessing the aggregate strength of the financial industry and following risk management trends. As such, the UFIRS assists regulatory agencies in fulfilling their mission of maintaining stability and public confidence in the nation's financial system.

### UFIRS Overview

Under the UFIRS, each financial institution is assigned a composite rating based on an evaluation of six financial and

**BASIC EXAMINATION CONCEPTS AND GUIDELINES**                    Section 1.1

operational components, which are also rated. The component ratings reflect an institution's capital adequacy, asset quality, management capabilities, earnings sufficiency, liquidity position, and sensitivity to market risk (commonly referred to as CAMELS ratings). When assigning ratings, examiners take into consideration an institution's size and sophistication, the nature and complexity of its activities, and its general risk profile.

Composite and component ratings are assigned based on a numerical scale from 1 to 5, with 1 indicating the highest rating, strongest performance and risk management practices, and least degree of supervisory concern. A 5 rating indicates the lowest rating, weakest performance and risk management practices, and highest degree of supervisory concern.

A bank's composite rating generally bears a close relationship to its component ratings. However, the composite rating is not derived by averaging the component ratings. Each component rating is based on a qualitative analysis of the factors comprising that component and its interrelationship with other components. When assigning a composite rating, some components may be given more weight than others depending on the situation at an institution. In general, assignment of a composite rating may incorporate any factor that bears significantly on the overall condition of the financial institution. Composite and component ratings are disclosed to an institution's board of directors and senior management. However, banks cannot, except in very limited circumstances, disclose the ratings or any part of a report of examination (ROE) without the prior written consent of their primary regulator.

Management's ability to respond to changing circumstances and address risks that result from new business conditions, activities, or products, is an important factor in determining an institution's risk profile and the level of supervisory concern. For this reason, the management component is given special consideration when assigning a composite rating.

The ability of management to identify and control the risks of its operations is also taken into account when assigning each component rating. All institutions are expected to properly manage their risks; however, it is recognized that appropriate management practices vary considerably among financial institutions depending on their size, complexity, and risk profile. Less complex institutions engaged solely in traditional banking activities and whose directors and senior managers are actively involved in the oversight and management of day-to-day operations may use relatively basic risk assessment, risk management, and internal control systems. At more complex institutions, formal, multifaceted systems and controls are needed to address their broader range of financial activities and to provide senior managers

and directors with the information they need to monitor and direct day-to-day activities.

Consumer Compliance, Community Reinvestment Act, and specialty examination findings and ratings are also taken into consideration, as appropriate, when assigning component and composite ratings under UFIRS. The specialty examination areas include: Bank Secrecy Act, Information Technology, Trust, Government Security Dealers, Municipal Security Dealers, and Registered Transfer Agent.

An addendum at the end of this section contains UFIRS composite and component rating definitions and descriptions.

## Disclosure of Ratings

The FDIC believes that disclosure of the UFIRS component and composite ratings to bank management is appropriate. The impact the financial services industry has on the general economy magnifies the importance of sound risk management practices. In this environment, the examination process is enhanced through disclosure of the UFIRS ratings by encouraging a more open and complete discussion of examination findings and recommendations. Disclosure also provides management with useful information for making effective risk management decisions.

Additionally, open discussion of the CAMELS ratings provides institutions with a better understanding of how ratings are derived, and enables management to better address any weaknesses in specific areas.

## Discussions with Management

Generally, the examiner-in-charge (EIC) should discuss the recommended component and composite ratings with senior management and, when appropriate, the board of directors, within a reasonable proximity to the conclusion of the examination. Examiners should clearly explain that their ratings are tentative and subject to the review and final approval by the regional director or designee. Examiners should follow regional guidance regarding the disclosure of component and composite ratings of 3 or worse. Generally, in these situations, examiners should contact the regional office overseeing the institution and discuss the proposed ratings with the case manager or assistant regional director prior to disclosing the ratings to management or the board.

Examiners should discuss with management and the board, the key factors they considered when assigning component and composite ratings. Examiners should also explain the composite rating is not based on a numerical average, but rather a qualitative evaluation of an institution's overall

# BASIC EXAMINATION CONCEPTS AND GUIDELINES

Section 1.1

managerial, operational, and financial performance.

The management component rating may be particularly sensitive and important. The quality of management is often the single most important element in the successful operation of an insured institution. It is usually the factor most indicative of how well risk is identified and controlled. For this reason, examiners should thoroughly review and explain the factors considered when assigning the management rating. Written comments in support of the management rating should include an assessment of the effectiveness of existing policies and procedures in identifying and managing risks.

Finally, management should be reminded that all examination findings, including the composite and component ratings, whether disclosed verbally or in the written report of examination, are subject to the confidentiality rules imposed by Part 309 of the FDIC's Rules and Regulations.

## Examination Letters

The FDIC's expectations for troubled institutions should be clearly communicated to bank management between the close of an examination and the issuance of an enforcement action. An examination letter should be delivered by FDIC Field Supervisors to chief executive officers/presidents during examination exit meetings, or earlier, for any bank newly-assigned a CAMELS composite 3 rating or worse.

Examination letters should notify management their institution's composite rating was tentatively downgraded and convey the expectation that management stabilize their institution's risk profile and strengthen its financial condition. The letter should notify management that actions taken to materially expand the institution's balance sheet or risk profile are inconsistent with supervisory expectations. The letter should also inform management they are required to obtain a non-objection from their regional director before engaging in any transactions that would materially change the institution's balance sheet composition, such as significantly increasing total assets or volatile funding sources. If practical, state banking departments should be included as a joint issuer of examination letters relating to FDIC supervised examinations. Furthermore, arrangements should be made to issue an examination letter relating to state authority examinations in which a downgrade is anticipated.

Immediate corrective measures, including the issuance of a temporary order requiring an institution to cease and desist, may be appropriate in higher-risk situations, such as when management:

- Fails to follow instructions in the examination letter,

- Does not acknowledge, or is slow to address, the institution's problems,
- Takes actions that compound the institution's problems,
- Increases the use of volatile funding sources,
- Extends credit in an unsafe and unsound manner,
- Pays excessive dividends, salaries, or bonuses, or
- Makes unjustified payments to institution-affiliated parties.

## EXAMINATION FREQUENCY

The first priority of the Division of Risk Management Supervision (RMS) is the effective oversight of banks requiring special attention. The identification and supervision of banks requiring special attention is best accomplished through the examination process.

Section 337.12 of the FDIC Rules and Regulations implements Section 10(d) of the FDI Act and governs the frequency of examinations for insured state nonmember banks. Section 347.211 governs the examination frequency of branches of foreign banks.

Section 337.12 requires an annual full-scope on-site examination of every insured state nonmember bank at least once during each 12-month period. Annual examination intervals may be extended to 18 months under the following conditions:

- The bank has total assets of $500 million or less,
- The bank is well capitalized as defined in Section 325.103 of the FDIC Rules and Regulations,
- The bank was assigned a management component rating of 1 or 2 at the most recent FDIC or applicable state banking agency examination,
- The bank was assigned a composite rating of 1 or 2 at the most recent FDIC or applicable state examination,
- The bank currently is not subject to a formal enforcement proceeding or order by the FDIC, OCC, or Federal Reserve System, and
- No person acquired control of the bank during the preceding 12-month period in which a full-scope on-site examination would have been required but for the above noted exceptions.

These rules apply similarly to U.S. branches or agencies of a foreign bank with total assets less than $500 million if the office received a composite ROCA rating of 1 or 2 at its most recent examination. In all cases, the FDIC reserves the right to examine more frequently if they deem it necessary.

The FDIC strives to provide risk management and specialty examinations of all state nonmember banks within prescribed

**BASIC EXAMINATION CONCEPTS AND GUIDELINES**                    Section 1.1

intervals. If examination frequency requirements, other than a few nominal and non-recurring exceptions, cannot be met, regional directors should prepare and submit a memorandum to the Director of RMS. The memorandum should include a description of the nature and cause of the situation and a description of any needed, planned, or implemented corrective measures designed to maintain an adequate supervision program.

## Alternate Examinations

Examinations may be conducted in alternate 12 (or 18) month periods if the FDIC determines that a full-scope, on-site examination completed by the appropriate state supervisory authority during the interim period is acceptable. However, such alternate examinations should be accepted only for the following institutions: composite 1- or 2-rated institutions, and for stable and improving composite 3-rated institutions if the composite rating is confirmed by the Statistical Camels Offsite Review (SCOR) review program and no adverse trends are noted from other available information. The length of time between the end of one examination and the start of the next (whether one or both of the examinations are conducted by a state supervisory agency or the FDIC) should not exceed 12 (or 18) months.

For purposes of monitoring compliance with examination frequency schedules, the end of the examination is defined as the earlier of the date the EIC submits the report for review, or 60 calendar days from the examination start date as defined in the Report of Examination Instructions.

## Specialty Examination Intervals

The statutory requirements in Section 10(d) of the FDI Act do not apply to specialty examinations. Thus, specialty examinations are governed by internal RMS policy. Specialty examinations should generally be conducted concurrently with risk management examinations, except when the size or arrangement of a department makes it impractical or inefficient to do so. Although there will be some differences, specialty examinations are generally subject to the same examination intervals, including appropriate extensions, as risk management examinations.

Regional directors can make reasonable adjustments to specialty examination intervals to accommodate concurrent examinations where rating differences or alternate state examinations result in examination intervals that are not conducive to scheduling concurrent examinations. Reasonable adjustments include extending the examination cycle for 1- and 2-rated specialty areas. Although not permitted by statute for safety and soundness examinations, internal policy allows regional directors to also extend the examination cycle for 3-rated specialty areas. Specialty areas rated 4 or 5 should normally not be extended beyond a one-year interval. Additionally, since Municipal Securities Dealers are subject to a two-year examination cycle under Municipal Securities Rulemaking Board rules, any adjustment in this area should not exceed the two-year requirement. The possibility of conducting specialty examinations with state authorities should be explored if reasonable adjustments can be made.

When the state supervisory authority has examination responsibility for the safety and soundness examination of an institution, it will not be the responsibility of the FDIC to conduct any specialty examinations that are not conducted by the state supervisory authority, with the exception of BSA examinations. If safety and soundness examinations are conducted under the alternating examination cycle program, and the state does not conduct a BSA examination, then the FDIC is required to conduct a BSA examination.

## Insured Branches of Foreign Banks

Insured branches of foreign banks are required to be examined every 12 months under Section 10(d) of the FDI Act. However, Section 347.211 of the FDIC Rules and Regulations specifies that domestic branches of foreign banks may be considered for an 18-month examination cycle when certain criteria are met and no other factors suggest more frequent examinations are necessary. To be eligible for an extended 18-month examination cycle, a US branch of a foreign bank must:

- Have total assets of less than $500 million,
- Have a composite ROCA supervisory rating of 1 or 2 at its most recent examination,
- Not be subject to a formal enforcement action,
- Not have undergone a change in control during the preceding 12-month period; and
- Have Tier 1 and total risk-based capital ratios (at the foreign bank) of at least 6 percent and 10 percent, respectively, when reported on a consolidated basis; or
- Has maintained on a daily basis, over the previous three quarters, eligible assets in an amount not less than 108 percent of the preceding quarter's average third party liabilities, and sufficient liquidity is currently available to meet its obligations to third parties.

Additional factors may also be considered in determining examination frequency, including certain discretionary standards outlined in Section 347.211.

**BASIC EXAMINATION CONCEPTS AND GUIDELINES**                    Section 1.1

## EXAMINATION TYPES

### Risk Focused Supervision

Effective risk management has always been central to safe and sound banking activities and has become more important as new technologies, product innovation, and the size and speed of financial transactions have changed the nature of banking. The objective of a risk-focused examination is to efficiently and effectively evaluate the safety and soundness of a bank. Examiners should focus their resources on a bank's highest risk areas when assessing risk management programs, financial conditions, internal controls, etc. The exercise of examiner judgment to determine the scope and depth of review in each functional area is crucial to the success of the risk-focused supervisory process.

The most effective examination approach focuses examiner resources on assessing management's ability to identify and control risks. Internal and external audits, loan reviews, and other control activities are integral considerations in an assessment of a bank's risk profile. Refer to the Internal Routine and Controls section of this Manual for an in depth discussion of this area.

Examiners should consider the adequacy of audit and control practices in determining a bank's risk profile and, when appropriate, try to reduce regulatory burdens by testing rather than duplicating the work of a bank's audit and control functions. Transaction testing remains a reliable and essential examination technique for use in the assessment of a bank's condition. However, the amount of transaction testing necessary to evaluate activities generally depends on the quality of the bank's risk management processes. Once the integrity of the bank's risk management system is verified through testing, conclusions regarding the extent of risks within an activity can often be based on the results of internal reports rather than in-depth, onsite assessments.

### Full Scope Examinations

The minimum requirements of a full-scope examination are defined as the procedures necessary to complete the mandatory pages of the uniform ROE and evaluate all components of the UFIRS/CAMELS (Capital, Asset Quality, Management, Earnings, Liquidity, and Sensitivity to Market Risk) rating system. The completion of additional steps and pages may often be appropriate.

In a full scope examination, all examination activities are considered in the overall assessment of the institution. These activities include the Risk Management, Information Technology, Bank Secrecy Act/Anti-Money Laundering and Office of Foreign Assets Control, Trust, Registered Transfer Agent, Municipal Securities Dealer, and Government Securities Dealer examination programs. Summary comments and ratings should be brought forward and consolidated in the risk management ROE. Compliance/Community Reinvestment Act examination activities are included in the overall supervision program, although separate reports and examination cycles will continue.

### Limited Scope Examinations and Visitations

The terms limited scope examination and visitation are interchangeable and may be defined as any examination that does not meet the minimum requirements of a full-scope examination. Since limited scope examinations and visitations are not full-scope examinations, they do not satisfy the requirements of Section 10(d) of the FDI Act. Limited scope examinations and visitations have a flexible format and may be used to determine changes in an institution's risk profile, monitor compliance with a corrective program, or comply with SCOR follow-up requirements. They may also be used to investigate adverse or unusual situations, determine progress in correcting deficiencies, act as an investigative or supervisory tool, or to comply with schedules described under Other Situations below.

Limited scope examinations and visitations may address the overall condition of the institution, including material changes since the previous examination and areas that exhibit more than normal risk. Depending on the scope and purpose of the examination or visitation, examiners can assign composite ratings, as well as component ratings for areas that were sufficiently reviewed. Ratings of component areas that were not reviewed should be carried forward from the previous examination.

Completion of the standard examination report form is not required, although appropriate report pages may be included if considered necessary to clarify a finding or recommendation. Results should generally be conveyed in a memorandum from the examiner-in-charge (EIC) to the regional director. If the examination or visitation results are to be sent to the institution, they can be in any appropriate form (letter or other suitable format).

### Other Situations

In addition to the preceding instructions, examinations should be performed in the following situations:

### Institutions Subject to Corrective Actions

Supervisory strategies for institutions operating under an enforcement action, particularly formal actions, should, in

# BASIC EXAMINATION CONCEPTS AND GUIDELINES

most cases, include interim on-site limited scope examinations or visitations. The on-site reviews should include an evaluation of management's understanding of, and adherence to, the provisions of the corrective program. Limited scope examinations or visitations should be scheduled within six months after an enforcement action is issued to evaluate an institution's progress in addressing the corrective program. Particular attention should be focused on the primary cause of the institution's problems and the principal objectives of corrective programs. Where a decision is made to forego or delay the interim on-site activity, the reasons should be documented in regional office files.

## Newly Chartered Insured Institutions

Adverse economic and other factors often negatively affect newly organized institutions more than they do established institutions. Further, failures of de novo institutions demonstrate that unseasoned institutions can pose a significant risk to the Deposit Insurance Fund and therefore, warrant enhanced supervision and monitoring.

Some newly organized institutions pursue early changes in established business plans. In some cases, those changes lead to increased risk and financial problems if accompanying controls and risk management practices are inadequate. Common risk elements observed at troubled or failed de novo institutions during their first seven years of operation include:

- Rapid growth,
- Over reliance on volatile funding sources,
- Concentrations without compensating controls,
- Significant deviations from approved business plans,
- Non-compliance with the order approving deposit insurance,
- Weak risk management practices,
- Unseasoned loan portfolios,
- Significant consumer protection problems, or
- Problematic third-party relationships.

### Examination and Visitation Cycles

If a newly chartered and insured institution is a subsidiary of a multi-bank holding company that is in satisfactory condition, normal examination cycles should be followed at the regional director's discretion; otherwise, a limited scope examination should be conducted within the first six months of operation and a full-scope examination within the first twelve months of operation. Subsequent to the first examination and through the seventh year of operation, at least one examination should be performed each year. Extended examination intervals should not be applied in the first seven years of operation. After the initial full-scope examination, examinations may be alternated with the state

supervisory authority.

### Monitoring Activities

During the seven-year de novo period, regional offices have a responsibility to monitor de novo institutions' activities, review compliance with any conditions of deposit insurance orders, and track performance in relation to approved business plans. Significant changes to business plans must be submitted to the appropriate regional office for approval. Examiners assist in those monitoring activities by:

- Conducting general visitation and examination procedures,
- Assessing institutions' overall risk profiles and management capabilities,
- Reviewing institutions' conformity with business plans,
- Evaluating compliance with any outstanding conditions, and
- Documenting their findings in reports of examination.

### Changes in Business Plans

There is a significant degree of judgment involved in determining a major deviation or material change in a business plan. Such changes may be evidenced by shifts in asset or liability mix, variances in loan, deposit, or total asset volumes from original projections, or the introduction or deletion of a specific business strategy (such as the initiation of subprime lending or the gathering of brokered deposits). Business plans generally address a number of factors which include, but are not limited to:

- Geographic markets,
- Loan products and services,
- Investment strategies and levels,
- Deposit products and services,
- Other services, such as private banking or trust services,
- Liquidity strategies and funding sources,
- Delivery channels, particularly through third party relationships,
- Fixed-assets (e.g. branches/loan production offices),
- Other activities (on- or off-balance sheet), including fee-for-service activities,
- Customer categories (such as money services businesses or foreign financial institutions), and
- Relationships with parent organizations and affiliates.

State nonmember banks requesting deposit insurance must agree to obtain the prior approval of the FDIC for any material change to their business plan. Any significant change in the items listed above should generally be viewed as a material change in business plan. Such changes may be

# BASIC EXAMINATION CONCEPTS AND GUIDELINES

evidenced by significant (+/- 25%) deviation in asset growth projections; changes in the asset/liability mix or products and services offered; or the introduction of new business strategies such as an unplanned establishment of loan production offices or use of third parties to broker, underwrite, or originate credit on behalf of the institution.

## Converting to Insured Nonmember Status

A full-scope examination should be conducted within twelve months of the last examination prior to conversion for national, state member, and thrift institutions. For noninsured institutions converting to insured status, a full-scope examination should be conducted within twelve months of the last examination prior to conversion. If the last examination was conducted by the state authority, the regional director has the discretion to accept it. However, such an examination should be accepted only for composite 1- or 2-rated institutions.

## Change of Ownership Control

A full-scope examination should be conducted within twelve months after a change of control. Thereafter, standard examination intervals apply.

## COORDINATING EXAM SCHEDULES

### State Authorities

Every effort should be made to coordinate examination schedules with state authorities to take advantage of state resources, to minimize duplications of effort, and to lessen business disruptions to institutions. A representative of the regional office should meet with representatives from each state banking authority to determine examination responsibilities for the upcoming year. Responsibilities may be defined by ratings, size, or location of institutions, or assigned by specific institutions as deemed appropriate. Such agreements should contain flexibility to allow either party to alter schedules with minimal notice. While state examination requirements should be considered in the coordination process, state requirements should not be the determining factor in the final agreement.

## Holding Company Inspections and Subsidiary Institution Examinations

Examinations of holding company subsidiaries should be coordinated with other Federal agencies whenever possible. Particular emphasis for coordinating examinations should be placed on banking organizations with over $10 billion in consolidated assets and those banking organizations (generally with assets in excess of $1 billion) that exhibit financial weaknesses.

Examinations and inspections of insured subsidiary banks and bank holding companies that do not meet the foregoing criteria should be coordinated to the extent practical and where resources permit. regional directors (or designees) should meet periodically with representatives from other Federal agencies to develop coordinated schedules that will maximize the use of examination resources and enhance the efficiency of bank and bank holding company examinations. The coordination of examinations should focus on the use of common financial statement dates, where possible, and allow for joint discussions of examination findings with management. However, absolute concurrence, common as-of dates, and simultaneous starting dates are not required. Appropriate state regulatory agencies should also be kept informed and encouraged to participate in the coordinated Federal efforts affecting state chartered institutions.

Examinations of nonbank affiliates may be conducted at the discretion of the regional director, but independent examinations of holding companies supervised by the Federal Reserve may not be conducted without prior approval of the Washington Office.

## Interstate Banking and Chain Banks

A coordinated supervisory strategy for interstate banking organizations (both intra- and inter-regional) should be developed. The supervisory strategy developed should combine traditional supervision of individual units with an appropriate top-down approach to assess risks and to monitor and coordinate supervisory actions. For these organizations, the regional director has discretion to omit, delay, or modify existing examination frequencies if the financial condition of the holding company and lead bank is considered satisfactory; the condition of the subsidiary units is believed to be satisfactory; control over all insured banks in the organization is effectively centralized; and, management is favorably regarded.

Regional directors are responsible for: (a) designating a lead Region to design an appropriate supervisory strategy for interstate banking organizations; and (b) ensuring pertinent information is conveyed in a timely manner to other RMS Regions and to appropriate Federal and State agencies.

Chain banking organizations generally involve a group of financial institutions or holding companies that are controlled by one individual or company. Regional directors are responsible for maintaining a record system for chain banking organizations and for developing an overall supervisory

**BASIC EXAMINATION CONCEPTS AND GUIDELINES**                    Section 1.1

strategy for these organizations. It is the policy of the Division to supervise banks that are part of a chain banking organization in a manner that considers the financial impact of the consolidated chain on the individual institutions within that chain. Refer to Section 4.3, Related Organizations for additional details on, and a full description of, chain banking organizations.

## SCHEDULING GUIDELINES

Periodic onsite examinations are critical to the supervisory process and are an integral part of the examination program. Diversified risks in the industry and the volatile performance and financial condition of individual institutions necessitate emphasis on more frequent and less structured supervision. Investigations, phone calls, e-mails, limited scope examinations, correspondence, and other forms of customized contact should be made as necessary. The purpose is to identify and obtain corrections in an institution's policies and procedures before serious financial problems develop.

Pre-examination activities should include efforts to determine the activities and condition of nonbank subsidiaries. If not determinable in advance, this information should be obtained early in the examination in order to assess the necessity for, and depth of, subsidiary examinations.

A major component of the risk-focused supervisory approach is the flexibility to conduct examination activities at various times during the examination cycle based on risk or staffing considerations. However, it is anticipated that most examination activities will be conducted as of a single point-in-time near the end of the risk management examination cycle, particularly in well-rated institutions.

### Anticipatory Supervision

To effectively prevent or mitigate serious problems in an institution, the conditions that caused, or may cause, problems must be identified and corrected early. Corrective action should be taken immediately upon identifying problems or unacceptable risk management practices. Corrective action taken after conditions have seriously deteriorated is often too late to avoid institutional failures. Moral suasion and informal agreements are normally sufficient when unacceptable risk levels or risk management practices are identified early, but formal action must be considered, even when an institution is rated 1 or 2, if circumstances warrant.

A forward-looking supervisory approach that identifies and seeks to correct objectionable conditions requires serious thought and a balanced response by examiners. Critical comments must be well-supported and based on facts, logic, and prudent supervisory standards. Although examiners can not predict future events, they should consider the likelihood that identified weaknesses will cause material problems in the future, and consider the severity of damage to an institution if conditions deteriorate. In questionable circumstances where formal action is considered, examiners should consult with their regional office while the examination is in progress regarding the material needed to support a potential action.

### Scheduling Considerations

The success of a risk focused examination program depends largely on the effectiveness of preplanning efforts and assignment scheduling. The objective of a risk focused examination process is to identify problems early and devise solutions in the quickest, most efficient manner possible. In some instances, evidence of objectionable practices or conditions may indicate the need for an accelerated examination or visitation. In less severe situations, the information is retained and factored into the scheduling of future examinations.

In order for examiners to proactively assess potential deficiencies, it is critical for Field Supervisors and other personnel to be aware of, and have access to, pertinent documentation. Regional directors should ensure copies of relevant correspondence and other information that may affect scheduling decisions is documented and made available to scheduling personnel.

The following list includes sources of information that may have an influence in prioritizing assignments. Some of these items, such as involvement in FDIC assistance transactions, have supervisory schedules specified in internal policies. Other items are merely information that may or may not raise a concern depending on what else is known about a bank. However, these or similar items may signal that further follow-up is warranted during the examination. The list, while not all inclusive, reflects the need for supervision to be anticipatory, and provides a reminder of common information sources that may warrant consideration when scheduling.

#### Offsite Analysis and Monitoring

- SCOR Monitoring System
- Comprehensive Analytical Reports
- Interim Financial Reports
- Growth Monitoring System
- UBPR Analysis
- Press Releases

#### Other Financial Indicators

# BASIC EXAMINATION CONCEPTS AND GUIDELINES

Section 1.1

- Unusually high or fluctuating profit levels
- Significant operating losses
- Significant provision expenses to the Allowance for Loan and Lease Loss (ALLL)
- Significant levels of delinquent loans
- Significant changes in balance sheet composition
- Unusually elevated or rapidly growing asset concentrations
- High reliance on brokered funds
- Excessive trading
- Excessive dividends
- Unusually high or low ratios or numbers

**Applications or Other Bank-Provided Data**

- Merger activity
- Large defalcation
- Change of control
- Adverse audit report findings
- Newly insured institution
- Change in external auditor
- New subsidiary(s) or line(s)-of-business
- Cancellation of blanket bond insurance
- Exercise of a new power or profit center
- Acquiring party in an FDIC assisted transaction
- Large paydown/payoff of previously classified loans
- Affiliation with a problem institution/holding company

**Known Characteristics**

- Unusually high or low salaries
- Compensation linked to performance (income, loan or deposit growth)
- Significant litigation
- Infighting among officers or directors
- Officers or directors with past due loans
- Dominating or self-serving management
- Operating at the margin of laws and regulations
- Inexperienced or questionable management
- Substantial outside business interests of a key officer
- Conducting business with questionable firms
- Lack of diversity in business lines
- Higher-risk business strategies
- Refinancing poor quality loans
- Advertising above-market interest rates
- Large blocks of bank stock pledged as collateral
- Numerous or unusual affiliated loan participations
- Improper handling of correspondent bank accounts
- Sacrificing price or quality to increase loan volumes
- Hiring of a dismissed, unethical, or marginal officer

**Other Bank Regulators**

- Improper handling of correspondent bank accounts
- Increased or unusual loan participations among affiliated or closely-held institutions
- Large blocks of stock pledged as collateral
- Affiliation with a 3-, 4-, or 5-rated institution or holding company
- Large defalcation
- Banker with past due loans at another institution
- Loans classified at other institutions

**Media**

- New chief executive officer or chief lending officer
- Adverse publicity
- Annual or interim period losses
- Adverse economic event in a community
- Natural disaster such as a flood, fire, or earthquake
- Large defalcation
- Large financial commitment as sponsor or lead bank in a major project or development
- Banker death or disappearance
- Announcement of major new activity or department

**Rumors/Observations/Other**

- Change in external auditor
- High or sudden employee turnover
- Significant litigation against the institution or insiders
- Unusual activity in stock of the institution (price movement up or down, or heavy trading volume)
- Institution advertising above market rates
- Significant change in asset/liability compositions
- Questionable loans being booked
- Relationships with borrowers of questionable character
- Confidential or anonymous tips

# RELYING ON STATE EXAMINATIONS

Section 349 of the Riegle Community Development and Regulatory Improvement Act of 1994 requires the FFIEC to issue guidelines establishing standards for the purpose of determining the acceptability of state reports of examination under Section 10(d)(3) of the FDI Act. Under Section 10(d)(3), a Federal banking agency may conduct an annual, on-site examination of an insured depository institution in alternate 12 (or 18) month periods if the agency determines that a state examination conducted during the intervening period is adequate. The standards issued by the FFIEC are to be used at the discretion of the appropriate Federal banking agency.

**BASIC EXAMINATION CONCEPTS AND GUIDELINES**                    Section 1.1

The supervisory divisions of the FDIC and the Board of Governors of the Federal Reserve System responsible for the examination of state-chartered, insured depository institutions, and the branches and agencies of foreign banks that have been chartered by the states, have a long history of coordinating with state banking departments to fulfill a mutual goal of promoting a safe and sound banking system. It is recognized that this close cooperation between the Federal and State regulators promotes efficiency in the examination process, reduces the regulatory burden on state-chartered, insured depository institutions, and improves the supervisory process.

The Federal and State banking agencies have worked together, to varying degrees, in the following areas:

- Conducting alternate, joint, and concurrent examinations of insured depository institutions, and of the branches and agencies of foreign banks that have been chartered by the states;
- Processing safety and soundness examination reports and applications on a timely basis;
- Using common examination report and application forms;
- Developing and issuing informal (e.g., board resolutions, memoranda of understanding or other similar agreements) and formal enforcement actions;
- Exchanging supervisory information;
- Offering Federal agency training programs to state examiners; and
- Providing access to the Federal agency databases.

The FDIC intends to continue these cooperative efforts to the maximum extent possible. It is recognized, however, that the adequacy of state budgeting, examiner staffing, and training are important factors to enhancing Federal and State coordination. The FDIC has entered into formal and informal arrangements with most state banking departments. These arrangements or working agreements generally address the following areas:

- The number of state-chartered, insured institutions to be examined on an alternating basis by the state banking department and by the FDIC;
- The frequency of safety and soundness examinations;
- The type of examinations to be conducted (independent, joint, or concurrent) by each agency;
- The pre-examination procedures to be performed;
- The responsibilities of each agency for processing reports of examination;
- The responsibilities of each agency for conducting specialty examinations (Compliance, IT, Trust, etc.);
- The procedures for coordinating informal and formal enforcement actions;

- The procedures for processing joint applications; and
- The procedures for sharing supervisory information.

These arrangements are structured to permit both Federal and State agencies the flexibility to conduct an independent examination subject only to notification to the other party. Generally, only institutions rated 1 or 2 are examined on an alternating basis allowing for a reasonable interval between examinations.

A hallmark of a successful program has been the flexibility to tailor cooperation to the particulars of each state and to the specifics of individual banks within a state, plus the reality of changing circumstances at both the Federal and State levels. The FFIEC guidelines strive to maintain that flexibility.

The FDIC will accept and rely on state reports of examination in all cases in which it is determined that state examinations enable the FDIC to effectively carry out its supervisory responsibilities. The following criteria may be considered, in whole or in part, when determining the acceptability of a state report of examination under Section 10(d) of the FDI Act:

- The completeness of the state examination report. The state report of examination should contain sufficient information to permit a reviewer to make an independent determination on the overall condition of the institution as well as each component factor and composite rating assigned under the UFIRS and commonly referred to as the CAMELS rating system, or the ROCA rating system used for branches and agencies of foreign banks.
- The adequacy of documentation maintained by state examiners to support observations made in examination reports.
- The ability over time of a state banking department to achieve examination objectives. At a minimum, the FDIC will consider the adequacy of state budgeting, examiner staffing and training, and the overall review and follow-up examination process of a state banking department. Accreditation of a state banking department by the Conference of State Bank Supervisors is among the factors that will be considered.
- The adequacy of any formal or informal arrangement or working agreement between a state banking department and the FDIC.

The FDIC, as part of its routine review of state examination reports, will assess the quality and scope of the reports to determine whether they continue to meet the general criteria noted above. The FDIC retains the option to conduct a follow-up examination in cases in which a state examination

# BASIC EXAMINATION CONCEPTS AND GUIDELINES

Section 1.1

report appears insufficient or the condition of an insured institution appears to be seriously deteriorating.

If a state and the FDIC have cooperative examination programs, regional directors may involve FDIC examiners in state examinations if an institution's condition is deteriorating, or areas of concern are identified.

The FDIC will work with state banking departments to resolve any concerns regarding the acceptability of each other's work, the operation of cooperative programs, or any other issues of mutual interest.

## PRE-EXAMINATION ACTIVITIES

Thorough pre-examination planning is critical to the efficient completion of an examination. Effective pre-examination planning helps support scoping decisions in terms of work performed and areas to receive special attention. It can also help determine staffing needs in regards to the number and expertise of personnel required. Finally, it can enhance examination efficiencies and reduce disruptions at institutions.

Part of the pre-examination planning should address the need for, or extent of, branch examinations. It is the FDIC's practice to examine the various offices of a branch banking system on an as-needed basis only. Such decisions are within the province of the regional director or may be delegated by the regional director to the Field Supervisor or EIC of a particular examination.

In general, examinations represent a comprehensive and coordinated effort between Risk Management and specialty examiners in the assessment of an institution's overall risk profile. Information request letters from various functions scheduled for the upcoming examination (for example Risk Management, Information Technology, Bank Secrecy Act, and Trust examinations) should be coordinated and combined whenever practical. Examiners should take special care to tailor information request letters to the specific characteristics of the institution, and remove unnecessary and redundant information from the request lists.

As a general rule, bankers should be given at least two weeks notice of an upcoming safety and soundness examination in order to provide them with enough time to complete pre-examination requests. A shorter period is permissible if the institution is not unduly burdened, or if a shorter period is occasionally needed due to resource requirements. Exceptions to this general policy may include problem institutions, situations where management and ownership of the institution are identical, or in situations where conditions

appear to be deteriorating rapidly.

Examiners should make every effort to conduct as many pre-, post-, and other examination procedures as reasonably possible off-site in order to minimize disruptions to an institution's normal business activities. Additionally, supervisors should be mindful of an institution's space and personnel limitations and schedule the number of examiners working on bank premises accordingly.

An examination procedures module titled Risk Scoping Activities is included in the Examination Documentation Modules. This module identifies and lists several activities to be completed by examiners during the pre-examination process. Refer to this module for additional guidance.

## Reviewing External Audit Workpapers

Examiners are generally required to review the workpapers of the independent public accountant or other auditor performing the external auditing program of certain insured institutions that have been or are expected to be assigned a UFIRS composite rating of 4 or 5. A workpaper review is intended to provide information prior to or during an examination relating to an institution's internal control environment and its financial reporting practices. Thus, a workpaper review assists examiners in determining the scope of the examination and the procedures to be applied to different areas of operations.

## Shared Loss Agreements

A shared loss agreement (SLA) is a contract between the FDIC and institutions that acquire failed bank assets. Under the agreements, the FDIC agrees to absorb a portion of the losses, if incurred, on specific assets (usually loans), purchased by an institution. If an institution makes recoveries on covered assets, they must reimburse the FDIC for part of the recoveries. Loss share agreements cover specific timeframes and are often written so the FDIC absorbs 80 percent of incurred losses (up to a stated threshold), and receives 80 percent of recoveries. To maintain loss coverage, institutions must adhere to the terms of their agreement and make good faith efforts to collect loans.

Note: The FDIC's reimbursement for losses on assets covered by an SLA is measured in relation to an asset's book value on the records of the failed institution on the date of its failure, not in relation to the acquisition-date fair value at which covered assets must be booked by an acquiring bank.

The FDIC uses different types of agreements for commercial loans and residential mortgages. Both types cover credit

# BASIC EXAMINATION CONCEPTS AND GUIDELINES
Section 1.1

losses and certain related expenses. However, for commercial assets, SLAs generally cover losses for five years and recoveries for eight years. For residential mortgages, SLAs generally cover losses and recoveries for ten years.

Shared loss agreements are designed to reduce the FDIC's burden of managing receivership assets and mitigate acquirers' losses. Banks should not allow shared loss considerations to unduly impact foreclosure decisions. Banks should only foreclose on properties after exhausting other loss-mitigation and workout options. To avoid unnecessary home foreclosures, most residential SLAs specifically require institutions to engage in loss-mitigation efforts in accordance with the FDIC's Mortgage Loan Modification Program or the national Home Affordable Modification Program.

**Examination Considerations**

Regional and field office personnel should regularly communicate with the Division of Resolutions and Receiverships (DRR) to coordinate activities and share SLA information. Pre-examination communication between examiners and DRR allows examiners to determine the type and extent of SLAs and find out if any issues exist that might affect an institution's safety and soundness. If any of a bank's assets are covered by a SLA, examiners should review the agreement and consider its implications when:

- Performing asset reviews,
- Assessing accounting entries,
- Assigning asset classifications, and
- Determining CAMELS ratings.

Risk management examiners should include a sample of SLA related commercial assets in their loan scope. The number of loans sampled should be sufficient to allow examiners to assess whether the assets are administered in a manner consistent with commercial assets not covered by SLAs. Examiners may determine it is unnecessary to include SLA related residential mortgages in their loan scope; however, SLA coverage should be considered when assigning adverse classifications to residential credits covered by SLAs.

In most cases, the portion of an asset covered by an SLA should not be subject to adverse classification because loss sharing represents a conditional guarantee from the FDIC. Generally, the amount that would otherwise be adversely classified (Substandard, Doubtful, or Loss), should be reduced by the applicable coverage rate (often 80 or 95 percent).

Risk management examiners are not expected to evaluate an institution's compliance with SLAs. Personnel from DRR evaluate compliance with SLAs; assess SLA related

accounting, reporting, and recordkeeping systems; and review loss-claim certificates. However, risk management examiners should notify their regional office and DRR staff if they identify potential problems or nonconformance with an agreement.

Examiners should refer to internal directives for additional information.

**Other Examination Considerations**

As noted above, if any of a bank's assets are covered by a SLA, examiners should review the agreement and consider its implications during examinations or visitations. The following scheduling considerations apply to FDIC supervised institutions that received FDIC assistance, or were involved in purchase and assumption or deposit transfer transactions.

Acquiring institutions with total assets in excess of ten times the deposits acquired, which are rated composite 2 or better are exempt from the following requirements. State nonmember institutions: a visitation or limited scope examination should be conducted within 30 days of the transaction date to determine how funds from the FDIC are being used and whether the bank is in accordance with any applicable assistance agreement. A second visitation or limited scope examination should be conducted within six months of the transaction. A full-scope examination should be conducted within twelve months of the transaction. Thereafter, standard examination frequency schedules apply. A cooperative program should be established with the appropriate Federal agency for national, state member, and thrift institutions, to ensure that all institutions receiving FDIC funds are properly monitored and that the FDIC Regional Director is informed of important developments.

# MEETINGS WITH MANAGEMENT

Ongoing communication between the examination staff and bank management is a critical element of effective bank supervision. Open communication helps ensure examination requests are met and disruptions to an institution's daily activities are minimized. During the pre-examination process, or on the first day of the examination, board members should be encouraged to attend any or all meetings conducted during an examination. Their attendance often improves communication with outside directors and increases director knowledge of the examination process. These meetings also provide an opportunity for directors to discuss their views with examiners on banking related matters, and give examiners the opportunity to gain further insight into the experience levels and leadership qualities of bank

# BASIC EXAMINATION CONCEPTS AND GUIDELINES

management. While encouraging participation in these meetings, the EIC should emphasize that attendance is voluntary and that a lack of participation will not be viewed negatively.

Pre-planning communication to coordinate examination activities should address information requests (including the names of contact individuals), work space plans, and the general scope of the examination. Other informal meetings should be held as needed throughout the examination to discuss various topics and to gain management's perspective on local economic conditions and bank-specific issues. Prior to the conclusion of the examination, examiners should thoroughly discuss their findings and recommendations with senior management. Such meetings are critical in communicating examination findings to the bank and providing management an opportunity to respond. Exit meetings should fully apprise bank management of all deficiencies and recommendations that will be cited in the Report of Examination.

The following examples represent situations that will prompt meetings and encourage dialogue between examiners and management during the course of an examination. The circumstances of each examination will determine the type and number of meetings necessary, as well as the degree of formality required to schedule and conduct the meetings.

**Pre-Examination Planning:** The EIC or designee should conduct an on-site pre-examination meeting with bank management, or conduct a telephone conversation with management if an on-site meeting is not feasible, well in advance of the examination. The discussion should focus on topics that assist the EIC in scoping the examination, identifying information needs, gathering documents, and planning examination logistics. The meeting provides an opportunity to get management's perspective on economic conditions, primary challenges/risks, significant audit findings since the prior examination, and key risk-management processes. Primary topics of conversation should generally include current financial conditions; significant changes (planned or completed) to bank policies, personnel, or strategic direction; and any other significant changes since the previous examination. The EIC should also discuss how and when information requests will be sent to the bank (electronic or hard copies), and the method and timing any requested information will be delivered to examiners (FDICconnect, external media, or hard copies). Importantly, the delivery method(s) must meet the security measures discussed in the FDIC's e-Exam policies for the exchange, use, and storage of electronic information.

**First Day** Generally, the EIC and examination team should meet with senior management and staff during the first day of the examination for introductions, to request additional information, and to discuss other general examination requirements. Such meetings provide an opportunity to establish open lines of communication.

**Follow-up on Prior Examination Issues** Early in the examination, it is useful for the EIC to meet with senior management and discuss the bank's progress in responding to prior supervisory recommendations, as well as outstanding internal and external audit recommendations. This is also a good opportunity for examiners to gain management's perspectives on other bank-specific concerns.

**Strategic Planning and Budget** The EIC and management should discuss asset and/or capital growth plans, new business or business products, and other strategic and budget issues during the course of the examination.

**Loan Discussion** Management should participate in loan discussions and the initial review of adverse classifications, as appropriate, considering the size and condition of the institution and loan portfolio.

**Material Preliminary Findings** Normally, the EIC should notify senior management of major findings and possible recommendations before the final management meeting.

**Management Meeting** All major examination issues should be discussed with senior management as soon as practical during an examination. At a minimum, all significant issues should be discussed at the end of the examination, prior to meeting with the board of directors. As noted in the Examination Letters for Troubled Institutions section above, the FDIC's expectations for troubled institutions should be clearly communicated to bank management between the close of an examination and the issuance of an enforcement action.

Regardless of the number or type of meetings held, it is critical that examiners ensure on-going two-way communication with management. Such communication enhances the effectiveness of the examination process by allowing all parties to freely exchange information.

## Meetings with Directors

The following policies have been established for meetings with boards of directors. These policies are designed to encourage director involvement in, and enhance director awareness of, FDIC supervisory efforts, and to increase the effectiveness of such efforts. The bank's composite rating is the most important variable in deciding if and when these meetings should be held. .

**Banks Assigned a Composite 4 or 5 Rating**

# BASIC EXAMINATION CONCEPTS AND GUIDELINES

Section 1.1

The EIC and the regional director or designee should meet with the board of directors (with the required quorum in attendance) during or subsequent to the examination. Additional meetings or contacts with the board of directors or appropriate board committee may be scheduled at the regional director's discretion.

**Banks Assigned a Composite 3 Rating**

The EIC should meet with the board (with the required quorum in attendance) during or subsequent to the examination. Regional office representation is at the discretion of the regional director. Additional meetings or other contacts with the board of directors or appropriate board committee may be scheduled at the discretion of the regional director or designee.

**Banks Assigned a Composite Rating of 1 or 2**

The EIC will meet with the board or a board committee during or subsequent to the examination when: 36 months or more have elapsed since the last such meeting; the management component of the CAMELS rating is 3, 4 or 5; any other CAMELS performance rating is 4 or 5; or any two performance ratings are 3, 4 or 5. It is important to note that meeting with a board committee (in lieu of the entire board) in conjunction with an examination is permissible only when the committee is influential as to policy, meets regularly, contains reasonable outside director representation and reports regularly to the entire board. Other factors that may be relevant to the decision of holding a board meeting include recent changes in control, ownership, or top management; adverse economic conditions; requests by management or the board for a meeting; or any unique conditions or trends pertinent to the institution. Regional office participation in meetings with composite-rated 1 or 2 banks is at the regional director's discretion.

**Other Considerations**

When a meeting is held in conjunction with an examination, reference should be made on the Examination Conclusions and Comments schedule as to the committee or board members, bank managers or personnel, and regulators in attendance. A clear but concise presentation of the items covered at the meeting, including corrective commitments and/or reactions of management, should also be indicated. If a meeting is held, but not in conjunction with an examination, a summary of the meeting, including the items noted above, should be prepared and a copy mailed to the institution, via certified mail, for consideration by the board and inclusion in the official minutes of the directorate's next meeting.

When it is concluded that a meeting with a board committee rather than the full board is appropriate, selection of the committee must be based on the group's actual responsibilities and functions rather than its title. In all cases, the committee chosen should include an acceptable representation of board members who are not full-time officers.

The success of a board meeting is highly dependent upon the examiner's preparation. A written agenda that lists all areas to be discussed and provides supporting documents or schedules generally enhances examiners' explanations of findings and recommendations. Failure to adequately prepare for a meeting can substantially diminish the supervisory value of an examination.

To encourage awareness and participation, examiners should inform bank management that the examination report (or copies thereof) should be made available to each director for thorough and timely review, and that a signature page is included in the examination report to be signed by each director after review of the report. Management should also be reminded that the report is confidential, remains the property of the FDIC, and that utmost care should be exercised in its reproduction and distribution. The bank should be advised to retrieve, destroy, and record the fact of destruction of any reproduced copies when they have served their purpose.

# OTHER SOURCES OF EXAMINATION INFORMATION AND POLICY GUIDANCE

The primary purpose of this Manual is to provide policy guidance and direction to the field examiner that should be applied in the risk management examination process. Other policy manuals or other instructional materials pertaining to additional areas of examination interest, such as trust department operations, IT activities, transfer agent, and consumer compliance have also been developed. Those areas were not addressed significantly in this Manual in order to enhance the organization of the primary risk management material and to keep the document reasonable in length. However, exclusion of these topics in no way implies that these activities do not impact a safety and soundness examination. To the contrary, deficiencies in other aspects of a bank's operations can have a major impact on an institution's overall condition. Therefore, it is critical for examiners to be aware of the existence and understand the significance of deficiencies in other areas.

Specialty examination findings should be addressed in the ECC section of the risk management report of examination (ROE). The placement and length of related comments should be commensurate with the significance of the findings and the impact on risk management ratings. There are no

**BASIC EXAMINATION CONCEPTS AND GUIDELINES**  Section 1.1

mandatory specialty examination pages; however, examiners may include specialty pages in the risk management ROE when separate pages are the most effective means to communicate findings.

If a specialty examination is conducted at a date substantially removed from other examination activities, examiners may communicate their findings through a visitation report and letter to the institution if warranted. However, summary comments should also be included in the risk management ROE and factored into risk management ratings.

In some situations, it may be necessary for examiners to conduct specialty examinations separately from the Risk Management examination. In these rare cases, a separate specialty examination report may be prepared, consistent with regional guidance and outstanding report preparation instructions.

To emphasize and illustrate how weaknesses in these ancillary activities can adversely affect the whole bank, a brief overview of trust, IT, BSA, and consumer protection activities is provided.

## Trust Department

A bank's trust department acts in a fiduciary capacity when the assets it manages are not the bank's, but belong to and are for the benefit of others. This type of relationship necessitates a great deal of confidence on the part of customers and demands a high degree of good faith and responsibility on a bank's part. The primary objective of a trust department examination is to determine whether its operations or the administration of its accounts have given rise to possible or contingent liabilities, or direct liabilities (estimated losses), which could reduce the bank's capital accounts. If the terms of trust instruments are violated, if relevant laws and regulations are not complied with, or if generally accepted fiduciary standards are not adhered to, the department, and hence the bank, may become liable and suffer losses. If the magnitude of these losses is very high, the viability of the bank may be threatened. To aid examiners in evaluating a trust department, the Uniform Interagency Trust Rating System was devised. Composite ratings of 1 (highest level of performance) through 5 (most critically deficient level of performance) are assigned based on analysis of five critical areas of a trust department's administration and operations. These include Management; Operations, Internal Controls and Audits; Earnings; Compliance; and Asset Management.

## Information Technology (IT)

Information technology services apply to virtually all recordkeeping and operational areas in banks. These IT services may be managed internally on a bank's own in-house computer system, or outsourced, wholly or in part, to an independent data center that performs most IT functions. Although some or all IT services may be outsourced, management and the board retain oversight responsibilities.

The potential consequences of receiving faulty data or suffering an interruption of services are serious and warrant comprehensive IT policies and procedures and thorough IT examinations. A primary objective of an IT examination is to determine the confidentiality, integrity, and availability of records produced by automated systems. Examination priorities include an evaluation of management's ability to identify risks and maintain appropriate compensating controls.

IT operations are rated in accordance with the Uniform Interagency Rating System for Information Technology (URSIT), which is based on an evaluation of four critical components: audit; management; development and acquisition; and support and delivery. The composite IT rating is influenced by the performance of the four component functions and reflects the effectiveness of a bank's IT risk management and information security programs and practices. A scale of 1 through 5 is used, wherein 1 indicates strong performance and 5 denotes critically deficient operating performance.

Most IT examinations are embedded in risk management ROEs and only include an URSIT composite rating. However, with approval from a regional director or their designee, examiners may conduct full-scope IT examinations that include composite and component ratings.

## Bank Secrecy Act (BSA)

The Financial Recordkeeping and Reporting of Currency and Foreign Transactions Act of 1970 is often referred to as the Bank Secrecy Act (BSA). The purpose of the BSA is to ensure U.S. financial institutions maintain appropriate records and file certain reports involving currency transactions and customer relationships. Several acts and regulations that strengthen the scope and enforcement of BSA, anti-money laundering, and counter-terrorist-financing measures have been signed into law. Some of these include:

Money Laundering Control Act - 1986
Annuzio-Wylie Anti-Money Laundering Act - 1992
Money Laundering Suppression Act - 1994
Money Laundering and Financial Crimes Strategy Act - 1998
USA PATRIOT Act - 2001

Findings from BSA examinations are generally included

**BASIC EXAMINATION CONCEPTS AND GUIDELINES**                    Section 1.1

within the safety and soundness report; however, separate BSA examinations can be conducted. Although a separate rating system for BSA does not exist, BSA findings can affect both the management rating and the overall composite rating of the institution. Refer to the BSA section of this Manual for additional information.

## Consumer Protection

The principal objective of consumer protection examinations is to determine a bank's compliance with various consumer, mortgage, and civil rights laws and regulations. Consumer protection statutes include, but are not limited to, Truth in Lending, Truth in Savings, Community Reinvestment Act, and Fair Housing regulations. Noncompliance with these regulatory restrictions and standards may result in an injustice to affected individual(s) and reflects adversely on an institution's management and reputation. Moreover, violations of consumer laws can result in civil or criminal liabilities, and consequently, financial penalties. If significant in amount, such losses could have an adverse financial impact on a bank. As is the case for IT and trust operations, an interagency rating system for consumer compliance has been designed. It provides a general framework for evaluating an institution's conformance with consumer protection and civil rights laws and regulations. A numbering scheme of 1 through 5 is used with 1 signifying the best performance and 5 the worst performance. A separate examination rating is assigned to each institution based on its performance in the area of community reinvestment. The four ratings are outstanding; satisfactory; needs to improve; and substantial noncompliance.

## Summary

Risk management examiners should have a general knowledge of the key principles, policies, and practices relating to IT, BSA, consumer protection, trust, and other specialty examinations. Additionally, examiners should be knowledgeable of state laws and regulations that apply to the banks they examine; the rules, regulations, statements of policy and various banking-related statutes contained in the FDIC's rule and regulations; and the instructions for completing Consolidated Reports of Condition and Income.

## DISCLOSING REPORTS OF EXAM

The Report of Examination is highly confidential. Although a copy is provided to a bank, that copy remains the property of the FDIC. Without the FDIC's prior authorization, directors, officers, employees, and agents of a bank are not permitted to disclose the contents of a report. Under specified circumstances, FDIC regulations permit disclosures by a bank to its parent holding company or majority shareholder.

Standard FDIC regulations do not prohibit employees or agents of a bank from reviewing the Report of Examination if it is necessary for purposes of their employment. Accountants and attorneys acting in their capacities as bank employees or agents may review an examination report without prior FDIC approval, but only insofar as it relates to their scope of employment. The FDIC believes the definition of agent includes an accountant or accounting firm which performs an audit of the bank.

Reports of Examination are routinely provided to a bank's chartering authority. Therefore, state bank examiners may review the bank's copy of an FDIC examination during a state examination.

## EXAMINATION WORKPAPERS

### Introduction

Examiners should document their findings through a combination of brief summaries, source documents, report comments, and other workpapers that clearly describe financial conditions, management practices, and examination conclusions. Documentation should generally describe:

- Key audit/risk scoping decisions,
- Core source documents reviewed, and
- General examination procedures performed.

Documentation should include summary statements. Summary statements can take many forms, including notations on copies of source documents, separate hand-written notes, comments in Examination Documentation (ED) modules, and electronic or hard-copy memorandums. At a minimum, summary comments should:

- Detail examination findings and recommendations,
- Describe supporting facts and logic, and
- Record management responses.

Although examination documentation may be maintained in various ways, examiners must securely retain appropriate supporting records of all major examination conclusions, recommendations, and assertions detailed in the Report of Examination.

### Safeguarding Examination Information

Examination information may contain non-public customer information as defined in Section 501(b) of the Gramm-

# BASIC EXAMINATION CONCEPTS AND GUIDELINES

Section 1.1

Leach-Bliley Act. Therefore, examiners must exercise a high degree of care to safeguard information and control the access, storage and transport of information stored on laptops, retained on other storage media, or paper copies.

Examiners must protect FDIC property and data and respond quickly to any security breech. Examiners should:

- Protect computer equipment and data in transit,
- Track data in transit, and
- Secure unattended equipment and data.

Examiners must report unauthorized access to data and equipment on a timely basis. Examiners should contact the FDIC's Help Desk Staff within one hour after discovery; their supervisor as soon as possible; and in instances where theft of equipment is involved, contact the local police.

FDIC regional offices must develop procedures for accessing, transporting, storing, and disposing of electronic and paper information. The procedures should include minimum technical, physical, and administrative safeguards, and include an incident response program.

Refer to internal directives for additional information.

## Examination Documentation Modules

Examination procedures have been developed jointly by the FDIC, the Federal Reserve, and various state agencies to provide examiners with tools to scope examination activities, evaluate financial conditions and risk-management practices, and document examination findings. The use of these modules is discretionary. When not used, examination findings should be documented as discussed above.

The ED modules incorporate questions and points of consideration into examination procedures that specifically address a bank's risk management strategies for each of its major business activities. The modules direct examiners to evaluate areas of risk and associated risk-control practices, thereby facilitating an effective supervisory program. The ED module examination procedures are generally separated into three distinct tiers: Core Analysis, Expanded Analysis, and Impact Analysis. The extent to which an examiner works through each of these levels of analysis depends upon the conclusions reached regarding the presence of significant concerns or deficiencies.

Where significant deficiencies or weaknesses are noted in the Core Analysis review, the examiner should complete the Expanded Analysis section, but only for the decision factors that present the greatest degree of risk to the bank. On the other hand, if risks are properly managed, examiners can

conclude their review after documenting conclusions concerning the Core Analysis Decision Factors and carrying forward any applicable comments to the Report of Examination. The Expanded Analysis section provides guidance to examiners to help determine if weaknesses are material to a bank's condition or if an activity is inadequately managed.

The use of the modules should be tailored to the characteristics of each bank based on its size, complexity, and risk profile. As a result, the extent to which each module is completed will vary. Individual procedures presented for each level are meant only to serve as a guide for answering the decision factors. Each procedure does not require an individual response.

## Substance of Workpapers

Appropriate documentation should be prepared and retained in the workpapers for each significant job task performed. A checklist of examination procedures performed may be used to document completed tasks and included as part of the examination workpapers. The checklist may also be used as the final documentation of lower-risk areas that receive limited reviews and findings are not material.

Examiners should use standardized loan line sheets except in special situations where alternative forms, such as institution generated line sheets, provide a clear and substantial time savings and the same general loan information. Line sheets must contain sufficient, albeit sometimes brief, supporting data to substantiate a pass or adverse classification.

For BSA examinations, examiners should document preliminary, core, and expanded procedures as needed, in accordance with current guidance relating to BSA/AML workprograms for examination procedures.

Workpaper forms are available in GENESYS to supplement report pages for certain areas of review, such as risk-weighted assets and cash flow projections. When warranted, supplemental workpapers may be included in the Report of Examination to the extent that they provide material support for significant findings.

## Filing of Workpapers

Workpapers relating to major assignments should be segregated and securely stored in separate folders, envelopes, or indexed binders. For example, workpapers generated for evaluating internal routines and controls may be filed together under one major heading or separately under the major categories reviewed. Line cards should be segregated from other workpapers, alphabetized, and securely banded.

**BASIC EXAMINATION CONCEPTS AND GUIDELINES**                              Section 1.1

When electronic workpapers are retained, the electronic media must be encrypted, password protected, and stored in a locked facility. Non-FDIC issued laptops, desktops, or other electronic devices may not be used to store institution-provided information or examination workpapers.

BSA workpapers should be maintained separately from the workpapers of the risk management examination and must be retained for five years. The separate retention of BSA workpapers will expedite their submission to the Treasury Department in the event that they are requested for an investigation.

Each folder, envelope, or binder should be labeled with the institution's name and location, the date of examination, and a list of documents that have been prepared and retained for each category. At its discretion, each region and field office may designate the major documentation categories and supplemental lists for their respective office(s). The workpaper folders, envelopes, or binders should then be organized in a labeled box, expandable file, or other appropriate centralized filing system and retained at the conclusion of the examination. The EIC is responsible for ensuring outdated workpapers are appropriately purged and current workpapers are properly organized and filed.

## Retention of Workpapers

Line sheets should generally be retained for one examination cycle, after which they may be purged from the active loan deck. Risk Management, IT, and Trust Officer's Questionnaires and BSA workpapers should be retained for a minimum of five years from the examination start date. Officer Questionnaires should be retained indefinitely when irregularities are discovered or suspected, especially if the signed questionnaire may provide evidence of these irregularities. The examiner may submit a copy of the Officer's Questionnaire with the Report of Examination if circumstances warrant, such as when the examiner suspects that an officer knowingly provided incorrect information on the document. Retention of other workpapers beyond one examination should generally be confined to those banks with existing or pending administrative actions, special documents relating to past insider abuse, documents which are the subject of previous criminal referral letters, or other such sensitive documents. While the retention of workpapers beyond one examination cycle is generally discouraged, major schedules and other pertinent workpapers can be retained if deemed useful. Additionally, if a bank's composite rating is 3 or worse, most workpapers should be maintained until the bank returns to a satisfactory condition.

**BASIC EXAMINATION CONCEPTS AND GUIDELINES**                    Section 1.1

## ADDENDUM TO SECTION 1.1

## UFIRS RATINGS DEFINITIONS

### Composite Ratings

Composite ratings are based on a careful evaluation of an institution's managerial, operational, financial, and compliance performance. The six key components used to assess an institution's financial condition and operations are: capital adequacy, asset quality, management capability, earnings quantity and quality, liquidity adequacy, and sensitivity to market risk. The composite ratings are defined as follows:

### Composite 1

Financial institutions in this group are sound in every respect and generally have components rated 1 or 2. Any weaknesses are minor and can be handled in a routine manner by the board of directors and management. These financial institutions are the most capable of withstanding the vagaries of business conditions and are resistant to outside influences such as economic instability in their trade area. These financial institutions are in substantial compliance with laws and regulations. As a result, these financial institutions exhibit the strongest performance and risk management practices relative to the institution's size, complexity, and risk profile, and give no cause for supervisory concern.

### Composite 2

Financial institutions in this group are fundamentally sound. For a financial institution to receive this rating, generally no component rating should be more severe than 3. Only moderate weaknesses are present and are well within the board of directors' and management's capabilities and willingness to correct. These financial institutions are stable and are capable of withstanding business fluctuations. These financial institutions are in substantial compliance with laws and regulations. Overall risk management practices are satisfactory relative to the institution's size, complexity, and risk profile. There are no material supervisory concerns and, as a result, the supervisory response is informal and limited.

### Composite 3

Financial institutions in this group exhibit some degree of supervisory concern in one or more of the component areas. These financial institutions exhibit a combination of weaknesses that may range from moderate to severe; however, the magnitude of the deficiencies generally will not cause a component to be rated more severely than 4. Management may lack the ability or willingness to effectively

address weaknesses within appropriate time frames. Financial institutions in this group generally are less capable of withstanding business fluctuations and are more vulnerable to outside influences than those institutions rated a composite 1 or 2. Additionally, these financial institutions may be in significant noncompliance with laws and regulations. Risk management practices may be less than satisfactory relative to the institution's size, complexity, and risk profile. These financial institutions require more than normal supervision, which may include formal or informal enforcement actions. Failure appears unlikely, however, given the overall strength and financial capacity of these institutions.

### Composite 4

Financial institutions in this group generally exhibit unsafe and unsound practices or conditions. There are serious financial or managerial deficiencies that result in unsatisfactory performance. The problems range from severe to critically deficient. The weaknesses and problems are not being satisfactorily addressed or resolved by the board of directors and management. Financial institutions in this group generally are not capable of withstanding business fluctuations. There may be significant noncompliance with laws and regulations. Risk management practices are generally unacceptable relative to the institution's size, complexity, and risk profile. Close supervisory attention is required, which means, in most cases, formal enforcement action is necessary to address the problems. Institutions in this group pose a risk to the deposit insurance fund. Failure is a distinct possibility if the problems and weaknesses are not satisfactorily addressed and resolved.

### Composite 5

Financial institutions in this group exhibit extremely unsafe and unsound practices or conditions; exhibit a critically deficient performance; often contain inadequate risk management practices relative to the institution's size, complexity, and risk profile; and are of the greatest supervisory concern. The volume and severity of problems are beyond management's ability or willingness to control or correct. Immediate outside financial or other assistance is needed in order for the financial institution to be viable. Ongoing supervisory attention is necessary. Institutions in this group pose a significant risk to the deposit insurance fund and failure is highly probable.

## Component Ratings

Each of the component rating descriptions are divided into an introductory paragraph, a list of principal evaluation factors, and a brief description of each numerical rating. Some of the evaluation factors are reiterated under one or more of the

**BASIC EXAMINATION CONCEPTS AND GUIDELINES**                    Section 1.1

other components to reinforce the interrelationship between components. The evaluation factors for each component rating are in no particular order of importance.

**Capital Adequacy**

A financial institution is expected to maintain capital commensurate with the nature and extent of risks to the institution and the ability of management to identify, measure, monitor, and control these risks. The effect of credit, market, and other risks on the institution's financial condition should be considered when evaluating the adequacy of capital. The types and quantity of risk inherent in an institution's activities will determine the extent to which it may be necessary to maintain capital at levels above required regulatory minimums to properly reflect the potentially adverse consequences that these risks may have on the institution's capital.

The capital adequacy of an institution is rated based upon, but not limited to, an assessment of the following evaluation factors:

- The level and quality of capital and the overall financial condition of the institution;
- The ability of management to address emerging needs for additional capital;
- The nature, trend, and volume of problem assets, and the adequacy of allowances for loan and lease losses and other valuation reserves;
- Balance sheet composition, including the nature and amount of intangible assets, market risk, concentration risk, and risks associated with nontraditional activities;
- Risk exposure represented by off-balance sheet activities;
- The quality and strength of earnings, and the reasonableness of dividends;
- Prospects and plans for growth, as well as past experience in managing growth; and
- Access to capital markets and other sources of capital including support provided by a parent holding company.

Ratings

A rating of 1 indicates a strong capital level relative to the institution's risk profile.

A rating of 2 indicates a satisfactory capital level relative to the financial institution's risk profile.

A rating of 3 indicates a less than satisfactory level of capital that does not fully support the institution's risk profile. The rating indicates a need for improvement, even if the institution's capital level exceeds minimum regulatory and statutory requirements.

A rating of 4 indicates a deficient level of capital. In light of the institution's risk profile, viability of the institution may be threatened. Assistance from shareholders or other external sources of financial support may be required.

A rating of 5 indicates a critically deficient level of capital such that the institution's viability is threatened. Immediate assistance from shareholders or other external sources of financial support is required.

**Asset Quality**

The asset quality rating reflects the quantity of existing and potential credit risk associated with the loan and investment portfolios, other real estate owned, and other assets, as well as off-balance sheet transactions. The ability of management to identify, measure, monitor, and control credit risk is also reflected here. The evaluation of asset quality should consider the adequacy of the Allowance for Loan and Lease Losses (ALLL) and weigh the exposure to counter-party, issuer, or borrower default under actual or implied contractual agreements. All other risks that may affect the value or marketability of an institution's assets, including, but not limited to, operating, market, reputation, strategic, or compliance risks, should also be considered.

The asset quality of a financial institution is rated based upon, but not limited to, an assessment of the following evaluation factors:

- The adequacy of underwriting standards, soundness of credit administration practices, and appropriateness of risk identification practices;
- The level, distribution, severity, and trend of problem, classified, nonaccrual, restructured, delinquent, and nonperforming assets for both on- and off-balance sheet transactions;
- The adequacy of the allowance for loan and lease losses and other asset valuation reserves;
- The credit risk arising from or reduced by off-balance sheet transactions, such as unfunded commitments, credit derivatives, commercial and standby letters of credit, and lines of credit;
- The diversification and quality of the loan and investment portfolios;
- The extent of securities underwriting activities and exposure to counter-parties in trading activities;
- The existence of asset concentrations;
- The adequacy of loan and investment policies, procedures, and practices;
- The ability of management to properly administer its

**BASIC EXAMINATION CONCEPTS AND GUIDELINES**                    Section 1.1

assets, including the timely identification and collection of problem assets;

- The adequacy of internal controls and management information systems; and
- The volume and nature of credit-documentation exceptions.

Ratings

A rating of 1 indicates strong asset quality and credit administration practices. Identified weaknesses are minor in nature and risk exposure is modest in relation to capital protection and management's abilities. Asset quality in such institutions is of minimal supervisory concern.

A rating of 2 indicates satisfactory asset quality and credit administration practices. The level and severity of classifications and other weaknesses warrant a limited level of supervisory attention. Risk exposure is commensurate with capital protection and management's abilities.

A rating of 3 is assigned when asset quality or credit administration practices are less than satisfactory. Trends may be stable or indicate deterioration in asset quality or an increase in risk exposure. The level and severity of classified assets, other weaknesses, and risks require an elevated level of supervisory concern. There is generally a need to improve credit administration and risk management practices.

A rating of 4 is assigned to financial institutions with deficient asset quality or credit administration practices. The levels of risk and problem assets are significant, inadequately controlled, and subject the financial institution to potential losses that, if left unchecked, may threaten its viability.

A rating of 5 represents critically deficient asset quality or credit administration practices that present an imminent threat to the institution's viability.

**Management**

The capability of the board of directors and management, in their respective roles to identify, measure, monitor, and control the risks of an institution's activities and to ensure a financial institution's safe, sound, and efficient operation in compliance with applicable laws and regulations is reflected in this rating. Generally, directors need not be actively involved in day-to-day operations; however, they must provide clear guidance regarding acceptable risk exposure levels and ensure that appropriate policies, procedures, and practices have been established. Senior management is responsible for developing and implementing policies, procedures, and practices that translate the board's goals, objectives, and risk limits into prudent operating standards.

Depending on the nature and scope of an institution's activities, management practices may need to address some or all of the following risks: credit, market, operating or transaction, reputation, strategic, compliance, legal, liquidity, and other risks. Sound management practices are demonstrated by active oversight by the board of directors and management; competent personnel; adequate policies, processes, and controls taking into consideration the size and sophistication of the institution; maintenance of an appropriate audit program and internal control environment; and effective risk monitoring and management information systems. This rating should reflect the board's and management's ability as it applies to all aspects of banking operations as well as other financial service activities in which the institution is involved.

The capability and performance of management and the board of directors is rated based upon, but not limited to, an assessment of the following evaluation factors:

- The level and quality of oversight and support of all institution activities by the board of directors and management;
- The ability of the board of directors and management, in their respective roles, to plan for, and respond to, risks that may arise from changing business conditions or the initiation of new activities or products;
- The adequacies of, and conformance with, appropriate internal policies and controls addressing the operations and risks of significant activities;
- The accuracy, timeliness, and effectiveness of management information and risk monitoring systems appropriate for the institution's size, complexity, and risk profile;
- The adequacy of audits and internal controls to: promote effective operations and reliable financial and regulatory reporting; safeguard assets; and ensure compliance with laws, regulations, and internal policies;
- Compliance with laws and regulations;
- Responsiveness to recommendations from auditors and supervisory authorities;
- Management depth and succession;
- The extent that the board of directors and management is affected by, or susceptible to, dominant influence or concentration of authority;
- Reasonableness of compensation policies and avoidance of self-dealing;
- Demonstrated willingness to serve the legitimate banking needs of the community; and
- The overall performance of the institution and its risk profile.

Ratings

**BASIC EXAMINATION CONCEPTS AND GUIDELINES**                   Section 1.1

A rating of 1 indicates strong performance by management and the board of directors and strong risk management practices relative to the institution's size, complexity, and risk profile.   All significant risks are consistently and effectively identified, measured, monitored, and controlled. Management and the board have demonstrated the ability to promptly and successfully address existing and potential problems and risks.

A rating of 2 indicates satisfactory management and board performance and risk management practices relative to the institution's size, complexity, and risk profile.   Minor weaknesses may exist, but are not material to the safety and soundness of the institution and are being addressed.   In general, significant risks and problems are effectively identified, measured, monitored, and controlled.

A rating of 3 indicates management and board performance that need improvement or risk management practices that are less than satisfactory given the nature of the institution's activities.  The capabilities of management or the board of directors may be insufficient for the type, size, or condition of the institution.   Problems and significant risks may be inadequately identified, measured, monitored, or controlled.

A rating of 4 indicates deficient management and board performance or risk management practices that are inadequate considering the nature of an institution's activities.   The level of problems and risk exposure is excessive.  Problems and significant risks are inadequately identified, measured, monitored, or controlled and require immediate action by the board and management to preserve the soundness of the institution. Replacing or strengthening management or the board may be necessary.

A rating of 5 indicates critically deficient management and board performance or risk management practices. Management and the board of directors have not demonstrated the ability to correct problems and implement appropriate risk management practices.   Problems and significant risks are inadequately identified, measured, monitored, or controlled and now threaten the continued viability of the institution.   Replacing or strengthening management or the board of directors is necessary.

**Earnings**

This rating reflects not only the quantity and trend of earnings, but also factors that may affect the sustainability or quality of earnings.  The quantity as well as the quality of earnings can be affected by excessive or inadequately managed credit risk that may result in loan losses and require additions to the ALLL, or by high levels of market risk that may unduly expose an institution's earnings to volatility in

interest rates.   The quality of earnings may also be diminished by undue reliance on extraordinary gains, nonrecurring events, or favorable tax effects.  Future earnings may be adversely affected by an inability to forecast or control funding and operating expenses, improperly executed or ill-advised business strategies, or poorly managed or uncontrolled exposure to other risks.

The rating of an institution's earnings is based upon, but not limited to, an assessment of the following evaluation factors:

- The level of earnings, including trends and stability;
- The ability to provide for adequate capital through retained earnings;
- The quality and sources of earnings;
- The level of expenses in relation to operations;
- The adequacy of the budgeting systems, forecasting processes, and management information systems in general;
- The adequacy of provisions to maintain the allowance for loan and lease losses and other valuation allowance accounts; and
- The earnings exposure to market risk such as interest rate, foreign exchange, and price risks.

Ratings

A rating of 1 indicates earnings that are strong.  Earnings are more than sufficient to support operations and maintain adequate capital and allowance levels after consideration is given to asset quality, growth, and other factors affecting the quality, quantity, and trend of earnings.

A rating of 2 indicates earnings that are satisfactory. Earnings are sufficient to support operations and maintain adequate capital and allowance levels after consideration is given to asset quality, growth, and other factors affecting the quality, quantity, and trend of earnings.  Earnings that are relatively static, or even experiencing a slight decline, may receive a 2 rating provided the institution's level of earnings is adequate in view of the assessment factors listed above.

A rating of 3 indicates earnings that need to be improved. Earnings may not fully support operations and provide for the accretion of capital and allowance levels in relation to the institution's overall condition, growth, and other factors affecting the quality, quantity, and trend of earnings.

A rating of 4 indicates earnings that are deficient.  Earnings are insufficient to support operations and maintain appropriate capital and allowance levels.  Institutions so rated may be characterized by erratic fluctuations in net income or net interest margin, the development of significant negative trends, nominal or unsustainable earnings, intermittent losses,

**BASIC EXAMINATION CONCEPTS AND GUIDELINES**                    Section 1.1

or a substantive drop in earnings from the previous years.

A rating of 5 indicates earnings that are critically deficient. A financial institution with earnings rated 5 is experiencing losses that represent a distinct threat to its viability through the erosion of capital.

**Liquidity**

In evaluating the adequacy of a financial institution's liquidity position, consideration should be given to the current level and prospective sources of liquidity compared to funding needs, as well as to the adequacy of funds management practices relative to the institution's size, complexity, and risk profile. In general, funds management practices should ensure that an institution is able to maintain a level of liquidity sufficient to meet its financial obligations in a timely manner and to fulfill the legitimate banking needs of its community. Practices should reflect the ability of the institution to manage unplanned changes in funding sources, as well as react to changes in market conditions that affect the ability to quickly liquidate assets with minimal loss. In addition, funds management practices should ensure that liquidity is not maintained at a high cost, or through undue reliance on funding sources that may not be available in times of financial stress or adverse changes in market conditions.

Liquidity is rated based upon, but not limited to, an assessment of the following evaluation factors:

• The adequacy of liquidity sources compared to present and future needs and the ability of the institution to meet liquidity needs without adversely affecting its operations or condition;
• The availability of assets readily convertible to cash without undue loss;
• Access to money markets and other sources of funding;
• The level of diversification of funding sources, both on- and off-balance sheet;
• The degree of reliance on short-term, volatile sources of funds, including borrowings and brokered deposits, to fund longer term assets;
• The trend and stability of deposits;
• The ability to securitize and sell certain pools of assets; and
• The capability of management to properly identify, measure, monitor, and control the institution's liquidity position, including the effectiveness of funds management strategies, liquidity policies, management information systems, and contingency funding plans.

Ratings

A rating of 1 indicates strong liquidity levels and well-developed funds management practices. The institution has reliable access to sufficient sources of funds on favorable terms to meet present and anticipated liquidity needs.

A rating of 2 indicates satisfactory liquidity levels and funds management practices. The institution has access to sufficient sources of funds on acceptable terms to meet present and anticipated liquidity needs. Modest weaknesses may be evident in funds management practices.

A rating of 3 indicates liquidity levels or funds management practices in need of improvement. Institutions rated 3 may lack ready access to funds on reasonable terms or may evidence significant weaknesses in funds management practices.

A rating of 4 indicates deficient liquidity levels or inadequate funds management practices. Institutions rated 4 may not have or be able to obtain a sufficient volume of funds on reasonable terms to meet liquidity needs.

A rating of 5 indicates liquidity levels or funds management practices so critically deficient that the continued viability of the institution is threatened. Institutions rated 5 require immediate external financial assistance to meet maturing obligations or other liquidity needs.

**Sensitivity to Market Risk**

The sensitivity to market risk component reflects the degree to which changes in interest rates, foreign exchange rates, commodity prices, or equity prices can adversely affect a financial institution's earnings or economic capital. When evaluating this component, consideration should be given to: management's ability to identify, measure, monitor, and control market risk; the institution's size; the nature and complexity of its activities; and the adequacy of its capital and earnings in relation to its level of market risk exposure.

For many institutions, the primary source of market risk arises from nontrading positions and their sensitivity to changes in interest rates. In some larger institutions, foreign operations can be a significant source of market risk. For some institutions, trading activities are a major source of market risk.

Market risk is rated based upon, but not limited to, an assessment of the following evaluation factors:

• The sensitivity of the financial institution's earnings or the economic value of its capital to adverse changes in interest rates, foreign exchange rates, commodity prices, or equity prices;
• The ability of management to identify, measure,

**BASIC EXAMINATION CONCEPTS AND GUIDELINES**                    Section 1.1

monitor, and control exposure to market risk given the institution's size, complexity, and risk profile;

- The nature and complexity of interest rate risk exposure arising from nontrading positions; and
- Where appropriate, the nature and complexity of market risk exposure arising from trading and foreign operations.

Ratings

A rating of 1 indicates that market risk sensitivity is well controlled and that there is minimal potential that the earnings performance or capital position will be adversely affected. Risk management practices are strong for the size, sophistication, and market risk accepted by the institution. The level of earnings and capital provide substantial support for the degree of market risk taken by the institution.

A rating of 2 indicates that market risk sensitivity is adequately controlled and that there is only moderate potential that the earnings performance or capital position will be adversely affected. Risk management practices are satisfactory for the size, sophistication, and market risk accepted by the institution. The level of earnings and capital provide adequate support for the degree of market risk taken by the institution.

A rating of 3 indicates that control of market risk sensitivity needs improvement or that there is significant potential that the earnings performance or capital position will be adversely affected. Risk management practices need to be improved given the size, sophistication, and level of market risk accepted by the institution. The level of earnings and capital may not adequately support the degree of market risk taken by the institution.

A rating of 4 indicates that control of market risk sensitivity is unacceptable or that there is high potential that the earnings performance or capital position will be adversely affected. Risk management practices are deficient for the size, sophistication, and level of market risk accepted by the institution. The level of earnings and capital provide inadequate support for the degree of market risk taken by the institution.

A rating of 5 indicates that control of market risk sensitivity is unacceptable or that the level of market risk taken by the institution is an imminent threat to its viability. Risk management practices are wholly inadequate for the size, sophistication, and level of market risk accepted by the institution.

# LOANS

## INTRODUCTION

The examiner's evaluation of a bank's lending policies, credit administration, and the quality of the loan portfolio is among the most important aspects of the examination process. To a great extent, it is the quality of a bank's loan portfolio that determines the risk to depositors and to the FDIC's insurance fund. Conclusions regarding the bank's condition and the quality of its management are weighted heavily by the examiner's findings with regard to lending practices. Emphasis on review and appraisal of the loan portfolio and its administration by bank management during examinations recognizes, that loans comprise a major portion of most bank's assets; and, that it is the asset category which ordinarily presents the greatest credit risk and potential loss exposure to banks. Moreover, pressure for increased profitability, liquidity considerations, and a vastly more complex society have produced great innovations in credit instruments and approaches to lending. Loans have consequently become much more complex. Examiners therefore find it necessary to devote a large portion of time and attention to loan portfolio examination.

## LOAN ADMINISTRATION

### Lending Policies

The examiner's evaluation of the loan portfolio involves much more than merely appraising individual loans. Prudent management and administration of the overall loan account, including establishment of sound lending and collection policies, are of vital importance if the bank is to be continuously operated in an acceptable manner.

Lending policies should be clearly defined and set forth in such a manner as to provide effective supervision by the directors and senior officers. The board of directors of every bank has the legal responsibility to formulate lending policies and to supervise their implementation. Therefore examiners should encourage establishment and maintenance of written, up-to-date lending policies which have been approved by the board of directors. A lending policy should not be a static document, but must be reviewed periodically and revised in light of changing circumstances surrounding the borrowing needs of the bank's customers as well as changes that may occur within the bank itself. To a large extent, the economy of the community served by the bank dictates the composition of the loan portfolio. The widely divergent circumstances of regional economies and the considerable variance in characteristics of individual loans preclude establishment of standard or universal lending policies. There are,

however, certain broad areas of consideration and concern that should be addressed in the lending policies of all banks regardless of size or location. These include the following, as minimums:

- General fields of lending in which the bank will engage and the kinds or types of loans within each general field;
- Lending authority of each loan officer;
- Lending authority of a loan or executive committee, if any;
- Responsibility of the board of directors in reviewing, ratifying, or approving loans;
- Guidelines under which unsecured loans will be granted;
- Guidelines for rates of interest and the terms of repayment for secured and unsecured loans;
- Limitations on the amount advanced in relation to the value of the collateral and the documentation required by the bank for each type of secured loan;
- Guidelines for obtaining and reviewing real estate appraisals as well as for ordering reappraisals, when needed;
- Maintenance and review of complete and current credit files on each borrower;
- Appropriate and adequate collection procedures including, but not limited to, actions to be taken against borrowers who fail to make timely payments;
- Limitations on the maximum volume of loans in relation to total assets;
- Limitations on the extension of credit through overdrafts;
- Description of the bank's normal trade area and circumstances under which the bank may extend credit outside of such area;
- Guidelines, which at a minimum, address the goals for portfolio mix and risk diversification and cover the bank's plans for monitoring and taking appropriate corrective action, if deemed necessary, on any concentrations that may exist;
- Guidelines addressing the bank's loan review and grading system ("Watch list");
- Guidelines addressing the bank's review of the Allowance for Loan and Lease Losses (ALLL); and
- Guidelines for adequate safeguards to minimize potential environmental liability.

The above are only as guidelines for areas that should be considered during the loan policy evaluation. Examiners should also encourage management to develop specific guidelines for each lending department or function. As with overall lending policies, it is not the FDIC's intent to suggest universal or standard loan policies for specific types of credit. The establishment of these policies is the

**LOANS**                                                                                                 Section 3.2

responsibility of each bank's Board and management. Therefore, the following discussion of basic principles applicable to various types of credit will not include or allude to acceptable ratios, levels, comparisons or terms. These matters should, however, be addressed in each bank's lending policy, and it will be the examiner's responsibility to determine whether the policies are realistic and being followed.

Much of the rest of this section of the Manual discusses areas that should be considered in the bank's lending policies. Guidelines for their consideration are discussed under the appropriate areas.

## Loan Review Systems

The term *loan review system* refers to the responsibilities assigned to various areas such as credit underwriting, loan administration, problem loan workout, or other areas. Responsibilities may include assigning initial credit grades, ensuring grade changes are made when needed, or compiling information necessary to assess ALLL.

The complexity and scope of a loan review system will vary based upon an institution's size, type of operations, and management practices. Systems may include components that are independent of the lending function, or may place some reliance on loan officers. Although smaller institutions are not expected to maintain separate loan review departments, it is essential that all institutions have an effective loan review system. Regardless of its complexity, an effective loan review system is generally designed to address the following objectives:

- To promptly identify loans with well-defined credit weaknesses so that timely action can be taken to minimize credit loss;
- To provide essential information for determining the adequacy of the ALLL;
- To identify relevant trends affecting the collectibility of the loan portfolio and isolate potential problem areas;
- To evaluate the activities of lending personnel;
- To assess the adequacy of, and adherence to, loan policies and procedures, and to monitor compliance with relevant laws and regulations;
- To provide the board of directors and senior management with an objective assessment of the overall portfolio quality; and
- To provide management with information related to credit quality that can be used for financial and regulatory reporting purposes.

## Credit Grading Systems

Accurate and timely credit grading is a primary component of an effective loan review system. Credit grading involves an assessment of credit quality, the identification of problem loans, and the assignment of risk ratings. An effective system provides information for use in establishing valuation allowances for specific credits and for the determination of an overall ALLL level.

Credit grading systems often place primary reliance on loan officers for identifying emerging credit problems. However, given the importance and subjective nature of credit grading, a loan officer's judgement regarding the assignment of a particular credit grade should generally be subject to review. Reviews may be performed by peers, superiors, loan committee(s), or other internal or external credit review specialists. Credit grading reviews performed by individuals independent of the lending function are preferred because they can often provide a more objective assessment of credit quality. A loan review system should, at a minimum, include the following:

- A formal credit grading system that can be reconciled with the framework used by Federal regulatory agencies;
- An identification of loans or loan pools that warrant special attention;
- A mechanism for reporting identified loans, and any corrective action taken, to senior management and the board of directors; and
- Documentation of an institution's credit loss experience for various components of the loan and lease portfolio.

**Loan Review System Elements**

Management should maintain a written loan review policy that is reviewed and approved at least annually by the board of directors. Policy guidelines should include a written description of the overall credit grading process, and establish responsibilities for the various loan review functions. The policy should generally address the following items:

- Qualifications of loan review personnel;
- Independence of loan review personnel;
- Frequency of reviews;
- Scope of reviews;
- Depth of reviews;
- Review of findings and follow-up; and
- Workpaper and report distribution.

# LOANS

**Section 3.2**

Qualifications of Loan Review Personnel

Personnel involved in the loan review function should be qualified based on level of education, experience, and extent of formal training. They should be knowledgeable of both sound lending practices and their own institution's specific lending guidelines. In addition, they should be knowledgeable of pertinent laws and regulations that affect lending activities.

Loan Review Personnel Independence

Loan officers should be responsible for ongoing credit analysis and the prompt identification of emerging problems. Because of their frequent contact with borrowers, loan officers can usually identify potential problems before they become apparent to others. However, institutions should be careful to avoid over reliance upon loan officers. Management should ensure that, when feasible, all significant loans are reviewed by individuals that are not part of, or influenced by anyone associated with, the loan approval process.

Larger institutions typically establish separate loan review departments staffed by independent credit analysts. Cost and volume considerations may not justify such a system in smaller institutions. Often, members of senior management that are independent of the credit administration process, a committee of outside directors, or an outside loan review consultant fill this role. Regardless of the method used, loan review personnel should report their findings directly to the board of directors or a board committee.

Frequency of Reviews

The loan review function should provide feedback on the effectiveness of the lending process in identifying emerging problems. Reviews of significant credits should generally be performed annually, upon renewal, or more frequently when factors indicate a potential for deteriorating credit quality. A system of periodic reviews is particularly important to the ALLL determination process.

Scope of Reviews

Reviews should cover all loans that are considered significant. In addition to loans over a predetermined size, management will review smaller loans that present elevated risk characteristics such as credits that are delinquent, on nonaccrual status, restructured, previously classified, or designated as Special Mention. Additionally, management may wish to periodically review insider loans, recently renewed credits, or loans affected by common

repayment factors. The percentage of the portfolio selected for review should provide reasonable assurance that all major credit risks have been identified.

Depth of Reviews

Loan reviews should analyze a number of important credit factors, including:

- Credit quality;
- Sufficiency of credit and collateral documentation;
- Proper lien perfection;
- Proper loan approval;
- Adherence to loan covenants;
- Compliance with internal policies and procedures, and applicable laws and regulations; and
- The accuracy and timeliness of credit grades assigned by loan officers.

Review of Findings and Follow-up

Loan review findings should be reviewed with appropriate loan officers, department managers, and members of senior management. Any existing or planned corrective action (including estimated timeframes) should be obtained for all noted deficiencies. All deficiencies that remain unresolved should be reported to senior management and the board of directors.

Workpaper and Report Distribution

A list of the loans reviewed, including the review date, and documentation supporting assigned ratings should be prepared. A report that summarizes the results of the review should be submitted to the board at least quarterly. Findings should address adherence to internal policies and procedures, and applicable laws and regulations, so that deficiencies can be remedied in a timely manner. A written response from management with corrective action outlined, should be provided in response to any substantive criticisms or recommendations.

## Allowance for Loan and Lease Losses (ALLL)

Each bank must maintain an ALLL adequate to absorb estimated credit losses associated with the loan and lease portfolio, i.e., loans and leases that the bank has the intent and ability to hold for the foreseeable future or until maturity or payoff. Each bank should also maintain, as a separate liability account, an allowance sufficient to absorb estimated credit losses associated with off-balance sheet credit instruments such as off-balance sheet loan commitments, standby letters of credit, and guarantees. This separate allowance for credit losses on off-balance

# LOANS

sheet credit exposures should not be reported as part of the ALLL on a bank's balance sheet. Because loans and leases held for sale are carried on the balance sheet at the lower of cost or fair value, no ALLL should be established for such loans and leases.

The term "estimated credit losses" means an estimate of the current amount of the loan and lease portfolio (net of unearned income) that is not likely to be collected; that is, net chargeoffs that are likely to be realized for a loan, or pool of loans. The estimated credit losses should meet the criteria for accrual of a loss contingency (i.e., a provision to the ALLL) set forth in generally accepted accounting principles (GAAP). When available information confirms specific loans and leases, or portions thereof, to be uncollectible, these amounts should be promptly charged-off against the ALLL.

Estimated credit losses should reflect consideration of all significant factors that affect repayment as of the evaluation date. Estimated losses on loan pools should reflect historical net charge-off levels for similar loans, adjusted for changes in current conditions or other relevant factors. Calculation of historical charge-off rates can range from a simple average of net charge-offs over a relevant period, to more complex techniques, such as migration analysis.

Portions of the ALLL can be attributed to, or based upon the risks associated with, individual loans or groups of loans. However, the ALLL is available to absorb credit losses that arise from the entire portfolio. It is not segregated for any particular loan, or group of loans.

## Responsibility of the Board and Management

It is the responsibility of the board of directors and management to maintain the ALLL at an adequate level. The allowance adequacy should be evaluated, and appropriate provisions made, at least quarterly. In carrying out their responsibilities, the board and management are expected to:

- Establish and maintain a loan review system that identifies, monitors, and addresses asset quality problems in a timely manner.
- Ensure the prompt charge-off of loans, or portions of loans, deemed uncollectible.
- Ensure that the process for determining an adequate allowance level is based on comprehensive, adequately documented, and consistently applied analysis.

For purposes of Reports of Condition and Income (Call Reports) and Thrift Financial Reports (TFR) an adequate ALLL should, after deduction of all assets classified loss, be no less than the sum of the following items:

- For loans and leases classified Substandard or Doubtful, whether analyzed and provided for individually or as part of pools, all estimated credit losses over the remaining effective lives of these loans.
- For loans and leases that are not classified, all estimated credit losses over the upcoming 12 months.
- Amounts for estimated losses from transfer risk on international loans.

Furthermore, management's analysis of an adequate reserve level should be conservative to reflect a margin for the imprecision inherent in most estimates of expected credit losses. This additional margin might be incorporated through amounts attributed to individual loans or groups of loans, or in an unallocated portion of the ALLL.

When determining an appropriate allowance, primary reliance should normally be placed on analysis of the various components of a portfolio, including all significant credits reviewed on an individual basis. Examiners should refer to Statement of Financial Accounting Standards No. (FAS) 114, *Accounting by Creditors for Impairment of a Loan*, for guidance in establishing reserves for impaired credits that are reviewed individually. When analyzing the adequacy of an allowance, portfolios should be segmented into as many components as practical. Each component should normally have similar characteristics, such as risk classification, past due status, type of loan, industry, or collateral. A depository institution may, for example, analyze the following components of its portfolio and provide for them in the ALLL:

- Significant credits reviewed on an individual basis;
- Loans and leases that are not reviewed individually, but which present elevated risk characteristics, such as delinquency, adverse classification, or Special Mention designation;
- Homogenous loans that are not reviewed individually, and do not present elevated risk characteristics; and
- All other loans and loan commitments that have not been considered or provided for elsewhere.

In addition to estimated credit losses, the losses that arise from the transfer risk associated with an institution's cross-border lending activities require special consideration. Over and above any minimum amount that is required by the Interagency Country Exposure Review Committee to be provided in the Allocated Transfer Reserve (or charged

# LOANS

to the ALLL), an institution must determine if their ALLL is adequate to absorb estimated losses from transfer risk associated with its cross-border lending exposure.

**Factors to Consider in Estimating Credit Losses**

Estimated credit losses should reflect consideration of all significant factors that affect the portfolio's collectibility as of the evaluation date.  While historical loss experience provides a reasonable starting point, historical losses, or even recent trends in losses, are not by themselves, a sufficient basis to determine an adequate level.  Management should also consider any factors that are likely to cause estimated losses to differ from historical loss experience, including, but not limited to:

- Changes in lending policies and procedures, including underwriting, collection, charge-off and recovery practices;
- Changes in local and national economic and business conditions;
- Changes in the volume or type of credit extended;
- Changes in the experience, ability, and depth of lending management;
- Changes in the volume and severity of past due, nonaccrual, restructured, or classified loans;
- Changes or the quality of an institution's loan review system or the degree of oversight by the board of directors; and,
- The existence of, or changes in the level of, any concentrations of credit.

Institutions are also encouraged to use ratio analysis as a supplemental check for evaluating the overall reasonableness of an ALLL.  Ratio analysis can be useful in identifying trends in the relationship of the ALLL to classified and nonclassified credits, to past due and nonaccrual loans, to total loans and leases and binding commitments, and to historical chargeoff levels.  However, while such comparisons can be helpful as a supplemental check of the reasonableness of management's assumptions and analysis, they are not, by themselves, a sufficient basis for determining an adequate ALLL level.  Such comparisons do not eliminate the need for a comprehensive analysis of the loan and lease portfolio and the factors affecting its collectibility.

**Examiner Responsibilities**

Generally, following the quality assessment of the loan and lease portfolio, the loan review system, and the lending policies, examiners are responsible for assessing the adequacy of the ALLL.  Examiners should consider all significant factors that affect the collectibility of the

portfolio.  Examination procedures for reviewing the adequacy of the ALLL are included in the Examination Documentation (ED) Modules..

In assessing the overall adequacy of an ALLL, it is important to recognize that the related process, methodology, and underlying assumptions require a substantial degree of judgement.  Credit loss estimates will not be precise due to the wide range of factors that must be considered.  Furthermore, the ability to estimate credit losses on specific loans and categories of loans improves over time.  Therefore, examiners will generally accept management's estimates of credit losses in their assessment of the overall adequacy of the ALLL when management has:

- Maintained effective systems and controls for identifying, monitoring and addressing asset quality problems in a timely manner;
- Analyzed all significant factors that affect the collectibility of the portfolio; and
- Established an acceptable ALLL evaluation process that meets the objectives for an adequate ALLL.

If, after the completion of all aspects of the ALLL review described in this section, the examiner does not concur that the reported ALLL level is adequate, or the ALLL evaluation process is deficient, recommendations for correcting these problems, including any examiner concerns regarding an appropriate level for the ALLL, should be noted in the Report of Examination.

**Regulatory Reporting of the ALLL**

An ALLL established in accordance with the guidelines provided above should fall within a range of acceptable estimates.  When an ALLL is deemed inadequate, management will be required to increase the provision for loan and lease loss expense sufficiently to restore the ALLL reported in its Call Report or TFR to an adequate level.

**Accounting and Reporting Treatment**

FAS 5, *Accounting for Contingencies*, provides the basic guidance for recognition of a loss contingency, such as the collectibility of loans (receivables), when it is probable that a loss has been incurred and the amount can be reasonably estimated.  FAS 114, provides more specific guidance about the measurement and disclosure of impairment for certain types of loans.  Specifically, FAS 114 applies to loans that are identified for evaluation on an individual basis.  Loans are considered impaired when, based on current information and events, it is probable that the

# LOANS

creditor will be unable to collect all interest and principal payments due according to the contractual terms of the loan agreement.

For individually impaired loans, FAS 114 provides guidance on the acceptable methods to measure impairment. Specifically, FAS 114 states that when a loan is impaired, a creditor should measure impairment based on the present value of expected future principal and interest cash flows discounted at the loan's effective interest rate, except that as a practical expedient, a creditor may measure impairment based on a loan's observable market price or the fair value of collateral, if the loan is collateral dependent. When developing the estimate of expected future cash flows for a loan, an institution should consider all available information reflecting past events and current conditions, including the effect of existing environmental factors.

Large groups of smaller-balance homogenous loans that are collectively evaluated for impairment are *not* included in the scope of FAS 114. Such groups of loans may include, but are not limited to, credit card, residential mortgage, and consumer installment loans. FAS 5 addresses the accounting for impairment of these loans. Also, FAS 5 provides the accounting guidance for impairment of loans that are not identified for evaluation on an individual basis and loans that are individually evaluated but are not individually considered impaired.

Institutions should not layer their loan loss allowances. Layering is the inappropriate practice of recording in the ALLL more than one amount for the same probable loan loss. Layering can happen when an institution includes a loan in one segment, determines its best estimate of loss for that loan either individually or on a group basis (after taking into account all appropriate environmental factors, conditions, and events), and then includes the loan in another group, which receives an additional ALLL amount.

While different institutions may use different methods, there are certain common elements that should be included in any ALLL methodology. Generally, an institution's methodology should:

- Include a detailed loan portfolio analysis, performed regularly;
- Consider all loans (whether on an individual or group basis);
- Identify loans to be evaluated for impairment on an individual basis under FAS 114 and segment the remainder of the portfolio into groups of loans with similar risk characteristics for evaluation and analysis under FAS 5;

- Consider all known relevant internal and external factors that may affect loan collectibility;
- Be applied consistently but, when appropriate, be modified for new factors affecting collectibility;
- Consider the particular risks inherent in different kinds of lending;
- Consider current collateral values (less costs to sell), where applicable;
- Require that analyses, estimates, reviews and other ALLL methodology functions be performed by competent and well-trained personnel;
- Be based on current and reliable data;
- Be well-documented, in writing, with clear explanations of the supporting analyses and rationale; and,
- Include a systematic and logical method to consolidate the loss estimates and ensure the ALLL balance is recorded in accordance with GAAP.

A systematic methodology that is properly designed and implemented should result in an institution's best estimate of the ALLL. Accordingly, institutions should adjust their ALLL balance, either upward or downward, in each period for differences between the results of the systematic determination process and the unadjusted ALLL balance in the general ledger.

Examiners are encouraged, with the acknowledgement of management, to communicate with an institution's external auditors and request an explanation of their rationale and findings, when differences in judgment concerning the adequacy of the institution's ALLL exist. In case of controversy, the auditors may be reminded of the consensus reached by the Financial Accounting Standards Board's Emerging Issues Task Force (EITF) on Issue No. 85-44, Differences Between Loan Loss Allowances for GAAP and RAP. This issue deals with the situation where regulators mandated that institutions establish loan loss allowances under regulatory accounting principles (RAP) that may be in excess of amounts recorded by the institution in preparing its financial statement under"GAAP. The EITF was asked whether and under what circumstances this can occur. The consensus indicated that auditors should be particularly skeptical in the case of GAAP/RAP differences and must justify them based on the particular facts and circumstances.

Additional guidance on the establishment of loan review systems and an adequate ALLL is provided in the Interagency Statement of Policy on the ALLL dated December 21, 1993, and the Interagency Policy Statement on Allowance for Loan and Lease Losses Methodologies and Documentation for Banks and Savings Associations, dated June 29, 2001.

**LOANS**                                                                    Section 3.2

## PORTFOLIO COMPOSITION

### Commercial Loans

#### General

Loans to business enterprises for commercial or industrial purposes, whether proprietorships, partnerships or corporations, are commonly described as commercial loans. In asset distribution, commercial or business loans frequently comprise one of the most important assets of a bank. They may be secured or unsecured and have short or long-term maturities. Such loans include working capital advances, term loans and loans to individuals for business purposes.

Short-term working capital and seasonal loans provide temporary capital in excess of normal needs. They are used to finance seasonal requirements and are repaid at the end of the cycle by converting inventory and accounts receivable into cash. Such loans may be unsecured; however, many working capital loans are advanced with accounts receivable and/or inventory as collateral. Firms engaged in manufacturing, distribution, retailing and service-oriented businesses use short-term working capital loans.

Term business loans have assumed increasing importance. Such loans normally are granted for the purpose of acquiring capital assets, such as plant and equipment. Term loans may involve a greater risk than do short-term advances, because of the length of time the credit is outstanding. Because of the potential for greater risk, term loans are usually secured and generally require regular amortization. Loan agreements on such credits may contain restrictive covenants during the life of the loan. In some instances, term loans may be used as a means of liquidating, over a period of time, the accumulated and unpaid balance of credits originally advanced for seasonal needs. While such loans may reflect a borrower's past operational problems, they may well prove to be the most viable means of salvaging a problem situation and effecting orderly debt collection.

At a minimum, commercial lending policies should address acquisition of credit information, such as property, operating and cash flow statements; factors that might determine the need for collateral acquisition; acceptable collateral margins; perfecting liens on collateral; lending terms, and charge-offs.

### Accounts Receivable Financing

Accounts receivable financing is a specialized area of commercial lending in which borrowers assign their interests in accounts receivable to the lender as collateral. Typical characteristics of accounts receivable borrowers are those businesses that are growing rapidly and need year-round financing in amounts too large to justify unsecured credit, those that are nonseasonal and need year-round financing because working capital and profits are insufficient to permit periodic cleanups, those whose working capital is inadequate for the volume of sales and type of operation, and those whose previous unsecured borrowings are no longer warranted because of various credit factors.

Several advantages of accounts receivable financing from the borrower's viewpoint are: it is an efficient way to finance an expanding operation because borrowing capacity expands as sales increase; it permits the borrower to take advantage of purchase discounts because the company receives immediate cash on its sales and is able to pay trade creditors on a satisfactory basis; it insures a revolving, expanding line of credit; and actual interest paid may be no more than that for a fixed amount unsecured loan.

Advantages from the bank's viewpoint are: it generates a relatively high yield loan, new business, and a depository relationship; permits continuing banking relationships with long-standing customers whose financial conditions no longer warrant unsecured credit; and minimizes potential loss when the loan is geared to a percentage of the accounts receivable collateral. Although accounts receivable loans are collateralized, it is important to analyze the borrower's financial statements. Even if the collateral is of good quality and in excess of the loan, the borrower must demonstrate financial progress. Full repayment through collateral liquidation is normally a solution of last resort.

Banks use two basic methods to make accounts receivable advances. First, blanket assignment, wherein the borrower periodically informs the bank of the amount of receivables outstanding on its books. Based on this information, the bank advances the agreed percentage of the outstanding receivables. The receivables are usually pledged on a non-notification basis and payments on receivables are made directly to the borrower who then remits them to the bank. The bank applies all or a portion of such funds to the borrower's loan. Second, ledgering the accounts, wherein the lender receives duplicate copies of the invoices together with the shipping documents and/or delivery receipts. Upon receipt of satisfactory information, the bank advances the agreed percentage of the outstanding receivables. The receivables are usually pledged on a notification basis. Under this method, the bank maintains complete control of the funds paid on all accounts pledged

**LOANS**                                                                                    Section 3.2

by requiring the borrower's customer to remit directly to the bank.

In the area of accounts receivable financing, a bank's lending policy should address at least the acquisition of credit information such as property, operating and cash flow statements. It should also address maintenance of an accounts receivable loan agreement that establishes a percentage advance against acceptable receivables, a maximum dollar amount due from any one account debtor, financial strength of debtor accounts, insurance that "acceptable receivables" are defined in light of the turnover of receivables pledged, aging of accounts receivable, and concentrations of debtor accounts.

## Leveraged Financing

The Federal bank regulatory agencies issued guidance on April 9, 2001 concerning sound risk management practices for institutions engaged in leveraged financing.

Leveraged financing is an important financing vehicle for mergers and acquisitions, business re-capitalizations and refinancings, equity buyouts, and business or product line build-outs and expansions. It is also used to increase shareholder returns and to monetize perceived "enterprise value" or other intangibles. A transaction is considered leveraged when the obligor's post-financing leverage as measured by debt-to-assets, debt-to-equity, cash flow-to-total debt, or other such standards unique to particular industries significantly exceeds industry norms for leverage. Leveraged borrowers typically have a diminished ability to adjust to unexpected events and changes in business conditions because of their higher ratio of total liabilities to capital. Consequently, leveraged financing can have significant implications for a banking organization's overall credit risk and presents unique challenges for its risk management systems.

Much of the leveraged financing activity ties into the merger and acquisition activity and the increasing values that were ascribed to firms as a result of a strong expansionary business climate. Leveraged financing transactions account for a sizeable portion of syndicated bank loans.

Institutions participate in leveraged financing on a number of levels. In addition to providing senior secured financing, they extend credit on a subordinated basis (mezzanine financing). Institutions and their affiliates also may take equity positions in leveraged companies with direct investments through affiliated securities firms, small business investment companies (SBICs), and venture capital companies or take equity interests via warrants and

other equity "kickers" received as part of a financing package. Institutions also may invest in leveraged loan funds managed by investment banking companies or other third parties. Although leveraged financing is far more prevalent in large institutions, this type of lending can be found in institutions of all sizes.

The extent to which institutions should apply these practices will depend on the size and risk profile of their leveraged exposures relative to assets, earnings, and capital; and the nature of their leveraged financing activities (i.e., origination and distribution, participant, equity investor, etc.).

**Risk Management Guidelines**

Institutions substantively engaged in leveraged financing should adequately risk rate, track, and monitor these transactions and should maintain policies specifying conditions that would require a change in risk rating, accrual status, loss recognition, or reserves. In general, the risk management framework for leveraged finance is no different from that which should be applied to all lending activities. However, because of the potential higher level of risk, the degree of oversight should be more intensive.

**Loan Policy**

The loan policy should specifically address the institutions' leveraged lending activities by including:

- A definition of leveraged lending;
- An approval policy that requires sufficient senior management oversight;
- Pricing policies that ensure a prudent tradeoff between risk and return; and
- A requirement for action plans whenever cash flow, asset sale proceeds, or collateral values decline significantly from projections. Action plans should include remedial initiatives and triggers for rating downgrades, changes to accrual status, and loss recognition.

**Underwriting Standards**

Either the loan policy or separate underwriting guidelines should prescribe specific underwriting criteria for leveraged financing. The standards should avoid compromising sound banking practices in an effort to broaden market share or realize substantial fees. The policy should:

- Describe appropriate leveraged loan structures;

# LOANS

Section 3.2

- Require reasonable amortization of term loans (i.e., allow a moderate time period to realize the benefit of synergies or augment revenues and institute meaningful repayment);
- Specify collateral policies including acceptable types of collateral, loan to value limits, collateral margins, and proper valuation methodologies;
- Establish covenant requirements, particularly minimum interest and fixed charge coverage and maximum leverage ratios;
- Describe how enterprise values and other intangible business values may be used; and
- Establish minimum documentation requirements for appraisals and valuations, including enterprise values and other intangibles.

## Limits

Leveraged finance and other loan portfolios with above-average default probabilities tend to behave similarly during an economic or sectoral downturn. Consequently, institutions should take steps to avoid undue concentrations by setting limits consistent with their appetite for risk and their financial capacity. Institutions should ensure that they monitor and control as separate risk concentrations those loan segments most vulnerable to default. Institutions may wish to identify such concentrations by the leveraged characteristics of the borrower, by the institution's internal risk grade, by particular industry or other factors that the institution determines are correlated with an above-average default probability. In addition, sub-limits may be appropriate by collateral type, loan purpose, industry, secondary sources of repayment, and sponsor relationships. Institutions should also establish limits for the aggregate number of policy exceptions.

## Credit Analysis

Effective management of leveraged financing risk is highly dependent on the quality of analysis during the approval process and after the loan is advanced. At a minimum, analysis of leveraged financing transactions should ensure that:

- Cash flow analyses do not rely on overly optimistic or unsubstantiated projections of sales, margins, and merger and acquisition synergies;
- Projections provide an adequate margin for unanticipated merger-related integration costs;
- Projections are stress tested for one or two downside scenarios;
- Transactions are reviewed quarterly to determine variance from financial plans, the risk implications

thereof, and the accuracy of risk ratings and accrual status;
- Collateral valuations are derived with a proper degree of independence and consider potential value erosion;
- Collateral liquidation and asset sale estimates are conservative;
- Potential collateral shortfalls are identified and factored into risk rating and accrual decisions;
- Contingency plans anticipate changing conditions in debt or equity markets when exposures rely on refinancing or re-capitalization; and
- The borrower is adequately protected from interest rate and foreign exchange risk.

## Enterprise Value

Enterprise value can be defined as the imputed value of a business. This valuation is often based on the anticipated or imputed sale value, market capitalization, or net worth of the borrower. The sale value is normally some multiple of sales or cash flow based on recent mergers or acquisitions of other firms in the borrower's industry.

This enterprise value is often relied upon in the underwriting of leveraged loans to evaluate the feasibility of a loan request, determine the debt reduction potential of planned asset sales, assess a borrower's ability to access the capital markets, and to provide a secondary source of repayment. Consideration of enterprise value is appropriate in the credit underwriting process. However, enterprise value and other intangible values, which can be difficult to determine, are frequently based on projections, and may be subject to considerable change. Consequently, reliance upon them as a secondary source of repayment can be problematic.

Because enterprise value is commonly derived from the cash flows of a business, it is closely correlated with the primary source of repayment. This interdependent relationship between primary and secondary repayment sources increases the risk in leveraged financing, especially when credit weaknesses develop. Events or changes in business conditions that negatively affect a company's cash flow will also negatively affect the value of the business, simultaneously eroding both the lender's primary and secondary source of repayment. Consequently, lenders that place undue reliance upon enterprise value as a secondary source of repayment or that utilize unrealistic assumptions to determine enterprise value are likely to approve unsound loans at origination or experience sizeable losses upon default.
It is essential that institutions establish sound valuation methodologies for enterprise value, apply appropriate

# LOANS

margins to protect against potential changes in value, and conduct ongoing stress testing and monitoring.

## Rating Leveraged Finance Loans

Institutions need thoroughly articulated policies that specify requirements and criteria for risk rating transactions, identifying loan impairment, and recognizing losses. Such specificity is critical for maintaining the integrity of an institution's risk management system. Institutions should incorporate both the probability of a default and loss given a default in their ratings and rating systems to ensure that both the borrower and transaction risk are clearly evaluated. This is particularly germane to leverage finance transaction structures, which in many recent cases have resulted in large losses upon default.

In cases where a borrower's condition or future prospects have significantly weakened, leverage finance loans will likely merit a Substandard classification based on the existence of well-defined weaknesses. If such weaknesses appear to be of a lasting nature and it is probable that a lender will be unable to collect all principal and interest owed, the loan should be placed on non-accrual and will likely have a Doubtful component. Such loans should be reviewed for impairment in accordance with FAS 114. If the primary source of repayment is inadequate and a loan is considered collateral dependent, it is generally inappropriate to consider enterprise value unless the value is well supported. Well supported enterprise values may be evidenced by a binding purchase and sale agreement with a qualified third party or through valuations that fully consider the effect of the borrower's distressed circumstances and potential changes in business and market conditions. For such borrowers, where a portion of the loan is not protected by pledged assets or a well supported enterprise value, examiners will generally classify the unprotected portion of the loan Doubtful or Loss.

In addition, institutions need to ensure that the risks in leveraged lending activities are fully incorporated in the ALLL and capital adequacy analysis. For allowance purposes, leverage exposures should be taken into account either through analysis of the expected losses from the discrete portfolio or as part of an overall analysis of the portfolio utilizing the institution's internal risk grades or other factors. At the transaction level, exposures heavily reliant on enterprise value as a secondary source of repayment should be scrutinized to determine the need for and adequacy of specific allocations.

## Problem Loan Management

For adversely rated borrowers and other high-risk borrowers who significantly depart from planned cash flows, asset sales, collateral values, or other important targets; institutions should formulate individual action plans with critical objectives and timeframes. Actions may include working with the borrower for an orderly resolution while preserving the institution's interests, sale in the secondary market, and liquidation. Regardless of the action, examiners and bankers need to ensure such credits are reviewed regularly for risk rating accuracy, accrual status, recognition of impairment through specific allocations, and charge-offs.

## Portfolio Analysis

Higher risk credits, including leveraged finance transactions, require frequent monitoring by banking organizations. At least quarterly, management and the board of directors should receive comprehensive reports about the characteristics and trends in such exposures. These reports at a minimum should include:

- Total exposure and segment exposures, including subordinated debt and equity holdings, compared to established limits;
- Risk rating distribution and migration data;
- Portfolio performance, noncompliance with covenants, restructured loans, delinquencies, non-performing assets, and impaired loans; and
- Compliance with internal procedures and the aggregate level of exceptions to policy and underwriting standards.

Institutions with significant exposure levels to higher risk credits should consider additional reports covering:

- Collateral composition of the portfolio. For example, percentages supported by working assets, fixed assets, intangibles, blanket liens, and stock of borrower's operating subsidiaries;
- Unsecured or partially secured exposures, including potential collateral shortfalls caused by defaults that trigger *pari passu* collateral treatment for all lender classes;
- Absolute amount and percentage of the portfolio dependent on refinancing, recapitalization, asset sales, and enterprise value;
- Absolute amounts and percentages of scheduled and actual annual portfolio amortizations; and

- Secondary market pricing data and trading volume for loans in the portfolio.

**LOANS**                                                    Section 3.2

### Internal Controls

Institutions engaged in leveraged finance need to ensure their internal review function is appropriately staffed to provide timely, independent assessments of leveraged credits. Reviews should evaluate risk rating integrity, valuation methodologies, and the quality of risk management. Because of the volatile nature of these credits, portfolio reviews should be conducted on at least an annual basis. For many institutions, the risk characteristics of the leveraged portfolio, such as high reliance on enterprise value, concentrations, adverse risk rating trends or portfolio performance, will dictate more frequent reviews.

### Distributions

Asset sales, participations, syndication, and other means of distribution are critical elements in the rapid growth of leveraged financing. Both lead and purchasing institutions to adopt formal policies and procedures addressing the distribution and acquisition of leveraged financing transactions. Policies should include:

- Procedures for defining, managing, and accounting for distribution fails;
- Identification of any sales made with recourse and procedures for fully reflecting the risk of any such sales.
- A process to ensure that purchasers are provided with timely, current financial information;
- A process to determine the portion of a transaction to be held for investment and the portion to be held for sale;
- Limits on the length of time transactions can be held in the held-for-sale account and policies for handling items that exceed those limits;
- Prompt recognition of losses in market value for loans classified as held-for-sale; and
- Procedural safeguards to prevent conflicts of interest for both bank and affiliated securities firms.

### Participations Purchased

Institutions purchasing participations and assignments in leveraged finance must make a thorough, independent evaluation of the transaction and the risks involved before committing any funds. They should apply the same standards of prudence, credit assessment, approval criteria, and "in-house" limits that would be employed if the purchasing organization were originating the loan.

### Process to Identify Potential Conflicts

Examiners should determine whether an institution's board of directors and management have established policies for leveraged finance that minimize the risks posed by potential legal issues and conflicts of interest.

<u>Conflicts of Interest</u>

When a banking company plays multiple roles in leveraged finance, the interests of different customers or the divisions of the institution may conflict. For example, a lender may be reluctant to employ an aggressive collection strategy with a problem borrower because of the potential impact on the value of the organization's equity interest. A lender may also be pressured to provide financial or other privileged client information that could benefit an affiliated equity investor. Institutions should develop appropriate policies to address potential conflicts of interest. Institutions should also track aggregate totals for borrowers and sponsors to which it has both a lending and equity relationship. Appropriate limits should be established for such relationships.

<u>Securities Laws</u>

Equity interests and certain debt instruments used in leveraged lending may constitute "securities" for the purposes of Federal securities laws. When securities are involved, institutions should ensure compliance with applicable securities law requirements, including disclosure and regulatory requirements. Institutions should also establish procedures to restrict the internal dissemination of material nonpublic information about leveraged finance transactions.

<u>Compliance Function</u>

The legal and regulatory issues raised by leveraged transactions are numerous and complex. To ensure that potential conflicts are avoided and laws and regulations are adhered to, an independent compliance function should review all leveraged financing activity.

### Mezzanine Financing

Mezzanine financing represents those parts of a leveraged financing package that are neither equity nor senior debt. It usually is extended through subsidiaries of banks or nonbank subsidiaries of bank holding companies. Examiners should review policies for mezzanine financing to ensure that they generally include:

# LOANS

- Limits for both aggregate volume and individual transactions;
- Designated booking units;
- Credit approval and reporting processing;
- Management and other reporting requirements;
- An internal risk rating system and requirements for periodic reviews; and
- Procedures for legal review.

## Allowance for Loan and Lease Losses

The potential impact of a bank's participation in leveraged financing should be carefully considered when reviewing the adequacy of the ALLL. The aggregate size and overall condition of the leveraged financing portfolio should be specifically addressed in any review of the overall ALLL adequacy. Examiners should review the bank's methodology for incorporating the special risks related to this financing in its determination of the adequacy of ALLL. Management's internal risk rating system is expected to include assessment of its equity and mezzanine financing portfolio in determining the need for valuation reserves.

## Examination Risk Rating Guidance for Leveraged Financing

When evaluating individual borrowers, examiners should pay particular attention to:

- The overall performance and profitability of a borrower and its industry over time, including periods of economic or financial adversity;
- The history and stability of a borrower's market share, earnings, and cash flow, particularly over the most recent business cycle and last economic downturn; and
- The relationship between a borrowing company's projected cash flow and debt service requirements and the resulting margin of debt service coverage.

### Cash Flow/Debt Service Coverage

Particular attention should be paid to the adequacy of the borrower's cash flow and the reasonableness of projections. Before entering into a leveraged financing transaction, bankers should conduct an independent, realistic assessment of the borrower's ability to achieve the projected cash flow under varying economic and interest rate scenarios. This assessment should take into account the potential effects of an economic downturn or other adverse business conditions on the borrower's cash flow and collateral values. Normally bankers and examiners should adversely rate a credit if material questions exist as to the borrower's ability to achieve the projected necessary

cash flows, or if orderly repayment of the debt is in doubt. Credits with only minimal cash flow for debt service are usually subject to an adverse rating.

### Enterprise Value

Many leveraged financing transactions rely on "enterprise value" as a secondary source of repayment. Most commonly, enterprise value is based on a "going concern" assumption and derived from some multiple of the expected income or cash flow of the firm. The methodology and assumptions underlying the valuation should be clearly disclosed, well supported, and understood by appropriate decision-makers and risk oversight units. Examiners should ensure that the valuation approach is appropriate for the company's industry and condition.

Enterprise value is often viewed as a secondary source of repayment and as such would be relied upon under stressful conditions. In such cases the assumptions used for key variables such as cash flow, earnings, and sale multiples should reflect those adverse conditions. These variables can have a high degree of uncertainty - sales and cash flow projections may not be achieved; comparable sales may not be available; changes can occur in a firm's competitive position, industry outlook, or the economic environment. Given these uncertainties, changes in the value of a firm's assets need to be tested under a range of stress scenarios, including business conditions more adverse than the base case scenario. Stress testing of enterprise values and their underlying assumptions should be conducted upon origination of the loan and periodically thereafter incorporating the actual performance of the borrower and any adjustments to projections. The bank should in all cases perform its own discounted cash flow analysis to validate "enterprise value" implied by proxy measures such as multiples of cash flow, earnings or sales.

Finally, it must be recognized that valuations derived with even the most rigorous valuation procedures are imprecise and may not be realized when needed by an institution. Therefore, institutions relying on enterprise value or illiquid and hard-to-value collateral must have lending policies that provide for appropriate loan-to-value ratios, discount rates and collateral margins.

### Deal Sponsors

Deal sponsors can be an important source of financial support for a borrower that fails to achieve cash flow projections. However, support from this source should only be considered positively in a risk rating decision when the sponsor has a history of demonstrated support as well as the economic incentive, capacity, and stated intent to

**LOANS**                                                                                 Section 3.2

continue to support the transaction. Even with capacity and a history of support, a sponsor's potential contributions should not mitigate criticism unless there is clear reason to believe it is in the best interests of the sponsor to continue that support or unless there is a formal guarantee.

## Oil and/or Gas Reserve-Based Loans

These guidelines apply to oil and/or gas reserve-based loans that are considered collateral dependent and are devoid of repayment capacity from other tangible sources.

The initial step to assessing the credit worthiness of reserve-based loans is an analysis of the engineering function. Cash flow generated from the future sale of encumbered oil and/or gas reserves is the primary, and in most cases the only intended, source of repayment. Therefore, engineering data integrity which depicts future cash stream, is critical to the initial lending decision and equally important to an examiner in the assessment of credit quality. For evaluation purposes, an acceptable engineering report must be an independent, detailed analysis of the reserve prepared by a competent engineering group. The report must address three critical concerns: pricing; discount factors; and timing. In those cases where the engineering reports do not meet one or more of these criteria, the examiner may need to use other methods, e.g., recent cash flow histories, to determine the current collateral value.

The extent of examiner analysis is a matter of judgment, but comprehensive analysis of the credit should definitely take place if:

- The loan balance exceeds 65 percent of the discounted present worth of future net income (PWFNI) of proved developed producing properties (PDP), or the cash flow analysis indicates that the loan will not amortize over four to five years;
- The credit is not performing in accordance with terms or repayment of interest and/or principal; or
- The credit is identified by the bank as a "problem" credit.

After performing the analysis, the examiner must determine if classification is warranted. The following guidelines are to be applied in instances where the obligor is devoid of primary and secondary repayment capacity or other reliable means of repayment, with total support of the debt provided solely by the pledged collateral. First, 65 percent of discounted PWFNI should be classified Substandard. A lesser percentage or less severe criticism may be appropriate in cases where a reliable alternate means of repayment exists for a portion of the debt. The 65 percent

percentage should be used when the discounted PWFNI is determined using historical production data. When less than 75 percent of the reserve estimate is determined using historical production data, or the discounted PWFNI is predicated on engineering estimates of the volume of oil/gas flow (volumetric and/or analogy-based engineering data), the collateral value assigned to Substandard should be reduced accordingly. The balance, but not more than 100 percent of discounted PWFNI of PDP reserves, should be classified Doubtful. Any remaining deficiency balance should be classified Loss.

In addition to PDP, many reserve-based credit collateral values will include items variously referred to as proved (or proven) developed non-producing reserves, shut-in reserves, behind-the-pipe reserves and proved undeveloped properties (PUP) as collateral. Due to the nature of these other reserves, there are no strict percentage guidelines for the proportion of the credit supported by this type of collateral that should remain as a bankable asset. However, only in very unusual situations would the proportion of collateral values for these other reserves assigned to a classification category approach values for PDP.

The examiner must ascertain the current status of each reserve and develop an appropriate collateral value. Examples could be reserves that are shut-in due to economic conditions versus reserves that are shut-in due to the absence of pipeline or transportation. PDP require careful evaluation before allowing any bankable collateral value.

## Real Estate Loans

### General

Real estate loans are part of the loan portfolios of almost all commercial banks. Real estate loans include credits advanced for the purchase of real property. However, the term may also encompass extensions granted for other purposes, but for which primary collateral protection is real property.

The degree of risk in a real estate loan depends primarily on the loan amount in relation to collateral value, the interest rate, and most importantly, the borrower's ability to repay in an orderly fashion. It is extremely important that a bank's real estate loan policy ensure that loans are granted with the reasonable probability the debtor will be able and willing to meet the payment terms. Placing undue reliance upon a property's appraised value in lieu of an adequate initial assessment of a debtor's repayment ability is a potentially dangerous mistake.

**LOANS**                                                                    Section 3.2

Historically, many banks have jeopardized their capital structure by granting ill-considered real estate mortgage loans. Apart from unusual, localized, adverse economic conditions which could not have been foreseen, resulting in a temporary or permanent decline in realty values, the principal errors made in granting real estate loans include inadequate regard to normal or even depressed realty values during periods when it is in great demand thus inflating the price structure, mortgage loan amortization, the maximum debt load and repayment capacity of the borrower, and failure to reasonably restrict mortgage loans on properties for which there is limited demand.

A principal indication of a troublesome real estate loan is an improper relationship between the amount of the loan, the potential sale price of the property, and the availability of a market. The potential sale price of a property may or may not be the same as its appraised value. The current potential sale price or liquidating value of the property is of primary importance and the appraised value is of secondary importance. There may be little or no current demand for the property at its appraised value and it may have to be disposed of at a sacrifice value.

Examiners must appraise not only individual mortgage loans, but also the overall mortgage lending and administration policies to ascertain the soundness of its mortgage loan operations as well as the liquidity contained in the account. The bank should establish policies that address the following factors: the maximum amount that may be loaned on a given property, in a given category, and on all real estate loans; the need for appraisals (professional judgments of the present and/or future value of the real property) and for amortization on certain loans.

**Real Estate Lending Standards**

Section 18(o) of the FDI Act requires the Federal banking agencies to adopt uniform regulations prescribing standards for loans secured by liens on real estate or made for the purpose of financing permanent improvements to real estate. For FDIC-supervised institutions, Part 365 of the FDIC Rules and Regulations requires each institution to adopt and maintain written real estate lending policies that are consistent with sound lending principles, appropriate for the size of the institution and the nature and scope of its operations. Within these general parameters, the regulation specifically requires an institution to establish policies that include:

- Portfolio diversification standards;
- Prudent underwriting standards including loan-to-value limits;

- Loan administration procedures;
- Documentation, approval and reporting requirements; and
- Procedures for monitoring real estate markets within the institution's lending area.

These policies also should reflect consideration of the Interagency Guidelines for Real Estate Lending Policies and must be reviewed and approved annually by the institution's board of directors.

The interagency guidelines, which are an appendix to Part 365, are intended to help institutions satisfy the regulatory requirements by outlining the general factors to consider when developing real estate lending standards. The guidelines suggest maximum supervisory loan-to-value (LTV) limits for various categories of real estate loans and explain how the agencies will monitor their use.

Institutions are expected to establish their own internal LTV limits consistent with their needs. These internal limits should not exceed the following recommended supervisory limits:

- 65 percent for raw land;
- 75 percent for land development;
- 80 percent for commercial, multi-family, and other non-residential construction;
- 85 percent for construction of a 1-to-4 family residence;
- 85 percent for improved property; and
- Owner-occupied 1-to-4 family home loans have no suggested supervisory LTV limits. However, for any such loan with an LTV ratio that equals or exceeds 90 percent at origination, an institution should require appropriate credit enhancement in the form of either mortgage insurance or readily marketable collateral.

Certain real estate loans are exempt from the supervisory LTV limits because of other factors that significantly reduce risk. These include loans guaranteed or insured by the Federal, State or local government as well as loans to be sold promptly in the secondary market without recourse. A complete list of excluded transactions is included in the guidelines.

Because there are a number of credit factors besides LTV limits that influence credit quality, loans that meet the supervisory LTV limits should not automatically be considered sound, nor should loans that exceed the supervisory LTV limits automatically be considered high risk. However, loans that exceed the supervisory LTV limit should be identified in the institution's records and the aggregate amount of these loans reported to the institution's

# LOANS

board of directors at least quarterly. The guidelines further State that the aggregate amount of loans in excess of the supervisory LTV limits should not exceed the institution's total capital. Moreover, within that aggregate limit, the total loans for all commercial, agricultural and multi-family residential properties (excluding 1-to-4 family home loans) should not exceed 30 percent of total capital.

Institutions should develop policies that are clear, concise, consistent with sound real estate lending practices, and meet their needs. Policies should not be so complex that they place excessive paperwork burden on the institution. Therefore, when evaluating compliance with Part 365, examiners should carefully consider the following:

- The size and financial condition of the institution;
- The nature and scope of the institution's real estate lending activities;
- The quality of management and internal controls;
- The size and expertise of the lending and administrative staff; and
- Market conditions.

It is important to distinguish between the regulation and the interagency guidelines. While the guidelines are included as an appendix to the regulation, they are not part of the regulation. Therefore, when an apparent violation of Part 365 is identified, it should be listed in the Report of Examination in the same manner as other apparent violations. Conversely, when an examiner determines that an institution is not in conformance with the guidelines and the deficiency is a safety and soundness concern, an appropriate comment should be included in the examination report; however, the deficiency would not be a violation of the regulation.

Examination procedures for various real estate loan categories are included in the ED Modules.

## Commercial Real Estate Loans

These loans comprise a major portion of many banks' loan portfolios. When problems exist in the real estate markets that the bank is servicing, it is necessary for examiners to devote additional time to the review and evaluation of loans in these markets.

There are several warning signs that real estate markets or projects are experiencing problems that may result in real estate values decreasing from original appraisals or projections. Adverse economic developments and/or an overbuilt market can cause real estate projects and loans to become troubled. Signs of troubled real estate markets or projects include, but are not limited to:

- Rent concessions or sales discounts resulting in cash flow below the level projected in the original appraisal.
- Changes in concept or plan: for example, a condominium project converting to an apartment project.
- Construction delays resulting in cost overruns which may require renegotiation of loan terms.
- Slow leasing or lack of sustained sales activity and/or increasing cancellations which may result in protracted repayment or default.
- Lack of any sound feasibility study or analysis.
- Periodic construction draws which exceed the amount needed to cover construction costs and related overhead expenses.
- Identified problem credits, past due and non-accrual loans.

## Real Estate Construction Loans

A construction loan is used to construct a particular project within a specified period of time and should be controlled by supervised disbursement of a predetermined sum of money. It is generally secured by a first mortgage or deed of trust and backed by a purchase or takeout agreement from a financially responsible permanent lender. Construction loans are vulnerable to a wide variety of risks. The major risk arises from the necessity to complete projects within specified cost and time limits. The risk inherent in construction lending can be limited by establishing policies which specify type and extent of bank involvement. Such policies should define procedures for controlling disbursements and collateral margins and assuring timely completion of the projects and repayment of the bank's loans.

Before a construction loan agreement is entered into, the bank should investigate the character, expertise, and financial standing of all related parties. Documentation files should include background information concerning reputation, work and credit experience, and financial statements. Such documentation should indicate that the developer, contractor, and subcontractors have demonstrated the capacity to successfully complete the type of project to be undertaken. The appraisal techniques used to value a proposed construction project are essentially the same as those used for other types of real estate. The bank should realize that appraised collateral values are not usually met until funds are advanced and improvements made.

The bank, the builder and the property owner should join in a written building loan agreement that specifies the

# LOANS

performance of each party during the entire course of construction. Loan funds are generally disbursed based upon either a standard payment plan or a progress payment plan. The standard payment plan is normally used for residential and smaller commercial construction loans and utilizes a preestablished schedule for fixed payments at the end of each specified stage of construction. The progress payment plan is normally used for larger, more complex, building projects. The plan is generally based upon monthly disbursements totaling 90 percent of the value with 10 percent held back until the project is completed.

Although many credits advanced for real estate acquisition, development or construction are properly considered loans secured by real estate, other such credits are, in economic substance, "investments in real estate ventures" and categorization of the asset as "other real estate owned" may be appropriate. A key feature of these transactions is that the bank as lender plans to share in the expected residual profit from the ultimate sale or other use of the development. These profit sharing arrangements may take the form of equity kickers, unusually high interest rates, a percentage of the gross rents or net cash flow generated by the project, or some other form of profit participation over and above a reasonable amount for interest and related loan fees. These extensions of credit may also include such other characteristics as nonrecourse debt, 100 percent financing of the development cost (including origination fees, interest payments, construction costs, and even profit draws by the developer), and lack of any substantive financial support from the borrower or other guarantors. Acquisition, Development, and Construction (ADC) arrangements that are in substance real estate investments of the bank should be reported accordingly.

On the other hand, if the bank will receive less than a majority of the expected residual profit, the ADC loan may be analogous to an interest in a joint real estate venture, which would be, considered an investment in unconsolidated subsidiaries and associated companies.

The following are the basic types of construction lending:

- Unsecured Front Money **-** Unsecured front money loans are working capital advances to a borrower who may be engaged in a new and unproven venture. Many bankers believe that unsecured front money lending is not prudent unless the bank is involved in the latter stages of construction financing. A builder planning to start a project before construction funding is obtained often uses front money loans. The funds may be used to acquire or develop a building site, eliminate title impediments, pay architect or standby fees, and/or meet minimum working capital requirements established by construction lenders.

Repayment often comes from the first draw against construction financing. Unsecured front money loans used for a developer's equity investment in a project or to cover initial costs overruns are symptomatic of an undercapitalized, inexperienced or inept builder.

- Land Development Loans **-** Land development loans are generally secured purchase or development loans or unsecured advances to investors and speculators. Secured purchase or development loans are usually a form of financing involving the purchase of land and lot development in anticipation of further construction or sale of the property. A land development loan should be predicated upon a proper title search and/or mortgage insurance. The loan amount should be based on appraisals on an "as is" and "as completed" basis. Projections should be accompanied by a study explaining the effect of property improvements on the market value of the land. There should be a sufficient spread between the amount of the development loan and the estimated market value to allow for unforeseen expenses. The repayment program should be structured to follow the sales or development program. In the case of an unsecured land development loan to investors or speculators, bank management should analyze the borrower's financial statements for sources of repayment other than the expected return on the property development.

- Commercial Construction Loans **-** Loans financing commercial construction projects are usually collateralized, and such collateral is generally identical to that for commercial real estate loans. Supporting documentation should include a recorded mortgage or deed of trust, title insurance policy and/or title opinions, appropriate liability insurance and other coverages, land appraisals, and evidence that taxes have been paid to date. Additional documents relating to commercial construction loans include loan agreements, takeout commitments, tri-party (buy/sell) agreements, completion or corporate bonds, and inspection or progress reports.

- Residential Construction Loans **-** Residential construction loans may be made on a speculative basis or as prearranged permanent financing. Smaller banks often engage in this type of financing and the aggregate total of individual construction loans may equal a significant portion of their capital funds. Prudence dictates that permanent financing be assured in advance because the cost of such financing can have a substantial affect on sales. Proposals to finance speculative housing should be evaluated in accordance with predetermined policy standards compatible with

**LOANS**                                                                                    Section 3.2

the institution's size, technical competence of its management, and housing needs of its service area. The prospective borrower's reputation, experience, and financial condition should be reviewed. The finished project's marketability in favorable and unfavorable market conditions should be realistically considered.

In addition to normal safeguards such as a recorded first mortgage, acceptable appraisal, construction agreement, draws based on progress payment plans and inspection reports, a bank dealing with speculative contractors should institute control procedures tailored to the individual circumstances. A predetermined limit on the number of unsold units to be financed at any one time should be included in the loan agreement to avoid overextending the contractor's capacity. Loans on larger residential construction projects are usually negotiated with prearranged permanent financing. Documentation of tract loans frequently includes a master note allocated for the entire project and a master deed of trust or mortgage covering all land involved in the project. Payment of the loan will depend largely upon the sale of the finished homes. As each sale is completed, the bank makes a partial release of the property covered by its master collateral document. In addition to making periodic inspections during the course of construction, periodic progress reports (summary of inventory lists maintained for each tract project) should be made on the entire project. The inventory list should show each lot number, type of structure, release price, sales price, and loan balance.

The exposure in any type of construction lending is that the full value of the collateral does not exist at the time the loan is granted. The bank must ensure funds are used properly to complete construction or development of the property serving as collateral. If default occurs, the bank must be in a position to either complete the project or to salvage its construction advances. The various mechanic's and materialmen's liens, tax liens, and other judgments that arise in such cases are distressing to even the most seasoned lender. Every precaution should be taken by the lender to minimize any outside attack on the collateral. The construction lender may not be in the preferred position indicated by documents in the file. Laws of some states favor the subcontractors (materialmen's liens, etc.), although those of other states protect the construction lender to the point of first default, provided certain legal requirements have been met. Depending on the type and size of project being funded, construction lending can be a complex and fairly high-risk venture. For this reason, bank management should ensure that it has enacted policies and retained sufficiently trained personnel before engaging in this type of lending.

## Home Equity Loans

A home equity loan is a loan secured by the equity in a borrower's residence. It is generally structured in one of two ways. First, it can be structured as a traditional second mortgage loan, wherein the borrower obtains the funds for the full amount of the loan immediately and repays the debt with a fixed repayment schedule. Second, the home equity borrowing can be structured as a line of credit, with a check, credit card, or other access to the line over its life.

The home equity line of credit has evolved into the dominant form of home equity lending. This credit instrument generally offers variable interest rates and flexible repayment terms. Additional characteristics of this product line include relatively low interest rates as compared to other forms of consumer credit, absorption by some banks of certain fees (origination, title search, appraisal, recordation cost, etc.) associated with establishing a real estate-related loan. The changes imposed by the Tax Reform Act of 1986 relating to the income tax deductibility of interest paid on consumer debt led to the increased popularity of home equity lines of credit.

Home equity lending is widely considered to be a low-risk lending activity. These loans are secured by housing assets, the value of which historically has performed well. Nevertheless, the possibility exists that local housing values or household purchasing power may decline, stimulating abandonment of the property and default on the debt secured by the housing. Certain features of home equity loans make them particularly susceptible to such risks. First, while the variable rate feature of the debt reduces the interest rate risk of the lender, the variable payment size exposes the borrower to greater cash flow risks than would a fixed-rate loan, everything else being equal. This, in turn, exposes the lender to greater credit risk. Another risk is introduced by the very nature of the home equity loan. Such loans are generally secured by a junior lien. Thus, there is less effective equity protection than in a first lien instrument. Consequently, a decline in the value of the underlying housing results in a much greater than proportional decline in the coverage of a home equity loan. This added leverage makes them correspondingly riskier than first mortgages.

Banks that make these kinds of loans should adopt specific policies and procedures for dealing with this product line. Management should have expertise in both mortgage lending as well as open-end credit procedures. Another major concern is that borrowers will become overextended and the bank will have to initiate foreclosure proceedings.

# LOANS

Section 3.2

Therefore, underwriting standards should emphasize the borrower's ability to service the line from cash flow rather than the sale of the collateral, especially if the home equity line is written on a variable rate basis. If the bank has offered a low introductory interest rate, repayment capacity should be analyzed at the rate that could be in effect at the conclusion of the initial term.

Other important considerations include acceptable loan-to-value and debt-to-income ratios, and proper credit and collateral documentation, including adequate appraisals and written evidence of prior lien status. Another significant risk concerns the continued lien priority for subsequent advances under a home equity line of credit. State law governs the status of these subsequent advances. It is also important that the bank's program include periodic reviews of the borrower's financial condition and continuing ability to repay the indebtedness.

The variation in contract characteristics of home equity debt affects the liquidity of this form of lending. For debt to be easily pooled and sold in the secondary market, it needs to be fairly consistent in its credit and interest rate characteristics. The complexity of the collateral structures, coupled with the uncertain maturity of revolving credit, makes home equity loans considerably less liquid than straight first lien, fixed maturity mortgage loans.

While home equity lending is considered to be fairly low-risk, subprime home equity loans and lending programs exist at some banks. These programs have a higher level of risk than traditional home equity lending programs. Individual or pooled home equity loans that have subprime characteristics should be analyzed using the guidance provided in the subprime section of this Manual.

## Agricultural Loans

### Introduction

Agricultural loans are an important component of many community bank loan portfolios. Agricultural banks represent a material segment of commercial banks and constitute an important portion of the group of banks over which the FDIC has the primary Federal supervisory responsibility.

Agricultural loans are used to fund the production of crops, fruits, vegetables, and livestock, or to fund the purchase or refinance of capital assets such as farmland, machinery and equipment, breeder livestock, and farm real estate improvements (for example, facilities for the storage, housing, and handling of grain or livestock). The production of crops and livestock is especially vulnerable to two risk factors that are largely outside the control of individual lenders and borrowers: commodity prices and weather conditions. While examiners must be alert to, and critical of, operational and managerial weaknesses in agricultural lending activities, they must also recognize when the bank is taking reasonable steps to deal with these external risk factors. Accordingly, loan restructurings or extended repayment terms, or other constructive steps to deal with financial difficulties faced by agricultural borrowers because of adverse weather or commodity conditions, will not be criticized if done in a prudent manner and with proper risk controls and management oversight. Examiners should recognize these constructive steps and fairly portray them in oral and written communications regarding examination findings. This does not imply, however, that analytical or classification standards should be compromised. Rather, it means that the bank's response to these challenges will be considered in supervisory decisions.

### Agricultural Loan Types and Maturities

Production or Operating Loans - Short-term (one year or less) credits to finance seed, fuel, chemicals, land and machinery rent, labor, and other costs associated with the production of crops. Family living expenses are also sometimes funded, at least in part, with these loans. The primary repayment source is sale of the crops at the end of the production season when the harvest is completed.

Feeder Livestock Loans - Short-term loans for the purchase of, or production expenses associated with, cattle, hogs, sheep, poultry or other livestock. When the animals attain market weight and are sold for slaughter, the proceeds are used to repay the debt.

Breeder Stock Loans - Intermediate-term credits (generally three to five years) used to fund the acquisition of breeding stock such as beef cows, sows, sheep, dairy cows, and poultry. The primary repayment source is the proceeds from the sale of the offspring of these stock animals, or their milk or egg production.

Machinery and Equipment Loans - Intermediate-term loans for the purchase of a wide array of equipment used in the production and handling of crops and livestock. Cash flow from farm earnings is the primary repayment source. Loans for grain handling and storage facilities are also sometimes included in this category, especially if the facilities are not permanently affixed to real estate.

Farm Real Estate Acquisition Loans - Long-term credits for the purchase of farm real estate, with cash flow from earnings representing the primary repayment source. Significant, permanent improvements to the real estate,

# LOANS

such as for livestock housing or grain storage, may also be included within this group.

Carryover Loans - This term is used to describe two types of agricultural credit. The first is production or feeder livestock loans that are unable to be paid at their initial, short-term maturity, and which are rescheduled into an intermediate or long-term amortization. This situation arises when weather conditions cause lower crop yields, commodity prices are lower than anticipated, production costs are higher than expected, or other factors result in a shortfall in available funds for debt repayment. The second type of carryover loan refers to already-existing term debt whose repayment terms or maturities need to be rescheduled because of inadequate cash flow to meet existing repayment requirements. This need for restructuring can arise from the same factors that lead to carryover production or feeder livestock loans. Carryover loans are generally restructured on an intermediate or long-term amortization, depending upon the type of collateral provided, the borrower's debt service capacity from ongoing operations, the debtor's overall financial condition and trends, or other variables. The restructuring may also be accompanied by acquisition of Federal guarantees through the farm credit system to lessen risk to the bank.

**Agricultural Loan Underwriting Guidelines**

Many underwriting standards applicable to commercial loans also apply to agricultural credits. The discussion of those shared standards is therefore not repeated. Some items, however, are especially pertinent to agricultural credit and therefore warrant emphasis.

Financial and Other Credit Information - As with any type of lending, sufficient information must be available so that the bank can make informed credit decisions. Basic information includes balance sheets, income statements, cash flow projections, loan officer file comments, and collateral inspections, verifications, and valuations. Generally, financial information should be updated not less than annually (loan officer files should be updated as needed and document all significant meetings and events). Credit information should be analyzed by management so that appropriate and timely actions are taken, as necessary, to administer the credit.

Banks should be given some reasonable flexibility as to the level of sophistication or comprehensiveness of the aforementioned financial information, and the frequency with which it is obtained, depending upon such factors as the credit size, the type of loans involved, the financial strength and trends of the borrower, and the economic, climatic or other external conditions which may affect loan repayment. It may therefore be inappropriate for the examiner to insist that all agricultural borrowers be supported with the full complement of balance sheets, income statements, and other data discussed above, regardless of the nature and amount of the credit or the debtor's financial strength and payment record. Nonetheless, while recognizing some leeway is appropriate, most of the bank's agricultural credit lines, and all of its larger or more significant ones, should be sufficiently supported by the financial information mentioned.

Cash Flow Analysis - History clearly demonstrated that significant problems can develop when banks fail to pay sufficient attention to cash flow adequacy in underwriting agricultural loans. While collateral coverage is important, the primary repayment source for intermediate and long-term agricultural loans is not collateral but cash flow from ordinary operations. This principle should be incorporated into the bank's agricultural lending policies and implemented in its actual practices. Cash flow analysis is therefore an important aspect of the examiner's review of agricultural loans. Assumptions in cash flow projections should be reasonable and consider not only current conditions but also the historical performance of the farming operation.

Collateral Support - Whether a loan or line of credit warrants unsecured versus secured status in order to be prudent and sound is a matter the examiner has to determine based on the facts of the specific case. The decision should generally consider such elements as the borrower's overall financial strength and trends, profitability, financial leverage, degree of liquidity in asset holdings, managerial and financial expertise, and amount and type of credit. Nonetheless, as a general rule, intermediate and long-term agricultural credit is typically secured, and many times production and feeder livestock advances will also be collateralized. Often the security takes the form of an all-inclusive lien on farm personal property, such as growing crops, machinery and equipment, livestock, and harvested grain. A lien on real estate is customarily taken if the loan was granted for the purchase of the property, or if the borrower's debts are being restructured because of debt servicing problems. In some cases, the bank may perfect a lien on real estate as an abundance of caution.

Examiner review of agricultural related collateral valuations varies depending on the type of security involved. Real estate collateral should be reviewed using normal procedures and utilizing Part 323 of the FDIC's Rules and Regulations as needed. Feeder livestock and grain are highly liquid commodities that are bought and sold daily in active, well-established markets. Their prices are widely reported in the daily media; so, obtaining their

# LOANS

market values is generally easy. The market for breeder livestock may be somewhat less liquid than feeder livestock or grain, but values are nonetheless reasonably well known and reported through local or regional media or auction houses. If such information on breeding livestock is unavailable or is considered unreliable, slaughter prices may be used as an alternative (these slaughter prices comprise "liquidation" rather than "going concern" values). The extent of use and level of maintenance received significantly affect machinery and equipment values. Determining collateral values can therefore be very difficult as maintenance and usage levels vary significantly. Nonetheless, values for certain pre-owned machinery and equipment, especially tractors, combines, and other harvesting or crop tillage equipment, are published in specialized guides and are based on prices paid at farm equipment dealerships or auctions. These used machinery guides may be used as a reasonableness check on the valuations presented on financial statements or in management's internal collateral analyses.

Prudent agricultural loan underwriting also includes systems and procedures to ensure that the bank has a valid note receivable from the borrower and an enforceable security interest in the collateral, should judicial collection measures be necessary. Among other things, such systems and procedures will confirm that promissory notes, loan agreements, collateral assignments, and lien perfection documents are signed by the appropriate parties and are filed, as needed, with the appropriate State, county, and/or municipal authorities. Flaws in the legal enforceability of loan instruments or collateral documents will generally be unable to be corrected if they are discovered only when the credit is distressed and the borrower relationship strained.

Structuring - Orderly liquidation of agricultural debt, based on an appropriate repayment schedule and a clear understanding by the borrower of repayment expectations, helps prevent collection problems from developing. Amortization periods for term indebtedness should correlate with the useful economic life of the underlying collateral and with the operation's debt service capacity. A too-lengthy amortization period can leave the bank under secured in the latter part of the life of the loan, when the borrower's financial circumstances may have changed. A too-rapid amortization, on the other hand, can impose an undue burden on the cash flow capacity of the farming operation and thus lead to loan default or disruption of other legitimate financing needs of the enterprise. It is also generally preferable that separate loans or lines of credit be established for each loan purpose category financed by the institution.

**Administration of Agricultural Loans**

Two aspects of prudent loan administration deserve emphasis: collateral control and renewal practices for production loans.

Collateral Control - Production and feeder livestock loans are sometimes referred to as self liquidating because sale of the crops after harvest, and of the livestock when they reach maturity, provides a ready repayment source for these credits. These self-liquidating benefits may be lost, however, if the bank does not monitor and exercise sufficient control over the disposition of the proceeds from the sale. In agricultural lending, collateral control is mainly accomplished by periodic on-site inspections and verifications of the security pledged, with the results of those inspections documented, and by implementing procedures to ensure sales proceeds are applied to the associated debt before those proceeds are released for other purposes. The recommended frequency of collateral inspections varies depending upon such things as the nature of the farming operation, the overall credit soundness, and the turnover rate of grain and livestock inventories.

Renewal of Production Loans - After completion of the harvest, some farm borrowers may wish to defer repayment of some or all of that season's production loans, in anticipation of higher market prices at a later point (typically, crop prices are lower at harvest time when the supply is greater). Such delayed crop marketing will generally require production loan extensions or renewals.. In these situations, the bank must strike an appropriate balance of, on the one hand, not interfering with the debtor's legitimate managerial decisions and marketing plans while, at the same time, taking prudent steps to ensure its production loans are adequately protected and repaid on an appropriate basis. Examiners should generally not take exception to reasonable renewals or extensions of production loans when the following factors are favorably resolved:

- The borrower has sufficient financial strength to absorb market price fluctuations. Leverage and liquidity in the balance sheet, financial statement trends, profitability of the operation, and past repayment performance are relevant indices.
- The borrower has sufficient financial capacity to support both old and new production loans. That is, in a few months subsequent to harvest, the farmer will typically be incurring additional production debt for the upcoming crop season.
- The bank has adequately satisfied itself of the amount and condition of grain in inventory, so that the renewed or extended production loans are adequately supported. Generally, this means that a current inspection report will be available.

**LOANS**                                                                      Section 3.2

**Classification Guidelines for Agricultural Credit**

When determining the level of risk in a specific lending relationship, the relevant factual circumstances must be reviewed in total. This means, among other things, that when an agricultural loan's primary repayment source is jeopardized or unavailable, adverse classification is **not** automatic. Rather, such factors as the borrower's historical performance and financial strength, overall financial condition and trends, the value of any collateral, and other sources of repayment must be considered. In considering whether a given agricultural loan or line of credit should be adversely classified, collateral margin is an important, though not necessarily the determinative, factor. If that margin is so overwhelming as to remove all reasonable prospect of the bank sustaining some loss, it is generally inappropriate to adversely classify such a loan. Note, however, that if there is reasonable uncertainty as to the value of that security, because of an illiquid market or other reasons, that uncertainty can, when taken in conjunction with other weaknesses, justify an adverse classification of the credit, or, at minimum, may mean that the margin in the collateral needs to be greater to offset this uncertainty. Moreover, when assessing the adequacy of the collateral margin, it must be remembered that deteriorating financial trends will, if not arrested, typically result in a shrinking of that margin. Such deterioration can also reduce the amount of cash available for debt service needs.

That portion of an agricultural loan(s) or line of credit, which is secured by grain, feeder livestock, and/or breeder livestock, will generally be withheld from adverse classification. The basis for this approach is that grain and livestock are highly marketable and provide good protection from credit loss. However, that high marketability also poses potential risks that must be recognized and controlled. The following conditions must therefore be met in order for this provision to apply:

- The bank must take reasonable steps to verify the existence and value of the grain and livestock. This generally means that on-site inspections must be made and documented. Although the circumstances of each case must be taken into account, the general policy is that, for the classification exclusion to apply, inspections should have been performed not more than 90 days prior to the examination start date for feeder livestock and grain collateral, and not more than six months prior to the examination start date for breeder stock collateral. Copies of invoices or bills of sale are acceptable substitutes for inspection reports prepared by bank management, in the case of loans for the purchase of livestock.

- Loans secured by grain warehouse receipts are generally excluded from adverse classification, up to the market value of the grain represented by the receipts.
- The amount of credit to be given for the livestock or grain collateral should be based on the daily, published, market value as of the examination start date, less marketing and transportation costs, feed and veterinary expenses (to the extent determinable), and, if material in amount, the accrued interest associated with the loan(s). Current market values for breeder stock may be derived from local or regional newspapers, area auction barns, or other sources considered reliable. If such valuations for breeding livestock cannot be obtained, the animals' slaughter values may be used.
- The bank must have satisfactory procedures for controlling sales proceeds when the borrower sells livestock and feed and grain.
- The bank must have a properly perfected and enforceable security interest in the assets in question.

Examiners should exercise great caution in granting the grain and livestock exclusion from adverse classification in those instances where the borrower is highly leveraged, or where the debtor's basic operational viability is seriously in question, or if the bank is in an under-secured position. The issue of control over proceeds becomes extremely critical in such highly distressed credit situations. If the livestock and grain exclusion from adverse classification is not given in a particular case, bank management should be informed of the reasons why.

With the above principles, requirements, and standards in mind, the general guidelines for determining adverse classification for agricultural loans are as follows, listed by loan type.

Feeder Livestock Loans - The self-liquidating nature of these credits means that they are generally not subject to adverse classification. However, declines in livestock prices, increases in production costs, or other unanticipated developments may result in the revenues from the sale of the livestock not being adequate to fully repay the loans. Adverse classification may then be appropriate, depending upon the support of secondary repayment sources and collateral, and the borrower's overall financial condition and trends.

Production Loans - These loans are generally not subject to adverse classification if the debtor has good liquidity and/or significant fixed asset equities, or if the cash flow information suggests that current year's operations should be sufficient to repay the advances. The examiner should

# LOANS

also take into account any governmental support programs or Federal crop insurance benefits from which the borrower may benefit. If cash flow from ongoing operations appears insufficient to repay production loans, adverse classification may be in order, depending upon the secondary repayment sources and collateral, and the borrower's overall financial condition and trends.

Breeder Stock Loans - These loans are generally not adversely classified if they are adequately secured by the livestock and if the term debt payments are being met through the sale of offspring (or milk and eggs in the case of dairy and poultry operations). If one or both of these conditions is not met, adverse classification may be in order, depending upon the support of secondary repayment sources and collateral, and the borrower's overall financial condition and trends.

Machinery and Equipment Loans - Loans for the acquisition of machinery and equipment will generally not be subject to adverse classification if they are adequately secured, structured on an appropriate amortization program (see above), and are paying as agreed. Farm machinery and equipment is often the second largest class of agricultural collateral, hence its existence, general state of repair, and valuation should be verified and documented during the bank's periodic on-site inspections of the borrower's operation. Funding for the payments on machinery and equipment loans sometimes comes, at least in part, from other loans provided by the bank, especially production loans. When this is the case, the question arises whether the payments are truly being "made as agreed." For examination purposes, such loans will be considered to be paying as agreed if cash flow projections, payment history, or other available information, suggests there is sufficient capacity to fully repay the production loans when they mature at the end of the current production cycle. If the machinery and equipment loan is not adequately secured, or if the payments are not being made as agreed, adverse classification should be considered.

Carryover Debt - Carryover debt results from the debtor's inability to generate sufficient cash flow to service the obligation as it is currently structured. It therefore tends to contain a greater degree of credit risk and must receive close analysis by the examiner. When carryover debt arises, the bank should determine the basic viability of the borrower's operation, so that an informed decision can be made on whether debt restructuring is appropriate. It will thus be useful for bank management to know how the carryover debt came about: Did it result from the obligor's financial, operational or other managerial weaknesses; from inappropriate credit administration on the bank's part, such as over lending or improper debt structuring; from external events such as adverse weather conditions that

affected crop yields; or from other causes? In many instances, it will be in the long-term best interests of both the bank and the debtor to restructure the obligations. The restructured obligation should generally be rescheduled on a term basis and require clearly identified collateral, amortization period, and payment amounts. The amortization period may be intermediate or long term depending upon the useful economic life of the available collateral, and on realistic projections of the operation's payment capacity.

There are no hard and fast rules on whether carryover debt should be adversely classified, but the decision should generally consider the following: borrower's overall financial condition and trends, especially financial leverage (often measured in farm debtors with the debt-to-assets ratio); profitability levels, trends, and prospects; historical repayment performance; the amount of carryover debt relative to the operation's size; realistic projections of debt service capacity; and the support provided by secondary collateral. Accordingly, carryover loans to borrowers who are moderately to highly leveraged, who have a history of weak or no profitability and barely sufficient cash flow projections, as well as an adequate but slim collateral margin, will generally be adversely classified, at least until it is demonstrated through actual repayment performance that there is adequate capacity to service the rescheduled obligation. The classification severity will normally depend upon the collateral position. At the other extreme are cases where the customer remains fundamentally healthy financially, generates good profitability and ample cash flow, and who provides a comfortable margin in the security pledged. Carryover loans to this group of borrowers will not ordinarily be adversely classified.

## Installment Loans

An installment loan portfolio is usually comprised of a large number of small loans scheduled to be amortized over a specific period. Most installment loans are made directly for consumer purchases, but business loans granted for the purchase of heavy equipment or industrial vehicles may also be included. In addition, the department may grant indirect loans for the purchase of consumer goods.

The examiner's emphasis in reviewing the installment loan department should be on the overall procedures, policies and credit qualities. The goal should not be limited to identifying current portfolio problems, but should include potential future problems that may result from ineffective policies, unfavorable trends, potentially dangerous concentrations, or nonadherence to established policies. At a minimum, the direct installment lending policies should address the following factors: loan applications and credit

# LOANS

checks; terms in relation to collateral; collateral margins; perfection of liens; extensions, renewals and rewrites; delinquency notification and follow-up; and charge-offs and collections. For indirect lending, the policy additionally should address direct payment to the bank versus payment to the dealer, acquisition of dealer financial information, possible upper limits for any one dealer's paper, other standards governing acceptance of dealer paper, and dealer reserves and charge-backs.

## Direct Lease Financing

Leasing is a recognized form of term debt financing for fixed assets. While leases differ from loans in some respects, they are similar from a credit viewpoint because the basic considerations are cash flow, repayment capacity, credit history, management and projections of future operations. Additional considerations for a lease transaction are the property type and its marketability in the event of default or lease termination. Those latter considerations do not radically alter the manner in which an examiner evaluates collateral for a lease. The assumption is that the lessee/borrower will generate sufficient funds to liquidate the lease/debt. Sale of leased property/collateral remains a secondary repayment source and, except for the estimated residual value at the expiration of the lease, will not, in most cases, become a factor in liquidating the advance. When the bank is requested to purchase property of significant value for lease, it may issue a commitment to lease, describing the property, indicating cost, and generally outlining the lease terms. After all terms in the lease transaction are resolved by negotiation between the bank and its customer, an order is usually written requesting the bank to purchase the property. Upon receipt of that order, the bank purchases the property requested and arranges for delivery and, if necessary, installation. A lease contract is drawn incorporating all the points covered in the commitment letter, as well as the rights of the bank and lessee in the event of default. The lease contract is generally signed simultaneously with the signing of the order to purchase and the agreement to lease.

The types of assets that may be leased are numerous, and the accounting for direct leasing is a complex subject which is discussed in detail in FAS 13. Familiarity with FAS 13 is a prerequisite for the management of any bank engaging in or planning to engage in direct lease financing. The following terms are commonly encountered in direct lease financing:

- Net Lease, one in which the bank is not directly or indirectly obligated to assume the expenses of maintaining the equipment. This restriction does not

prohibit the bank from paying delivery and set up charges on the property.

- Full Payout Lease, one for which the bank expects to realize both the return of its full investment and the cost of financing the property over the term of the lease. This payout can come from rentals, estimated tax benefits, and estimated residual value of the property.

- Leveraged Lease, in which the bank as lessor purchases and becomes the equipment owner by providing a relatively small percentage (20-40%) of the capital needed. Balance of the funds is borrowed by the lessor from long-term lenders who hold a first lien on the equipment and assignments of the lease and lease rental payments. This specialized and complex form of leasing is prompted mainly by a desire on the part of the lessor to shelter income from taxation. Creditworthiness of the lessee is paramount and the general rule is a bank should not enter into a leveraged lease transaction with any party to whom it would not normally extend unsecured credit.

- Rentals, which include only those payments reasonably anticipated by the bank at the time the lease is executed.

Bank management should carefully evaluate all lease variables, including the estimate of the residual value. Banks may be able to realize unwarranted lease income in the early years of a contract by manipulating the lease variables. In addition, a bank can offer the lessee a lower payment by assuming an artificially high residual value during the initial structuring of the lease. But this technique may present the bank with serious long-term problems because of the reliance on speculative or nonexistent residual values.

Often, lease contracts contain an option permitting the lessee to continue use of the property at the end of the original term, working capital restrictions and other restrictions or requirements similar to debt agreements and lease termination penalties. Each lease is an individual contract written to fulfill the lessee's needs. Consequently, there may be many variations of each of the above provisions. However, the underlying factors remain the same: there is a definite contractual understanding of the positive right to use the property for a specific period of time, and required payments are irrevocable.

Examination procedures for reviewing direct lease financing activities are included in the ED Modules in the Loan References section.

## Floor Plan Loans

**LOANS**

Floor plan (wholesale) lending is a form of retail goods inventory financing in which each loan advance is made against a specific piece of collateral. As each piece of collateral is sold by the dealer, the loan advance against that piece of collateral is repaid. Items commonly subject to floor plan debt are automobiles, home appliances, furniture, television and stereophonic equipment, boats, mobile homes and other types of merchandise usually sold under a sales finance contract. Drafting agreements are a relatively common approach utilized in conjunction with floor plan financing. Under this arrangement, the bank establishes a line of credit for the borrower and authorizes the good's manufacturer to draw drafts on the bank in payment for goods shipped. The bank agrees to honor these drafts, assuming proper documentation (such as invoices, manufacturer's statement of origin, etc.) is provided. The method facilitates inventory purchases by, in effect, guaranteeing payment to the manufacturer for merchandise supplied. Floor plan loans involve all the basic risks inherent in any form of inventory financing. However, because of the banker's inability to exercise full control over the floored items, the exposure to loss may be greater than in other similar types of financing. Most dealers have minimal capital bases relative to debt. As a result, close and frequent review of the dealer's financial information is necessary. As with all inventory financing, collateral value is of prime importance. Control requires the bank to determine the collateral value at the time the loan is placed on the books, frequently inspect the collateral to determine its condition, and impose a curtailment requirement sufficient to keep collateral value in line with loan balances.

Handling procedures for floor plan lines will vary greatly depending on bank size and location, dealer size and the type of merchandise being financed. In many cases, the term "trust receipt" is used to describe the debt instrument existing between the bank and the dealer. Trust receipts may result from drafting agreements between a bank and a manufacturer for the benefit of a dealer. In other instances, the dealer may order inventory, bring titles or invoices to the bank, and then obtain a loan secured or to be secured by the inventory. Some banks may use master debt instruments, and others may use a trust receipt or note for each piece of inventory. The method of perfecting a security interest also varies from state to state. The important point is that a bank enacts realistic handling policies and ensures that its collateral position is properly protected.

Examination procedures and examiner considerations for reviewing floor plan lending activities are included in the ED Modules in the Loan References section.

## Check Credit and Credit Card Loans

Check credit is defined as the granting of unsecured revolving lines of credit to individuals or businesses. Check credit services are provided by the overdraft system, cash reserve system, and special draft system. The most common is the overdraft system. In that method, a transfer is made from a preestablished line of credit to a customer's demand deposit account when a check which would cause an overdraft position is presented. Transfers normally are made in stated increments, up to the maximum line of credit approved by the bank, and the customer is notified that the funds have been transferred. In a cash reserve system, customers must request that the bank transfer funds from their preestablished line of credit to their demand deposit account before negotiating a check against them. A special draft system involves the customer negotiating a special check drawn directly against a preestablished line of credit. In that method, demand deposit accounts are not affected. In all three systems, the bank periodically provides its check credit customers with a statement of account activity. Required minimum payments are computed as a fraction of the balance of the account on the cycle date and may be made by automatic charges to a demand deposit account.

Most bank credit card plans are similar. The bank solicits retail merchants, service organizations and others who agree to accept a credit card in lieu of cash for sales or services rendered. The parties also agree to a discount percentage of each sales draft and a maximum dollar amount per transaction. Amounts exceeding that limit require prior approval by the bank. Merchants also may be assessed a fee for imprinters or promotional materials. The merchant deposits the bank credit card sales draft at the bank and receives immediate credit for the discounted amount. The bank assumes the credit risk and charges the nonrecourse sales draft to the individual customer's credit card account. Monthly statements are rendered by the bank to the customer who may elect to remit the entire amount, generally without service charge, or pay in monthly installments, with an additional percentage charged on the outstanding balance each month. A cardholder also may obtain cash advances from the bank or dispensing machines. Those advances accrue interest from the transaction date. A bank may be involved in a credit card plan in three ways:

- Agent Bank, which receives credit card applications from customers and sales drafts from merchants and forwards such documents to banks described below, and is accountable for such documents during the process of receiving and forwarding.

**LOANS**                                                                  Section 3.2

- Sublicensee Bank, which maintains accountability for credit card loans and merchant's accounts; may maintain its own center for processing payments and drafts; and may maintain facilities for embossing credit cards.
- Licensee Bank, which is the same as sublicensee bank, but in addition may perform transaction processing and credit card embossing services for sublicensee banks, and also acts as a regional or national clearinghouse for sublicensee banks.

Check credit and credit card loan policies should address procedures for careful screening of account applicants; establishment of internal controls to prevent interception of cards before delivery, merchants from obtaining control of cards, or customers from making fraudulent use of lost or stolen card; frequent review of delinquent accounts, accounts where payments are made by drawing on reserves, and accounts with steady usage; delinquency notification procedures; guidelines for realistic charge-offs; removal of accounts from delinquent status (curing) through performance not requiring a catch-up of delinquent principal; and provisions that preclude automatic reissuance of expired cards to obligors with charged-off balances or an otherwise unsatisfactory credit history with the bank.

Examination procedures for reviewing these activities are included in the ED Modules.  Also, the FDIC has separate manuals on Credit Card Specialty Bank Examination Guidelines and Credit Card Securitization Activities.

## Credit Card-related Merchant Activities

Merchant credit card activities basically involve the acceptance of credit card sales drafts for clearing by a financial institution (clearing institution).  For the clearing institution, these activities are generally characterized by thin profit margins amidst high transactional and sales volumes.  Typically, a merchant's customer will charge an item on a credit card, and the clearing institution will give credit to the merchant's account.  Should the customer dispute a charge transaction, the clearing institution is obligated to honor the customer's legitimate request to reverse the transaction.  The Clearing Institution must then seek reimbursement from the merchant.  Problems arise when the merchant is not creditworthy and is unable, or unwilling, to reimburse the clearing institution.  In these instances, the clearing institution will incur a loss.  Examiners should review for the existence of any such contingent liabilities.

In order to avoid losses and to ensure the safe and profitable operation of a clearing institution's credit card activities, the merchants with whom it contracts for

clearing services should be financially sound and honestly operated.  To this end, safe and sound merchant credit card activities should include clear and detailed acceptance standards for merchants.  These standards include the following:

- A clearing institution should scrutinize prospective merchants with the same care and diligence that it uses in evaluating prospective borrowers.
- Financial institutions engaging in credit card clearing operations must closely monitor their merchants.  Controls should be in place to ensure that early warning signs are recognized so that problem merchants can be removed from a clearing institution's program promptly to minimize loss exposure.
- In cases of merchants clearing large dollar volumes, a clearing institution should establish an account administration program that, at a minimum, incorporates periodic reviews of the merchants' financial statements and business activities.
- A clearing institution should establish an internal periodic reporting system of merchant account activities regardless of the amount or number of transactions cleared, and these reports should be reviewed for irregularities so that the Clearing Institution alerts itself quickly to problematic merchant activity.
- Clearing institutions should follow the guidelines that are established by the card issuing networks.

Another possible problem with merchant activities involves clearing institutions that sometimes engage the services of agents, such as an independent sales organization (ISO).  ISOs solicit merchants' credit card transactions for a clearing institution.  In some cases, the ISOs actually contract with merchants on behalf of clearing institutions.  Some of these contracts are entered into by the ISOs without the review and approval of the clearing institutions.  At times, clearing institutions unfortunately rely too much on the ISOs to oversee account activity.  In some cases, clearing institutions have permitted ISOs to contract with disreputable merchants.  Because of the poor condition of the merchant, or ISO, or both, these clearing institutions can ultimately incur heavy losses.

A financial institution with credit card clearing activities should develop its own internal controls and procedures to ensure sound agent selection standards before engaging an ISO.  ISOs that seek to be compensated solely on the basis of the volume of signed-up merchants should be carefully scrutinized.  A clearing institution should adequately supervise the ISO's activities, just as the institution should supervise any third party engaged to perform services for any aspect of the institution's operations.  Also, it should

**LOANS**                                                                            Section 3.2

reserve the right to ratify or reject any merchant contract that is initiated by an ISO.

Examination procedures for reviewing credit card related merchant activities are included in the Examination Documentation Modules in the Supplemental Modules Section and in the Credit Card Specialty Bank Examination Guidelines.

## OTHER CREDIT ISSUES

### Appraisals

Appraisals are professional judgments of the market value of real property. Three basic valuation approaches are used by professional appraisers in estimating the market value of real property; the cost approach, the market data or direct sales comparison approach, and the income approach. The principles governing the three approaches are widely known in the appraisal field and are referenced in parallel regulations issued by each of the Federal bank and thrift regulatory agencies. When evaluating collateral, the three valuation approaches are not equally appropriate.

- **Cost Approach -** In this approach, the appraiser estimates the reproduction cost of the building and improvements, deducts estimated depreciation, and adds the value of the land. The cost approach is particularly helpful when reviewing draws on construction loans. However, as the property increases in age, both reproduction cost and depreciation become more difficult to estimate. Except for special purpose facilities, the cost approach is usually inappropriate in a troubled real estate market because construction costs for a new facility normally exceed the market value of existing comparable properties.
- **Market Data or Direct Sales Comparison Approach -** This approach examines the price of similar properties that have sold recently in the local market, estimating the value of the subject property based on the comparable properties' selling prices. It is very important that the characteristics of the observed transactions be similar in terms of market location, financing terms, property condition and use, timing, and transaction costs. The market approach generally is used in valuing owner-occupied residential property because comparable sales data is typically available. When adequate sales data is available, an analyst generally will give the most weight to this type of estimate. Often, however, the available sales data for commercial properties is not sufficient to justify a conclusion.

- **The Income Approach -** The economic value of an income-producing property is the discounted value of the future net operating income stream, including any "reversion" value of property when sold. If competitive markets are working perfectly, the observed sales price should be equal to this value. For unique properties or in depressed markets, value based on a comparable sales approach may be either unavailable or distorted. In such cases, the income approach is usually the appropriate method for valuing the property. The income approach converts all expected future net operating income into present value terms. When market conditions are stable and no unusual patterns of future rents and occupancy rates are expected, the direct capitalization method is often used to estimate the present value of future income streams. For troubled properties, however, the more explicit discounted cash flow (net present value) method is more typically utilized for analytical purposes. In the rent method, a time frame for achieving a "stabilized", or normal, occupancy and rent level is projected. Each year's net operating income during that period is discounted to arrive at present value of expected future cash flows. The property's anticipated sales value at the end of the period until stabilization (its terminal or reversion value) is then estimated. The reversion value represents the capitalization of all future income streams of the property after the projected occupancy level is achieved. The terminal or reversion value is then discounted to its present value and added to the discounted income stream to arrive at the total present market value of the property.

**Valuation of Troubled Income-Producing Properties**

When an income property is experiencing financial difficulties due to general market conditions or due to its own characteristics, data on comparable property sales is often difficult to obtain. Troubled properties may be hard to market, and normal financing arrangements may not be available. Moreover, forced and liquidation sales can dominate market activity. When the use of comparables is not feasible (which is often the case for commercial properties), the net present value of the most reasonable expectation of the property's income-producing capacity - not just in today's market but over time - offers the most appropriate method of valuation in the supervisory process.

Estimates of the property's value should be based upon reasonable and supportable projections of the determinants of future net operating income: rents (or sales), expenses, and rates of occupancy. The primary considerations for these projections include historical levels and trends, the current market performance achieved by the subject and

# LOANS

similar properties, and economically feasible and defensible projections of future demand and supply conditions. If current market activity is dominated by a limited number of transactions or liquidation sales, high capitalization and discount rates implied by such transactions should not be used. Rather, analysts should use rates that reflect market conditions that are neither highly speculative nor depressed.

## Appraisal Regulation

Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 requires that appraisals prepared by certified or licensed appraisers be obtained in support of real estate lending and mandates that the Federal financial institutions regulatory agencies adopt regulations regarding the preparation and use of appraisals in certain real estate related transactions by financial institutions under their jurisdiction. In addition, Title XI created the Appraisal Subcommittee (Subcommittee) of the Federal Financial Institutions Examination Council (FFIEC) to provide oversight of the real estate appraisal process as it relates to federally related real estate transactions. The Subcommittee is composed of six members, each of whom is designated by the head of their respective agencies. Each of the five financial institution regulatory agencies which comprise the FFIEC and the U.S. Department of Housing and Urban Development are represented on Subcommittee. A responsibility of the Subcommittee is to monitor the state certification and licensing of appraisers. It has the authority to disapprove a state appraiser regulatory program, thereby disqualifying the state's licensed and certified appraisers from conducting appraisals for federally related transactions. The Subcommittee gets its funding by charging state certified and licensed appraisers an annual registration fee. The fee income is used to cover Subcommittee administrative expenses and to provide grants to the Appraisal Foundation.

Formed in 1987, the Appraisal Foundation was established as a private not for profit corporation bringing together interested parties within the appraisal industry, as well as users of appraiser services, to promote professional standards within the appraisal industry. The Foundation sponsors two independent boards referred to in Title XI, The Appraiser Qualifications Board (AQB) and The Appraisal Standards Board (ASB). Title XI specifies that the minimum standards for state appraiser certification are to be the criteria for certification issued by the AQB. Title XI does not set specific criteria for the licensed classification. These are individually determined by each state. Additionally, Title XI requires that the appraisal standards prescribed by the Federal agencies, at a minimum, must be the appraisal standards promulgated by

the ASB. The ASB has issued The Uniform Standards of Professional Appraisal Practice (USPAP) which set the appraisal industry standards for conducting an appraisal of real estate. To the appraisal industry, USPAP is analogous to generally accepted accounting principles for the accounting profession.

In conformance with Title XI, Part 323 of the FDIC regulations identifies which real estate related transactions require an appraisal by a certified or licensed appraiser and establishes minimum standards for performing appraisals. Substantially similar regulations have been adopted by each of the Federal financial institutions regulatory agencies.

Real estate-related transactions include real estate loans, mortgage-backed securities, bank premises, real estate investments, and other real estate owned. All real estate-related transactions by FDIC-insured institutions not specifically exempt are, by definition, "federally related transactions" subject to the requirements of the regulation. Exempt real estate-related transactions include:

- The transaction value is $250,000 or less;
- A lien on real estate has been taken as collateral in an abundance of caution;
- The transaction is not secured by real estate;
- A lien on real estate has been taken for purposes other than the real estate's value;
- The transaction is a business loan that: (i) has a transaction value of $1 million or less; and (ii) is not dependent on the sale of, or rental income derived from, real estate as the primary source of repayment;
- A lease of real estate is entered into, unless the lease is the economic equivalent of a purchase or sale of the leased real estate;
- The transaction involves an existing extension of credit at the lending institution, provided that: (i) There has been no obvious and material change in the market conditions or physical aspects of the property that threatens the adequacy of the institution's real estate collateral protection after the transaction, even with the advancement of new monies; or (ii) There is no advancement of new monies, other than funds necessary to cover reasonable closing costs;
- The transaction involves the purchase, sale, investment in, exchange of, or extension of credit secured by, a loan or interest in a loan, pooled loans, or interests in real property, including mortgage-backed securities, and each loan or interest in a loan, pooled loan, or real property interest met FDIC regulatory requirements for appraisals at the time of origination;

# LOANS

- The transaction is wholly or partially insured or guaranteed by a United States government agency or United States government sponsored agency;
- The transaction either; (i) Qualifies for sale to a United States government agency or United States government sponsored agency; or (ii) Involves a residential real estate transaction in which the appraisal conforms to the Federal National Mortgage Association or Federal Home Loan Mortgage Corporation appraisal standards applicable to that category of real estate;
- The regulated institution is acting in a fiduciary capacity and is not required to obtain an appraisal under other law; or
- The FDIC determines that the services of an appraiser are not necessary in order to protect Federal financial and public policy interests in real estate-related financial transaction or to protect the safety and soundness of the institution.

Section 323.4 establishes minimum standards for all appraisals in connection with federally related transactions. Appraisals performed in conformance with the regulation must conform to the requirements of the USPAP and certain other listed standards. The applicable sections of USPAP are the Preamble (ethics and competency), Standard 1 (appraisal techniques), Standard 2 (report content), and Standard 3 (review procedures). USPAP Standards 4 through 10 concerning appraisal services and appraising personal property do not apply to federally related transactions.

An appraisal satisfies the regulation if it is performed in accordance with all of its provisions and it is still current and meaningful. In other words, a new appraisal does not necessarily have to be done every time there is a transaction, provided the institution has an acceptable process in place to review existing appraisals.

Adherence to the appraisal regulation and appraisal guidelines should be part of the examiner's overall review of the lending function. An institution's written appraisal program should contain specific administrative review procedures that provide some evidence, such as a staff member's signature on an appraisal checklist that indicates the appraisal was reviewed and that all standards were met. In addition, the regulation requires that the appraisal contain the appraiser's certification that it was prepared in conformance with USPAP. When analyzing individual transactions, examiners should review appraisal reports to determine the institution's conformity to its own internal appraisal policies and for compliance with the regulation. Examiners may need to conduct a more detailed review if the appraisal does not have sufficient information, does not

explain assumptions, is not logical, or has other major deficiencies that cast doubt as to the validity of its opinion of value. Examination procedures regarding appraisal reviews are included in the Examination Documentation Modules.

Loans in a pool such as an investment in mortgage- backed securities or collateralized mortgage obligations should have some documented assurance that each loan in the pool has an appraisal in accordance with the regulation. Appropriate evidence could include an issuer's certification of compliance.

All apparent violations of Part 323 should be listed in the examination report in the usual manner. Significant systemic failures to meet standards and procedures could call for formal corrective measures.

## Interagency Appraisal and Evaluation Guidelines

These Interagency Appraisal and Evaluation Guidelines dated October 27, 1994 address supervisory matters relating to real estate-related financial transactions and provide guidance to examining personnel and federally regulated institutions about prudent appraisal and evaluation policies, procedures, practices, and standards. The guidelines were reiterated and clarified in a Statement issued by the regulatory agencies on October 27, 2003.

An institution's real estate appraisal and evaluation policies and procedures will be reviewed as part of the examination of the institution's overall real estate-related activities. An institution's policies and procedures should be incorporated into an effective appraisal and evaluation program. Examiners will consider the institution's size and the nature of its real estate-related activities when assessing the appropriateness of its program.

When analyzing individual transactions, examiners should review an appraisal or evaluation to determine whether the methods, assumptions, and findings are reasonable and in compliance with the agencies' appraisal regulations, policies, supervisory guidelines, and internal policies. Examiners also will review the steps taken by an institution to ensure that the individuals who perform its appraisals and evaluations are qualified and are not subject to conflicts of interest. Institutions that fail to maintain a sound appraisal or evaluation program or to comply with the agencies' appraisal regulations, policies, or these supervisory guidelines will be cited in examination reports and may be criticized for unsafe and unsound banking practices. Deficiencies will require corrective action.

Appraisal and Evaluation Program **-** An institution's board of directors is responsible for reviewing and adopting

# LOANS

policies and procedures that establish an effective real estate appraisal and evaluation program. The program should:

- Establish selection criteria and procedures to evaluate and monitor the ongoing performance of individuals who perform appraisals or evaluations;
- Provide for the independence of the person performing appraisals or evaluations;
- Identify the appropriate appraisal for various lending transactions;
- Establish criteria for contents of an evaluation;
- Provide for the receipt of the appraisal or evaluation report in a timely manner to facilitate the underwriting decision;
- Assess the validity of existing appraisals or evaluations to support subsequent transactions;
- Establish criteria for obtaining appraisals or evaluations for transactions that are otherwise exempt from the agencies' appraisal regulations; and
- Establish internal controls that promote compliance with these program standards.

<u>Selection of Individuals Who May Perform Appraisals and Evaluations</u> **-** An institution's program should establish criteria to select, evaluate, and monitor the performance of the individual(s) who performs a real estate appraisal or evaluation. The criteria should ensure that:

- The institution's selection process is non-preferential and unbiased;
- The individual selected possesses the requisite education, expertise and competence to complete the assignment;
- The individual selected is capable of rendering an unbiased opinion; and
- The individual selected is independent and has no direct or indirect interest, financial or otherwise, in the property or the transaction.

Under the agencies' appraisal regulations, the appraiser must be selected and engaged directly by the institution or its agent. The appraiser's client is the institution, not the borrower. Also, an institution may not use an appraisal that has been "readdressed" – appraisal reports that are altered by the appraiser to replace any references to the original client with the institution's name. An institution may use an appraisal that was prepared by an appraiser engaged directly by another financial services institution, as long as the institution determines that the appraisal conforms to the agencies' appraisal regulations and is otherwise acceptable.

<u>Independence of the Appraisal And Evaluation Function</u> **-** Because the appraisal and evaluation process is an integral component of the credit underwriting process, it should be isolated from influence by the institution's loan production process. An appraiser and an individual providing evaluation services should be independent of the loan and collection functions of the institution and have no interest, financial or otherwise, in the property or the transaction. In addition, individuals independent from the loan production area should oversee the selection of appraisers and individuals providing evaluation services. If absolute lines of independence cannot be achieved, an institution must be able to clearly demonstrate that it has prudent safeguards to isolate its collateral evaluation process from influence or interference from the loan production process. That is, no single person should have sole authority to render credit decisions on loans which they ordered or reviewed appraisals or evaluations.

The agencies recognize, however, that it is not always possible or practical to separate the loan and collection functions from the appraisal or evaluation process. In some cases, such as in a small or rural institution or branch, the only individual qualified to analyze the real estate collateral may also be a loan officer, other officer, or director of the institution. To ensure their independence, such lending officials, officers, or directors should abstain from any vote or approval involving loans on which they performed an appraisal or evaluation.

<u>Transactions That Require Appraisals</u> **-** Although the agencies' appraisal regulations exempt certain categories of real estate-related financial transactions from the appraisal requirements, most real estate transactions over $250,000 are considered federally related transactions and thus require appraisals. A "federally related transaction" means any real estate-related financial transaction, in which the agencies engage, contract for, or regulate and that requires the services of an appraiser. An agency also may impose more stringent appraisal requirements than the appraisal regulations require, such as when an institution's troubled condition is attributable to real estate loan underwriting problems.

<u>Minimum Appraisal Standards</u> **-** The agencies' appraisal regulations include five minimum standards for the preparation of an appraisal. The appraisal must:

- Conform to generally accepted appraisal standards as evidenced by the Uniform Standards of Professional Appraisal Practice (USPAP) promulgated by the Appraisal Standards Board (ASB) of the Appraisal Foundation unless principles of safe and sound banking require compliance with stricter standards. Although allowed by USPAP, the agencies' appraisal

regulations do not permit an appraiser to appraise any property in which the appraiser has an interest, direct or indirect, financial or otherwise;

- Be written and contain sufficient information and analysis to support the institution's decision to engage in the transaction. As discussed below, appraisers have available various appraisal development and report options; however, not all options may be appropriate for all transactions. A report option is acceptable under the agencies' appraisal regulations only if the appraisal report contains sufficient information and analysis to support an institution's decision to engage in the transaction.

- Analyze and report appropriate deductions and discounts for proposed construction or renovation, partially leased buildings, non-market lease terms, and tract developments with unsold units. This standard is designed to avoid having appraisals prepared using unrealistic assumptions and inappropriate methods. For federally related transactions, an appraisal is to include the current market value of the property in its actual physical condition and subject to the zoning in effect as of the date of the appraisal. For properties where improvements are to be constructed or rehabilitated, the regulated institution may also request a prospective market value based on stabilized occupancy or a value based on the sum of retail sales. However, the sum of retail sales for a proposed development is not the market value of the development for the purpose of the agencies' appraisal regulations. For proposed developments that involve the sale of individual houses, units, or lots, the appraiser must analyze and report appropriate deductions and discounts for holding costs, marketing costs and entrepreneurial profit. For proposed and rehabilitated rental developments, the appraiser must make appropriate deductions and discounts for items such as leasing commission, rent losses, and tenant improvements from an estimate based on stabilized occupancy;

- Be based upon the definition of market value set forth in the regulation. Each appraisal must contain an estimate of market value, as defined by the agencies' appraisal regulations; and,

- Be performed by state licensed or certified appraisers in accordance with requirements set forth in the regulation.

Appraisal Options - An appraiser typically uses three market value approaches to analyze the value of a property cost, income, and sales market. The appraiser reconciles the results of each approach to estimate market value. An appraisal will discuss the property's recent sales history and contain an opinion as to the highest and best use of the

property. An appraiser must certify that he/she has complied with USPAP and is independent. Also, the appraiser must disclose whether the subject property was inspected and whether anyone provided significant assistance to the person signing the appraisal report.

An institution may engage an appraiser to perform either a Complete or Limited Appraisal. When performing a Complete Appraisal assignment, an appraiser must comply with all USPAP standards - without departing from any binding requirements - and specific guidelines when estimating market value. When performing a Limited Appraisal, the appraiser elects to invoke the Departure Provision which allows the appraiser to depart, under limited conditions, from standards identified as specific guidelines. For example, in a Limited Appraisal, the appraiser might not utilize all three approaches to value; however, departure from standards designated as binding requirements is not permitted. There are numerous binding requirements which are detailed in the USPAP. Use of the USPAP Standards publication as a reference is recommended. The book provides details on each appraisal standard and advisory opinions issued by the Appraisal Standards Board.

An institution and appraiser must concur that use of the Departure Provision is appropriate for the transaction before the appraiser commences the appraisal assignment. The appraiser must ensure that the resulting appraisal report will not mislead the institution or other intended users of the appraisal report. The agencies do not prohibit the use of a Limited Appraisal for a federally related transaction, but the agencies believe that institutions should be cautious in their use of a Limited Appraisal because it will be less thorough than a Complete Appraisal. Complete and Limited Appraisal assignments may be reported in three different report formats: a Self-Contained Report, a Summary Report, or a Restricted Report. The major difference among these three reports relates to the degree of detail presented in the report by the appraiser. The Self-Contained Appraisal Report provides the most detail, while the Summary Appraisal Report presents the information in a condensed manner. The Restricted Report provides a capsulated report with the supporting details maintained in the appraiser's files.

The agencies believe that the Restricted Report format will not be appropriate to underwrite a significant number of federally related transactions due to the lack of sufficient supporting information and analysis in the appraisal report. However, it might be appropriate to use this type of appraisal report for ongoing collateral monitoring of an institution's real estate transactions and under other circumstances when an institution's program requires an evaluation.

# LOANS

Moreover, since the institution is responsible for selecting the appropriate appraisal report to support its underwriting decisions, its program should identify the type of appraisal report that will be appropriate for various lending transactions. The institution's program should consider the risk, size, and complexity of the individual loan and the supporting collateral when determining the level of appraisal development and the type of report format that will be ordered. When ordering an appraisal report, institutions may want to consider the benefits of a written engagement letter that outlines the institution's expectations and delineates each party's responsibilities, especially for large, complex, or out-of-area properties.

Transactions That Require Evaluations - A formal opinion of market value prepared by a state licensed or certified appraiser is not always necessary. Instead, less formal evaluations of the real estate may suffice for transactions that are exempt from the agencies' appraisal requirements.

Institutions should also establish criteria for obtaining appraisals or evaluations for safety and soundness reasons for transactions that are otherwise exempt from the agencies' appraisal regulations.

Evaluation Content - An institution should establish prudent standards for the preparation of evaluations. At a minimum, an evaluation should:

- Be written;
- Include the preparer's name, address, and signature, and the effective date of the evaluation;
- Describe the real estate collateral, its condition, its current and projected use;
- Describe the source(s) of information used in the analysis;
- Describe the analysis and supporting information, and;
- Provide an estimate of the real estate's market value, with any limiting conditions.

An evaluation report should include calculations, supporting assumptions, and, if utilized, a discussion of comparable sales. Documentation should be sufficient to allow an institution to understand the analysis, assumptions, and conclusions. An institution's own real estate loan portfolio experience and value estimates prepared for recent loans on comparable properties might provide a basis for evaluations.

An evaluation should provide an estimate of value to assist the institution in assessing the soundness of the transaction. Prudent practices also require that as an institution engages in more complex real estate-related financial transactions,

or as its overall exposure increases, a more detailed evaluation should be performed. For example, an evaluation for a home equity loan might be based primarily on information derived from a sales data services organization or current tax assessment information, while an evaluation for an income-producing real estate property should fully describe the current and expected use of the property and include an analysis of the property's rental income and expenses.

Qualifications of Evaluation Providers - Individuals who prepare evaluations should have real estate-related training or experience and knowledge of the market relevant to the subject property. Based upon their experience and training, professionals from several fields may be qualified to prepare evaluations of certain types of real estate collateral. Examples include individuals with appraisal experience, real estate lenders, consultants or sales persons, agricultural extension agents, or foresters. Institutions should document the qualifications and experience level of individuals whom the institution deems acceptable to perform evaluations. An institution might also augment its in-house expertise and hire an outside party familiar with a certain market or a particular type of property. Although not required, an institution may use state licensed or certified appraisers to prepare evaluations. As such, Limited Appraisals reported in a Summary or Restricted format may be appropriate for evaluations of real estate-related financial transactions exempt from the agencies' appraisal requirements.

Valid Appraisals and Evaluations - The agencies allow an institution to use an existing appraisal or evaluation to support a subsequent transaction, if the institution documents that the existing estimate of value remains valid. Therefore, a prudent appraisal and evaluation program should include criteria to determine whether an existing appraisal or evaluation remains valid to support a subsequent transaction. Criteria for determining whether an existing appraisal or evaluation remains valid will vary depending upon the condition of the property and the marketplace, and the nature of any subsequent transaction. Factors that could cause changes to originally reported values include: the passage of time; the volatility of the local market; the availability of financing; the inventory of competing properties; improvements to, or lack of maintenance of, the subject property or competing surrounding properties; changes in zoning; or environmental contamination. The institution must document the information sources and analyses used to conclude that an existing appraisal or evaluation remains valid for subsequent transactions.

Renewals, Refinancings, and Other Subsequent Transactions - The agencies' appraisal regulations

# LOANS

generally allow appropriate evaluations of real estate collateral in lieu of an appraisal for loan renewals and refinancings; however, in certain situations an appraisal is required. If new funds are advanced in excess of reasonable closing costs, an institution is expected to obtain a new appraisal for the renewal of an existing transaction when there is a material change in market conditions or in the physical aspects of the property that threatens the institution's real estate collateral protection.

The decision to reappraise or reevaluate the real estate collateral should be guided by the exemption for renewals, refinancings, and other subsequent transactions. Loan workouts, debt restructurings, loan assumptions, and similar transactions involving the addition or substitution of borrowers may qualify for the exemption for renewals, refinancings, and other subsequent transactions. Use of this exemption depends on the condition and quality of the loan, the soundness of the underlying collateral and the validity of the existing appraisal or evaluation.

A reappraisal would not be required when an institution advances funds to protect its interest in a property, such as to repair damaged property, because these funds should be used to restore the damaged property to its original condition. If a loan workout involves modification of the terms and conditions of an existing credit, including acceptance of new or additional real estate collateral, which facilitates the orderly collection of the credit or reduces the institution's risk of loss, a reappraisal or reevaluation may be prudent, even if it is obtained after the modification occurs.

An institution may engage in a subsequent transaction based on documented equity from a valid appraisal or evaluation, if the planned future use of the property is consistent with the use identified in the appraisal or evaluation. If a property, however, has reportedly appreciated because of a planned change in use of the property, such as rezoning, an appraisal would be required for a federally related transaction, unless another exemption applied.

Program Compliance - An institution's appraisal and evaluation program should establish effective internal controls that promote compliance with the program's standards. An individual familiar with the appropriate agency's appraisal regulation should ensure that the institution's appraisals and evaluations comply with the agencies' appraisal regulations, these guidelines, and the institution's program. Loan administration files should document this compliance review, although a detailed analysis or comprehensive analytical procedures are not required for every appraisal or evaluation. For some loans, the compliance review may be part of the loan officer's

overall credit analysis and may take the form of either a narrative or a checklist. Corrective action should be undertaken for noted deficiencies by the individual who prepared the appraisal or evaluation.

An institution's appraisal and evaluation program should also have comprehensive analytical procedures that focus on certain types of loans, such as large-dollar credits, loans secured by complex or specialized properties, non-residential real estate construction loans, or out-of-area real estate. These comprehensive analytical procedures should be designed to verify that the methods, assumptions, and conclusions are reasonable and appropriate for the transaction and the property. These procedures should provide for a more detailed review of selected appraisals and evaluations prior to the final credit decision. The individual(s) performing these reviews should have the appropriate training or experience, and be independent of the transaction.

Appraisers and persons performing evaluations should be responsible for any deficiencies in their reports. Deficient reports should be returned to them for correction. Unreliable appraisals or evaluations should be replaced prior to the final credit decision. Changes to an appraisal's estimate of value are permitted only as a result of a review conducted by an appropriately qualified state licensed or certified appraiser in accordance with Standard III of USPAP.

Portfolio Monitoring - The institution should also develop criteria for obtaining reappraisals or reevaluations as part of a program of prudent portfolio review and monitoring techniques, even when additional financing is not being contemplated. Examples of such types of situations include large credit exposures and out-of-area loans.

Referrals - Financial institutions are encouraged to make referrals directly to state appraiser regulatory authorities when a state licensed or certified appraiser violates USPAP, applicable State law, or engages in other unethical or unprofessional conduct. Examiners finding evidence of unethical or unprofessional conduct by appraisers will forward their findings and recommendations to their supervisory office for appropriate disposition and referral to the State, as necessary.

**Examination Treatment**

All apparent violations of the appraisal regulation should be described in the schedule of violations of laws and regulations. Management's comments and any commitments for correcting the practices that led to the apparent violation should be included. Violations that are technical in nature and do not impact the value conclusion

# LOANS

generally should not require a new appraisal. (These technical violations should not be relisted in subsequent examinations.) Since the point of an appraisal is to help make sound loan underwriting decisions, getting an appraisal on a loan already made simply to fulfill the requirements of the appraisal regulation, would be of little benefit. However, an institution should be expected to obtain a new appraisal on a loan in violation of the appraisal regulation when there is a safety and soundness reason for such action. For example, construction loans and lines of credit need to have the value of the real estate reviewed frequently in order for the institution to properly manage the credit relationship. A new appraisal might also be needed to determine the proper classification for examination purposes of a collateral dependent loan.

## Loan Participations

A loan participation is a sharing or selling of ownership interests in a loan between two or more financial institutions. Normally, a lead bank originates the loan and sells ownership interests to one or more participating banks at the time the loan is closed. The lead (originating) bank retains a partial interest in the loan, holds all loan documentation in its own name, services the loan, and deals directly with the customer for the benefit of all participants. Properly structured, loan participations allow selling banks to accommodate large loan requests which would otherwise exceed lending limits, diversify risk, and improve liquidity. Participating banks are able to compensate for low local loan demand or invest in large loans without servicing burdens and origination costs. If not appropriately structured and documented, a participation loan can present unwarranted risks to both the seller and purchaser of the loan. Examiners should determine the nature and adequacy of the participation arrangement as well as analyze the credit quality of the loan.

**Accounting and Capital Treatment -** The proper accounting treatment for loan participations is governed by FAS 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*. FAS applies to both the transferor (seller) of assets and the transferee (purchaser).

Loan participations are accounted for as sales provided the sales criteria in FAS 140 are met. If the sales criteria are not met, participations are accounted for as secured borrowings. The sales criteria focus on whether or not control is effectively transferred to the purchaser. To qualify for sales treatment three criteria must be met:

- The purchaser's interest in the loan must be isolated from the seller, meaning that the purchaser's interest in the loan is presumptively beyond the reach of the seller and its creditors, even in bankruptcy or other receivership;
- Each purchaser has the right to pledge or exchange its interest in the loan, and there are no conditions that both constrain the purchaser from taking advantage of that right and provide more than a trivial benefit to the seller; and
- The agreement does not both entitle and obligate the seller to repurchase or redeem the purchaser's interest in the loan prior to the loan's maturity, and it does not provide the seller with the ability to unilaterally cause the purchaser to return its interest in the loan to the seller (other than through a cleanup call).

**Right to Repurchase -** Some loan participation agreements may give the seller a contractual right to repurchase the participated interest in the loan at any time. In this case, the seller's right to repurchase the participation effectively provides the seller with a call option on a specific asset and precludes sale accounting. If a loan participation agreement contains such a provision, the participation should be accounted for as a secured borrowing.

**Recourse Arrangements -** Recourse arrangements may, or may not, preclude loan participations from being accounted for as sales for financial reporting purposes. The date of the participation and the formality of the recourse provision affect the accounting for the transaction. Formal recourse provisions may affect the accounting treatment of a participation depending upon the date that the participation is transferred to another institution. Implicit recourse provisions would not affect the financial reporting treatment of a participation because the accounting standards look to the contractual terms of asset transfers in determining whether or not the criteria necessary for sales accounting treatment have been met. Although implicit recourse provisions would not affect the accounting treatment of a loan participation, they may affect the risk-based capital treatment of a participation.

Loan participations transferred prior to April 1, 2001, are accounted for based on FAS 125, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*. The sales criteria contained in FAS 125 are very similar to those contained in FAS 140, which are summarized above. However, for FDIC-insured institutions, the first of the sales criteria in FAS 140, known as the isolation test, applies to transfers occurring after December 31, 2001. As a result, loan participations transferred from April 1 through December 31, 2001, are

**LOANS**                                                                                           Section 3.2

subject to the isolation test in FAS 125, but are otherwise accounted for based on FAS 140. Based upon the FASB's initial understanding of the nature of the FDIC's receivership power to reclaim certain assets sold by institutions that subsequently failed when it was drafting FAS 125, the FASB deemed assets sold by FDIC-insured institutions to be beyond the reach of creditors in an FDIC receivership. Therefore in FAS 125, the FASB concluded that assets transferred by an FDIC-insured institution, including participations, generally met the isolation test for sales accounting treatment with respect to receiverships. (Depending on the terms of the transfer, the transferred assets might not meet the isolation test for other reasons.) As a result, the mere existence of formal (written, contractual) recourse provisions would not, in and of themselves, preclude loan participations transferred prior to January 1, 2002, from being accounted for as sales provided all other criteria necessary for sales accounting treatment are met. However, participations transferred prior to January 1, 2002, which are subject to formal recourse provisions, as well as those subject to implicit (unwritten, noncontractual) recourse provisions in which the seller demonstrates intent to repurchase participations in the event of default even in the absence of a formal obligation to do so, would be considered assets sold with recourse when calculating the seller's risk-based capital ratios.

After the issuance of FAS 125, the FASB further clarified its understanding of the FDIC's ability to reclaim certain assets in a receivership, and the FDIC clarified when it would not seek to reclaim loan participations sold in Part 360 of the FDIC Rules and Regulations. Section 360.6 limits the FDIC's ability to reclaim certain loan participations sold without recourse, but does not limit the FDIC's ability to reclaim loan participations sold with recourse. For purposes of Section 360.6, the phrase "without recourse" means that the participation is not subject to any agreement which requires the lead bank (seller) to repurchase the participant's (purchaser's) interest in the loan or to otherwise compensate the participant due to a default on the underlying loan. The FASB's new understanding of the FDIC's receivership powers, including Part 360, is addressed in FAS 140.

Loan participations transferred after December 31, 2001, must be accounted for pursuant to all of the provisions of FAS 140, including its isolation test. In accordance with FAS 140, loan participations sold by FDIC-insured institutions with recourse generally will not be considered isolated from creditors in the event of receivership due to the FDIC's power to reclaim the participated assets. As a result, loan participations transferred after December 31, 2001, which are subject to formal (written, contractual) recourse provisions should be accounted for as secured

borrowings by both the seller and the purchaser for financial reporting purposes. This means that the seller must not reduce the loan assets on its balance sheet for the participation, and that the entire amount of the loan must be included in the seller's assets for both leverage and risk-based capital purposes. Participations transferred after December 31, 2001, which are subject to implicit (unwritten, noncontractual) recourse provisions may be accounted for as sales by both the seller and the purchaser for financial reporting purposes, provided the other sales criteria addressed above are met. However, if the seller demonstrates intent to repurchase participations sold in the event of default even in the absence of a formal obligation to do so, then these participations will be treated as assets sold with recourse when calculating the seller's risk-based capital ratios. Consistent with an AICPA auditing interpretation, FDIC-insured institutions which account for loan participations transferred after December 31, 2001, as sales rather than as secured borrowings for financial reporting purposes should generally do so only if the participation agreement is supported by a legal opinion explaining how the isolation test for sales accounting treatment is met given the FDIC's receivership powers.

**Call Report Treatment** - When a loan participation is accounted for as a sale, the seller removes the participated interest in the loan from its books. The purchaser reports its interest in the loan as Loans in the Report of Condition, and in Call Report Schedule RC-C - Loans and Lease Financing Receivables, based upon collateral, borrower, or purpose. If a loan participation is accounted for as a secured borrowing, the seller does not remove the loan from its books. The participated portion of the loan is reported as both Loans and Other Borrowed Money in the Report of Condition. The purchaser would report its interest in the loan as Loans in the Report of Condition, and as Loans to depository institutions and acceptances of other banks in Schedule RC-C. More detailed guidance on accounting for transfers of financial assets, including loan participations, is contained in the Transfers of Financial Assets entry in the Glossary of the Call Report Instructions.

**Independent Credit Analysis -** A bank purchasing a participation loan is expected to perform the same degree of independent credit analysis on the loan as if it were the originator. To determine if a participation loan meets its credit standards, a participating bank must obtain all relevant credit information and details on collateral values, lien status, loan agreements and participation agreements before a commitment is made to purchase. The absence of such information may be evidence that the participating bank has not been prudent in its credit decision.

During the life of the participation, the participant should monitor the servicing and the status of the loan. In order to

# LOANS

exercise control of its ownership interest, a purchasing bank must ascertain that the selling bank will provide complete and timely credit information on a continuing basis.

The procedures for purchasing loan participations should be provided for in the bank's formal lending policy. The criteria for participation loans should be consistent with that for similar direct loans. The policy would normally require the complete analysis of the credit quality of obligations to be purchased, determination of value and lien status of collateral, and the maintenance of full credit information for the life of the participation.

**Participation Agreements -** A participation loan can present unique problems if the borrower defaults, the lead bank becomes insolvent, or a party to the participation arrangement does not perform as expected. These contingencies should be considered in a written participation agreement. The agreement should clearly state the limitations the originating and participating banks impose on each other and the rights all parties retain. In addition to the general terms of the participation transaction, participation agreements should specifically include the following considerations:

- The obligation of the lead bank to furnish timely credit information and to provide notification of material changes in the borrower's status;
- Requirements that the lead bank consult with participants prior to modifying any loan, guaranty, or security agreements and before taking any action on defaulted loans;
- The specific rights and remedies available to the lead and participating banks upon default of the borrower;
- Resolution procedures when the lead and participating banks cannot agree on the handling of a defaulted loan;
- Resolution of any potential conflicts between the lead bank and participants in the event that more than one loan to the borrower defaults; and
- Provisions for terminating the agency relationship between the lead and participating banks upon such events as insolvency, breach of duty, negligence, or misappropriation by one of the parties.

In some loan participation agreements, the participation agreement provides for the allocation of loan payments on some basis other than in proportion to ownership interest. For example, principal payments may be applied first to the participant's ownership interest and all remaining payments to the lead bank's ownership interest. In these instances, the participation agreement must also specify that in case of loan default, participants will share in all

subsequent payments and collections in proportion to their respective ownership interest at the time of default. Without such a provision, the banks would not have a pro-rata sharing of credit risk. Provided the sales criteria contained in FAS 140 are met, loan participations sold in which the participation agreements provide for the allocation of loan payments, absent default, on some basis other than proportional ownership interests, may be treated as sold and removed from the balance sheet for financial reporting purposes. However, if the participation agreements do not also contain a provision requiring that all payments and collections received subsequent to default be allocated based on ownership interests in the loan as of the date of default, those participations will be treated as loans sold with recourse for risk-based capital purposes regardless of the financial reporting treatment. Further discussion of loans sold with recourse is contained in the Sales of Assets for Risk-Based Capital Purposes entry in the glossary of the Call Report Instructions.

**Participations Between Affiliated Institutions -** Examiners should ascertain that banks do not relax their credit standards when dealing with affiliated institutions and that participation loans between affiliated institutions are in compliance with Section 23A of the Federal Reserve Act. The Federal Reserve Board Staff has interpreted that the purchase of a participation loan from an affiliate is exempt from Section 23A provided that the commitment to purchase is obtained by the affiliate before the loan is consummated by the affiliate, and the decision to participate is based upon the bank's independent evaluation of the creditworthiness of the loan. If these criteria are not strictly met, the loan participation could be subject to the qualitative and/or quantitative restrictions of Section 23A. Refer to the Related Organizations Section of this Manual which describes transactions with affiliates.

**Sales of 100 Percent Loan Participations -** In some cases, depository institutions structure loan originations and participations with the intention of selling off 100 percent of the underlying loan amount. Certain 100 percent loan participation programs raise unique safety and soundness issues that should be addressed by an institution's policies, procedures and practices.

If not appropriately structured, these 100 percent participation programs can present unwarranted risks to the originating institution including legal, reputation and compliance risks. While this statement applies only to a small number of mostly very large insured depository institutions, the agreements should clearly state the limitations the originating and participating institutions impose on each other and the rights all parties retain. The originating institution should state that loan participants are participating in loans and are not investing in a business

# LOANS

enterprise. The policies of an institution engaged in these originations should address safety and soundness concerns and include criteria to address:

- The program's objectives – these should be of a commercial nature (structured as commercial undertakings and not as investments in securities).
- The plan of distribution – participants should be limited to sophisticated financial and commercial entities and sophisticated persons and the participations should not be sold directly to the public.
- The credit requirements applicable to the borrower - the originating institution should structure 100% loan participation programs only for borrowers who meet the originating institution's credit requirements.
- Access afforded program participants to financial information on the borrower - the originating institution should allow potential loan participants to obtain and review appropriate credit and other information to enable the participants to make an informed credit decision.

## Environmental Risk Program

A lending institution should have in place appropriate safeguards and controls to limit exposure to potential environmental liability associated with real property held as collateral. The potential adverse effect of environmental contamination on the value of real property and the potential for liability under various environmental laws have become important factors in evaluating real estate transactions and making loans secured by real estate. Environmental contamination, and liability associated with environmental contamination, may have a significant adverse effect on the value of real estate collateral, which may in certain circumstances cause an insured institution to abandon its right to the collateral. It is also possible for an institution to be held directly liable for the environmental cleanup of real property collateral acquired by the institution. The cost of such a cleanup may exceed by many times the amount of the loan made to the borrower. A loan may be affected adversely by potential environmental liability even where real property is not taken as collateral. For example, a borrower's capacity to make payments on a loan may be threatened by environmental liability to the borrower for the cost of a hazardous contamination cleanup on property unrelated to the loan with the institution. The potential for environmental liability may arise from a variety of Federal and State environmental laws and from common law tort liability.

### Guidelines for an Environmental Risk Program

As part of the institution's overall decision-making process, the environmental risk program should establish procedures for identifying and evaluating potential environmental concerns associated with lending practices and other actions relating to real property. The board of directors should review and approve the program and designate a senior officer knowledgeable in environmental matters responsible for program implementation. The environmental risk program should be tailored to the needs of the lending institution. That is, institutions that have a heavier concentration of loans to higher risk industries or localities of known contamination may require a more elaborate and sophisticated environmental risk program than institutions that lend more to lower risk industries or localities. The environmental risk program should provide for staff training, set environmental policy guidelines and procedures, require an environmental review or analysis during the application process, include loan documentation standards, and establish appropriate environmental risk assessment safeguards in loan workout situations and foreclosures.

### Examination Procedures

Examiners should review an institution's environmental risk program as part of the examination of its lending and investment activities. When analyzing individual credits, examiners should review the institution's compliance with its own environmental risk program. Failure to establish or comply with an appropriate environmental program should be criticized and corrective action required.

## LOAN PROBLEMS

It would be impossible to list all sources and causes of problem loans. They cover a multitude of mistakes a bank may permit a borrower to make, as well as mistakes directly attributable to weaknesses in the bank's credit administration and management. Some well-constructed loans may develop problems due to unforeseen circumstances on the part of the borrower; however, bank management must endeavor to protect a loan by every means possible. One or more of the items in the following list is often basic to the development of loan problems. Many of these items may also be indicative of potential bank fraud and/or insider abuse. Additional information on the warning signs and suggested areas for investigation are included in the Bank Fraud and Insider Abuse Section of this Manual.

## Poor Selection of Risks

# LOANS

Problems in this area may reflect the absence of sound lending policies, and/or management's lack of sound credit judgment in advancing certain loans. The following are general types of loans which may fall within the category of poor risk selection. It should be kept in mind that these examples are generalizations, and the examiner must weigh all relevant factors in determining whether a given loan is indeed a poor risk.

- Loans to finance new and untried business ventures which are inadequately capitalized.
- Loans based more upon the expectation of successfully completing a business transaction than on sound worth or collateral.
- Loans for the speculative purchase of securities or goods.
- Collateral loans made without adequate margin of security.
- Loans made because of other benefits, such as the control of large deposit balances, and not based upon sound worth or collateral.
- Loans made without adequate owner equity in underlying real estate security.
- Loans predicated on collateral which has questionable liquidation value.
- Loans predicated on the unmarketable stock of a local corporation when the bank is at the same time lending directly to the corporation. Action which may be beneficial to the bank from the standpoint of the one loan may be detrimental from the standpoint of the other loan.
- Loans which appear to be adequately protected by collateral or sound worth, but which involve a borrower of poor character risk and credit reputation.
- Loans which appear to be adequately protected by collateral, but which involve a borrower with limited or unassessed repayment ability.
- An abnormal amount of loans involving out-of-territory borrowers (excluding large banks properly staffed to handle such loans).
- Loans involving brokered deposits or link financing.

## Overlending

It is almost as serious, from the standpoint of ultimate losses, to lend a sound financial risk too much money as it is to lend to an unsound risk. Loans beyond the reasonable capacity of the borrower to repay invariably lead to the development of problem loans.

## Failure to Establish or Enforce Liquidation Agreements

Loans granted without a well-defined repayment program violate a fundamental principle of sound lending. Regardless of what appears to be adequate collateral protection, failure to establish at inception or thereafter enforce a program of repayment almost invariably leads to troublesome and awkward servicing problems, and in many instances is responsible for serious loan problems including eventual losses. This axiom of sound lending is important not only from the lender's standpoint, but also the borrower's.

## Incomplete Credit Information

Lending errors frequently result because of management's failure to obtain and properly evaluate credit information. Adequate comparative financial statements, income statements, cash flow statements and other pertinent statistical support should be available. Other essential information, such as the purpose of the borrowing and intended plan or sources of repayment, progress reports, inspections, memoranda of outside information and loan conferences, correspondence, etc., should be contained in the bank's credit files. Failure of a bank's management to give proper attention to credit files makes sound credit judgment difficult if not impossible.

## Overemphasis on Loan Income

Misplaced emphasis upon loan income, rather than soundness, almost always leads to the granting of loans possessing undue risk. In the long run, unsound loans usually are far more expensive than the amount of revenue they may initially produce.

## Self-Dealing

Pronounced self-dealing practices are often present in serious problem bank situations and in banks which fail. Such practices with regard to loans are found in the form of overextensions of unsound credit to insiders, or their interests, who have improperly used their positions to obtain unjustified loans. Active officers, who serve at the pleasure of the ownership interests, are at times subjected to pressures which make it difficult to objectively evaluate such loans. Loans made for the benefit of ownership interests that are carried in the name of a seemingly unrelated party are sometimes used to conceal self-dealing loans.

## Technical Incompetence

Technical incompetence usually is manifested in management's inability to obtain and evaluate credit information or put together a well-conceived loan package.

# LOANS

Management weaknesses in this area are almost certain to lead to eventual loan losses. Problems can also develop when management, technically sound in some forms of lending, becomes involved in specialized types of credit in which it lacks expertise and experience.

## Lack of Supervision

Loan problems encountered in this area normally arise for one of two reasons:

- Absence of effective active management supervision of loans which possessed reasonable soundness at inception. Ineffective supervision almost invariably results from lack of knowledge of a borrower's affairs over the life of the loan. It may well be coupled with one or more of the causes and sources of loan problems previously mentioned.
- Failure of the board and/or senior management to properly oversee subordinates to determine that sound policies are being carried out.

## Lack of Attention to Changing Economic Conditions

Economic conditions, both national and local, are continuously changing, management must be responsive to these changes. This is not to suggest that lending policies should be in a constant state of flux, nor does it suggest that management should be able to forecast totally the results of economic changes. It does mean, however, that bankers should realistically evaluate lending policies and individual loans in light of changing conditions. Economic downturns can adversely affect borrowers' repayment potential and can lessen a bank's collateral protection. Reliance on previously existing conditions as well as optimistic hopes for economic improvement can, particularly when coupled with one or more of the causes and sources of loan problems previously mentioned, lead to serious loan portfolio deterioration.

## Competition

Competition among financial institutions for growth, profitability, and community influence sometimes results in the compromise of sound credit principles and acquisition of unsound loans. The ultimate cost of unsound loans outweighs temporary gains in growth, income and influence.

## Potential Problem Indicators by Document

The preceding discussions describe various practices or conditions which may serve as a source or cause of weak loans. Weak loans resulting from these practices or conditions may manifest themselves in a variety of ways. While it is impossible to provide a complete detailing of potential "trouble indicators", the following list, by document, may aid the examiner in identifying potential problem loans during the examination process.

- **Debt Instrument -** Delinquency; irregular payments or payments not in accordance with terms; unusual or frequently modified terms; numerous renewals with little or no principal reduction; renewals that include interest; and extremely high interest rate in relation to comparable loans granted by the bank or the going rate for such loans in the bank's market area.
- **Liability Ledger -** Depending on the type of debt, failure to amortize in a regular fashion over a reasonable period of time, e.g., on an annual basis, seasonally, etc.; and a large number of out-of-territory borrowers, particularly in cases where these types of loans have increased substantially since the previous examination.
- **Financial and Operating Statements -** Inadequate or declining working capital position; excessive volume or negative trend in receivables; unfavorable level or negative trend in inventory; no recent aging of receivables, or a marked slowing in receivables; drastic increase in volume of payables; repeated and increasing renewals of carry-over operating debt; unfavorable trends in sales and profits; rapidly expanding expenses; heavy debt-to-worth level and/or deterioration in this relationship; large dividend or other payments without adequate or reasonable earnings retention; and net worth enhancements resulting solely from reappraisal in the value of fixed assets.
- **Cash Flow Documentation -** Absence of cash flow statements or projections, particularly as related to newly established term borrowers; projections indicating an inability to meet required interest and principal payments; and statements reflecting that cash flow is being provided by the sale of fixed assets or nonrecurring situations.
- **Correspondence and Credit Files -** Missing and/or inadequate collateral or loan documentation, such as financial statements, security agreements, guarantees, assignments, hypothecation agreements, mortgages, appraisals, legal opinions and title insurance, property insurance, loan applications; evidence of borrower credit checks; corporate or partnership borrowing authorizations; letters indicating that a borrower has suffered financial difficulties or has been unable to meet established repayment programs; and documents

**LOANS**                                                                    Section 3.2

that reveal other unfavorable factors relative to a line of credit.

- **Collateral -** Collateral evidencing a speculative loan purpose or collateral with inferior marketability characteristics (single purpose real estate, restricted stock, etc.) which has not been compensated for by other reliable repayment sources; and collateral of questionable value acquired subsequent to the extension of the credit.

## LOAN APPRAISAL AND CLASSIFICATION

### Loan Appraisal

In order to properly analyze any credit, an examiner must acquire certain fundamental information about a borrower's financial condition, purpose and terms of the borrowing, and prospects for its orderly repayment. The process involved in acquiring the foregoing information will necessarily vary with the size of the bank under examination and the type and sophistication of records utilized by the bank.

Because of the sheer volume of loans, it is necessary to focus attention on the soundness of larger lines of credit. Relatively smaller loans that appear to be performing satisfactorily may ordinarily be omitted from individual appraisal. The minimum size of the loan to be appraised depends upon the characteristics of the individual bank. The cut-off point should be low enough to permit an accurate appraisal of the loan portfolio as a whole, yet not so high as to preclude a thorough analysis of a representative portion of total loans. This procedure does not prevent an examiner from analyzing smaller loans which do not show adequate amortization for long periods of time, are overdue, are deficient in collateral coverage, or otherwise possess characteristics which would cause them to be subject to further scrutiny. In most instances, there should be direct correlation between the cut-off point utilized, the percentage of loans lined, and the asset quality and management ratings assigned at the previous examination.

The following types of loans or lines of credit should be analyzed at each examination:

- Loans or lines of credit listed for Special Mention or adversely classified at the previous FDIC examination or State examination, if applicable as a result of an alternating examination program;

- Loans reflected on the bank's problem loan list, if such a list exists, or identified as problem loans by the bank's credit grading system;
- Significant overdue loans as determined from the bank's delinquency list;
- Other significant loans which exhibit a high degree of risk that have come to the examiner's attention in the review of minutes, audit reports or other sources; and
- Loans to the bank's insiders, and their related interests and insiders of other banks.

The degree of analysis and/or time devoted to the above loans may vary. For example, the time devoted to a previously classified loan which has been substantially reduced or otherwise improved may be significantly less than other loans. Watch list loans should initially be sampled to assess if management's ratings are accurate. The reworking of certain loan files, such as seasoned real estate mortgages, which are not subject to significant change, should be kept to a minimum or omitted. This does not mean that an examiner should not briefly review new file information (since the previous examination) to determine any adverse trends with respect to significant loans. In addition, the examiner should review a sufficient volume of different types of loans offered by the bank to determine that bank policies are adequate and being followed.

### Review of Files and Records

Commercial loan liability ledgers or comparable subsidiary records vary greatly in quality and detail. Generally, they will provide the borrower's total commercial loan liability to the bank, and the postings thereto will depict a history of the debt. Collateral records should be scrutinized to acquire the necessary descriptive information and to ascertain that the collateral held to secure the notes is as transcribed.

Gathering credit information is an important process and should be done with care to obtain the essential information, which will enable the examiner to appraise the loans accurately and fairly. Failure to obtain and record pertinent information contained in the credit files can reflect unfavorably on examiners, and a good deal of examiner and loan officer time can be saved by carefully analyzing the files. Ideally, credit files will also contain important correspondence between the bank and the borrower. However, this is not universally the case; in some instances, important correspondence is deliberately lodged in separate files because of its sensitive character. Correspondence between the bank and the borrower can be especially valuable to the examiner in developing added insight into the status of problem credits.

**LOANS**                                                                      Section 3.2

Verification of loan proceeds is one of the most valuable and effective loan examining techniques available to the examiner and often one of the most ignored. This verification process can disclose fraudulent or fictitious notes, misapplication of funds, loans made for the benefit or accommodation of parties other than the borrower of record, or utilization of loans for purposes other than those reflected in the bank's files. Verification of the disbursement of a selected group of large or unusual loans, particularly those subject to classification or Special Mention and those granted under circumstances which appear illogical or incongruous is important. However, it is more important to carry the verification process one step further to the apparent utilization of loan proceeds as reflected by the customer's deposit account or other related bank records. The examiner should also determine the purpose of the credit and the expected source of repayment.

Examination Procedures regarding loan portfolio analysis are included in the Examination Documentation Modules.

## Loan Discussion

The examiner must comprehensively review all data collected on the individual loans. In most banks, this review should allow the majority of loans to be passed without criticism, eliminating the need for discussing these lines with the appropriate bank officer(s). No matter how thoroughly the supporting loan files have been reviewed, there will invariably be a number of loans which will require additional information or discussion before an appropriate judgment can be made as to their credit quality, relationship to other loans, proper documentation, or other circumstances related to the overall examination of the loan portfolio. Such loans require discussion with the appropriate bank officer(s) as do other loans for which adequate information has been assembled to indicate that classification or Special Mention is warranted.

Proper preparation for the loan discussion is essential, and the following points should be given due consideration by the examiner. Loans which have been narrowed down for discussion should be reviewed in depth to insure a comprehensive grasp of all factual material. Careful advance preparation can save time for all concerned. Particularly with regard to large, complicated lines, undue reliance should not be placed on memory to cover important points in loan discussion. Important weaknesses and salient points to be covered in discussion, questions to be asked, and information to be sought should be noted. The loan discussion should not involve discussion of trivialities since the banker's time is valuable, and it is no

place for antagonistic remarks and snide comments directed at loan officers. The examiner should listen carefully to what the banker has to say, and concisely and accurately note this information. Failure to do so can result in inaccuracies and make follow-up at the next examination more difficult.

## Loan Analysis

In the appraisal of individual loans, the examiner should weigh carefully the information obtained and arrive at a judgment as to the credit quality of the loans under review. Each loan is appraised on the basis of its own characteristics. Consideration is given to the risk involved in the project being financed; the nature and degree of collateral security; the character, capacity, financial responsibility, and record of the borrower; and the feasibility and probability of its orderly liquidation in accordance with specified terms. The willingness and ability of a debtor to perform as agreed remains the primary measure of a loan's risk. This implies that the borrower must have earnings or liquid assets sufficient to meet interest payments and provide for reduction or liquidation of principal as agreed at a reasonable and foreseeable date. However, it does not mean that borrowers must at all times be in a position to liquidate their loans, for that would defeat the original purpose of extending credit.

Following analysis of specific credits, it is important that the examiner ascertain whether troublesome loans result from inadequate lending and collection policies and practices or merely reflect exceptions to basically sound credit policies and practices. In instances where troublesome loans exist due to ineffective lending practices and/or inadequate supervision, it is quite possible that existing problems will go uncorrected and further loan quality deterioration may occur. Therefore, the examiner should not only identify problem loans, but also ascertain the cause(s) of these problems. Weaknesses in lending policies or practices should be stressed, along with possible corrective measures, in discussions with the bank's senior management and/or the directorate and in the Report of Examination.

## Loan Classification

To quantify and communicate the results of the loan appraisal, the examiner must arrive at a decision as to which loans are to be subjected to criticism and/or comment in the examination report. Adversely classified loans are allocated on the basis of risk to three categories: Substandard; Doubtful; and Loss.

# LOANS

Other loans of questionable quality, but involving insufficient risk to warrant classification, are designated as Special Mention loans. Loans lacking technical or legal support, whether or not adversely classified, should be brought to the attention of the bank's management. If the deficiencies in documentation are severe in scope or volume, a schedule of such loans should be included in the Report of Examination.

Loan classifications are expressions of different degrees of a common factor, risk of nonpayment. All loans involve some risk, but the degree varies greatly. It is incumbent upon examiners to avoid classification of sound loans. The practice of lending to sound businesses or individuals for reasonable periods is a legitimate banking function. Adverse classifications should be confined to those loans which are unsafe for the investment of depositors' funds.

If the internal grading system is determined to be accurate and reliable, examiners can use the institution's data for preparing the applicable examination report pages and schedules, for determining the overall level of classifications, and for providing supporting comments regarding the quality of the loan portfolio. If the internal classifications are overly conservative, examiners should make appropriate adjustments and include explanations in the report's comments.

A uniform agreement on the classification of assets and appraisal of securities in bank examinations was issued jointly on June 15, 2004, by the Office of the Comptroller of the Currency, the FDIC, the Federal Reserve Board, and the Office of Thrift Supervision. This interagency statement provides definitions of Substandard, Doubtful, and Loss categories used for adversely classifying bank assets. Amounts classified Loss should be promptly eliminated from the bank's books.

Uniform guidelines have been established by the FDIC regarding the Report of Exam treatment of assets classified Doubtful. The general policy is not to require charge-off or similar action for Doubtful classifications. Examiners should make a statement calling for a bank to charge-off a portion of loans classified Doubtful only when State law or policy requires. Further, any such statement should be clear as to the intended purpose of bringing the bank into conformity with those State requirements. An exception is made for formal actions under Section 8 of the FDI Act.

A statement addressing the chargeoff of loans classified Loss is a required comment Report of Examination when the amount is material. Amounts classified Loss should be promptly eliminated from the bank's books.

## Definitions

- **Substandard -** Substandard loans are inadequately protected by the current sound worth and paying capacity of the obligor or of the collateral pledged, if any. Loans so classified must have a well-defined weakness or weaknesses that jeopardize the liquidation of the debt. They are characterized by the distinct possibility that the bank will sustain some loss if the deficiencies are not corrected.

- **Doubtful -** Loans classified Doubtful have all the weaknesses inherent in those classified Substandard with the added characteristic that the weaknesses make collection or liquidation in full, on the basis of currently known facts, conditions and values, highly questionable and improbable.

- **Loss -** Loans classified Loss are considered uncollectible and of such little value that their continuance as bankable assets is not warranted. This classification does not mean that the loan has absolutely no recovery or salvage value but rather it is not practical or desirable to defer writing off this basically worthless asset even though partial recovery may be effected in the future.

There is a close relationship between classifications, and no classification category should be viewed as more important than the other. The uncollectibility aspect of Doubtful and Loss classifications makes their segregation of obvious importance. The function of the Substandard classification is to indicate those loans which are unduly risky and, if unimproved, may be a future balance.

A complete list of adversely classified loans is to be provided to management, either during or at the close of an examination.

## Special Mention Assets

**Definition -** A Special Mention asset has potential weaknesses that deserve management's close attention. If left uncorrected, these potential weaknesses may result in deterioration of the repayment prospects for the asset or in the institution's credit position at some future date. Special Mention assets are not adversely classified and do not expose an institution to sufficient risk to warrant adverse classification.

**Use of Special Mention -** The Special Mention category is not to be used as a means of avoiding a clear decision to classify a loan or pass it without criticism. Neither should it include loans listed merely "for the record" when uncertainties and complexities, perhaps coupled with large size, create some reservations about the loan. If

**LOANS**

weaknesses or evidence of imprudent handling cannot be identified, inclusion of such loans in Special Mention is not justified.

Ordinarily, Special Mention credits have characteristics which corrective management action would remedy. Often weak origination and/or servicing policies are the cause for the Special Mention designation. Examiners should not misconstrue the fact that most Special Mention loans contain management correctable deficiencies to mean that loans involving merely technical exceptions belong in this category. However, instances may be encountered where technical exceptions are a factor in scheduling loans for Special Mention.

Careful identification of loans which properly belong in this category is important in determining the extent of risk in the loan portfolio and providing constructive criticism for bank management. While Special Mention Assets should not be combined with adversely classified assets, their total should be considered in the analysis of asset quality and management, as appropriate.

The nature of this category precludes inclusion of smaller lines of credit unless those loans are part of a large grouping listed for related reasons. Comments on loans listed for Special Mention in the Report of Examination should be drafted in a fashion similar to those for adversely classified loans. There is no less of a requirement upon the examiner to record clearly the reasons why the loan is listed. The major thrust of the comments should be towards achieving correction of the deficiencies identified.

## Troubled Commercial Real Estate Loan Classification Guidelines

Additional classification guidelines have been developed to aid the examiner in classifying troubled commercial real estate loans. These guidelines are intended to supplement the uniform guidelines discussed above. After performing an analysis of the project and its appraisal, the examiner must determine the classification of any exposure.

The following guidelines are to be applied in instances where the obligor is devoid of other reliable means of repayment, with support of the debt provided solely by the project. If other types of collateral or other sources of repayment exist, the project should be evaluated in light of these mitigating factors.

- **Substandard -** Any such troubled real estate loan or portion thereof should be classified Substandard when well-defined weaknesses are present which jeopardize the orderly liquidation of the debt. Well-defined

weaknesses include a project's lack of marketability, inadequate cash flow or collateral support, failure to complete construction on time or the project's failure to fulfill economic expectations. They are characterized by the distinct possibility that the bank will sustain some loss if the deficiencies are not corrected.

- **Doubtful -** Doubtful classifications have all the weaknesses inherent in those classified Substandard with the added characteristic that the weaknesses make collection or liquidation in full, on the basis of currently known facts, conditions and values, highly questionable and improbable. A Doubtful classification may be appropriate in cases where significant risk exposures are perceived, but Loss cannot be determined because of specific reasonable pending factors which may strengthen the credit in the near term. Examiners should attempt to identify Loss in the credit where possible thereby limiting the excessive use of the Doubtful classification.

- **Loss -** Advances in excess of calculated current fair value which are considered uncollectible and do not warrant continuance as bankable assets. There is little or no prospect for near term improvement and no realistic strengthening action of significance pending.

## Technical Exceptions

Deficiencies in documentation of loans should be brought to the attention of management for remedial action. Failure of management to effect corrections may lead to the development of greater credit risk in the future. Moreover, an excessive number of technical exceptions may be a reflection on management's quality and ability. Inclusion of the schedule "Assets With Credit Data or Collateral Documentation Exceptions" and various comments in the Report of Examination is appropriate in certain circumstances. Refer to the Report of Examination Instructions for further guidance.

## Past Due and Nonaccrual

Overdue loans are not necessarily subject to adverse criticism. Nevertheless, a high volume of overdue loans almost always indicates liberal credit standards, weak servicing practices, or both. Because loan renewal and extension policies vary among banks, comparison of their delinquency ratios may be misleading. A more significant method of evaluating this factor lies in determination of the trend within the bank under examination, keeping in mind the distortion resulting from seasonal influences, economic conditions, or the timing of examinations. It is important for the examiner to carefully consider the makeup and reasons for the volume of overdue loans. Only then can it

# LOANS

be determined whether the volume of past due paper is a significant factor reflecting adversely on the quality or soundness of the overall loan portfolio or the efficiency and quality of management. It is important that overdue loans be computed on a uniform basis. This allows for comparison of overdue totals between examinations and/or with other banks.

The Report of Examination includes information on overdue and nonaccrual loans. Loans which are still accruing interest but are past their maturity or on which either interest or principal is due and unpaid (including unplanned overdrafts) are separated by loan type into two distinct groupings: 30 to 89 days past due and 90 days or more past due. Nonaccrual loans may include both current and past due loans. In the case of installment credit, a loan will not be considered overdue until at least two monthly payments are delinquent. The same will apply to real estate mortgage loans, term loans or any other loans payable on regular monthly installments of principal and interest.

Some modification of the overdue criteria may be necessary because of applicable State law, joint examinations, or unusual circumstances surrounding certain kinds of loans or in individual loan situations. It will always be necessary for the examiner to ascertain the bank's renewal and extension policies and procedures for collecting interest prior to determining which loans are overdue, since such practices often vary considerably from bank to bank. This is important not only to validate which loans are actually overdue, but also to evaluate the soundness of such policies. Standards for renewal should be aimed at achieving an orderly liquidation of loans and not at maintaining a low ratio of past due paper through unwarranted extensions or renewals.

In larger departmentalized banks or banks with large branch systems, it may be informative to analyze delinquencies by determining the source of overdue loans by department or branch. This is particularly true if a large volume of overdue loans exist. The production of schedules delineating overdue loans by department or branch is encouraged if it will aid in pinpointing the source of a problem or be otherwise informative..

Continuing to accrue income on assets which are in default as to principal and interest overstates a bank's assets, earnings and capital. Call Report Instructions indicate that where the period of default of principal or interest equals or exceeds 90 days, the accruing of income should be discontinued unless the asset is well-secured and in process of collection. A debt is well-secured if collateralized by liens on or pledges of real or personal property, including securities that have a realizable value sufficient to discharge the debt in full; or by the guarantee of a financially responsible party. A debt is in process of collection if collection is proceeding in due course either through legal action, including judgment enforcement procedures, or, in appropriate circumstances, through collection efforts not involving legal action which are reasonably expected to result in repayment of the debt or its restoration to a current status. Banks are strongly encouraged to follow this guideline not only for reporting purposes but also bookkeeping purposes. There are several exceptions, modifications and clarifications to this general standard. First, consumer loans and real estate loans secured by one-to-four family residential properties are exempt from the nonaccrual guidelines. Nonetheless, these exempt loans should be subject to other alternative methods of evaluation to assure the bank's net income is not materially overstated. Second, any State statute, regulation or rule which imposes more stringent standards for nonaccrual of interest should take precedence over these instructions. Third, reversal of previously accrued but uncollected interest applicable to any asset placed in a nonaccrual status, and treatment of subsequent payments as either principal or interest, should be handled in accordance with generally accepted accounting principles. Acceptable accounting treatment includes reversal of all previously accrued but uncollected interest against appropriate income and balance sheet accounts.

## Nonaccrual Loans That Have Demonstrated Sustained Contractual Performance

The following guidance applies to borrowers who have resumed paying the full amount of scheduled contractual interest and principal payments on loans that are past due and in nonaccrual status. Although a prior arrearage may not have been eliminated by payments from a borrower, the borrower may have demonstrated sustained performance over a period of time in accordance with the contractual terms. Such loans to be returned to accrual status, even though the loans have not been brought fully current, provided two criteria are met:

- All principal and interest amounts contractually due (including arrearage) are reasonably assured of repayment within a reasonable period, and
- There is a sustained period of repayment performance (generally a minimum of six months) by the borrower, in accordance with the contractual terms involving payments of cash or cash equivalents.

When the regulatory reporting criteria for restoration to accrual status are met, previous charge-offs taken would not have to be fully recovered before such loans are returned to accrual status. Loans that meet the above

**LOANS** <span style="float:right">Section 3.2</span>

criteria would continue to be disclosed as past due, as appropriate, until they have been brought fully current.

## Troubled Debt Restructuring - Multiple Note Structure

The basic example of a trouble debt restructure (TDR) multiple note structure is a troubled loan that is restructured into two notes where the first or "A" note represents the portion of the original loan principal amount which is expected to be fully collected along with contractual interest. The second part of the restructured loan, or "B" note, represents the portion of the original loan that has been charged-off.

Such TDRs generally may take any of three forms. In certain TDRs, the "B" note may be a contingent receivable that is payable only if certain conditions are met (e.g., sufficient cash flow from property). For other TDRs, the "B" note may be contingently forgiven (e.g., note "B" is forgiven if note "A" is paid in full). In other instances, an institution would have granted a concession (e.g., rate reduction) to the troubled borrower but the "B" note would remain a contractual obligation of the borrower. Because the "B" note is not reflected as an asset on the institution's books and is unlikely to be collected, for reporting purposes the "B" note could be viewed as a contingent receivable.

Institutions may return the "A" note to accrual status provided the following conditions are met:

- The restructuring qualifies as a TDR as defined by FAS 15 and there is economic substance to the restructuring.
- The portion of the original loan represented by the "B" note has been charged-off. The charge-off must be supported by a current, well-documented credit evaluation of the borrower's financial condition and prospects for repayment under the revised terms. The charge-off must be recorded before or at the time of the restructuring.
- The "A" note is reasonably assured of repayment and of performance in accordance with the modified terms.
- In general, the borrower must have demonstrated sustained repayment performance (either immediately before or after the restructuring) in accordance with the modified terms for a reasonable period prior to the date on which the "A" note is returned to accrual status. A sustained period of payment performance generally would be a minimum of six months and involve payments in the form of cash or cash equivalents.

Under existing reporting requirements, the "A" note would be disclosed as a TDR. In accordance with these requirements, if the "A" note yields a market rate of interest and performs in accordance with the restructured terms, such disclosures could be eliminated in the year following restructuring. To be considered a market rate of interest, the interest rate on the "A" note at the time of restructuring must be equal to or greater than the rate that the institution is willing to accept for a new receivable with comparable risk.

## Interagency Retail Credit Classification Policy

The quality of consumer credit soundness is best indicated by the repayment performance demonstrated by the borrower. Because retail credit generally is comprised of a large number of relatively small balance loans, evaluating the quality of the retail credit portfolio on a loan-by-loan basis is burdensome for the institution being examined and examiners. To promote an efficient and consistent credit risk evaluation, the FDIC, the Comptroller of Currency, the Federal Reserve and the Office of Thrift Supervision adopted the Uniform Retail Credit Classification and Account Management Policy (Retail Classification Policy.)

Retail credit includes open-end and closed-end credit extended to individuals for household, family, and other personal expenditures. It includes consumer loans and credit cards. For purposes of the policy, retail credit also includes loans to individuals secured by their personal residence, including home equity and home improvement loans.

In general, retail credit should be classified based on the following criteria:

- Open-end and closed-end retail loans past due 90 cumulative days from the contractual due date should be classified Substandard.
- Closed-end retail loans that become past due 120 cumulative days and open-end retail loans that become past due 180 cumulative days from the contractual due date should be charged-off. The charge-off should be taken by the end of the month in which the 120-or 180-day time period elapses.
- Unless the institution can clearly demonstrate and document that repayment on accounts in bankruptcy is likely to occur, accounts in bankruptcy should be charged off within 60 days of receipt of notification of filing from the bankruptcy court or within the delinquency time frames specified in this classification policy, whichever is shorter. The charge-off should be taken by the end of the month in which the applicable

**LOANS**                                                                    Section 3.2

time period elapses. Any loan balance not charged-off should be classified Substandard until the borrower re-establishes the ability and willingness to repay (with demonstrated payment performance for six months at a minimum) or there is a receipt of proceeds from liquidation of collateral.

- Fraudulent loans should be charged off within 90 days of discovery or within the delinquency time frames specified in this classification policy, whichever is shorter. The charge-off should be taken by the end of the month in which the applicable time period elapses.

- Loans of deceased persons should be charged off when the loss is determined or within the delinquency time frames adopted in this classification policy, whichever is shorter. The charge-off should be taken by the end of the month in which the applicable time period elapses.

- One-to four-family residential real estate loans and home equity loans that are delinquent 90 days or more with loan-to-value ratios greater than 60 percent, should be classified Substandard.

When a residential or home equity loan is 120 days past due for closed-end credit and 180 days past due for open-end credit, a current assessment of value should be made and any outstanding loan balance in excess of the fair value of the property, less cost to sell, should be classified Loss. Properly secured residential real estate loans with loan-to-value ratios equal to or less than 60 percent are generally not classified based solely on delinquency status. Home equity loans to the same borrower at the same institution as the senior mortgage loan with a combined loan-to-value ratio equal to or less than 60 percent should not be classified. However, home equity loans where the institution does not hold the senior mortgage, that are delinquent 90 days or more should be classified Substandard, even if the loan-to-value ratio is equal to, or less than, 60 percent.

If an institution can clearly document that the delinquent loan is well secured and in the process of collection, such that collection will occur regardless of delinquency status, then the loan need not be classified. A well secured loan is collateralized by a perfected security interest in, or pledges of, real or personal property, including securities, with an estimated fair value, less cost to sell, sufficient to recover the recorded investment in the loan, as well as a reasonable return on that amount. In the process of collection means that either a collection effort or legal action is proceeding and is reasonably expected to result in recovery of the loan balance or its restoration to a current status, generally within the next 90 days.

This policy does not preclude an institution from adopting an internal classification policy more conservative than the one detailed above. It also does not preclude a regulatory agency from using the Doubtful or Loss classification in certain situations if a rating more severe than Substandard is justified. Loss in retail credit should be recognized when the institution becomes aware of the loss, but in no case should the charge-off exceed the time frames stated in this policy.

**Re-aging, Extensions, Deferrals, Renewals, or Rewrites**

Re-aging is the practice of bringing a delinquent account current after the borrower has demonstrated a renewed willingness and ability to repay the loan by making some, but not all, past due payments. Re-aging of open-end accounts, or extensions, deferrals, renewals, or rewrites of closed-end accounts should only be used to help borrowers overcome temporary financial difficulties, such as loss of job, medical emergency, or change in family circumstances like loss of a family member. A permissive policy on re-agings, extensions, deferrals, renewals, or rewrites can cloud the true performance and delinquency status of the portfolio. However, prudent use of a policy is acceptable when it is based on recent, satisfactory performance and the true improvement in a borrower's other credit factors, and when it is structured in accordance with internal policies.

The decision to re-age a loan, like any other modification of contractual terms, should be supported in the institution's management information systems. Adequate management information systems usually identify and document any loan that is extended, deferred, renewed, or rewritten, including the number of times such action has been taken. Documentation normally shows that institution personnel communicated with the borrower, the borrower agreed to pay the loan in full, and the borrower shows the ability to repay the loan.

Institutions that re-age open-end accounts should establish a reasonable written policy and adhere to it. An account eligible for re-aging, extension, deferral, renewal, or rewrite should exhibit the following:

- The borrower should show a renewed willingness and ability to repay the loan.
- The account should exist for at least nine months before allowing a re-aging, extension, renewal, referral, or rewrite.
- The borrower should make at least three minimum consecutive monthly payments or the equivalent lump sum payment before an account is re-aged. Funds may not be advanced by the institution for this purpose.

**LOANS**
Section 3.2

- No loan should be re-aged, extended, deferred, renewed, or rewritten more than once within any twelve-month period; that is, at least twelve months must have elapsed since a prior re-aging. In addition, no loan should be re-aged, extended, deferred, renewed, or rewritten more than two times within any five-year period.
- For open-end credit, an over limit account may be re-aged at its outstanding balance (including the over limit balance, interest, and fees). No new credit may be extended to the borrower until the balance falls below the designated predelinquency credit limit.

**Partial Payments on Open-End and Closed-End Credit**

Institutions should use one of two methods to recognize partial payments. A payment equivalent to 90 percent or more of the contractual payment may be considered a full payment in computing delinquency. Alternatively, the institution may aggregate payments and give credit for any partial payment received. For example, if a regular installment payment is $300 and the borrower makes payments of only $150 per month for a six-month period, the loan would be $900, or three full months delinquent. An institution may use either or both methods in its portfolio, but may not use both methods simultaneously with a single loan.

**Examination Considerations**

Examiners should ensure that institutions adhere to the Retail Classification Policy. Nevertheless, there may be instances that warrant exceptions to the general classification policy. Loans need not be classified if the institution can document clearly that repayment will occur regardless of delinquency status. Examples might include loans well secured by marketable collateral and in the process of collection, loans for which claims are filed against solvent estates, and loans supported by valid insurance claims. Conversely, the Retail Classification Policy does not preclude examiners from reviewing and classifying individual large dollar retail credit loans that exhibit signs of credit weakness regardless of delinquency status.

In addition to reviewing loan classifications, the examiner should ensure that the ALLL provides adequate coverage for inherent losses. Sound risk and account management systems, including a prudent retail credit lending policy, measures to ensure and monitor adherence to stated policy, and detailed operating procedures, should also be implemented. Internal controls should be in place to ensure that the policy is followed. Institutions lacking sound policies or failing to implement or effectively follow established policies will be subject to criticism.

**Examination Treatment**

Use of the formula classification approach can result in numerous small dollar adversely classified items. Although these classification details are not always included in the Report of Examination, an itemized list is to be left with management. A copy of the listing should also be retained in the examination work papers.

Examiner support packages are available which have built in parameters of the formula classification policy, and which generate a listing of delinquent consumer loans to be classified in accordance with the policy. Use of this package may expedite the examination in certain cases, especially in larger banks.

Losses are one of the costs of doing business in consumer installment credit departments. It is important for the examiner to give consideration to the amount and severity of installment loan charge-offs when examining the department. Excessive loan losses are the product of weak lending and collection policies and therefore provide a good indication of the soundness of the consumer installment loan operation. The examiner should be alert also to the absence of installment loan charge-offs, which may indicate that losses are being deferred or concealed through unwarranted rewrites or extensions.

Dealer lines should be scheduled in the report under the dealer's name regardless of whether the contracts are accepted with or without recourse. Any classification or totaling of the nonrecourse line can be separately identified from the direct or indirect liability of the dealer. Comments and format for scheduling the indirect contracts will be essentially the same as for direct paper. If there is direct debt, comments will necessarily have to be more extensive and probably will help form a basis for the indirect classification.

No general rule can be established as to the proper application of dealers' reserves to the examiner's classifications. Such a rule would be impractical because of the many methods used by banks in setting up such reserves and the various dealer agreements utilized. Generally, where the bank is handling a dealer who is not financially responsible, weak contracts warrant classification irrespective of any balance in the dealer's reserve. Fair and reasonable judgment on the part of the examiner will determine application of dealer reserves.

If the amount involved would have a material impact on capital, consumer loans should be classified net of unearned income. Large business-type loans placed in consumer installment loan departments should receive

# LOANS

individual appraisal and, in all cases, the applicable unearned income discount should be deducted when such loans are classified.

## Impaired Loans, Troubled Debt Restructurings, Foreclosures and Repossessions

**Loan Impairment** - A loan is impaired when, based on current information and events, it is likely that an institution will be unable to collect all amounts due according to the contractual terms of the loan agreement (i.e., principal and interest). The accounting standard for impaired loans is set forth in FAS 114, *Accounting by Creditors for Impairment of a Loan* as amended by FAS 118, *Accounting by Creditors for Impairment of a Loan - Income Recognition and Disclosures.* FAS 114 applies to all loans, except large groups of smaller-balance homogenous loans that are collectively evaluated for impairment and loans that are measured at fair value or the lower of cost or fair value.

When a loan is impaired under FAS 114, the amount of impairment should be measured based on the present value of expected future cash flows discounted at the loan's effective interest rate (i.e., the contractual interest rate adjusted for any net deferred loan fees or costs and premium or discount existing at the origination or acquisition of the loan). As a practical expedient, impairment may also be measured based on a loan's observable market price, or the fair value of the collateral, if the loan is collateral dependent. A loan is collateral dependent if repayment is expected to be provided solely by the underlying collateral and there are no other available and reliable sources of repayment.

If the measure of a loan calculated in accordance with FAS 114 is less than the book value of that loan, impairment should be recognized as a valuation allowance against the loan. For regulatory reporting and examination report purposes, this valuation allowance is included as part of the general allowance for loan and lease losses. In general, when the excess amount of the loan's book value is determined to be uncollectible, this excess amount should be promptly charged-off against the ALLL. When a loan is collateral dependent, any portion of the loan balance in excess of the fair value of the collateral (or fair value less cost to sell) should similarly be charged-off.

**Troubled Debt Restructuring** - Troubled debt restructuring takes placed when a bank grants a concession to a debtor in financial difficulty. The accounting standards for troubled debt restructurings are set forth in FAS 15, *Accounting by Debtors and Creditors for Troubled Debt Restructurings*, as amended by FAS 114.

In certain situations FASB 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*, also applies. It is the FDIC's policy that restructurings be reflected in examination reports in accordance with this accounting guidance. In addition, banks are expected to follow these principles when filing the Call Report.

Troubled debt restructurings may be divided into two broad groups: those where the borrower transfers assets to the creditor to satisfy the claim, which would include foreclosures; and those in which the terms of a debtor's obligation are modified, which may include reduction in the interest rate or an interest rate that is less than the current market rate for new obligations with similar risk , extension of the maturity date, or forgiveness of principal or interest. A third type of restructuring combines a receipt of assets and a modification of loan terms. A loan extended or renewed at an interest rate equal to the current interest rate for new debt with similar risk is not reported as a restructured loan for examination purposes.

**Transfer of Assets to the Creditor** - A bank that receives assets (except long-lived assets that will be sold) from a borrower in full satisfaction of the book value of a loan should record those assets at fair value. If the fair value of the assets received is less than the institution's recorded investment in the loan, a loss is charged to the ALLL. When property is received in full satisfaction of an asset other than a loan (e.g., a debt security), the loss should be reflected in a manner consistent with the balance sheet classification of the asset satisfied. When long-lived assets that will be sold, such as real estate, are received in full satisfaction of a loan, the real estate is recorded at its fair value less cost to sell. This fair value (less cost to sell) becomes the "cost" of the foreclosed asset.

To illustrate, assume a bank forecloses on a defaulted mortgage loan of $100,000 and takes title to the property. If the fair value of the realty at the time of foreclosure is $90,000 and costs to sell are estimated at $10,000, a $20,000 loss should be immediately recognized by a charge to the ALLL. The cost of the foreclosed asset becomes $80,000. If the bank is on an accrual basis of accounting, there may also be adjusting entries necessary to reduce both the accrued interest receivable and loan interest income accounts. Assume further that in order to effect sale of the realty to a third party, the bank is willing to offer a new mortgage loan (e.g., of $100,000) at a concessionary rate of interest (e.g., 10 percent while the market rate for new loans with similar risk is 20 percent). Before booking this new transaction, the bank must establish its "economic value". Pursuant to Accounting Principles Board Opinion No. 21 (APB 21, Interest on Receivables and Payables), the value is represented by the sum of the present value of the income stream to be

**LOANS**                                                                                    Section 3.2

received from the new loan, discounted at the current market rate for this type of credit, and the present value of the principal to be received, also discounted at the current market rate. This economic value is the proper carrying value for the asset at its origination date, and if less than the fair value less cost to sell at time of foreclosure (e.g., $78,000 vs. $80,000), an additional loss has been incurred and should be immediately recognized. This additional loss should be reflected in the allowance if a relatively brief period has elapsed between foreclosure and subsequent resale of the property. However, the loss should be treated as "other operating expenses" if the asset has been held for a longer period. The new loan would be placed on the books at its face value ($100,000) and the difference between the new loan amount and the "economic value" ($78,000) is treated as unearned discount ($22,000). For examination and Call Report purposes, the asset would be shown net of the unearned discount which is reduced periodically as it is earned over the life of the new loan. Interest income is earned on the restructured loan at the previously established market rate. This is computed by multiplying the carrying value (i.e., face amount of the loan reduced by any principal payments, less unearned discount) by that rate (20 percent).

The basis for this accounting approach is the assumption that financing the sale of the property at a concessionary rate exacts an opportunity cost which the bank must recognize. That is, unearned discount represents the present value of the "imputed" interest differential between the concessionary and market rates of interest. Present value accounting also assumes that both the bank and the third party who purchased the property are indifferent to a cash sales price at the "economic value" or a higher financed price repayable over time.

**Modification of Terms -** When the terms of a TDR provide for a reduction of interest or principal, the institution should measure any loss on the restructuring in accordance with the guidance for impaired loans as set forth in FAS 114 unless the loans are measured at fair value or the lower of cost or fair value. If the fair value of the restructured loan is less than the book value of that loan, FAS 114 requires impairment to be recognized as a valuation allowance against the loan. For regulatory reporting and examination report purposes, this valuation allowance should be included as part of ALLL. If the excess amount of the loan's book value is determined to be uncollectible, this excess amount should be promptly charged-off against the ALLL.

For example, in lieu of foreclosure, a bank chooses to restructure a $100,000 loan to a borrower which had originally been granted with an interest rate of 10 percent for 10 years. The bank and the borrower have agreed to

capitalize the accrued interest ($10,000) into the note balance, but the restructured terms will permit the borrower to repay the debt over 10 years at a six percent interest rate. The bank does not believe the loan is collateral dependent. In this situation, the bank would record the restructured loan at the present value of the new note amount ($110,000) discounted at the 10 percent rate specified in the original contract. This amount becomes the loan's fair value. The difference between the calculated fair value and the book value of the bank's restructured loan (which includes accrued interest, net deferred loan fees or costs, and unamortized premium or discount) is recognized by creating a valuation allowance with a corresponding charge to the provision for loan and lease losses. As a result, the net book value of the restructured loan is reflected at fair value.

**Combination Approach -** In some instances, the bank may receive assets in partial rather than full satisfaction of a loan or security and may also agree to alter the original repayment terms. In these cases, the recorded investment should be reduced by the fair value of the assets received and the remaining investment accounted for as a restructuring involving only modification of terms.

**Examination Report Treatment -** Examiners should continue to classify troubled loans, including any troubled collateral dependent loans, based on the definitions of Loss, Doubtful, and Substandard. When a loan is collateral dependent, any portion of the loan balance which exceeds the fair value of the collateral should be promptly charged-off against the ALLL. For other loans that are impaired or have been restructured, the excess of the book value of the loan over its fair value (or fair value less cost to sell, as appropriate) is recognized by creating a valuation allowance which is included in the ALLL. However, when available information confirms that loans and leases (including any recorded accrued interest, net deferred loan fees or costs, and unamortized premium or discount) other than collateral dependent loans, or portions thereof, are uncollectible, these amounts should be promptly charged-off against the ALLL, regardless of whether an allowance was established to recognize impairment under FAS 114.

An examiner should not automatically require an additional allowance for credit losses of impaired loans over and above what is calculated in accordance with these standards. However, an additional allowance on impaired loans may be necessary based on consideration of institution-specific factors, such as historical loss experience compared with estimates of such losses and concerns about the reliability of cash flow estimates, the quality of an institution's loan review function, and

**LOANS**                                                                    Section 3.2

controls over its process for estimating its FAS 114 allowance.

**Other Considerations -** Examiners may encounter situations where impaired loans and restructured debts are identified, but the bank has not properly accounted for the transactions. Where incorrect accounting treatment resulted in an overstatement of earnings, capital and assets, it will be necessary to determine the proper carrying values for these assets, utilizing the best available information developed by the examiner after consultation with bank management. Nonetheless, proper accounting for impaired and restructured loans is the responsibility of bank management. Examiners should not spend a disproportionate amount of time developing the appropriate accounting entries, but instead discuss with and require corrective action by bank management when the bank's treatment is not in accordance with accepted accounting guidelines. It must also be emphasized that collectability and proper accounting and reporting are separate matters; restructuring a borrower's debt does not ensure collection of the loan or security. As with all other assets, adverse classification should be assigned if analysis indicates there is risk of loss present. Examiners should take care, however, not to discourage or be critical of bank management's legitimate and reasonable attempts to achieve debt settlements through concessionary terms. In many cases, restructurings offer the only realistic means for a bank to bring about collection of weak or nonearning assets. Finally, the volume of impaired loans and restructured debts having concessionary interest rates should be considered when evaluating the bank's earnings performance and assigning the earnings performance rating.

Examination procedures for reviewing TDRs are included in the ED Modules.

## Report of Examination Treatment of Classified Loans

The Items Subject to Adverse Classification page allows an examiner to present pertinent and readily understandable comments related to loans which are adversely classified. In addition, the Analysis of Loans Subject to Adverse Classification page permits analysis of present and previous classifications from the standpoint of source and disposition. These loan schedules should be prepared in accordance with the Report of Examination Instructions.

An examiner must present, in writing, relevant and readily understandable comments related to criticized loans. Therefore, a thorough understanding of all factors surrounding the loan is required and only those germane to

description, collectability, and management plans should be included in the comments. Comments should be concise, but brevity is not to be accomplished by omission of adequate information. Comments should be informative and factual data emphasized. The important weaknesses of the loan should not be overshadowed by extraneous information which might well have been omitted. An ineffective presentation of a classified loan weakens the value of a Report of Examination and frequently casts doubt on the accuracy of the classifications. The essential test of loan comments is whether they justify the classification.

Careful organization is an important ingredient of good loan comments. Generally, loan comments should include the following items:

- **Identification -** Indicate the name and occupation or type of business of the borrower. Cosigners, endorsers and guarantors should be identified and in the case of business loans, it should be clear whether the borrower is a corporation, partnership, or sole proprietorship.

- **Description -** The make-up of the debt should be concisely described as to type of loan, amount, origin and terms. The history, purpose, and source of repayment should also be indicated.

- **Collateral -** Describe and evaluate any collateral, indicating the marketability and/or condition thereof. If values are estimated, note the source.

- **Financial Data -** Current balance sheet information along with operating figures should be presented, if such data are considered necessary. The examiner must exercise judgment as to whether a statement should be detailed in its entirety. When the statement is relevant to the classification, it is generally more effective to summarize weaknesses with the entire statement presented. On the other hand, if the statement does not significantly support or detract from the loan, a very brief summarization of the statement is in order.

- **Summarize the Problem -** The examiner's comments should explicitly point out reasons for the classification. Where portions of the line are accorded different classifications or are not subject to classification, comments should clearly set forth the reasoning for the split treatment.

- **Management's Intentions -** Comments should include any corrective program contemplated by management.

Examiners should avoid arbitrary or penalty classifications, nor should "conceded" or "agreed" be given as the principal reason for adverse classifications. Management's

**LOANS**
Section 3.2

opinions and ideas should not have to be emphasized; if a classification is well-founded, the facts will speak for themselves. If well-written, there is little need for long summary comments reemphasizing major points of the loan write-up.

When the volume of loan classifications reaches the point of causing supervisory concern, analysis of present and previous classifications from the standpoint of source and disposition becomes very important. For this reason, the Analysis of Loans Subject to Adverse Classification page should be completed in banks possessing characteristics which present special supervisory problems; when the volume or composition of adversely classified loans has changed significantly since the previous examination, including both upward and downward movements; and, in such other special or unusual situations as examiners deem appropriate. Generally, the page should not include consumer loans and overdrafts and it should be footnoted to indicate that these assets are not included.

## Issuance of "Express Determination" Letters to Banks for Federal Income Tax Purposes

**Tax Rules -** The Internal Revenue Code and tax regulations allow a deduction for a loan that becomes wholly or partially worthless. All pertinent evidence is taken into account in determining worthlessness. Special tax rules permit a federally supervised depository institution to elect a method of accounting under which it conforms its tax accounting for bad debts to its regulatory accounting for loan charge-offs, provided certain conditions are satisfied. Under these rules, loans that are charged-off pursuant to specific orders of the institution's supervisory authority or that are classified by the institution as Loss assets under applicable regulatory standards are conclusively presumed to have become worthless in the taxable year of the charge-offs. These special tax rules are effective for taxable years ending on or after December 31, 1991.

To be eligible for this accounting method for tax purposes, an institution must file a conformity election with its Federal income tax return. The tax regulations also require the institution's primary Federal supervisory authority to expressly determine that the institution maintains and applies loan loss classification standards that are consistent with the regulatory standards of its supervisory authority.

For taxable years ending before the completion of the first examination of an institution's loan review process that is after October 1, 1992, transition rules allow an institution to make the conformity election without the determination letter from its primary supervisory authority. However, the

letter must be obtained at the first examination involving the loan review process after October 1, 1992. If the letter is not issued by the supervisory authority at the examination, the election is revoked retroactively.

Once the first examination of the loan review process after October 1, 1992, has been performed by an institution's primary Federal supervisory authority, the transition rules no longer apply and the institution must have the "express determination" letter before making the election. To continue using the tax-book conformity method, the institution must request a new letter at each subsequent examination that covers the loan review process. If the examiner does not issue an "express determination" letter at the end of such an examination, the institution's election of the tax-book conformity method is revoked automatically as of the beginning of the taxable year that includes the date of examination. However, that examiner's decision not to issue an "express determination" letter does not invalidate an institution's election for any prior years. The supervisory authority is not required to rescind any previously issued "express determination" letters.

When an examiner does not issue an "express determination" letter, the institution is still allowed tax deductions for loans that are wholly or partially worthless. However, the burden of proof is placed on the institution to support its tax deductions for loan charge-offs.

**Examination Guidelines -** Banks are responsible for requesting "express determination" letters during examinations that cover their loan review process, i.e., during safety and soundness examinations. Examiners should not alter the scope or frequency of examinations merely to permit banks to use the tax-book conformity method.

When requested by a bank that has made or intends to make the election under Section 1.166-2(d)(3) of the tax regulations, the examiner-in-charge should issue an "express determination" letter, provided the bank does maintain and apply loan loss classification standards that are consistent with the FDIC's regulatory standards. The letter should only be issued at the completion of a safety and soundness examination at which the examiner-in-charge has concluded that the issuance of the letter is appropriate.

An "express determination" letter should be issued to a bank only if:

- The examination indicates that the bank maintains and applies loan loss classification standards that are

# LOANS

consistent with the FDIC's standards regarding the identification and charge-off of such loans; and

- There are no material deviations from the FDIC's standards.

Minor criticisms of the bank's loan review process as it relates to loan charge-offs or immaterial individual deviations from the FDIC's standards should not preclude the issuance of an "express determination" letter.

An "express determination" letter should not be issued if:

- The bank's loan review process relating to charge-offs is subject to significant criticism;
- Loan charge-offs reported in the Report of Condition and Income (Call Reports) are consistently overstated or understated; or

- There is a pattern of loan charge-offs not being recognized in the appropriate year.

When the issuance of an "express determination" letter is appropriate, it should be prepared on FDIC letterhead using the following format. The letter should be signed and dated by the examiner-in-charge and provided to the bank for its files. The letter is not part of the Report of Examination.

---

Express Determination Letter for IRS Regulation 1.166-2(d)(3)

"In connection with the most recent examination of [Name of Bank], by the Federal Deposit Insurance Corporation, as of [examination date], we reviewed the institution's loan review process as it relates to loan charge-offs. Based on our review, we concluded that the bank, as of that date, maintained and applied loan loss classification standards that were consistent with regulatory standards regarding loan charge-offs.

This statement is made on the basis of a review that was conducted in accordance with our normal examination procedures and criteria. It does not in any way limit or preclude any formal or informal supervisory action (including enforcement actions) by this supervisory authority relating to the institution's loan review process or the level at which it maintains its allowance for loan and lease losses.

*[signature]*
Examiner-in-charge
*[date signed]*

---

When an "express determination" letter is issued to a bank, a copy of the letter as well as documentation of the work performed by examiners in their review of the bank's loan loss classification standards should be maintained in the workpapers. A copy of the letter should also be forwarded to the Regional Office with the Report of Examination. The issuance of an "express determination" letter should be noted in the Report of Examination according to procedure in the Report of Examination Instructions.

When an examiner-in-charge concludes that the conditions for issuing a requested "express determination" letter have not been met, the examiner-in-charge should discuss the reasons for this conclusion with the Regional Office. The examiner-in-charge should then advise bank management that the letter cannot be issued and explain the basis for this conclusion. A comment indicating that a requested "express determination" letter could not be issued, together with a brief statement of the reasons for not issuing the letter are addressed in the Report of Examination Instructions.

## CONCENTRATIONS

Generally a concentration is a significantly large volume of economically-related assets that an institution has advanced or committed to one person, entity, or affiliated group. These assets may in the aggregate present a substantial risk to the safety and soundness of the institution. Adequate diversification of risk allows the institution to avoid the excessive risks imposed by credit concentrations. It should also be recognized, however, that factors such as location and economic environment of the area limit some institutions' ability to diversify. Where reasonable diversification realistically cannot be achieved, the resultant concentration calls for capital levels higher than the regulatory minimums.

Concentrations generally are not inherently bad, but do add a dimension of risk which the management of the institution should consider when formulating plans and policies. In formulating these policies, management should, at a minimum, address goals for portfolio mix and limits within the loan and other asset categories. The institution's business strategy, management expertise and location should be considered when reviewing the policy. Management should also consider the need to track and monitor the economic and financial condition of specific geographic locations, industries and groups of borrowers in which the bank has invested heavily. All concentrations should be monitored closely by management and receive a more in-depth review than the diversified portions of the institution's assets. Failure to monitor concentrations can

**LOANS**                                                                    Section 3.2

result in management being unaware how significant economic events might impact the overall portfolio. This will also allow management to consider areas where concentration reductions may be necessary. Management and the board can monitor any reduction program using accurate concentration reports. If management is not properly monitoring concentration levels and limits, examiners may consider criticizing management.

To establish a meaningful tracking system for concentrations of credit, financial institutions should be encouraged to consider the use of codes to track individual borrowers, related groups of borrowers, industries, and individual foreign countries. Financial institutions should also be encouraged to use the standard industrial classification (SIC) or similar code to track industry concentrations. Any monitoring program should be reported regularly to the board of directors.

Refer to the Report of Examination Instructions for guidance in identifying and listing concentrations in the examination report.

## FEDERAL FUNDS SOLD AND REPURCHASE AGREEMENTS

Federal funds sold and securities purchased under agreement for resale represent convenient methods to employ excess funds to enhance earnings. Federal funds are excess reserve balances and take the form of a one-day transfer of funds between banks. These funds carry a specified rate of interest and are free of the risk of loss due to fluctuations in market prices entailed in buying and selling securities. However, these transactions are usually unsecured and therefore do entail potential credit risk. Securities purchased under agreement for resale represent an agreement between the buying and selling banks that stipulates the selling bank will buy back the securities sold at an agreed price at the expiration of a specified period of time.

Federal funds sold are not "risk free" as is often supposed, and the examiner will need to recognize the elements of risk involved in such transactions. While the selling of funds is on a one-day basis, these transactions may evolve into a continuing situation. This development is usually the result of liability management techniques whereby the buying bank attempts to utilize the acquired funds to support a rapid expansion of its loan-investment posture and as a means of enhancing profits. Of particular concern to the examiner is that, in many cases, the selling bank will automatically conclude that the buying bank's financial condition is above reproach without proper investigation

and analysis. If this becomes the case, the selling bank may be taking an unacceptable risk unknowingly.

Another area of potential risk involves selling Federal funds to a bank which may be acting as an intermediary between the selling bank and the ultimate buying bank. In this instance, the intermediary bank is acting as agent with the true liability for repayment accruing to the third bank. Therefore, it is particularly important that the original selling bank be aware of this situation, ascertain the ultimate disposition of its funds, and be satisfied as to the creditworthiness of the ultimate buyer of the funds.

Clearly, the "risk free" philosophy regarding the sale of Federal funds is inappropriate. Selling banks must take the necessary steps to assure protection of their position. The examiner is charged with the responsibility of ascertaining that selling banks have implemented and adhered to policy directives in this regard to forestall any potentially hazardous situations.

Examiners should encourage management of banks engaged in selling Federal funds to implement a policy with respect to such activity. This policy should include consideration of such matters as the aggregate sum to be sold at any one time, the maximum amount to be sold to any one buyer, the maximum duration of time the bank will sell to any one buyer, a list of acceptable buyers, and the terms under which a sale will be made. As in any form of lending, thorough credit evaluation of the prospective purchaser, both before granting the credit extension and on a continuing basis, is a necessity. Such credit analysis should emphasize the borrower's ability to repay, the source of repayment, and alternative sources of repayment should the primary source fail to materialize. While sales of Federal funds are normally unsecured unless otherwise regulated by State statutes, and while collateral protection is no substitute for thorough credit review, the selling bank should consider the possibility of requiring security if sales agreements are entered into on a continuing basis for specific but extended periods of time, or for overnight transactions which have evolved into longer term sales. Where the decision is made to sell Federal funds on an unsecured basis, the selling bank should be able to present logical reasons for such action based on conclusions drawn from its credit analysis of the buyer and bearing in mind the potential risk involved.

A review of Federal funds sold between examinations may prompt examiners to broaden the scope of their analysis of such activity if the transactions are not being handled in accordance with sound practices as outlined above. Where the bank has not developed a formal policy regarding the sale of Federal funds or fails to conduct a credit analysis of the buyer prior to a sale and during a continuous sale of

**LOANS**                                                                Section 3.2

such funds, the matter should be discussed with management. In such discussion, it is incumbent upon examiners to inform management that their remarks are not intended to cast doubt upon the financial strength of any bank to whom Federal funds are sold. Rather, the intent is to advise the banker of the potential risks of such practices unless safeguards are developed. The need for policy formulation and credit review on all Federal funds sold should be reinforced via a comment in the Report of Examination. Also, if Federal funds sold to any one buyer equals or exceeds 100 percent of the selling bank's Tier 1 Capital, it should be listed on the Concentrations schedule unless secured by U.S. Government securities. Based on the circumstances, the examiner should determine the appropriateness of additional comments regarding risk diversification.

Securities purchased under an agreement to resell are generally purchased at prevailing market rates of interest. The purchasing bank must keep in mind that the transaction merely represents another form of lending. Therefore, considerations normally associated with granting secured credit should be made. Repayment or repurchases by the selling bank is a major consideration, and the buying bank should satisfy itself that the selling bank will be able to generate the necessary funds to repurchase the securities on the prescribed date. Policy guidelines should limit the amount of money extended to one seller. Collateral coverage arrangements should be controlled by procedures similar to the safeguards used to control any type of liquid collateral. Securities held under such an arrangement should not be included in the bank's investment portfolio but should be reflected in the Report of Examination under the caption Securities Purchased Under Agreements to Resell. Transactions of this nature do not require entries to the securities account of either bank with the selling bank continuing to collect all interest and transmit such payments to the buying bank.

## FUNDAMENTAL LEGAL CONCEPTS AND DEFINITIONS

Laws and regulations that apply to credit extended by banks are more complicated and continually in a state of change. However, certain fundamental legal principles apply no matter how complex or innovative a lending transaction. To avoid needless litigation and ensure that each loan is a legally enforceable claim against the borrower or collateral, adherence to certain rules and prudent practices relating to loan transactions and documentation is essential. An important objective of the examiner's analysis of collateral and credit files is not only to obtain information about the loan, but also to determine

if proper documentation procedures and practices are being utilized. While examiners are not expected to be experts on legal matters, it is important they be familiar with the Uniform Commercial Code (UCC) adopted by their respective states as well as other applicable State laws governing credit transactions. A good working knowledge of the various documents necessary to attain the desired collateral or secured position, and how those documents are to be used or handled in the jurisdiction relevant to the bank under examination, is also essential.

## Uniform Commercial Code – Secured Transactions

Article 9 of the UCC governs secured transactions; i.e., those transactions which create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts. Article 9 was significantly revised effective July 1, 2001, but each individual state must adopt the changes for it to become law. Because some states have enacted modified versions of the UCC and subsequent revisions, each applicable State statute should be consulted.

### General Provisions

A Security Agreement is an agreement between a debtor and a secured party that creates or provides for a security interest. The Debtor is the person that has an interest in the collateral other than a security interest. The term Debtor also includes a seller of payment intangibles or promissory notes. The obligor is the person who owes on a secured transaction. The Secured Party is the lender, seller or other person in whose favor there is a security interest.

### Grant of Security Interest

For a security interest to be enforceable against the debtor or third party with respect to the collateral, the collateral must be in the possession of the secured party pursuant to agreement, or the debtor must sign a security agreement which covers the description of the collateral.

### Collateral

Any description of personal property or real estate is a sufficient description of the collateral whether or not it is specific if it reasonably identifies what is described. If the parties seek to include property acquired after the signing of the security agreement as collateral, additional requirements must be met.

Unless otherwise agreed a security agreement gives the secured party the rights to proceeds from the sale, exchange, collection or disposition of the collateral.

**LOANS**                                                                                                  Section 3.2

In some cases, the collateral that secures an obligation under one security agreement can be used to secure a new loan, too. This can be done by using a cross-collateralization clause in the security agreement.

**Perfecting the Security Interest**

Three terms basic to secured transactions are attachment, security agreement and security interest. Attachment refers to that point when the creditor's legal rights in the debtor's property come into existence or "attach." This does not mean the creditor necessarily takes physical possession of the property, or does it mean acquisition of ownership of the property. Rather, it means that before attachment, the borrower's property is free of any legal encumbrance, but after attachment, the property is legally bound by the creditor's security interest. In order for the creditor's security interest to attach, there must be a security agreement in which the debtor authenticates and provides a description of the collateral. A creditor's security interest can be possessory or nonpossessory, a secured party with possession pursuant to "agreement" means that the "agreement" for possession has to be an agreement that the person will have possession for purposes of security. The general rule is a bank must take possession of deposit accounts (proprietary), letter of credit rights, electronic chattel, paper, stocks and bonds to perfect a security interest therein. In a transaction involving a nonpossessory security interest, the debtor retains possession of the collateral. A security interest in collateral automatically attaches to the proceeds of the collateral and is automatically perfected in the proceeds if the credit was advanced to enable the purchase

A party's security interest in personal property is not protected against a debtor's other creditors unless it has been perfected. A security interest is perfected when it has attached and when all of the applicable steps required for perfection, such as the filing of a financing statement or possession of the collateral, have been taken. These provisions are designed to give notice to others of the secured party's interest in the collateral, and offer the secured party the first opportunity at the collateral if the need to foreclose should arise. If the security interest is not perfected, the secured party loses its secured status.

**Right to Possess and Dispose of Collateral**

Unless otherwise agreed, when a debtor defaults on a secured loan, a secured party has the right to take possession of the collateral without going to court if this can be done without breaching the peace. Alternatively, if the security agreement so provides, the secured party may require the debtor to assemble the collateral and make it

available to the secured party at a place to be designated by the secured party which is reasonably convenient to both parties.

A secured party may then sell, lease or otherwise dispose of the collateral with the proceeds applied as follows: (a) foreclosure expenses, including reasonable attorneys' fees and legal expenses; (b) the satisfaction of indebtedness secured by the secured party's security interest in the collateral; and (c) the satisfaction of indebtedness secured by any subordinate security interest in the collateral if the secured party receives written notification of demand before the distribution of the proceeds is completed. If requested by the secured party, the holder of a subordinate security interest must furnish reasonable proof of his interest, and unless he does so, the secured party need not comply with his demand.

Examiners should determine bank policy concerning the verification of lien positions prior to advancing funds. Failure to perform this simple procedure may result in the bank unknowingly assuming a junior lien position and, thereby, greater potential loss exposure. Management may check filing records personally or a lien search may be performed by the filing authority or other responsible party. This is especially important when the bank grants new credit lines.

**Agricultural Liens**

An agricultural lien is generally defined as an interest, other than a security interest, in farm products that meets the following three conditions:

- The lien secures payment or performance of an obligation for goods or services furnished in connection with a debtor's farming operation or rent on real property leased by a debtor in connection with its farming operation.
- The lien is created by statute in favor of a person that in the ordinary course of its business furnished goods or services to a debtor in connection with a debtor's farming operation or leased property to a debtor in connection with the debtor's farming operation.
- The lien's effectiveness does not depend on the person's possession of the personal property.

An agricultural lien is therefore non-possessory. Law outside of UCC-9 governs creation of agricultural liens and their attachment to collateral. An agricultural lien cannot be created or attached under Article 9. Article 9, however, does govern perfection. In order to perfect an agricultural lien, a financing statement must be filed. A perfected agricultural lien on collateral has priority over a conflicting

# LOANS

security interest in or agricultural lien on the same collateral if the statute creating the agricultural lien provides for such priority.  Otherwise, the agricultural lien is subject to the same priority rules as security interests (for example, date of filing).

A distinction is made with respect to proceeds of collateral for security interests and agricultural liens.  For security interests, collateral includes the proceeds under Article 9.  For agricultural liens, the collateral does not include proceeds unless State law creating the agricultural lien gives the secured party a lien on proceeds of the collateral subject to the lien.

**Special Filing Requirements** – There is a national uniform Filing System form.  Filers, however are not required to use them.  If permitted by the filing office, parties may file and otherwise communicate by means of records communicated and stored in a media other than paper. A peculiarity common to all states is the filing of a lien on aircraft; the security agreement must be submitted to the Federal Aviation Administration in Oklahoma City, Oklahoma.

**Default and Foreclosure -** As a secured party, a bank's rights in collateral only come into play when the obligor is in default.  What constitutes default varies according to the specific provisions of each promissory note, loan agreement, security agreement, or other related documents.  After an obligor has defaulted, the creditor usually has the right to foreclose, which means the creditor seizes the security pledged to the loan, sells it and applies the proceeds to the unpaid balance of the loan.  For consumer transactions, there are strict consumer notification requirements prior to disposition of the collateral.  For consumer transactions, the lender must provide the debtor with certain information regarding the surplus or deficiency in the disposition of collateral.  There may be more than one creditor claiming a right to the sale proceeds in foreclosure situations.  When this occurs, priority is generally established as follows: (1) Creditors with a perfected security interest (in the order in which lien perfection was attained); (2) Creditors with an unperfected security interest; and (3) General creditors.

Under the UCC procedure for foreclosing security interests, four concepts are involved.  First is repossession or taking physical possession of the collateral, which may be accomplished with judicial process or without judicial process (known as self-help repossession), so long as the creditor commits no breach of the peace.  The former is usually initiated by a replevin action in which the sheriff seizes the collateral under court order.  A second important concept of UCC foreclosure procedures is redemption or the debtor's right to redeem the security after it has been

repossessed.  Generally, the borrower must pay the entire balance of the debt plus all expenses incurred by the bank in repossessing and holding the collateral.  The third concept is retention that allows the bank to retain the collateral in return for releasing the debtor from all further liability on the loan.  The borrower must agree to this action, hence would likely be so motivated only when the value of the security is likely to be less than or about equal to the outstanding debt.  Finally, if retention is not agreeable to both borrower and lender, the fourth concept, resale of the security, comes into play.  Although sale of the collateral may be public or private, notice to the debtor and other secured parties must generally be given.  The sale must be commercially reasonable in all respects.  Debtors are entitled to any surplus resulting from sale price of the collateral less any unpaid debt.  If a deficiency occurs (i.e., the proceeds from sale of the collateral were inadequate to fully extinguish the debt obligation), the bank has the right to sue the borrower for this shortfall.  This is a right it does not have under the retention concept.

**Exceptions to the Rule of Priority -** There are three exceptions to the general rule that the creditor with the earliest perfected security interest has priority.  The first concerns a specific secured transaction in which a creditor makes a loan to a dealer and takes a security interest in the dealer's inventory.  Suppose such a creditor files a financing statement with the appropriate public official to perfect the security interest.  While it might be possible for the dealer's customers to determine if an outstanding security interest already exists against the inventory, it would be impractical to do so.  Therefore, an exception is made to the general rule and provides that a buyer in the ordinary course of business, i.e., an innocent purchaser for value who buys in the normal manner, cuts off a prior perfected security interest in the collateral.

The second exception to the rule of priority concerns the vulnerability of security interests perfected by doing nothing.  While these interests are perfected automatically, with the date of perfection being the date of attachment, they are extremely vulnerable at the hands of subsequent bona fide purchasers.  Suppose, for example, a dealer sells a television set on a secured basis to an ultimate consumer.  Since the collateral is consumer goods, the security interest is perfected the moment if attaches.  But if the original buyer sells the television set to another person who buys it in good faith and in ignorance of the outstanding security interest, the UCC provides that the subsequent purchase cuts off the dealer's security interest.  This second exception is much the same as the first except for one important difference: the dealer (creditor) in this case can be protected against purchase of a customer's collateral by filing a financing statement with the appropriate public official.

**LOANS**                                                                    Section 3.2

The third exception regards the after-acquired property clause that protects the value of the collateral in which the creditor has a perfected security interest. The after-acquired property clause ordinarily gives the original creditor senior priority over creditors with later perfected interests. However, it is waived as regards the creditor who supplies replacements or additions to the collateral or the artisan who supplies materials and services that enhance the value of the collateral as long as a perfected security interest in the replacement or additions, or collateral is held.

## Borrowing Authorization

Borrowing authorizations in essence permit one party to incur liability for another. In the context of lending, this usually concerns corporations. A corporation may enter into contracts within the scope of the powers authorized by its charter. In order to make binding contracts on behalf of the corporation, the officers must be authorized to do so either by the board of directors or by expressed or implied general powers. Usually a special resolution expressly gives certain officers the right to obligate the corporate entity, pledge assets as collateral, agree to other terms of the indebtedness and sign all necessary documentation on behalf of the corporate entity.

Although a general resolution is perhaps satisfactory for the short-term, unsecured borrowings of a corporation, a specific resolution of the corporation's board of directors is generally advisable to authorize such transactions as term loans, loans secured by security interests in the corporation's personal property, or mortgages on real estate. Further, mortgaging or pledging substantially all of the corporation's assets without prior approval of the shareholders of the corporation is often prohibited, therefore, a bank may need to seek advice of counsel to determine if shareholder consent is required for certain contemplated transactions.

Loans to corporations should indicate on their face that the corporation is the borrower. The corporate name should appear followed by the name, title and signature of the appropriate officer. If the writing is a negotiable instrument, the UCC states the party signing is personally liable as a general rule. To enforce payment against a corporation, the note or other writing should clearly show that the debtor is a corporation.

## Bond and Stock Powers

As mentioned previously, a bank generally obtains a security interest in stocks and bonds by possession. The documents which allow the bank to sell the securities if the borrower defaults are called stock powers and bond powers. The examiner should ensure the bank has, for each borrower who has pledged stocks or bonds, one signed stock power for all stock certificates of a single issuer, and a separate signed bond power for each bond instrument. The signature must agree with the name on the actual stock certificate or bond instrument. Refer to Federal Reserve Board Regulations Part 221 (Reg U) for further information on loans secured by investment securities.

## Comaker

Two or more persons who are parties to a contract or promise to pay are known as comakers. They are a unit to the performance of one act and are considered primarily liable. In the case of default on an unsecured loan, a judgment would be obtained against all. A release against one is a release against all because there is but one obligation and if that obligation is released as to one obligor, it is released as to all others.

## Loan Guarantee

Since banks often condition credit advances upon the backup support provided by third party guarantees, examiners should understand the legal fundamentals governing guarantees. A guarantee may be a guarantee of payment or of collection. "Payment guaranteed" or equivalent words added to a signature means that if the instrument is not paid when due, the guarantor will pay it according to its terms without resort by the holder to any other party. "Collection guaranteed" or equivalent words added to a signature means that if the instrument is not paid when due, the guarantor will pay it, but only after the holder has reduced to judgment a claim against the maker and execution has been returned unsatisfied, or after the maker has become insolvent or it is otherwise useless to proceed against such a party.

Contracts of guarantee are further divided into a limited guarantee which relates to a specific note (often referred to as an "endorsement") or for a fixed period of time, or a continuing guarantee which, in contrast, is represented by a separate instrument and enforceable for future (duration depends upon State law) transactions between the bank and the borrower or until revoked. A well drawn continuing guarantee contains language substantially similar to the following: "This is an absolute and unconditional guarantee of payment, is unconditionally delivered, and is not subject to the procurement of a guarantee from any person other than the undersigned, or to the performance or happening of any other condition." The aforementioned

# LOANS

unambiguous terms are necessary to the enforceability of contracts of guarantee, as they are frequently entered into solely as an accommodation for the borrower and without the guarantor's participation in the benefits of the loan. Thus, courts tend to construe contracts of guarantee strictly against the party claiming under the contract. Unless the guarantee is given prior to or at the time the initial loan is made, the guarantee may not be enforceable because of the difficulty of establishing that consideration was given. Banks should not disburse funds on such loans until they have the executed guarantee agreement in their possession. Banks should also require the guarantee be signed in the presence of the loan officer, or, alternatively, that the guarantor's signature be notarized. If the proposed guarantor is a partnership, joint venture, or corporation, the examiner should ensure the signing party has the legal authority to enter into the guarantee agreement. Whenever there is a question concerning a corporation's authority to guarantee a loan, counsel should be consulted and a special corporate resolution passed by the organization's board of directors.

## Subordination Agreement

A bank extending credit to a closely held corporation may want to have the company's officers and shareholders subordinate to the bank's loan any indebtedness owed them by the corporation. This is accomplished by execution of a subordination agreement by the officers and shareholders. Subordination agreements are also commonly referred to as standby agreements. Their basic purpose is to prevent diversion of funds from reduction of bank debt to reduction of advances made by the firm's owners or officers.

## Hypothecation Agreement

This is an agreement whereby the owner of property grants a security interest in collateral to the bank to secure the indebtedness of a third party. Banks often take possession of the stock certificates, plus stock powers endorsed in blank, in lieu of a hypothecation agreement. Caution, however, dictates that the bank take a hypothecation agreement setting forth the bank's rights in the event of default.

## Real Estate Mortgage

A mortgage may be defined as a conveyance of realty given with the intention of providing security for the payment of debt. There are several different types of mortgage instruments but those commonly encountered are regular mortgages, deeds of trust, equitable mortgages, and deeds absolute given as security.

**Regular Mortgages -** The regular mortgage involves only two parties, the borrower and the lender. The mortgage document encountered in many states today is referred to as the regular mortgage. It is, in form, a deed or conveyance of realty by the borrower to the lender followed or preceded by a description of the debt and the property, and includes a provision to the effect that the mortgage be released upon full payment of the debt. Content of additional paragraphs and provisions varies considerably.

**Deeds of Trust -** In the trust deed, also known as the deed of trust, the borrower conveys the realty not to the lender but to a third party, a trustee, in trust for the benefit of the holder of the notes(s) that constitutes the mortgage debt. The deed of trust form of mortgage has certain advantages, the principle being that in a number of states it can be foreclosed by trustee's sale under the power of sale clause without court proceedings.

**Equitable Mortgages -** As a general rule, any instrument in writing by which the parties show their intention that realty be held as security for the payment of a debt, constitutes an equitable mortgage capable of being foreclosed in a court of equity.

**Deeds Absolute Given as Security -** Landowners who borrow money may give as security an absolute deed to the land. "Absolute deed" means a quitclaim or warranty deed such as is used in an ordinary realty sale. On its face, the transaction appears to be a sale of the realty; however, the courts treat such a deed as a mortgage where the evidence shows that the instrument was really intended only as security for a debt. If such proof is available, the borrower is entitled to pay the debt and demand reconveyance from the lender, as in the case of an ordinary mortgage. If the debt is not paid, the grantee must foreclose as if a regular mortgage had been made.

The examiner should ensure the bank has performed a title and lien search of the property prior to taking a mortgage or advancing funds. Proper procedure calls for an abstractor bringing the abstract up to date, and review of the abstract by an attorney or title insurance company. If an attorney performs the task, the abstract will be examined and an opinion prepared indicating with whom title rests, along with any defects and encumbrances disclosed by the abstract. Like an abstractor, an attorney is liable only for damages caused by negligence. If a title insurance company performs the task of reviewing the abstract, it does essentially the same thing; however, when title insurance is obtained, it represents a contract to make good, loss arising through defects in title to real estate or liens or encumbrances thereon. Title insurance covers various items not covered in an abstract and title opinion.

**LOANS**                                                                      Section 3.2

Some of the more common are errors by abstractors or attorneys include unauthorized corporate action, mistaken legal interpretations, and unintentional errors in public records by public officials. Once the bank determines title and lien status of the property, the mortgage can be prepared and funds advanced. The bank should record the mortgage immediately after closing the loan. Form, execution, and recording of mortgages vary from state to state and therefore must conform to the requirements of State law.

## Collateral Assignment

An assignment is generally considered as the transfer of a legal right from one person to another. The rights acquired under a contract may be assigned if they relate to money or property, but personal services may not be assigned. Collateral assignments are used to establish the bank's rights as lender in the property or asset serving as collateral. It is generally used for loans secured by savings deposits, certificates of deposit or other cash accounts as well as loans backed by cash surrender value of life insurance. In some instances, it is used in financing accounts receivable and contracts. If a third party holder of the collateral is involved, such as life insurance company or the payor of an assigned contract, an acknowledgement should be obtained from that party as to the bank's assigned interest in the asset for collateral purposes.

## CONSIDERATION OF BANKRUPTCY LAW AS IT RELATES TO COLLECTABILITY OF A DEBT

### Introduction

Familiarity with the basic terms and concepts of the Federal bankruptcy law (formally known as the Bankruptcy Reform Act of 1978) is necessary in order for examiners to make informed judgments concerning the likelihood of collection of loans to bankrupt individuals or organizations. The following paragraphs present an overview of the subject. Complex situations may arise where more in-depth consideration of the bankruptcy provisions may be necessary and warrant consultation with the bank's attorney, Regional Counsel or other member of the Regional Office staff. For the most part, however, knowledge of the following information when coupled with review of credit file data and discussion with bank management should enable examiners to reach sound conclusions as to the eventual repayment of the bank's loans.

## Forms of Bankruptcy Relief

Liquidation and rehabilitation are the two basic types of bankruptcy proceedings. Liquidation is pursued under Chapter 7 of the law and involves the bankruptcy trustee collecting all of the debtor's nonexempt property, converting it into cash and distributing the proceeds among the debtor's creditors. In return, the debtor obtains a discharge of all debts outstanding at the time the petition was filed which releases the debtor from all liability for those pre-bankruptcy debts.

Rehabilitation (sometimes known as reorganization) is effected through Chapter 11 or Chapter 13 of the law and in essence provides that creditors' claims are satisfied not via liquidation of the obligor's assets but rather from future earnings. That is, debtors are allowed to retain their assets but their obligations are restructured and a plan is implemented whereby creditors may be paid.

Chapter 11 bankruptcy is available to all debtors, whether individuals, corporations or partnerships. Chapter 13 (sometimes referred to as the "wage earner plan"), on the other hand, may be used only by individuals with regular incomes and when their unsecured debts are under $100,000 and secured debts less than $350,000. The aforementioned rehabilitation plan is essentially a contract between the debtor and the creditors. Before the plan may be confirmed, the bankruptcy court must find it has been proposed in good faith and that creditors will receive an amount at least equal to what would be received in a Chapter 7 proceeding. In Chapter 11 reorganization, all creditors are entitled to vote on whether or not to accept the repayment plan. In Chapter 13 proceedings, only secured creditors are so entitled. A majority vote binds the minority to the plan, provided the latter will receive pursuant to the plan at least the amount they would have received in a straight liquidation. The plan is fashioned so that it may be carried out in three years although the court may extend this to five years.

Most cases in bankruptcy courts are Chapter 7 proceedings, but reorganization cases are increasingly common. From the creditor's point of view, Chapter 11 or 13 filings generally result in greater debt recovery than do liquidation situations under Chapter 7. Nonetheless, the fact that reorganization plans are tailored to the facts and circumstances applicable to each bankrupt situation means that they vary considerably and the amount recovered by the creditor may similarly vary from nominal to virtually complete recovery.

## Functions of Bankruptcy Trustees

**LOANS**

Trustees are selected by the borrower's creditors and are responsible for administering the affairs of the bankrupt debtor's estate. The bankrupt's property may be viewed as a trust for the benefit of the creditors, consequently it follows the latter should, through their elected representatives, exercise substantial control over this property.

## Voluntary and Involuntary Bankruptcy

When a debtor files a bankruptcy petition with the court, the case is described as a voluntary one. It is not necessary the individual or organization be insolvent in order to file a voluntary case. Creditors may also file a petition, in which case the proceeding is know as an involuntary bankruptcy. However, this alternative applies only to Chapter 7 cases and the debtor generally must be insolvent, i.e., unable to pay debts as they mature, in order for an involuntary bankruptcy to be filed.

## Automatic Stay

Filing of the bankruptcy petition requires (with limited exceptions) creditors to stop or "stay" further action to collect their claims or enforce their liens or judgements. Actions to accelerate, set off or otherwise collect the debt are prohibited once the petition is filed, as are post-bankruptcy contacts with the obligor. The stay remains in effect until the debtor's property is released from the estate, the bankruptcy case is dismissed, the debtor obtains or is denied a discharge, or the bankruptcy court approves a creditor's request for termination of the stay. Two of the more important grounds applicable to secured creditors under which they may request termination are as follows: (1) The debtor has no equity in the encumbered property, and the property is not necessary to an effective rehabilitation plan; or (2) The creditor's interest in the secured property is not adequately protected. In the latter case, the law provides three methods by which the creditor's interests may be adequately protected: the creditor may receive periodic payments equal to the decrease in value of the creditor's interest in the collateral; an additional or substitute lien on other property may be obtained; or some other protection is arranged (e.g., a guarantee by a third party) to adequately safeguard the creditor's interests. If these alternatives result in the secured creditor being adequately protected, relief from the automatic stay will not be granted. If relief from the stay is obtained, creditors may continue to press their claims upon the bankrupt's property free from interference by the debtor or the bankruptcy court.

## Property of the Estate

When a borrower files a bankruptcy petition, an "estate" is created and, under Chapter 7 of the law, the property of the estate is passed to the trustee for distribution to the creditors. Certain of the debtor's property is exempt from distribution under all provisions of the law (not just Chapter 7), as follows: homeowner's equity up to $7,500; automobile equity and household items up to $1,200; jewelry up to $500; cash surrender value of life insurance up to $4,000; Social Security benefits (unlimited); and miscellaneous items up to $400 plus any unused portion of the homeowner's equity. The bankruptcy code recognizes a greater amount of exemptions may be available under State law and, if State law is silent or unless it provides to the contrary, the debtor is given the option of electing either the Federal or State exemptions. Examiners should note that some liens on exempt property which would otherwise be enforceable are rendered unenforceable by the bankruptcy. A secured lender may thus become unsecured with respect to the exempt property. The basic rule in these situations is that the debtor can render unenforceable judicial liens on any exempt property and security interests that are both nonpurchase money and nonpossessory on certain household goods, tools of the trade and health aids.

## Discharge and Objections to Discharge

The discharge, as mentioned previously, protects the debtor from further liability on the debts discharged. Sometimes, however, a debtor is not discharged at all (i.e., the creditor has successfully obtained an "objection to discharge") or is discharged only as regards to a specific creditor(s) and a specific debt(s) (an action known as "exception to discharge"). The borrower obviously remains liable for all obligations not discharged, and creditors may pursue customary collection procedures with respect thereto. Grounds for an "objection to discharge" include the following actions or inactions by the bankrupt debtor (this is not an all-inclusive list): fraudulent conveyance within 12 months of filing the petition; unjustifiable failure to keep or preserve financial records; false oath or account or presentation of a false claim in the bankruptcy case and estate, respectively; withholding of books or records from the trustee; failure to satisfactorily explain any loss or deficiency of assets; refusal to testify when legally required to do so; and receiving a discharge in bankruptcy within the last six full years. Some of the bases upon which creditors may file "exceptions to discharge" are: nonpayment of income taxes for the three years preceding the bankruptcy; money, property or services obtained through fraud, false pretenses or false representation; debts not scheduled on the bankruptcy petition and which the creditor had no notice; alimony or child support payments (this exception may be asserted

# LOANS

only by the debtor's spouse or children, property settlements are dischargeable); and submission of false or incomplete financial statements. If a bank attempts to seek an exception on the basis of false financial information, it must prove the written financial statement was materially false, it reasonably relied on the statement, and the debtor intended to deceive the bank. These assertions can be difficult to prove. Discharges are unavailable to corporations or partnerships. Therefore, after a bankruptcy, corporations and partnerships often dissolve or become defunct.

## Reaffirmation

Debtors sometimes promise their creditors after a bankruptcy discharge that they will repay a discharged debt. An example wherein a debtor may be so motivated involves the home mortgage. To keep the home and discourage the mortgagee from foreclosing, a debtor may reaffirm this obligation. This process of reaffirmation is an agreement enforceable through the judicial system. The law sets forth these basic limitations on reaffirmations: the agreement must be signed before the discharge is granted; a hearing is held and the bankruptcy judge informs the borrower there is no requirement to reaffirm; and the debtor has the right to rescind the reaffirmation if such action is taken within 30 days.

## Classes of Creditors

The first class of creditors is known as priority creditors. As the name implies, these creditors are entitled to receive payment prior to any others. Priority payments include administrative expenses of the debtor's estate, unsecured claims for wages and salaries up to $2,000 per person, unsecured claims for employee benefit plans, unsecured claims of individuals up to $900 each for deposits in conjunction with rental or lease of property, unsecured claims of governmental units and certain tax liabilities. Secured creditors are only secured up to the extent of the value of their collateral. They become unsecured in the amount by which collateral is insufficient to satisfy the claim. Unsecured creditors are of course the last class in terms of priority.

## Preferences

Certain actions taken by a creditor before or during bankruptcy proceedings may be invalidated by the trustee if they result in some creditors receiving more than their share of the debtor's estate. These actions are called "transfers" and fall into two categories. The first involves absolute transfers, such as payments received by a creditor; the trustee may invalidate this action and require the

payment be returned and made the property of the bankrupt estate. A transfer of security, such as the granting of a mortgage, may also be invalidated by the trustee. Hence, the trustee may require previously encumbered property be made unencumbered, in which case the secured party becomes an unsecured creditor. This has obvious implications as regards loan collectability.

Preferences are a potentially troublesome area for banks and examiners should have an understanding of basic principles applicable to them. Some of the more important of these are listed here.

- A preference may be invalidated (also known as "avoided") if it has all of these elements: the transfer was to or for the benefit of a creditor; the transfer was made for or on account of a debt already outstanding; the transfer has the effect of increasing the amount a creditor would receive in Chapter 7 proceedings; the transfer was made within 90 days of the bankruptcy filing, or within one year if the transfer was to an insider who had reasonable cause to believe the debtor was insolvent at the time of transfer; and the debtor was insolvent at the time of the transfer. Under bankruptcy law, borrowers are presumed insolvent for 90 days prior to filing the bankruptcy petition.
- Payment to a fully secured creditor is not a preference because such a transfer would not have the effect of increasing the amount the creditor would otherwise receive in a Chapter 7 proceeding. Payment to a partially secured creditor does, however, have the effect of increasing the creditor's share and is thus deemed a preference which the trustee may avoid.
- Preference rules also apply to a transfer of a lien to secure past debts, if the transfer has all five elements set forth under the first point.
- There are certain situations wherein a debtor has given a preference to a creditor but the trustee is not permitted to invalidate it. A common example concerns floating liens on inventory under the Uniform Commercial Code. These matters are subject to complex rules, however, and consultation with the Regional Office may be advisable when this issue arises.

## Setoffs

Setoffs occur when a party is both a creditor and a debtor of another; amounts which a party owes are netted against amounts which are owed to that party. If a bank exercises its right of setoff properly and before the bankruptcy filing, the action is generally upheld in the bankruptcy proceedings. Setoffs made after the bankruptcy may also

**LOANS**                                                                    Section 3.2

be valid but certain requirements must be met of which the following are especially important: First, the debts must be between the same parties in the same right and capacity. For example, it would be improper for the bank to setoff the debtor's loan against a checking account of the estate of the obligor's father, of which the debtor is executor. Second, both the debt and the deposit must precede the bankruptcy petition filing. Third, the setoff may be disallowed if funds were deposited in the bank within 90 days of the bankruptcy filing and for the purpose of creating or increasing the amount to be set off.

## Transfers Not Timely Perfected or Recorded

Under most circumstances, a bank which has not recorded its mortgage or otherwise fails to perfect its security interest in a proper timely manner runs great risk of losing its security. This is a complex area of the law but prudence clearly dictates that liens be properly obtained and promptly filed so that the possibility of losing the protection provided by collateral is eliminated.

## SYNDICATED LENDING

### Overview

Syndicated loans often represent a substantial portion of the commercial and industrial loan portfolios of large banks. A syndicated loan involves two or more banks contracting with a borrower, typically a large or middle market corporation, to provide funds at specified terms under the same credit facility. The average commercial syndicated credit is in excess of $100 million. Syndicated credits differ from participation loans in that lenders in a syndication participate jointly in the origination process, as opposed to one originator selling undivided participation interests to third parties. In a syndicated deal, each financial institution receives a pro rata share of the income based on the level of participation in the credit. Additionally, one or more lenders take on the role of lead or "agent" (co-agents in the case of more than one) of the credit and assume responsibility of administering the loan for the other lenders. The agent may retain varying percentages of the credit, which is commonly referred to as the "hold level."

The syndicated market formed to meet basic needs of lenders and borrowers, specifically:

- raising large amounts of money,
- enabling geographic diversification,
- satisfying relationship banking,
- obtaining working capital quickly and efficiently,
- spreading risk for large credits amongst banks, and

- gaining attractive pricing advantages.

The syndicated loan market has grown steadily, and growth in recent years has been extraordinary as greater market discipline has lead to uniformity in pricing. In recent years syndicated lending has come to resemble a capital market, and this trend is expected to continue as secondary market liquidity for these products continues to grow. The volume of syndicated credits is currently measured in trillions of dollars, and growth is expected to continue as pricing structures continue to appeal to lenders or "investors."

In times of excess liquidity in the marketplace, spreads typically are quite narrow for investment-grade facilities, thus making it a borrower's market. This may be accompanied by an easing of the structuring and covenants. In spite of tightening margins, commercial banks are motivated to compete regarding pricing in order to retain other business.

Relaxing covenants and pricing may result in lenders relying heavily on market valuations, or so-called "enterprise values" in arriving at credit decisions. These values are derived by applying a multiple to cash flow, which differs, by industry and other factors, to historical or projected cash flows of the borrower. This value represents the intangible business value of a company as a going concern, which often exceeds its underlying assets.

Many deals involve merger and acquisition financing. While the primary originators of the syndicated loans are commercial banks, most of the volume is sold and held by other investors.

A subset of syndicated lending is leveraged lending which refers to borrowers with an excessive level of debt and debt service compared with cash flow. By their very nature, these instruments are of higher risk.

### Syndication Process

There are four phases in a loan syndication: Pre-Launch, Launch, Post-Launch, and Post-Closing.

**The Pre-Launch Process** - During this phase, the syndicators identify the borrower's needs and perform their initial due diligence. Industry information is gathered and analyzed, and background checks may be performed. Potential pricing and structure of the transaction takes shape. Formal credit write-ups are sent to credit officers for review and to senior members of syndication group for pricing approval. Competitive bids are sent to the borrower. The group then prepares for the launch.

# LOANS

An information memorandum is prepared by the agent. This memorandum is a formal and confidential document that should address all principal credit issues relating to the borrower and to the project being financed. It should, at a minimum, contain an overview of the transaction including a term sheet, an overview of the borrower's business, and quarterly and annual certified financial statements. This documents acts as both the marketing tool and as the source of information for the syndication.

**The Launch Phase** - The transaction is launched into the market when banks are sent the information memoranda mentioned above. Legal counsel commences to prepare the documentation. Negotiations take place between the banks and the borrower over pricing, collateral, covenants, and other terms. Often there is a bank meeting so potential participants can discuss the company's business and industry both with the lead agent and with the company.

**Post-Launch Phase** - Typically there is a two-week period for potential participants to evaluate the transaction and to decide whether or not to participate in the syndication. During this period, banks do their due diligence and credit approval. Often this entails running projection models, including stress tests, doing business and industry research; and presenting the transaction for the approval process once the decision is made to commit to the transaction.

After the commitment due date, participating banks receive a draft credit agreement for their comments. Depending upon the complexity of the agreement, they usually have about a week to make comments. The final credit agreement is then negotiated based on the comments and the loan would then close two to five days after the credit agreement is finalized.

**Post-Closing Phase** - Post-Closing, there should be ongoing dialogue with the borrower about financial/operating performance as well as quarterly credit agreement covenant compliance checks. Annually, a full credit analysis should be done as well as annual meetings of the participants for updates on financial and operating performance. Both the agent bank and the participants need to assess the loan protection level by analyzing the business risk as well as the financial risk. Each industry has particular dominant risks that must be assessed.

## Loan Covenants

Loan covenants are special or particular conditions that are included in a loan agreement and that the borrower is required to fulfill in order for the loan agreement to remain valid. Typically, covenants cover several domains but can broadly be divided into financial and non-financial categories. The former refers to respecting certain financial conditions that can be defined either in absolute amounts or ratios. Some examples are:

*Net worth test:* restricts the total amount of debt a borrower can incur, expressed as a percentage of net worth.

*Current ratio/ Quick Ratio tests:* measures liquidity.

*Interest, Debt service or Fixed Charges Coverage test*: assure that some level of cash flow is generated by a company above its operating expenses and other fixed obligations.

*Profitability test*: Particularly important for the nonrated company; some usual ratios include EBITDA (earnings before interest, taxes, depreciation, and amortization) divided by average capital, operating income as a percentage of sales and earnings on business segment assets.

*Capital expenditure limitations*: Should be set according to the company's business plan and then measured accordingly.

*Borrowing Base Limitations:* Ascertain that companies are not borrowing to overinvest in inventory and provide a first line of fallback for the lenders if a credit begins to deteriorate.

*Cash Flow volatility*: Actual leverage covenant levels vary by industry segment. Typical ratios that are used to measure cash flow adequacy include EBITDA divided by total debt and EBITDA divided by interest expense.

Non-financial covenants may include restrictions on other matters such as management changes, provisions of information, guarantees, disposal of assets, etc.

## Credit Ratings

Over the past several years, large credit rating agencies have entered the syndicated loan market (Standard and Poors, Moody, Fitch Investor Services). Loan ratings differ from bond ratings in that bond ratings emphasize the probability of default of the bond; whereas loan ratings emphasize the probability of default as well as the likelihood of collection upon default. Loan ratings emphasize the loan's structural characteristics (covenants, cash flow, collateral, etc.) and the expected loss on the loan.

**LOANS**                                                                                     Section 3.2

## Overview of the Shared National Credit (SNC) Program

The Shared National Credit (SNC) Program is an interagency initiative administered jointly by the FDIC, Federal Reserve Board, and the Office of the Comptroller of the Currency. The program was established in the 1970's for the purpose of ensuring consistency among the three Federal banking regulators in the classification of large syndicated credits.

Each SNC is reviewed annually at its agent bank or a designated review bank and the quality rating assigned by examiners is reported to all participating banks. These ratings are subsequently used during all examinations of participating banks, thus avoiding duplicate reviews of the same loan and ensuring consistent treatment with regard to regulatory credit ratings. Examiners should not change SNC ratings during risk management examinations. Any material change in a SNC should be reported to the appropriate regional SNC coordinator so that a determination can be made as to the appropriate action, including inclusion in the credit re-review process.

### Definition of a SNC

Any loan and/or formal loan commitment, including any asset such as other real estate, stocks, notes, bonds and debentures taken for debts previously contracted, extended to a borrower by a supervised institution, its subsidiaries, and affiliates which in original amount aggregates $20 million or more and, which is shared by three or more unaffiliated institutions under a formal lending agreement; or, a portion of which is sold to two or more unaffiliated institutions, with the purchasing institution(s) assuming its pro rata share of the credit risk.

SNC's Include:

- All international credits to borrowers in the private sector, regardless of currency denomination, which are administered by a domestic office.
- Assets taken for debts previously contracted such as other real estate, stocks, notes, bonds, and debentures.
- Credits or credit commitments which have been reduced to less than $20 million and were classified or criticized during the previous SNC review, provided they have not been reduced below $10 million.
- Any other large credit(s) designated by the supervisory agencies as meeting the general intent or purpose of the SNC program.
- Two or more credits to the same borrower that aggregate $20 million and each credit has the same participating lenders

SNCs Do Not Include:

- Credits shared solely between affiliated supervised institutions.
- Private sector credits that are 100 percent guaranteed by a sovereign entity.
- International credits or commitments administered in a foreign office.
- Direct credits to sovereign borrowers.
- Credits known as "club credits", which include related borrowings but are not extended under the same lending agreement.
- Credits with different maturity dates for different lenders.

For additional information regarding the SNC Program examiners can contact the regional SNC coordinator.

## Glossary of Syndicated Lending Terms

*Agent* – Entity that assumes the lead role in originating and administering the credit facility.

*Arranging Banks* – The banks that arrange a financing on behalf of a corporate borrower. Usually the banks commit to underwriting the whole amount only if they are unable to place the deal fully. Typically, however, they place the bulk of the facility and retain a portion on their books. For their efforts in arranging a deal, these banks collect an arrangement fee.

*Front-end costs* – Commissions, fees or other payments that are taken at the outset of a loan. Some examples are: *lead management fees* – paid in recognition of the lead manager's organization; *management fees* – usually divided equally between the management group and is payable regardless of drawdown; *underwriting fees* – a percentage of the sum being underwritten; *participation fees* – expressed as a percentage of each bank's participation in the loan; and *agency fees* – levied on most loans and provide for the appointment of one or more agent banks. The fee may be a percentage of the whole facility or a pre-arranged fixed sum.

*LIBOR* – London Interbank Offered Rate – The interest rate at which major international banks in London lend to each other and the rate(s) frequently underlying loan interest calculations. LIBOR will vary according to market conditions and will of course depend upon the loan period as well as the currency in question.

*Participating Banks* – a bank that has lent a portion of the outstanding amount to the borrower.

# LOANS

Section 3.2

*Reference Bank* – A bank that sets the lending rate (LIBOR) at the moment of each loan rollover period

*Tranche* – In a large syndicated loan, different portions of the facility may be made available at different time periods, and in different currencies. These separate components are known as "tranches" of the facility.

*Underwriter* - A bank that guarantees the lending of the funds to the borrower irrespective of successful syndication or not.

*Zeta score* - There are models which predict bankruptcy based on the analysis of certain financial ratios. Edward Altman of New York University developed a model in 1968 which is used by the regulatory agencies called Zeta. The Zeta score methodology is intended to forecast the probability of a company entering bankruptcy within a twelve month period. It uses five financial ratios from reported accounting information to produce an objective measure of financial strength of a company. The ratios included in the measurement are: working capital/total assets; retained earnings/total assets; earnings before interest and taxes/total assets; market value of common and preferred equity/total liabilities (in non-public organizations, the book value of common and preferred equity should be substituted); and sales/total assets (for non-manufacturing companies, this variable is eliminated).

## CREDIT SCORING

Automated credit scoring systems allow institutions to underwrite and price loans more quickly than was possible in the past. This efficiency has enabled some banks to expand their lending into national markets and originate loan volumes once considered infeasible. Scoring also reduces unit-underwriting costs, while yielding a more consistent loan portfolio that is easily securitized. These benefits have been the primary motivation for the proliferation of credit scoring systems among both large and small institutions.

Credit scoring systems identify specific characteristics that help define predictive variables for acceptable performance (delinquency, amount owed on accounts, length of credit history, home ownership, occupation, income, etc.) and assign point values relative to their overall importance. These values are then totaled to calculate a credit score, which helps institutions to rank order risk for a given population. Generally, an individual with a higher score will perform better relative to an individual with a lower credit score.

Few, if any, institutions have an automated underwriting system where the credit score is used exclusively to make the credit decision. Some level of human review is usually present to provide the flexibility needed to address individual circumstances. Institutions typically establish a minimum cut-off score below which applicants are denied and a second cutoff score above which applicants are approved. However, there is usually a range, or "gray area," in between the two cut-off scores where credits are manually reviewed and credit decisions are judgmentally determined.

Most, if not all, systems also provide for overrides of established cut-off scores. If the institution's scoring system effectively predicts loss rates and reflects management's risk parameters, excessive overrides will negate the benefits of an automated scoring system. Therefore, it is critical for management to monitor and control overrides. Institutions should develop acceptable override limits and prepare monthly override reports that provide comparisons over time and against the institution's parameters. Override reports should also identify the approving officer and include the reason for the override.

Although banks often use more than one type of credit scoring methodology in their underwriting and account management practices, many systems incorporate credit bureau scores. Credit bureau scores are updated periodically and validated on an ongoing basis against performance in credit bureau files. Scores are designed to be comparable across the major credit bureaus; however, the ability of any score to estimate performance outcome probabilities depends on the quality, quantity, and timely submission of lender data to the various credit bureaus. Often, the depth and thoroughness of data available to each credit bureau varies, and as a consequence, the quality of scores varies.

As a precaution, institutions that rely on credit bureau scores should sample and compare credit bureau reports to determine which credit bureau most effectively captures data for the market(s) in which the institution does business. For institutions that acquire credit from multiple regions, use of multiple scorecards may be appropriate, depending on apparent regional credit bureau strength. In some instances, it may be worthwhile for institutions to pull scores from each of the major credit bureaus and establish rules for selecting an average value. By tracking credit bureau scores over time and capturing performance data to differentiate which score seems to best indicate probable performance outcome, institutions can select the best score for any given market. Efforts to differentiate and select the best credit bureau score should be documented.

# LOANS

Although some institutions develop their own scoring models, most are built by outside vendors and subsequently maintained by the institution. Vendors build scoring models based upon specific information and parameters provided by bank management. Therefore, management must clearly communicate with the vendor and ensure that the scorecard developer clearly understands the bank's objectives. Bank management should also adhere closely to vendor manual specifications for system maintenance and management, particularly those that provide guidance for periodically assessing performance of the system.

Scoring models generally become less predictive as time passes. Certain characteristics about an applicant, such as income, job stability, and age change over time, as do overall demographics. One-by-one, these changes will result in significant shifts in the profile of the population. Once a fundamental change in the profile occurs, the model is less able to identify potentially good and bad applicants. As these changes continue, the model loses its ability to rank order risk. Thus, institutions must periodically validate the system's predictability and refine scoring characteristics when necessary. These efforts should be documented.

Institutions initially used credit scoring for consumer lending applications such as credit card, auto, and mortgage lending. However, credit scoring eventually gained acceptance in the small business sector. Depending on the manner in which it is implemented, credit scoring for small business lending may represent a fundamental shift in underwriting philosophy if institutions view a small business loan as more of a high-end consumer loan and, thus, grant credit more on the strength of the principals' personal credit history and less on the fundamental strength of the business. While this may be appropriate in some cases, it is important to remember that the income from small business remains the primary source of repayment for most loans. Banks that do not analyze business financial statements or periodically review their lines of credit may lose an opportunity for early detection of credit problems.

The effectiveness of any scoring system directly depends on the policies and procedures established to guide and enforce proper use. Policies should include an overview of the institution's scoring objectives and operations; the establishment of authorities and responsibilities over scoring systems; the use of a chronology log to track internal and external events that affect the scoring system; the establishment of bank officials responsible for reporting, monitoring, and reviewing overrides; as well as the provision of a scoring system maintenance program to ensure that the system continues to rank risk and to predict default and loss under the original parameters.

Examiners should refer to the Credit Card Specialty Bank Examination Guidelines and the Credit Card Activities section of the Examination Modules for additional guidance on credit scoring systems.

## SUBPRIME LENDING

### Introduction

There is not a universal definition of a subprime loan in the industry, but subprime lending is generally characterized as a lending program or strategy that targets borrowers who pose a significantly higher risk of default than traditional retail banking customers. Institutions often refer to subprime lending by other names such as the nonprime, nonconforming, high coupon, or alternative lending market.

Well-managed subprime lending can be a profitable business line; however, it is a high-risk lending activity. Successful subprime lenders carefully control the elevated credit, operating, compliance, legal, market, and reputation risks as well as the higher overhead costs associated with more labor-intensive underwriting, servicing, and collections. Subprime lending should only be conducted by institutions that have a clear understanding of the business and its inherent risks, and have determined these risks to be acceptable and controllable given the institution's staff, financial condition, size, and level of capital support. In addition, subprime lending should only be conducted within a comprehensive lending program that employs strong risk management practices to identify, measure, monitor, and control the elevated risks that are inherent in this activity. Finally, subprime lenders should retain additional capital support consistent with the volume and nature of the additional risks assumed. If the risks associated with this activity are not properly controlled, subprime lending may be considered an unsafe and unsound banking practice.

The term, subprime, refers to the credit characteristics of the borrower at the loan's origination, rather than the type of credit or collateral considerations. Subprime borrowers typically have weakened credit histories that may include a combination of payment delinquencies, charge-offs, judgments, and bankruptcies. They may also display reduced repayment capacity as measured by credit scores, debt-to-income ratios, or other criteria. Generally, subprime borrowers will display a range of credit risk characteristics that may include one or more of the following:

# LOANS

- Two or more 30-day delinquencies in the last 12 months, or one or more 60-day delinquencies in the last 24 months;
- Judgment, foreclosure, repossession, or charge-off in the prior 24 months;
- Bankruptcy in the last 5 years;
- Relatively high default probability as evidenced by, for example, a Fair Isaac and Co. risk score (FICO) of 660 or below (depending on the product/collateral), or other bureau or proprietary scores with an equivalent default probability likelihood; and/or
- Debt service-to-income ratio of 50 percent or greater, or otherwise limited ability to cover family living expenses after deducting total monthly debt-service requirements from monthly income.

This list is illustrative rather than exhaustive and is not meant to define specific parameters for all subprime borrowers. Additionally, this definition may not match all market or institution-specific subprime definitions, but should be viewed as a starting point from which examiners should expand their review of the bank's lending program.

Subprime lenders typically use the criteria above to segment prospects into subcategories such as, for example, A-, B, C, and D. However, subprime subcategories can vary significantly among lenders based on the credit grading criteria. What may be an "A" grade definition at one institution may be a "B" grade at another bank, but generally each grade represents a different level of credit risk.

While the industry often includes borrowers with limited or no credit histories in the subprime category, these borrowers can represent a substantially different risk profile than those with a derogatory credit history and are not inherently considered subprime. Rather, consideration should be given to underwriting criteria and portfolio performance when determining whether a portfolio of loans to borrowers with limited credit histories should be treated as subprime for examination purposes.

Subprime lending typically refers to a lending program that targets subprime borrowers. Institutions engaging in subprime lending generally have knowingly and purposefully focused on subprime lending through planned business strategies, tailored products, and explicit borrower targeting. An institution's underwriting guidelines and target markets should provide a basis for determining whether it should be considered a subprime lender. The average credit risk profile of subprime loan programs will exhibit the credit risk characteristics listed above, and will likely display significantly higher delinquency and/or loss rates than prime portfolios. High interest rates and fees are a common and relatively easily identifiable characteristic of subprime lending. However, high interest rates and fees by themselves do not constitute subprime lending.

Subprime lending does not include traditional consumer lending that has historically been the mainstay of community banking, nor does it include making loans to subprime borrowers as discretionary exceptions to the institution's prime retail lending policy. In addition, subprime lending does not refer to: prime loans that develop credit problems after acquisition; loans initially extended in subprime programs that are later upgraded, as a result of their performance, to programs targeted to prime borrowers; or community development loans as defined in the CRA regulations.

For supervisory purposes, a subprime lender is defined as an insured institution or institution subsidiary that has a subprime lending program with an aggregate credit exposure greater than or equal to 25 percent of Tier 1 capital. Aggregate exposure includes principal outstanding and committed, accrued and unpaid interest, and any retained residual assets relating to securitized subprime loans.

## Capitalization

The FDIC's minimum capital requirements generally apply to portfolios that exhibit substantially lower risk profiles than exist in subprime loan programs. Therefore, these requirements may not be sufficient to reflect the risks associated with subprime portfolios. Each subprime lender is responsible for quantifying the amount of capital needed to offset the additional risk in subprime lending activities, and for fully documenting the methodology and analysis supporting the amount specified.

Examiners will evaluate the capital adequacy of subprime lenders on a case-by-case basis, considering, among other factors, the institution's own documented analysis of the capital needed to support its subprime lending activities. Examiners should expect capital levels to be risk sensitive, that is, allocated capital should reflect the level and variability of loss estimates within reasonably conservative parameters. Examiners should also expect institutions to specify a direct link between the estimated loss rates used to determine the required ALLL, and the unexpected loss estimates used to determine capital.

The sophistication of this analysis should be commensurate with the size, concentration level, and relative risk of the institution's subprime lending activities and should consider the following elements:

**LOANS**                                                                                    Section 3.2

- Portfolio growth rates;
- Trends in the level and volatility of expected losses;
- The level of subprime loan losses incurred over one or more economic downturns, if such data/analyses are available;
- The impact of planned underwriting or marketing changes on the credit characteristics of the portfolio, including the relative levels of risk of default, loss in the event of default, and the level of classified assets;
- Any deterioration in the average credit quality over time due to adverse selection or retention;
- The amount, quality, and liquidity of collateral securing the individual loans;
- Any asset, income, or funding source concentrations;
- The degree of concentration of subprime credits;
- The extent to which current capitalization consists of residual assets or other potentially volatile components;
- The degree of legal and/or reputation risk associated with the subprime business line(s) pursued; and
- The amount of capital necessary to support the institution's other risks and activities.

Given the higher risk inherent in subprime lending programs, examiners should reasonably expect, as a starting point, that an institution would hold capital against such portfolios in an amount that is one and one half to three times greater than what is appropriate for non-subprime assets of a similar type. Refinements should depend on the factors analyzed above, with particular emphasis on the trends in the level and volatility of loss rates, and the amount, quality, and liquidity of collateral securing the loans. Institutions with subprime programs affected by this guidance should have capital ratios that are well above the averages for their traditional peer groups or other similarly situated institutions that are not engaged in subprime lending.

Some subprime asset pools warrant increased supervisory scrutiny and monitoring, but not necessarily additional capital. For example, well-secured loans to borrowers who are slightly below what is considered prime quality may entail minimal additional risks compared to prime loans, and may not require additional capital if adequate controls are in place to address the additional risks. On the other hand, institutions that underwrite higher-risk subprime pools, such as unsecured loans or high loan-to-value second mortgages, may need significantly higher levels of capital, perhaps as high as 100% of the loans outstanding depending on the level and volatility of risk. Because of the higher inherent risk levels and the increased impact that subprime portfolios may have on an institution's overall capital, examiners should document and reference each

institution's subprime capital evaluation in their comments and conclusions regarding capital adequacy.

## Stress Testing

An institution's capital adequacy analysis should include stress testing as a tool for estimating unexpected losses in its subprime lending pools. Institutions should project the performance of their subprime loan pools under conservative stress test scenarios, including an estimation of the portfolio's susceptibility to deteriorating economic, market, and business conditions. Portfolio stress testing should include "shock" testing of basic assumptions such as delinquency rates, loss rates, and recovery rates on collateral. It should also consider other potentially adverse scenarios, such as: changing attrition or prepayment rates; changing utilization rates for revolving products; changes in credit score distribution; and changes in the capital markets demand for whole loans, or asset-backed securities supported by subprime loans.

These are representative examples. Actual factors will vary by product, market segment, and the size and complexity of the portfolio relative to the institution's overall operations. Whether stress tests are performed manually, or through automated modeling techniques, the Regulatory Agencies will expect that:

- The process is clearly documented, rational, and easily understood by the board and senior management;
- The inputs are reliable and relate directly to the subject portfolios;
- Assumptions are well documented and conservative; and
- Any models are subject to a comprehensive validation process.

The results of the stress test exercises should be a documented factor in the analysis and determination of capital adequacy for the subprime portfolios.

Institutions that engage in subprime lending without adequate procedures to estimate and document the level of capital necessary to support their activities should be criticized. Where capital is deemed inadequate to support the risk in subprime lending activities, examiners should consult with their Regional Office to determine the appropriate course of action.

## Risk Management

# LOANS

Section 3.2

The following items are essential components of a risk management program for subprime lenders.

**Planning and Strategy**. Prior to engaging in subprime lending, the board and management should ensure that proposed activities are consistent with the institution's overall business strategy and risk tolerances, and that all involved parties have properly acknowledged and addressed critical business risk issues. These issues include the costs associated with attracting and retaining qualified personnel, investments in the technology necessary to manage a more complex portfolio, a clear solicitation and origination strategy that allows for after-the-fact assessment of underwriting performance, and the establishment of appropriate feedback and control systems. The risk assessment process should extend beyond credit risk and appropriately incorporate operating, compliance, market, liquidity, reputation and legal risks.

Institutions establishing a subprime lending program should proceed slowly and cautiously into this activity to minimize the impact of unforeseen personnel, technology, or internal control problems and to determine if favorable initial profitability estimates are realistic and sustainable. Strategic plan performance analysis should be conducted frequently in order to detect adverse trends or circumstances and take appropriate action in a timely manner.

**Management and Staff.** Prior to engaging in subprime lending, the board should ensure that management and staff possess sufficient expertise to appropriately manage the risks in subprime lending and that staffing levels are adequate for the planned volume of activity. Subprime lending requires specialized knowledge and skills that many financial institutions do not possess. Marketing, account origination, and collections strategies and techniques often differ from those employed for prime credit; thus it is generally not sufficient to have the same staff responsible for both subprime and prime loans. Servicing and collecting subprime loans can be very labor intensive and requires a greater volume of staff with smaller caseloads. Lenders should monitor staffing levels, staff experience, and the need for additional training as performance is assessed over time. Compensation programs should not depend primarily on volume or growth targets. Any targets used should be weighted towards factors such as portfolio quality and risk-adjusted profitability.

**Lending Policies and Procedures**. Lenders should have comprehensive written policies and procedures, specific to each subprime lending product, that set limits on the amount of risk that will be assumed and address how the

institution will control portfolio quality and avoid excessive exposure. Policies and procedures should be in place before initiating the activity. Institutions may originate subprime loans through a variety of channels, including dealers, brokers, correspondents, and marketing firms. Regardless of the source, it is critical that underwriting policies and procedures incorporate the risk tolerances established by the board and management and explicitly define underwriting criteria and exception processes. Subprime lending policies and procedures should, at a minimum, address the items outlined in the loan reference module of the Examination Documentation Modules for subprime lending. If the institution elects to use scoring systems for approvals or pricing, the model should be tailored to address the behavioral and credit characteristics of the subprime population targeted and the products offered. It is not acceptable to rely on models developed for standard risk borrowers or products. Furthermore, the models should be reviewed frequently and updated as necessary to ensure assumptions remain valid.

Given the higher credit risk associated with the subprime borrower, effective subprime lenders use mitigating underwriting guidelines and risk-based pricing to reduce the overall risk of the loan. These guidelines include lower loan-to-value ratio requirements and lower maximum loan amounts relative to each risk grade within the portfolio. Given the high-risk nature of subprime lending, the need for thorough analysis and documentation is heightened relative to prime lending. Compromises in analysis or documentation can substantially increase the risk and severity of loss. In addition, subprime lenders should develop criteria for limiting the risk profile of borrowers selected, giving consideration to factors such as the frequency, recency, and severity of delinquencies and derogatory items; length of time with re-established credit; and reason for the poor credit history.

While the past credit deficiencies of subprime borrowers reflect a higher risk profile, subprime loan programs must be based upon the borrowers' current reasonable ability to repay and a prudent debt amortization schedule. Loan repayment should not be based upon foreclosure proceedings or collateral repossession. Institutions must recognize the additional default risks and determine if these risks are acceptable and controllable without resorting to foreclosure or repossession that could have been predetermined by the loan structure at inception.

**Profitability and Pricing**. A key consideration for lenders in the subprime market is the ability to earn risk-adjusted yields that appropriately compensate the institution for the increased risk and costs assumed. The institution must have a comprehensive framework for

# LOANS

pricing decisions and profitability analysis that considers all costs associated with each subprime product, including origination, administrative/servicing, expected charge-offs, funding, and capital. In addition, the pricing framework should allow for fluctuations in the economic cycle. Fees often comprise a significant portion of revenue in subprime lending. Consideration should be given to the portion of revenues derived from fees and the extent to which the fees are a recurring and viable source of revenue. Profitability projections should be incorporated into the business plan. Management should track actual performance against projections regularly and have a process for addressing variances.

**Loan Review and Monitoring**. Institutions must have comprehensive analysis and information systems that identify, measure, monitor and control the risks associated with subprime lending. Analysis must promote understanding of the portfolio and early identification of adverse quality/performance trends. Systems employed must posses the level of detail necessary to properly evaluate subprime activity. Recommended portfolio segmentation and trend analyses are fully discussed in the subprime lending loan reference module of the Examination Modules.

Analysis should take into consideration the effects of portfolio growth and seasoning, which can mask true performance by distorting delinquency and loss ratios. Vintage, lagged delinquency, and lagged loss analysis methods are sometimes used to account for growth, seasoning, and changes in underwriting. Analysis should also take into account the effect of cure programs on portfolio performance. Refer to the glossary of the Credit Card Specialty Bank Examination Guidelines for definitions of vintage, roll rate, and migration analysis.

**Servicing and Collections**. Defaults occur sooner and in greater volume than in prime lending; thus a well-developed servicing and collections function is essential for the effective management of subprime lending. Strong procedures and controls are necessary throughout the servicing process; however, particular attention is warranted in the areas of new loan setup and collections to ensure the early intervention necessary to properly manage higher risk borrowers. Lenders should also have well-defined written collection policies and procedures that address default management (e.g., cure programs and repossessions), collateral disposition, and strategies to minimize delinquencies and losses. This aspect of subprime lending is very labor intensive but critical to the program's success.

Cure programs include practices such as loan restructuring, re-aging, renewal, extension, or consumer credit

counseling. Cure programs should be used only when the institution has substantiated the customer's renewed willingness and ability to pay. Management should ensure that its cure programs are neither masking poor initial credit risk selection nor deferring losses. Effective subprime lenders may use short-term loan restructure programs to assist borrowers in bringing loans current when warranted, but will often continue to report past due status on a contractual basis. Cure programs that alter the contractual past due status may mask actual portfolio performance and inhibit the ability of management to understand and monitor the true credit quality of the portfolio.

Repossession and resale programs are integral to the subprime business model. Policies and procedures for foreclosure and repossession activities should specifically address the types of cost/benefit analysis to be performed before pursuing collateral, including valuation methods employed; timing of foreclosure or repossession; and accounting and legal requirements. Policies should clearly outline whether the bank will finance the sale of the repossessed collateral, and if so, the limitations that apply. Banks should track the performance of such loans to assess the adequacy of these policies.

**Compliance and Legal Risks**. Subprime lenders generally run a greater risk of incurring legal action given the higher fees, interest rates, and profits; targeting customers who have little experience with credit or damaged credit records; and aggressive collection efforts. Because the risk is dependent, in part, upon the public perception of a lender's practices, the nature of these risks is inherently unpredictable. Institutions that engage in subprime lending must take special care to avoid violating consumer protection laws. An adequate compliance management program must identify, monitor and control the consumer protection hazards associated with subprime lending. The institution should have a process in place to handle the potential for heightened legal action. In addition, management should have a system in place to monitor consumer complaints for recurring issues and ensure appropriate action is taken to resolve legitimate disputes.

**Audit**. The institution's audit scope should provide for comprehensive independent reviews of subprime activities. Audit procedures should ensure, among other things, that a sufficient volume of accounts is sampled to verify the integrity of the records, particularly with respect to payments processing.

**Third Parties**. Subprime lenders may use third parties for a number of functions from origination to collections. In dealing with high credit-risk products, management must

**LOANS**
Section 3.2

take steps to ensure that exposures from third-party practices or financial instability are minimized. Proper due diligence should be performed prior to contracting with a third party vendor and on an ongoing basis thereafter. Contracts negotiated should provide the institution with the ability to control and monitor third party activities (e.g. growth restrictions, underwriting guidelines, outside audits, etc.) and discontinue relationships that prove detrimental to the institution.

Special care must be taken when purchasing loans from third party originators. Some originators who sell subprime loans charge borrowers high up-front fees, which may be financed into the loan. These fees provide incentive for originators to produce a high volume of loans with little emphasis on quality, to the detriment of a potential purchaser. These fees also increase the likelihood that the originator will attempt to refinance the loans. Contracts should restrict the originator from the churning of customers. Further, subprime loans, especially those purchased from outside the institution's lending area, are at special risk for fraud or misrepresentation. Management must also ensure that third party conflicts of interest are avoided. For example, if a loan originator provides recourse for poorly performing loans purchased by the institution, the originator or related interest thereof should not also be responsible for processing and determining the past due status of the loans.

**Securitizations**. Securitizing subprime loans carries inherent risks, including interim credit, liquidity, interest rate, and reputation risk, that are potentially greater than those for securitizing prime loans. The subprime loan secondary market can be volatile, resulting in significant liquidity risk when originating a large volume of loans intended for securitization and sale. Investors can quickly lose their appetite for risk in an economic downturn or when financial markets become volatile. As a result, institutions may be forced to sell loan pools at deep discounts. If an institution lacks adequate personnel, risk management procedures, or capital support to hold subprime loans originally intended for sale, these loans may strain an institution's liquidity, asset quality, earnings, and capital. Consequently, institutions actively involved in the securitization and sale of subprime loans should develop a contingency plan that addresses back-up purchasers of the securities, whole loans, or the attendant servicing functions, alternate funding sources, and measures for raising additional capital. An institution's liquidity and funding structure should not be overly dependent upon the sale of subprime loans.

Given some of the unique characteristics of subprime lending, accounting for the securitization process requires assumptions that can be difficult to quantify reliably, and

erroneous assumptions can lead to the significant overstatement of an institution's assets. Institutions should take a conservative approach when accounting for these transactions and ensure compliance with existing regulatory guidance. Refer to outstanding memoranda and examination instructions for further information regarding securitizations.

## Classification

The Uniform Retail Credit Classification and Account Management Policy (Retail Classification Policy) governs the evaluation of consumer loans. This policy establishes general classification thresholds based on delinquency, but also grants examiners the discretion to classify individual retail loans that exhibit signs of credit weakness regardless of delinquency status. An examiner may also classify retail portfolios, or segments thereof, where underwriting standards are weak and present unreasonable credit risk, and may criticize account management practices that are deficient. Given the high-risk nature of subprime portfolios and their greater potential for loan losses, the delinquency thresholds for classification set forth in the Retail Classification Policy should be considered minimums. Well-managed subprime lenders should recognize the heightened risk-of-loss characteristics in their portfolios and, if warranted, internally classify their delinquent accounts well before the timeframes outlined in the interagency policy. If examination classifications are more severe than the Retail Classification Policy suggests, the examination report should explain the weaknesses in the portfolio and fully document the methodology used to determine adverse classifications.

## ALLL Analysis

The institution's documented ALLL analysis should identify subprime loans as a specific risk exposure separate from the prime portfolio. In addition, the analysis should segment the subprime lending portfolios by risk exposure such as specific product, vintage, origination channel, risk grade, loan to value ratio, or other grouping deemed relevant.

Pools of adversely classified subprime loans (to include, at a minimum, all loans past due 90 days or more) should be reviewed for impairment, and an adequate allowance should be established consistent with existing interagency policy. For subprime loans that are not adversely classified, the ALLL should be sufficient to absorb at least all estimated credit losses on outstanding balances over the current operating cycle, typically 12 months. To the extent that the historical net charge-off rate is used to estimate expected credit losses, it should be adjusted for changes in

**LOANS**  Section 3.2

trends, conditions, and other relevant factors, including business volume, underwriting, risk selection, account management practices, and current economic or business conditions that may alter such experience.

## Subprime Auto Lending

**Underwriting**. Subprime auto lenders use risk-based pricing of loans in addition to more stringent advance rates, discounting, and dealer reserves than those typically used for prime auto loans to mitigate the increased credit risk. As credit risk increases, advance rates on collateral decrease while interest rates, dealer paper discounts, and dealer reserves increase. In addition to lower advance rates, collateral values are typically based on the wholesale value of the car. Lenders will typically treat a new dealer with greater caution, using higher discounts and/or purchasing the dealer's higher quality paper until a database and working relationship is developed.

**Servicing and Collections**. Repossession is quick, generally ranging between 30 to 60 days past due and sometimes earlier. The capacity of a repossession and resale operation operated by a prime lender could easily be overwhelmed if the lender begins targeting subprime borrowers, leaving the lender unable to dispose of cars quickly. Resale methods include wholesale auction, retail lot sale, and/or maintaining a database of retail contacts. While retail sale will command a greater price, subprime lenders should consider limiting the time allocated to retail sales before sending cars to auction in order to ensure adequate cash flow and avoid excessive inventory build-up. Refinancing resales should be limited and tightly controlled, as this practice can mask losses. Lenders typically implement a system for tracking the location of the collateral.

## Subprime Residential Real Estate Lending

**Underwriting**. To mitigate the increased risk, subprime residential real estate lenders use risk-based pricing in addition to more conservative LTV ratio requirements and cash-out restrictions than those typically used for prime mortgage loans. As the credit risk of the borrower increases, the interest rate increases and the loan-to-value ratio and cash-out limit decreases. Prudent loan-to-value ratios are an essential risk mitigant in subprime real estate lending and generally range anywhere from 85 percent to 90 percent for A- loans, to 65 percent for lower grades. High loan-to-value (HLTV) loans are generally not considered prudent in subprime lending. HLTV loans should be targeted at individuals who warrant large unsecured debt, and then only in accordance with outstanding regulatory guidance. The appraisal process

takes on increased importance given the greater emphasis on collateral. Prepayment penalties are sometimes used on subprime real estate loans, where allowed by law, given that prepayment rates are generally higher and more volatile for subprime real estate loans. Government Sponsored Agencies, Fannie Mae and Freddie Mac, participate in the subprime mortgage market to a limited degree through purchases of subprime loans and guarantees of subprime securitizations.

**Servicing and Collections**. Collection calls begin early, generally within the first 10 days of delinquency, within the framework of existing laws. Lenders generally send written correspondence of intent to foreclosure or initiate other legal action early, often as early as 31 days delinquent. The foreclosure process is generally initiated as soon as allowed by law. Updated collateral valuations are typically obtained early in the collections process to assist in determining appropriate collection efforts. Frequent collateral inspections are often used by lenders to monitor the condition of the collateral.

## Subprime Credit Card Lending

**Underwriting**. Subprime credit card lenders use risk-based pricing as well as tightly controlled credit limits to mitigate the increased credit risk. In addition, lenders may require full or partial collateral coverage, typically in the form of a deposit account at the institution, for the higher-risk segments of the subprime market. Initial credit lines are set at low levels, such as $300 to $1,000, and subsequent line increases are typically smaller than for prime credit card accounts. Increases in credit lines should be subject to stringent underwriting criteria similar to that required at origination.

Underwriting for subprime credit cards is typically based upon credit scores generated by sophisticated scoring models. These scoring models use a substantial number of attributes, including the frequency, severity, and recency of previous delinquencies and major derogatory items, to determine the probability of loss for a potential borrower. Subprime lenders typically target particular subprime populations through prescreening models, such as individuals who have recently emerged from bankruptcy. Review of the attributes in these models often reveals the nature of the institution's target population.

**Servicing and Collections**. Lenders continually monitor customer behavior and credit quality and take proactive measures to avert potential problems, such as decreasing or freezing credit lines or providing consumer counseling, before the problems become severe or in some instances before the loans become delinquent. Lenders often use

# LOANS

**Section 3.2**

sophisticated scoring systems to assist in monitoring credit quality and frequently re-score customers. Collection calls on delinquent loans begin early, generally within the first 10 days delinquent, and sometimes as early as 1-day delinquent, within the framework of existing laws. Lenders generally send written correspondence within the first 30 days in addition to calling. Account suspensions occur early, generally within the first 45 days of delinquency or immediately upon a negative event such as refusal to pay. Accounts over 90 days past due are generally subject to account closure and charge-off. In addition, account closures based upon a borrower's action, such as repeated refusal to pay or broken promises to bring the account current within a specified time frame, may occur at any time in the collection process. Account closure practices are generally more aggressive for relatively new credit card accounts, such as those originated in the last six months.

## Payday Lending

Payday lending is a particular type of subprime lending. Payday loans (also known as deferred deposit advances) are small dollar, short-term, unsecured loans that borrowers promise to repay out of their next paycheck or regular income payment (such as social security check). Payday loans are usually priced at a fixed dollar fee, which represents the finance charge. Because these loans have such short terms to maturity, the cost of borrowing, expressed as an annual percentage rate is very high.

In return for the loan, the borrower usually provides the lender with a check or debit authorization for the amount of the loan plus the fee. The check is either post-dated to the borrower's next payday or the lender agrees to defer presenting the check for payment until a future date, usually two weeks or less. When the loan is due, the lender expects to collect the loan by depositing the check or debiting the borrower's account or by having the borrower redeem the check with a cash payment. If the borrower informs the lender that he or she does not have the funds to repay the loan, the loan is often refinanced (payday lenders may use the terms "rollover," "same day advance," or "consecutive advance") through payment of an additional finance charge. If the borrower does not redeem the check in cash and the loan is not refinanced, the lender normally puts the check or debit authorization through the payment system. If the borrower's deposit account has insufficient funds, the borrower typically incurs a NSF charge on this account. If the check or the debit is returned to the lender unpaid, the lender also may impose a returned item fee plus collection charges on the loan.

**Significant Risks**

Credit Risk. Borrowers who obtain payday loans generally have cash flow difficulties and few, if any, lower-cost borrowing alternatives. In addition, some payday lenders perform minimal analysis of the borrower's ability to repay either at the loan's inception or upon refinancing; they may merely require a current pay stub or proof of a regular income source and evidence that the customer has a checking account. Other payday lenders use scoring models and consult nationwide databases that track bounced checks and persons with outstanding payday loans. However, payday lenders typically do not obtain or analyze information regarding the borrower's total level of indebtedness or information from the major national credit bureaus. The combination of the borrower's limited financial capacity, the unsecured nature of the credit, and the limited underwriting analysis of the borrower's ability to repay pose substantial credit risk for insured depository institutions.

Legal and Reputation Risk. Federal law authorizes Federal and state-chartered insured depository institutions making loans to out-of-state borrowers to "export" favorable interest rates provided under the laws of the State where the bank is located. That is, a state-chartered bank is allowed to charge interest on loans to out-of-state borrowers at rates authorized by the State where the bank is located, regardless of usury limitations imposed by the State laws of the borrower's residence. Nevertheless, institutions face increased reputation risk when they enter into certain arrangements with payday lenders, including arrangements to originate loans on terms that could not be offered directly by the payday lender.

Transaction Risk. Payday loans are a form of specialized lending not typically found in state nonmember institutions, and are most frequently originated by specialized nonbank firms subject to State regulation. Payday loans can be subject to high levels of transaction risk given the large volume of loans, the handling of documents, and the movement of loan funds between the institution and any third party originators. Because payday loans may be underwritten off-site, there also is the risk that agents or employees may misrepresent information about the loans or increase credit risk by failing to adhere to established underwriting guidelines.

Third-Party Risk. Insured depository institutions may have payday lending programs that they administer directly, using their own employees, or they may enter into arrangements with third parties. In the latter arrangements, the institution typically enters into an agreement in which the institution funds payday loans originated through the third party. These arrangements also may involve the sale to the third party of the loans or servicing rights to the loans. Institutions also may rely on the third party to

# LOANS

provide additional services that the bank would normally provide, including collections, advertising and soliciting applications. The existence of third party arrangements may, when not properly managed, significantly increase institutions' transaction, legal, and reputation risks.

Arrangements with third parties should be guided by written contract and approved by the institution's board. At a minimum, the arrangement should:

- Describe the duties and responsibilities of each party, including the scope of the arrangement;
- Specify that the third party will comply with all applicable laws and regulations;
- Specify which party will provide consumer compliance related disclosures;
- Authorize the institution to monitor the third party and periodically review and verify that the third party and its representatives are complying with its agreement with the institution;
- Authorize the institution and the appropriate banking agency to have access to such records of the third party and conduct onsite transaction testing and operational reviews at the third party locations as necessary or appropriate to evaluate such compliance;
- Require the third party to indemnify the institution for potential liability resulting from action of the third party with regard to the payday lending program; and
- Address customer complaints, including any responsibility for third-party forwarding and responding to such complaints.

Bank management should sufficiently monitor the third party with respect to its activities and performance. Management should dedicate sufficient staff with the necessary expertise to oversee the third party. The bank's oversight program should monitor the third party's financial condition, its controls, and the quality of its service and support, including its resolution of consumer complaints if handled by the third party. Oversight programs should be documented sufficiently to facilitate the monitoring and management of the risks associated with third-party relationships.

## Concentrations

Given the risk inherent in payday lending, concentrations of credit in this line of business pose a significant safety and soundness concern. In the context payday lending, a concentration would be defined as a volume of payday loans totaling 25 percent or more of a bank's Tier 1 capital. Where concentrations of payday lending are noted, bank management should be criticized for a failure to diversify risks. Appropriate supervisory action may be necessary to address concentrations, including directing the institution to reduce its loans to an appropriate level, raising additional capital, or submitting a plan to achieve compliance.

## Capital Adequacy

Payday lending is among the highest risk subsets of subprime lending, and significantly higher levels of capital than the starting point for subprime loans - one and a half to three times what is appropriate for nonsubprime assets of a similar type - should be required. Institutions that underwrite payday loans may be required to maintain as high as one hundred percent of the loans outstanding (dollar-for-dollar capital), depending on the level and volatility of risk. Risks to consider when determining capital requirements include the unsecured nature of the credit, the relative levels of risk of default, loss in the event of default, and the level of classified assets. The degree of legal or reputation risk associated with payday lending should also be considered, especially as it relates to third party agreements.

## Allowance for Loan and Lease Losses

Institutions should maintain an ALLL that is adequate to absorb estimated credit losses with the payday portfolio. Although the contractual term of each payday loan may be short, institutions' methodologies for estimating credit losses on these loans should take into account the fact that many payday loans remain continuously outstanding for longer periods because of renewals and rollovers. In addition, institutions should evaluate the collectibility of accrued fees and finance charges on payday loans and employ appropriate methods to ensure that income is accurately measured.

## Classifications

The Retail Classification Policy establishes general classification thresholds for consumer loans based on delinquency, but also grants examiners the discretion to classify individual retail loans that exhibit signs of credit weakness regardless of delinquency status. Examiners also may classify retail portfolios, or segments thereof, where underwriting standards are weak and present unreasonable credit risk, and may criticize account management practices that are deficient.

Most payday loans have well-defined weaknesses that jeopardize the liquidation of the debt. Weaknesses include limited or no analysis of repayment capacity and the unsecured nature of the credit. In addition, payday loan portfolios are characterized by a marked proportion of obligors whose paying capacity is questionable. As a result

# LOANS

of these weaknesses, payday loan portfolios should be classified Substandard.

Furthermore, payday loans that have been outstanding for extended periods of time evidence a high risk of loss. While such loans may have some recovery value, it is not practical or desirable to defer writing off these essentially worthless assets. Payday loans that are outstanding for greater than 60 days from origination generally meet the definition of Loss. In certain circumstances, earlier charge-off may be appropriate (i.e., the bank does not renew beyond the first payday and the borrower is unable to pay, the bank closes an account, etc.). The institution's policies regarding consecutive advances also should be considered when determining Loss classifications. Where the economic substance of consecutive advances is substantially similar to "rollovers" – without appropriate "cooling off" or waiting periods – examiners should treat these loans as continuous advances and classify accordingly.

When classifying payday loans, examiners should reference the Retail Classification Policy as the source document. Examiners would normally not classify loans for which the institution has documented adequate paying capacity of the obligors and/or sufficient collateral protection or credit enhancement.

## Renewals/Rewrites

The Retail Classification Policy establishes guidelines for extensions, deferrals, renewals, or rewrites of closed-end accounts. Despite the short-term nature of payday loans, borrowers that request an extension, deferral, renewal, or rewrite should exhibit a renewed willingness and ability to repay the loan. Examiners should ensure that institutions adopt and adhere to the *Retail* Classification Policy standards that control the use of extensions, deferrals, renewals, or rewrites of payday loans. Under the Retail Classification Policy, institutions' standards should:

- Limit the number and frequency of extensions, deferrals, renewals, and rewrites;
- Prohibit additional advances to finance unpaid interest and fees and simultaneous loans to the same customer; and
- Ensure that comprehensive and effective risk management, reporting, and internal controls are established and maintained.

In addition to the above items, institutions also should:

- Establish appropriate "cooling off" or waiting periods between the time a payday loan is repaid and another application is made:
- Establish the maximum number of loans per customer that are allowed within one calendar year or other designated time period; and
- Provide that no more than one payday loan is outstanding with the bank at a time to any one borrower.

## Accrued Fees and Finance Charges

Institutions should evaluate the collectibility of accrued fees and finance charges on payday loans because a portion of accrued interest and fees is generally not collectible. Although regulatory reporting instructions do not require payday loans to be placed on nonaccrual based on delinquency status, institutions should employ appropriate methods to ensure that income is accurately measured. Such methods may include providing loss allowances for uncollectible fees and finance charges or placing delinquent and impaired receivables on nonaccrual status. After a loan is placed on nonaccrual status, subsequent fees and finance charges imposed on the borrower would not be recognized in income and accrued, but unpaid fees and finance charges normally would be reversed from income.

# EXHIBIT 5

www.hudclips.org

U. S. Department of Housing and Urban Development
Washington, D.C. 20410-8000

May 26, 1993
OFFICE OF THE ASSISTANT SECRETARY
FOR HOUSING-FEDERAL HOUSING COMMISSIONER
Mortgagee Letter 93-14
     TO:  All Approved Mortgagees
     SUBJECT:  Quality Control for Origination and Servicing
               Revisions to Mortgagee Letter 89-32

     The purpose of this Letter is to clarify, revise and update some
of the requirements of Mortgagee Letter 89-32.

     Since Mortgagee Letter 89-32 was issued in December of 1989,
most mortgagees have made considerable progress towards the
implementation of effective Quality Control Plans.  Since that time,
we have received suggestions from within the Department and from the
industry concerning ways our Quality Control requirements could be
improved and/or modified.

Sampling Requirement

     We have received several requests for permission to use
statistical sampling in the selection of loans for review.  For large
originators and servicers we agree this proposal is more reasonable
while providing similar results.  Therefore, originating mortgagees
may choose to review the lesser of 10% of all loans closed on a
monthly basis or a random sample that provides a 95% confidence level
with 2% precision.  Lenders choosing to use the random sample approach
must review all loans that went into default within six months of
closing in addition to the number selected for random sample.
Servicers may apply the same criteria to their portfolio within the
time constraints discussed later in this Mortgagee Letter.
Originators and servicers may be asked by the HUD local office or the
Office of Lender Activities and Land Sales Registration to explain the
method they used in statistical sampling.

     Lenders closing fewer than 10 loans annually must review at
least one loan.  If fewer than 10 loans are originated monthly, the
10% sampling requirement may be on a quarterly basis.

Loan Origination

     Loan Correspondents

     All HUD/FHA-approved lenders, including loan correspondents, are
required to have and implement a Quality Control Plan.  Sponsors of
loan correspondents are required to perform quality control reviews on
loans purchased from each of their correspondents; however, this is
not meant to be a substitute for the correspondent's own quality
control.  A correspondent may enter into a contractual arrangement
with its sponsor or some other entity to perform its quality control.
The results of these reviews must be passed on to the management of
the loan correspondent and appropriate action must be taken.  (Please
see "Use of Outside Firms" on page 4 of this letter.)

_____

2

Selection of Loans

To improve the quality of reviews, we are providing guidelines that lenders may use in selecting loans for review.  Lenders must ensure that all loan officers, underwriters, appraisers and branches are subject to review.  A more thorough review will include emphasis on those individuals (including real estate agents) who are large producers, newly employed, or concentrating in soft market areas.  In addition, all loans going into default within the first six months must be reviewed.

The Department's experience in reviewing loans that went into early default has shown that many of the characteristics listed below are often present.  We recommend lenders use these characteristics, or any additional ones they find necessary, in identifying loans to be reviewed.  Such targeting of loans will make quality control reviews more effective.

Loan Selection Guidelines

LOAN CHARACTERISTICS                    MORTGAGOR CHARACTERISTICS

- Mortgagors owning other              - No credit history
  real estate                          - No or new bank accounts
- 2-4 unit properties                  - Large earnest money deposit
- Non-occupying                        - Large increase in bank
   co-mortgagors                          account
- Sweat equity                         - Little cash remaining after
- Excessive seller                       closing
  concessions                          - Housing expense increasing
- Identity of interest                   by 1.5 times
  between buyer and                    - Front ratio > 29%
  seller                               - Back ratio > 41%
- New construction                     - <18 months with current
- Soft market areas                      employer
- Rent credit                          - Gift letter
                                       - Self-employed

Credit Report

It is no longer necessary for a lender to obtain a full Residential Mortgage Credit Report (RMCR) on all loans reviewed, as previously required by 89-32.  It is permissible to use a three-repository infile report.  All information received from the repositories must be included in the merged report.  The merge function must be limited to listing duplicate tradelines together for ease in reading the report.  However, a full RMCR must be obtained on at least 10% of all loans subject to quality control, on cases in which the infile credit report reveals discrepancies, and in cases of early default.

_____

3

Appraisal Review

A desk review of the property appraisal must be performed on all loans chosen for a quality control review.  HUD Handbook 4000.4 REV-1,

paragraph 2-6(D), identifies the elements of that review.

Ten percent (10%) of all appraisals done by staff appraisers must be field reviewed and a sampling of appraisals done by fee personnel must be field reviewed.  The size of the sample for fee appraisals is left to the lender to determine.  Field reviews must be performed by the Direct Endorsement Underwriter or by review appraisers employed on a contract basis.  Loans selected for field review may be included in the normal universe of loans selected for quality control.

Home Mortgage Disclosure Act

Based upon our experience in collecting information under the Home Mortgage Disclosure Act (HMDA), we have found that the information is often inaccurate.  For this reason we are requiring that HMDA reporting be included in lenders' ongoing quality control.  The review must ensure that HMDA reporting to HUD/FHA is being done; the information being reported is accurate; all required information is being reported; and the information is reported promptly.

Rejected Loans

A minimum of 10% of total loans rejected must be reviewed, concentrating on three particular areas.  First, the reasons given for rejection must be reviewed and determined to be valid.  Second, lenders must ensure that a senior staff person or officer of the company or a committee chaired by a senior staff person or officer concurred with the rejection.  Finally, lenders must ensure that the requirements of the Equal Credit Opportunity Act were met and documented in each file.  Where possible discrimination is noted, the lender is expected to take immediate corrective action.

Alternative Document Loans

Alternative document loans must be included in quality control reviews.  The requirements for these loans are set forth in Mortgagee Letters 91-51 and 92-15.

_____

4

Loan Servicing

Sampling Requirement

Because much of servicing is computerized, we do not think it is necessary to review all areas on a monthly basis.  However, we do consider the following areas of sufficient importance to warrant monthly review: servicing delinquent accounts, foreclosures, Section 235 loans, MIP billing, forbearance, claims and reporting under the Single Family Default Monitoring System (SFDMS).  All other areas such as escrow analysis, adjustable rate mortgages, paid-in-full mortgages and assumptions may be reviewed on a quarterly basis.

Other Issues

The Department has found that many lenders are not submitting the correct monthly MIP to HUD or are failing to submit monthly MIP at all.  It is the servicer's responsibility to ensure the correct monthly MIP is being

submitted.  It is especially important to determine the correct MIP has been paid on all loans being purchased from other lenders.  Therefore, your quality control reviews of escrow accounts must include a review of the Mortgage Insurance Certificate to check the Section of the Act Code and date of endorsement.  This will determine whether a monthly or risk-based premium is due.  This review must include a sampling of recently purchased loans.

In addition, the Department has found the location of loans to be a problem.  Therefore, servicers must include a review of the Mortgage Record Change, HUD-92080, in their quality control reviews to ensure these forms are completed when loans are sold to another servicer.  It is also important to review recently purchased loans to ensure the selling servicer submitted the 92080.  Therefore, your quality control reviews of transfers of servicing must include a sampling of each recently purchased portfolio.

General

Use of Outside Firms

Those lenders who elect to not perform their own quality control are free to make use of outside firms that provide this service.  Service provided by these firms must comply with the Department's quality control requirements, and must provide written reports to management.  The lender will be responsible for ensuring these requirements are met.  Lenders must carefully review and analyze the results of these quality control efforts and take prompt corrective measures when specific deficiencies are noted or procedural problems are identified.  Also, any instance of mortgage finance fraud must be reported to the Department.

_____

5

File Retention

The results of quality control reviews, whether performed by the lender or an outside firm, must be retained by the lender for a period of one year.

Lenders must have effective Quality Control Plans to ensure that the Direct Endorsement Program continues to be a success.  The Mortgagee Review Board has imposed administrative sanctions on lenders for failing to have or implement a Quality Control Plan.  Referrals may also be made to the Housing Civil Penalty Panel which may impose monetary penalties against lenders found to be in noncompliance with the Department's Quality Control requirements.

If you have any questions on this letter, please contact the Office of Lender Activities and Land Sales Registration at (202)708-1824.

Sincerely,


Nicolas P. Retsinas
Assistant Secretary For Housing
- Federal Housing Commissioner

*U.S. G.P.O.:1993-342-362:80109