**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of Southwest Corporate Federal Credit Union and Members United Corporate Federal Credit Union, <br><br> Plaintiff, <br> v. <br><br> UBS SECURITIES LLC, <br><br> Defendant. | No. 13-cv-6731 (DLC) <br><br> **FILED UNDER SEAL** |
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of Southwest Corporate Federal Credit Union and Members United Corporate Federal Credit Union, <br><br> Plaintiff, <br> v. <br><br> CREDIT SUISSE SECURITIES (USA) LLC, CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., <br><br> Defendants. | No. 13-cv-6736 (DLC) <br><br> **FILED UNDER SEAL** |

**NCUA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR**
**SUMMARY JUDGMENT REGARDING DAMAGES**

# TABLE OF CONTENTS

BACKGROUND .................................................................................................................2

I.    Credit Unions' Purchases of the RMBS Certificates.................................................2

II.    The Credit Unions Fail:  Enter NCUA-Exec, the Appointment of NCUA-Liq, and the NGN Program ...................................................................................................3

III.    NCUA's Expert Reports ...........................................................................................10

    A.    Calculating the "Amounts Received for or on Account of the Disposition" of the Certificates in the NGN Program ...........................................................11

    B.    Calculating Prejudgment Interest ...................................................................13

    C.    Expert Report Regarding NGN Program ......................................................13

IV.    Defendants' Expert Reports......................................................................................14

STANDARD....................................................................................................................14

ARGUMENT....................................................................................................................15

I.    NCUA-Liq Is Entitled To Damages Because It No Longer Owns the Certificates...............15

    A.    The NGN Transactions Constitute "Sales" under the Illinois and Texas Securities Laws.................................................................................................17

    B.    NCUA-Liq "No Longer Owns" the Certificates Because It Cannot Tender the Certificates to Obtain Rescission....................................................................19

    C.    The NGN Transactions Constitute Sales under NCUA's Regulations ......................20

    D.    Defendants' Contrary Arguments Are Unpersuasive.....................................23

        1.    The Liquidation Estates Relinquished Effective Control over the Certificates...................................................................................................23

        2.    The Liquidation Estates Do Not Hold the Risk of the Certificates...............24

II.    The Net Proceeds Overstate the Amounts Received by the Liquidation Estates "for or on Account of" the Certificates..................................................................................26

    A.    NCUA's Damages Are Offset Only by the "Amounts Received on the Certificates" or the "Consideration Received for the Certificates."...........................26

    B.    The Amounts Received for the Guarantee Are Not Part of the Amounts Received "for or on Account of the Certificates" ...........................................28

C.    Dr. Finnerty Conservatively Calculated the "Consideration Received for the Certificates" and the "Amounts Received for or on Account of the Disposition of the Certificates"...................................................................................30

D.    Defendants' Damages Calculations Conflict with the Plain Language of the Illinois and Texas Securities Laws...........................................................................31

III.    The Illinois and Texas Securities Laws Exclude Principal Payments and Interest Payments from the Calculation of Prejudgment Interest...........................................................34

A.    The Illinois Blue Sky Law Excludes Principal Payments and Interest Payments from the Calculation of Prejudgment Interest...............................................34

B.    The Texas Blue Sky Law Excludes Principal Payments and Interest Payments from the Calculation of Prejudgment Interest ...............................................35

CONCLUSION..............................................................................................................................37

# TABLE OF AUTHORITIES

CASES

*A.G. Edwards, Inc. v. Sec'y of State, Dep't of Sec. of State of Ill.*, 772 N.E.2d 362 (2002) ............................27

*Adams v. Zimmerman*, 73 F.3d 1164 (1st Cir. 1996) ........................................................19

*AOL Time Warner, Inc. Sec. & "ERISA" Litig., In re*, 381 F. Supp. 2d 192 (S.D.N.Y. 2004)..................................................................................................................16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...........................................14

*Arthur v. Catour*, 833 N.E.2d 847 (2005) ....................................................28, 29

*Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812 (Tex.1997) ....................33

*Broderbund/Learning Co. Sec. Litig., In re*, 294 F.3d 1201 (9th Cir. 2002)..................33

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..................................................14

*Chris-Craft Indus. v. Piper Aircraft Corp.*, 516 F.2d 172 (2d Cir. 1975), *rev'd on other grounds, Piper v. Chris-Craft Indus.*, 430 U.S. 1 (1977) ....................................12

*Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430 (Tex. 2007)........................27, 37

*City of Houston v. Bates*, 406 S.W.3d 539 (Tex. 2013).....................................37

*Disher v. Fulgoni*, 514 N.E.2d 767 (Ill. App. Ct. 1987) .....................................17

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ........................15

*F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680 (Tex. 2007).................16, 34

*FHFA v. Nomura Holding Am., Inc.*,

    2015 WL 629336 (S.D.N.Y. Feb. 13, 2015) ..................................................22

    2015 WL 640875 (S.D.N.Y. Feb. 16, 2015) ..................................................35

*Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*, 97 S.W.3d 779 (Tex. App. 2003), *rev'd on other grounds*, 161 S.W.3d 482 (Tex. 2005)....................................16-17

*Goldfine v. Barack, Ferrazzano, Kirschbaum & Perlman*, 18 N.E.3d 884 (Ill. 2013) .............2, 13, 16, 34, 35

*Gomez v. Franco*, 677 S.W.2d 231 (Tex. App. 1984) ........................................18

*Graco, Inc. v. CRC, Inc. of Texas*, 47 S.W.3d 742 (Tex. App. 2001) ........................28

*Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275 (S.D.N.Y. 1998) ..........18, 22

*Haygood v. De Escabedo*, 356 S.W.3d 390 (Tex. 2011) ................................................................33

*Hicks v. Baines*, 593 F.3d 159 (2d Cir. 2010) ............................................................................15

*Huett v. State*, 1998 WL 297206 (Tex. App. June 9, 1998) .........................................................17

*Katz v. Comdisco, Inc.*, 117 F.R.D. 403 (N.D. Ill. 1987) ...........................................................33

*Kern Cty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582 (1973) ..................................18

*Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538 (3d Cir. 1979) ...................25

*Monetary Mgmt. Grp. of St. Louis, Inc. v. Kidder, Peabody & Co.*, 604 F. Supp. 764 (E.D. Mo. 1985) ...........................................................................................................19, 20, 22

*Morales v. Gould Inv'rs Tr.*, 445 F. Supp. 1144 (S.D.N.Y. 1977) *aff'd* 578 F.2d 1369 (2d Cir. 1978) ....................................................................................................................18

*Muranyi v. Turn Verein Frisch-Auf*, 719 N.E.2d 366 (1999) ......................................................28

*NCUA v. Fisher*, 653 F. Supp. 349 (E.D. Mo. 1986) ...............................................................3, 26

*O. P. M. Leasing Servs., Inc., In re*, 23 B.R. 104 (Bankr. S.D.N.Y. 1982) ..................................18

*Oil Country Haulers, Inc. v. Griffin*, 668 S.W.2d 903 (Tex. App. 1984) ....................................28

*People v. Gillett*, 243 Ill. App. 41 (1926) .................................................................................17

*Posner v. Davis*, 395 N.E.2d 133 (1979) ..................................................................................33

*Randall v. Loftsgaarden*, 478 U.S. 647 (1986) .................................................................*passim*

*Ridinger v. Dow Jones & Co.*, 651 F.3d 309 (2d Cir. 2011) .....................................................15

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) ................23

*Rubin v. United States*, 449 U.S. 424 (1981) ...........................................................................17

*Sash v. Zenk*, 344 F. Supp. 2d 376 (E.D.N.Y. 2004) *aff'd*, 428 F.3d 132 (2d Cir. 2005), *as amended on denial of reh'g*, 439 F.3d 61 (2d Cir. 2006) ..............................................36

*State v. Pub. Util. Comm'n of Tex.*, 344 S.W.3d 349 (Tex. 2011) ..............................................17

*Todd v. Exxon Corp.*, 275 F.3d 191, 205 (2d Cir. 2001) ...........................................................23

*West v. Am. Tel. & Tel. Co.*, 311 U.S. 223 (1940) ....................................................................34

*Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028 (2d Cir. 1979) .......................................................20, 33

*Wills v. Foster*, 892 N.E.2d 1018 (Ill. 2008) ....................................................................29-30, 32

*Wright v. Goord*, 554 F.3d 255 (2d Cir. 2009) ...........................................................................................15

STATUTES, REGULATIONS, AND RULES

12 U.S.C.

§ 1752(a)...........................................................................................................................26

§ 1766 ...............................................................................................................................21

§ 1781 .................................................................................................................................4

§ 1787 ..........................................................................................................................21, 25

§ 1787(b) .............................................................................................................................4

§ 1787(b)(2) ......................................................................................................................25

§ 1787(f)(2) .....................................................................................................................9, 25

§ 1789 ...............................................................................................................................21

15 U.S.C. § 77*l*(a)(2) ...........................................................................................................35

D.C. Code § 31-5606.05 .......................................................................................................35

Illinois Securities Law of 1953, 815 Ill. Comp. Stat. Act 5 (Illinois Blue Sky Law) ........................*passim*

§ 2.5 ..................................................................................................................................17

§ 13 .............................................................................................................................*passim*

Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581 (Texas Blue Sky Law)...............................*passim*

§ 4(E) ................................................................................................................................17

§ 33 .............................................................................................................................*passim*

Va. Code Ann. § 13.1-522.....................................................................................................35

12 C.F.R. § 709.10................................................................................................................21

Fed. R. Civ. P.

1 ......................................................................................................................................14

56(a)..................................................................................................................................14

56(e)..................................................................................................................................15

Final Rule, *Involuntary Liquidation of Federal Credit Unions and Adjudication of Creditor Claims Involving Federally-Insured Credit Unions in Liquidation*, 65 Fed. Red. 55,439 ...........................................................................................................................21

Proposed Rule, NCUA, 79 Fed. Reg. 36,252 (June 26, 2014).................................................21

OTHER MATERIALS

Black's Law Dictionary (10th ed. 2014).................................................................................36

Joseph C. Long, 12A Blue Sky Law § 9:15 (2015) ...............................................................36

Restatement (First) of Restitution (1937)..............................................................................27

S. Rep. No. 47, 73d Cong., 1st Sess., 1 (1933)......................................................................27

Statement of Financial Accounting Standards No. 140 ....................................................22, 24

NCUA, as liquidating agent ("NCUA-Liq") for Members United Corporate Federal Credit Union ("Members United") and Southwest Corporate Federal Credit Union ("Southwest" and together with Members United, "the Credit Unions"), respectfully submits this memorandum of law in support of its motion for summary judgment regarding the calculation of damages in these actions under the Illinois Securities Law of 1953, 815 Ill. Comp. Stat. Act 5 (the "Illinois Blue Sky Law"), and the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581, § 33 (the "Texas Blue Sky Law").

If NCUA-Liq can prove liability at trial, there is no genuine dispute as to any material fact regarding the proper computation of damages.  The first step in this analysis is to determine whether rescission or money damages is the appropriate remedy:  both the Illinois and Texas Blue Sky Laws provide for rescission if the plaintiff still owns the securities at issue; or, if the plaintiff "no longer owns" the securities, for money damages.  With the assistance of Barclays Capital ("Barclays"), a leading Wall Street investment bank, NCUA-Liq sold the residential mortgage-backed securities ("RMBS") certificates at issue in these actions (the "Certificates") to independent trusts in a series of market re-securitization transactions in 2010 and 2011 called the NCUA Guaranteed Notes ("NGN") Program.  Each of the relevant offering documents accurately describes these market transactions as "sales."  Because of these sales of the Certificates, it is undisputed that NCUA-Liq cannot tender the Certificates back to Defendants to obtain rescission.  Accordingly, the undisputed facts show that NCUA-Liq no longer owns the RMBS Certificates at issue in these actions (the "Certificates"), and thus is entitled to damages rather than rescission.

The Illinois and Texas securities laws provide that damages are calculated as  (1) the price originally paid to purchase the security, less (2) the principal pre-payments and interest income received, less (3) the amount received by the plaintiff "for or on account of" that security when it was sold or "disposed of."  The prices paid for the Certificates are undisputed:  each purchase of

each Certificate is supported by clear documentary evidence setting forth the applicable purchase price. The principal payments and interest income received by the Credit Unions are also undisputed. Finally, the only possible "disposition" in this case was the NGN Program and there is no genuine dispute of material fact regarding the amounts received by NCUA-Liq "for or on account of" the Certificates at issue through the NGN Program. Barclays allocated the total proceeds from the NGN Transactions to each Certificate based on its "intrinsic" value at the time of the NGN Transactions. Because these amounts also reflect the value of a Government guarantee on the Certificates, they represent the upper bound of what NCUA-Liq received "for or on account of" the Certificates themselves.

Finally, the Court should rule as a matter of law that prejudgment interest is calculated on the prices the Credit Unions paid for the Certificates, prior to subtracting any principal payments or interest payments on the Certificates. The Illinois Supreme Court has held that the Illinois Blue Sky Law "unambiguously requires the calculation of interest prior to deducting any amounts received by the purchaser of the securities." *Goldfine v. Barack, Ferrazzano, Kirschbaum & Perlman*, 18 N.E.3d 884, 898 (Ill. 2013). The Texas Blue Sky Law contains language nearly identical to the Illinois statute, and it is likely that the Supreme Court of Texas would follow the Illinois Supreme Court's well-reasoned decision.

## BACKGROUND

## I.   Credit Unions' Purchases of the RMBS Certificates

Before their liquidation, Members United and Southwest were two of the four largest corporate credit unions in the country. *See* NCUA's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment Regarding Damages ("SUF") ¶ 10. As corporate credit unions, Members United and Southwest provided investment and financial services to

hundreds of smaller credit unions that served primarily individual members.  SUF ¶ 11.  Corporate credit unions were systemically important institutions within the credit union system.  SUF ¶ 11.

This action involves 29 RMBS Certificates that were purchased from Credit Suisse and UBS (collectively, "Defendants") between January 26, 2006 and July 27, 2007.  SUF ¶ 7.  Defendants sold each of the Certificates pursuant to a Shelf Registration Statement, a Prospectus, a Prospectus Supplement, and in some instances a free writing prospectus (collectively, the "Offering Documents").  SUF ¶ 8.  In the Offering Documents, Defendants made numerous specific representations about the characteristics of the Mortgage Loans underlying the Certificates.  Specifically, Defendants represented that the underlying Mortgage Loans had been originated pursuant to an originator's underwriting guidelines, that the Mortgage Loans had certain loan-to-value ratios, and that a certain number of the Mortgage Loans were secured by owner-occupied properties.  SUF ¶ 9. Those representations were false.  As a result, the underlying Mortgage Loans performed far worse than anticipated and the Certificates plummeted in value, ultimately forcing the Credit Unions into liquidation and destabilizing the credit union system.  SUF ¶ 12.

## II.   The Credit Unions Fail:  Enter NCUA-Exec, the Appointment of NCUA-Liq, and the NGN Program

As relevant here, NCUA acts in two different capacities.  *First*, NCUA acts in its capacity as liquidating agent for the Credit Unions; when acting in this way, NCUA is described as "NCUA-Liq."  *Second*, NCUA acts in its capacity as a federal agency and part of the Executive Branch of the United States Government; when acting in this way, NCUA is described as "NCUA-Exec."  *See NCUA v. Fisher*, 653 F. Supp. 349, 350 (E.D. Mo. 1986) ("NCUA[] acting as liquidating agent for [a liquidated entity] is clearly a separate entity from NCUA[] acting as insurer/regulator.").[1]

---

[1] Throughout this litigation, we have typically used "NCUA" to refer to NCUA as Liquidating Agent.  Because in this memorandum we discuss the different roles played by these distinct entities so much, we refer to them separately as "NCUA-Liq" and "NCUA-Exec."

A.      NCUA-Exec is responsible for regulating and protecting the national system of federally insured credit unions.  *See* 12 U.S.C. § 1781.  From 2009 to 2010, the four largest corporate credit unions in the United States failed, due primarily to the large amounts of distressed RMBS they held as investments.  Because these corporate credit unions held the deposits and capital contributions of the thousands of natural-person credit unions throughout the United States (who in turn, served millions of individual account holders), the failure of these corporate credit unions created a tremendous liquidity crisis in, and threatened the existence of, the entire credit union system.  SUF ¶ 12.

NCUA-Exec placed the two largest corporate credit unions – U.S. Central and WesCorp – into conservatorship on March 20, 2009, and ultimately liquidation on September 24, 2010.  *See* SUF ¶ 13.  NCUA-Exec placed Members United and Southwest into conservatorship on September 24, 2010, and liquidation on October 31, 2010.  *See* SUF ¶ 14.  As a result of NCUA-Exec's actions, NCUA-Liq became conservator, and then liquidating agent, of these Credit Unions.  *See* 12 U.S.C. § 1787(b); SUF ¶¶ 15-16.

B.      In an effort to provide the liquidity necessary to stabilize the credit union system, NCUA-Exec instituted the Corporate System Resolution Program, which was announced on September 24, 2010. SUF ¶ 17.  As part of this Program, the Credit Unions' distressed assets – including the Credit Unions' large RMBS portfolios and the specific Certificates at issue in these cases – were held in independent estates (the "Liquidation Estates") managed by NCUA-Liq.  SUF ¶ 18.  NCUA-Liq retained Barclays to sell the liquidated Credit Unions' distressed assets in order to raise necessary liquidity.  SUF ¶ 21.

Barclays concluded that it would be difficult or impossible to sell the Credit Unions' RMBS portfolios in an outright "as-is" sale directly to investors because there was very little demand for impaired RMBS securities at the time.  As NCUA-Exec deputy executive director Larry Fazio

testified, the Credit Unions' RMBS had "bec[o]me very illiquid and the market values were very—very impaired by the economic conditions." SUF ¶ 22. ███████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████. SUF ¶ 23. Accordingly,

NCUA-Liq and Barclays investigated alternatives to an outright sale that would enable NCUA-Liq

to obtain far greater value for the Liquidation Estates and the credit union system. SUF ¶ 25. These

efforts led to the re-securitization and sale of the Certificates through the NGN Program.

The NGN Program was a re-securitization of distressed investment securities (the

"Underlying Securities") from five failed corporate credit unions, including Members United and

Southwest. SUF ¶ 26. These Underlying Securities included each of the Certificates at issue in these

actions, as well as hundreds of other RMBS, commercial mortgage-backed securities ("CMBS"), and

other asset-backed securities. SUF ¶¶ 27-28. The purpose of the NGN Program was to allow the

Liquidation Estates to obtain far more proceeds than they could have obtained through an outright

sale of these Underlying Securities at severely depressed market values. SUF ¶ 29. To help achieve

this goal, NCUA-Exec agreed to provide a guarantee, backed by the full faith and credit of the

United States, to ensure payments on the re-securitized NGN Notes for investors (the

"Guarantee"). SUF ¶¶ 64, 66. The Guarantee was a central feature of the NGN Program – it

transformed the Underlying Securities from distressed securities into essentially riskless assets and

substantially increased the amounts investors were willing to pay for the re-securitized NGN Notes.

SUF ¶ 98.

The mechanics of each NGN Transaction were as follows. At the outset of each

transaction, the Liquidated Estate transferred the Underlying Securities to one of thirteen

independent trusts created by NCUA-Liq (the "NGN Trusts"). SUF ¶¶ 34-35, 52-53. Each NGN

Trust was a legally distinct entity with an independent trustee and independent administrator. SUF

¶¶ 33, 51.  Each transfer of Underlying Securities constituted an irrevocable and absolute sale of the assets by the Liquidation Estates to the NGN Trusts.  SUF ¶¶ 37-38, 54-55.  The Trust Agreements effectuating the transactions, for instance, provided that "[t]he conveyance of the Underlying Securities . . . by [the Liquidation Estates] . . . is absolute and is intended by the parties . . . to constitute a sale of the Underlying Securities."  SUF ¶ 37.  The Agreements further provided that "the [Liquidation Estates] . . . shall [not] be able to revoke the Trust established hereunder" or "withdraw from the Trust, the Underlying Securities."  SUF ¶ 38.

After receiving the Underlying Securities from the Liquidation Estates, the NGN Trusts issued two kinds of securities backed by the Underlying Securities:  The first were called NCUA Guaranteed Notes ("NGN Notes"), which were issued to investors in the marketplace.  SUF ¶ 64.  As set forth in Figure 1, the NGN Notes were funded by cash flows from the Underlying Securities.  SUF ¶ 65.  NGN Noteholders also received the benefit of a Guarantee from NCUA-Exec – backed by the full faith and credit of the United States – that they would receive all interest payments and principal repayments on the NGN Notes.  SUF ¶ 66.

**Figure 1:  Value of NGN Notes to Investors**



NCUA-Exec provided that Guarantee at a steep discount, charging the NGN Trusts a fee of 35 basis points (0.35%) per year on the outstanding principal balance of the NGN Notes.  SUF ¶¶ 69-70.  That rate was far below the market value of such ironclad insurance.  SUF ¶ 69.  Indeed, there is no market evidence that any private insurer would have agreed to insure those securities for any

price during the times of the NGN Transactions; and no private insurer could have offered a guarantee as valuable as the U.S. Government's.  SUF ¶ 71.  NCUA-Exec also retained the right of reimbursement from the NGN Trusts for any Guarantee payments it would have to make.  SUF ¶ 72.

The NGN Trusts received $28.3 billion in cash from the sale of NGN Notes to the market (the "Net Proceeds"), which the Trusts passed to the Liquidation Estates as of the closing date of the NGN Notes.  SUF ¶ 73.  These Net Proceeds represented the amounts that investors paid for the NGN Notes and NCUA-Exec's Guarantee of payment on those Notes.

*Second*, the NGN Trusts issued Owner Trust Certificates ("OTCs").  SUF ¶ 74.  The OTCs entitled the holders of these securities to any residual cash flows from the Underlying Securities that might exist at maturity of the NGN Notes.  SUF ¶ 76.  In other words, as depicted below in Figure 2, the OTCs would have value if, at maturity of the NGN Notes, some money remained after all obligations of the NGN Trusts had been satisfied, including all principal and interest payments to investors on the NGN Notes, all trust expenses, NCUA-Exec's 35 bps Guarantee fee, and all reimbursements of Guarantee payments made by NCUA-Exec.  SUF ¶ 76.  The Liquidation Estates received these OTCs in addition to the Net Proceeds.  SUF ¶ 74.[2]

---

[2] Because the NGN Transactions were market transactions, the values exchanged by the parties to the NGNs transactions were equivalent, and can be expressed by the following equation, with each component reflecting the fair market value of that component (*see* SUF ¶ 77):

**Certificates + Guarantee = Net Proceeds + Owner Trust Certificates + Guarantee Fee**

Figure 2:  Cash Flow Waterfall



C.    Barclays structured the NGN Transactions to achieve two primary goals:  (1) to maximize the Net Proceeds (that is, the cash received upfront by the Liquidation Estates); and (2) to minimize the unreimbursed payments NCUA-Exec would have to make as a result of the Guarantee.  SUF ¶ 78.  To achieve these goals, Barclays designed the NGN Transactions so that the cash flows from the Underlying Securities would exactly equal all obligations of the NGN Trusts – *i.e.*, the trust fees, principal repayment and interest coupon obligations on the NGN Notes, any reimbursement to NCUA-Exec of Guarantee Payments, and the 35 bps Guarantee fee.  SUF ¶¶ 78-79.  Because nothing was projected to be left over after all the obligations of the NGN Trusts were satisfied, the OTCs were designed to receive zero net cash flows (and, hence, to make zero

payments to the holder of the OTCs).  SUF ¶ 80.  As Barclays's 30(b)(6) witness testified, Barclays "targeted" cash flows on the OTCs "as close to zero as possible."[3] SUF ¶ 77.

To achieve these goals, Barclays priced the NGN Notes by assigning an "intrinsic value" to each Certificate, which reflected Barclays's best estimate of the present value of all future cash flows from that Certificate.  SUF ¶ 84.  These intrinsic values significantly exceeded the impaired market value of each Certificate.  SUF ¶ 85.  Barclays set the issuance value of each NGN (in other words, the market price of the NGN Notes) as equal to the total intrinsic value of the Underlying Securities backing that NGN.  SUF ¶ 87.  Hence, the Net Proceeds of the NGN Notes were equal to the intrinsic values of each Underlying Security (minus any underwriting fees and pricing discounts). SUF ¶¶ 74, 87.

It is undisputed that the Guarantee provided by NCUA-Exec was a critical and valuable component of the NGN Program.[4]  That Guarantee transformed the underlying Certificates from highly speculative and distressed investments into essentially riskless assets.  SUF ¶ 98.  ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████  SUF ¶ 88.  By way of comparison, the cash flows from the 35

---

[3] One NGN Transaction not at issue in this litigation was collateralized by CMBS and was projected to have positive residual cash flows.  SUF ¶ 81.

[4] It is undisputed that NCUA-Exec issued this Guarantee in its capacity as a federal agency of the United States Government.  SUF ¶ 67.  Because NCUA-Liq's liability is limited to the property of the liquidated entity, *see* 12 U.S.C. § 1787(f)(2), a guarantee by NCUA-Liq would have been backed only by the value of the Liquidation Estates – which would have made such a guarantee essentially worthless.

bps Guarantee fee were approximately $99 million in the first year of the NGN Program (.35% *
$28.3 billion) and less each subsequent year as the principal balance of the NGN Notes paid down.
SUF ¶ 70.  The remaining value of the Guarantee (*i.e.*, the value in excess of the 35 bps fee ("Excess
Value")) accrued to the Liquidation Estates, which received all of the Net Proceeds from the NGN
Transactions.  SUF ¶ 73.

The NGN Program issued $28.3 billion of NGNs in thirteen transactions between October
2010 and June 2011; of these, eight were collateralized by RMBS Certificates at issue in these cases.
SUF ¶¶ 31, 73.  The proceeds from these NGNs were used to pay the debts of the failed corporate
credit unions, provide necessary liquidity to natural person credit unions, and stabilize the credit
union system.  SUF ¶¶ 12-14, 17-18.  The undisputed record evidence shows that had NCUA-Exec
not provided a Government Guarantee – leaving NCUA-Liq to sell the Certificates into the market
"as is" for whatever investors would have paid for the Certificates themselves – the Liquidation
Estates would have received far less value.  SUF ¶ 88.

### III.   NCUA's Expert Reports

On August 14, 2015, NCUA-Liq submitted expert reports in these actions from Dr. John
Finnerty that calculated NCUA-Liq's damages under the Illinois and Texas Blue Sky Laws.  *See* SUF
¶ 115.  The Illinois Blue Sky Law provides:

> [T]he [defendant] shall be jointly and severally liable to the purchaser as follows:
>
> (1) for the full amount paid, together with interest from the date of payment for the
> securities sold at the rate of the interest or dividend stipulated in the securities sold
> (or if no rate is stipulated, then at the rate of 10% per annum) less any income or
> other amounts received by the purchaser on the securities, upon offer to tender to
> the seller or tender into court of the securities sold or, where the securities were not
> received, of any contract made in respect of the sale; or
>
> (2) if the purchaser no longer owns the securities, for the amounts set forth in clause
> (1) of this subsection A less any amounts received by the purchaser for or on
> account of the disposition of the securities.

815 Ill. Comp. Stat. 5/13.  The Texas Blue Sky Law provides:

A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security. . . .

\* \* \* \*

On rescission, a buyer shall recover (a) the consideration he paid for the security plus interest thereon at the legal rate from the date of payment by him, less (b) the amount of any income he received on the security, upon tender of the security (or a security of the same class and series). . . .

\* \* \* \*

In damages, a buyer shall recover (a) the consideration the buyer paid for the security plus interest thereon at the legal rate from the date of payment by the buyer, less (b) the greater of:

      (i) the value of the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security; or

      (ii) the actual consideration received for the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security.

Tex. Rev. Civ. Stat. Ann. art. 581, § 33.

### A.    Calculating the "Amounts Received for or on Account of the Disposition" of the Certificates in the NGN Program

The Illinois and Texas securities laws provide that a plaintiff's damages are offset by the amounts received by the plaintiff "for" or "on account of" the disposition of the securities. ██

████████████████████████████████████████████████████

████████████████████████████████████████████ SUF

¶ 95.[5] That is an extremely conservative figure that is highly favorable to Defendants in computing

---

    [5] The parties agree that the relevant dates of disposition, for purposes of calculating damages, are the dates of the last distribution of principal and interest on the Certificates before they were transferred to the NGN Trusts. *See* SUF ¶¶ 125-128.  The prices paid for the Certificates are

damages.  As discussed above, the Net Proceeds included the amounts paid by investors (and received by the Liquidation Estates) for (1) the cash flows from the Certificates up to the amount of the payments on the NGN Notes and (2) NCUA-Exec's Guarantee of payments.  Accordingly, the Net Proceeds significantly overstate the "amounts received for or on account of" the Certificates themselves.  ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████ SUF ¶ 88.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ *See* SUF ¶ 95. ███████████████████████████████████

█████████████████████████████████████████████ SUF ¶ 95.  These IDC values are "market-based measurements that represent [IDC's] good faith opinion as to what the holder would receive in an orderly transaction . . . under current market conditions."  SUF ¶ 92.  Because IDC prices do not account for the significant illiquidity that would result from selling billions of dollars of distressed RMBS securities into the market simultaneously or in a short period, they are themselves artificially high.[6]  SUF ¶ 96.  Nonetheless, the IDC prices for these RMBS were on average 24% lower than the Net Proceeds, confirming that the Net Proceeds overstate the amounts received "for or on account of" the Certificates themselves in the NGN Transactions.  SUF ¶ 97.

---

also undisputed, as are the principal payments and interest income received by the Credit Unions on the Certificates.  SUF ¶ 129 & Tbl. 1.

[6] *See Chris-Craft Indus. v. Piper Aircraft Corp.*, 516 F.2d 172, 184 n.13 (2d Cir. 1975), *rev'd on other grounds, Piper v. Chris-Craft Indus.*, 430 U.S. 1 (1977) ("[T]he fair market value of a large block of [securities] actually may be substantially less than the quoted market price because of the inability of the market to absorb a sale of the entire block.").

### B.        Calculating Prejudgment Interest

Dr. Finnerty also calculated NCUA-Liq's prejudgment interest, which is mandatory under both the Illinois and Texas securities laws.  The Illinois Blue Sky Law provides that prejudgment interest is calculated on "the full amount paid" for the security, 815 Ill. Comp. Stat. 5/13.  The Illinois Supreme Court has held that this plain language mandates that prejudgment interest must be calculated on the price the plaintiff paid for the security, and not on the remaining principal balance of the security at some later point in time.  *Goldfine*, 18 N.E.3d at 890.  The Texas Blue Sky Law uses substantively identical language, providing that prejudgment interest is calculated on "the consideration the buyer paid" for the security, prior to subtracting "any income the buyer received." Tex. Rev. Civ. Stat. Ann. art. 581, § 33. ████████████████████████████████

████████████████████████████████████████████████████████

███████████████████

### C.        Expert Report Regarding NGN Program

NCUA also submitted an expert report in these actions from Professor Adam Levitin regarding the NGN Program.  *See* SUF ¶¶ 116-117.  Prof. Levitin explained that the marketplace would view the NGN Program as a sale of the Certificates.  Although NCUA believed (and still believes) that whether the NGN Program constitutes a disposition of the Certificates under the Illinois and Texas securities laws presents a legal question for the Court to resolve, NCUA submitted Prof. Levitin's expert report out of an abundance of caution in the event that the issue needed to be presented to a fact finder at trial.

---

[7] Anticipating a legal dispute regarding the appropriate calculation of prejudgment interest, Dr. Finnerty also provided certain alternative calculations using various rates and methodologies. Dr. Finnerty also reserved the right to make additional calculations if the Court were to find that some other interest rate or methodology was required.

**IV.    Defendants' Expert Reports**

On October 16, 2015, Defendants submitted their own expert reports on damages.  *See* SUF ¶ 118.  As relevant to this summary judgment motion, Defendants' experts █████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ SUF ¶ 123.

Alternatively, Defendants' experts ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ █████████████████████ SUF ¶ 124. Finally, Defendants' experts █████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████

Defendants also submitted expert reports from Dr. Christopher James and Professor Jonathan Lipson ███████████████████████████████████████████████████████████ ███████████  *See* SUF ¶ 119.

**STANDARD**

Summary judgment is a procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute concerning a factual issue is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party" on the issue.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  An issue of fact is "material" only if it "might affect the outcome of the suit under the governing law."  *Id.*

The movant has the burden of demonstrating the absence of a genuine dispute concerning a material fact and establishing that summary judgment is appropriate as a matter of law. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). Once the movant has met that initial burden, summary judgment is appropriate unless the non-movant is able to "set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). The non-movant cannot "merely rest on the allegations or denials" in its pleadings. *Id.* "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," *Ridinger v. Dow Jones & Co.*, 651 F.3d 309, 317 (2d Cir. 2011), as are "mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

## ARGUMENT

### I.    NCUA-Liq Is Entitled To Damages Because It No Longer Owns the Certificates

Under the Illinois and Texas securities laws, the calculation of damages depends on whether the plaintiff "no longer owns" the securities.[8] If the plaintiff still owns the securities, then it is entitled to actual rescission upon tender of the securities. On the other hand, if the plaintiff "no longer owns" the securities, then it is entitled to damages based on the difference between the price the plaintiff paid for the securities and the amounts received by the plaintiff "for" or "on account of" those securities upon "disposition" of the securities.

NCUA-Liq "no longer owns" the Certificates because it sold them through the NGN Program.



*See* SUF ¶ 122

---

[8] *See* 815 Ill. Comp. Stat. 5/13 (providing for rescission "upon tender" of the securities or for damages "if the purchaser no longer owns the securities"); Tex. Rev. Civ. Stat. Ann. art. 581, § 33 (providing for rescission "upon tender" of the securities, "or for damages if the buyer no longer owns the security").

██████████████████████████████████████████████████████; *cf.*

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 247 (S.D.N.Y. 2004) (where

plaintiff had not "sold" the security, plaintiff was entitled to rescission rather than damages under

federal securities laws).  The Illinois and Texas securities laws broadly define a "sale" to include

every disposition of a security or interest in a security for value.  The sales of the Certificates to the

NGN Trusts fall comfortably within those expansive definitions.  Each of the NGN Transactions

constitutes sales of the Certificates under the express terms of the governing agreements for those

market transactions; under the definitions provided by the Texas and Illinois blue sky laws; and

under the standard provided by NCUA-Exec's own regulations.

　　　　That conclusion also follows from the undisputed fact that NCUA-Liq cannot tender the

Certificates back to Defendants; accordingly, actual rescission – the only alternative to damages

under the Illinois and Texas blue sky laws – is not an available remedy.  NCUA-Liq relinquished all

effective control over the Certificates – including the ability to tender the Certificates – when it

transferred them to the NGN Trusts.

　　　　Because NCUA-Liq "no longer owns" the Certificates, it is entitled to damages under the

Texas and Illinois blue sky laws based in part on the difference between the price paid for the

Certificates and the amounts received "for or on account of" those Certificates upon their

"disposition" in the NGN Program.  This question regarding the meaning of statutory language and

the availability of a civil remedy is an issue of law for the Court to resolve.  *See Goldfine*, 18 N.E.3d at

890 ("The applicability of the civil remedies provisions of section 13(A) of the Illinois [Blue Sky]

Law" is a "question of statutory interpretation" and thus a "question of law") (citation omitted);

*F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 683 (Tex. 2007) ("Statutory construction is a

legal question."); *Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*, 97 S.W.3d 779, 785 (Tex. App.

2003), *rev'd on other grounds*, 161 S.W.3d 482 (Tex. 2005) ("[W]hether a remedy exists under [the Texas

Blue Sky Law] is a question of law.").

A.    The NGN Transactions Constitute "Sales" under the Illinois and Texas
       Securities Laws

The Illinois Blue Sky Law defines "sale" to "include every contract of sale or disposition of a

security or interest in a security for value." 815 Ill. Comp. Stat. 5/2.5.  The Texas Blue Sky Law

similarly defines "sale" to "include every disposition, or attempt to dispose of a security for value,"

as well as "any transfer or agreement to transfer, in trust or otherwise." Tex. Rev. Civ. Stat. Ann.

art. 581, § 4(E).  These definitions are intended to be "broad" and "liberal".  *See State v. Pub. Util.*

*Comm'n of Tex.*, 344 S.W.3d 349, 359 n.56 (Tex. 2011) ("As with the federal securities statutes, the

Texas definition of 'sale' of a security is broad, including 'every disposition' and 'any transfer or

agreement to transfer.'"); *Disher v. Fulgoni*, 514 N.E.2d 767, 772 (Ill. App. Ct. 1987) ("The definition

of a sale under our Securities Law is itself liberal; its purpose has been held to include every

transaction which reasonably could be regarded as a sale.").  Accordingly, "sales" under these laws

include the transfer of any "portion" of a security, *Huett v. State*, 1998 WL 297206, at *6 (Tex. App.

June 9, 1998) (assignment of "one percent of [party's] twenty percent carried working interest"

constituted a sale), as well as the exchange of one security for another, *People v. Gillett*, 243 Ill. App.

41, 47 (1926); *see also Rubin v. United States*, 449 U.S. 424, 429 (1981) (pledge of a security as collateral

for a loan constituted a "sale" under federal securities laws, even though the pledge "transfer[red]

less than absolute title").

The NGN Transactions (which included each of the Certificates in these actions) clearly

satisfy this expansive standard.  The relevant documents refer consistently to the NGN Transactions

as "Sale[s]" of the Certificates and to NCUA-Liq as the "Seller" of the Certificates.  For example,

the Trust Agreements state that NCUA-Liq is "the Seller" and further state that "[t]he conveyance

of the Underlying Securities . . . by the Seller . . . is absolute and is intended by the parties . . . to

constitute a sale of the Underlying Securities."  SUF ¶ 37; *see also* SUF ¶ 38 ("the Seller . . . shall [not]

be able to revoke the Trust established hereunder" and may not "withdraw from the Trust, the

Underlying Securities or any other asset constituting the related Trust Estate").  Similarly, the

Offering Memoranda for the NGN Transactions (which were distributed to investors) repeatedly

refer to NCUA-Liq as the "Seller" of the Certificates and state that "the Seller will Sell the

Underlying Securities" to the NGN Trusts.  These closing documents unambiguously express the

intent of all parties involved to treat the NGN Transactions as sales of the Certificates by the

Liquidation Estates to the NGN Trusts.[9]

Nor is there any reason to doubt the accuracy of those characterizations.  The NGN

Transactions bear the hallmarks of a sale of securities in the market.  NCUA-Liq transferred the

Certificates to the independent NGN Trusts in exchange for money provided by market investors,

who received the rights to future payments from the Certificates.  Defendants' own expert has

testified that this transaction constitutes a disposition of a security or interest in a security for value.

SUF ¶ 136.  That is more than enough to satisfy the "broad" and "liberal" standards set by Illinois

and Texas law for defining a "sale."

---

[9] *See Morales v. Gould Inv'rs Tr.*, 445 F. Supp. 1144, 1150 (S.D.N.Y. 1977) *aff'd* 578 F.2d 1369
(2d Cir. 1978) (holding that transaction constituted sale under Securities Exchange Act where
"circumstances indicate[d] that the parties understood and intended that the [transaction] was in fact
a sale" (quoting *Kern Cty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 603 (1973)); *Granite
Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 300 (S.D.N.Y. 1998) ("To determine whether
the parties to a transaction intended to create [a sale or a] a security interest, courts look to the
agreement governing the transaction. Where the parties' intention is clearly and unambiguously set
forth in the agreement, effect must be given to the expressed intent."); *Gomez v. Franco*, 677 S.W.2d
231, 235 (Tex. App. 1984) ("The question of whether a particular transaction is a sale or some other
type of transaction is determined by the intention of the parties."); *In re O. P. M. Leasing Servs., Inc.*,
23 B.R. 104, 116 n.8 (Bankr. S.D.N.Y. 1982) ("It would have been a simple matter for the parties
expressly to provide in the [transaction documents] for the grant of a security interest [rather than a
sale].").

**B.** **NCUA-Liq "No Longer Owns" the Certificates Because It Cannot Tender the Certificates to Obtain Rescission**

NCUA-Liq's inability to obtain rescission as a remedy here provides an independent and equally compelling way to conclude that NCUA-Liq "no longer owns" the Certificates as a matter of law. The Illinois and Texas blue sky laws provide two mutually exclusive remedies: a plaintiff is entitled to either (1) rescission "upon tender" of the security, or (2) damages if it "no longer owns" the security. *See* 815 Ill. Comp. Stat. 5/13; Tex. Rev. Civ. Stat. Ann. art. 581, § 33. Because these remedies are mutually exclusive, the securities laws equate a plaintiff's ability to tender a security with the plaintiff's ownership of that security.[10] Thus, under § 12 (which is generally similar to the state blue sky laws at issue here), a plaintiff "no longer owns" a security when the plaintiff relinquishes "sufficient control or authority to effectuate a tender of the securities in question." *Monetary Mgmt. Grp. of St. Louis, Inc. v. Kidder, Peabody & Co.*, 604 F. Supp. 764, 768 (E.D. Mo. 1985). Texas courts have adopted this same rule under the Texas Blue Sky Law. *See Summers v. WellTech, Inc.*, 935 S.W.2d 228, 233 (Tex. App. 1996) (citing *Monetary Mgmt. Grp.*, 604 F. Supp. at 768). The Illinois Blue Sky Law contains identical language, so it is likely that the Illinois Supreme Court would adopt the same rule.

Indeed, if ownership and ability to tender were not synonymous, then an entire class of plaintiffs would be left without a remedy under the securities laws. Such plaintiffs would be unable to accomplish actual rescission (because they could not tender the securities) but would be ineligible for damages (because they own the securities, and damages are available only to plaintiffs who "no longer own" the securities). That is contrary to the express purpose of the securities laws to provide

---

[10] *See Monetary Mgmt. Grp. of St. Louis, Inc. v. Kidder, Peabody & Co.*, 604 F. Supp. 764, 768 (E.D. Mo. 1985) ("Obviously, the reason that a non-owner is limited to a damage remedy [under § 12] is that a non-owner cannot tender the security back to the defendant and thereby accomplish rescission."); *see also Adams v. Zimmerman*, 73 F.3d 1164, 1175 (1st Cir. 1996) ("[In] a situation like that in which a purchaser cannot tender the security because she no longer owns it . . . damages are awarded" under the Massachusetts blue sky law).

an injured plaintiff with a remedy in the form of either rescission or damages.  *See Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1035 (2d Cir. 1979) ("If plaintiff owns the stock, he is entitled to rescission but not damages.  If plaintiff no longer owns the stock, he is entitled to damages but not rescission.").  The structure of these laws thus makes plain that a plaintiff who cannot tender a security "no longer owns" that security and is eligible for damages.

It is beyond legal or factual dispute that NCUA-Liq cannot tender the Certificates in this litigation.  No reasonable jury could conclude otherwise.  As discussed above, NCUA-Liq forfeited all effective control over the Certificates when they transferred them to the NGN Trusts.  By the terms of the NGN closing documents, the transfer of Certificates was absolute and irrevocable, and neither NCUA-Exec nor NCUA-Liq exercises any control over the NGN Trusts themselves, which are managed by independent trustees and administrators.  SUF ¶¶ 33, 51.[11]  Accordingly, NCUA-Liq cannot tender the Certificates, and thus cannot obtain rescission.  It follows as a matter of law that NCUA-Liq "no longer owns" the Certificates and is entitled to damages under the Texas and Illinois Blue Sky Laws.

### C.    The NGN Transactions Constitute Sales under NCUA's Regulations

NCUA's regulations confirm that the NGN Transactions constitute sales of the Certificates.  NCUA-Exec is empowered to "prescribe such rules and regulations as it may deem necessary to

---

[11] Defendants have suggested that NCUA-Liq retains some control over the Certificates, but the purported control features they have pointed to are irrelevant to the issue of rescission.  Defendants note the option to reclaim the Certificates only when 10% of the Certificates original principal balance remains, or during the month prior to the final distribution date of the trusts.  SUF ¶¶ 42-45.  These provisions are commonly found in asset-backed securities in order to minimize the administrative costs of winding-down small balances.  But these events generally cannot happen until on or around the maturity dates of the NGNs, which is typically in 2020 or later.  SUF ¶¶ 43, 45.  Accordingly, these provisions cannot constitute "sufficient control or authority to effectuate a tender of the securities in question."  *Monetary Mgmt. Grp.*, 604 F. Supp. at 768.  If NCUA were required to wait until then to seek rescission, the statute of limitations on all of its claims against Defendants would have long since expired.  *See also infra* at pp. 23-24 (discussing such "clean up call" options).

carry out the provisions of" the Federal Credit Union Act, including regulations that apply to the Credit Unions here.  *See* 12 U.S.C. §§ 1766, 1789.  NCUA regulations provide that NCUA-LIQ shall consider a securitization to be a sale and the transferred assets "legally isolated" if (1) the credit union "receives adequate consideration for the transfer of financial assets at the time of the transfer," (2) the "documentation effecting the transfer of financial assets reflects the intent of the parties to treat the transaction as a sale . . . for accounting purposes," and (3) the transfer "meets all conditions for sale accounting treatment under generally accepted accounting principles, other than the 'legal isolation condition.'"  12 C.F.R. § 709.10; *see also* Proposed Rule, NCUA, 79 Fed. Reg. 36,252 (June 26, 2014).[12]  The NGN Transactions meet all three requirements of this definition.[13]

     **1.**       It is undisputed that the Liquidation Estates received "adequate consideration" for the Certificates.  Defendants' experts have conceded that the consideration received by the Liquidation Estates was "adequate" and "valuable."  SUF ¶¶ 139-140.  As discussed above, the NGN securitizations allowed the Liquidation Estates to receive far *more* than they could have received in an outright sale of the Certificates into the marketplace.

     **2.**       The NGN closing documents uniformly "reflect[] the intent of the parties to treat the transaction as a sale . . . for accounting purposes."  The Trust Agreements effectuating the transfer of the Certificates to the NGN Trusts, for instance, state that "[t]he conveyance of the

---

[12] The "legal isolation" condition refers to whether creditors of the transferor could reclaim the transferred assets in a bankruptcy proceeding.  NCUA's regulations do not require such isolation for accounting purposes because NCUA-Liq's broad powers to reclaim assets transferred by a liquidated entity would threaten the bankruptcy isolation of most of these assets.  *See* Final Rule, *Involuntary Liquidation of Federal Credit Unions and Adjudication of Creditor Claims Involving Federally-Insured Credit Unions in Liquidation*, 65 Fed. Red. 55,439.

[13] Although 12 C.F.R. § 709.10 by its terms applies to "contracts entered into before [the] appointment of conservator or liquidating agent," 12 U.S.C. § 1787, it is nonetheless relevant in determining the sale treatment of a securitization undertaken by NCUA as liquidating agent, especially in the absence of other regulations purporting to assess when a securitization undertaken by NCUA-Liq constitutes a sale.

Underlying Securities . . . is intended by the parties, other than for federal, state, and local income and franchise tax purposes, to constitute a sale of the Underlying Securities."[14]  SUF ¶ 37.

**3.**      The NGN Transactions meet all conditions for sale accounting required by NCUA's regulations.  Statement of Financial Accounting Standards No. 140 ("SFAS 140") provides three requirements for sale accounting, two of which are required for sale treatment under NCUA's regulations.  *First*, under SFAS 140(b), the transferee must have "the right to pledge or exchange" the transferred assets.  SUF ¶ 102.  Here, there is no dispute that the NGN Trusts had the right to pledge the Certificates; they did exactly that when they pledged the Certificates as collateral for the NGNs.  SUF ¶ 65.  *Second*, under SFAS 140(c), the transferor must not "maintain effective control over the transferred assets through either (1) an agreement that both entitles and obligates the transferor to repurchase or redeem them before their maturity or (2) the ability to unilaterally cause the holder to return specific assets, other than through a cleanup call."  SUF ¶ 103.  Again, the Liquidation Estates did not maintain effective control over the Certificates in the manner described in SFAS 140(c).  SUF ¶ 48; *see infra* pp. 23-24.  Accordingly, the NGN Transactions satisfy all requirements for sale treatment under NCUA's own regulations.  Because the NGN Transactions constitute sales under these regulations, NCUA-Liq "no longer owns" the Certificates and is entitled to damages.

---

[14] Defendants have made much of the fact that the financial statements for the Temporary Corporate Credit Union Stabilization Fund – which are consolidated statements for the Liquidation Estates and the NGN Trusts – may account for certain aspects of the NGN Program as secured borrowings.  But, as NCUA's regulations make clear, the accounting used by the parties after the consummation of the transaction is irrelevant; what matters is the parties' contemporaneous intent, as expressed in the transaction documents themselves.  *See also Granite Partners*, 17 F. Supp. 2d at 300 (S.D.N.Y. 1998) ("To determine whether the parties to a transaction intended to create [a sale or a] a security interest, courts look to the agreement governing the transaction."); *Monetary Mgmt. Grp.*, 604 F. Supp. at 768 ("Elusive notions of legal, equitable, or beneficial title should not be controlling in a § 12(2) case."); *cf. FHFA v. Nomura Holding Am., Inc.*, 2015 WL 629336, at *11 (S.D.N.Y. Feb. 13, 2015) (finding that the plaintiffs' accounting treatment was not relevant to a defendant's loss causation defense).

D.      **Defendants' Contrary Arguments Are Unpersuasive**

Defendants have contended that, as a matter of "economic reality," the NGN Program amounted to a financing transaction, and not a sale of the Underlying Securities.  For the reasons set forth above, that argument has no legal merit under the plain text of the Illinois and Texas securities laws.  *See Randall v. Loftsgaarden*, 478 U.S. 647, 658 (1986) ("Generalities such as these . . . fall far short of the showing required to overcome the plain language of [the securities laws].").  But even if considered on its own terms, the argument fails.  It is common ground that the economic realities of a transaction depend on how market participants would view that transaction. SUF ¶ 141; *see Todd v. Exxon Corp.*, 275 F.3d 191, 205 (2d Cir. 2001) ("[W]e assume that the economic actors usually have accurate perceptions of economic realities." (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219 n.4 (D.C. Cir. 1986))).  The parties further agree that marketplace participants would assess the economic realities of the NGN Transactions by examining the extent of the risk retained by the Liquidation Estates and the amount of control that the Liquidating Estates exercised over the Certificates after they were transferred.  SUF ¶ 142.  The application of these principles confirms that the NGN Transactions constitute sales of the Certificates.

1.      **The Liquidation Estates Relinquished Effective Control over the Certificates**

NCUA-Liq relinquished effective control over the Certificates by transferring them to the NGN Trusts.  The Trust Agreements make clear that the Liquidation Estates have no ability to control or reclaim the Certificates.  SUF ¶¶ 37-38; 54-55.  Nor does NCUA-Exec have any ability to control the Certificates.  Indeed, NCUA-Exec is not even a party to the Trust Agreements.  The Trusts have an independent trustee and an independent administrator.  SUF ¶¶ 33, 51.

Defendants point to a handful of features of the NGN Trusts that they claim vest control of the Certificates in the Liquidation Estates.  Defendants assert, for instance, that the Liquidation Estates could reclaim the Certificates from the NGN Trusts during the month prior to each Trust's

final distribution date (generally in 2020 or later), or when the combined principal balance of the

Underlying Securities in each Trust depletes to 10% of their original principal balance at the time of

the NGN Transactions.  SUF ¶¶ 42-45.  Even Defendants admit, however, that these provisions

permit the Liquidation Estates to reclaim the Certificates only at specified times in the future, at or

near the maturity of the Notes.  SUF ¶¶ 43, 45.  These "clean-up call" provisions are standard

features in securitizations because it is often uneconomical for assets in a trust to be serviced by a

third-party servicer once their outstanding principal balance nears zero; they do not represent

significant economic interests in a securitization.  SUF ¶¶ 46-47.  For this reason, GAAP explicitly

excludes clean-up call provisions from the kinds of agreements that might vest "effective control" in

a seller of securities.  SUF ¶ 103.  The existence of such a standard option cannot seriously call into

question whether such a security was sold to investors; if that were so, virtually no securitization

would ever constitute a sale under the securities laws.[15]

## 2. The Liquidation Estates Do Not Hold the Risk of the Certificates

The Liquidation Estates also hold none of the risk associated with the Certificates.  As part

of the NGN Transactions, the Liquidation Estates received $28.3 billion in cash and OTCs that

---

[15] Defendants may assert that one of the NGN Trust, NGN 2011-M1, which re-securitized three of the 29 Certificates at issue, has a unique "revolving" structure that allows NCUA-Liq to remove certificates from the Trust.  NCUA-Liq, however, may only remove certificates from the 2011-M1 trust if such removal "(i) will not cause an Event of Default to occur or materially and adversely affect the amount or timing of payments to be made to the . . . Noteholders"; (ii) the removal is "not for the primary purpose of recognizing gains or decreasing losses resulting from market value changes"; and (iii) if there is a "good faith determination that such remaining Collateral and funds are sufficient to support timely payment of all required amounts on the . . . Notes."  SUF ¶ 59.  These onerous conditions preclude any argument that NCUA-Liq retained effective control over the certificates.  Indeed, as set forth above, the NGN Transactions were structured such that cash flows from the Distressed Assets were expected to exactly equal the Trust's obligations.  *See supra* p.8.  Accordingly, removing even a single Certificate from the Trust would at a minimum "materially and adversely affect the amount or timing of payments to be made to the . . . Noteholders."

were projected to have zero cash flows.[16]  The Liquidation Estates did not retain any material risk in the Certificates.

Defendants have asserted that the Liquidation Estates retained the "downside" of the Certificates by virtue of NCUA-Exec's full faith and credit Guarantee.  This argument ignores the clear legal distinction between the NCUA as liquidating agent and NCUA as executive agency.  It is undisputed that the Guarantee was provided by NCUA-Exec in its capacity as a federal regulatory agency (which was backed by the full faith and credit of the U.S. Government), not by NCUA-Liq in its capacity as liquidating agent (whose assets are necessarily limited to those of the failed institutions[17]).  No one disputes that this distinction was critical to investors.  Thus, through the NGN Transactions, the "downside" risk of the Underlying Securities was transferred away from the Liquidation Estates and to the federal government through the Guarantee.  Defendants attempt to ignore the statutory distinction between these separate roles in a way that investors never would have.  *Compare* 12 U.S.C. § 1752(a) (NCUA's role as a federal agency) *with* § 1787 (NCUA's role as a

---

[16] The OTCs could have increased in value if the performance of the Certificates exceeded expectation.  But this upside was severely circumscribed by NCUA-Exec's right of reimbursement from the NGN Trusts:  if NCUA-Exec made any Guarantee payments, then it was entitled to reimbursement for those payments *before* any cash flows accrued to the OTCs.  Thus, even if the Certificates exceeded expectations, the OTCs would not have received cash flows until NCUA-Exec was fully paid.  In any event, as Defendants' own experts have conceded, the retention of some upside benefit in a security cannot void the sale of that security.  *See* SUF ¶ 138; *see also Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 544 (3d Cir. 1979) ("[T]he presence of recourse in a sale agreement without more will not automatically convert a sale into a security interest.").  If that were so, then any market sale of a security would be void if the seller obtained or retained a hedge, insurance, or an option related to that security.  In any case, the upside benefit to the OTCs was expected to be zero.

[17] *See* 17 U.S.C. § 1787(b)(2) (NCUA as Liquidating Agent "succeed[s] to all rights, titles, powers, and privileges of the credit union"), *id.* § 1787(f)(2) (limiting maximum liability of NCUA as Liquidating Agent to the "assets and liabilities of such credit union").

liquidating agent); *e.g.*, *Fisher*, 653 F. Supp. at 350 ("NCUA[] acting as liquidating agent for [a liquidated entity] is clearly a separate entity from NCUA[] acting as insurer/regulator.").[18]

## II.     The Net Proceeds Overstate the Amounts Received by the Liquidation Estates "for or on Account of" the Certificates

The Illinois and Texas securities laws provide that a plaintiff's damages are calculated as the purchase price of the security, less any principal pre-payments and income received, less the amounts received by the plaintiff "for" or "on account of the disposition" of that security.  There is no dispute that the only possible "dispositions" of the Certificates in these actions were the NGN Transactions.  ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ It is thus beyond genuine dispute that the Net Proceeds substantially overstate the amounts received "for or on account of" the Certificates; and accordingly, there should be no further offsets to the amounts received for the Certificates in calculating damages.

### A.     NCUA's Damages Are Offset Only by the "Amounts Received on the Certificates" or the "Consideration Received for the Certificates."

The Texas Blue Sky Law provides that a plaintiff's damages are offset by the "actual consideration received *for the security*," Tex. Rev. Civ. Stat. Ann. art. 581, § 33 (emphasis added), while the Illinois Blue Sky Law provides that a plaintiff's damages are offset by the "amounts received by

---

[18] Defendants' experts have also asserted that, even if NCUA-Liq and NCUA-Exec are separate entities, NCUA-Liq still held some "downside" risk through its ownership of the OTCs. No reasonable factfinder could conclude that the OTCs were a meaningful source of downside risk to NCUA-Liq.  NCUA-Liq could not be forced to make any payments via the OTCs.  Its worst-case scenario was that it would receive nothing from them – which was exactly the outcome that Barclays had attempted to achieve.

the purchaser *for or on account of the disposition of the securities*," 815 Ill. Comp. Stat. 5/13 (emphasis

added).  The plain text of these laws mandates that amounts received by a plaintiff for reasons other

than the Certificates themselves are not relevant to the damages calculation.

The Supreme Court's decision in *Randall v. Loftsgaarden*, 478 U.S. 647, helps illustrate this

principle.  In interpreting § 12 of the federal Securities Act, the Court held that tax benefits received

by the plaintiff from the government on a security he purchased from the defendant did not

constitute "income received" on the security.  478 U.S. at 655.  The Court rejected the argument that

allowing the plaintiff to keep those tax benefits while rescinding the securities transaction would

confer a windfall onto the plaintiff.  The Court noted that § 12's civil remedy differed from common

law rescission in that it was "intended to do more than ensure that defrauded investors will be

compensated:  the Act also 'aim[s] . . . to prevent further exploitation of the public by the sale of

unsound, fraudulent, and worthless securities through misrepresentation [and] to place adequate and

true information before the investor.'"  *Id.* at 659 (quoting S. Rep. No. 47, 73d Cong., 1st Sess., 1

(1933)).[19]  The Court further noted that even under common law rescission, tax benefits would not

offset the plaintiff's recovery because "the party seeking rescission was required to credit the party

against whom rescission was sought only with gains that were the 'direct product' of the property

the plaintiff had acquired under the transaction to be rescinded."  *Loftsgaarden*, 478 U.S at 648.  "The

phrase 'direct product' means that which is derived from the ownership or possession of the

property *without the intervention of an independent transaction by the possessor*."  *Id.* (quoting Restatement

(First) of Restitution § 157 cmt. b (1937)) (emphasis added).  Because the tax benefits the plaintiff

---

[19] Similarly, the purpose of civil liability under the Texas and Illinois Blue Sky Laws is not
only to "indemnify investors victimized by violations" but also to "encourage compliance with [its]
regulatory and disclosure provisions, and create[] incentives for its private enforcement." *Citizens
Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 440 (Tex. 2007); *see A.G. Edwards, Inc. v. Sec'y of State, Dep't
of Sec. of State of Ill.*, 772 N.E.2d 362, 370 (2002) ("[T]he purpose of the [Illinois Blue Sky] Law is to
protect innocent persons who might be induced to invest their money in speculative enterprises over
which they have little control.").

received from the government were not "derived from the ownership or possession of the [security]" – but depended rather on the "intervention of an independent transaction by the [plaintiff]" – they did not reduce defendant's liability under § 12.  The same is true here.

This principle finds further support in the collateral source rule, which has been adopted by both Illinois and Texas.  Under that rule, "benefits received by the injured party from a source wholly independent of, and collateral to, the tortfeasor will not diminish damages otherwise recoverable from the tortfeasor."  *Arthur v. Catour*, 833 N.E.2d 847, 851 (2005).  "The collateral source rule is generally phrased in terms of common-law tort liability, but Illinois courts have also applied it to statutory causes of action."  *Muranyi v. Turn Verein Frisch-Auf*, 719 N.E.2d 366, 369 (1999); *see also Graco, Inc. v. CRC, Inc. of Texas*, 47 S.W.3d 742, 744 (Tex. App. 2001) (applying collateral source rule to statutory products-liability claim); *Oil Country Haulers, Inc. v. Griffin*, 668 S.W.2d 903, 904 (Tex. App. 1984) (applying collateral source rule to statutory claim for deceptive trade practices).  The Illinois and Texas securities laws incorporate the collateral source rule by specifying that a plaintiff's damages are offset only by amounts received "for" or "on account of" the securities themselves, not by amounts received from a collateral source.

### B.  The Amounts Received for the Guarantee Are Not Part of the Amounts Received "for or on Account of the Certificates"

No one disputes that the amounts received by Liquidation Estates in the NGN Transactions far exceed what the Liquidation Estates could have received for the Certificates in an outright sale of those Certificates: ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████    SUF ¶ 88.  It is also common ground that NCUA-Exec's Guarantee transformed the distressed Certificates into essentially riskless assets, which significantly increased the amounts that investors were willing to pay for them.  SUF ¶ 98.  NCUA-Exec provided this Guarantee to NCUA-Liq at a substantial discount: although the Guarantee

increased the proceeds from the NGN Transactions by billions of dollars, NCUA-Exec charged

only a 35 bps fee for the Guarantee.  SUF ¶ 68.  The remaining value of the Guarantee (*i.e.*, the value

in excess of the 35 bps fee ("Excess Value")) accrued to the Liquidation Estates.  SUF ¶ 73.  The

amounts received by the Liquidation Estates in the NGN Transactions were therefore attributable

*both* to the value of the Certificates themselves *and* to the Excess Value contained in the Net

Proceeds for NCUA-Exec's Guarantee.

The Excess Value paid by investors for the Guarantee was part of the Net Proceeds, but not

paid "for or on account" of the Certificates.  As with the tax benefits received by the plaintiff in

*Loftsgaarden*, the payments NCUA-Liq received for the Guarantee were not "derived" from or a

"direct product" of the securities themselves; they depended, rather, on the "intervention of an

independent transaction," 478 U.S. at 658 – the full faith and credit Guarantee separately provided

by NCUA-Exec.  Defendants cannot use the separate amounts received from investors for the

Guarantee to reduce their liability under the Illinois and Texas securities laws.

The collateral source rule further supports this conclusion.  "A situation in which courts

frequently apply the collateral source rule is where the defendant seeks a reduction of damages

because the plaintiff has received insurance benefits that partly or wholly indemnifies the plaintiff

for the loss."  *Arthur*, 833 N.E.2d at 852.  In *Wills v. Foster*, for instance, the Illinois Supreme Court

held that the defendant was precluded from offsetting the plaintiff's damages by introducing into

evidence the portions of the plaintiff's medical bills that were paid by the government through

Medicare and Medicaid.  892 N.E.2d 1018, 1031 (Ill. 2008).[20]  The Court reasoned that "the

wrongdoer should not benefit from the expenditures made by the injured party or take advantage of

contracts or other relations that may exist between the injured party and third persons," including "a

---

[20] Importantly, the collateral source rule is an "evidentiary and substantive" bar that precludes defendants from offsetting a plaintiff's damages as a matter of law.  *Wills*, 892 N.E.2d at 1022.

relationship with the government that allows the plaintiff's medical expenses to be paid." *Id.* at 1030.  The analogous benefit provided by NCUA-Exec to NCUA-Liq here – a full faith and credit Guarantee for the NGN Program at a substantially discounted fee of 35 bps – likewise does not reduce Defendants' liability here.

Accordingly, to measure the "actual consideration received for the [Certificates]" and the "amounts received for or on account of the disposition of the [Certificates]," one should identify the portions of the amounts received by the Liquidation Estates in the NGN Transactions for the Certificates themselves, and the portions received for NCUA-Exec's Guarantee.  Only the former may properly be deducted from the purchase price of the Certificates to calculate NCUA-Liq's damages.

### C. Dr. Finnerty Conservatively Calculated the "Consideration Received for the Certificates" and the "Amounts Received for or on Account of the Disposition of the Certificates"

In the NGN Transactions, the Liquidation Estates received Net Proceeds of $28.3 billion and OTCs with zero projected cash flows. ████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████  ████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████  It follows that investors valued

the Guarantee far more than they valued the residual cash flows and OTCs.[21]  Because the Net

Proceeds incorporate the Excess Value of the Guarantee, any value attributable to the OTCs is

irrelevant, as the Net Proceeds already overstate the amounts received for the Certificates

themselves by an amount greater than the value of the OTCs.

Accordingly, there is no genuine dispute that the Net Proceeds attributable to the

Certificates are a conservative estimate of the amounts received for the Certificates themselves in

computing damages under the Illinois and Texas securities laws.

### D.   Defendants' Damages Calculations Conflict with the Plain Language of the Illinois and Texas Securities Laws

Defendants have maintained that the purchase price of the Certificates should be offset by

both the entirety of the Net Proceeds (which already overstate the amounts received "for or on

account of" the Certificates") *and* the "value" of the OTCs.  In other words, they contend that even

---

[21] This is further reflected in the equation set forth in note 2:

**Certificates + Guarantee = Net Proceeds + Owner Trust Certificates + Guarantee Fee**

This equation can be re-written as follows:

**Guarantee – Owner Trust Certificates – Guarantee Fee = Net Proceeds – Certificates**

The right hand side of the equation (Net Proceeds – Certificates) is necessarily positive because the Net Proceeds raised in the NGN Transactions far exceeded the market value of the Certificates at that time.  (This is undisputed: if the Certificates could have been sold for more than the Net Proceeds amount in an outright sale, NCUA-Liq would not have engaged in the NGN Transactions at all, and instead would have sold the Certificates in an outright sale.)  Because the right hand side of the equation is positive, the left hand side (Guarantee – Owner Trust Certificates – Guarantee Fee) must also be positive.  This means that the Guarantee was necessarily worth *more* than the Owner Trust Certificates plus the Guarantee Fee.

though ███████████████████████████████████████████████████

████████████████████████████, a separate and additional deduction should be made for

the supposed value of the OTCs.  That argument fails as a matter of law.

Defendants have made no attempt to differentiate between the amounts received by the

Liquidation Estates "for or on account of" the Certificates themselves, and amounts received "for

or on account of" NCUA-Exec's Guarantee.  Instead, they claim that all amounts received by the

Liquidation Estates in the NGN Transactions should be subtracted from the purchase price of the

Certificates to calculate NCUA-Liq's damages, regardless of whether the amounts were received for

the Certificates themselves.  That methodology runs afoul of the plain language of the Illinois and

Texas securities laws, the purposes of civil remedies under those laws (as explained by the Supreme

Court in *Loftsgaarden*), and the collateral source rule as adopted by both Illinois and Texas.  NCUA-

Exec provided the discounted Guarantee to raise the liquidity necessary to stabilize the credit union

system.  The additional amounts that the Liquidation Estates received as a result of that Guarantee

were not received "for or on account of" the Certificates, nor were they a "direct product" of the

value of the Certificates.  Accordingly, they "should not become a windfall for the defendant."

*Wills*, 892 N.E.2d at 1024.  Moreover, Defendants cannot seek to deduct separately the purported

value of the OTCs unless they assign a specific value to both the Certificates and the Guarantee; and

then discount the Net Proceeds received by the Liquidation Estates by the Excess Value of the

Guarantee.  In failing to provide any such analysis, Defendants have failed to provide a reasonable

basis for a jury to properly calculate damages without awarding Defendants a significant windfall

(*i.e.*, first giving Defendants the benefit of all of the Net Proceeds without any deduction for the

portion of the Net Proceeds that was paid for the Guarantee; and then giving Defendants the

additional value of the OTCs).  *See Haygood v. De Escabedo*, 356 S.W.3d 390, 395 (Tex. 2011) ("[A]

benefit that is directed to the injured party should not be shifted so as to become a windfall for the

[defendant].").  By contrast, Dr. Finnerty ██████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████

In any event, there is no evidence from which a reasonable jury could determine that the market value of the OTCs was substantially greater than zero at the relevant times.  Both the Illinois and Texas securities laws provide that the amounts received for a security are calculated "at the time the buyer disposed of it."  Tex. Rev. Civ. Stat. Ann. art. 581, § 33.[22]  Although Defendants speculate that some investor might have offered to purchase the OTCs for some amount of money – betting that they might have some positive value in the future despite Barclays' projections – they have provided no evidence or expert analysis for a jury to reasonably decide upon such a valuation.[23]  It is undisputed that Barclays provided the only contemporaneous cash flow projections for the OTCs at the time of the NGN Transactions; that the Barclays valuations were relied upon by all relevant parties during those transactions; and that Barclays structured the NGN Transactions such that the OTCs would have zero expected cash flows at the time they were created and transferred to the Liquidation Estates.  SUF ¶ 86.

---

[22] *See Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 817 (Tex.1997) (damages in a misrepresentation case are measured "at the time of sale"); *Katz v. Comdisco, Inc.,* 117 F.R.D. 403, 408 (N.D. Ill. 1987) (measuring damages in a securities case "at the time of the transaction").  *See also Posner v. Davis,* 395 N.E.2d 133, 138 (1979) (measuring damages based on "the value the property would have had at the time of sale"); *Wigand,* 609 F.2d at 1037 (instructing the district court to "determine what the value of [the rights received for the security] as of [the date of the disposition]"); *In re Broderbund/Learning Co. Sec. Litig.,* 294 F.3d 1201, 1204 (9th Cir. 2002) (under federal securities laws, "damages must be measured by the difference between the amount paid for the security and its price at either the time it was sold or the date the . . . claim was filed" (quotation marks omitted)).

[23] Instead, Defendants' experts have simply pointed to third-party discounted cash flow projections of the OTCs at later points in time that do not even purport to determine the market value of the OTCs at the time of the NGN Transactions.  Accordingly, there is no genuine issue of material fact regarding the value of the OTCs at the time the Liquidation Estates obtained the "actual consideration" or "amounts received" for the Certificates.

III.   **The Illinois and Texas Securities Laws Exclude Principal Payments and Interest Payments from the Calculation of Prejudgment Interest**

The Illinois and Texas securities laws provide that prejudgment interest is calculated on the price the plaintiff paid for the security, prior to deducting principal payments and interest payments. The Illinois Supreme Court has confirmed this plain-text reading of the Illinois Securities Act, and that interpretation furthers the purpose of the law to protect the public and deter securities fraud. The Texas Securities Law contains materially identical language.  Defendants, however, have applied prejudgment interest only after subtracting principal payments and interest payments from the prices paid by the Credit Unions.  The Court should resolve this question of statutory construction as a matter of law.  *See Goldfine*, 18 N.E.3d at 890; *Duenez*, 237 S.W.3d at 683 (Tex. 2007).

A.   **The Illinois Blue Sky Law Excludes Principal Payments and Interest Payments from the Calculation of Prejudgment Interest**

"[T]he starting point in construing a statute is the language of the statute itself."  *Loftsgaarden*, 478 U.S. at 656.  The plain text of the Illinois Blue Sky Law provides that a plaintiff may recover "the full amount paid, together with interest" on the security, prior to deducting "any income or other amounts received by the purchaser on the securities," such as principal payments and interest payments.  815 Ill. Comp. Stat. 5/13.  The Illinois Supreme Court has confirmed this plain reading, holding that "the statute unambiguously requires the calculation of interest prior to deducting any amounts received by the purchaser of the securities."  *Goldfine*, 18 N.E.3d at 898.  That decision is binding here.  *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.").

To be clear, the Illinois Supreme Court's calculation of prejudgment interest differs from the methodology this Court determined was appropriate to calculate prejudgment interest on FHFA's § 12(a)(2) and its Virginia and District of Columbia Blue Sky law claims.  *See FHFA v. Nomura Holding Am., Inc.*, 2015 WL 640875, at *2 (S.D.N.Y. Feb. 16, 2015).  There, this Court held that where the

plaintiff still owns the security and can effect rescission, prejudgment interest should be calculated

on the price paid for the securities after deducting principal payments on the securities, but prior to

subtracting interest payments.  The Court did not have occasion to determine the appropriate

methodology for calculating pre-judgment interest where the plaintiff "no longer owns the

security."[24]  Moreover, Illinois law did not apply in *Nomura*; neither party to that cited the analysis in

*Goldfine*; and neither party urged a similar interpretation of § 12 or the Virginia or DC Blue Sky laws

where the plaintiff "no longer owns the security."  *See Sash v. Zenk*, 344 F. Supp. 2d 376, 383

(E.D.N.Y. 2004) *aff'd*, 428 F.3d 132 (2d Cir. 2005), *as amended on denial of reh'g*, 439 F.3d 61 (2d Cir.

2006) (where an "issue was not briefed by any party in [the] case," the court would not "presume

that binding precedent was created by a single declaratory statement" in a prior order).  Accordingly,

the Court should give dispositive weight to the Illinois Supreme Court's ruling that prejudgment

interest under the Illinois Blue Sky Law is calculated on the entire purchase price of the securities at

issue, prior to subtracting principal payments and interest payments.

### B.      The Texas Blue Sky Law Excludes Principal Payments and Interest Payments from the Calculation of Prejudgment Interest

Like the Illinois Blue Sky Law, the Texas Blue Sky Law provides that plaintiff may recover

"the consideration the buyer paid for the security, plus interest thereon at the legal rate[,]" prior to

deducting "any income the buyer received on the security."  Tex. Rev. Civ. Stat. Ann. art. 581, § 33.

---

[24] Indeed the relevant language of § 12(a)(2) and the DC and Virginia Blue Sky laws is materially different than the language under the Illinois Blue Sky laws.  *See* 15 U.S.C. § 77*l*(a)(2) (stating that where the plaintiff "no longer owns the security" and cannot effect rescission, the plaintiff shall be entitled to "damages"); D.C. Code § 31-5606.05 (stating that a buyer "may sue at law or in equity… [f]or damages if the buyer no longer owns the security.  The amount of damages shall be the amount that would be recoverable on a tender less the value of the security when the buyer disposed of it, plus interest at the rate used in the Superior Court of the District of Columbia from the date of disposition."); Va. Code Ann. § 13.1-522 (stating that the plaintiff shall be entitled to "recover the consideration paid for such security, together with interest thereon at the annual rate of six percent, costs, and reasonable attorneys' fees, less the amount of income received on the security, upon tender of such security, or for the substantial equivalent in damages if he no longer owns the security."),

This language specifies that prejudgment interest is calculated on the "consideration the buyer *paid* for the security," with no allowance for deductions for later payments (*i.e.*, the consideration "held" at a given time).  That reading is reinforced by the word "thereon," which confirms that interest must be calculated "on that thing" – that is, the "consideration the buyer paid for the security."  *See* Black's Law Dictionary (10th ed. 2014) (defining "thereon" as "on that [thing]").

The statute further provides that "*any* income the buyer received on the security" should be subtracted after the calculation of prejudgment interest.  Tex. Rev. Civ. Stat. Ann. art. 581, § 33 (emphasis added).  The phrase "any income" is broad enough to encompass principal payments and interest payments.  *Cf. Loftsgaarden*, 478 U.S. at 659-60 ("There is no indication that Congress intended the word 'consideration' in § 12(2) to mean anything other than what the context would suggest – the money or property given by the investor in exchange for the security.  And, in view of the express offset for 'income received,' we think any implicit offset for a return of consideration must be confined to the clear case in which such money or property is returned to the investor.").

Although the Texas Supreme Court has not ruled upon this issue, a leading treatise on blue sky law states that the Texas Blue Sky Law "does not require a deduction of interest earned on the proceeds of the sale of the original securities," Joseph C. Long, 12A Blue Sky Law § 9:15 (2015).  It is likely that the Texas Supreme Court would reach the same conclusion as the Illinois Supreme Court in construing nearly identical language in the Illinois Securities Act.  *City of Houston v. Bates*, 406 S.W.3d 539, 543 (Tex. 2013) ("We begin with the statute's text and the presumption that the Legislature intended what it enacted.").  Moreover, this approach to prejudgment interest serves the purpose of civil liability under the Texas Blue Sky Law, which is not only "to indemnify investors" but also to "encourage compliance with the Act's regulatory and disclosure provisions, and create incentives for its private enforcement."  *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 444 (Tex. 2007).  Accordingly, the Texas Supreme Court would likely hold that prejudgment interest under the

Texas Blue Sky Law is calculated on the entire "consideration the [plaintiff] paid" for the securities, prior to subtracting "any income received" by the plaintiff, including principal payments and interest payments.

## CONCLUSION

For the reasons stated, this Court should enter summary judgment on damages in favor of NCUA-Liq on the issues set forth above.

Date:   February 5, 2016

Respectfully submitted,

*David C. Frederick/ggr*

David C. Frederick
Wan J. Kim
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HUBER, HANSEN, TODD,
   EVANS & FIGEL PLLC.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
dfrederick@khhte.com
wkim@khhte.com
grapawy@khhte.com
ashen@khhte.com

George A. Zelcs
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Tel: (312) 641-9750
Fax: (312) 641-9751
gzelcs@koreintillery.com

Stephen M. Tillery
Robert L. King
KOREIN TILLERY LLC
505 North Seventh Street, Suite 3600
St. Louis, MO 63101
Tel: (314) 241-4844
Fax: (314) 241-3525
stillery@koreintillery.com
rking@koreintillery.com

Erik Haas
Peter W. Tomlinson
Philip R. Forlenza
Henry J. Ricardo
PATTERSON, BELKNAP, WEBB & TYLER
   LLP
1133 Avenue of the Americas
New York, NY 10036
Tel: (212) 336-2000
Fax: (212) 336-2222
ehaas@pbwt.com
pwtomlinson@pbwt.com
prforlenza@pbwt.com
hjricardo@pbwt.com

David H. Wollmuth
Frederick R. Kessler
Steven S. Fitzgerald
Ryan A. Kane
WOLLMUTH, MAHER & DEUTSCH LLP
500 Fifth Avenue, 12th Floor
New York, NY 10110
Tel: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
fkessler@wmd-law.com
sfitzgerald@wmd-law.com
rkane@wmd-law.com

## CERTIFICATE OF SERVICE

I certify that on February 5, 2016, I served or caused to be served by electronic mail on all counsel of record in this case a copy of the following documents:  1) Notice of NCUA's Motion for Summary Judgment Regarding Certain Statutory Damages Calculations, 2) NCUA's Memorandum of Law in Support of Its Motion for Summary Judgment Regarding Damages, 3) NCUA's Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment Regarding Certain Statutory Damages Calculations, and 4) Declaration of Wan J. Kim in Support of NCUA's Motion for Summary Judgment Regarding Damages.

Gregory G. Rapawy