**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of Southwest Corporate Federal Credit Union and Members United Corporate Federal Credit Union,<br><br>Plaintiff,<br><br>v.<br><br>CREDIT SUISSE SECURITIES (USA) LLC, et al.,<br><br>Defendants. | Case No. 13-CV-6736 (DLC)<br><br>**(FILED UNDER SEAL)** |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO NCUA'S MOTION
FOR PARTIAL SUMMARY JUDGMENT ON CREDIT SUISSE'S DUE DILIGENCE
AND REASONABLE CARE DEFENSES**

**Table of Contents**

Table of Authorities ........................................................................................................ iii

Citation Conventions ....................................................................................................... v

Preliminary Statement ..................................................................................................... 1

Factual Background ......................................................................................................... 3

     A.    The Disclosures in the Offering Documents ............................................... 3

     B.    Due Diligence Concerning Principal Securitizations (ARMT 2006-3, ARMT 2007-1, ARMT 2007-2, HEAT 2006-6, HEMT 2006-2, and HEMT 2007-2)............................................................................................ 7

          1.    Credit Suisse Conducted Extensive Loan Level Due Diligence on the Vast Majority of SLG Loans at Issue Here ............................ 8

          2.    Credit and Compliance Due Diligence in the Bulk Channel .................. 10

               (a)    Credit and Compliance Sampling in the Bulk Channel ............... 10

               (b)    Scope of Credit and Compliance Due Diligence on Bulk Loans............................................................................................ 13

          3.    Credit and Compliance Due Diligence in the Conduit Channels ............ 17

          4.    Property Valuation Due Diligence (All Channels) ................................... 21

          5.    Data Integrity and Collateral Due Diligence (All Channels).................... 23

          6.    Securitization of Credit Suisse-Sponsored Securitizations........................ 23

          7.    Credit Suisse's Quality Control ............................................................. 24

          8.    Whole Loan Sales to Other Banks Did Not Suggest Deficiencies in Credit Suisse's Due Diligence Processes........................................... 26

     C.    Due Diligence Concerning Third-Party Securitizations (RALI 2006-QA9, LBMLT 2006-1, LBMLT 2006-6) ........................................................... 27

          1.    RALI 2006-QA9 ................................................................................... 27

          2.    LBMLT 2006-1 .................................................................................... 29

          3.    LBMLT 2006-6..................................................................................... 30

     D.    Credit Suisse's Incentives to Conduct Strong Due Diligence .............................. 31

Standard ...................................................................................................................... 31

Argument ..................................................................................................................... 32

I.    Both the Texas and Illinois Blue Sky Laws Allow a Complete Defense if Credit Suisse Exercised Reasonable Care in Connection with the Securitizations. .................... 32

     A.    The Texas Securities Act's Reasonable Care Defense Mirrors the Defense in Section 12 of the Securities Act.............................................................. 32

     B.    The Illinois Securities Law Includes a Reasonable Care Defense that Mirrors the Defense in Section 12 of the Securities Act ................................. 32

C.     The TSA and ISL Require Only "Reasonable Care"..............................................35

II.    Credit Suisse Exercised Reasonable Care........................................................................36

A.     Credit Suisse's Diligence Processes on the Loans Underlying the Principal
       Securitizations Constituted Reasonable Care. .......................................................36

       1.     The Timing of Credit Suisse's Due Diligence Was Reasonable. ..............36

       2.     Credit Suisse's Due Diligence of Bulk Loans Was Reasonable................41

       3.     Credit Suisse's Due Diligence of Conduit Loans Was Reasonable..........46

       4.     Credit Suisse's Valuation Due Diligence Was Reasonable.......................47

B.     Credit Suisse's Third-Party Securitization Due Diligence Was Reasonable.........48

       1.     Lead Securitizations.................................................................................48

       2.     Non-Lead Securitization ...........................................................................50

Conclusion .........................................................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbasi ex rel. Abbasi v. Paraskevoulakos*, 187 Ill. 2d 386 (1999) ................................33

*Barthel v. Ill. Cent. Gulf R. Co.*, 74 Ill. 2d 213 (1978) ...................................................33

*Binder & Binder PC v. Barnhardt*, 481 F.3d 141 (2d Cir. 2007) ....................................31

*Bybee v. O'Hagen*, 612 N.E.2d 99 (Ill. App. Ct. 1993) ...................................................33

*Curry v. City of Syracuse*, 316 F.3d 324 (2d Cir. 2003) .................................................31

*Densberger v. United Techs. Corp.*, 297 F.3d 66 (2d Cir. 2002) .....................................36

*FHFA v. Nomura*, 68 F. Supp. 3d 439 (S.D.N.Y. 2014) ............................................ passim

*Foster v. Alex*, 572 N.E.2d 1242 (Ill. App. Ct. 1991) .....................................................35

*In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419 (S.D.N.Y. 2009)..............................36

*In re MetLife Demutualization Litig.*, 262 F.R.D. 217 (E.D.N.Y. 2009).........................36

*In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) .............................35

*In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 WL 638268
   (S.D.N.Y. Mar. 21, 2005) ...........................................................................................32

*Mass. Mutual Life Ins. Co. v. DB Structured Prods., Inc.*, 110 F. Supp. 3d 288 (D.
   Mass. 2015).................................................................................................31, 37, 42

*MBIA Insurance Corp. v. Credit Suisse Securities (USA) LLC*, No. 603751/09
   (N.Y. Sup. Ct.) ....................................................................................................20, 21

*NCUA v. Morgan Stanley*, 13-cv-6705 (DLC), 2014 WL 1673351 (S.D.N.Y. Apr.
   28, 2014) ...............................................................................................................32, 34

*NCUA v. RBS Sec.*, 112 F. Supp. 3d 61 (S.D.N.Y. 2015).............................................33, 34

*Parrent v. Midwest Rug Mills, Inc.*, 455 F.2d 123 (7th Cir. 1972)..................................34

*SQP, Inc. v. Sirrom Sales, Inc.*, 130 F. Supp. 2d 364 (N.D.N.Y. 2001) ..........................44

*Sterling Trust Co. v. Adderley*, 168 S.W.3d 836 (Tex. 2005)..........................................32

*Tirapeli v. Advanced Equities, Inc.*, 813 N.E.2d 1138 (Ill. App. Ct. 2004)....................34

**Statutes & Rules**

Fed. R. Civ. P. 56(a) ..............................................................................................31

Illinois Securities Law of 1953, 815 Ill. Comp. Stat. Act 5...................................... passim

Rule 10b-5.............................................................................................................34

SEC, Release No. 33-9176 (Jan. 20, 2011), 2011 WL 194494 ....................................44

SEC, Release No. 9671 (July 27, 1972), 1972 WL 125474 ........................................50

SEC, Securities Offering Reform, Securities Act Release No. 75 (Aug. 3, 2005),
    2005 WL 1692642 ..............................................................................................35

Securities Act § 12(a)(2)........................................................................................ passim

Securities Exchange Act § 10(b)........................................................................34, 35

Tex. Rev. Civ. Stat. Ann. art. 581, § 33(A)(2)..........................................................32

## Citation Conventions

**Entities**

"Credit Suisse":  Credit Suisse Securities (USA) LLC and Credit Suisse First Boston Mortgage Securities Corp.

"Credit Unions":  Southwest and Members United

"DLJ":  DLJ Mortgage Capital

"Lydian":  Lydian Data Services

"Members United":  Members United Corporate Federal Credit Union

"NCUA":  The National Credit Union Administration Board

"Ocwen":  Ocwen Financial Corporation

"Southwest":  Southwest Corporate Federal Credit Union

**Pleadings and Court Submissions**

"First Amended Complaint" or "First Am. Compl.":  NCUA's First Amended Complaint, dated November 14, 2014

"NCUA Mem.":  NCUA's Memorandum of Law in Support of Its Motion for Partial Summary Judgment on Credit Suisse's Due Diligence and Reasonable Care Defenses, dated February 5, 2016

"SOF":  Credit Suisse's Response and Counterstatement to NCUA's Local Civil Rule 56.1 Statement of Undisputed Facts in Support of Its Motion for Partial Summary Judgment on Credit Suisse's Due Diligence and Reasonable Care Defenses, dated March 11, 2016

**Terms**

"Certificates":  Certificates that Credit Suisse underwrote, sold and/or issued to the Credit Unions that are at issue in this litigation (First Am. Compl. ¶ 8)

"Ex.":  Exhibit to Compendium Declaration of Benjamin Diessel in Support of Defendants' Memorandum of Law in Opposition to NCUA's Motion for Summary Judgment Regarding Damages and Defendants' Memorandum of Law in Opposition to NCUA's Motion for Partial Summary Judgment on Credit Suisse's Due Diligence and Reasonable Care Defenses

"Kim Dil. Ex.":  Exhibit to Declaration of Wan J. Kim in Support of NCUA's Motion for Partial Summary Judgment in Credit Suisse's Due Diligence and Reasonable Care Defenses, filed February 5, 2016

"Kim Comp. Ex.":  Exhibit to Compendium Declaration of Wan J. Kim, filed February 5, 2016

"Offering Documents":  Collectively, Base Prospectus, Prospectus Supplement, and any associated term sheets, preliminary prospectus supplements, and free writing prospectuses

"PS":  Prospectus Supplement or Base Prospectus

"RMBS":  Residential mortgage-backed securities

"Securitizations":  Securitizations from which the Credit Unions allegedly purchased Certificates (First Am. Compl. ¶ 8, Tbl. 1)

**Fact Depositions Taken in *NCUA v. Credit Suisse Securities (USA) LLC et al.*, No. 13-cv-6736 (S.D.N.Y.) and *NCUA v. Credit Suisse Securities (USA) LLC et al.*, No. 12-cv-2648 (JWL-JPO) (D. Kan.)**

"Cheung Tr.":  Transcript from the May 13, 2015 deposition of H. Cheung (Ex. 23)

"Gallagher Tr.":  Transcript from the July 1, 2015 deposition of P. Gallagher (Ex. 26)

"Heckman Tr.":  Transcript from the May 7, 2015 deposition of P. Heckman (Ex. 22)

"Hwang Tr.":  Transcript from the April 29, 2015 deposition of J. Hwang (Ex. 21)

"Jones Tr.":  Transcript from the July 14, 2015 deposition of K. Jones (Kim Comp. Ex. NN; Ex. 27)

"Pensari Tr.":  Transcript from the June 12, 2015 deposition of M. Pensari (Ex. 24)

"Salomon Tr.":  Transcript from the June 17, 2015 deposition of H. Salomon (Ex. 25)

**Fact Depositions Taken in Other Actions**

"Beal *FHLB Seattle* Tr.":  Transcript from the January 23, 2013 and January 24, 2013 deposition of V. Beal taken in *Fed. Home Loan Bank of Seattle v. Credit Suisse Sec. (USA) LLC, et al.*, No. 09-2-46353-1 SEA (Wash. Super. Ct., King Cnty.) (Ex. 28)

"Beal *Mass. Mutual* Tr.":  Transcript from the July 30, 2014 deposition of V. Beal taken in *Mass. Mut. Life Ins. Co. v. DLJ Mortg. Capital, Inc., et al.*, No. 11-cv-30048 (D. Mass.) (Ex. 55)

"Bielich-Whalen *MBIA* Tr.":  Transcript from the July 29, 2014 deposition of K. Bielich-Whalen taken in *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC, et al.*, No. 603751/09 (N.Y. Sup. Ct.) (Ex. 54)

"Daniel *Cambridge Place* Tr.":  Transcript from the April 14, 2014 deposition of M. Daniel taken in *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co., Inc., et al.*, No. 10-2741-BLS1 (Mass. Super. Ct. Suffolk Co.) (Ex. 49)

"Fallacara *Cambridge Place* Tr.":  Transcript from the January 25, 2014 deposition of M. Fallacara taken in *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co., Inc., et al.*, No. 10-2741-BLS1 (Mass. Super. Ct. Suffolk Co.) (Ex. 46)

"Fallacara *FHFA* Tr.":  Transcript from the November 22, 2013 deposition of M. Fallacara taken in *Fed. Hous. Fin. Agency v. Credit Suisse Holdings (USA) Inc., et al.*, 11-CV-6200 (DLC) (S.D.N.Y.) (Ex. 36)

"Herbert *FHLB Chicago* 30(b)(6) Tr.":  Transcript from the June 6, 2013 deposition of J. Herbert taken in *Fed. Home. Loan Bank of Chicago v. Banc of Am. Sec. LLC, et al.*, No. 10-2-36526-5 SEA (Wash. Super. Ct., King Cnty.) (Ex. 29)

"Hill *MBIA* Tr.":  Transcript from the October 3, 2013 deposition of B. Hill taken in *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC, et al.*, No. 603751/09 (N.Y. Sup. Ct.) (Ex. 33)

"Huang *MBIA* Tr.:  Transcript from the January 9, 2014 deposition of A. Huang taken in *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC, et al.*, No. 603751/09 (N.Y. Sup. Ct.) (Kim Dil. Ex. 12; Ex. 44)

"Johnson *MBIA* Tr.":  Transcript from the August 15, 2012 deposition of D. Johnson taken in *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC, et al.*, No. 603751/09 (N.Y. Sup. Ct.) (Ex. 51)

"Jones *FHFA* Tr.":  Transcript from the December 12, 2013 deposition of K. Jones taken in *Fed. Hous. Fin. Agency v. Credit Suisse Holdings (USA) Inc., et al.*, 11-CV-6200 (DLC) (S.D.N.Y.) (Ex. 39)

"Kaiserman *Mass. Mutual* 30(b)(6) Tr.":  Transcript from the July 15, 2014 30(b)(6) deposition of B. Kaiserman taken in *Mass. Mut. Life Ins. Co. v. DLJ Mortg. Capital, Inc., et al.*, No. 11-cv-30047 (D. Mass.) (Ex. 53)

"Kaiserman *FHLB Seattle* 30(b)(6) Tr.":  Transcript from the July 24, 2013 30(b)(6) deposition of B. Kaiserman taken in *Fed. Home Loan Bank of Seattle v. Credit Suisse Sec. (USA) LLC, et al.*, No. 09-2-46353-1 SEA (Wash. Super. Ct., King Cnty.) (Ex. 32)

"Kimura *Cambridge Place* Tr.":  Transcript from the December 13, 2013 deposition of A. Kimura taken in *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co., Inc., et al.*, No. 10-2741-BLS1 (Mass. Super. Ct. Suffolk Co.) (Ex. 41)

"Kuo *MBIA* Tr.":  Transcript from the April 25, 2014 and August 29, 2014 deposition of T. Kuo taken in *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC, et al.*, No. 603751/09 (N.Y. Sup. Ct.) (Kim Dil. Ex. 19)

"Nordyk *FDIC* Tr.":  Transcript from the March 24, 2014 deposition of J. Nordyk taken in *Fed. Deposit Ins. Corp. v. Countrywide Sec. Corp., et al.*, No. 12-cv-8317 (C.D. Cal.) (Ex. 47)

"Nordyk *FHFA* Tr.":  Transcript from the November 23, 2013 and November 24, 2013 deposition of J. Nordyk taken in *Fed. Hous. Fin. Agency v. Credit Suisse Holdings (USA) Inc., et al.*, 11-CV-6200 (DLC) (S.D.N.Y.) (Kim Dil. Ex. 24; Ex. 37)

"Nordyk *FHLB San Francisco* Tr.":  Transcript from the December 1, 2014 deposition of J. Nordyk taken in *Fed. Home Loan Bank of S.F. v. Credit Suisse Sec. (USA) LLC, et al.*, No. CGC-10-497840 (Cal. Super. Ct., San Francisco Cnty.) (Ex. 56)

"Nordyk *FHLB Seattle* Tr.":  Transcript from the June 13, 2013 and June 14, 2013 deposition of J. Nordyk taken in *Fed. Home Loan Bank of Seattle v. Credit Suisse Sec. (USA) LLC, et al.*, No. 09-2-46353-1 SEA (Wash. Super. Ct., King Cnty.) (Kim Dil. Ex. 25; Ex. 31)

"Nordyk *Mass. Mutual* Tr.":  Transcript from the June 23, 2014 deposition of J. Nordyk taken in *Mass. Mut. Life Ins. Co. v. DLJ Mortg. Capital, Inc., et al.*, No. 11-cv-30048 (D. Mass.) (Ex. 52)

"Nordyk *MBIA* Tr.":  Transcript from the October 23, 2013 deposition of J. Nordyk taken in *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC, et al.*, No. 603751/09 (N.Y. Sup. Ct.) (Ex. 35)

"Othman *FHLB Seattle* Tr.":  Transcript from the June 8, 2013 deposition of E. Othman taken in *Fed. Home Loan Bank of Seattle v. Credit Suisse Sec. (USA) LLC, et al.*, No. 09-2-46353-1 SEA (Wash. Super. Ct., King Cnty.) (Ex. 30)

"Othman *MBIA* Tr.":  Transcript from the December 14, 2013 deposition of E. Othman taken in *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC, et al.*, No. 603751/09 (N.Y. Sup. Ct.) (Ex. 38)

"Rosenberg *FHFA* Tr.":  Transcript from the December 12, 2013 deposition of K. Rosenberg taken in *Fed. Hous. Fin. Agency v. Credit Suisse Holdings (USA) Inc., et al.*, 11-CV-6200 (DLC) (S.D.N.Y.) (Ex. 40)

"Sacco *Cambridge Place* Tr.":  Transcript from the April 3, 2014 deposition of R. Sacco taken in *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co., Inc., et al.*, No. 10-2741-BLS1 (Mass. Super. Ct. Suffolk Co.) (Ex. 48)

"Sacco *FHFA* Tr.":  Transcript from the December 19, 2013 deposition of R. Sacco taken in *Fed. Hous. Fin. Agency v. Credit Suisse Holdings (USA) Inc., et al.*, 11-CV-6200 (DLC) (S.D.N.Y.) (Ex. 43)

"Sacco *FHLB Seattle* Tr.":  Transcript from the October 18, 2013 deposition of R. Sacco taken in *Fed. Home Loan Bank of Seattle v. Credit Suisse Sec. (USA) LLC, et al.*, No. 09-2-46353-1 SEA (Wash. Super. Ct., King Cnty.) (Ex. 34)

"Sacco *MBIA* Tr.":  Transcript from the May 14, 2014 deposition of R. Sacco taken in *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC, et al.*, No. 603751/09 (N.Y. Sup. Ct.) (Ex. 50)

"Schoen *FHFA* Tr.":  Transcript from the December 16, 2013 deposition of C. Schoen taken in *Fed. Hous. Fin. Agency v. Credit Suisse Holdings (USA) Inc., et al*., 11-CV-6200 (DLC) (S.D.N.Y.) (Kim Dil. Ex. 17; Ex. 42)

"Szukala *MBIA* Tr.":  Transcript from the December 8, 2013 deposition of R. Szukala taken in *MBIA Ins. Corp. v. Credit Suisse Sec. (USA) LLC, et al.*, No. 603751/09 (N.Y. Sup. Ct.) (Kim Dil. Ex. 77)

"Vibert *Cambridge Place* Tr.":  Transcript from the January 16, 2014 deposition of J. Vibert taken in *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co., Inc., et al.*, No. 10-2741-BLS1 (Mass. Super. Ct. Suffolk Co.) (Ex. 45)

**Expert Reports and Depositions**

"Aug. 14, 2015 Grice Rpt.":  Expert Report of Charles Grice (Aug. 14, 2015) (Kim Dil. Ex. 21)

"Oct. 16, 2015 Grice Rpt.":  Rebuttal Expert Report of Charles Grice (Oct. 16, 2015) (Kim Dil. Ex. 53)

"Nov. 20, 2015 Grice Rpt.":  Reply Expert Report of Charles Grice (Nov. 20, 2015) (Ex. 63)

"Aug. 14, 2015 Oldfield Rpt.":  Expert Report of George S. Oldfield on behalf of Plaintiff (Aug. 14, 2015) (Kim Dil. Ex. 14)

"Oct. 16, 2015 Oldfield Rpt.":  Rebuttal Report of George S. Oldfield on behalf of Plaintiff (Oct. 16, 2015) (Kim Dil. Ex. 22)

"Nov. 20, 2015 Oldfield Rpt.":  Expert Report of George S. Oldfield, Ph.D. In Response to the Rebuttal Expert Reports of Charles Grice and Arnold Barnett, Ph.D (Nov. 20, 2015) (Ex. 64)

"Oct. 16, 2015 Barnett Rpt.":  Expert Report of Arnold Barnett, Ph.D. Concerning Purposive Sampling (Oct. 16, 2015) (Ex. 62)

"Butler Tr.":  Transcript from the January 21, 2016 deposition of S. Butler (Ex. 66)

"Grice Tr.":  Transcript from the December 17, 2015 deposition of C. Grice (Ex. 65)

"Oldfield Tr.":  Transcript from the January 28, 2016 deposition of G. Oldfield (Ex. 67)

**Credit Suisse RMBS**

"ARMT 2006-3":  Adjustable Rate Mortgage Trust 2006-3

"ARMT 2007-1":  Adjustable Rate Mortgage Trust 2007-1

"ARMT 2007-2":  Adjustable Rate Mortgage Trust 2007-2

"HEAT 2006-6":  Home Equity Asset Trust 2006-6

"HEMT 2006-2":  Home Equity Mortgage Trust 2006-2

"HEMT 2007-2":  Home Equity Mortgage Trust 2007-2

"LBMLT 2006-1":  Long Beach Mortgage Loan Trust 2006-1

"LBMLT 2006-6":  Long Beach Mortgage Loan Trust 2006-6

"RALI 2006-QA9":  RALI Series 2006-QA9 Trust

"Principal Securitizations":  ARMT 2006-3, ARMT 2007-1, ARMT 2007-2, HEAT 2006-6, HEMT 2006-2 and HEMT 2007-2

"Third-Party Securitizations":  RALI 2006-QA9, LBMLT 2006-1 and LBMLT 2006-6

The Credit Suisse defendants respectfully submit this memorandum in opposition to NCUA's motion for partial summary judgment on Credit Suisse's reasonable care defenses under the Illinois Securities Law of 1953, 815 Ill. Comp. Stat. Act 5 ("ISL"), and the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581, § 33 ("TSA").

**Preliminary Statement**

The Blue Sky statutes at issue in this case afford Credit Suisse a complete defense to each of NCUA's claims if Credit Suisse exercised "reasonable care" in connection with the disclosures that NCUA alleges to have been misstated in the Offering Documents for the Securitizations at issue.  The record in this case demonstrates that Credit Suisse conducted rigorous due diligence well beyond "reasonable care".  Credit Suisse carefully reviewed and monitored originators from whom Credit Suisse acquired loans, tailoring its acquisition of loans and due diligence accordingly.  (*See infra* Factual Background ("FB") § B.1.)  Credit Suisse conducted credit and compliance diligence on roughly 84% of the loans across all of the Principal Securitizations; for roughly half of the Bulk pools that contributed loans to the supporting loan groups ("SLGs"), Credit Suisse conducted credit and compliance diligence on *100%* of the loans.  (*Id.* § B.2(a).)  Credit Suisse conducted credit and compliance diligence on *all* of the loans that were acquired or originated through its Conduit channels.  (*Id.* § B.3.)  Credit Suisse also tested the reasonableness of the appraisals for *100%* of the loans it acquired.  (*Id.* § B.4.)  Credit Suisse's loan-level reviews continued after loan acquisition, including data integrity and collateral review conducted at securitization.  (*Id.* § B.5.)  Credit Suisse also improved its due diligence processes over time, in part as a result of its quality control program, through which Credit Suisse conducted loan-level reviews of previously acquired loans to identify trends and issues with originators and to provide continuous feedback to its third-party due diligence vendors.  (*Id.* § B.7.)  Credit Suisse's extensive due diligence program went far beyond what was

1

the practice in the RMBS industry and what its own policies required, and certainly went far beyond the minimum necessary to establish "reasonable care".

Credit Suisse's approach to due diligence concerning the Third-Party Securitizations also far exceeded the minimum standard of "reasonable care". As lead underwriter on two of those Securitizations, Credit Suisse conducted detailed loan-level review using sample sizes that met or exceeded its own polices and industry practice. (*See id.* § C.1-2.) Credit Suisse vetted the loans for compliance with underwriting guidelines, legal compliance and valuation, and removed loans from the securitizations that did not meet the requisite standards. As a secondary underwriter on the third Third-Party Securitization, Credit Suisse had a limited role, and reasonably relied on the thorough due diligence performed by the lead underwriter—a bank whose processes were well known to Credit Suisse from experience on previous securitizations and with which Credit Suisse discussed the due diligence results. (*Id.* § C.3.)

NCUA would like this Court to view this case as the same as *FHFA v. Nomura*, 68 F. Supp. 3d 439 (S.D.N.Y. 2014), but the reasonableness of Credit Suisse's care in connection with the nine Securitizations at issue here must be judged on its own merits. Although Credit Suisse does not agree with all aspects of the *Nomura* decision, now on appeal, the "exquisitely fact intensive inquiry" required, *id.* at 466, demands a different result here. Credit Suisse is entitled to have its reasonable care defense decided by the factfinder at trial.

- The defendants in *Nomura* reviewed fewer than 40% of the loans in the SLGs for compliance with underwriting guidelines, 68 F. Supp. 3d at 477; Credit Suisse doubled that, reviewing over 80% of all loans in the Principal Securitizations for underwriting guideline compliance. (*See infra* FB § B.1.)

- Credit Suisse used sampling for just a fraction of the loan pools that it acquired (*see id.* § B.2(a)), unlike Nomura, which relied extensively on sampling in the loan pools that contributed to its SLGs, 68 F. Supp. 3d at 450. When sampling was used, Credit Suisse's sample sizes far exceeded the 10 to 20% review that was called for by Credit Suisse's policies and industry practice. (*See infra* FB § B.2(a).)

- Nomura's trading desk entered into agreements "that prohibited Nomura from sampling more than a fixed percentage of loans in the pool", and Nomura's traders "agreed to limit its sampling" for *half* of the sampled bulk pools contributing to the SLGs, 68 F. Supp. 3d at 450; the "trade stipulations" Credit Suisse entered into concerning due diligence sample size were not hard "caps", and only six percent of the 166 Bulk pools were even subject to them.  (*See infra* FB § B.2(a).)

- Credit Suisse's reviews as lead underwriter on the Third-Party Securitizations likewise were far more extensive than those conducted on certain securitizations in *Nomura*.  68 F. Supp. 3d at 482.  As lead underwriter, Credit Suisse conducted its own in-depth diligence on the loans in the pools, and removed loans from those pools that it was not comfortable securitizing.  (*See infra* FB § C.1-2.)

There is overwhelming record evidence that Credit Suisse's due diligence reviews were robust and effective, and each of the criticisms NCUA raises in support of its motion presents disputed questions of fact that must be reserved for the factfinder at trial.  Resolving this motion in NCUA's favor would require this Court to ignore the testimony of Credit Suisse and third party witnesses who testified that they were confident in Credit Suisse's processes and proud of the work they did to review acquired loans.  This Court also would need to resolve hotly disputed issues, such as the effectiveness of Credit Suisse's sampling, the meaning of Offering Document disclosures, and what constitutes a "reasonable" review under the circumstances.  Those are all questions for trial.  NCUA's motion should be denied.

**Factual Background**

**A.    The Disclosures in the Offering Documents**

The Credit Unions purchased eleven Certificates from nine Securitizations between January 2006 and May 2007.  (SOF ¶ 4.)  A Credit Suisse affiliate served as sponsor and Credit Suisse also served as underwriter for the six "Principal Securitizations":  ARMT 2006-3, ARMT 2007-1, ARMT 2007-2, HEAT 2006-6, HEMT 2006-2, and HEMT 2007-2. (SOF ¶ 5.)  Credit Suisse served as third-party underwriter on the three "Third-Party Securitizations":  RALI 2006-QA9, LBMLT 2006-1, and LBMLT 2006-6.  (SOF ¶ 12.)

3

NCUA's motion claims that Credit Suisse failed to exercise reasonable care in connection with three categories of disclosures within the Offering Documents concerning the mortgage loans in these Securitizations, namely that the loans (1) were "originated or acquired generally in accordance with applicable underwriting guidelines, or had sufficient compensating factors," (2) had "certain statistical characteristics, such as certain LTV and CLTV ratios",[1] and (3) "were secured by a certain percentage of owner-occupied properties".  (NCUA Mem. 5-6.) Each of these representations contained express limitations on its scope.

*First*, with respect to compliance with underwriting guidelines, the Offering Documents expressly disclosed that guideline compliance was assessed based upon an "overall qualitative evaluation" of the loans rather than compliance with each specific guideline criterion, and that it would be expected that certain loans in the securitization would not comply with all requirements of the guidelines, even in the absence of compensating factors:

> "The underwriting standards of any particular originator typically include a set of specific criteria by which the underwriting evaluation is made.  However, the application of the underwriting standards does not imply that each specific criterion was satisfied individually.  Rather, a loan will be considered to be originated in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards.  For example, a loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied *or* if the loan is considered to be in substantial compliance with the underwriting standards."[2]

---

[1] Although NCUA cites "certain LTV and CLTV ratios" as examples of representations concerning "statistical characteristics" of the mortgage loans, those ratios are the only such characteristics to which its motion refers. NCUA's due diligence expert similarly opined that Credit Suisse's due diligence was inadequate only with respect to disclosures concerning LTV ratios and not to other characteristics (including owner occupancy).  (*See* Kim Dil. Ex. 14 (Aug. 14, 2015 Oldfield Rpt.) ¶ 9; Ex. 67 at 234:13-235:23 (Oldfield Tr.).)

[2] Kim Comp. Ex. A (ARMT 2006-3 PS) at 30 (emphasis added); for identical or substantially similar disclosures for the remaining Securitizations, *see* SOF ¶ 327.

NCUA's due diligence expert, Dr. George Oldfield, testified that this language disclosed that some loans would have been originated with exceptions to guideline requirements and without compensating factors for those exceptions.  (SOF ¶¶ 8, 13; Ex. 67 at 243:21-244:11(Oldfield Tr.)) ("Q. So it's your opinion that a loan that fails to meet one or more specific criteria . . . included in the underwriting standards would not be a due diligence failure if the loan is considered to be in substantial compliance with the underwriting standards?  . . . A. Yes.").)

In addition, the Offering Documents disclosed that a certain level of non-compliance with guidelines was expected.  They stated that "[t]he mortgage loans were originated or acquired *generally* in accordance with the underwriting guidelines described in this prospectus supplement".  (SOF ¶¶ 8, 13, 327 (emphasis added).)  Credit Suisse's due diligence expert, Charles Grice, testified that, in his opinion, investors would have understood this language to have "limited the scope of the disclosure by indicating that not every loan complied with the guidelines."  (SOF ¶ 336; Kim Dil. Ex. 21 (Aug. 14, 2015 Grice Rpt.) ¶ 95.)  The Offering Documents further disclosed that remedies for non-conformance with guidelines for individual loans were available under separate agreements.  For example, certain Prospectus Supplements stated that Credit Suisse would be obligated to cure, repurchase, or substitute any mortgage loan "[i]n the event of a breach of any representation or warranty relating to" the loan "that materially and adversely affects the interests of the certificateholders in the mortgage loan." (SOF ¶ 327.)[3]  These disclosures informed investors that some loans in each of the securitizations would be non-compliant with guidelines even under the broad definition set forth above.

---

[3] *See also* SOF ¶ 327 for similar disclosures in the Offering Documents for the remaining Securitizations.

*Second*, the Offering Documents expressly stated that the disclosed LTV and CLTV ratios were calculated based on properties' values "at origination", and that "[n]o assurance can be given that the value of any mortgaged property has remained or will remain at the level that existed on the appraisal or sales date".[4]  (SOF ¶¶ 9, 14.)  They also disclosed that appraisals were not always used to calculate the ratios:  For loans where the buyer was purchasing the property, the LTV was based upon the lesser of the property's selling price or the appraisal obtained at origination.[5]  (*Id.*)  Of the 17,322 loans in the SLGs in the Principal Securitizations for which both purchase price and appraisal data is available, for 17,032 loans, or approximately 98.3%, the purchase price was equal to or lower than the appraisal value. (SOF ¶ 425.)  So for at least those 17,032 loans—61.1% of the loans in the SLGs—the purchase price rather than the appraisal was the basis for the LTV ratio disclosed in the Offering Documents, and NCUA's criticisms of Credit Suisse's valuation due diligence are irrelevant. (*Id.*)

*Third*, the Offering Documents disclosed that occupancy status representations were "based on representations of the mortgagor at the time of origination of the related mortgage loans."  (SOF ¶ 10.)  The Offering Documents made no guarantees or statements regarding the veracity of the borrowers' stated intentions to occupy the mortgaged properties in the future.  (SOF ¶¶ 10, 15.)

The loans in the SLGs typically were securitized between a few weeks and several months following Credit Suisse's acquisition of them.  (SOF ¶ 39.)  For example, over

---

[4] *See, e.g.*, Kim Comp. Ex. C at S-33 (ARMT 2007-2 PS); for identical or substantially similar disclosures for the remaining Securitizations, *see* SOF ¶ 328.

[5] For refinances, the LTV and CLTV ratios were disclosed to be calculated based upon the appraised value of the property at the time of the refinance.  (SOF ¶¶ 9, 14.)

half of the loans in the ARMT 2006-3 SLG were securitized within two months of acquisition,

and almost 99% were securitized within five months of acquisition.  (SOF ¶ 38.)  In the HEMT

2006-2 SLG, only 9 loans out of the 2,349 loans in the SLG were securitized more than five

months following acquisition.  (*Id.*)  The time between origination and securitization was

disclosed in the Offering Documents.  (SOF ¶ 333; *see, e.g.*, Kim Comp. Ex. C at III-11 (ARMT

2007-2 PS) (disclosing "Months Since Origination" for loans in the relevant SLG), Kim Comp.

Ex. D, at 33 (HEAT 2006-6 PS) ("A substantial period of time may have elapsed between [the

date a loan was acquired by Credit Suisse] and the date of initial issuance of the series of

certificates evidencing an interest in that mortgage loan".).)  Credit Suisse's expert took into

account the time between acquisition and securitization and concluded that Credit Suisse's due

diligence processes were reasonable.  (SOF ¶ 345; Kim Dil. Ex. 53 (Oct. 16, 2015 Grice Rpt.)

¶ 29-30.)  Credit Suisse's expert further concluded that the information concerning the

characteristics of the SLG loans obtained at the time of acquisition or origination did not

deteriorate within the time between Credit Suisse's pre-purchase due diligence and the loans'

later securitization.  (SOF ¶ 346; Kim Dil. Ex. 21 (Aug. 14, 2015 Grice Rpt.) ¶ 254.)

**B.      Due Diligence Concerning Principal Securitizations (ARMT 2006-3, ARMT 2007-1, ARMT 2007-2, HEAT 2006-6, HEMT 2006-2, and HEMT 2007-2)**

The six Principal Securitizations were sponsored by the Residential Mortgage

Backed Securities Group ("RMBS Group") within Credit Suisse.  In the RMBS Group, Credit

Suisse acquired the loans in the SLGs at issue through four channels:  the Bulk channel, the

Mini-Bulk channel, the Loan-by-Loan ("LBL") channel, and the Wholesale channel.  The Mini-

Bulk, LBL and Wholesale channels sometimes were referred to collectively as the "Conduit".

(SOF ¶ 27.)  The Bulk, Mini-Bulk and LBL channels involved closed loans whereas in the

Wholesale channel, authorized mortgage brokers brought loans to Credit Suisse's affiliate, Credit

Suisse Financial Corporation, for origination.  (*Id.*)  Table 1 shows the source by channel of the loans in the SLGs for the Principal Securitizations.

| Table 1: Percentages of SLG Loans By Channel[6] | | | | |
|---|---|---|---|---|
| **SLG** | **Bulk** | **Mini-Bulk** | **LBL** | **Wholesale** |
| ARMT 2006-3 | 39.9% | 3.5% | 37.9% | 18.7% |
| ARMT 2007-1 | 25.3% | 6.3% | 31.5% | 36.9% |
| ARMT 2007-2 | 20.0% | 11.8% | 44.5% | 23.6% |
| HEAT 2006-6 | 92.9% | 2.9% | 3.4% | 0.9% |
| HEMT 2006-2 | 22.6% | 44.8% | 32.6% | 0.0% |
| HEMT 2007-2 | 46.9% | 18.1% | 21.6% | 13.4% |

Credit Suisse also conducted an extensive originator approval process of loan sellers and Wholesale brokers, as well as ongoing monitoring, which included (1) requiring initial applications and annual recertification forms; (2) monitoring seller performance, including loan delinquencies, repurchases, mark-downs and QC results; and (3) maintaining a "Watch List" of brokers and counterparties to monitor more closely.  (SOF ¶ 343.)  In certain instances, Credit Suisse also conducted on-site diligence of originators.  (SOF ¶ 344.)

> **1.    Credit Suisse Conducted Extensive Loan Level Due Diligence on the Vast Majority of SLG Loans at Issue Here**

For securitizations it sponsored, Credit Suisse generally conducted loan-level credit, compliance, property valuation, data integrity, and collateral due diligence at the time the loans were acquired (or originated, in the case of Wholesale loans).  Credit Suisse then conducted additional procedures at securitization.  (*See infra* § B.6.)  Credit Suisse's due diligence (or loan underwriting, for the Wholesale channel) processes varied across these channels, but in each channel, Credit Suisse conducted robust due diligence of loans it acquired.

---

[6] *See* Kim Dil. Ex. 29 (App'x A to Credit Suisse's Second Supp. Resps. & Objs. to Pl.'s First Set of Interrogs.).

Across all channels, during credit and compliance due diligence, Credit Suisse reviewed loans for their general adherence to the applicable underwriting guidelines and compliance with applicable laws.  (*See infra* §§ B.2-B.3.)  Property valuation due diligence assessed whether the appraisal on the property securing the mortgage reasonably stated the property's value.  (*See infra* § B.4.)  Data integrity reviews verified that the loan-level data provided by the loan seller accurately reflected the information in the loan file.  (*See infra* § B.5.)  Collateral due diligence involved an outside document custodian for the loans verifying that it had received key collateral documents, such as a copy of the original mortgage.  (*See id.*)  These processes provided Credit Suisse with substantial information and insight concerning the assets it would later securitize.  (*See* Ex. 65 at 111:14-112:21 (Grice Tr.).)

As described in more detail below, with respect to the Bulk channel, which contributed 43% of the loans in the SLGs, Credit Suisse used sampling to conduct credit and compliance due diligence on some Bulk pools, but it diligenced 100% of the loans in nearly half of the Bulk pools contributing loans to the SLGs, and Credit Suisse conducted property valuation diligence on 100% of the loans it acquired through the Bulk channel.  (*See infra* §§ B.2, B.4.)  Credit Suisse conducted credit and compliance and property valuation due diligence on 100% of the loans it acquired through the Conduit channels, which contributed approximately 57% of the loans to the SLGs.[7]  (*See infra* §§ B.3-B.4.)  Credit Suisse performed multiple types of loan-level due diligence on *all* of the SLG loans, including credit and compliance due diligence on approximately 84% of the SLG loans, as set forth in Table 2, and property valuation due

---

[7] Credit Suisse typically performed credit and compliance due diligence on 100% of the loans it acquired through the Mini-Bulk channel.  (SOF ¶ 136.)  Occasionally, as for example when the loans were acquired from sellers from which Credit Suisse also purchased packages of loans through the Bulk Channel, fewer than 100% of the loans may have been reviewed for credit.  (*Id.*)  There is no evidence that any of the loans acquired through the Mini-Bulk channel at issue here were subject to less than 100% credit and compliance due diligence.

diligence on *100%* of the SLG loans.  By comparison, in *Nomura*, Nomura reviewed less than 40% of the total SLG loans for credit and compliance after sampling.  68 F. Supp. 3d at 477.

| Table 2: Percentages of SLG Loans Subject to Credit and Compliance Due Diligence[8] | | | | | |
|---|---|---|---|---|---|
| **SLG** | **Loan Acquisition Channel** | | | | **All Channels** |
| | **Bulk** | **Mini-Bulk** | **LBL** | **Wholesale** | |
| ARMT 2006-3 | 24.9% | 100.0% | 100.0% | 100.0% | 70.1% |
| ARMT 2007-1 | 38.6% | 100.0% | 100.0% | 100.0% | 85.1% |
| ARMT 2007-2 | 41.3% | 100.0% | 100.0% | 100.0% | 88.3% |
| HEAT 2006-6 | 79.3% | 100.0% | 100.0% | 100.0% | 80.7% |
| HEMT 2006-2 | 62.3% | 100.0% | 100.0% | 100.0% | 91.4% |
| HEMT 2007-2 | 69.0% | 100.0% | 100.0% | 100.0% | 85.4% |

### 2.      Credit and Compliance Due Diligence in the Bulk Channel

Loans acquired through the Bulk channel made up approximately 43% of the SLGs for the Principal Securitizations.  (SOF ¶ 56.)  Credit Suisse conducted both credit and compliance due diligence on Bulk loans.  During credit review, the loans were reviewed for their general adherence to the originator's underwriting guidelines, and during compliance review, the loans were reviewed for adherence to applicable laws.  (SOF ¶ 61.)

#### (a)      Credit and Compliance Sampling in the Bulk Channel

Credit Suisse's policies called for samples of between 10 and 20% on pools of non-subprime loans, such as Alt-A and second lien loans, and 100% on pools of subprime loans. (SOF ¶ 357; Conduit Manual (2006 ed.) at 13.3.)  Industry practice at the time was to do due diligence on 10 to 20% across all product types.  (SOF ¶ 358; Kim Dil. Ex. 56 at 2 (V. Beal FCIC Written Testimony).)  In practice, Credit Suisse's samples vastly exceeded these rates:  In the 166 Bulk pools that contributed loans to the SLGs at issue, the median credit and compliance due diligence sample size was 41.1% in 2005, rising to 63.3% in 2007.  ((SOF ¶ 360; Kim Dil.

---

[8] Ex. 154 (Grice Master File); Kim Dil. Ex. 29 (App'x A to Credit Suisse's Second Supp. Resps. to Pl.'s First Set of Interrogs.).

Ex. 21 (Aug. 14, 2015 Grice Rpt.) ¶ 391; Kim Dil. Ex. 154 (Grice Master File).)  The median

sample sizes for second lien pools and Alt-A pools were 71.4% and 37.1%, respectively.  (SOF ¶

359; Kim Dil. Ex. 154 (Grice Master File); Kim Dil. Ex. 21 (Aug. 14, 2015 Grice Rpt.) ¶ 390.)

       In total, of the 166 Bulk pools at issue, about half of them (82 pools) were subject

to 100% credit and compliance review.  (SOF ¶ 361; Kim Dil. Ex. 154 (Grice Master File).)  The

remaining 84 Bulk pools were sampled ("Sampled Bulk Pools").  (SOF ¶ 57.)  The Sampled

Bulk Pools had an average sample size of approximately 42%.  (SOF ¶ 362; Kim Dil. Ex. 154

(Grice Master File).)  The 84 Sampled Bulk Pools contributed only 24% of the total loans in the

SLGs (SOF ¶ 58).  By comparison, in *Nomura*, sampled bulk pools contributed over 82% of the

SLG loans.  68 F. Supp. 3d, at 450.  Moreover, for 21 of these 84 pools, the only loans that were

securitized in the SLGs at issue were those that were actually diligenced as part of the credit and

compliance sample.  (SOF ¶ 58.)

       On occasion, Credit Suisse entered into agreements with loan sellers concerning

loan acquisition transactions; these "trade stipulations" often were unrelated to due diligence, but

sometimes specified a particular due diligence sample size.  (SOF ¶¶ 72, 368.)  Stipulations

regarding due diligence were not forced on Credit Suisse by originators.  To the contrary, Credit

Suisse would simply inform loan sellers of the level of due diligence it would conduct as part of

its bid on the loan pool.  (SOF ¶ 370; Ex. 53 at 167:16-19 (Kaiserman *Mass. Mutual* 30(b)(6)

Tr.) ("[I]t was not uncommon for us to simply say this is what we are going to do, and you can

make a decision to accept our bid or not based upon it.").)  Moreover, these agreements did not

"cap[]" the number of loans on which Credit Suisse could conduct due diligence, as NCUA

claims.  (NCUA Mem. 10.)  Rather, Credit Suisse's due diligence managers retained flexibility

to review additional loans if they deemed it necessary, "even if they were outside the stipulated

sample".  (SOF ¶ 73; Ex. 27 at 82:19-83:16, 256:20-257:5 (Jones Tr.).)  In any event, trade

stipulations concerning the due diligence sample size were present for only 11 of the 166 Bulk

pools at issue, less than 6%.  (SOF ¶¶ 72-73, 371.)[9]

   Where sampling was used, samples were selected by Credit Suisse's Bulk due

diligence managers generally using an adverse sampling methodology aimed at identifying loans

with a higher risk of principal loss or exceptions to underwriting guidelines.  (SOF ¶ 367; Ex. 70

(email from J. Nordyk to R. Sacco (Nov. 14, 2005)) CSNCUA004962176 ("The loans that were

chosen for full credit and compliance due diligence review were generally those loans that

displayed loan characteristics that were considered the most risky when evaluating the pool in its

entirety".).)  As a tool to aid sample selection, Credit Suisse employed a proprietary model that

was designed to identify loans that were more likely to become delinquent by correlating

historical delinquency data with loan characteristics, such as borrower credit score, LTV ratio

and property location.  (SOF ¶¶ 68, 364.)  The model used a "layered risk" approach,

highlighting loans with criteria which "when tied together might have more attributes that

[Credit Suisse] would want to take a look at".  (SOF ¶ 365; Ex. 35 at 162:25-163:19 (Nordyk

*MBIA* Tr.).)  Contrary to NCUA's assertion (NCUA Mem. 10), the model did not dictate or

"recommend" the specific sample.  (SOF ¶ 83.)  Rather, the model "highlighted" loans for

consideration by the Bulk due diligence manager, who would use his or her discretion and

experience to select the sample.  (SOF ¶¶ 68, 83; Ex. 31 at 72:15-73:3 (Nordyk *FHLB Seattle*

Tr.); Ex. 56 at 40:24-41:2, 58:7-11 (Nordyk *FHLB San Francisco* Tr.).)

---

  [9] NCUA notes that Credit Suisse identified over 1,000 documents in its interrogatory responses that reflected bid or trade stipulations relating to the pools at issue.  (NCUA Mem. 10 n.6.)  These documents concerned bid or trade stipulations on *any* topic, however, not just due diligence.  (SOF ¶ 77.)

(b)      Scope of Credit and Compliance Due Diligence on Bulk Loans

Credit Suisse employed industry-leading third-party vendors to conduct credit, compliance, and data integrity due diligence on loans acquired through the Bulk channel.  (SOF ¶ 372.)  Credit Suisse instructed its due diligence vendors to review loans using both the applicable originator underwriting guidelines and additional criteria known as Credit Suisse "overlays".  (SOF ¶ 373.)  Overlays "rais[ed] the guidelines" and generally required additional issues to be flagged for Credit Suisse's review above and beyond compliance with guidelines. (SOF ¶¶ 111, 374; Ex. 102 at 172 (Transcript of Sept. 23, 2010 Hearing, Financial Crisis Inquiry Commission, testimony of V. Beal); Kim Dil. Ex. 21 (Aug. 14, 2015 Grice Rpt.) ¶ 156.)  Two of Credit Suisse's due diligence providers, Clayton and Watterson Prime, stated that Credit Suisse's overlays were "tighter" and more extensive than those used in the industry.  (SOF ¶ 376; Ex. 81 (email from Keith Jones to Jason Nordyk and Robert Sacco (Mar. 31, 2006) (CS-NCUA-TR000111833).)  Credit Suisse's due diligence expert, Charles Grice, likewise testified that Credit Suisse's "extensive use of [] overlays, the flexible employment of overlays[] [and] the actual overlays themselves . . . distinguish Credit Suisse from other banks".  (SOF ¶ 377.)

After reviewing the loan files against applicable originator's guidelines and overlays provided by Credit Suisse, the vendor assigned initial credit and compliance event level grades to the loans.  (SOF ¶¶ 96-98.)  An EV1 grade indicated a loan complied with the applicable guidelines and Credit Suisse's overlays.  (SOF ¶ 96.)  An EV2 grade indicated a loan deviated from at least one aspect of the guidelines or a Credit Suisse overlay, but the deviation was either immaterial or offset by sufficient compensating factors.  (SOF ¶ 97.)  An EV3 grade indicated either that the loan did not comply with applicable guidelines, was missing a document that was necessary to assess underwriting guideline or legal compliance, or was flagged due to an overlay.  (SOF ¶ 98.)  Credit Suisse instructed vendors to grade loans triggering its overlays EV3

13

even if they met guidelines to allow Credit Suisse to review more loans, giving less discretion to its vendors.  (SOF ¶ 378.)  Robert Sacco, Head of Underwriting and Compliance in the RMBS Group, testified that an EV3 grade "does not mean the loan is problematic. . . .  It just means that we have asked [the vendor] to categorize loans as 3s because we want to look at those loans for review.  We want to make the decision on those loans.  We don't want Clayton [Credit Suisse's vendor] to make the decision."  (SOF ¶ 378; Ex. 50 at 314:5-17 (Sacco *MBIA* Tr.).)

     After initial grades were assigned, Credit Suisse, the vendor, and the loan seller worked closely in an iterative process to investigate the initial due diligence results.  The identification of EV3s and follow up concerning loans graded EV3s reflected robust and thorough reviews of the loan files by Credit Suisse and its vendors.  (SOF ¶ 379; Kim Dil. Ex. 53 (Oct. 16, 2015 Grice Rebuttal Rpt.) ¶ 67.)  Loans receiving an initial grade of EV3 were further investigated, for example, by clarifying guideline and overlay issues with the loan sellers, requesting and receiving missing documents from the lender, and by identifying compensating factors.  (SOF ¶ 380.)  It is therefore unsurprising that over half of the loans in the Bulk pools at issue that *initially* were graded EV3 ultimately received grades of EV2 or EV1 by the time the vendors' reviews were completed.[10]  (*See* NCUA Mem. 11-12.)  Frequently, Credit Suisse's review continued after its vendors submitted their final reports.  It was not uncommon for loan grades not to have been formally changed even though the reasons for an EV3 grade were cured or cleared as Credit Suisse's review continued (for example, where Credit Suisse obtained a missing document after having received its vendor's final report).  (SOF ¶¶ 121; 381; Kim Dil. Ex. 21 (Aug. 14, 2015 Grice Rpt.) ¶ 165.)  NCUA's expert has offered no opinions questioning

---

   [10] In addition, loans receiving an initial grade of EV1 or EV2 on occasion were regraded as EV3s based on further review by Credit Suisse due diligence managers.  (SOF ¶¶ 101-102.)

the sufficiency of the compensating factors identified during due diligence for the loans in the SLGs.  (SOF ¶ 382; Ex. 67 at 247:19-25 (Oldfield Tr.).)

When sampling for credit and compliance due diligence was used, Credit Suisse could and did review additional loans after receiving due diligence results or additional information.  (SOF ¶ 125.)  This took place for transaction-specific reasons, for example, if Credit Suisse encountered "specific compliance finding[s]" on loans that led it to review additional loans "of that same type" (*id.*; SOF ¶ 124; Ex. 47 at 58:11-19 (Nordyk *FDIC* Tr.)) or if Credit Suisse "saw a systemic issue or trend in an area" that warranted review of additional loans.  (SOF ¶ 384; Ex. 34 at 61:5-62:7 (Sacco *FHLB Seattle* Tr.).)  For example, for one of the Sampled Bulk Pools that contributed loans to the SLGs, Credit Suisse expanded its due diligence sample following receipt of its vendor's initial results.  (SOF ¶ 125.)  Credit Suisse witnesses recalled that similar "upsizing" took place on other occasions.  (*Id.*)

At the end of the vendors' review, Credit Suisse removed loans that remained graded as EV3 (and sometimes certain loans graded EV1 and EV2 as well) from acquisition pools, including some loans graded EV3 due to overlays, unless assessment of the totality of information concerning those loans, including the nature of the EV3 grading and any compensating factors, allowed the loan to be purchased.  (SOF ¶ 385.)  Specifically, Credit Suisse removed over 83% of the loans in the Bulk pools at issue that remained EV3s for credit at the conclusion of the vendors' review, and over 82% of the loans that remained EV3s for compliance.  (SOF ¶ 386.)  The number of Bulk loans that remained an EV3 for credit at the end of the vendors' review and were acquired and securitized in the SLGs represent only *0.6%* of the total number of Bulk loans sampled.  For loans with a "final" EV3 grade for compliance, the corresponding figure is *0.02%.*  (SOF ¶ 387.)

15

EV3 loans acquired by Credit Suisse were not "waivers" or "overrides".  (NCUA Mem. 10-12.)  Rather, they represented Credit Suisse's determination, based on its individualized review of the loans' characteristics, that the loans were appropriate to acquire from a diligence perspective.  (SOF ¶ 114.)  As support for its "waived" characterization, NCUA cites its expert's analysis of loans graded "EV2W" in internal reports produced by one of Credit Suisse's due diligence vendors, Clayton, for 16 Bulk pools (less than 10% of the Bulk pools that contributed loans to the SLGs).  (NCUA Mem. 12.)  In seven of these pools, EV2Ws made up less than 2% of the sampled loans.  (SOF ¶ 119.)  Moreover, an EV2W grade did not signify that Credit Suisse ignored its vendors' findings.  EV2W was an internal designation used for a period of time by one vendor, Clayton, for loans graded EV3 that its clients had informed it they had nevertheless acquired.  As Clayton's former senior vice president Vicki Beal testified, a EV2W grade could signify that "the client obtained [a missing] document" or "made a determination that the loan had sufficient compensating factors to offset the guideline exception".  (SOF ¶ 388; Ex. 55 at 85:8-10, 86:21-87:4, 93:4-11 (Beal *Mass. Mutual* Tr.); Kim Dil. Ex. 53 (Oct. 16, 2015 Grice Rpt.) ¶ 116.)  It could also signify that Credit Suisse had considered but waived an overlay, and Ms. Beal testified that banks with more overlays (such as Credit Suisse) would see more such "waivers".  (SOF ¶ 389; Kim Dil. Ex. 53 (Oct. 16, 2015 Grice Rpt.) ¶ 117; Ex. 28 at 371:19-372:14, 403:15-25, 421:12-422:16 (Beal *FHLB Seattle* Tr.).)  Clayton typically did not know precisely why an EV3 loan was deemed acceptable by its clients and marked all such loans as EV2Ws during the period that grade was in use.  (SOF ¶ 390.)

NCUA's expert calculated what he termed "Sample Failure Rates" in the Sampled Bulk Pools by counting the number of loans in each sample receiving a "final" vendor grade of EV3.  (NCUA Mem. 12-13, 45.)  He then purported to extrapolate these "Sample Failure Rates"

to each Securitization and calculated "weighted average Sample Failure Rates" for each Securitization.  (*Id.*)  Upon scrutiny, NCUA's "Sample Failure Rates" do not suggest due diligence "failures" in any way.  As an initial matter, NCUA's Sample Failure Rates incorporate significant numbers of loans that were graded EV3 that Credit Suisse *removed* from acquisition pools and did *not* include in the SLGs.  (SOF ¶ 392; Ex. 67 at 255:15-256:15 (Oldfield Tr.).)  Identifying EV3s and removing them during due diligence—which Credit Suisse did—was not a due diligence failure but the hallmark of a working and effective process.  (SOF ¶ 391.)  NCUA's rates of purported "failure" are further inflated because NCUA's expert did no analysis of the reasons for an EV3 grade, and included in his "Sample Failure Rates" loans graded EV3 due to a Credit Suisse overlay and loans initially graded EV3 but which Credit Suisse determined had adequate compensating factors.  (SOF ¶ 393; Ex. 67 at 255:15-256:15, 259:7-24 (Oldfield Tr.).)  In a partial attempt to remedy this deficiency, NCUA's expert estimated that 17.5% of loans were graded EV3 due only to an overlay, but he relied upon incomplete data for only 39 of the Bulk pools at issue, and therefore understated overlays' effects.[11]  (SOF ¶¶ 109, 113.)

### 3.     Credit and Compliance Due Diligence in the Conduit Channels

Credit Suisse acquired approximately 57% of the loans in the SLGs for the Principal Securitizations through the Conduit (*i.e.*, Mini-Bulk, LBL, and Wholesale channels).  (SOF ¶ 131.)  Loan level due diligence (or underwriting for wholesale loans) on loans acquired or originated through the Conduit channels was performed at the time of purchase or origination by Credit Suisse's Fulfillment Centers, primarily Lydian and Ocwen, industry-leading vendors vetted and monitored by Credit Suisse.  (SOF ¶¶ 135, 395.)

---

[11] Specifically, NCUA's expert did nothing to identify loans graded EV3 due to an overlay other than some keyword searches in a limited set of vendor reports for less than 25% of the Bulk pools at issue, searching for terms that were not used consistently or systematically by Credit Suisse's vendor to identify overlays.  (SOF ¶¶ 109, 113.)

17

Credit Suisse generally performed credit and compliance due diligence (or underwriting) on 100% of the loans acquired via the Conduit.  (SOF ¶ 136.)  The Fulfillment Centers' reviews included review of the loan files for compliance with the applicable underwriting guidelines (in the LBL channel, Credit Suisse's guidelines were used, and in the Mini-Bulk channel, either the originator's or Credit Suisse's guidelines were used), as well as compliance with applicable laws.  (SOF ¶ 396.)  Eddie Othman, Credit Suisse's head of Fulfillment Center Operations, testified that the Fulfillment Centers conducted collateral, compliance, and credit review; "they reviewed the files that they received . . . [a]nd if the validations passed, meaning they met Credit Suisse's or a particular correspondent's guidelines", the Fulfillment Centers would indicate to Credit Suisse that the loans could be purchased.[12] (SOF ¶¶ 149, 397; Ex. 38 at 43:5-16 (Othman *MBIA* Tr.).)  For loans submitted for origination through the Wholesale channel, the Fulfillment Centers performed an analysis of the loans' credit quality, documentation and compliance, and provided Credit Suisse with an "approve" or "decline" recommendation.  (SOF ¶ 135.)[13]  Wholesale loans were underwritten using Credit Suisse's underwriting guidelines.  (SOF ¶ 400.)

The Fulfillment Centers' credit and compliance review was thorough.  In the course of conducting credit and compliance due diligence on loans submitted through the Mini-Bulk and LBL channels, and Wholesale loan origination, the Fulfillment Centers were

---

[12] Contrary to NCUA's selective quotation (NCUA Mem. 14), Mr. Othman testified that the functions of the Fulfillment Centers were "*not* limited [to] data entry and validation" (SOF ¶ 139 (emphasis added)).

[13] NCUA inaccurately quotes Credit Suisse's expert as stating that Wholesale loans were "never subject to 'typical sponsor/underwriter due diligence.'"  (NCUA Mem. 14.)  In fact, Credit Suisse's expert explained that, "*Because loans delivered through Credit Suisse's Wholesale Channel were being originated and underwritten for the first time*, this underwriting review is not the typical sponsor/underwriter due diligence discussed elsewhere in this report."  (SOF ¶ 143; Kim Dil. Ex. 21 (Aug. 14, 2015 Grice Rpt.) ¶ 137; *see also* Ex. 65 at 170:3-171:3 (Grice Tr.) (describing Wholesale underwriting review, "We just last week created this loan so we controlled that exercise. So . . . it is a fundamentally different kind of assessment . . . .").)

responsible for determining whether there were outstanding "conditions" that needed to be resolved prior to approval and purchase of the loans. (SOF ¶ 402.) Their progress was tracked in regular reports to Credit Suisse. (*Id*.). The Fulfillment Centers identified numerous "conditions" in connection with their reviews, reflecting detailed review of the loan files and the identification of specific issues that were monitored and resolved. (SOF ¶ 403.) Many of these "conditions" related to documents missing from the loan files that were later located (*id.*), and many (particularly in the Wholesale channel, in which the loans were not yet closed and the Fulfillment Centers conducted loan underwriting reviews) did not relate to compliance with underwriting guidelines.[14] The Fulfillment Centers assessed and often resolved conditions by requesting and reviewing follow-up documents provided by the seller and updating the reporting to Credit Suisse—a process referred to as "curing" or "clearing" conditions. (SOF ¶ 406.) Even where conditions were not specifically marked as "cleared" by the Fulfillment Centers in the records that exist today, other documentation shows the Fulfillment Centers received information from loan sellers that allowed issues to be resolved.[15] (SOF ¶ 407.)

When appropriate, Fulfillment Centers escalated requests for "exceptions" to Credit Suisse's Underwriting Group, which reviewed requests on an individual basis based on the overall characteristics of each loan and the compensating factors present for such loan. (SOF ¶ 408; Ex. 25 at 139:23-140:1 (Salomon Tr.) (describing credit exceptions, "[Y]ou have

---

[14] For example, the available records indicate that nearly 4,000 "conditions" were identified by the Fulfillment Centers for Wholesale loans in the SLGs requiring that the name of the mortgagee in the loan file be corrected to state "Credit Suisse Financial Corporation." (SOF ¶ 404; Kim Dil. Ex. 53 (Oct. 16, 2015 Grice Rpt.) ¶ 131.) NCUA's due diligence expert did not review the conditions to determine whether they actually related to compliance with underwriting guidelines, and did not review the underwriting guidelines themselves in connection with his opinions on the Conduit channels. (SOF ¶ 405; Ex. 67 at 348:18-349:22 (Oldfield Tr.).)

[15] Available records today indicate that certain conditions were "waived" rather than "cleared", but a "waived" condition meant that Credit Suisse due diligence personnel either determined that the condition should not prevent acquisition of the loan or considered the condition satisfied. (SOF ¶¶ 164, 168.)

something that [doesn't] fit the guidelines, somewhat out of parameter, you're looking for some other compensating factor.").)[16]  The Fulfillment Centers had no authority to "waive" loans with exceptions to underwriting guidelines, whether in response to "pressure" or otherwise.[17]  (SOF ¶ 157; Ex. 30 at 131:9-16 (Othman *FHLB Seattle* Tr.).)  Likewise, account executives had no role in underwriting loans and "[t]he sales staff had zero credit authority and could not insert themselves in making a credit decision.  They could request an exception, but they had no impact on the decision whether it was approved or denied."  (SOF ¶ 156; Ex. 22 at 54:22-25, 302:11-25 (Heckman Tr.).)  Lydian's director of operations, Kimberly Bielich-Whalen, was firm in her testimony that outside pressure did not affect Lydian's performance, and that she was "proud of the job that" Lydian did.  (SOF ¶ 157; Ex. 54 at 122:6-7 (Bielich-Whalen *MBIA* Tr.).)  The testimony from Fulfillment Center employees on which NCUA relies (NCUA Mem. 15-16) is both limited[18] and questionable.  For example, the Supreme Court of the State of New York found that certain former employees of the Fulfillment Centers who gave testimony in *MBIA Insurance Corp. v. Credit Suisse Securities (USA) LLC*, No. 603751/09 (N.Y. Sup. Ct.), including the witnesses NCUA cites (NCUA Mem. 14-16) "worked extensively" with plaintiff's counsel in that litigation, and that these witnesses "admit[ted] to swearing to facts that do not entirely comport with the truth while being handsomely compensated [by plaintiff's counsel] for

---

[16] Henry Salomon, one of the Credit Suisse employees responsible for reviewing credit exception requests in the LBL and Wholesale channels, testified that he did not take into account Credit Suisse's or an individual salesperson's relationship with a loan seller in considering exceptions.  (SOF ¶ 184.)

[17] NCUA asserts that the Fulfillment Centers were incentivized to approve loans because they were "compensated based on volume".  (NCUA Mem. 15.)  In fact, the Fulfillment Centers were compensated based on the incremental work performed on each loan; if loans were withdrawn or declined during their review, the Fulfillment Centers received "a portion of [a] per loan" fee that Credit Suisse agreed to pay them pursuant to specified compensation schedules.  (SOF ¶¶ 147-148, 150; Ex. 38 at 216:24-217:21 (Othman *MBIA* Tr.).)

[18] For example, NCUA relies upon an affidavit from Ronald Szukala, a Lydian underwriter, who testified that he worked on Wholesale loans only and "did not interact" with Lydian's teams conducting due diligence on closed loans in the LBL or Mini-Bulk channels.  (SOF ¶ 158.)  The Wholesale channel contributed only 14% of the loans in the SLGs;  HEMT 2006-2 SLG had no Wholesale loans at all.  (*See* Kim. Dil. Ex. 29; *supra* Tbl. 2.)

doing so."  (SOF ¶ 156; Ex. 104 at 2,5 (Oct. 4, 2013 Memorandum Decision and Order, *MBIA Insurance Corp. v. Credit Suisse Securities (USA) LLC*, No. 603751/09 (N.Y. Sup. Ct.)).)

### 4.     Property Valuation Due Diligence (All Channels)

Credit Suisse conducted property valuation due diligence on *every* loan it was considering for purchase to assess whether the appraisal on the property securing the mortgage appeared to provide a reasonable assessment of the property's value.  (SOF ¶ 410.)  Credit Suisse utilized a number of different valuation tools to conduct these assessments, although these tools were not substitutes for, and were based upon less data than was assessed by, a full appraisal.  (SOF ¶ 411.)  Indeed, both NCUA's and Credit Suisse's experts agree that valuation tools are not able to estimate the value of a property perfectly, and thus, some degree of variance between the appraisal value and the value generated during valuation due diligence using such tools was to be expected.  (SOF ¶ 419; Kim Dil. Ex. 21 (Aug. 14, 2015 Grice Rpt.) ¶¶ 77-78; Ex. 67 at 353:2-354:5 (Oldfield Tr.).)  Credit Suisse's expert reviewed its valuation due diligence processes and concluded that they were reasonable.  (SOF ¶ 420.)

In the Bulk, Mini-Bulk, and LBL channels, Credit Suisse began its valuation due diligence by running either the HistoryPro valuation tool and/or an Automated Valuation Model ("AVM") on every loan it was considering for purchase, including, in the Bulk channel, loans outside of the credit and compliance due diligence samples.  (SOF ¶ 412.)  HistoryPro was "a tool used to detect flips, fraud, market issues and value inconsistencies on appraisals."  (SOF ¶ 413.)  As shown in the product's manual, HistoryPro's results incorporated sales data for comparable properties, property characteristics, neighborhood information, and property sale history information.  (SOF ¶ 414; Kim Dil. Ex. 92 at -390-393(CSNCUA000495385); Ex. 31 at 100:8-15, 135:22-136:3 (Nordyk *FHLB Seattle* Tr.); Kim Dil. Ex. 53 (Oct. 16, 2015 Grice Rpt.) ¶ 171.)  Credit Suisse's expert testified that Credit Suisse's use of HistoryPro to identify for

further review loans with the greatest risk of appraisal inflation was a reasonable method of conducting valuation due diligence and was consistent with industry practices.  (SOF ¶ 423; Kim Dil. Ex. 53 (Oct. 16, 2015 Grice Rpt.) ¶ 173.)

After HistoryPro was run, Credit Suisse (or its Fulfillment Centers) used the results to determine whether further valuation due diligence was called for.  For loans scoring between 0 and 2, which indicated the appraisal value was "within tolerance", generally no further action was taken, though Credit Suisse did perform additional valuation due diligence on some loans even with these low scores (for example, when the properties were located in a known "soft market", like Las Vegas, Nevada).  (SOF ¶¶ 206, 415.)  For loans for which HistoryPro was unable to produce a result, or with scores between 3 and 7, Credit Suisse ran an AVM, a "statistically-based computer program[] that use[s] real estate information such as comparable sales, property characteristics, tax assessments, and price trends to provide an estimate of value for a specific property."  (SOF ¶ 416; Ex. 103 at 1233 (Fannie Mae, *Selling Guide:  Fannie Mae Single Family*, at 1233 (July 30, 2013).)  For loans with scores of 8 or higher, Credit Suisse generally ordered either a "Broker Price Opinion" (BPO)—an evaluation of a property by a real estate professional using local and regional market information, comparable listings and recent sales (SOF ¶ 211)—or a similar analysis such as a desk review of the original appraisal by a second appraiser.  (SOF ¶ 417.)  Credit Suisse generally rejected loans for acquisition if the variance between the AVM, BPO, or desk review and the appraised value exceeded certain thresholds.  (SOF ¶ 418.)

In the Wholesale channel, the Fulfillment Centers reviewed the appraisals for all loans submitted for origination and ordered AVMs, BPOs, or second appraisals as necessary. HistoryPro was not used for valuation due diligence in the Wholesale channel.  (SOF ¶ 424.)

5.      **Data Integrity and Collateral Due Diligence (All Channels)**

In addition to the credit, compliance, and property valuation due diligence discussed above, Credit Suisse also conducted data integrity and collateral due diligence in connection with all acquisitions in the Bulk, Mini-Bulk and LBL channels, and all loan originations in the Wholesale channel.  Data integrity due diligence verified that the loan-level data provided by the loan seller was accurate based on a comparison with the loan files. (SOF ¶ 426.)  Collateral due diligence involved a document custodian's confirmation that it had received from a loan seller key collateral documents, including original mortgage documents or certified true copies.  (SOF ¶ 427.)  In the Bulk channel, Credit Suisse conducted data integrity due diligence on all of the loans in the credit and compliance due diligence samples, and collateral due diligence on all of the loans (including those loans outside the credit and compliance samples) that were ultimately acquired.  (SOF ¶ 428.)  NCUA's due diligence expert offered no opinions on Credit Suisse's data integrity or collateral due diligence.  (SOF ¶ 429.)

6.      **Securitization of Credit Suisse-Sponsored Securitizations**

Credit Suisse selected loans for securitizations by reviewing loan-level data in its internal databases and selecting loans with characteristics generally consistent with the characteristics of particular Credit Suisse shelves (for example, for the ARMT securitizations, adjustable-rate first lien loans).  (SOF ¶ 43.)  Prior to securitization, Credit Suisse performed additional due diligence on the loans, retaining outside accountants to review data presented in the Offering Documents by performing data integrity review on a sample of loans in the securitization.  (SOF ¶ 430.)  In addition, the securitization's document custodian reviewed all of the loans to be securitized to make sure it had received the original mortgage loan note and any required assignments for each loan.  (SOF ¶ 431.)

### 7.      Credit Suisse's Quality Control

Credit Suisse conducted post-acquisition quality control (QC) on a sample of loans it had acquired each month through the Bulk, Mini-Bulk, LBL and Wholesale channels. (SOF ¶ 218.)  The purpose of QC was to monitor third-party due diligence vendors' adherence to Credit Suisse's policies and procedures, evaluate the quality of due diligence reviews conducted by those vendors, and identify issues relating to particular sellers, brokers, Fulfillment Centers and third-party vendors.  (SOF ¶ 219.)  NCUA's expert agreed that RMBS issuers were not required to conduct such QC, but that conducting QC was a "prudent practice".  (SOF ¶ 432; Ex. 67 at 392:16-393:2 (Oldfield Tr.).)  Credit Suisse's QC was "similar to an audit function"; it was "forward looking" and "part of a continuous improvement process" Credit Suisse employed in its loan acquisition business.  (SOF ¶ 433; Ex. 65 at 274:17-24 (Grice Tr.).)  Credit Suisse used the QC results to provide feedback to its third-party due diligence vendors and as part of its analysis of and decisions regarding future business with certain sellers.  (SOF ¶ 434.)  Following receipt of QC reports, Credit Suisse would hold periodic meetings with its third-party due diligence vendors and Fulfillment Centers and share the findings.  (SOF ¶ 435.)  Credit Suisse also conducted regular calls with its Fulfillment Centers and Bulk due diligence vendors to go over the findings.  (SOF ¶ 436.)  Credit Suisse asked its vendors and Fulfillment Centers to provide responses to certain items flagged in the reports.  (SOF ¶ 437.)

Credit Suisse's QC vendors used the term "critical" when they identified particular issues in the course of QC reviews.  (SOF ¶ 222.)  Credit Suisse witnesses testified that QC vendors were conservative in their evaluations of the loans.  Robert Sacco, who oversaw the QC Group within Credit Suisse, testified that the term "critical" as used by the QC vendors "doesn't mean the loan was defective, there was an issue with it, it was unsalable, it was unsecuritizable, it was of not investment quality".  The term simply meant that the vendor had

assigned certain ratings to the loans for issues that "*could* affect investment quality"; Mr. Sacco explained that Credit Suisse "would look at the individual loans to determine what [the vendor] bucketed into critical issues.  We would look at the loans on an individual basis and say we -- whether we agree it's investment quality or not."  (SOF ¶ 222; Ex. 48 at 121:4-125:8, 128:17-21, 171:11-14 (Sacco *Cambridge Place* Tr.).)  Melissa Pensari, who worked in the Quality Control Group at Credit Suisse, similarly testified that "[i]t was common for [a QC vendor] to flag things . . . [t]hat upon further review, Credit Suisse did not agree were critical issues."  (SOF ¶ 228; Ex. 24 at 159:9-16 (Pensari Tr.).)  QC vendors did not assign "cumulative" scores to loans and did not characterize loans as having "failed quality control."  (SOF ¶ 222.)

Credit Suisse's QC reviews did not, and were not intended to, replicate Credit Suisse's credit and compliance due diligence originally conducted on the same loans.  For example, QC vendors applied Credit Suisse's underwriting guidelines in reviewing the loans, even though those guidelines "were not necessarily those that were utilized at the time of purchase".  (SOF ¶ 222.)  Indeed, all loans acquired through the Bulk channel and certain loans acquired through the Mini-Bulk channel were subject to credit and compliance due diligence at acquisition based upon the originator's or seller's underwriting guidelines.  (*Id.*)  As a result, as NCUA's expert recognized, QC findings did not indicate that a loan did not comply with applicable underwriting guidelines at the time of origination.  (SOF ¶ 222; Ex. 67 at 399:11-401:13 (Oldfield Tr.) (testifying that if "a more lenient [originator] guideline was used at origination but a more stringent [Credit Suisse] guideline was used during QC, noncompliance with the [Credit Suisse] guideline would not necessarily indicate that the loan did not comply with the origination guideline", and that Credit Suisse's instruction to its vendors to apply its own guidelines would result in a "more conservative view of [the] QC results").)  Additionally,

QC results did not necessarily reflect the characteristics of the loans or the borrowers at the time of origination; QC vendors reviewed post-origination credit reports and re-verified the employment, income, assets and appraisals for all loans sampled.  (SOF ¶ 222.)  It was common for those characteristics to have changed after origination.  For example, borrowers' credit scores often dropped following the origination of their mortgages, as a reflection of the new mortgage obligations.  (SOF ¶ 441.)

   8.   **Whole Loan Sales to Other Banks Did Not Suggest Deficiencies in Credit Suisse's Due Diligence Processes**

      NCUA points to instances in which other banks declined to purchase loans from Credit Suisse as purported evidence that Credit Suisse's due diligence processes were flawed.  (NCUA Mem. 25-26.)  On occasion, Credit Suisse sold pools of whole loans from its inventory to other banks rather than hold them in inventory or securitize them.  (SOF ¶ 272.)  Loan buyers in those transactions sometimes declined to purchase loans based on their own preferences and underwriting guidelines, and indeed had incentives to decline loans to achieve the lowest price possible for the pools.  (SOF ¶¶ 274, 442.)  For example, in the Citigroup sale referenced by NCUA (NCUA Mem. 25), Citigroup applied its own guidelines when reviewing loans for purchase.  (SOF ¶¶ 274, 276, 443; Ex. 83 at -948 (email from Tim Kuo (Oct. 4, 2006) (CSNCUA003049948) ("Citi did use our guides in reviewing the loans, but applied a gap analysis, which basically means that where our guides and their guides were different or silent, they will use the Citi guides (which in fact means they are using their guides).").)  In some cases loan buyers were even more conservative, rejecting loans that met both parties' guidelines.  (SOF ¶ 444; Ex. 92 at -842 (email from T. Kuo to A. Sneathen of Citigroup (Mar. 28, 2007)) (CSNCUA017606842) (discussing a loan declined by Citi where the "[l]oan meets CS and CITI guidelines").)  Accordingly, to the extent that Citibank or another bank declined to purchase

26

certain loans for its own reasons, that does not mean that those loans did not comply with the applicable underwriting guidelines disclosed in the Offering Documents.

Credit Suisse monitored other banks' reasons for declining to purchase certain loans, and where Credit Suisse did observe that declined loans raised implications for Credit Suisse's own due diligence process Credit Suisse employees took the issue seriously and investigated.  (SOF ¶ 275.)  Indeed, NCUA's own data shows that the number and percentages of loans "kicked" (removed) from these sales to other banks declined over time, and no loans were "underwriting kicks" from the last two of the eight sales the data cover.  (SOF ¶ 274.)

### C.  Due Diligence Concerning Third-Party Securitizations (RALI 2006-QA9, LBMLT 2006-1, and LBMLT 2006-6)

The RMBS Group served as a third-party underwriter for the RALI 2006-QA9 securitization, while Credit Suisse's Asset Finance Capital Markets Group ("Asset Finance") served as a third-party underwriter on the LBMLT 2006-1 and LBMLT 2006-6 securitizations. (SOF ¶ 22.)  Credit Suisse served as lead underwriter on RALI 2006-QA9 and LBMLT 2006-1 and as secondary underwriter on LBMLT 2006-6.  (SOF ¶ 292.)

### 1.  RALI 2006-QA9

The RALI 2006-QA9 securitization was sponsored by Residential Funding Company, LLC ("RFC").  (SOF ¶ 317.)  Credit Suisse's policy called for a sample of 3 to 5% of third-party securitizations.  (SOF ¶ 448.)  This was consistent with industry practice.  (SOF ¶ *Id*.) Credit Suisse performed credit and compliance due diligence on a sample well beyond what was called for by the policy and industry practice.  Credit Suisse sampled 105 loans, over 11% of the final securitization size, using the same sample-selection methods used for the Bulk channel. (SOF ¶ 321.)  NCUA claims Credit Suisse's sampling was flawed because it did not draw its sample from the "final" population of the securitization.  (NCUA Mem. 28, 53.)  It was typical

during the 2005 to 2007 time period for sponsors to add a certain number of loans to the initial

pool of a securitization.  (SOF ¶ 319, 467.)  Credit Suisse was generally aware of the collateral

characteristics of loans that could be added.  (SOF ¶ 314; Ex. 26 at 210:5-9 (Gallagher Tr.) (as a

third-party underwriter, Credit Suisse "would receive stipulations about the loans in the

pool").)[19]  Being aware of this practice, Credit Suisse's due diligence personnel, including Jason

Nordyk, who served as the due diligence manager on the RALI 2006-QA9 securitization,

deliberately "oversample[d]" the initial pool based on the expected size of the final

securitization.  (SOF ¶ 319; Ex. 87 at -711 (CSNCUA019631710).)

       As part of the credit and compliance review it conducted on third-party

securitizations, Credit Suisse instructed its loan-level credit and compliance due diligence

vendors to review the loan file appraisals and conduct data integrity review.  (SOF ¶ 326.)

Additionally, Credit Suisse ordered BPOs "to be completed as part of due diligence for above

reference securitization [RALI 2006-QA9]" on nine loans.  (SOF ¶ 326.)  Outside accountants

were also retained to perform additional data integrity review on certain data reported in the

Offering Documents.  (SOF ¶ 449.)

       After the conclusion of the credit and compliance due diligence process, seven of

the loans sampled were removed from the securitization.  (SOF ¶ 322.)  Credit Suisse's internal

report on the due diligence results shows that only two loans with final grades of EV3 were

deemed eligible for the securitization; for both of those loans, Credit Suisse noted that a missing

document would be provided prior to the closing date.  (SOF ¶ 468; Kim Dil. Ex. 108-1

(Pullthrough Report for Pool RFC-GMAC—20061004, at tab "eligible").)

---

[19] Contrary to NCUA's suggestion (NCUA Mem. 53 n.28), Mr. Gallagher did not testify that loans with "latent defects" could be added to the pools; he testified only that if a borrower made a fraudulent representation in a loan application, "it would not be in the strats".   (SOF ¶ 314.)

### 2.    LBMLT 2006-1

The LBMLT 2006-1 securitization was sponsored by Long Beach Mortgage Company ("Long Beach").  (SOF ¶ 305.)  Credit Suisse had served as a third-party underwriter on a number of Long Beach securitizations prior to this securitization.  (SOF ¶ 457; *see e.g.*, Ex. 60 (LBMLT-2005-WL2 PS); Ex. 61 (LBMLT 2005-WL3 PS); Ex. 57 (LBMLT 2005-1 PS); Ex. 58 (LBMLT 2005-2 PS); Ex. 59 (LBMLT 2005-3 PS).)  Credit Suisse employee Janie Hwang, who worked on the securitization, had a "long-standing relationship" with Long Beach and was "familiar with [its] business practices as they pertained to the origination of mortgages".  (SOF ¶ 458; Ex. 21 at 211:11-15 (Hwang Tr.).)

Credit Suisse chose an initial credit and compliance sample of 300 loans randomly, to which 200 additional randomly selected loans were added after additional loans were added to the securitization.  (SOF ¶¶ 306, 311.)  Credit Suisse conducted credit, compliance and data integrity reviews on the combined sample of 500 loans, 4.4% of the total size of the securitization.  (SOF ¶ 311.)  Deloitte also was engaged to perform additional data integrity review.  (SOF ¶ 450.)  Credit Suisse's expert performed an in-depth review of all of the available documentation of the due diligence conducted on LBMLT 2006-1.  He observed that numerous loans initially graded EV3 were re-graded after the vendor received additional information that resolved credit and compliance issues, or as missing documents were located.  (SOF ¶ 453.)  At the conclusion of the credit and compliance review, Credit Suisse removed from the securitization all of the loans in the sample that remained graded EV3 for credit and all but five of the loans that remained graded EV3 for compliance.  (SOF ¶ 454.)  Those five loans were graded EV3 due to a Credit Suisse overlay, and each had compensating factors justifying its securitization.  (SOF ¶ 455.)  Based upon his in-depth review of the documentation, Mr. Grice

opined that Credit Suisse's due diligence on the LBMLT 2006-1 securitization was reasonable and consistent with industry practices during the time period.  (SOF ¶ 456.)

### 3.    LBMLT 2006-6

Credit Suisse served as a secondary underwriter on the LBMLT 2006-6 securitization.  (SOF ¶ 293.)  LBMLT 2006-6 was sponsored by Long Beach, with WaMu Capital Corp. ("WaMu") acting as lead underwriter.  Consistent with industry practice for secondary underwriters, Credit Suisse relied upon the due diligence conducted on behalf of the underwriting syndicate by the lead underwriter, WaMu.  (SOF ¶ 296.)  Similar to Credit Suisse's due diligence process, WaMu engaged a reputable vendor, Bohan, and conducted due diligence on a sample of loans to be securitized.  (SOF ¶ 459.)  WaMu sampled 7% of the loans in the securitization using a combination of adversely and randomly selected loans, and removed all of the loans in the sample that remained graded EV3 at the conclusion of Bohan's review.  (SOF ¶ 460.)  Credit Suisse's expert reviewed the documentation of WaMu's due diligence process and determined that it was reasonable.  (SOF ¶ 461.)

At the end of WaMu's diligence process, WaMu held a final due diligence call with Credit Suisse and Banc of America (another secondary underwriter) on July 21, 2006.  In advance of that call, outside counsel circulated a list of due diligence topics for discussion, including, among other things:  "WaMu's origination guidelines, policies, quality, performance, procedures [and] capacity with respect to the mortgage loans"; "instances of fraud in the origination process", the "performance of past securitization transactions with respect to prepayments, defaults, servicing" and the "number of loans repurchased", and "any material developments or circumstances of which [the underwriters] should be aware before [they] enter the market to sell the securities".  (SOF ¶ 299-300; Ex. 82 (CSNCUA005444205-4207).)

### D.    Credit Suisse's Incentives to Conduct Strong Due Diligence

Credit Suisse had strong reputational interests in conducting effective due diligence; it could not build and sustain demand for its products without a record of providing accurate information to investors. (*See* SOF ¶ 347.) In addition, Credit Suisse's practice of retaining residual interests and first loss positions in RMBS securitizations provided Credit Suisse with further incentive to conduct reasonable due diligence. (SOF ¶ 348.) Specifically, Credit Suisse retained positions of approximately $2.6 billion in the Principal Securitizations at issue and approximately $14.1 million in the third-party Securitizations at issue. (SOF ¶ 350.)

### Standard

Summary judgment is appropriate only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[I]f there is any evidence in the record . . . from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhardt*, 481 F.3d 141, 148 (2d Cir. 2007) (quotation omitted). "[C]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the factfinder, not for the court on a motion for summary judgment." *Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) (quotation omitted).

"The reasonableness of a defendant's due diligence investigation will, in most cases, be a question for the factfinder. It is a mixed question of law and fact that will often hinge on disputed factual issues. Even when it does not, reasonable minds often disagree about whether a given investigation would have satisfied a prudent man in the management of his own property." *Nomura*, 68 F. Supp. 3d at 444-45; *see Mass. Mutual Life Ins. Co. v. DB Structured Prods., Inc.*, 110 F. Supp. 3d 288, 297 (D. Mass. 2015) ("'A defendant's assertion of the due

31

diligence defense requires an exquisitely fact intensive inquiry into all of the circumstances surrounding the facts upon which the claim is premised', and 'such fact-intensive inquiries do not lend themselves easily to resolution on summary judgment.'"  (quoting *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 WL 638268, at *11 (S.D.N.Y. Mar. 21, 2005))).

**Argument**

**I.     Both the Texas and Illinois Blue Sky Laws Allow a Complete Defense if Credit Suisse Exercised Reasonable Care in Connection with the Securitizations.**

**A.     The Texas Securities Act's Reasonable Care Defense Mirrors the Defense in Section 12 of the Securities Act.**

Under the TSA, it is a complete defense to liability if the defendant can demonstrate that he "did not know, and in the exercise of reasonable care could not have known, of the untruth or omission."  Tex. Rev. Civ. Stat. Ann. art. 581, § 33(A)(2).  There is no dispute that this defense is "to be interpreted in the same manner as the 'reasonable care' defense under § 12 of the Securities Act, 15 U.S.C. § 77*l*(a)(2)."  (NCUA Mem. 33.)  *See Sterling Trust Co. v. Adderley*, 168 S.W.3d 836, 840 (Tex. 2005) ("[T]he Legislature intended the TSA to be interpreted in harmony with federal securities law.").

**B.     The Illinois Securities Law Includes a Reasonable Care Defense that Mirrors the Defense in Section 12 of the Securities Act**

The Illinois Supreme Court has not ruled on the availability of a due diligence or reasonable care defense under § 12(G) of the ISL.  (*See* FAC ¶ 8.)  This Court therefore must "predict how that court would construe Section 12(G), which includes considering decisions of the Illinois appellate courts."  *NCUA v. Morgan Stanley*, 13-cv-6705 (DLC), 2014 WL 1673351 at *4 (S.D.N.Y. Apr. 28, 2014).  This Court should predict that the Illinois Supreme Court would find a reasonable care defense under § 12(G) equivalent to that available under the TSA and § 12(a)(2) of the Securities Act.

Section 12 of the ISL defines violations for which the ISL creates both civil and criminal liabilities. *See* 815 Ill. Comp. Stat. 5/14(A)-(B-10) (criminal provisions for violations of § 12). This Court recognized in *RBS* that the civil analogue of § 12(G) is § 12(a)(2) of the Securities Act. *NCUA v. RBS Sec.*, 112 F. Supp. 3d 61, 64, 68 (S.D.N.Y. 2015) (considering whether § 12(G) includes a reliance element). As such, this Court should look to § 12(a)(2) of the Securities Act in addressing the availability of a reasonable care defense under § 12(G), as Illinois courts likewise would do. Because a reasonable care defense is available under § 12(a)(2) of the Securities Act, a reasonable care defense must also be available under § 12(G).

The conclusion that the Illinois Supreme Court would construe the ISL to allow a reasonable care defense is bolstered by that court's firm "reject[ion]" of the principle that "the mere existence of a statutory provision creating a cause of action for violating a law evinces a legislative intent to impose strict liability on defendants for such violations." *Barthel v. Ill. Cent. Gulf R. Co.*, 74 Ill. 2d 213, 224 (1978). In *Barthel*, the Illinois Supreme Court held that Section 73 of the state's Public Utilities Act allowed for a defense of contributory negligence, even though the text of the provision did not provide for one. *Id.* at 218, 220-21. The court refused to conclude that the statute abrogated common law defenses "unless it plainly appears that the intent of the statute is to impose strict liability." *Id*. at 221. The court since has repeated that it must be the legislature's clear intent to impose strict liability before statutes are construed to do so: "[T]he violation of a statute is not negligence *per se*, which refers to strict liability, but rather only prima facie evidence of negligence unless the legislature clearly intends to impose strict liability." *Abbasi ex rel. Abbasi v. Paraskevoulakos*, 187 Ill. 2d 386, 394 (1999) (citations omitted); *see also Bybee v. O'Hagen*, 612 N.E.2d 99, 103 (Ill. App. Ct. 1993) ("Normally [] violation of a statute is not a strict liability tort unless the court finds that the legislature clearly

intended to impose strict liability.  In the ordinary case, all that is required is reasonable diligence to obey the statute, and it frequently has been recognized that a violation of the law may be reasonable, and may be excused." (quotation omitted)).  Because there is no such clear legislative intention expressed here, Credit Suisse is entitled to assert a reasonable care defense.

NCUA's argument that the reasonable care defense is not available because it is not specifically enumerated in § 13 of the ISL (NCUA Mem. 31) is wrong.  Section 13 sets forth the requirements for civil actions for violations of § 12 (hence the inclusion of the notice and statute of limitations provisions in §§ 13(B) and (D)), but does not list the substantive defenses to a § 13 claim based on a § 12(G) violation.  If NCUA were correct that the only "defenses" to claims based upon § 12 violations are enumerated in § 13, there would also be no substantive defenses associated with *any* of the provisions of § 12.  But that is clearly not the law, as Illinois courts have allowed such defenses to prevail.  *See, e.g.*, *Tirapeli v. Advanced Equities, Inc.*, 813 N.E.2d 1138, 1142-44 (Ill. App. Ct. 2004) (affirming summary judgment in favor of defendants on  claims under ISL §§ 12(F), 12(G), and 12(I) for lack of reliance).[20]

This Court has stated that "only statutory, not equitable, defenses [may] be raised by a defendant in a case involving a blue sky violation".  *Morgan Stanley*, 2014 WL 1673351, at *7 (quotation omitted).  That statement is consistent with Credit Suisse's argument here, which is that the Illinois Supreme Court likely would construe § 12(G) consistently with § 12(a)(2) to include a reasonable care defense.  This Court also has stated—in rejecting RBS's argument that § 12(G) requires proof of reliance—that § 12(G) is a "strict liability statute", *RBS*, 112 F. Supp. 3d at 68, but that was in the context of rejecting an analogy to a *fraud* provision,

---

[20] *Parrent v. Midwest Rug Mills, Inc.*, 455 F.2d 123 (7th Cir. 1972), on which NCUA relies (NCUA Mem. 32), is not to the contrary.  The claims in that case involved claims for fraud, 455 F.2d at 124-25, and in that context, the Seventh Circuit held that the predecessor to ISL § 12 (though not specifically § 12(G)), was most analogous to a claim under § 10(b) and Rule 10b-5, *id.* at 127.

§ 10(b) of the Securities Exchange Act; this Court also noted that § 12(G) "is comparable to Securities Act Section 12(a)(2)", *id.*; *see also In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 175 (S.D.N.Y. 2003) ("Section 12(2) imposes strict liability, subject to the reasonable-care defense. The resulting standard is one of negligence." (quotation omitted)).

Finally, separate from the analogy to § 12(a)(2), there is an independent basis to conclude that reasonable care is a defense to liability under the ISL. At least one Illinois intermediate appellate court has analogized the § 12(G) claim to a common law negligent misrepresentation claim, for which evidence of reasonable care would clearly support at least a defense, if not rebut an element on which the plaintiff would have the burden. *See Foster v. Alex*, 572 N.E.2d 1242, 1244-45 (Ill. App. Ct. 1991).[21]

### C.  The TSA and ISL Require Only "Reasonable Care".

The due diligence standard applicable to the TSA and ISL, which derives from § 12(a)(2), imposes the modest requirement of demonstrating "reasonable care"; this is a less demanding standard than is required by Section 11. *Nomura*, 68 F. Supp. 3d at 474-75 ("Section 12(a)(2)'s reasonable care defense is 'less demanding' . . . than Section 11's due diligence defense" because "while Section 11 imposes a duty to conduct a reasonable investigation", § 12(a)(2) "only requires the defendant to show that it used reasonable care." (internal citations and quotations omitted)). As the SEC has stated, "the standard of care under Section 12(a)(2) is less demanding than that prescribed by Section 11 or, put another way, . . . Section 11 requires a more diligent investigation than Section 12(a)(2)". SEC, Securities Offering Reform, Securities Act Release No. 75 (Aug. 3, 2005), 2005 WL 1692642, at *79. The § 12(a)(2) reasonable care

---

[21] This Court in *RBS* stated that *Foster* failed to apply the "appropriate analogy" to Section 17(a)(2), and thus the Illinois Supreme Court would not likely follow it. *RBS*, 112 F. Supp. 3d at 64. Credit Suisse respectfully disagrees, and believes *Foster* is at least a "data point" suggesting that the Illinois Supreme Court would also construe § 12(G) consistent with a claim for negligent misrepresentation.

defense imposes a negligence standard.  *See, e.g., In re MetLife Demutualization Litig.*, 262

F.R.D. 217, 234-35 (E.D.N.Y. 2009); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 435

n.10 (S.D.N.Y. 2009).  "'Reasonable care is the degree of care which a reasonably prudent

[person] would use under like circumstances.'"  *MetLife*, 262 F.R.D. at 234 (quoting *Densberger*

*v. United Techs. Corp.*, 297 F.3d 66, 69 (2d Cir. 2002)).

## II.    Credit Suisse Exercised Reasonable Care.

### A.    Credit Suisse's Diligence Processes on the Loans Underlying the Principal Securitizations Constituted Reasonable Care.

A review of the extensive due diligence conducted by Credit Suisse with respect

to the Principal Securitizations demonstrates that Credit Suisse is entitled to the reasonable care

defense.  At the very least, there is sufficient evidence to raise an issue for the factfinder at trial.

### 1.    The Timing of Credit Suisse's Due Diligence Was Reasonable.

Credit Suisse's due diligence review, which included aspects of review both at the

time of loan acquisition and at the time of securitization, far exceeded the standard of reasonable

care.  The Offering Documents disclosed that the reported loan characteristics that NCUA claims

were misrepresented—LTVs and owner occupancy—were based on the characteristics of the

loans *at origination* (SOF ¶¶ 9, 14), and, in the case of owner occupancy, were based upon

representations of the borrowers *at that time*.  (*Id.* ¶¶ 10, 15.)  Credit Suisse conducted extensive

loan-level reviews at the time it acquired the loans that gave it substantial information

concerning the characteristics of the loans at origination, and those reviews were reasonable

exercises of care in connection with such disclosures.  (*See infra* §§ II.A.2-4.)  That extensive

acquisition due diligence included credit and compliance review of approximately 80% of all the

loans in the SLGs, and as much as 91% for one Securitization (HEMT 2006-2) (SOF ¶ 447; *see*

*supra* Table 2)—far more than the 40% review at issue in *Nomura*, 68 F. Supp. 3d at 477.

Whereas this Court stated that Nomura selected loans for securitization based on "factors that might cause it to bundle together a large number of defective loans", *Nomura*, 68 F. Supp. 3d at 477, there is no evidence in the record that Credit Suisse did so.  As NCUA itself emphasizes, Credit Suisse generally selected available loans from its inventory for securitization based on the product type of the particular Credit Suisse shelves.  (SOF ¶ 43; *supra* FB § B.1(d).)  Accordingly, through the robust due diligence performed at acquisition, as well as the manner in which Credit Suisse selected loans for securitization and conducted additional review at that time, Credit Suisse took great lengths—far more than reasonable care—concerning the disclosures in the Offering Documents that are the subject of NCUA's claims.

Although NCUA assumes that an RMBS issuer's failure to conduct a second round of detailed loan-level due diligence "at or near the time of the securitization" is *per se* unreasonable (NCUA Mem. 42-43), that is not the law.  The mere fact of a time lag between loan acquisition and securitization does not establish lack of reasonable care.  *See Mass. Mutual*, 110 F. Supp. 3d at 300 ("[C]onducting the reviews at the time of acquisition may have been reasonable.").  Although *Nomura* referenced the time between Nomura's acquisition and the later securitization dates, that was not dispositive to the Court's analysis.  68 F. Supp. 3d at 454.  The Court stated that "it is conceivable that a review of loans at purchase—which may occur months before Nomura selects the loans to be placed in a particular SLG—might have been sufficient for a factfinder to find in Nomura's favor on these affirmative defenses."  *Id.* at 445.

This is particularly true with respect to the securitizations at issue here, as the representations concerning the mortgage loans (which NCUA claims were misstated) concerned the characteristics of those loans at origination.  (*See supra* Factual Background § A.)  *Mass. Mutual*, 110 F. Supp. 3d at 300 ("It makes some sense to review the loans at acquisition, which is

closer to the origination date, rather than at the securitization stage.").   Changes to a loan's characteristics after that point are not indicative of the loan's compliance with guidelines at the time it was originated.  (SOF ¶ 340; Ex. 65 at 400:20-407:9 (Grice Tr.) ("[I]t is understood that the representations [are] with respect to guidelines in effect at the time the loan originated. . . . [W]hen you are approved for a loan, it is not for whatever FICO you may have ever.  It is based on the facts and circumstances at the time.  The rules in the guidelines I matched against your characteristics. . . . [U]nderwriting of mortgages generally contemplates life events, future changes, including FICO changes between the date of approval, the date of acquisition, [and] the date of securitization.").  The Offering Documents contained express disclosures that the property values were as of origination, and could not be guaranteed to remain the same.  (SOF ¶¶ 9, 328.)  The accuracy of these disclosures would not have changed based on due diligence performed at a later date.  Accordingly, there is no logic to NCUA's rule that would *require* due diligence to be conducted or re-done at the time of securitization, farther in time from origination.  Even if, as NCUA speculates, additional reviews "might" have disclosed additional information relating to the loans at origination (NCUA Mem. 43), a factfinder could find that such later checks were not required for Credit Suisse to have exercised "reasonable care".

NCUA also points to small numbers of loans found by Credit Suisse's QC vendors to have "critical" issues prior to securitization and loans rejected by other banks in whole loan sales prior to securitization as evidence that Credit Suisse became aware of post-acquisition information indicating that the loans were "defective".  (NCUA Mem. 43.)  However, neither QC results nor loans rejected by purchasers in whole loan sale transactions called into question the loans' compliance with underwriting guidelines at the time of origination.

*First*, with respect to QC, Credit Suisse's robust QC process further demonstrates the care that Credit Suisse put into its due diligence process, and further sets it apart from the facts in *Nomura*.  Whereas the Court in *Nomura* noted that Nomura ignored the quality control results it produced, 68 F. Supp. 3d at 452, Credit Suisse used QC results to provide feedback to its third-party due diligence vendors and Fulfillment Centers, and it used them to monitor the performance of loan sellers and brokers.  (*See supra* FB § B.7.)  NCUA contends that Credit Suisse's QC results indicated that 35% of the loans reviewed had "critical issues", and thus Credit Suisse's due diligence process must have failed to screen out defective loans.  (NCUA Mem. at 20-22.)  But QC reviews were not (nor were they intended to be) apples-to-apples replications of the credit and compliance due diligence conducted at acquisition.  For example, Credit Suisse instructed its QC vendors to use Credit Suisse's own underwriting guidelines to review the loan files for loans selected for QC, and the vendors' reports stated that those guidelines "were not necessarily those that were utilized at the time of purchase".  (SOF ¶ 222; Ex. 69 at -977 (CSNCUA023700976-1002)).)  NCUA's expert admitted if "a more lenient [originator] guideline was used at origination but a more stringent DLJ guideline was used during QC, noncompliance with the DLJ guideline would not necessarily indicate that the loan did not comply with the origination guideline".  (SOF ¶ 222; Ex. 67 at 399:11-401:13 (Oldfield Tr.).)  The statistics NCUA cites concerning loans found to have "critical" issues do not demonstrate that those loans in fact did not comply with applicable guidelines.

*Second*, with respect to whole loan sales, NCUA has provided no basis for a factfinder to conclude that that the loans declined by other banks in whole loan sale transactions failed to comply with guidelines at the time of origination.  In fact, the evidence suggests that the loans were compliant with guidelines.  (*See* supra FB § B.8.)  NCUA also vastly overstates the

significance of these loans that were declined from whole loan sales, which comprised only a small number (0.7%) of loans in the SLGs at issue here.  (*Id.*; *see* NCUA Mem. 26 (purporting to identify 200 loans in the SLGs).)

NCUA also points to 486 loans (1.7% of the loans in the SLGs) securitized after Credit Suisse had issued repurchase requests to loan sellers.  (NCUA Mem. 43.)  The vast majority of these repurchases were for missed payments that breached so-called "early payment default" covenants in the purchase agreements between the loan sellers and Credit Suisse.  (SOF ¶ 252; Kim Dil. Ex. 53 (Oct. 16, 2015 Grice Rpt.) ¶¶ 158-163.)  The Offering Documents disclosed the number of loans that had missed payments in the past (*see, e.g.*, Kim Comp. Ex. D (HEAT 2006-6 PS) at S-21) and did not guarantee that no such missed payments would happen in the future.  (SOF ¶ 331.)  A missed payment does not mean that the loan did not comply with guidelines at origination.  (Kim Dil. Ex. 53 (Oct. 16, 2015 Grice Rpt.) ¶ 164.)

NCUA also makes much of internal Credit Suisse documents suggesting "concerns" with the "quality of loans provided by particular originators" or "express[ing] concerns" about the effectiveness of Credit Suisse's due diligence.  (NCUA Mem. 24.)  Such documents are evidence of a working process where senior personnel at Credit Suisse took due diligence seriously and continued to work to improve the due diligence process.  *Compare Nomura*, 68 F. Supp. 3d at 460 (quoting the head of another bank's due diligence group, "I took the liberty to bullshit" the underwriters of a securitization on a due diligence call).  The record is replete with testimony of Credit Suisse employees who firmly believed in Credit Suisse's due diligence processes.  For example, Jason Nordyk testified that he "had no reservation, whatsoever, about the results of [the] due diligence . . . . I completed due diligence and made decisions to the best of my ability, based on the data and the loans and the information available

to me" (SOF ¶ 341; Ex. 37 at 148:8-18 (Nordyk *FHFA* Tr.).)  Similarly, Robert Sacco, who

oversaw due diligence in all channels testified, "I know . . . my group did what we felt was in the

best interests of Credit Suisse and not any individual salesperson, fulfillment center or anyone

else".  (SOF ¶ 342; Ex. 48 at 300:2-12 (Sacco *Cambridge Place* Tr.).)  A factfinder could

conclude that Credit Suisse personnel acted with care, responded to concerns, and continuously

improved Credit Suisse's processes.[22]

### 2. Credit Suisse's Due Diligence of Bulk Loans Was Reasonable.

Credit Suisse conducted a thorough and searching due diligence review of the

Bulk loans in the SLGs.  Credit Suisse's review identified and resolved issues concerning a large

number of loans graded EV3 (in the Bulk channel), providing demonstrable evidence of Credit

Suisse's rigorous due diligence process.  For over 80 Bulk pools, Credit Suisse conducted credit

and compliance due diligence on *all* of the loans and subsequently removed *all* EV3s from the

pools, other than a small fraction that Credit Suisse determined were appropriate to acquire based

on the overall loan file.  (SOF ¶ 361; Kim Dil. Ex. 154 (Grice Master File).)  (*See supra* FB

§ B.1(a)(2).)  Credit Suisse likewise conducted due diligence on samples for the other Bulk pools

with great care, again removing *all* loans graded EV3 other than a fraction that Credit Suisse

identified were appropriate to acquire.  (*See supra* FB § B.1.)

To the extent that sampling was used at acquisition on certain Bulk pools, that

was consistent with Credit Suisse's exercise of reasonable care.  As noted above, sampling had a

limited impact on the SLGs at issue here; Credit Suisse conducted credit and compliance due

---

[22] The evidence shows that Credit Suisse became more conservative over time:  Credit Suisse sampled higher percentages of loans in Bulk pools over time (SOF ¶ 356), it continually updated and tightened its own underwriting guidelines, (SOF ¶ 401), and it monitored originators and stopped purchasing from those whose performance failed to improve (SOF ¶ 265).  As just one example, the documents NCUA cites concerning Resource Bank in fact show that Credit Suisse recognized performance issues with its loans and, by March 2007, had cut off its price concessions, resulting in a "drop off" in acquisitions from Resource Bank.  (SOF ¶¶ 264-270.)

diligence on at least 70% of the loans in each of the SLGs and up to over 91% in one SLG

(HEMT 2006-2).  (*Supra* Tbl. 2.)  A factfinder could find that a review of this many loans in the

SLGs constituted reasonable care for ensuring the accuracy of disclosures about those loans.  *See*

*Mass. Mutual*, 110 F. Supp. 3d at 300 (rejecting the argument that RMBS issuer's due diligence

was unreasonable as a matter of law where issuer "conducted the Acquisition Diligence on

different pools of loans than the ones underlying the securitizations").  The limited impact of

sampling in this case is unsurprising because Bulk loans contributed only approximately 43% of

the loans to the SLGs and about half of those Bulk pools were subject to 100% credit and

compliance review (SOF ¶¶ 56, 57), whereas in *Nomura*, over 82% of SLG loans were sourced

from sampled bulk pools, 68 F. Supp. 3d at 450, 477.  Even with sampling, the average

percentage of loans that Credit Suisse reviewed in each Bulk pool for credit and compliance due

diligence was well above the industry practice of conducting credit and compliance due diligence

on only 10 to 20%.  (*Supra* FB § B.2(a).)[23]  Simply put, NCUA's focus on due diligence

sampling in this case is a red herring.

        Notwithstanding sampling's limited impact on Credit Suisse's due diligence,

NCUA focuses much of its motion on Credit Suisse's use of sampling.  NCUA's principal

criticism is Credit Suisse's use of adverse sampling, which NCUA claims cannot be used to

make statistically valid extrapolations.  (NCUA Mem. 38-39.)  NCUA's criticisms—confined to

a small fraction of the SLG loans that were subject to sampling—are unfounded.  To the extent

---

[23] Although this Court noted in *Nomura* that "caution [was] warranted" in looking to industry standards in the RMBS context to determine the reasonableness of a defendant's investigation, it agreed that industry standards remained "relevant to the reasonableness inquiry", 68 F. Supp. 3d at 473; *see also*, *e.g.*, *Worldcom*, 352 F. Supp. 2d at 492 (noting that "good faith compliance" with industry standards can establish a due diligence defense).  Credit Suisse's expert, who possesses extensive experience in the financial industry, has opined that Credit Suisse's due diligence met and in many cases exceeded industry standards for the RMBS industry during the 2005 to 2007 time period.  (SOF ¶ 337; Kim Dil. Ex. 21 (Aug. 14, 2015 Grice Rpt.) ¶ 415.)  NCUA's expert has offered no opinion to the contrary.  (*See* Ex. 67 at 239:23-240:3 (Oldfield Tr.).)

that sampling was used, Credit Suisse used adverse sampling to identify, review, and if necessary, remove the "loans that displayed loan characteristics that were considered the most risky when evaluating the pool in its entirety". (*Supra* FB § B.2(a).) That review included review of a high percentage of loans from sampled pools, based upon characteristics Credit Suisse determined were likely to identify loans with highest risk of default or non-compliance with underwriting guidelines. (*Id.*) Credit Suisse's experts have testified that Credit Suisse's use of adverse sampling under these circumstances allowed conclusions to be drawn concerning the characteristics of the pools as a whole, and allowed Credit Suisse to achieve comfort that it had sampled the loans most likely to be exceptions to underwriting guidelines. (SOF ¶ 352; Ex. 62 (Oct. 16, 2015 Barnett Rpt.) ¶¶ 8-9, 12-17, 19-20 (testimony from Credit Suisse expert Dr. Arnold Barnett, a professor of statistics at MIT, that "to the extent that Credit Suisse's adverse sampling appropriately targeted [loans with characteristics suggesting relatively high credit risk and/or higher likelihood of exceptions to underwriting guidelines], the proportion of loans in the adverse sample . . . would allow estimates of a conceptual upper bound on the corresponding proportion in the whole population"); Kim Dil. Ex. 53 (Oct. 16, 2015 Grice Rpt.) ¶ 46 (testimony from Credit Suisse expert Charles Grice that "[a]ssuming a properly selected adverse sample, Credit Suisse reasonably could expect that the un-sampled portion of a pool would have a lower risk of principal loss, default, and exceptions to underwriting guidelines than the sampled portion").) NCUA cites no authority and there is no basis to equate "reasonable care" with statistical certainty. Adverse sampling was and remains an industry-standard method for conducting due diligence on asset-backed securities. (SOF ¶ 353; Ex. 65 at 106:18-107:7 (Grice Tr.).) Even following the 2008 financial crisis, in 2011, the SEC adopted rules governing reviews of assets underlying asset-backed securities but declined to "adopt a minimum sample

43

size" instead adopting a "flexible" and "principles-based" approach to such reviews.  SEC, Rel.

No. 33-9176 (Jan. 20, 2011), 2011 WL 194494, at *5-6.  The SEC's rule explicitly contemplates

adverse sampling being used, requiring only that the chosen technique be disclosed.  *Id.* at *10.

Although NCUA's experts opine that Credit Suisse's use of adverse sampling was not

reasonable, that is not amenable to resolution on summary judgment.  *See, e.g.*, *SQP, Inc. v.*

*Sirrom Sales, Inc.*, 130 F. Supp. 2d 364, 368 (N.D.N.Y. 2001) ("The differing views of each

expert about the reliability of the sampling and testing methods used by the respective

adversaries creates questions of fact.").

   Although NCUA asserts that Credit Suisse's use of adverse sampling was

unreliable because Credit Suisse supposedly "excluded" from samples loans that purportedly met

its adverse criteria (NCUA Mem. 40), NCUA misinterprets the sample model documentation

(*see, e.g.*, SOF ¶¶ 85, 88) and distorts the way Credit Suisse's samples actually were selected.

Credit Suisse considered various criteria for selecting loans, and the model, using a "layered

risk" approach, highlighted loans for Credit Suisse's Bulk due diligence managers, who were

intimately involved in reviewing the data highlighted by Credit Suisse's own adverse sampling

model and selecting the samples themselves based on their own experience and judgment.[24]  (*See*

*supra* FB § B.2(a).)  The SEC in 2011 expressly preserved the role for such professional

judgment in sample selection, providing that "[w]e continue to believe that the nature of the

review may vary depending on numerous circumstances and factors which could include, for

example, the nature of the assets being securitized".  SEC, Rel. No. 33-9176 (Jan. 20, 2011),

2011 WL 194494, at *6.

---

[24] By contrast, the Court in *Nomura* noted that Nomura's due diligence personnel had a "limited role in the process".  68 F. Supp. 3d at 450-51.

NCUA's "Sample Failure Rates"—again of limited significance given that 80% of all SLG loans were subject to 100% credit and compliance review—do not present any sort of "red flag" that could call into question Credit Suisse's due diligence. *First*, the identification of EV3s itself demonstrates the searching and thorough review conducted by Credit Suisse. *Second*, as explained above, NCUA's "Sample Failure Rates" include loans graded EV3 that Credit Suisse removed from acquisition pools and did not acquire—by definition, a due diligence *success*.[25]  (SOF ¶ 392; Ex. 67 at 255:15-256:15 (Oldfield Tr.).)  *Third*, NCUA's alleged rates are inflated in several other respects because they count as "failures" loans that were graded EV3 solely due to a Credit Suisse overlay; loans that were graded EV3 due to missing documents that were subsequently provided; and loans that were graded EV3 but had adequate compensating factors.  Critically, NCUA's expert never attempted to determine why any loan was actually graded an EV3, and whether that grade was warranted or whether the loan was an actual "failure".  (SOF ¶ 393; Ex. 67 at 249:15-250:12 (Oldfield Tr.).)  Simply put, he treated any EV3 as a "failure" without further inquiry.  By contrast, Credit Suisse's expert reviewed loans graded EV3 in certain pools in depth, finding that the due diligence conducted on those loans was reasonable and gave Credit Suisse a reasonable basis to acquire or securitize them.  (SOF ¶ 354; Kim Dil. Ex. 21 (Aug. 14, 2015 Grice Rpt.) §§ X.B.2-3; Kim Dil. Ex. 53 (Oct. 16, 2015 Grice Rpt.) § IV.C.5.)[26]

---

[25] NCUA conflates the term "Sample Failure Rate" with "kick-out rate" (NCUA Mem. 45), a term used in *Nomura*, but the two are not synonymous:  NCUA's "Sample Failure Rates" incorporate loans graded EV3 that were removed from acquisition pools as well as those that were acquired by Credit Suisse after further individualized review.  (NCUA Mem. 12-13.)  Thus, NCUA's "Sample Failure Rates" misdescribe the percentages of loans that "failed" due diligence in the Sampled Bulk Pools and they overstate the "kick-out rates".

[26] NCUA cites an email in which Bruce Kaiserman stated with respect to a particular transaction that "if the error rate on the sample exceeds 5%, the sample size should be expanded until such time as we achieve an error rate of less than 5% (even if this means exceeding the 25% cap on the number of loans we can review on this trade)".  (SOF ¶124; Kim Dil. Ex. 58, at CSNCUA001972878.)  Mr. Kaiserman was not making any general statement of Credit Suisse policy or expressing any "concern" about so-called "Failure Rates" as a general matter (NCUA Mem.

Although NCUA contends that "trade stipulations" "capped" the number of loans that Credit Suisse could review (NCUA Mem. at 10), the "trade stipulations" Credit Suisse entered into concerning due diligence sample size were not hard "caps" according to Credit Suisse's due diligence personnel, and only six of the 166 Bulk pools even had such stipulations. (*See supra* FB § B.2(a).)  In *Nomura*, by sharp contrast, the Court noted that Nomura's trading desk entered into agreements "that prohibited Nomura from sampling more than a fixed percentage of loans in the pool", and Nomura's traders "agreed to limit its sampling" for *half* of the sampled bulk pools contributing to the SLGs.  68 F. Supp. 3d at 450.

### 3.  Credit Suisse's Due Diligence of Conduit Loans Was Reasonable.

NCUA does not dispute that Credit Suisse conducted due diligence review on 100% of the Conduit loans.  (SOF ¶ 136.)  That review was undertaken by industry-leading vendors who undertook a multi-step review and effectively escalated issues to Credit Suisse for further attention.  (SOF ¶¶ 395-97.)  Based on that review, Credit Suisse identified and resolved a large volume of issues based on detailed review of each individual loan.  (SOF ¶¶ 406-08.)  Each loan that it acquired had to and did pass through this due diligence process, which more than meets the standard of "reasonable care".

In arguing otherwise, NCUA relies upon disputed witness testimony concerning the nature of the Fulfillment Centers' reviews and supposed "pressure" put on the Fulfillment Centers (NCUA Mem. 13-16), much of which is directly contradicted by other witnesses, including Lydian's own director of operations and Credit Suisse personnel overseeing the

---

12 n.7.)  Mr. Kaiserman testified that there were instances in which Credit Suisse determined based upon the due diligence results for a particular loan pool that it wanted to review additional loans in that pool, but "[t]he process was dependent upon the facts and circumstances of the particular transaction and the results".  (SOF ¶ 124; Ex. 53 at 137:5-22 (Kaiserman *Mass. Mutual* 30(b)(6) Tr.).)  Mr. Kaiserman made the quoted suggestion in the context of a specific trade in which the loan seller attempted to alter the applicable underwriting guidelines after Credit Suisse's bid for the loan pool had been accepted; Credit Suisse had approved a previous set of guidelines that required higher borrower reserves.  (Kim Dil. Ex. 58, at CSNCUA001972878.)

Conduit.  (*See supra* Factual Background § B.1(b).)  Resolving the varying witness accounts and assessing witness credibility is of course a quintessential function for the factfinder at trial.

With no apparent irony, after falsely accusing Credit Suisse of conducting a "limited" review of Conduit channel loans for mere data validation, NCUA then turns around and accuses Credit Suisse of identifying *too many* issues during the Fulfillment Centers' reviews of such loans, citing "conditions" statistics that in fact show detailed review of the loans by the Fulfillment Centers.  (NCUA Mem. 16-19.)  NCUA ignores testimony and other documentation that puts that data in context (for example, it cites figures for the numbers of "conditions" identified by the Fulfillment Centers generally without examining what those conditions actually were (NCUA Mem. 41)).[27]  In some cases NCUA simply misinterprets the data, and in all cases it ignores additional information that shows that the Fulfillment Centers identified and resolved numerous issues.  As just one example, although NCUA cites a figure of 248 SLG loans "acquired pursuant to a 'business exception'" (NCUA Mem. 19), in fact the data entries to which NCUA refers correspond to only 40 distinct loan numbers, and the available comments to those entries (which NCUA ignores) establish that for many of these loans the issues associated with them had been resolved.  (SOF ¶ 193 (*e.g.*, "BPO received and acceptable to underwriting").)  Summary judgment cannot be granted based upon such a thin and disputed showing.

### 4.    Credit Suisse's Valuation Due Diligence Was Reasonable.

NCUA's only criticism of Credit Suisse's valuation due diligence—which Credit Suisse conducted on each and every acquired loan—is Credit Suisse's use of HistoryPro as one

---

[27] NCUA points to a number of conditions that it asserts, without any basis, "could not be cleared or . . . reasonably be waived" (NCUA Mem. 41 n.23), but its examples are clearly disputable.  For example, it is simply incorrect that "satisfactory 12 month housing payment history" is *necessarily* an "integral part of verifying a borrower's ability to repay a loan", as, for example, first-time homebuyers might not have such payment histories but could compensate with other factors, such as low DTI ratios, high FICO scores or verified reserves.  (Ex. 66 at 275:14-19 (Butler Tr.).)

aspect of its multi-faceted valuation review.  (NCUA Mem. 44.)  NCUA asserts that HistoryPro

is "not an independent appraisal tool," citing a HistoryPro product guide (SOF ¶ 203),

insinuating that Credit Suisse's use of the tool renders its entire due diligence program

unreasonable as a matter of law.  NCUA is wrong.  HistoryPro was an industry standard tool

used to identify property value inconsistencies.  (*Supra* FB § B.4.)  As the very product guide

that NCUA relies on shows, HistoryPro's results identified "value inconsistencies" and flagged

loans with potential for inflated appraisals, based upon numerous pieces of information about the

property and its neighborhood.  (SOF ¶ 203; Kim Dil. Ex. 92, at CSNCUA000495393.)  Credit

Suisse's expert opined that Credit Suisse's use of HistoryPro as a part of its valuation due

diligence program was reasonable.  (SOF ¶ 423.)  In sum, NCUA does not present grounds for

concluding that Credit Suisse's valuation due diligence was inadequate as a matter of law.

NCUA's criticism targets just one piece of the overall review Credit Suisse conducted, and that

criticism, at minimum, requires resolution of genuine issues of material fact.

> ### B. Credit Suisse's Third-Party Securitization Due Diligence Was Reasonable.

NCUA's criticisms of Credit Suisse's due diligence on the Third-Party

Securitizations (NCUA Mem. 49-54) are unfounded, and raise contested matters of material fact

that should be left for the factfinder at trial.

> #### 1. Lead Securitizations

A factfinder at trial could conclude that Credit Suisse's sampling practices for

RALI 2006-QA9 and LBMLT 2006-1 were reasonable.  The sample size for the RALI

securitization (11.3% of the final pool) was larger than the industry's typical sample size for a

third-party securitization.  (SOF ¶¶ 321, 448.)  Asset Finance's 4.4% sample for the LBMLT

2006-1 securitization was similarly consistent with Credit Suisse's policies, (*see* SOF ¶ 448; Kim

Dil. Ex. 21 (Aug. 14, 2015 Grice Rpt.) ¶ 145), and was reasonable given Credit Suisse's

familiarity with Long Beach as issuer from its previous roles underwriting LBMLT-shelf

securitizations.  (SOF ¶ 452; Ex. 21 at 199:19-200:11 (Hwang Tr.) ("We would take a look with

our experience with the originator.  We would work to come up with a sample size and make

sure all parties were comfortable with the due diligence that we were conducting . . . .").)

   That loans were added to the securitizations after the due diligence was concluded

did not render Credit Suisse's reviews unreasonable.  It was typical during this time period for

sponsors to add a certain number of loans to the initial pool of a securitization.  (SOF ¶ 319; Kim

Dil. Ex. 53 (Oct. 16, 2015 Grice Rpt.) ¶ 189.)  Credit Suisse was aware of the collateral

characteristics of loans that could be added.  (SOF ¶ 314.)  Being aware of this practice, Credit

Suisse's due diligence personnel, including Jason Nordyk, who served as the due diligence

manager on the RALI 2006-QA9 securitization, deliberately "oversample[d]" the initial pool

based on the expected size of the final securitization.  (SOF ¶ 319; Ex. 87 (email from J. Nordyk

(Dec. 1, 2006), CSNCUA01963171 at 3172)).)  With respect to LBMLT 2006-1, Credit Suisse in

fact drew its due diligence sample from the combined pool of nearly all of the loans that were

securitized.  (SOF ¶ 311; *see supra* FB § C.2.)  A factfinder at trial could find that the addition of

a mere 87 loans following due diligence (0.7% of the total population of loans in the

securitization) did not render Credit Suisse's due diligence on the securitization unreasonable.

   *Third*, a factfinder at trial could find Credit Suisse's valuation due diligence on

the two securitizations adequate.  (NCUA Mem. 54.)  In addition to the BPOs Credit Suisse

ordered in connection with the RALI 2006-QA9 securitization (SOF ¶ 326), Credit Suisse

instructed its credit and compliance due diligence vendors on both securitizations to review the

appraisals in the loan files, and Credit Suisse conducted data integrity review on the valuation

information in the Offering Documents.  (*Id.*; SOF ¶ 316.)  These reviews resulted in the credit

and compliance vendors scrutinizing appraisal values and identifying loans with discrepancies. (SOF ¶ 316; Kim Dil. Ex. 53 (Oct. 16, 2015 Grice Rpt.) ¶ 195.)

Credit Suisse's reviews as lead underwriter on these securitizations were notably more thorough and searching than those conducted by the lead underwriter on certain securitizations in *Nomura*. For one of the securitizations in *Nomura*, the lead underwriter conducted no loan-level review whatsoever, instead accepting summaries of pre-acquisition due diligence conducted by the issuer. *Nomura*, 68 F. Supp. 3d at 482. For other securitizations, the underwriter overrode all of the EV3 grades assigned by its vendor, in one case within one hour of receiving its vendor's results, without any evidence that it had identified compensating factors. *Id.* at 462-63. Nothing of the sort happened here, and Credit Suisse was far from a rubber stamp as a third-party underwriter. Credit Suisse's expert conducted an in-depth review of the due diligence documentation for LBMLT 2006-1 to assess the reasonableness of Credit Suisse's due diligence as a third-party underwriter, and concluded that Credit Suisse's due diligence was reasonable, robust and searching. (SOF ¶ 456.) Credit Suisse and its vendor investigated the loans that were graded EV3, and the review led to either issues initially identified by the vendor being adequately addressed or the loans being excluded from the securitization. (*Id.*)

## 2. Non-Lead Securitization

This Court recognized in *Nomura* that a non-lead, "participating underwriter," like Credit Suisse on the LBMLT 2006-6 securitization, "need not duplicate the investigation made by the manag[ing]" underwriter and "may delegate the performance of the investigation to the manager," so long as the participating underwriter "assure[s] himself that the manager's program of investigation and actual investigative performance are adequate." *Nomura*, 68 F. Supp. 3d at 472-473 (quoting New High Risk Ventures: Obligations of Underwriters, Brokers and Dealers, SEC Release No. 9671, 1972 WL 125474, at *6 (July 27, 1972) ("SEC Release

9671")).  Reliance by such participating underwriters on the loan-level due diligence conducted by the lead underwriter was, and remains today, the standard industry practice.  (SOF ¶ 463.)  The reasonableness of such delegation is evaluated "in light of all the circumstances," *Nomura*, 68 F. Supp. 3d at 472, which here include Credit Suisse's knowledge of Long Beach's origination practices and business from its previous experience as underwriter on prior Long Beach securitizations (*see supra* FB § C.2-3; SOF ¶ 457) and Credit Suisse's participation in the final due diligence call for the securitization with WaMu (*supra* FB § C.3; SOF ¶¶ 299-301).  The agenda for that call included specific discussion of WaMu's due diligence processes, the nature of the assets in the securitization, and the performance of previous Long Beach and WaMu securitizations including the reasons for any significant repurchase activity.  (*See supra* FB § C.3; SOF ¶ 301.)  Credit Suisse's expert has testified that these processes provided Credit Suisse, as a secondary underwriter, with sufficient assurance of WaMu's review (*see* SOF ¶ 462; Ex. 65 at 431:24-432:8 (Grice Tr.) ("If you and I have a conversation and you describe the diligence that you embark upon; and we're talking about assets that I, Credit Suisse, because of prior deals know, I know Long Beach transactions and Long Beach assets; you tell me how you did it.  I can get comfort from that practice consistent with market practices for secondary underwriters.")).  A factfinder is entitled to hear and assess that testimony at trial.

Credit Suisse had a more substantial basis to believe that WaMu's "program of investigation and actual investigative performance [were] adequate" than did the third-party underwriter defendant in *Nomura*.  There, the participating underwriter had "received very little information about Nomura's review processes" at the time of the securitization.  *Nomura*, 68 F. Supp. 3d at 483.  Indeed, the *only* information the underwriter had was a one-page summary of Nomura's pre-acquisition reviews that explicitly stated that it was "not complete" and not

represented to be "accurate." *Id.* at 482.  By contrast, WaMu performed credit and compliance due diligence on a sample of loans in LBMLT 2006-6, and Credit Suisse discussed WaMu's due diligence with WaMu after that diligence was complete.  (*See* FB § B.2(c).)  Indeed, WaMu's due diligence processes, involving the use of a reputable third-party vendor and an iterative and interactive process to resolve issues identified during the vendor's review (*id.*; *see* Kim Dil. Ex. 21 (Aug. 14, 2015 Grice Rpt.) ¶¶ 233-235), was "the kind of investigation the participant [Credit Suisse] would have performed if [it] were the manager".  SEC Release 9761, 1972 WL 125474, at *6.  A factfinder at trial could find that Credit Suisse's discussion with WaMu, coupled with Credit Suisse's knowledge of WaMu's processes and products that it had gained from other securitizations (*see* Kim Dil. Ex. 21 (Aug. 14, 2015 Grice Rpt.) ¶ 229), gave Credit Suisse sufficient assurance of the reasonableness of WaMu's investigative program to satisfy its reasonable care obligations.  (SOF ¶¶ 463.)

NCUA's argument that Credit Suisse "represented" or "held itself out" as a co-lead or co-managing underwriter on LBMLT 2006-6, and thus must be held to the higher standard applicable to lead or managing underwriters, is unsupported and inconsistent with how investors would have understood the Offering Documents.  (NCUA Mem. 27, 49-50.)  NCUA points only to the fact that WaMu and Credit Suisse were listed on the same line on the cover of the Prospectus Supplement (NCUA Mem. 49), but that placement (in which WaMu was listed first, then Credit Suisse, then Banc of America) did not identify any particular underwriter as a "co-lead" or "co-manager"; by contrast, the offering documents of previous LBMLT securitizations on which Credit Suisse served as third-party underwriter explicitly stated when Credit Suisse acted in a capacity as "co-lead".  (SOF ¶ 464; *see, e.g.*, Ex. 60 (LBMLT 2005-WL2 PS).)  The only disclosure in the LBMLT 2006-6 Offering Documents relating to the

relationships between the three listed underwriters is the disclosure of the principal amounts of

the offered certificates that WaMu, Credit Suisse and Bank of America agreed to purchase:

WaMu purchased the largest quantity, twice as much in every class of certificate from the other

underwriters, and is the only underwriter that purchased any Class 1-A certificates. (SOF ¶ 12;

Kim Comp. Ex. H at S-133-134 (LBMLT 2006-6 PS).)  This indicated to investors that Credit

Suisse was *not* a lead but rather a participating underwriter.  (*See* SOF ¶ 465; Ex. 21 at 90:9-17,

92:7-15 (Hwang Tr.) ("Typically there is a table in prospectuses that will show the allocation . . .

how the securities were split. . . . [B]ased on the method of distribution [Credit Suisse] played a

lesser role just because of our allocation so typically when you play a lesser role it means you are

not in the lead status, you are in the lower status.").)

 In any event, the semantics of "lead" and "co-lead" are less important to assessing

Credit Suisse's reasonable care obligations compared with the actual roles the different

underwriters played in the transaction, and it would have been well understood by investors that

there was a single underwriter responsible for conducting the loan-level due diligence.  As John

Herbert, a Director in Asset Finance, testified in his Rule 30(b)(6) deposition, "The syndicate

structure for a typical deal in terms of roles, you have one lead manager that's in charge of doing

the actual structuring, working with the rating agencies, coordinating the due diligence on behalf

of the underwriters, that's the structuring lead role. . . . . It would have been not standard for

anyone other than the structuring lead to get the collateral and have it reviewed because the

structuring lead would be doing that on our behalf."  (SOF ¶ 466; Ex. 29 at 22:16-2, 55:22-56:1

(Herbert *FHLB Chicago* 30(b)(6) Tr.).)  Even if Credit Suisse had "held itself out" as co-lead

(which it did not), NCUA does not contend that Credit Suisse was therefore obligated to re-do

the diligence performed by WaMu.  *See Nomura*, 68 F. Supp. 3d at 472 ("the participating underwriter need not duplicate the investigation made by the manager").

### Conclusion

For the foregoing reasons, this Court should deny the NCUA's motion for partial summary judgment on Credit Suisse's reasonable care defenses.

Dated: New York, New York
       March 11, 2016

Respectfully submitted,

Richard W. Clary
Michael T. Reynolds
Lauren A. Moskowitz
Omid H. Nasab
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Tel:  (212) 474-1000
Fax:  (212) 474-3700
rclary@cravath.com
mreynolds@cravath.com
lmoskowitz@cravath.com
onasab@cravath.com

*Attorneys for Defendants Credit Suisse
Securities (USA) LLC and Credit Suisse First
Boston Mortgage Securities Corp.*