# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of Southwest Corporate Federal Credit Union and Members United Corporate Federal Credit Union, | ) ) ) ) ) | Case No. 13-cv-6736 (DLC) |
| Plaintiff, | ) ) | **FILED UNDER SEAL** |
| v. | ) ) | |
| CREDIT SUISSE SECURITIES (USA) LLC, CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., | ) ) ) ) | |
| Defendants. | ) ) | |

## NCUA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON CREDIT SUISSE'S DUE DILIGENCE AND REASONABLE CARE DEFENSES

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ............................................................................................................... 4

I.      Credit Suisse's Representations About the Certificates ........................................ 5

II.     Credit Suisse's Mortgage Securitization Business ............................................... 6

        A.        Principal Securitizations ............................................................................. 6

                1.        Bulk Channel .................................................................................. 8

                2.        Conduit Channels .......................................................................... 13

                3.        Valuation Due Diligence ............................................................... 20

                4.        Quality Control ............................................................................... 20

                5.        Other Purchases from Problem Originators .................................. 24

                6.        Whole Loan Sales ........................................................................... 25

        B.        Third-Party Securitizations ...................................................................... 27

                1.        LBMLT 2006-6 .............................................................................. 27

                2.        LBMLT 2006-1 .............................................................................. 28

                3.        RALI 2006-QA9 ............................................................................ 28

STANDARD ...................................................................................................................... 29

ARGUMENT ..................................................................................................................... 30

I.      The Illinois Blue Sky Law Does Not Provide a Due Diligence or Reasonable
      Care Defense ....................................................................................................... 30

II.     The Reasonable Care Defense Under the Texas Blue Sky Law Mirrors the
     Reasonable Care Defense Under Section 12 of the Federal Securities Act ............... 33

III.    Credit Suisse Failed as a Matter of Law To Exercise Reasonable Care ..................... 34

        A.        Credit Suisse Must Satisfy a Rigorous Standard of Care .................................. 34

        B.        Credit Suisse's Acquisition-Stage Review of Principal Transactions
               Did Not Reasonably Ensure the Accuracy of the Offering
               Documents ....................................................................................... 38

1.    Credit Suisse's Use of Sampling for Bulk Loans Gave It No Reasonable Assurance that the Offering Documents Were Accurate.............................................................................................38

2.    Credit Suisse's Use of the Fulfillment Centers for Conduit Loans Gave It No Reasonable Assurance that the Offering Documents Were Accurate ...............................................................40

3.    Credit Suisse's Delay Between Review and Securitization Also Rendered Its Process Unreasonable.....................................................43

4.    Credit Suisse's Valuation Screening Gave It No Reasonable Assurance that the Offering Documents Were Accurate ...............................44

5.    Credit Suisse Unreasonably Failed To Investigate Red Flags.........................44

      a)   Credit Suisse Failed To Investigate High Failure Rates In Its Due Diligence Samples .................................................45

      b)   Credit Suisse Failed To Act on Quality Control Results .................................................................................47

      c)   Credit Suisse Failed To Act on Whole Loan Sale Rejections .................................................................48

C.   Credit Suisse's Due Diligence for Third-Party Securitizations Was Inadequate as a Matter of Law.........................................................................49

1.    Credit Suisse Performed No Loan-Level Due Diligence for LBLMT 2006-6...........................................................................49

2.    Credit Suisse's Due Diligence as a Lead Underwriter for the RALI 2006-QA9 and LBMLT 2006-1 Third-Party Securitizations Was Insufficient.........................................................52

CONCLUSION.............................................................................................................54

# TABLE OF AUTHORITIES

Page

CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................................29

*Bridgestone/Firestone, Inc. v. Aldridge*, 688 N.E.2d 90 (Ill. 1997) ...........................................32

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................................................29

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir. 1973) .................................34

*Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643 (S.D.N.Y. 1968) ...........................................49

*FDIC v. Giammettei*, 34 F.3d 51 (2d Cir. 1994) .............................................................................. 29

*Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544 (E.D.N.Y. 1971) .........................36

*FHFA v. Nomura Holding Am., Inc.*:

    68 F. Supp. 3d 439 (S.D.N.Y. 2014) ..................................................................................*passim*

    74 F. Supp. 3d 639 (S.D.N.Y. 2015) ....................................................................... 37, 42, 52

    104 F. Supp. 3d 441 (S.D.N.Y. 2015), *appeals pending*, Nos. 15-1872 & 15-1874
    (2d Cir.) ................................................................................................................. 37, 44

*Flowers v. Dempsey-Tegeler & Co.*, 472 S.W.2d 112 (Tex. 1971) ...................................................33

*Gap Stores Sec. Litig., In re*, 79 F.R.D. 283 (N.D. Cal. 1978) .......................................................35

*Hanly v. SEC*, 415 F.2d 589 (2d Cir. 1969) ...................................................................................34

*Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392 (7th Cir. 1995) .......................................52

*Hicks v. Baines*, 593 F.3d 159 (2d Cir. 2010) ................................................................................30

*Metzger v. DaRosa*, 805 N.E.2d 1165 (Ill. 2004) ...........................................................................31

*Morgan Stanley Info. Fund Sec. Litig., In re*, 592 F.3d 347 (2d Cir. 2010) .............................. 35, 37

*NCUA v. Morgan Stanley & Co.*:

    2014 WL 241739 (S.D.N.Y. Jan. 22, 2014) .....................................................................34

    2014 WL 1673351 (Apr. 28, 2014), *recon. denied*, 2014 WL 1909499
    (S.D.N.Y. May 13, 2014) .............................................................................................. 30, 32

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145
    (2d Cir. 2012) .................................................................................................................35

*Parrent v. Midwest Rug Mills, Inc.*, 455 F.2d 123 (7th Cir. 1972) ...................................................32

*ProShares Tr. Sec. Litig.*, *In re*, 728 F.3d 96 (2d Cir. 2013) ..........................................................37

*Quincy Co-Op Bank v. A.G. Edwards & Sons, Inc.*, 655 F. Supp. 78 (D. Mass. 1986) .............................34

*Rodriguez v. Village Green Realty, Inc.*, 788 F.3d 31 (2d Cir. 2015) ...................................................29

*S & D Trading Acad., LLC v. AAFIS Inc.*, 336 F. App'x 443 (5th Cir. 2009) ................................. 33, 34

*Salahuddin v. Goord*, 467 F.3d 263 (2d Cir. 2006) .......................................................................29

*Sanders v. John Nuveen & Co.*, 619 F.2d 1222 (7th Cir. 1980) .......................................................34

*Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385 (7th Cir. 1990) .....................................................32

*Software Toolworks Inc.*, *In re*, 50 F.3d 615 (9th Cir. 1994) ..........................................................34

*Sterling Tr. Co. v. Adderley*, 168 S.W.3d 835 (Tex. 2005) .............................................................33

*University Hill Found. v. Goldman Sachs & Co.*, 422 F. Supp. 879 (S.D.N.Y. 1976) .................................36

*WorldCom, Inc. Sec. Litig.*, *In re*, 346 F. Supp. 2d 628 (S.D.N.Y. 2004) ........................... 34, 35, 36, 44, 45

## STATUTES, REGULATIONS, AND RULES

Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ........................................................................30

       § 2(a)(4), 15 U.S.C. § 77b(a)(4) ..............................................................................35

       § 11, 15 U.S.C. § 77k ..............................................................................................35

       § 11(c), 15 U.S.C. § 77k(c) ......................................................................................35

       § 12, 15 U.S.C. § 77*l*.............................................................................31, 32, 33

       § 12(a)(2), 15 U.S.C. § 77*l*(a)(2) ..............................................................................33

       § 17(a)(2), 15 U.S.C. § 77q(a)(2) ..............................................................................32

Illinois Securities Law of 1953, 815 Ill. Comp. Stat. Act 5 (Illinois Blue Sky Law) .......................*passim*

       § 4(F)(2)(g), 815 Ill. Comp. Stat. 5/4(F)(2)(g) ...............................................................31

       § 12, 815 Ill. Comp. Stat. 5/12 ..................................................................................31

       § 12(G), 815 Ill. Comp. Stat. 5/12(G) ....................................................................31, 32

§ 13, 815 Ill. Comp. Stat. 5/13 ......................................................................................31

§ 13(A), 815 Ill. Comp. Stat. 5/13(A) ...........................................................................31

§ 13(B), 815 Ill. Comp. Stat. 5/13(B) ...........................................................................31

§ 13(D), 815 Ill. Comp. Stat. 5/13(D) ...........................................................................31

Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581 (Texas Blue Sky Law) ..............................*passim*

§ 10-1(A) .......................................................................................................................33

§ 33 .................................................................................................................................1

§ 33(A) ............................................................................................................................2

§ 33(A)(2) ......................................................................................................................33

§ 33 cmt. to 1977 amendment .................................................................................33, 35

17 C.F.R. § 230.176 ............................................................................................................35

Fed. R. Civ. P.:

Rule 56(a) .......................................................................................................................29

Rule 56(e) .......................................................................................................................29

OTHER MATERIALS

John C. Coffee, Jr., *Re-engineering Corporate Disclosure: The Coming Debate Over Company Registration*, 52 Wash. & Lee L. Rev. 1143 (1995) ....................................................34

47 Fed. Reg. 1372 (Jan. 13, 1982) .......................................................................................52

E.L. Folk III, *Civil Liabilities Under the Federal Securities Acts: The* BarChris *Case*, 55 Va. L. Rev. 1 (1969) ...................................................................................................35

*New High Risk Ventures: Obligations of Underwriters, Brokers and Dealers*, SEC Release No. 9671, 1972 WL 125474 (July 27, 1972) ...................................................................50

Samuel H. Young, *Interpretive Comments and Notes on Sections of the Securities Law of 1953 as Amended*, S.H.A. Ch. 121 1/2, Appendix (1960) ...................................................32

NCUA, as liquidating agent for Southwest Corporate Federal Credit Union ("Southwest") and Members United Corporate Federal Credit Union ("Members United," and collectively the "Credit Unions"), respectfully submits this memorandum of law in support of its motion for partial summary judgment on the due diligence and reasonable care affirmative defenses asserted by Defendants Credit Suisse Securities (USA), LLC and Credit Suisse First Boston Mortgage Securities Corp. (collectively, "Credit Suisse") under the Illinois Securities Law of 1953, 815 Ill. Comp. Stat. Act 5 ("Illinois Blue Sky Law"), and the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581, § 33 ("Texas Blue Sky Law"). *See* ECF No. 134, at 65 (Dec. 15, 2014) (asserting that Credit Suisse "had reasonable grounds to believe and did believe that the statements contained in the Offering Documents were true").

## PRELIMINARY STATEMENT

NCUA's claims arise out of representations made by Credit Suisse in connection with the sale of 11 residential mortgage-backed securities ("RMBS") certificates (collectively, the "Certificates") that were part of 9 RMBS securitizations for which Credit Suisse served as underwriter.  Credit Suisse sold each of the Certificates to the Credit Unions by means of Offering Documents that made representations about the mortgage loans backing the Certificates.  The offering documents represented that those loans were originated in accordance with applicable underwriting guidelines, had certain loan-to-value ("LTV") or combined loan-to-value ("CLTV") ratios, and were secured by a certain percentage of owner-occupied properties.  NCUA will prove at trial that each of these representations was materially false or misleading when made because a substantial percentage of the mortgage loans backing the Certificates were not originated in accordance with applicable underwriting guidelines and deviated in other ways from the descriptions in the Offering Documents.  As a result, the Certificates presented significantly more risk to investors than was disclosed.

Credit Suisse cannot avoid blue sky law liability for these misstatements and omissions by asserting a due diligence or reasonable care defense.  No such defense is available under the Illinois Blue Sky Law.  Further, Credit Suisse's reasonable care defense under the Texas Blue Sky Law fails as a matter of law.  That defense allows Credit Suisse to avoid liability if it can prove that it "did not know, and in the exercise of reasonable care could not have known, of the untruth or omission" at issue.  Tex. Rev. Civ. Stat. Ann. art. 581, § 33(A).  The defense is materially identical to the federal reasonable care defense on which this Court granted summary judgment in *FHFA v. Nomura Holding America, Inc.*, 68 F. Supp. 3d 439 (S.D.N.Y. 2014).  The undisputed facts show that Credit Suisse, like the defendants in *Nomura*, cannot meet its burden.[1]

*First*, the undisputed facts show that Credit Suisse did not have in place a reasonable process for ensuring the accuracy of the Offering Documents.  Credit Suisse only reviewed loans for credit, compliance, and valuation problems when it acquired loans, not when it securitized them.  That acquisition-based process was designed to protect Credit Suisse, not investors.  Credit Suisse retained the option of purchasing loans outside of guidelines if it so chose; it did choose to do so on many occasions; and, aside from certain loans that Credit Suisse sold to other banks, it sooner or later securitized everything that it purchased.  Further, employees who selected loans for securitizations and who drafted the Offering Documents never looked at the loan-level review in doing so.  The broken link between loan-level review and securitization led Credit Suisse to securitize many defective loans and left it without any reasonable basis to believe the statements in the Offering Documents were true.

*Second*, the undisputed facts also show that Credit Suisse relied on sampling procedures that were incapable of supporting conclusions about all of the loans in a pool.  A significant portion of

---

[1] Credit Suisse also could not meet its burden under Illinois law even if Illinois law provided a similar defense.

the loans came from loan pools for which Credit Suisse performed due diligence on only small samples of loans.  Credit Suisse failed to use random sampling procedures that would have allowed it to extrapolate findings from the samples to the entire pools.  Further, its own review found high numbers of defective loans in the samples.  It nevertheless proceeded to purchase and securitize the pools without investigating the unsampled loans[2] or making any other efforts to ensure that the Offering Documents were accurate as to those loans.

*Third*, even as to loans that came from channels for which Credit Suisse performed a 100% review, the undisputed facts show that Credit Suisse's review identified so many problems with the loans at issue – and there is so little evidence that the problems were actually resolved in any reasonable way – that no reasonable factfinder could approve its conduct.  For example, Credit Suisse's third-party fulfillment centers, although asked only to conduct "data verification" rather than independent scrutiny of the loans, nevertheless identified a staggering number of problems with the loans that ultimately backed the Certificates at issue:  185,907 "conditions" that purportedly had to be "cleared" before the loans could be purchased.  Credit Suisse purchased the loans anyway, and the record contains no evidence that it or the third-party centers ultimately gave the conditions anything more than just lip service.

*Fourth*, the evidence shows as a matter of law that Credit Suisse failed to investigate in response to obvious red flags that arose during and after due diligence.  Those red flags included not only the high kick-out rates in the samples, but also quality control results that revealed "critical issues" in more than one-third of the loans in Credit Suisse's inventory, and transactions in which other banks rejected Credit Suisse's loans as defective.  Credit Suisse did not take any corrective measures in response to these results, even though its own documents show that its employees recognized the implications of the dismal quality control results and unsuccessfully urged their

---

[2] In one isolated exception, Credit Suisse expanded its sample by 18 loans.  *See infra* n.8.

colleagues and superiors to fix the problems with Credit Suisse's loan review process. Instead, Credit Suisse continued to purchase and securitize loans from the originators with the worst quality control results, and even securitized loans it knew had been identified as defective.

*Fifth*, and finally, Credit Suisse's due diligence on the three Third-Party Securitizations at issue in this case was inadequate as a matter of law. As to one securitization (LBMLT 2006-6), Credit Suisse performed no independent due diligence, instead relying on the representations of Washington Mutual – the parent company of the securitization's sponsor. As to the other two securitizations (RALI 2006-QA9 and LBMLT 2006-1), Credit Suisse performed almost no valuation due diligence and very limited credit due diligence, sampling less than 10% of the loans and failing to increase these sample sizes in response to alarming results. No reasonable factfinder could conclude that any of this conduct met the high standard imposed on an underwriter by the securities laws.

## BACKGROUND

The Credit Unions purchased 11 Certificates from 9 RMBS securitizations underwritten by Credit Suisse between January 26, 2006, and May 25, 2007. Credit Suisse sponsored six of the securitizations (the "Principal Securitizations") through its wholly owned subsidiary DLJ Mortgage Capital ("DLJ"). *See* NCUA's Statement of Undisputed Material Facts ("SUF") ¶¶ 5-6. For the other three securitizations (the "Third-Party Securitizations"), Credit Suisse served solely as underwriter, and the sponsors were unaffiliated. SUF ¶ 12. Table 1 below sets forth the Securitizations (*see* SUF ¶¶ 5-6, 12):

**Table 1:  Securitizations at Issue**

| Security | Purchase Date(s) | Underwriter(s) | Sponsor | Primary Originators |
|---|---|---|---|---|
| ARMT 2006-3 | 7/26/2006 | Credit Suisse | DLJ | Countrywide (33.20%) DLJ (32.96%) CSFC (15.14%) |
| ARMT 2007-1 | 2/23/2007 | Credit Suisse | DLJ | CSFC (35.80%) DLJ (32.74%) |
| ARMT 2007-2 | 5/25/2007 | Credit Suisse | DLJ | DLJ (42.88%) CSFC (21.62%) Countrywide (15.86%) |
| HEAT 2006-6 | 7/12/2006 | Credit Suisse | DLJ | OwnIt (32.6%) Encore (16.6%) Decision One (13.4%) Lime (13.1%) |
| HEMT 2006-2 | 4/3/2006 | Credit Suisse | DLJ | CIT (14.57%) Quicken Loans (13.10%) |
| HEMT 2007-2 | 4/20/2007 | Credit Suisse | DLJ | DLJ (34.43%) New Century (14.78%) |
| RALI 2006-QA9 | 10/25/2006 | Credit Suisse | Residential Funding Company | PHH Mortgage (28.5%) Homecomings (25.2%) GMAC (14.3%) |
| LBMLT 2006-1 | 1/26/2006 1/30/2006 | Credit Suisse Washington Mutual | Long Beach | Long Beach (100%) |
| LBMLT 2006-6 | 7/21/2006 | Credit Suisse Banc of America Washington Mutual | Long Beach | Long Beach (100%) |

## I.    Credit Suisse's Representations About the Certificates

Credit Suisse sold the Certificates to the Credit Unions by means of registration statements, prospectuses, free-writing prospectuses, prospectus supplements, term sheets, and other written materials (the "Offering Documents").  SUF ¶ 7.  As relevant here, the Offering Documents represented that the mortgage loans:  (i) were originated or acquired generally in accordance with applicable underwriting guidelines, or had sufficient compensating factors;[3] (ii) had certain statistical

---

[3] In this memorandum, references to loans being originated or acquired in accordance with or generally in accordance with underwriting guidelines encompass the point that there may be exceptions to guideline compliance if there are sufficient legitimate compensating factors.

characteristics, such as certain LTV and CLTV ratios; and (iii) were secured by a certain percentage of owner-occupied properties.  *See* SUF ¶¶ 8-11, 13-16.

For example, the Prospectus Supplement for ARMT 2007-1 stated that "[t]he mortgage loans were originated or acquired generally in accordance with the underwriting guidelines described in this prospectus supplement."  *See* SUF Tbl. 2. It also contained an Annex of "Mortgage Loan Statistical Information," including LTV ratios and occupancy status percentages.  *See* SUF ¶¶ 8-11, 13-16 (listing relevant representations for all of the Certificates at issue in this motion).  At trial, NCUA will present the findings of its reunderwriting expert Steven Butler, whose review determined that these representations were false as to 63% of the loans in the supporting loan groups.

## II.    Credit Suisse's Mortgage Securitization Business

Two different groups within Credit Suisse were responsible for sponsoring and underwriting the nine securitizations at issue here.  The Asset Finance Capital Markets Group ("Asset Finance") underwrote two of the three Third-Party Securitizations (LBMLT 2006-1 and LBMLT 2006-6), SUF ¶ 22, while the Structured Products Trading Group ("RMBS Group") sponsored all six Principal Securitizations and underwrote one of the three Third-Party Securitizations, SUF ¶ 24.

### A.    Principal Securitizations

Andrew Kimura and Michael Marriott co-headed Credit Suisse's RMBS Group, which sponsored and underwrote all six Principal Securitizations.  SUF ¶ 25.  Robert Sacco oversaw Credit Suisse's due diligence on these securitizations.  SUF ¶ 26.  The RMBS Group acquired and securitized loans through four separate channels:  the Bulk Channel, the Loan-by-Loan Channel, the Wholesale Channel, and the Mini-Bulk Channel.  SUF ¶ 27.  The RMBS Group's stated goal was to securitize every loan that it acquired through these channels.  As Peter Sack, a co-head of Transaction Management at Credit Suisse, testified:  "[T]he business generally wasn't to be an investment portfolio, it was a conduit.  So if the loans are accumulating in the inventory, that's

counter to kind of the basic concept of the business."  SUF ¶¶ 28-30.  Patrick Gallagher and Alex Huang, two traders responsible for selecting loans for the Principal Securitizations, both testified that it was their practice to securitize every loan in Credit Suisse's inventory.  SUF ¶¶ 31-37.

Credit Suisse securitized the loans in the supporting loan groups an average of three months after it acquired them.  SUF ¶¶ 38-39.  The average number of days between acquisition and securitization for each of the six Principal Securitizations at issue in this case are set forth below in Table 2:

**Table 2: Time Lag Between Acquisition and Securitization**

| Securitization | Bulk | Mini-Bulk | Loan-by-Loan | Wholesale |
|---|---|---|---|---|
| ARMT 2006-3 | 50 | 91 | 77 | 75 |
| ARMT 2007-1 | 117 | 141 | 139 | 115 |
| ARMT 2007-2 | 81 | 86 | 133 | 119 |
| HEAT 2006-6 | 81 | 90 | 93 | 62 |
| HEMT 2006-2 | 132 | 195 | 141 | N/A |
| HEMT 2007-2 | 134 | 155 | 112 | 123 |

SUF Tbl. 12.  Aside from some limited accounting and collateral review, Credit Suisse did not perform any loan-level due diligence at the time of securitization, but instead relied on the review that outside vendors performed at the time the loans were acquired.  SUF ¶¶ 40-41.  As Mr. Sack put it, "anything that is good enough for us to buy is good enough for us to securitize."  SUF ¶ 42. Neither the traders who selected loans for securitizations nor the transaction managers who drafted and reviewed the Offering Documents reviewed due diligence results for the loans backing the securitizations.  SUF ¶¶ 44-50.  In some cases they did not even know what Credit Suisse's acquisition-stage review process entailed.  SUF ¶ 45.  Instead, Credit Suisse "selected loans with characteristics that generally were consistent with the characteristics of [a] securitization's particular shelf" – for example, adjustable-rate first lien mortgages for the ARMT shelf.  SUF ¶ 43.  Similarly,

the employees who supervised the acquisition-stage review often did not know what Credit Suisse's Offering Documents represented about the loans backing each deal.  SUF ¶¶ 51-54.

The RMBS Group's policies for reviewing loans acquired for principal securitizations were set forth in the Credit Suisse Conduit Process Control Manual ("Conduit Manual").  SUF ¶ 55.  The mechanics of Credit Suisse's review differed for each of the four channels through which Credit Suisse acquired loans.  For the Bulk Channel, Credit Suisse tasked its vendors with assessing whether loans were "consistent with the [s]eller's underwriting policy," complied with applicable law, and were properly appraised.  SUF ¶ 61.  For the Mini-Bulk and Loan-by-Loan Channel, Credit Suisse had loans reviewed by one of two fulfillment centers.  SUF ¶ 135.  The scope of this review was limited.  Eddie Othman, the Credit Suisse employee who managed the fulfillment centers, did not consider the review performed by the fulfillment centers to be "due diligence," but "merely data verification" that did not involve reevaluating the credit decision made by the original underwriter of each loan.  SUF ¶¶ 138-139.  Finally, loans originated by Credit Suisse in the Wholesale Channel were subject to underwriting review by the fulfillment centers, but were never subject to post-origination due diligence.  SUF ¶ 143.

### 1.    Bulk Channel

Credit Suisse acquired 43% of the loans in the supporting loan groups backing the Principal Securitizations in bulk pools of loans.  SUF ¶ 56.  For just over half of these pools (84 of 166), Credit Suisse performed a credit review of only a sample of the loans in the pool.  SUF ¶ 57.  Approximately 24% of the loans in the supporting loan groups at issue (including loans in all of the supporting loan groups) were sourced from these 84 bulk pools.  SUF ¶ 58.  For the remaining 82 pools (which were predominantly composed of subprime loans), Credit Suisse reviewed all of the loans in the pool.  SUF ¶¶ 59-60.

**a.  Sampling Procedure.**  For pools for which Credit Suisse's review was limited to a sample set of loans, its due diligence managers chose the sample.  SUF ¶ 62.  According to Credit Suisse's employees, due diligence samples should have been "representative" of the larger pool, so that results could be extrapolated to the unsampled portion of the pool.[4]  In practice, Credit Suisse did not actually select samples in a manner that permitted extrapolation.

*First*, Credit Suisse selected samples using an automated sampling model that identified loans based on certain "adverse" criteria – for instance, loans originated in states or cities with particularly strict housing laws, or loans with high balances.  SUF ¶ 68.  The final sample for each pool was then chosen by the due diligence manager assigned to the transaction.  SUF ¶¶ 62, 68.[5]  Credit Suisse's due diligence employees admitted that this non-random sampling prevented them from extrapolating the results of a sample to the larger pool.  *See* SUF ¶ 70 (Mr. Nordyk) (testifying that he "wouldn't feel comfortable saying that the sampling process is done such that you can attempt to extrapolate results over the entire population"); SUF ¶ 71 (Mr. Jones) (testifying that "there wasn't some extrapolation back from the sample to the whole pool").  No Credit Suisse employee testified either that extrapolation was possible or that Credit Suisse ever attempted to perform extrapolations before securitizing loans.

*Second*, Credit Suisse actually sampled only a fraction of the loans that met its adverse sampling criteria.  Credit Suisse produced data from its sampling model for 76 loan pools purchased

---

[4] Jason Nordyk, who managed Credit Suisse's bulk due diligence team, testified that "at some point you do sampling believing that sampling would be representative and would give you the indication of the information that you need to provide the feedback that you want to provide.  So looking at more loans would certainly give you more low level results."  SUF ¶¶ 63-64.  When he was asked whether a due diligence sample was "designed to be representative of the larger pool," he responded, "It should have been."  SUF ¶ 65.  Keith Jones, another bulk due diligence manager, described the purpose of sampling as, "[i]n a general sense, to identify a population of or a subset of a population for purposes of, you know, being a, you know, representative portion of that overall population."  SUF ¶ 66.

[5] Credit Suisse also sometimes used random selection to supplement the number of loans to be reviewed in order to meet the desired sample size.  SUF ¶ 69.

through its Bulk Channel whose loans were securitized in the supporting loan groups.  SUF ¶ 82.
Within those 76 pools, Credit Suisse excluded from its samples more than 30% of the loans that met
its adverse sampling criteria – a total of 4,161 loans.  SUF ¶ 83 & Tbl. 13.  Further, for 55 of the 76
pools, Credit Suisse's sample size was smaller than the minimum recommended by its own model.
SUF ¶ 83 & Tbl. 13.  The excluded loans and small samples resulted at least in part from Credit
Suisse's practice of agreeing to trade stipulations as part of negotiated loan purchases.  SUF ¶¶ 84-
87.[6]  Those stipulations capped the number of loans on which Credit Suisse was able to perform
credit, compliance, and valuation review.  SUF ¶¶ 72-76.

Credit Suisse adhered to trade stipulations even when members of its due diligence team
expressed concern that the sample sizes to which Credit Suisse had agreed would not permit
sufficient compliance and credit review.  For example, in July 2006, after Credit Suisse agreed to cap
its review of an American Home Mortgage pool of 275 loans at 10%, due diligence manager Keith
Jones explained that a 10% cap was "really not wise" because "[i]t doesn't even cover half the
compliance selection, let alone any of the credit concern loans."  SUF ¶ 90.  After his concerns were
rejected, Mr. Jones picked a sample of just 29 loans, or 10.5% of the pool.  SUF ¶ 91.  As Mr. Sack
explained in an April 2005 e-mail to due diligence manager Jason Nordyk, if Credit Suisse did not
make, and honor, such stipulations, originators would sell their loans to other banks:  "This is what
will happen, I guarantee:  [Countrywide] will say 'we sold to another counterparty because we don't
want the headache/expense/kicks of [a] large CSFB DD sample.'"  SUF ¶ 92.

**b.  Vendor Review, Waivers, and Overrides.**  After the due diligence manager selected the
sample, Credit Suisse sent the loans to a third-party due diligence vendor, such as Clayton Holdings,

---

[6] Credit Suisse's interrogatory responses identify 1,135 documents as "bid or trade
stipulations as to the amount or nature of Due Diligence that [Credit Suisse] would perform and/or
the underwriting guidelines that would be used to determine the eligibility of a mortgage loan for
purchase . . . and any other restrictions on mortgage loans eligible for purchase."  SUF ¶ 77.

for review.  SUF ¶ 94.  These vendors generally used the following codes (called "Event Levels") to grade the loans:

- **EV1**:  The loan complied with all applicable underwriting guidelines.

- **EV2**:  The loan deviated from underwriting guidelines, but the deviation was immaterial or compensating factors were present.

- **EV3**:  The loan materially deviated from underwriting guidelines and no compensating factors were present.

SUF ¶¶ 96-98.

In addition to instructing its due diligence vendors to review loans against the applicable guidelines, Credit Suisse also instructed its vendors to apply "overlays."  SUF ¶ 106. Overlays were additional criteria that, if not met, would result in a grade of EV3 for that loan.  Some overlays overlapped with underwriting guidelines:  for instance, Credit Suisse instructed Clayton to grade a loan EV3 if the borrower's "Stated Income [was] not Reasonable," if the "Borrower had had multiple [bankruptcies]," or if the borrower had a "Missing Pay[ment] History."  SUF ¶ 107 & Tbl. 14.  Other overlays went beyond what applicable underlying guidelines required.  Clayton tracked these overlays for 39 pools at issue here.  SUF ¶ 109.  Across these 39 pools, 17.5% of the loans graded EV3 received that grade due to an overlay.  SUF ¶ 110.  Credit Suisse's expert agreed that the 17.5% figure was "accurate or in the ballpark" and "a fair measure of the weight of overlays here." SUF ¶ 112.  Because some of those overlays were duplicative of, or less stringent than, the underlying guidelines, SUF ¶ 111, the 17.5% figure includes some loans that would have been graded EV3 even in the absence of an overlay.

After receiving a vendor's grades, Credit Suisse generally reviewed every loan that its vendor had graded EV3.  SUF ¶¶ 99-100.  Of the 24,134 loans that its vendors initially graded EV1 or EV2, Credit Suisse changed less than 2% of them (464) to EV3; by contrast, of the 15,266 loans that its

vendors initially graded EV3, Credit Suisse changed more than half (8,631) to an EV1 or EV2.[7]
SUF ¶¶ 101-104.  In some cases, these changes occurred after the due diligence review located a
missing document; in other instances, Credit Suisse simply "waived" or overrode its vendor's
findings.  SUF ¶ 114.  This practice eventually became so systematic that Clayton introduced a
fourth event level – EV2W – to signify a "client override."  SUF ¶ 115.  A grade of EV2W meant
that Clayton had graded the loan EV3 but that Credit Suisse had overridden that grade.  SUF ¶ 115.
NCUA has been able to obtain Clayton reports showing the number of loans that were graded
EV2W for 16 pools of loans, which contributed 5,344 bulk loans to the supporting loan groups (or
44.3% of all bulk loans).  SUF ¶¶ 116-119 & Tbl. 15.  Across these 16 pools, an average of 6.2% of
the loans in the sample had final grades of EV2W.  SUF Tbl. 15.  For one pool (contributing 356
loans), the waiver rate was greater than 40%.  SUF ¶ 120 & Tbl. 15.

  **c. Sample Failure Rates.**  Across the 84 bulk pools for which Credit Suisse performed due
diligence on a sample of loans, an average of 22% of the loans in each sample remained EV3s after
Credit Suisse had completed its review of the vendor's findings (the "Sample Failure Rate").  SUF
¶ 121.  Adjusting this figure for the portion of each pool that was securitized in the supporting loan
groups at issue here, the weighted average Sample Failure Rate increases to 28%.  SUF ¶ 122.  Sixty-
seven of the 84 sampled pools had Sample Failure Rates above 5%.  SUF ¶ 123.

  Credit Suisse management recognized that high Sample Failure Rates were cause for
concern:  Bruce Kaiserman, the co-head of Transaction Management at Credit Suisse, stated that, if
the percentage of EV3s in a sample "exceeds 5%, the sample size should be expanded until such

---

[7] Conversely, only 33 loans in the supporting loan groups that had initial due diligence grades
of EV1 or EV2 were re-graded as EV3; in only five of those 33 cases could Credit Suisse confirm
that it had instructed the vendor to make that change.  SUF ¶ 105.

time as we achieve an error rate of less than 5%." SUF ¶ 124.  With one exception,[8] however, Credit Suisse never increased the size of a due diligence sample in response to the Sample Failure Rate or took any other measures to increase its scrutiny of the unsampled loans.  SUF ¶ 125.

Under Credit Suisse due diligence policies, EV3s should not have been purchased.  SUF ¶ 127.  But Credit Suisse due diligence personnel did not make the final decision as to whether to purchase or reject each loan in a bulk pool.  SUF ¶ 128.  Credit Suisse purchased 392 loans with final grades of EV3 and included them in the securitizations at issue.  SUF ¶ 129.  Credit Suisse has stated that it is not able to explain why it purchased or securitized these loans.  SUF ¶ 130.

### 2.    Conduit Channels

Credit Suisse acquired or originated approximately 57% of the loans in the supporting loan groups for the Principal Securitizations through the Loan-by-Loan Channel (26%), the Mini-Bulk Channel (17%), and the Wholesale Channel (14%) – referred to collectively as the "Conduit."  SUF ¶ 131.  In the Loan-by-Loan Channel, Credit Suisse acquired single closed loans from small lenders.  SUF ¶ 132.  In the Mini-Bulk Channel, Credit Suisse acquired small pools of closed loans (generally, less than $5 million in value).  SUF ¶ 133.  And, in the Wholesale Channel, Credit Suisse originated loans through its wholly owned subsidiary, Credit Suisse Financial Corporation ("CSFC").  SUF ¶ 134.

**a. The Fulfillment Centers.**  Credit Suisse contracted with third-party "fulfillment centers" – primarily Ocwen Loan Servicing ("Ocwen") and Lydian Data Services ("Lydian") – to review loans it acquired or originated through the Conduit channels.  SUF ¶ 135.  These vendors generally reviewed all of the loans that Credit Suisse acquired or originated through the Conduit, although they occasionally reviewed samples of loans acquired through the Mini-Bulk Channel.  SUF

---

[8] The one exception is Pool 7894, a bulk pool of 49 loans.  Credit Suisse originally sampled 25 of the 51 loans in the initial pool, and later added an additional 18 loans to the sample.  SUF ¶¶ 125-126.

¶ 136.  Credit Suisse did not produce data showing the sample sizes used for Mini-Bulk loans.  SUF ¶ 137.  According to Diane Johnson, the Director of Due Diligence for Ocwen from 2004 through January 2008, Ocwen reviewed 100% of Mini-Bulk pools of less than 150 loans, and 10-30% of Mini-Bulk pools of 150 loans or more.  SUF ¶ 136.

The review undertaken by the fulfillment centers was limited in scope.  Eddie Othman, the Credit Suisse employee who managed the fulfillment centers, testified that he did not consider the review performed by the fulfillment centers to be "due diligence" but "merely data verification" that did not involve reevaluating the credit decision made by the original underwriter of each loan.  SUF ¶¶ 138-139.  Lydian underwriters Taurez Ashley, Carmen Torrance, and Tammy Barefield each testified that the due diligence performed by Lydian was limited to "data entry" and that Lydian did not make an independent determination as to whether the information disclosed in the loan file was accurate or reasonable.  SUF ¶¶ 140-142.  Credit Suisse's due diligence expert also acknowledged that loans originated by Credit Suisse in the Wholesale Channel were subject to underwriting review, but were never subject to "typical sponsor/underwriter due diligence."  SUF ¶ 143.

After reviewing a loan, a fulfillment center could make one of three recommendations:

- <u>Approve the purchase of the loan</u>.  The fulfillment center determined that the loan met all applicable underwriting guidelines or was outside guidelines but had compensating factors.

- <u>Conditionally approve the purchase of the loan</u>.  The fulfillment center determined that the loan could meet all applicable underwriting guidelines as long as certain conditions were met, such as locating a missing document.

- <u>Reject the loan</u>.  The fulfillment center determined that the loan was outside guidelines and lacked compensating factors.  Even if a fulfillment center rejected a loan, however, the seller or a member of Credit Suisse's sales staff could request an "exception" to the fulfillment center's rejection of that loan.

SUF ¶ 144.  If the fulfillment center approved the purchase of a loan, Credit Suisse generally purchased that loan without further due diligence.  SUF ¶ 145.  If a fulfillment center conditionally

approved the purchase of a loan, then Credit Suisse and the fulfillment center would attempt to "clear" the conditions attached to the approval prior to the funding date of the loan. SUF ¶ 146. If a fulfillment center declined a loan, then the Credit Suisse salesperson could request an "exception" to the fulfillment center's rejection of that loan. SUF ¶¶ 177-178.

> **b. Incentives of and Pressure on Fulfillment Centers.** Like Credit Suisse's sales force, the fulfillment centers were compensated based on volume. SUF ¶¶ 147-148. Eddie Othman, who managed Credit Suisse's fulfillment centers, wrote to Mr. Heckman in a December 2006 e-mail that "Lydian . . . want[s] to hit [Credit Suisse's sales target] as much as we do. They make NO money if they don't hit the funded loan count with CS. Fund is [their] #1 priority to make revenue each month." SUF ¶¶ 149-150.

Credit Suisse's sales force also directly pressured the fulfillment centers to approve more loans. Paul Heckman, the head of sales at Credit Suisse, instructed his account executives on the sales team: "Don't forget to call your pipeline and push closing," and "if you need to bring Michael Fallacara [who ran the Conduit], Eddie Othman, Henry Salomon or Gary Timmerman into the picture to assist make sure you reach out to them for help," SUF ¶ 151. In September 2006, Mr. Heckman set a sales goal of "$300K" for September and October and wrote to his sales force that "Eddie [Othman] has assured me he will do everything he can [fulfillment center] wise to help hit this goal." SUF ¶ 152. Mr. Othman forwarded this e-mail to Ocwen and Lydian, adding: "We need to do our best to get great pull through. Please meet with your teams without sharing this to make sure we are all on the same page about the upcoming goals for the next few months." SUF ¶ 153. Mr. Othman later wrote to Michael Daniel, a co-head of Credit Suisse's trading desk, that he was "frustrat[ed] with Paul and some of his sales force" because they "don't care when the firm gets jammed with crap." SUF ¶ 154. Mr. Daniel reported to Mr. Kimura, a co-head of Credit Suisse's RMBS Group, that "the fulfillment centers have come under such pressure from sales to overlook

questionable loan characteristics (e.g., unreasonable income or unclear credit history), that they have basically given up." SUF ¶ 155.

Fulfillment center employees have uniformly testified that the pressure applied by Credit Suisse's sales force significantly affected the fulfillment centers' incentives and performance. Diane Johnson, the Director of Due Diligence at Ocwen, and Ronald Szukala, the Director of Underwriting at Lydian, both testified that it was impossible to decline a loan without facing significant pushback from Credit Suisse. Ms. Johnson testified that "Credit Suisse Account Executives would frequently directly call Ocwen due diligence underwriters and attempt to intimidate them into speeding up the review or approving bad loans" and that she had to "change[] the phone numbers of my staff on numerous occasions due to the harassing calls from Credit Suisse Account Executives." SUF ¶ 156. Mr. Szukala similarly testified that "Credit Suisse sales and trading executives, particularly the sales [account executives], routinely inserted themselves into the underwriting process to solicit and direct the approval of loans that did not meet underwriting guidelines, even when we had informed them that the loans were defective." SUF ¶ 157. Mr. Szukala further testified that he "frequently had a line of people waiting to meet with me" about loans he had declined. SUF ¶ 157.

**c. Use of Conditional Approvals.** During the relevant period, the fulfillment centers made heavy use of conditional approvals. According to Credit Suisse's interrogatory responses, across the 15,784 loans in the supporting loan groups that Credit Suisse acquired through its Conduit channels, the fulfillment centers applied a total of 185,907 conditions – an average of 11.8 conditions per loan. SUF ¶¶ 159-160 & Tbl. 16.[9] This practice was particularly prevalent in the Wholesale Channel, where each loan had an average of 38.8 conditions attached to it. SUF Tbl. 16.

---

[9] This is a conservative measure of the true number of conditions applied by the fulfillment centers to the loans at issue. By doing so, NCUA has almost certainly excluded some unique conditions that merely appear duplicative. SUF ¶ 162..

Mr. Szukala testified the centers used conditional approvals so heavily because of the extreme pressure applied to them to avoid rejecting loans. *See* SUF ¶ 158 ("[I]t was much simpler for an underwriter to take a problematic loan and simply apply lots of conditions to it, assuming that the loan would be declined when the conditions could not be cleared, rather than decline the loan outright.").

Credit Suisse gave its fulfillment centers eight days total to review a loan file, but only two days to review each condition attached to a loan. SUF ¶ 163. If a fulfillment center took more than the allotted time to clear a condition, Credit Suisse could impose financial penalties on the fulfillment center. SUF ¶ 163. According to Credit Suisse's interrogatory responses, the fulfillment centers cleared 160,674 conditions between the conditional approval of the loans in the supporting loan groups at issue here and the funding of those loans. In December 2006, Lydian alone cleared 22,252 conditions on Wholesale Channel loans – an average of 717 conditions per day. SUF ¶ 165. At the time, Lydian employed no more than a few dozen underwriters, who were responsible for reviewing loans as well as clearing conditions, as well as one additional person dedicated to reviewing and clearing more than 100 conditions per day. SUF ¶ 166.

**d. Waivers and Exceptions.** If the fulfillment centers were unable to clear a condition, Credit Suisse frequently "waived" that condition. According to Credit Suisse's interrogatory responses, across the 11,131 loans that Credit Suisse acquired through the Loan-by-Loan and Wholesale Channels, Credit Suisse "waived" 17,187 conditions – an average of 1.6 waived conditions per loan. SUF ¶ 164 & Tbl.17. More than half of all the loans acquired through those two channels (54.5%) were purchased subject to at least one waived condition, and more than one-fifth (23.7%) were purchased subject to two or more waived conditions. SUF ¶ 168 & Tbl. 18. Credit Suisse did not produce and apparently did not maintain data on waived conditions in the Mini-Bulk Channel. SUF ¶ 170. Its interrogatory responses indicate that 2,358 of the 4,653 loans

acquired through the Mini-Bulk Channel were "reviewed with conditions/exceptions."[10]  SUF ¶ 173.

Credit Suisse has presented no evidence that anyone (at the fulfillment centers or at Credit Suisse)

cleared these conditions prior to securitization.

When a fulfillment center declined a loan, Credit Suisse salespeople could request an

"exception" to that rejection.  SUF ¶ 177.  McKinsey, an independent consultant that Credit Suisse

retained in 2007 to review its Conduit operations, noted in its findings that "75% of exception

requests were submitted only to appease [account executives]" and "exceptions can be escalated to

six different people before a final decision is made on a loan."  SUF ¶¶ 179-180.  Credit Suisse

policy dictated that exceptions could be made for reasons extrinsic to the creditworthiness of the

loan itself:  the Conduit Manual provided explicitly that, "[i]f [an] Exception is denied by the CSFB

Underwriting Department, then the loan is sent to the CSFB Loan By Loan Pricing Desk to ask if

they will purchase the loan and require any applicable pricing adjustments."  SUF ¶ 181.

Credit Suisse also made exceptions to foster relationships with sellers.  *See* SUF ¶ 182 (e-mail

from Mr. Heckman:  "We wouldn't buy from a seller[] if all they showed us was the bad stuff and

they wouldn't sell if all we bought was the best stuff and kick the rest.").  Credit Suisse

communicated this policy to brokers themselves:  in a "Sample Exception Request" that Credit

Suisse distributed to brokers, for instance, Credit Suisse listed the fact that a "broker[] does $6

million in business with us" as an example of a "compensating factor" that brokers and sellers could

submit to obtain an exception.  SUF ¶ 184.  Credit Suisse's documents show that brokers requested

– and received – exceptions based on "compensating factors" such as the fact that a seller was a

"major account[]," SUF ¶¶ 185-186; that there was "client potential," SUF ¶¶ 187-188; that the

client "ha[d] a 10m pipeline with a great track record with us," SUF ¶¶ 189-190; and that a purchase

---

[10] Again, this is a conservative measure; other loans in the Mini Bulk channel were flagged as
"fail[ing] edit checks," "missing collateral,"  or "pending [a] . . . compliance review."  SUF ¶ 173.

was a "business decision/accommodation to my #1 client and in our top 10 nationally," SUF

¶¶ 191-192.  Credit Suisse has admitted that at least 248 of the loans in the supporting loan groups at

issue here were acquired pursuant to a "business exception," SUF ¶ 193, and that number is likely a

substantial underestimate because Credit Suisse generally kept no records at all of its reasons for

making exceptions.[11]

      **e.  Resubmissions.**  Even if a loan was finally rejected by a fulfillment center, it might still

make its way into a later securitization.  Ms. Johnson testified that if Ocwen "kicked" a high

percentage of loans from a particular originator in the Loan-by-Loan Channel, Credit Suisse would

"circumvent[]" the 100% Loan-by-Loan review process by pooling loans from that originator and

submitting them as a Mini-Bulk package to be reviewed on a sample basis.  SUF ¶¶ 194-198.  She

further testified that "quite frequently" Ocwen would discover that Credit Suisse had re-submitted in

Mini-Bulk pools loans that Ocwen previously had "kicked" when they were originally submitted for

Loan-by-Loan review, and that, when Ocwen brought this to Credit Suisse's attention, Credit Suisse

told Ocwen not to review those loans unless they happened to be selected for the review sample.  *Id.*

      **3.      Valuation Due Diligence**

      Before performing any valuation due diligence – that is, due diligence to confirm the

appraised value of the property underlying a loan – Credit Suisse ran almost all loans[12] through a

fraud-detection software package called "HistoryPro," which cost $3.50 per loan (compared to

between $8 and $11.50 per loan for a more comprehensive Automated Valuation Model ("AVM")

review).  SUF ¶¶ 202, 209.  If the HistoryPro results for a loan indicated a low risk of fraud, Credit

---

[11] Credit Suisse's interrogatory responses did not categorize the vast majority of the
exceptions disclosed therein (2,436 of 3,372), and business exceptions account for more than a
quarter (26.4%) of all categorized exceptions.  SUF ¶ 193.  Any reasonable factfinder would
accordingly infer that a significant number of the exceptions for which Credit Suisse gave no reason
were also business exceptions.

[12] Credit Suisse ran HistoryPro on 11,486 of the 12,061 loans it acquired through the Bulk
Channel.  SUF ¶ 204.

Suisse did not conduct any valuation due diligence on that loan, such as an AVM, a Broker Price Opinion ("BPO"), or a desk review.  SUF ¶ 206.  Credit Suisse performed limited valuation due diligence on approximately 29% of loans it acquired.  SUF ¶ 217.

Credit Suisse was aware that its valuation due diligence was failing to screen unreliable appraisals.  In April 2006, Credit Suisse performed new BPOs on a set of 298 loans it had previously acquired; these BPOs varied from the original appraisals by an average of 54%.  SUF ¶ 213.  Almost a year later, in March 2007, Mr. Sacco proposed that Credit Suisse strengthen its valuation due diligence to "address the issue of inflated appraisals and . . . high severity numbers we are seeing today."  SUF ¶ 214.  Mr. Fallacara responded that he first wanted to "see what % of our current production would be [a]ffected" by the policy change.  SUF ¶ 215.  Credit Suisse ultimately never implemented Mr. Sacco's suggestions.  SUF ¶ 216.

### 4.    Quality Control

**a.  Quality Control Process and Results.**  Credit Suisse performed quality control on a sample of the loans it purchased and originated.  SUF ¶ 218.  Quality control took place after the acquisitions involving the loans closed.  SUF ¶ 220.  Unlike the review at the time of acquisition, the quality control sample was designed to be random and representative of all loans in Credit Suisse's inventory.  SUF ¶ 221.  The Conduit Manual stated that the purpose of quality control was to "confirm that all purchased and originated loans . . . contain accurate data (data integrity), had due diligence accurately and appropriately performed, are originated and underwritten to the applicable underwriting guidelines, and are in compliance with all applicable laws."  SUF ¶ 219

Across the six Principal Securitizations, Credit Suisse's quality control showed that 35% of the loans it was acquiring or originating had "critical issues" – 43% for the Bulk Channel, 30% for

the Loan-by-Loan Channel, 33% for the Mini-Bulk Channel, and 35% for the Wholesale Channel.[13]

SUF ¶ 225.  In the Bulk Channel, the failure rate for pools on which Credit Suisse performed due

diligence on a sample of loans (43%) was similar to the failure rate for pools on which Credit Suisse

performed due diligence on every loan (41.7%).  SUF ¶ 226.  Credit Suisse did not screen loans that

failed quality control from securitizations, and Credit Suisse traders testified that they did not review

quality control results before selecting loans for securitization.  SUF ¶¶ 227-308.  Based on a review

of Credit Suisse's quality control documentation, NCUA has identified 89 loans in the supporting

loan groups that were securitized after being graded "critical" in quality control.  SUF ¶ 228.

    **b.  Internal Recognition of Problems.**  Credit Suisse management recognized that the

high critical issue rates in quality control indicated that Credit Suisse's due diligence processes were

failing to screen out defective loans.  In January 2007, for instance, John Vibert (the head of the

ARMs trading desk) wrote an e-mail acknowledging that Credit Suisse's quality control results

undermined its statements to "investors that we do 100% due diligence" on loans acquired through

the Conduit, and observed that Credit Suisse's "own underwriting group agree[d] with the QC firm

rather than our fulfillment centers."  SUF ¶ 235.[14]  Credit Suisse has offered no evidence that it ever

took any remedial steps in response to the quality control results.   To the contrary, Bertram Hill, its

sole full-time quality control employee, could not identify at his deposition any concrete action

Credit Suisse took in response to adverse quality control results other than to issue a repurchase

demand to the originator of the loan.  *See* SUF ¶ 231.

---

    [13] These figures do not include loans that failed quality control solely because of appraisal
problems.

    [14] Mr. Vibert attributed the problem to "mixed messages" from Credit Suisse's "conduit and
underwriting group."  SUF ¶ 235; *see id.* ("On the one hand they profess horror that our deals are
defaulting like banana republics, but on the other hand every time we try to tighten up our
underwriting processes they push back claiming it makes us uncompetitive.").

Credit Suisse due diligence employees repeatedly expressed concerns that Credit Suisse was not using its quality control results effectively.  In May 2006, Mr. Sacco asked Mr. Hill what Credit Suisse was doing about originators with high rates of critical loans.  SUF ¶ 230.  Mr. Hill responded that Credit Suisse had "not identif[ied] a process/action plan on sellers with high critical [percentages]."  *Id.*  Four months later, in September 2006, due diligence manager Rachel Romero advised quality control manager Melissa Pensari that "we will need to establish a policy/procedure for brokers/sellers" with high rates of critical issues identified in quality control.  SUF ¶ 232.  In November 2006, Credit Suisse had still not decided on an action plan for using quality control results, leading Ms. Pensari to ask, "[W]hat good is pulling the sample if we're not doing anything with the results?"  SUF ¶ 233.  Mr. Hill responded, "I agree – we should have a process around sellers and underwriting that are identified in these reports."  *Id.*  Two months after that, in January 2007, Mr. Sacco once again told Mr. Hill, "[w]e need to put a policy in place on error/defect rates."  SUF ¶ 234.

c. **Continuing Loan Purchases from Problem Originators.**  There is no evidence that any effective screening policy was put in place before the securizations at issue.  Instead, Credit Suisse continued to purchase loans from originators with high critical rates identified in quality control.  Many were in the supporting loan groups at issue here.

- A July 2006 report showed that 20.7% of the loans originated by Taylor, Bean & Whitaker Mortgage Corporation between May 2005 and April 2006 had critical issues.  Credit Suisse purchased and securitized 1,367 loans from Taylor Bean after July 2006.  SUF ¶¶ 237-278.

- An August 2006 quality control report showed that 41.7% of loans acquired from Alliance Bancorp between June 2005 and May 2006 had critical issues.  Credit Suisse purchased and securitized 668 loans from Alliance Bancorp after August 2006.  SUF ¶¶ 239-240.

- Four consecutive monthly quality control reports from July to October 2006 showed that, on average, 23.8% of loans originated by Decision One had critical issues.  Credit Suisse purchased and securitized 1,523 loans from Decision One after October 2006.  SUF ¶¶ 241-242.

- A December 2006 quality control report showed that 29.55% percent of loans acquired from NC Capital Corporation between October 2005 and September 2006 had critical issues. Four previous quality control reports had also shown that more than 20% of the loans acquired from NC Cap Corporation had critical issues. Five days after the December quality control report was circulated, Credit Suisse acquired (and ultimately securitized) 1,876 loans from NC Capital Corporation  SUF ¶¶ 243-245.

Credit Suisse's own Wholesale Channel was often the worst offender in quality control.  A March 2007 quality control report showed that 72.2% of the loans reviewed in quality control that were originated through Credit Suisse's Wholesale Channel had critical issues.  SUF ¶¶ 246-267.  Credit Suisse securitized 2,241 loans from its Wholesale Channel after March 2007.

**d. Focus of Quality Control on Put-Back Loans.**  In March 2007, Credit Suisse began to discuss steps to focus the quality control process on identifying loans that Credit Suisse could "put back" to originators – *i.e.*, loans that Credit Suisse could demand that originators re-purchase from Credit Suisse – while at the same time excluding from quality control loans that Credit Suisse might itself be required to re-purchase from securitization trusts.  SUF ¶¶ 248-249.  Mr. Sack explained the benefits of this approach:  "[W]e will likely QC fewer loans and therefore cut cost, but we should achieve a higher success rate in putting back bad loans.  And, we will cut down on the number of negative QC results floating around that we do not respond to by repurchasing loans from deals."  SUF ¶ 250; *see also* SUF ¶ 251 (later e-mail explaining Mr. Sack's view that quality control was of limited use to Credit Suisse because "we already know we have systemic problems in [the fulfillment centers] re both compliance and credit.").  Credit Suisse securitized at least 486 loans after identifying them as defective (through quality control or otherwise) and requesting that the originator re-purchase them.  SUF ¶ 252.[15]

---

[15] Credit Suisse rescinded the put-back requests for 40 of the 486 loans after making them. SUF ¶ 253.  When Credit Suisse issued a put-back request for a loan that was *already* securitized, Credit Suisse frequently did not inform the securitization trustee that the loan was defective; instead, Credit Suisse often simply accepted a cash payment from the originator of the loan and pocketed the proceeds.  SUF ¶ 255.  This meant that the most profitable loans for Credit Suisse were loans that

### 5.   Other Purchases from Problem Originators

On a number of occasions, Credit Suisse's employees expressed concern about the quality of the loans provided by particular originators, often in graphic terms. Credit Suisse nevertheless continued to purchase loans from those originators.

- In January 2007, Credit Suisse trader James Buccola compared loans originated by Fairmont Funding to a case of "genital warts" (and also described the Mortgage Store, from which Credit Suisse previously had purchased loans, as "the worst chop shop I've visited" and "the boiler room of mortgages"). SUF ¶ 260. Credit Suisse continued to purchase and securitize loans from Fairmont after January 2007.

- That same month, senior trader Michael Daniel circulated an e-mail about the "worst 5" Loan-by-Loan sellers: "Resource Bank, Dream House, Sallie Mae, Mortgage Store Financial, and Meridias." SUF ¶ 262. Credit Suisse subsequently purchased and securitized 514 loans from those five originators. SUF ¶ 263.

- In February 2007, Mr. Daniel sent an e-mail stating that "Resource Bank's underwriting is horrible," and that "[w]e need to come up with a concrete plan before we buy too many more loans from this account. Their performance is SO BAD that we can't afford not to." SUF ¶ 264. A month later, in March 2007, Resource Bank and Meridias again appeared on a list of poor sellers, along with Wall Street Mortgage and New York Mortgage Company. At that point, Mr. Daniel called Resource Bank's loans "[u]tter complete garbage," while Mr. Vibert described them as "complete crap." SUF ¶ 265. Credit Suisse nevertheless continued to purchase loans from Resource Bank until at least March 2007. SUF ¶¶ 266-270. Credit Suisse also securitized 264 loans from Resource Bank and 709 loans from Meridias in ARMT 2007-2 and HEMT 2007-2, both of which closed after March 2007. SUF ¶ 271.

Credit Suisse not only purchased loans from Resource Bank, but offered it volume incentives for more loans, a practice that Mr. Vibert described as "outrageous" and suggested was being concealed from the trading desk. *See* SUF ¶ 269 ("Not only does it encourage these guys to continue delivering us crap, but its [sic] all done on the DL so that unless Kaiserman catches wind of it, the [trading] desk never knows."). Mr. Vibert was correct that incentives were paid without his knowledge. *See*

---

were securitized and found to be subject to a put-back request. For those loans, Credit Suisse was paid twice: first when it securitized the loan, and again when the originator refunded Credit Suisse's purchase price. *Id.* This "bulk settlement" scheme continued unabated from 2005 through 2010. SUF ¶ 256. In 2012, the Securities and Exchange Commission ("SEC") issued a cease-and-desist order describing and condemning the scheme. SUF ¶ 257. Credit Suisse employees have admitted that the facts alleged in the cease-and-desist order are accurate. SUF ¶ 258.

SUF ¶ 270 (March 2007 e-mail to Mr. Fallacara listing incentives and observing: "Mike D[aniel] and [John] Vibert will blow their lid if/when they find out we are still paying Resource").

### 6.    Whole Loan Sales

In addition to securitizing loans, Credit Suisse sold pools of closed loans in its inventory to other investment banks.  SUF ¶ 272.  Before each sale closed, the purchasing bank generally performed its own due diligence on a sample of the loans in the pool offered by Credit Suisse.  SUF ¶ 273.  These banks' due diligence frequently revealed that a large percentage of the loans in Credit Suisse's inventory were materially defective.   Across eight whole loan sales for which NCUA was able to obtain complete due diligence information, the purchasing banks rejected an average of 20.9% of the loans in the sample for diligence reasons.  SUF ¶ 274 & Tbl. 19.

Credit Suisse employees expressed concern about these high rejection rates.  In April 2005, after GreenPoint identified defects in more than half of the loans in a loan pool, Mr. Sack wrote that Credit Suisse "need[ed] to figure out how these slipped through" and "should consider whether we should be more focused on credit issues."  SUF ¶ 275.  In June 2006, after Citigroup kicked out several loans in a pool, Elizabeth Pavlov (a transaction manager at Credit Suisse) asked Mr. Kaiserman (the co-head of Transaction Management) to "help [her] persuade internal management . . . that our reviews need to improve" because Credit Suisse was "not being as diligent as [it] should."  SUF ¶ 276.  In October 2006, after Countrywide kicked another 53 loans from a trade, Susan Tobin, who managed Credit Suisse's Wholesale Channel referred to the results as "terrible" and suggested that they meant that "Lydian is not underwriting and closing . . . loans in an acceptable manner."  SUF ¶ 277.  That same month, when Citigroup kicked out a substantial number of loans from another whole loan sale, Mr. Vibert observed that there were "an embarrassing number of diligence kicks" and that, "[i]f [Citigroup's] results are in any way representative of our compliance with our reps and warrants, we have major problems."  SUF ¶ 278.

On several occasions, Credit Suisse employees confirmed that Credit Suisse agreed with the reasons for these kicks and that they were not the result of unusually stringent review by the purchasing banks.[16]

Credit Suisse has identified no steps it took to investigate the quality of the loans in its inventory or improve its due diligence processes in response to these results.  SUF ¶ 284.  On several occasions, Credit Suisse employees instead discussed securitizing defective loans that had been kicked out of whole loan sales.[17]  Patrick Gallagher, a trader for the three ARMT securitizations, testified that "[t]here would have been no reason why" loans kicked from whole loan sales "wouldn't have been securitized."  SUF ¶ 289.  Based on a review of limited documentation regarding Credit Suisse's whole loan sales to other banks, NCUA has identified 200 loans in the supporting loan groups that had previously been rejected by other banks for due diligence reasons. SUF ¶ 291.

## B.    Third-Party Securitizations

Credit Suisse served as the co-managing underwriter for one of the three Third-Party Securitizations (LBMLT 2006-6) and as the lead underwriter for the other two Third-Party Securitizations (LBMLT 2006-1 and RALI 2006-QA9).  SUF ¶ 292.  For LBMLT 2006-6, Credit

---

[16] *See, e.g.*, SUF ¶ 280 ("Citi[group] conditions are not restrictive for a Whole Loan deal, basically normal underwriting stips."); SUF ¶ 281 ("It appears as though exceptions are being made to our stated policy or underwriters are not following policy. . . .  [W]e don't think they [Citigroup] are more stringent than we should be."); SUF ¶ 283 (e-mail exchange noting that Credit Suisse determined that 58 of 66 whole loans Citi rejected for underwriting defects were defective under Credit Suisse's own guidelines, some incurably so).

[17] Those discussions included a September 2005 e-mail in which a Credit Suisse trader proposed that Credit Suisse "sprinkle a few" such loans "into securitizations," SUF ¶ 287; an April 2007 e-mail in which Mr. Sack expressed an "inclin[ation] to securitize loans that are close calls or marginally non-compliant . . . rather than adding to sludge in inventory," SUF ¶ 286; a May 2007 e-mail in which a Credit Suisse analyst said that he would "check . . .  to see if we can add some loans into the [ARMT 2007-2] deal that will be falling out of Citi Sales," SUF ¶ 288; and a June 2007 e-mail in which a transaction manager instructed another employee to mark loans that were kicked from a sale as "unsourceable for Citi sales" but "sourceable [i.e., eligible] for securitizations," SUF ¶ 290.

Suisse performed no independent due diligence, instead relying exclusively on representations made by Washington Mutual ("WaMu"), the parent company of the securitization's sponsor and lead originator (Long Beach).  SUF ¶¶ 296-297.  For LBMLT 2006-1 and RALI 2006-QA9, Credit Suisse performed credit due diligence on a limited sample of loans, using incomplete loan tapes provided by the sponsors.  Credit Suisse performed no valuation due diligence on any of the loans in LBMLT 2006-1 and performed valuation due diligence on only 8 of the 727 loans (1.1%) in the supporting loan group backing RALI 2006-QA9.

### 1.    LBMLT 2006-6

Credit Suisse was the co-managing underwriter for LBMLT 2006-6, a Third-Party Securitization sponsored by Long Beach Mortgage Company.  SUF ¶ 292.  Credit Suisse performed no independent loan-level due diligence on LBMLT 2006-6 and instead "relied on the loan-level diligence performed on behalf of the underwriters by the lead underwriter[]," WaMu.  SUF ¶ 296.  WaMu was and remains the parent company of Long Beach.  SUF ¶ 297.  According to the LBMLT 2006-6 Prospectus Supplement, the securitization included approximately 7,958 loans.  SUF ¶ 298.

The only evidence in the record that Credit Suisse consulted with WaMu about due diligence on those loans is a list of 29 discussion topics that was circulated for a "Due Diligence Conference Call" that was to take place on July 21, 2006 – the day that LBMLT 2006-6 closed.  SUF ¶¶ 299-300.  Nine of those topics concerned the current state of WaMu's business; five concerned the servicer for the deal; three concerned any litigation in which WaMu may have been involved; five concerned the performance of prior WaMu securitizations; and seven concerned the loans that were to back the deal.  SUF ¶ 300.  One of the 29 topics was "Have you [*i.e.*, WaMu] experienced any increased instances of fraud in the origination process."  SUF ¶ 300.  Credit Suisse has identified no record of what was actually discussed on the call. SUF ¶ 301.

### 2.     LBMLT 2006-1

Credit Suisse was the lead underwriter for LBMLT 2006-1, a Third-Party Securitization sponsored by Long Beach Mortgage Company.  SUF ¶ 305.  Credit Suisse initially performed credit due diligence on 300 out of the 6,856 loans collateralizing LBMLT 2006-1 – a 4.4% sample.  SUF ¶ 306.  After most of the due diligence had been completed, Credit Suisse and Long Beach together decided to increase the size of the pool by 4,432 loans worth about $1 billion.  SUF ¶¶ 309-310.  Credit Suisse then added 200 loans to the sample, of which 45 (roughly 1%) were from the 4,432 new loans added to the pool.  SUF ¶ 311.  Clayton performed due diligence on the sample of loans selected by Credit Suisse and found that 11.6% of them violated underwriting guidelines and lacked any compensating factors.  SUF ¶ 312.  Credit Suisse did not increase the size of its sample in response to this finding or test any other loans in the supporting loan groups.  SUF ¶ 313.  After due diligence was complete, Credit Suisse and Long Beach added another 87 loans to the pool.  SUF ¶ 315.  Credit Suisse did not perform any due diligence on these loans.  *Id.*  Credit Suisse performed no valuation due diligence on any of the loans backing LBMLT 2006-1.  SUF ¶ 316.

### 3.     RALI 2006-QA9

Credit Suisse was the lead underwriter for RALI 2006-QA9, a securitization sponsored by Residential Funding Company, LLC ("RFC").  SUF ¶ 317.  RALI 2006-QA9 ultimately included 933 adjustable-rate mortgage loans worth about $370 million.  SUF ¶ 318.  Credit Suisse performed its due diligence by sampling a small portion of an incomplete loan tape that included only 746 of those 933 loans.  SUF ¶¶ 318-319.  Credit Suisse's sampling model recommended a sample size of 57% for RALI 2006-QA9.  SUF ¶ 320.  Credit Suisse nonetheless sampled about 13% of the incomplete pool and graded 8.4% of those loans EV3.  SUF ¶¶ 321-322.  Clayton further classified 12 of the 95 sampled loans (12.6%) as EV2Ws.  SUF ¶ 323.  Credit Suisse did not increase the size of its sample in response to these findings.  SUF ¶ 324. Credit Suisse's valuation due diligence on RALI 2006-

QA9 was limited to performing BPOs on nine of the 746 loans on the initial tape.  SUF ¶ 326.  RFC

added the remaining 187 loans to the pool after the conclusion of due diligence, and Credit Suisse

performed no due diligence of any kind on these additional loans, all of which were securitized.

SUF ¶ 325.

**STANDARD**

Summary judgment is appropriate if the moving party demonstrates that there is "no

genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could

return a verdict for the nonmoving party'" on the issue.  *Rodriguez v. Village Green Realty, Inc.*, 788

F.3d 31, 39-40 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A

fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing

law.'"  *Id.* at 39 (quoting *Liberty Lobby*, 477 U.S. at 248).

Where, as here, "a plaintiff uses a summary judgment motion . . . to challenge the legal

sufficiency of an affirmative defense – on which the defendant bears the burden of proof at trial – a

plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support

an essential element of the non-moving party's case."  *FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir.

1994) (brackets omitted).  "[T]here is 'no express or implied requirement in Rule 56 that the moving

party support its motion with affidavits or other similar material *negating* the opponent's claim.'"  *Id.*

(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If the movant makes the required

showing, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue

of material fact."  *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006) (citing Fed. R. Civ. P. 56(e)).

In this regard, the nonmovant "must point to specific evidence in the record," *id.*, and "may not rely

on mere speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment" because "[m]ere conclusory allegations or denials cannot by themselves create a

genuine issue of material fact where none would otherwise exist," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (alteration omitted).

## ARGUMENT

Credit Suisse's due diligence or reasonable care defenses all fail as a matter of law. No such defense exists under the Illinois Blue Sky Law. The Texas Blue Sky Law does recognize a reasonable care defense that mirrors the defense under Section 12 of the federal Securities Act of 1933. On this record, that defense is unavailable to Credit Suisse. Based on the undisputed facts, no reasonable factfinder could conclude that Credit Suisse took reasonable care to ensure the accuracy of the Offering Documents. Further, in the alternative, any comparable defense that existed under Illinois law would fail on this record as well.

## I.  The Illinois Blue Sky Law Does Not Provide a Due Diligence or Reasonable Care Defense

NCUA's claims for the Certificates purchased by Members United are brought under the Illinois Blue Sky Law. *See* Second Am. Compl. ¶ 8 & Tbl. 1.[18] Credit Suisse has attempted to assert defenses of due diligence or reasonable care for all of NCUA's claims, including those brought under the Illinois Blue Sky Law. *See* ECF No. 134, at 59 (Dec. 15, 2014). Those defenses fail as a matter of law because the Illinois Blue Sky Law does not provide such a defense. It instead imposes strict liability for any material misstatement or misleading omission in the offering documents for a security. This Court has previously observed, in striking Morgan Stanley's loss-causation defense, that "Section 12(G) of the Illinois Blue Sky Law is notable, even among state blue sky laws, in that it does not provide for *any* affirmative defenses to liability." *NCUA v. Morgan Stanley & Co.*, 2014 WL 1673351, at *5 (Apr. 28, 2014), *recon. denied*, 2014 WL 1909499 (S.D.N.Y. May 13, 2014). The same observation applies again here and should lead to the same result.

---

[18] The Complaint also asserted claims under the federal Securities Act, but this Court dismissed those claims. *See* ECF No. 58 (Mar. 17, 2014).

The text of the Illinois Blue Sky Law plainly does not create the due diligence or reasonable care defenses that Credit Suisse seeks to assert.  Section 12 of the Illinois statute lists a series of acts that "shall be . . . violation[s] of the provisions of this Act" if committed by "any person."  815 Ill. Comp. Stat. 5/12.  The prohibition at issue here is § 12(G), which makes it a violation

> [t]o obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

*Id.*  That is the whole of § 12(G).  It creates no defense based on the alleged exercise of due diligence or of reasonable care.  The next section, § 13, provides in relevant part that "[e]very sale of a security made in violation of the provisions of this Act shall be voidable at the election of the purchaser."  *Id.* § 13(A).  Like § 12, it creates no defense based on a seller's alleged exercise of due diligence or reasonable care.  Under the plain language of those provisions, a material misstatement or omission in the offering documents for a security permits the purchaser to recover regardless of the degree of care exercised by the seller:  "any" sale by means of a material misstatement is a violation, and "[e]very" violation makes the sale voidable.

Other provisions of the Illinois Blue Sky Law reinforce the point.  Section 13 defines certain defenses available to a seller of securities, including the limitations and notice defenses on which NCUA also moves for summary judgment today.  *See id.*; § 13(B), (D).  The absence of any due diligence or reasonable care defense from that defined set is a reason to think the Illinois legislature did not mean to create one.  *See Metzger v. DaRosa*, 805 N.E.2d 1165, 1172 (Ill. 2004) (applying the "familiar maxim *expressio unius est exclusio alterius*").  In addition, another provision of the Illinois Blue Sky Law concerning certain exempt sales of securities allows a seller to escape liability by "sustain[ing] the burden of proof that [it] did not know, and in the exercise of reasonable care, could not have known" of the termination of a certain state regulatory approval.  815 Ill. Comp. Stat. 5/4(F)(2)(g).  That language creates a reasonable care defense.  Its appearance in other parts of the

Illinois Blue Sky Law but not in § 12(G) underscores that the Illinois legislature did not intend such a defense for violations of that section. *See Bridgestone/Firestone, Inc. v. Aldridge,* 688 N.E.2d 90, 96 (Ill. 1997) (legislature's use of particular words in one part of a statute but not another "cannot be deemed to be inadvertent").

Comparing § 12(G) to its federal antecedent further strengthens the inference that the Illinois legislature intentionally declined to include a due diligence or reasonable care defense. This Court has previously observed that § 12(G) was "was modelled directly off Section 17(a)(2) of the Securities Act," which in turn should be "read *in pari materia* with the pre-1995 version of Section 12 of the Securities Act." *Morgan Stanley*, 2014 WL 1673351, at \*5, \*6; *see id.* at \*5 (citing Samuel H. Young, *Interpretive Comments and Notes on Sections of the Securities Law of 1953 as Amended*, S.H.A. Ch. 121 1/2, Appendix at 629 (1960)). Section 12(a)(2) by its express terms contains a reasonable care defense, as do similarly worded state statutes such as the Texas Blue Sky Law. *See infra* p. 33. Section 17(a)(2), like § 12(G), does not. The Illinois legislature's choice of Section 17(a)(2) rather than Section 12(a)(2) as its specific model suggests that it weighed the advantages of the different federal provisions and chose one with no due diligence or reasonable care defense.

Finally, there is authority recognizing the absence of a reasonable care defense from § 12(G). *See Parent v. Midwest Rug Mills, Inc.*, 455 F.2d 123, 127 (7th Cir. 1972) (noting that § 12's predecessor does not "contain[] the defense that one 'did not know and in the exercise of reasonable care could not have known' of the misrepresentation which is contained in Section 12(2) of the federal statute (15 U.S.C. § 77*l*(2)) and at common law"), *overruled on other grounds by Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1387-90 (7th Cir. 1990). This Court's own decision in *Morgan Stanley* is itself closely on point: it is as true here as it was there that the text, structure, and history of the Illinois Blue Sky Law all point to the conclusion that the statute "does not provide for *any* affirmative defenses to liability." 2014 WL 1673351, at \*5.

In the alternative, even if the Court were to hold that the Illinois Blue Sky Law contains a reasonable care defense, summary judgment would still be warranted because Credit Suisse's due diligence was unreasonable as a matter of law. *See infra* Part III.

## II.     The Reasonable Care Defense Under the Texas Blue Sky Law Mirrors the Reasonable Care Defense Under Section 12 of the Federal Securities Act

The Texas Blue Sky Law makes liable "[a] person who offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." Tex. Rev. Civ. Stat. Ann. art. 581, § 33(A)(2). It also provides an affirmative defense that "a person is not liable if he sustains the burden of proof that . . . the (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." *Id.* Credit Suisse has asserted this affirmative defense in its Answer to NCUA's Second Amended Complaint. *See* ECF No. 134, at 59 (Dec. 15, 2014).

The Texas legislature intended this "reasonable care" defense to be interpreted in the same manner as the "reasonable care" defense under Section 12 of the federal Securities Act, 15 U.S.C. § 77*l*(a)(2). When the Texas legislature adopted the "reasonable care" defense in 1977, it noted that the federal securities laws already "have the same provision" in Section 12. Tex. Rev. Civ. Stat. Ann. art. 581, § 33 cmt. to 1977 amendment; *see also Flowers v. Dempsey-Tegeler & Co.*, 472 S.W.2d 112, 114 (Tex. 1971) ("Section 33 of the Texas Securities Act was lifted almost verbatim from Section 12 of the 1933 Federal Act"). Moreover, "[t]he statute's history demonstrates that the Legislature intended the [Texas Blue Sky Law] to be interpreted in harmony with federal securities laws, and the [statute] itself instructs that 'this Act may be construed and implemented to effectuate its general purpose to maximize coordination with federal and other states' law and administration.'" *Sterling Tr. Co. v. Adderley*, 168 S.W.3d 835, 840 (Tex. 2005) (quoting Tex. Rev. Civ. Stat. Ann. art. 581, § 10-1(A)); *see also S & D Trading Acad., LLC v. AAFIS Inc.*, 336 F. App'x 443, 447-48 (5th Cir. 2009) (per

curiam).  "It is therefore appropriate to look to the federal construction of the identical language" in

Section 12 to interpret the "reasonable care" defense under the Texas Blue Sky Law.  *See NCUA v.*

*Morgan Stanley & Co.*, 2014 WL 241739, at *13 (S.D.N.Y. Jan. 22, 2014) (citing cases in which Texas

courts have relied upon federal interpretations of the federal securities laws).[19]

## III.   Credit Suisse Failed as a Matter of Law To Exercise Reasonable Care

### A.   Credit Suisse Must Satisfy a Rigorous Standard of Care

"No greater reliance in our self-regulatory system is placed on any single participant in the

issuance of securities than upon the underwriter."  *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480

F.2d 341, 370 (2d Cir. 1973).  "Prospective investors look to the underwriter – a fact well known to

all concerned and especially to the underwriter – to pass on the soundness of the security and the

correctness of the registration statement and prospectus."  *Id.*[20]  Underwriters of a security, who "are

free to assume an adverse role, have little incentive to accept the risk of liability, and possess the

facilities and competence to undertake an independent investigation," are expected and required to

---

[19] Section 11's due diligence defense is substantively identical to Section 12's reasonable care defense under the circumstances of this case.  *See In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir. 1994) ("Because Section 11's 'reasonable investigation' standard is similar, if not identical, to section 12(2)'s 'reasonable care' standard, the analysis of each on summary judgment is the same.") (citations omitted); *Sanders v. John Nuveen & Co.*, 619 F.2d 1222, 1228 (7th Cir. 1980) (holding that the defenses are substantively the same where the defendant is an underwriter); *see also In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 663 (S.D.N.Y. 2004) (noting that Section 12's "reasonable care" defense may be "less demanding" than the duty of due diligence imposed under Section 11 for certain defendants).  Accordingly, federal case law interpreting the due diligence defense under Section 11 is equally applicable to the reasonable care defense under the Texas Blue Sky Law.

[20] *See also Hanly v. SEC*, 415 F.2d 589, 596-97 (2d Cir. 1969) (holding that "securities dealer" "must disclose facts which he knows and those which are reasonably ascertainable" because "[b]y his recommendation he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investigation"); *Quincy Co-Op Bank v. A.G. Edwards & Sons, Inc.*, 655 F. Supp. 78, 86 (D. Mass. 1986) ("[A]n underwriter who purchases and resells all of an issuer's securities, is held to a more rigorous duty of care in investigating the security."); John C. Coffee, Jr., *Re-engineering Corporate Disclosure:  The Coming Debate Over Company Registration*, 52 Wash. & Lee L. Rev. 1143, 1169 (1995) (observing "the underwriter is a disciplinary force – a 'gatekeeper,'" and, "by its association with a securities offering, a high prestige underwriter places its 'seal of approval' on the offering" and "thereby becomes a reputational intermediary").

"play devil's advocate" and "exercise a high degree of care in investigation and independent verification of the [issuer's] representations." *Nomura*, 68 F. Supp. 3d at 469.

The applicable "standard of reasonableness" is a negligence standard that focuses on what "a prudent man [would do] in the management of his own property." 15 U.S.C. § 77k(c); *see In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 156 (2d Cir. 2012). In order to establish this defense, Credit Suisse must demonstrate that it engaged in a "'thorough and searching'" investigation "'with systematic attention to detail.'" *Nomura*, 68 F. Supp. 3d at 468 (quoting *WorldCom*, 346 F. Supp. 2d at 678). Credit Suisse must "probe the issuer, even to the point of rudeness," and must "insist upon documentary evidence to support all material representations in the registration statement." *In re Gap Stores Sec. Litig.*, 79 F.R.D. 283, 299 n.19 (N.D. Cal. 1978) (quoting E.L. Folk III, *Civil Liabilities Under the Federal Securities Acts: The* BarChris *Case*, 55 Va. L. Rev. 1, 54-56 (1969)); *see also Nomura*, 68 F. Supp. 3d at 468 ("[A] defendant must establish that it undertook such investigation in order to claim the benefit of this defense.").

"Reasonableness . . . is determined according to all relevant circumstances," *Nomura*, 68 F. Supp. 3d at 468, including: "(a) The type of issuer; (b) The type of security; (c) The type of [defendant]; . . . (g) When the person is an underwriter, the type of underwriting arrangement, the role of the particular person as an underwriter and the availability of information with respect to the registrant." 17 C.F.R. § 230.176; *see* Tex. Rev. Civ. Stat. Ann. art. 581, § 33 cmt. to 1977 amendment (listing materially similar factors). Because the issuers of the Principal Securitizations were "the creature of the underwriter," Credit Suisse's duty of care with respect to those securitizations is at its zenith. *Nomura*, 68 F. Supp. 3d at 471. Where, as here, an underwriter (Credit Suisse) is heavily intertwined with the issuer, and the underwriter thereby enjoys complete access to all relevant information about the security (as was the case for the Principal Securitizations), the underwriter's

"liability 'approaches that of the issuer as guarantor of the accuracy of the prospectus' and a due diligence defense will fail 'in practically all cases of misrepresentation.'"  *Id.* (quoting *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 578 (E.D.N.Y. 1971) (Weinstein, J.)).  Because Credit Suisse "itself [was] the entity effectively creating the [Principal Securitizations]," it had "all of the 'intimate knowledge' expected of the issuer," and therefore had "the greatest burden of diligence." *Nomura*, 68 F. Supp. 3d at 472; *see also University Hill Found. v. Goldman Sachs & Co.*, 422 F. Supp. 879, 900-01 (S.D.N.Y. 1976) (underwriter "must be judged by a fairly rigorous standard" when "its relationship to the [issuer]" is "uniquely close").  Even for the Third-Party Securitizations, Credit Suisse "bear[s] a heavy burden" as underwriter to verify the accuracy of the Offering Documents. *Nomura*, 68 F. Supp. 3d at 471.

Moreover, for the type of security at issue here (RMBS), an underwriter's vigilance and independence "may be even more vital" than in the context of equity securities because "the value of [RMBS] certificates depends upon the reliability of the data listed on the loan tapes, and the sole source against which to check the tapes – the loan files – are not available to the public."  *Id.*  The underwriter is thus one of the few (or only) entities with access to information necessary to evaluate the representations in the Offering Documents, and, if the underwriter does not adequately investigate the Offering Documents, "there [is] a substantial risk no one w[ill]."  *Id.* at 472.

The representations in the Offering Documents also affect the scope and nature of the investigation that Credit Suisse needed to perform.  *See id.* at 466 ("[a] defendant's assertion of the due diligence defense requires an exquisitely fact intensive inquiry into all of the circumstances surrounding the facts upon which" the claim is based); *WorldCom*, 346 F. Supp. 2d at 675 ("the underwriters are made responsible for the truth of the prospectus," and so they "must make some reasonable attempt to verify the data submitted to them").  Here, the Prospectus Supplements made broad statements that all loans were originated or acquired generally in compliance with

underwriting guidelines, *see* SUF ¶¶ 8, 13, and contained descriptions of the underwriting guidelines

for each of the originators who originated a significant proportion of the loans in a supporting loan

group, *see* SUF ¶¶ 8, 13 & Tbls. 2, 7.  Such representations "[t]hat *all* of the loans 'generally' met

guidelines indicated that certain immaterial exceptions might exist, not that a material number of the

loans might substantially deviate from the guidelines, without compensating factors."  *Nomura*, 68 F.

Supp. 3d at 485.  The Offering Documents also contained collateral tables that disclosed summary

statistics regarding the mortgage loans, such as LTV and owner occupancy, and mortgage loan

schedules that contained statistics for each loan (such as DTI, LTV, and owner occupancy).  *See* SUF

¶¶ 9, 14.

The underwriting guideline compliance "representations, taken together and in context," *In*

*re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013), are "high-level descriptions of a far more

complex underwriting process undertaken by all Originators prior to the securitization of the loans

or the preparation of the Offering Documents for the Securitization."  *FHFA v. Nomura Holding*

*Am., Inc.*, 74 F. Supp. 3d 639, 652 (S.D.N.Y. 2015).  After all, "the only standards and criteria to

which the [Offering Documents] could be referring are those that were in the hands of the original

lenders."  *Id.* at 654.  The underwriting guideline representations "provide[d] assurance that [Credit

Suisse] investigated the guidelines and practices of all originators, whether named or not, and it

vouche[d] for the fact that each of the loans was originated generally in compliance with those

originators' guidelines," not just the descriptions within the Offering Documents.  *FHFA v. Nomura*

*Holding Am., Inc.*, 104 F. Supp. 3d 441, 562-63 (S.D.N.Y. 2015), *appeals pending*, Nos. 15-1872 &

15-1874 (2d Cir.).[21]  Thus, to prevail on its reasonable care defense, Credit Suisse must establish that

---

[21] At the very least, these representations would have been misleading if loans in fact did not
comply with the applicable underwriting guidelines.  *See Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d
at 366 (holding that, when there is a "disclosure about a particular topic, whether voluntary or
required, the representation must be complete and accurate").

it performed a "searching review" to determine that all of the underlying loans complied with the applicable underwriting guidelines and to ensure that the loans' statistical information was not misrepresented. *Nomura*, 68 F. Supp. 3d at 472.

**B.      Credit Suisse's Acquisition-Stage Review of Principal Transactions Did Not Reasonably Ensure the Accuracy of the Offering Documents**

The undisputed facts show a basic disconnect between Credit Suisse's duty to take reasonable care to ensure the accuracy of the Offering Documents and its actual practices.  It is undisputed that Credit Suisse's due diligence group reviewed loans only at the time of their acquisition and that it was not part of that group's job to draft or to review the Offering Documents.  SUF ¶¶ 40-42.  It is also undisputed that the employees who did draft and review the Offering Documents (transaction managers and traders) did not review the results of the work done by the due diligence group.  SUF ¶¶ 44-50.  Instead, Credit Suisse's system was based on the assumption that "anything that is good enough . . . to buy is good enough . . . to securitize."  SUF ¶ 42.  Numerous fundamental flaws in the process through which Credit Suisse determined what to buy make clear that assumption was completely unwarranted.

**1.      Credit Suisse's Use of Sampling for Bulk Loans Gave It No Reasonable Assurance that the Offering Documents Were Accurate**

Credit Suisse represented in the Offering Documents for the Principal Securitizations that all of the mortgage loans in the supporting loan groups were underwritten generally in accordance with the applicable underwriting guidelines.  SUF ¶¶ 8, 13.  Credit Suisse did not perform credit and compliance due diligence on all of those loans.  Instead, it used sampling.  But the reasonableness of a sampling approach depended on Credit Suisse's ability to extrapolate from the results of reviewing those samples to the unsampled loans in each pool.  Here, Credit Suisse's non-random sample selection methodology meant that Credit Suisse could not extrapolate and knew little or nothing about the unsampled loans.

*First*, Credit Suisse selected samples that were almost entirely "adverse," rather than random. SUF ¶ 68.  Credit Suisse's employees admitted that the failure to use random sampling prevented Credit Suisse from extrapolating the results of a sample to the larger unsampled population of loans in each pool.  SUF ¶¶ 70-71.  As a result, Credit Suisse had no reliable data whatsoever about most of the loans in the sampled pools.  For that reason alone, it was unreasonable for Credit Suisse to "close [its] eyes and hope," *Nomura*, 68 F. Supp. 3d at 477, that the Offering Documents accurately described those loans it had never reviewed.

*Second*, Credit Suisse had no reasonable basis to assume that the criteria it used to create adverse samples were successfully culling the loans that were most likely to deviate from applicable underwriting guidelines.  As this Court explained in *Nomura*, in the presence of a "high kick-out rate, the testing of a single set of loans based on adverse sampling provide[s] no reliable basis to believe that all or most of the defective loans ha[ve] been located and culled."  68 F. Supp. 3d at 476.  Here, not only the high kick-out rate from the sampled loans themselves but also the dismal quality control results and failures of whole loan sales raised exactly the same problem.  *See infra* Parts III.B.3(b)-(c).

*Third*, even if Credit Suisse's adverse sampling criteria had been effective at identifying the riskiest loans, it is nevertheless undisputed that Credit Suisse did not sample all of the loans in each pool that its criteria identified as adverse.  Uncontroverted evidence establishes that Credit Suisse excluded from its samples almost one-third of the loans that met its adverse sampling criteria.  SUF Tbl. 13.  Whether those exclusions resulted from Credit Suisse's practice of agreeing to trade stipulations that limited its sample sizes, *see* SUF ¶¶ 74-80, or from unilateral use of samples too small to catch all the loans that met its own criteria, it shows Credit Suisse had no basis to believe it was catching all defective loans.

*Fourth*, the disconnect between Credit Suisse's review process and its securitization process made it even more unreasonable for Credit Suisse to rely on sampled pools.  As noted earlier, neither the traders who selected loans for securitizations nor the transaction managers who drafted and reviewed the Offering Documents reviewed any due diligence results for the loans backing the securitizations; it was enough that the loans were acquired and in inventory.  SUF ¶¶ 44-54.  As a consequence, when traders populated the supporting loan groups for the deals at issue, they had no idea whether the loans they selected had been reviewed by Credit Suisse's vendors or, if so, what the vendors had found.  SUF ¶ 44-54.  As a result, by the time of securitization, a loan that had been part of a 100% review set and deemed by Credit Suisse's vendors to be within guidelines (whether reasonably or not) had become indistinguishable from loans in a sampled pool that were never reviewed at all.  Taken as a whole, this process "could well have caused [Credit Suisse] to put a string of defective loans in a given [supporting loan group]."  *Nomura*, 68 F. Supp. 3d at 475.  Certainly, Credit Suisse had no reasonable basis to assume otherwise.

### 2. Credit Suisse's Use of the Fulfillment Centers for Conduit Loans Gave It No Reasonable Assurance that the Offering Documents Were Accurate

Even when Credit Suisse purported to review 100% of the loans acquired through the Conduit, or in certain bulk pools, that review fell far short of reasonable due diligence.  No reasonable factfinder could conclude that Credit Suisse conducted a "thorough and searching" investigation "with systematic attention to detail."  *Nomura*, 68 F. Supp. 3d at 468.

*First*, Credit Suisse's own witnesses have admitted that the fulfillment centers were not performing "due diligence" of the kind required to relieve an underwriter of liability for a securities offering.  Mr. Othman, who was in charge of the fulfillment centers, and several fulfillment center employees all testified that the review performed on Conduit loans was limited to "data verification" and did not involve an independent determination as to whether information in the loan file was

accurate or reasonable.  SUF ¶ 139.  Even Credit Suisse's own due diligence expert conceded that Wholesale loans, which Credit Suisse originated, were never subject to "typical sponsor/underwriter due diligence."  SUF ¶ 143.  Credit Suisse's contemporaneous internal documents show its employees expressing similar concerns in more candid terms.[22]

*Second*, the fulfillment centers' use of conditional approvals was so pervasive that no reasonable factfinder could conclude that the centers were taking reasonable care even to perform the data verification they were assigned.  The numbers for the loans in the supporting loan groups – an average of 11.8 conditions assigned to each loan in the Conduit channel, and 160,674 total conditions purportedly "cleared" before loan funding, SUF Tbls 16, 17 – are staggering.  Undisputed facts show that those conditions were cleared with implausible speed, *see* SUF ¶ 165 (in December 2006, Lydian cleared 717 conditions per day); that many were not dealt with at all, but simply were "waived," *see* SUF ¶ 164 & Tbl. 17 (1.6 waived conditions per loan); and that Credit Suisse has no evidence of whether conditions attached to thousands of loans were either cleared or waived, *see* SUF ¶ 173 (no records concerning conditions attached to 2,358 of the 4,653 loans in the Mini-Bulk Channel).  In the face of those objective facts, a reasonable factfinder would require more than mere assertion from Credit Suisse to find that the fulfillment centers' review was actually reliable or reasonable; and, on its side, Credit Suisse can point to nothing more than such assertions.[23]

---

[22] *See* SUF ¶ 200 (Vibert) (observing with regard to fulfillment center review of Mini-Bulk loans:  "our due diligence process is such a joke . . . [that] any loan could, and did, get through what passed for due diligence"); SUF ¶ 199  (Vibert) ("[W]e make these underwriting exceptions [in the Conduit] and then we have liability down the road when the loans go bad and people point out that we violated our own guidelines."); SUF ¶ 251 (Sack) ("I think we already know we have systemic problems in FC/UW [Fulfillment Center/Underwriting] re both compliance and credit.").

[23] Further, many of the conditions by their nature could not be cleared or could not reasonably be waived.  More than a thousand waived conditions were a lack of "satisfactory 12 month housing payment history," which is an integral part of verifying a borrower's ability to repay a loan, SUF ¶ 169; another 1,300 were for missing verifications of employment, another crucial part of a loan application, *Id.*; and many others were simply guideline violations rephrased as conditions – such as "90% CLTV > 80% allowed per guidelines," "$250,000 exceeds max loan amount –

*Third*, no reasonable factfinder could conclude that the fulfillment centers played the independent "devil's advocate" role envisioned for an underwriter, *Nomura*, 68 F. Supp. 3d at 482, in light of the unrebutted evidence that they were under consistent pressure from Credit Suisse – the actual underwriter – to approve loans regardless of their quality.  That pressure included financial incentives to meet volume targets, SUF ¶¶ 147-148; goals formulated by Credit Suisse's sales force and communicated directly to the centers' managers by Mr. Othman, SUF ¶¶ 152-153; and aggressive (even "harassing") calls and in-person meetings from Credit Suisse account executives, SUF ¶ 157.  Credit Suisse could not at the same time prevent the fulfillment centers from doing their jobs and rely on them as a shield against liability to investors.

*Fourth*, even to the extent the fulfillment centers identified defective loans regardless of the constraints under which they were operating, Credit Suisse could and did override them by making "business exceptions" – which accounted for an admitted 248 loans at issue, and possibly many more, SUF ¶ 193; and by resubmitting rejected loans through the Mini-Bulk Channel without including them in the selected sample, *see* SUF ¶¶ 194-198.  Those practices, which bypassed the only mechanism that was even theoretically protecting investors in the Certificates, were unreasonable as a matter of law and further undermine Credit Suisse's assertions that it took reasonable care.

### 3. Credit Suisse's Delay Between Review and Securitization Also Rendered Its Process Unreasonable

Even if Credit Suisse's acquisition-stage review had been a reasonable way to ensure accuracy at the time it was performed (which it was not), it would still be unreasonable because of the undisputed delay between the review and the acquisition.  Those delays varied by securitization and channel, ranging from a low of 50 days for Bulk loans backing ARMT 2006-3 to a high of 195

---

exception requested," and "Subject to receipt of exception on # of investment properties (limit is 4)," *Id.*

days for Mini-Bulk loans backing HEMT 2006-2. *See supra* p. 7. Here, as in *Nomura*, it was

unreasonable for Credit Suisse not to "conduct[] a due diligence program to confirm the accuracy of

the representations in the Offering Documents . . . at or near the time of the securitization."

*Nomura*, 68 F. Supp. 3d at 445.[24]

      The unreasonable delay meant that Credit Suisse necessarily missed any additional facts that

became available over time to check the representations in the Offering Documents. Such facts

might include a credit report showing that the borrower had undisclosed debts at the time of

origination or a post-origination bankruptcy filing showing that the borrower's income was

substantially lower at the time of origination than the borrower had stated in his or her loan

application, thereby causing the loan not to comply with the applicable underwriting guidelines. *See*

*Nomura*, 74 F. Supp. 3d at 653.

      In this case, the undisputed facts show that Credit Suisse actually did become aware during

the period between acquisition and securitization that hundreds of relevant loans were defective.

The supporting loan groups contain 89 loans that Credit Suisse had previously graded critical in

quality control, *see supra* p. 21; 486 loans for which Credit Suisse had previously issued repurchase

requests to originators, *see supra* p. 23; and at least 200 loans that had been rejected by other banks as

defective, *see supra* p. 26. Notably, Credit Suisse's pre-securitization repurchase requests included

requests in which Credit Suisse relied on post-origination (and post-acquisition) credit reports and

online database searches, and requests based on what Credit Suisse deemed "Borrower

---

     [24] Although this Court's opinion in *Nomura* found it "conceivable that a review of loans at purchase – which may occur months before Nomura selects the loans to be placed in a particular [supporting loan group] – might have been sufficient for a jury to find in Nomura's favor on these affirmative defenses," it did so merely for the sake of argument. 68 F. Supp. 3d at 445. It did not hold as a matter of law that, where, as here, an underwriter conducts due diligence months prior to securitization, it can survive a motion for summary judgment with respect to its reasonable care defense. At the very least, Credit Suisse's failure to perform due diligence at the time of securitization is a relevant factor in assessing the reasonableness of its due diligence. *See id.* at 476-77.

Misrepresentation."  SUF ¶ 254.  But because Credit Suisse did not review loans for credit or compliance issues at or near the time of securitization, it never even considered whether it was appropriate to securitize those loans after learning they were defective.

### 4.   Credit Suisse's Valuation Screening Gave It No Reasonable Assurance that the Offering Documents Were Accurate

Because the Offering Documents include representations about the values of the properties collateralizing the loans in the supporting loan groups, Credit Suisse can succeed on its reasonable care defense only if it establishes that it performed a "'thorough and searching'" investigation, *Nomura*, 68 F. Supp. 3d at 468 (quoting *WorldCom*, 346 F. Supp. 2d at 678), into the true values of these properties.  Credit Suisse cannot do that here because it reviewed the valuation of only approximately 29% of the loans it acquired.  SUF ¶ 217.  Like Nomura, Credit Suisse "used a less expensive, proprietary risk assessment program called HistoryPro to screen loans for further review."  *Nomura*, 104 F. Supp. 3d at 478.  But Credit Suisse's valuation due diligence was even less rigorous than Nomura's; while Nomura flagged all loans with an F-Score greater than zero for further review, Credit Suisse's policy was not to conduct any further review of loans with F-Scores between zero and two.  SUF ¶ 208.  As a result, many loans – including 71% of those acquired through the Bulk Channel, SUF ¶ 207 – received no scrutiny other than HistoryPro.  That was unreasonable as a matter of law.[25]

### 5.   Credit Suisse Unreasonably Failed To Investigate Red Flags

Credit Suisse's approach was also unreasonable because it failed to investigate numerous glaring red flags.  "[A] 'red flag' is any information that would cause a 'prudent man in the management of his own property' to question the accuracy" of the Offering Documents.  *Nomura*,

---

[25] This Court declined to decide in *Nomura* whether Nomura's valuation due diligence itself was unreasonable because the "lack of any reasonable credit and compliance due diligence program" was sufficient to justify summary judgment for FHFA.  68 F. Supp. 3d at 481 n.61.  The same approach is also available here.

68 F. Supp. 3d at 473 (quoting *WorldCom*, 346 F. Supp. 2d at 679).  "Where a defendant encounters a red flag, a 'duty of investigation' arises that requires the defendant to 'look deeper and question more' in order to restore a reasonable belief in the registration statement's accuracy."  *Id.* (quoting *WorldCom*, 346 F. Supp. 2d at 677, 679).  There were many red flags here, and Credit Suisse did not meaningfully address any of them.

> ### a)   Credit Suisse Failed To Investigate High Failure Rates In Its Due Diligence Samples

Credit Suisse reviewed samples of loans for credit and compliance from 84 bulk pools that contributed loans to the Principal Securitizations at issue.  SUF ¶ 57.  Those pools account for approximately 24% of all of the loans in the supporting loan groups for those securitizations.  SUF ¶ 58.  Across all 84 pools, a weighted average of 22% of the sampled loans received a final grade of EV3 and were "kicked out" of the pools.  SUF ¶ 121.  For the Principal Securitizations, the weighted average kick-out rates for the relevant sample pools ranged from a low of approximately 8% for ARMT 2006-3 to a high of approximately 41% for HEMT 2007-2.  SUF ¶ 122.  A clear majority (67 out of 84) of the sample pools had kick-out rates higher than 5%; those 67 pools accounted for about 92% of the loans that the sampled pools contributed to the Principal Securitizations.  SUF ¶ 123.  Every Principal Securitization drew from pools with a weighted kick-out rate well above 5%.  *Id.*

Those kick-out rates were a warning sign that there might well be additional non-compliant loans in the unsampled portion of the population of each pool, and required Credit Suisse to perform additional due diligence to assure itself that the Offering Documents were accurate as to all of the loans in the supporting loan groups.  *See Nomura*, 68 F. Supp. 3d at 475-76 (describing Nomura's average failure rate of 15.2% as a "high kick-out rate" that "raised red flags"); *see also id.* at 479 ("A kick-out rate substantially above 7-8% would cause a prudent man in the management of his own property to question the accuracy of the Offering Documents.").  Credit Suisse, like

Nomura, "would have had reason to expect – had it stopped to consider this, which there is no evidence it did – that at least as many of the unreviewed loans in the [supporting loan groups] might be defective." *Id.* at 476.

Credit Suisse can identify only one instance in which it increased the size of a due diligence sample in response to a high kick-out rate. SUF ¶ 125. It also cannot point to any other investigative or remedial measures that it took in response to those rates. Instead, its practice was to kick out the loans graded at EV3 and securitize the rest of the pool (at a significantly later date) without "tak[ing] steps to confirm," *Nomura*, 68 F. Supp. 3d at 481, that the securitized loans did not include at least as many defects. Its duty to investigate demanded more.

Credit Suisse's expert, Mr. Grice, has contended that the high numbers of EV3 grades must be considered in light of Credit Suisse's use of "overlays" – voluntary criteria that were in some cases more stringent than applicable underwriting guidelines. SUF ¶ 112. That contention is insufficient to raise a genuine dispute of material fact. Even if final EV3 grades based purely on overlay violations might not in themselves be inconsistent with the representations in the Offering Documents, they would still reflect a red flag that required investigation. And, even if Credit Suisse could have reasonably declined to investigate kick-outs based on overlay violations (which it could not), unrebutted evidence shows that overlays (even those that overlapped with guidelines) accounted for a small proportion (17.5%) of final EV3 grades. SUF ¶¶ 110-111; *see also* SUF ¶ 112 (testimony of Credit Suisse due diligence expert Charles Grice conceding that the 17.5% figure was "accurate or in the ballpark" and reflected a "fair measure of the weight of overlays here"). Granting a 17.5% reduction for argument's sake, the remaining kick-out rates were still more than high enough to require investigation (an average of 18.15% across the 84 sampled pools). In any event, there is no contention that the other red flags that Credit Suisse ignored, such as quality control results and whole loan rejections, were based on overlays.

**b)      Credit Suisse Failed To Act on Quality Control Results**

Credit Suisse's quality control results and attempts to sell packages of whole loans revealed significant shortcomings in Credit Suisse's due diligence processes and large numbers of material defects in the loans Credit Suisse was acquiring and securitizing.  The high failure rates in quality control and whole loan sales should have been even more concerning to Credit Suisse than the bulk pool kick-out rates, because they related to loans that Credit Suisse had already acquired.

Credit Suisse's quality control results were stark.  They showed that fully 35% of the loans in Credit Suisse's inventory had "critical issues" rendering them "ineligible" for securitization.  SUF ¶ 225.  In the Bulk Channel (which accounts for almost half the loans backing the Principal Securitizations), the critical rate was almost 43%.  *Id.*  That defect rate was also roughly the same for bulk pools on which Credit Suisse performed due diligence on a sample of the loans (43%), and bulk pools on which Credit Suisse performed due diligence on every loan in the pool (41.7%).  SUF ¶ 226.  Those numbers sent a clear message to Credit Suisse that its review process was failing across the board.

Credit Suisse management recognized the implications of the quality control results.  Mr. Vibert observed the sharp contrast between what Credit Suisse told investors about its due diligence and the fact that, "when we have a competent QC firm do an underwriting review, they flag all kinds of errors that our fulfillment centers did not catch."  SUF ¶ 235.  Despite that recognition, there is no evidence that Credit Suisse ever attempted to improve its processes in response to these quality control results or to take other remedial actions such as suspending securitizations or changing the language in Offering Documents.  SUF ¶ 236.  That failure to act continued even though Credit Suisse's due diligence employees repeatedly proposed that the company create an "action plan" to deal with the quality control results.  SUF ¶ 231.  Credit Suisse did not even take the basic step of preventing loans that had failed quality control from being included in later securitizations.  SUF

¶ 228.  So far as the record shows, it used quality control results only to increase its own profits by identifying loans it could "put back" to investors.  SUF ¶¶ 248-258.

Credit Suisse's quality control results also showed that many originators were selling it a disproportionate number of defective loans.  SUF ¶¶ 236-247.  Credit Suisse nevertheless continued to purchase and securitize loans from originators whose loans its employees compared to diseases, SUF ¶ 260; human waste, SUF ¶ 269; and refuse, SUF ¶ 265.  It also took no remedial steps in connection with its own Wholesale Channel, which had a remarkable 72.2% critical rate in early 2006.  SUF ¶ 246.  Credit Suisse nevertheless securitized 2,241 loans from its Wholesale Channel after those findings, SUF ¶ 247, even as its own employees acknowledged Wholesale's patently unacceptable performance.[26]

### c)      Credit Suisse Failed To Act on Whole Loan Sale Rejections

Credit Suisse's whole loan sales to other banks further illustrated the shortcomings of Credit Suisse's due diligence and the serious problems with the loans in its inventory.  In eight whole loan sales for which NCUA was able to locate complete diligence information, the average sample kick-out rate by the purchasing bank was 20.9%.  SUF ¶274.  As with the quality control results, the whole loan rejections were objective (and undisputed) facts showing that defects were widespread in loans that Credit Suisse already had acquired.  They should have put Credit Suisse on notice that its processes were failing; that immediate corrective action was needed before it continued securitizing loans and selling the resulting products to investors; and that, at the very least, the Offering Documents had to be revised to ensure that they did not overstate the quality of the loans passed on to investors.

---

[26] Credit Suisse's own employees acknowledged in 2007 that "our performance in Wholesale has been crap" and that Credit Suisse's "deal performance is tainted in large part by wholesale and a small number of other correspondents."  SUF ¶ 154.

Credit Suisse's internal e-mails reveal clear admissions about the importance of the whole loan rejections.  *See* SUF ¶ 276 (June 2006 e-mail from transaction manager to her superior: "[p]lease help me persuade internal management that our reviews need to improve . . .  we are not being as diligent as we should"); SUF ¶ 277 (October 2006 e-mail from manager for Wholesale Channel:  the rejections "mean[t] that Lydian is not underwriting and closing our loans in an acceptable manner").  Credit Suisse nevertheless cannot identify a single meaningful step it took in response to those results to improve processes or investigate the quality of its inventory.  Instead, Mr. Sack advocated securitizing the loans to avoid "adding to sludge in inventory," SUF ¶ 286; and at least 200 rejected loans ended up in the supporting loan groups, SUF ¶ 291.  No reasonable jury could find that a "prudent man in the management of his own property," *Nomura*, 68 F. Supp. 3d at 483, would behave this way.

### C. Credit Suisse's Due Diligence for Third-Party Securitizations Was Inadequate as a Matter of Law

Many of the flaws in Credit Suisse's due diligence for Principal deals, including Credit Suisse's unreliable sampling methodology and its failure to investigate and act upon red flags, applied to Third-Party Securitizations.  Credit Suisse's due diligence for the three Third-Party Securitizations at issue also suffered from additional unique flaws that rendered it unreasonable as a matter of law.

### 1. Credit Suisse Performed No Loan-Level Due Diligence for LBLMT 2006-6

Credit Suisse represented to investors that it was the co-lead underwriter for LBMLT 2006-6, listing itself in the Prospectus Supplement as an underwriter on equal terms as with WaMu and Banc of America.  "In order to make the underwriters' participation in this enterprise of any value to the investors, the underwriters must make some reasonable attempt to verify the data submitted to them."  *Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643, 697 (S.D.N.Y. 1968).  Here, it is undisputed that Credit Suisse did not conduct *any* due diligence on the loans underlying LBMLT 2006-6, but

instead relied on the due diligence that WaMu conducted on those loans.  SUF ¶ 296.  Its due

diligence defense therefore fails as a matter of law.  *See Nomura*, 68 F. Supp. 3d at 482-83 (granting

summary judgment where an underwriter "performed no review of the underlying loans").

   Credit Suisse's due diligence expert, Charles Grice, has incorrectly contended that, even

though Credit Suisse held itself out to the public as a co-lead managing underwriter for LBMLT

2006-6, it carried a reduced due diligence burden because it actually played the lesser role of a

"[s]econdary" or "participating" underwriter.  SUF ¶ 293.  That contention overlooks a major reason

for applying a lower due diligence burden on a participating underwriter:  "the public looks more to

the managing underwriter than to the participant for protection."  *New High Risk Ventures:*

*Obligations of Underwriters, Brokers and Dealers*, SEC Release No. 9671, 1972 WL 125474, at *6 n.27

(July 27, 1972) ("SEC Rel. 9671").  Here, because Credit Suisse held itself out as a co-lead managing

underwriter, *see* SUF ¶ 294, the public looked to it just as much as to WaMu.

   In any event, even if Credit Suisse could benefit from a lower standard of care, its reasonable

care defense still would fail as a matter of law.  "'The participating underwriter's reasonable

investigation may not be as heavy a burden as that of the managing underwriter's, and, in making a

reasonable investigation, the participating underwriter need not duplicate the investigation made by

the manager'" but instead "'may delegate the performance of the investigation to the manager.'"

*Nomura*, 68 F. Supp. 3d at 472 (quoting SEC Rel. 9671, 1972 WL 125474, at *6).  Still, if the

participating underwriter – here, Credit Suisse – chooses to rely upon the investigation of the lead

underwriter, that reliance must be "reasonable in light of all the circumstances*." Id*.  That requires

"'assur[ance] . . . that the manager's program of investigation and actual investigative performance

are adequate.'"  *Id.* at 472-73 (quoting SEC Rel. 9671, 1972 WL 125474, at *6).

   Credit Suisse has presented no evidence that it assured itself that WaMu's investigation into

the representations in the Offering Documents was adequate, or indeed that it had any information

about the details of WaMu's investigation at all.  Mr. Grice has opined that WaMu's due diligence

practices were reasonable, but only based on a review of documents that Credit Suisse subpoenaed

during discovery in this litigation; there is no evidence that Credit Suisse itself reviewed those

documents prior to the closing of LMBLT 2006-6.  If Credit Suisse *had* performed a reasonable

investigation of WaMu's underwriting practices, it would have seen that WaMu suffered from the

same sorts of problems that afflicted Credit Suisse.  For example, WaMu observed in a February 1,

2006 report on Long Beach loans that were in default that "[u]nderwriting guidelines [were] not

followed and conditions [were] not always met or cleared with appropriate documentation" at Long

Beach.  SUF ¶ 302.  Credit Suisse also would have known that 73 out of 549 loans in the sample

WaMu reviewed were graded as "3," for a kick-out rate of 13%.  SUF ¶ 304.  Contrary to Mr.

Grice's conclusion, Credit Suisse had no basis to be reasonably confident that the Offering

Documents for LBMLT 2006-6 were accurate.

     The only evidence that Credit Suisse even consulted with WaMu about the latter's due

diligence on those loans is a list of 29 discussion topics that were circulated for a conference call that

was to take place on July 21, 2006 – the same day that LBMLT 2006-6 closed.  SUF ¶ 300.  None of

the 29 topics directly concerned the due diligence that WaMu performed for this deal in particular.

*Id.*  There is no evidence of how long this call lasted or what, if anything, Credit Suisse learned

during the call about WaMu due diligence.  Nor could Credit Suisse have taken any significant steps

before the deal closing if it had learned that WaMu's due diligence for that deal in fact was

inadequate.  Just as RBS could not claim a reasonable investigation "having seen only a one-page

summary of Nomura's pre-acquisition review,"[27] Credit Suisse cannot rely on the agenda for a single

---

[27] *See Nomura*, 74 F. Supp. 3d at 657 n.32 ("As the *Nomura* opinion explains, RBS did no due
diligence with respect to Securitization 2006-HE3, and possessed only a one-page statement from
Nomura summarizing its pre-acquisition review of loans.  Possession of that document was
insufficient as a matter of law to constitute due diligence by RBS.") (citation omitted).

conference call that took place after the Offering Documents for LBMLT 2006-6 already had been drafted.

Credit Suisse's failure to check WaMu's work was especially unreasonable because WaMu owned the depositor of the loans and was both the sponsor of the transaction and the originator of the mortgage loans.  In other words, every significant party to the transaction was affiliated except for the third-party co-managing underwriters, Credit Suisse and Banc of America.  SUF ¶ 297.  The SEC has noted the "conflicts of interest inherent in affiliated underwriting transactions" and the need for "independent underwriters . . . to ensure that the protective functions performed by underwriters . . . were performed in affiliated transactions."  *Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1402-03 (7th Cir. 1995) (citing 47 Fed. Reg. 1372, 1372 (Jan. 13, 1982)).  Credit Suisse's admission that it relied on WaMu's due diligence, combined with the lack of evidence that it reasonably investigated WaMu's process, confirms beyond genuine dispute that it failed to play the required independent role and cannot assert a due diligence defense here.

> 2. **Credit Suisse's Due Diligence as a Lead Underwriter for the RALI 2006-QA9 and LBMLT 2006-1 Third-Party Securitizations Was Insufficient**

Credit Suisse performed sampling-based due diligence on RALI 2006-QA9 and LBMLT 2006-1 using methods that were materially identical to the methods it used for pools of loans acquired through its Bulk Channel – that is, highly flawed.  *See supra* pp. 8-12.  But Credit Suisse compounded the shortcomings of its sampling process for these two securitizations in two ways.

*First*, Credit Suisse's sample sizes for RALI 2006-QA9 and LBMLT 2006-1 were even smaller than those Credit Suisse used for Principal Securitizations:  Credit Suisse sampled approximately 13% of the loans in RALI 2006-QA9 (its sampling model recommended a sample size of 57%) and 4.4% of the subprime loans in LBMLT 2006-1 (the Conduit Manual required a sample size of 100% for subprime loans).  SUF ¶¶ 308-310, 320-321.  Moreover, Credit Suisse's

credit and compliance review for both RALI 2006-QA9 and LBMLT 2006-1 revealed unacceptably high Failure Rates that Credit Suisse ignored. The Sample Failure Rate for LBMLT 2006-1 was 11.6%, and for RALI 2006-QA9 it was approximately 8.4% (with 12.6% of the loans graded EV2W). SUF ¶¶ 312, 322-323. Those rates were red flags that required further investigation, which Credit Suisse did not perform.

*Second*, Credit Suisse took these limited samples from sponsor-provided loan tapes that Credit Suisse knew did not include every loan in the pool. Thus, the loan tape for RALI 2006-QA9 contained 746 loans; 187 additional loans were added after sampling; and Credit Suisse drew no additional sample after the additions. SUF ¶ 325. The loan tape for LBMLT 2006-1 contained 6,856 loans; Credit Suisse and Long Beach added 4,519 loans to the pool after initial sampling; and Credit Suisse sampled an additional 45 loans – roughly 1% of the additions. SUF ¶ 311. Credit Suisse and Long Beach later added another 87 loans, and Credit Suisse did not sample any of them. SUF ¶ 315. That process meant that Credit Suisse had no assurances about the added loans and no protection (for itself or for investors) against the possibility that the sponsor would add particularly problematic loans to the post-sample additions.[28] It accordingly had no reasonable basis to endorse the representations in the Offering Documents for those transactions about the characteristics of "[a]ll of the mortgage loans" backing each deal.[29]

---

[28] Credit Suisse did enter into stipulations regarding certain characteristics of loans added to the pool after the initial loan tape was provided to Credit Suisse (such as LTV and FICO score). As Mr. Gallagher admitted at his deposition, those stipulations could not prevent sellers from adding loans with latent defects (such as overstated incomes) to the pool. SUF ¶ 314.

[29] *See* Prospectus Supplement for LBMLT 2006-1 (Jan. 30, 2006) at S-32 – S-33 ("All of the mortgage loans owned by the trust have been either originated by the sponsor through wholesale brokers or purchased by the sponsor from approved correspondents and were underwritten or re-underwritten by the sponsor generally in accordance with its underwriting guidelines as described in this prospectus supplement."); Prospectus Supplement for RALI 2006-QA9 (Oct. 26, 2006) at S-51 ("All of the mortgage loans in the mortgage pool were originated in accordance with the underwriting criteria of Residential Funding described under '—The Program' in this prospectus supplement.").

In addition, Credit Suisse's valuation due diligence for RALI 2006-QA9 and LBMLT 2006-6 was utterly inadequate.  For LBMLT 2006-1, Credit Suisse did not perform any valuation due diligence.  SUF ¶ 316.  For RALI 2006-QA9, Credit Suisse performed valuation due diligence on only nine of the 933 loans backing that deal.  SUF ¶ 326.  Here again, as with every other aspect of Credit Suisse's fundamentally flawed process, "no reasonable jury could find that a prudent man in the management of his own property would do so little to assure himself that the loans were accurately described in the Offering Documents."  *Nomura*, 68 F. Supp. 3d at 483.

## CONCLUSION

For the reasons stated, this Court should enter partial summary judgment on the due diligence and reasonable care affirmative defenses asserted by Credit Suisse under the Illinois Blue Sky Law and Texas Blue Sky Law.

## CERTIFICATE OF SERVICE

I certify that on February 5, 2016, I served or caused to be served by electronic mail on all counsel of record in this case a copy of the following documents:  1) Notice of NCUA's Motion for Partial Summary Judgment on Credit Suisse's Due Diligence and Reasonable Care Defenses, 2) NCUA's Memorandum of Law in Support of Its Motion for Partial Summary Judgment Regarding Credit Suisse's Due Diligence and Reasonable Care Defenses, 3) Plaintiff's Statement of Undisputed Material Facts in Support of Its Motion for Partial Summary Judgment Regarding Credit Suisse's Due Diligence and Reasonable Care Defenses, and 4) Declaration of Wan J. Kim in Support of NCUA's Motion for Summary Judgment Regarding Credit Suisse's Due Diligence and Reasonable Care Defenses.

Gregory G. Rapawy

Date:   February 5, 2016

Respectfully submitted,

*David C. Frederick/gqr*

David C. Frederick
Wan J. Kim
Gregory G. Rapawy
Andrew C. Shen
KELLOGG, HUBER, HANSEN, TODD,
   EVANS & FIGEL PLLC.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
dfrederick@khhte.com
wkim@khhte.com
grapawy@khhte.com
ashen@khhte.com

George A. Zelcs
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Tel: (312) 641-9750
Fax: (312) 641-9751
gzelcs@koreintillery.com

Stephen M. Tillery
Robert L. King
KOREIN TILLERY LLC
505 North Seventh Street, Suite 3600
St. Louis, MO 63101
Tel: (314) 241-4844
Fax: (314) 241-3525
stillery@koreintillery.com
rking@koreintillery.com

Erik Haas
Peter W. Tomlinson
Philip R. Forlenza
Henry J. Ricardo
PATTERSON, BELKNAP, WEBB & TYLER
   LLP
1133 Avenue of the Americas
New York, NY 10036
Tel: (212) 336-2000
Fax: (212) 336-2222
ehaas@pbwt.com
pwtomlinson@pbwt.com
prforlenza@pbwt.com
hjricardo@pbwt.com